## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

RICHARD WILCOXON,

      Plaintiff,

    vs.

RED CLAY CONSOLIDATED
SCHOOL DISTRICT, and
JANAY FREEBERY

      Defendants.

C.A. No.

**JURY TRIAL DEMANDED**

## COMPLAINT
## INTRODUCTION

1.    This action for injunctive relief and damages is brought pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 200 e *et seq*., Title VII of the Civil Rights Act of 1964, as amended, codified as 42 U.S.C. § 2000E-(5)(f)(1), Title I of the Civil Rights Act of 1991, and the First Amendment to the United States Constitution.

## PARTIES

2.    Plaintiff, Richard Wilcoxon ("Plaintiff" or "Mr. Wilcoxon"), is a Caucasian male citizen of the State of Delaware, residing at 220 Wharton Drive, Newark, DE 19711.

3.    Defendant, Red Clay Consolidated School District ("Defendant" or "District"), is and was at all times relevant to this Complaint, a Delaware public school district operating under the laws of and within the State of Delaware. Defendant is subject to service of process through Red Clay Consolidated School District; c/o Dr. Robert J. Andrzejewski, Superintendent, 2916 Duncan Road, Wilmington, DE 19808.

4.      Defendant, Janay Freebery, ("Ms. Freebery"), is and was at all times relevant to this Complaint a resident of the State of Delaware, residing at 203 Saturn Road, Hockessin, DE 19707.

5.      This Court has jurisdiction of the claims herein pursuant to 28 U.S.C. §§ 1331 and 1343 and 42 U.S.C. § 1988. This action arises under the Constitution and laws of the United States. Plaintiff alleges violations of his rights under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C, § 2000(e)-(5)(f)(1). Plaintiff's state law claims are properly before this Court pursuant to 28 U.S.C. § 1367.

## FACTUAL BACKGROUND

6.      Mr. Wilcoxon began working for Defendant Red Clay Consolidated School District at Skyline Middle School in Pike Creek, Delaware in October of 2002.

7.      During the fall and into the winter of 2002, Mr. Wilcoxon team-taught[1] with a long-term substitute who was filling in for a female physical education teacher, Janay Freebery. In early 2003, Ms. Freebery returned to work at Skyline. Ms. Freebery had been out of work the previous fall on sabbatical.

8.      Ms. Freebery and Mr. Wilcoxon team-taught some of their Physical Education classes and all of their Health classes together.

9.      Immediately after her return to work Ms. Freebery was frequently tardy in getting to work and often absent during class time. The extra work and responsibility caused by her absences fell to Mr. Wilcoxon.

---

[1] Team-teaching is a style of teaching whereby two teachers teach a large group of children a single subject. The idea behind team-teaching is that the two teachers combined knowledge will provide a more meaningful learning experience for the students.

10.     Mr. Wilcoxon said nothing to Ms. Freebery or anybody regarding her absence from class during the 2002-2003 school year. His silence was due in part to his status as a new teacher. Simply stated, he did not want to rock the boat, nor did he want to come across as someone who was not a team-player. But Mr. Wilcoxon's silence was also attributable to his sympathy for Ms. Freebery. She had just returned from sabbatical and he knew that she was struggling with her recent divorce and her role as a single mother. Therefore, he felt that he could carry the burden until Ms. Freebery had a chance to become accustomed to her new roles and responsibilities. The 2002-2003 school year ended without incident.

11.     In the Fall of 2003, Mr. Wilcoxon and Ms. Freebery again were scheduled to team-teach. They conducted morning duty[2] at the beginning of each school day and taught some of their physical education and health classes together.

12.     With respect to morning duty, Ms. Freebery arrived late virtually every day. This placed an unfair burden on Mr. Wilcoxon because this required him to supervise two groups of students. There were some mornings during this time that Ms. Freebery did not arrive until morning duty was over.

13.     Ms. Freebery also frequently left their classroom during regular class time. Again, this forced Mr. Wilcoxon to cover her portion of the class. The proffered reasons for Ms. Freebery's absences were not legitimate reasons for a teacher to leave her class. For instance, she routinely met with boyfriend, Bruce Hannah, at school for breakfast during class time. In addition to occurring during class time these rendezvous were in direct violation of the District's policy because Mr. Hannah did not follow proper sign-in procedures.

---

[2] In addition to teaching their regularly scheduled classes, each teacher is assigned a morning duty. Mr. Wilcoxon

14.    Other reasons that Ms. Freebery gave for being absent from or leaving during the middle of a class was to work on her Master's Degree project or to watch her daughter's swim lessons. There were many times when Ms. Freebery abandoned her class, she did not even tell Mr. Wilcoxon that she was leaving.

15.    As the weeks progressed, Ms. Freebery's absences continued to increase in frequency and duration. In response, sometime in October 2003 Mr. Wilcoxon explained to Ms. Freebery how unfair he thought it was for her to continually impose the responsibilities of the class on him and that he would appreciate it if she would show up on time and stay in the class as she was required.

16.    Shortly after this conversation, other teachers at the school began to tell Mr. Wilcoxon that Ms. Freebery was spreading a rumor to the staff and administration that he was difficult to work with.

17.    Concerned with Ms. Freebery's motives, as well as the safety of the children who were supposed to be under Ms. Freebery's supervision, Mr. Wilcoxon sought advice from two more senior members of the teaching staff, Linda Filer ("Ms. Filer") and Tom Karpinski ("Mr. Karpinski"), regarding a course of action for him to take with respect to Ms. Freebery's absences from class.

18.    Ms. Filer and Mr. Karpinski counseled Mr. Wilcoxon to keep a written journal of times and dates of Ms. Freebery's absences and other pertinent information about Ms. Freebery's actions and inactions. Such a record could protect Mr. Wilcoxon in the event one of Ms. Freebery's students was injured while she was absent from class and the District would seek to impose

---

and Ms. Freebery's assignment was to run the Student Leader Program.

discipline upon Mr. Wilcoxon in response. Mr. Wilcoxon took his mentors' advice and began to record Ms. Freebery's absences and actions in a journal which he kept locked in his office.

19.    On December 15, 2003, Mr. Wilcoxon was ill and reported off from work. During his absence, Frank Rumford ("Mr. Rumford"), acting Assistant Principal and close friend of Ms. Freebery, entered Mr. Wilcoxon's locked office, went into his desk and removed the journal containing the documentation of Ms. Freebery's actions. Mr. Rumford then turned the journal over to Ms. Freebery, who in turn gave it to her close friend, the Acting Principal of Skyline Middle School, Janet Basara ("Ms. Basara").

20.    Mr. Rumford telephoned Mr. Wilcoxon at home and informed him that he had gone into his office in an effort to locate Mr. Wilcoxon's student list for Mr. Wilcoxon's substitute. He did not find the student list but did find the journal. Mr. Rumford claimed that he did not read the journal and simply turned it over to Ms. Freebery, ostensibly so she could determine if it was information that would be helpful to Mr. Wilcoxon's substitute. Mr. Rumford's justification for going into Mr. Wilcoxon's locked office is dubious due to the fact that Mr. Rumford had access to Mr. Wilcoxon's student list on his own computer.

21.    Up until this point in his career, Mr. Wilcoxon had never had a bad performance review and had never been subject to any discipline.

22.    Mr. Wilcoxon returned to work the next day, December 16, 2003. During his scheduled planning period, he left school to run an errand. When he returned, he found a Post-it note in the teachers' sign-out book stating, "Rich, Janet [Basara] needs to see you." The note was in Ms. Freebery's handwriting. Mr. Wilcoxon promptly went to see Ms. Basara.

23.     The topic of this meeting with Ms. Basara was the journal that had come into Ms. Basara's possession via her close personal friends, Frank Rumford and Janay Freebery. Mr. Wilcoxon explained to Ms. Basara the reasons for his keeping of the journal. However, instead of indicating that she would investigate Ms. Freebery's tardiness and absences from class, Ms. Basara verbally reprimanded *Mr. Wilcoxon*. In addition, Ms. Basara demanded to know who advised Mr. Wilcoxon to keep the journal. She stated that she needed this information to conduct an investigation. Fearing that Ms. Basara would retaliate against his mentors, Mr. Wilcoxon only revealed Ms. Filer's name to prevent being accused of insubordination.

24.     Later that day, Ms. Filer and Mr. Wilcoxon met with Mr. Rumford to ensure that Mr. Rumford would not reveal Ms. Filer's identity to Ms. Freebery. Ms. Filer threatened to file a complaint with Mr. Orga if her name was revealed.

25.     On December 17, 2003, Ms. Basara called Mr. Wilcoxon into her office for a meeting. The purpose of the meeting to get Mr. Wilcoxon to reveal who had advised him to record Ms. Freebery's absences. During the meeting, in an apparent attempt to get Mr. Wilcoxon to tell her who advised him to keep the journal, Ms. Basara told Mr. Wilcoxon all the different ways that she and Ms. Freebery could find out this information. Ms. Basara also made the comment that they needed to have another meeting to determine how Mr. Wilcoxon and Ms. Freebery could finish the rest of this school year working together. Mr. Wilcoxon questioned why she limited her statement to "the rest of this school year." Ms. Basara replied, "[y]ou're not tenured are you?" Mr. Wilcoxon took this as a direct threat to his career and understood it to mean that he had better not pursue this matter any further.

26. Later that day, Mr. Wilcoxon was unexpectedly called into another meeting. In attendance were Ms. Freebery, Mr. Rumford and Ms. Basara. During this meeting Ms. Freebery took control and repeatedly demanded to know the identities of the individuals who advised him to keep the journal. Again, Mr. Wilcoxon refused to reveal them. After asking Mr. Wilcoxon this question four separate times, and in apparent realization that she was not going to get an answer, Ms. Freebery falsely accused Mr. Wilcoxon of saying inappropriate things to her and threatened to file a sexual harassment complaint against him. Mr. Wilcoxon steadfastly denied any and all inappropriate statements.

27. Ms. Freebery's accusations about Mr. Wilcoxon were false and made with malice, they were publicized to third parties, it regarded and damaged Mr. Wilcoxon's personal and professional reputation and ultimately he suffered financial damages by virtue of being terminated from his employment.

28. Article 4:4.1 of the collective bargaining agreement between the District and the Red Clay Education Association Affiliate of NCCEA-DSEA-NEA, Inc. ("collective bargaining agreement"), holds in pertinent part:

> If an employee is required to appear before the Board or an agent thereof concerning a matter which could adversely affect his/her continued employment, salary or any increments, he/she will be given *prior written notice and specific reasons for such meeting or interview at least forty-eight (48) hours in advance*. Any topic not included in the letter will not be covered at said meeting unless agreed to by the employee; if not agreed it will be discussed at a later date after proper notice has been given. The employee will also be *notified in writing of any additional persons who will be present*. An employee required to appear in this instance will be *entitled to have an Association representative of his/her choice present* to advise and to represent him/her during such meeting or interview. . . . (emphasis added).

29.    This December 17, 2003 meeting was held in direct contravention of the collective bargaining agreement in that Mr. Wilcoxon was:

        a.    not given forty-eight hours notice of the meeting;

        b.    not informed in writing of the specific reason for the meeting;

        c.    not informed in writing of the individuals who would be in attendance at the meeting; and,

        d.    not permitted to have an Association representative of his/her choice present to advise and to represent him during the meeting.

30.    Because the meeting violated the terms of the collective bargaining agreement any subsequent disciplinary actions based upon that which occurred at the meeting should have been prohibited.

31.    Mr. Wilcoxon was very troubled by Ms. Freebery's false statements. So much so that after school concluded that day, Mr. Wilcoxon again met with Mr. Rumford and Ms. Basara to make a complaint about her false accusations and threats against him. He related that Ms. Freebery had *never* expressed any concern over *anything* that Mr. Wilcoxon had said to her prior to her knowledge that he was keeping the journal – suggesting that this was her way of getting back at him. He then asked what it was that he allegedly said that had offended Ms. Freebery. He got no answer. In fact, both Mr. Rumford and Ms. Basara indicated that Ms. Freebery was not uncomfortable with anything that Mr. Wilcoxon had said until the journal was found. Ms. Basara assured Mr. Wilcoxon that he was not in any sort of trouble and that Ms. Freebery's accusations were not a formal complaint.

32.    Mr. Wilcoxon informed Ms. Basara that Ms. Freebery brought up the topic of sex routinely in the course of conversation with Mr. Wilcoxon. He related exact stories that he could not possibly have known without Ms. Freebery telling him. Ms. Freebery received no reprimand or discipline of any sort.

33.     On January 22, 2004, Mr. Wilcoxon received a letter in his school mailbox at 11:30 a.m. stating that he needed to report to Ms. Basara's after school for a meeting – essentially giving Mr. Wilcoxon three hours notice of the meeting.. There was no mention of the topic of the meeting or any other persons who would be present at the meeting.     After receiving this notice, Mr. Wilcoxon asked Ms. Basara if the topic of the meeting warranted union representation. She responded that "it might." Mr. Wilcoxon contacted both of the union representatives who worked in his building and requested that they attend the meeting with him, but because of the short notice they were unable to attend the meeting.

34.     Mr. Wilcoxon notified Ms. Basara of his inability to secure union representation. She responded that he was to attend the meeting without representation because she had already arranged for other individuals to be present at the meeting. This was the first time that Mr. Wilcoxon was notified that other individuals would be present. The other individuals who were in attendance were Frank Rumford and Bob Bartoli.

35.     At this January 22, 2004 meeting, contrary to Ms. Basara's prior assurances during the meeting of December 17 2003 that Mr. Wilcoxon was not in trouble, she presented Mr. Wilcoxon with a disciplinary letter that concluded that he had made inappropriate comments about Ms. Freebery. Because Mr. Wilcoxon disagreed with the conclusions in the letter, Mr. Wilcoxon refused to sign it. He then informed Ms. Basara that before the meeting proceeded any further, he wanted to have a union representative present. Ms. Basara refused his request and instructed him not to leave until he received two other disciplinary letters.

36.    The second letter imposed on Mr. Wilcoxon during the January 22, 2004 meeting alleged that his emergency lesson plans[3] did not include a class list or bell schedule. However, when he requested to see the emergency lesson plan so that they could specifically show him its shortcomings, he was told that they did not have them.

37.    The third letter given to Mr. Wilcoxon during the January 22, 2004 meeting concluded that he did not sign up for after school bus duties and, as a result, other teachers and administrators had to make up for his absences. However, anytime that Mr. Wilcoxon missed the 10:00 a.m. deadline to sign up, either he would call himself or ensure that another teacher called the bus company personally to make sure the students had a ride home.

38.    On January 7, 2004 a female teacher made an error signing up for bus duty, for the after-school activity busses, and as a result, numerous students were crowded onto buses and there was a lot of concern that the students would not all fit on the busses. Unlike Mr. Wilcoxon, this teacher was given no discipline for her error.

39.    This meeting was held in direct contravention of the collective bargaining agreement in that Mr. Wilcoxon was:

a.    not given forty-eight hours notice of the meeting;

b.    not informed in writing or otherwise of the specific reason for the meeting;

c.    not informed in writing or otherwise of the individuals who would be in attendance at the meeting; and,

d.    not permitted to have an Association representative of his choice present to advise and to represent him during the meeting.

---

[3] These are plans the teacher creates but stores in the main office in case the teacher is unable to come to school for some emergency reason. They include instructions on everything a substitute would need to know to run the teacher's class in his or her absence.

40.    Because the January 22, 2004 meeting violated the terms of the collective bargaining agreement, the disciplinary letters were not "properly placed" in Mr. Wilcoxon's personnel file and therefore could not be used as a basis for any termination of Mr. Wilcoxon's employment according to 14 *Del. C.* § 1410.

41.    These disciplinary letters were given to Mr. Wilcoxon in retaliation for exercising his First Amendment right to free speech in keeping the journal and for making a valid workplace complaint to Ms. Basara that Ms. Freebery had lodged a false complaint of sexual harassment against him.

42.    Based upon her actions and the surrounding factual circumstances, Ms. Basara was laying the groundwork to terminate Mr. Wilcoxon.

43.    Shortly after this meeting, Mr. Wilcoxon called Anthony Orga ("Mr. Orga"), Director of Secondary Education for the District, to set up a meeting to discuss his concerns about how he was being treated at Skyline Middle School. The meeting took place on February 25, 2004. During the meeting Mr. Wilcoxon informed Mr. Orga of everything that had happened that year with Ms. Basara, Ms. Freebery and Mr. Rumford and the unfair treatment that he was receiving at Skyline. Mr. Wilcoxon also wrote Mr. Orga a number of letters regarding the same topics. Mr. Orga never responded to Mr. Wilcoxon on this issue.

44.    Prior to his December 17, 2003, Ms. Perez contacted Mr. Rumford regarding the organization of a student-teacher basketball game.. Mr. Rumford asked Mr. Wilcoxon to return her call. Ms. Freebery was not one of the original faculty members contacted. In response, Mr. Wilcoxon made the initial contact with Ms. Perez to get the effort started. Then the issue with the journal arose and Mr. Wilcoxon heard nothing further about the event.

45.    On January 29, Mr. Wilcoxon received a memo in his box, addressed to all of the staff, from Mr. Rumford, Ms. Freebery and Ms. Basara regarding the upcoming game. When Mr. Wilcoxon questioned Ms. Basara why he had been replaced on the organizing team by Ms. Freebery. Ms. Basara responded that there had been just "too many hands in the soup" and he could still help with the game if he wanted to.

46.    Because nobody in the District was responding to his concerns, and with nowhere else to turn, Mr. Wilcoxon filed a Charge of Discrimination, alleging gender discrimination, with the Department of Labor on February 22, 2004.

47.    Upon information and belief, the District became aware of Mr. Wilcoxon's filing with the Department of Labor in mid to late March 2004.

48.    On April 21, 2004, Ms. Basara entered Mr. Wilcoxon's classroom and informed him that she was going to conduct an unannounced observation.[4] This was the first time that Ms. Basara had spoken to Mr. Wilcoxon in over a month – presumably since she was notified of his filing with the Department of Labor.

49.    Had Mr. Wilcoxon had any advanced warning that he was going to be subject to an observation, he would have objected to Ms. Basara conducting the observation due to her animus toward him.

---

[4] An observation is where an administrator observes a class noting the teacher's effectiveness and the students' responses. Based upon these observations, the administrator makes a subjective determination if the teacher is effective or not. If the teacher is deemed not effective he or she is put on an Individual Improvement Plan designed to correct the alleged deficiencies. If the teacher does not meet the Individual Improvement Plan, he or she can be terminated. There are two types of observations: announced and unannounced. An announced observation is where the teacher is aware beforehand that he or she will be observed and the teacher and administrator meet ahead of time to discuss the lesson plan and activities. An unannounced observation is where the administrator shows up at the teacher's classroom with no advanced notice or preliminary discussion with the teacher to be observed.

50.     Immediately after the observation, Mr. Wilcoxon called Mr. Orga because he felt that Ms. Basara's objectivity was tainted due her knowledge that Mr. Wilcoxon had filed a Charge of Discrimination against the District – due in large part to Ms. Basara's own actions, and also due to her expressed anger over Mr. Wilcoxon keeping the journal.

51.     The result of the observation was overwhelmingly negative. This was the first negative observation that Mr. Wilcoxon had ever received.

52.     Ms. Basara's unannounced observation and the corresponding poor review of his effectiveness was conducted in retaliation against Mr. Wilcoxon for filing his Charge of Discrimination with the Department of Labor, for his workplace complaints to Mr. Orga, for exercising his First Amendment right to free speech and for making a workplace complaint to Ms. Basara that Ms. Freebery had lodged a false complaint of sexual harassment against him.

53.     Based upon her actions and the surrounding factual circumstances, Ms. Basara was laying the groundwork to terminate Mr. Wilcoxon.

54.     Having not heard back from Mr. Orga, Mr. Wilcoxon wrote another letter to him communicating his misgivings about Ms. Basara's objectivity and carbon copied the Superintendent of the District. He requested that the letter be stricken from his personnel file. Mr. Orga responded that there was no evidence that Ms. Basara had done anything improper and therefore, the poor observation would remain in his personnel records.

55.     On May 5, 2004, Ms. Basara called Mr. Wilcoxon into another surprise meeting. This time, in an effort to give an illusion of fairness, Ms. Basara had taken the liberty of securing union representation for Mr. Wilcoxon.   She had retained the services of Tom Meade, a union

representative who also happened to be a friendly associate of Ms. Basara. This individual was present to act ostensibly on Mr. Wilcoxon's behalf. He was not chosen by Mr. Wilcoxon.

56.    The disciplinary letter that Mr. Wilcoxon received at this meeting addressed a situation where Mr. Wilcoxon had allegedly failed to secure a small sum of money properly and the money was stolen out of his desk. Two other female teachers, Patty Root and Marilyn Morgan, also failed to secure money and had it stolen from their desks during this same school year, but neither received a disciplinary letter.

57.    This meeting was held in direct contravention of the collective bargaining agreement in that Mr. Wilcoxon was not:

       a.    given forty-eight hours notice of the meeting;

       b.    informed in writing or otherwise of the specific reason for the meeting;

       c.    informed in writing or otherwise of the individuals who would be in attendance at the meeting; and,

       d.    was not permitted to have an Association representative *of his choice* present to advise and to represent him during the meeting.

58.    Because the meeting violated the terms of the collective bargaining agreement, the disciplinary letters were not "properly placed" in Mr. Wilcoxon's personnel file and therefore could not be used as a basis for any termination of Mr. Wilcoxon's employment according to 14 *Del. C.* § 1410.

59.    The May 5, 2004 meeting that was held, and the letter that was given to Mr. Wilcoxon was discriminatory against Mr. Wilcoxon based upon his gender and was in retaliation for filing his Charge of Discrimination with the Department of Labor, for his workplace complaints to Mr. Orga,

for exercising his First Amendment right to free speech and for making a workplace complaint to Ms. Basara that Ms. Freebery had lodged a false complaint of sexual harassment against him.

60.     Based upon her actions and the surrounding factual circumstances, Ms. Basara was laying the groundwork to terminate Mr. Wilcoxon.

61.     On May 11, 2004 a union representative contacted Mr. Wilcoxon to inform him that he was to meet once again with Mrs. Basara, *that day*. At this meeting, Mr. Wilcoxon was given another disciplinary letter. The letter stated that Plaintiff's lesson plans were inappropriate.

62.     Ms. Freebery, a female, used the very same lesson plans as did Mr. Wilcoxon. However, her lesson plans were not deemed inappropriate and she received no negative consequences for her lesson plans.

63.     Other female teachers at Skyline Middle School, including an unnamed female teacher and Linda Filer have never had the lesson plans reviewed.

64.     Again, this meeting was held in direct contravention of the collective bargaining agreement in that Mr. Wilcoxon was:

       a.     not given forty-eight hours notice of the meeting;

       b.     not informed in writing or otherwise of the specific reason for the meeting; and,

       c.     not permitted to have an Association representative *of his choice* present to advise and to represent him during the meeting.

65.     Because the May 11, 2004 meeting was held in violation of the collective bargaining agreement, the disciplinary letters were not "properly placed" in Mr. Wilcoxon's personnel file and therefore could not be used as a basis for any termination of Mr. Wilcoxon's employment according to 14 *Del. C.* § 1410.

66.     This meeting was held, and the disciplinary letter that given to Mr. Wilcoxon were discriminatory against Mr. Wilcoxon based upon his gender and was in retaliation for filing his Charge of Discrimination with the Department of Labor, for his workplace complaints to Mr. Orga, for exercising his First Amendment right to free speech and for making a workplace complaint to Ms. Basara that Ms. Freebery had lodged a false complaint of sexual harassment against him.

67.     Mr. Wilcoxon's earned a grade of "exemplary" for instructional planning on his Performance Appraisal for 2003.

68.     Based upon her actions and the surrounding factual circumstances, Ms. Basara was continuing to lay the groundwork to terminate Mr. Wilcoxon.

69.     On May 14, 2004, Mr. Wilcoxon was again called into Ms. Basara's office, where once again, Ms. Basara had taken the liberty of securing union representation for Mr. Wilcoxon. Hence this individual was not a representative of Mr. Wilcoxon's choosing. Mr. Wilcoxon objected to the meeting because he had not been given forty-eight hours notice but Ms. Basara proceeded with the meeting regardless. Ms. Basara handed Mr. Wilcoxon a letter stating that the District would not renew his contract for the ensuing school year.

70.     At that point, Mr. Wilcoxon requested the reasons for the non-renewal. In response, he was sent a letter dated May 18, 2004 stating that he was terminated because of poor lesson plans, poor classroom management and for making inappropriate comments. However, at the Non-Renewal Hearing, July 28, 2004, Dr. Andrzejewski acknowledged that two of the reasons should not be considered because there was no conclusive evidence of inappropriate comments or poor lesson plans.

71.    Once again, this May 14 meeting was held in direct contravention of the collective

bargaining agreement in that Mr. Wilcoxon was:

> a.    not given forty-eight hours notice of the meeting;
>
> b.    not informed in writing or otherwise of the specific reason for the
>        meeting;
>
> c.    not informed in writing or otherwise of the individuals who would be
>        in attendance at the meeting; and,
>
> d.    not was not permitted to have an Association representative of his/her
>        choice present to advise and to represent him during the meeting.

72.    Because this meeting violated the terms of the collective bargaining agreement, the

termination has no effect and is therefore a nullity. 14 *Del. C.* § 1410.

73.    Mr. Wilcoxon's termination violated 14 *Del. C.* § 1410 because the termination was

based upon information not "properly placed" in Mr. Wilcoxon's personnel file prior to the notice of

termination.

74.    The termination of Mr. Wilcoxon was conducted was discriminatory against Mr.

Wilcoxon based upon his gender and was in retaliation for filing his Charge of Discrimination with

the Department of Labor, for his workplace complaints to Mr. Orga, for exercising his First

Amendment right to free speech and for making a workplace complaint to Ms. Basara that Ms.

Freebery had lodged a false complaint of sexual harassment against him.

75.    On June 9, 2004, Mr. Wilcoxon filed another Charge of Discrimination with the

Delaware Department of Labor alleging that he had been retaliated against for filing his original

Charge of Discrimination. (See Ex. C)

76.     Contrary to one of the stated reasons for his termination, "poor classroom management," on June 10, 2004, Mr. Wilcoxon received his yearly performance appraisal and was given an "effective" rating for his classroom management.

77.     When the Department of Labor concluded its investigation of this matter it determined that there was reasonable cause to believe that Mr. Wilcoxon was administered discipline and was terminated in a discriminatorily biased manner based upon retaliation. It issued him a Final Determination and Right to Sue Notice on April 25, 2005. (attached hereto as Ex. B).

78.     But for his unlawful termination at the close of the 2003 – 2004 school year, Mr. Wilcoxon would have become a tenured school teacher in October 2004.

## COUNT I
## GENDER DISCRIMINATION
### (*Against the Defendant Red Clay Consolidated School District*)

79.     Plaintiff repeats and realleges the allegations of Paragraphs 1 through 78 as if specifically set forth herein.

80.     The practices of the District's representatives set forth above are imputable to the District in violation of 42 U.S.C. §2000e-2(a) and 3(a).

81.     Defendant intentionally and maliciously discriminated against Plaintiff on the basis of his gender (male) in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e(2)(a).

82.     As a result of Defendant's unlawful gender discrimination, Plaintiff suffered and continues to suffer loss of employment, loss of income, loss of other employment benefits, distress, humiliation, conscious pain, suffering, embarrassment, other emotional harm and damage to his reputation, both personal and professional.

## COUNT II
## RETALIATION
### (*Against the Defendant Red Clay Consolidated School District*)

83.    Plaintiff repeats and realleges the allegations of paragraphs 1 through 82 as if specifically set forth herein.

84.    Defendant intentionally and maliciously discriminated against Plaintiff in retaliation for his complaints in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e(2)(a) when it:

> (a)    repeatedly disciplined Plaintiff for violations that were either unwarranted or for which others were not disciplined;
>
> (b)    ostracized Plaintiff by refusing to speak to him;
>
> (c)    falsely accused him of making inappropriate sexual comments; and,
>
> (d)    unlawfully terminated Plaintiff's employment.

85.    As a direct and proximate result of said acts, Mr. Wilcoxon suffered and continues to suffer loss of employment, loss of income, loss of other employment benefits, distress, humiliation, conscious pain, suffering, embarrassment, other emotional harm and damage to his reputation, both personal and professional.

## COUNT III
## VIOLATION OF CIVIL RIGHTS (FIRST AMENDMENT)
### (*Against the Defendant Red Clay Consolidated School District*)

86.    Plaintiff repeats and realleges the allegations of the paragraphs 1 through 85 as if specifically set forth herein.

87.    Defendant breached Plaintiff's First Amendment right to freedom of speech when it wrongfully punished Plaintiff for documenting Ms. Freebery's actions, for voicing his concerns over

events that occurred at Skyline Middle School and for objecting to wrongful accusations and discipline lodged against him.

88.    As a direct and proximate result of said acts, Plaintiff has suffered and continues to suffer loss of employment, loss of income, loss of other employment benefits, and has suffered and continues to suffer distress, humiliation, great expense, embarrassment and damages to his reputation, both personal and professional.

**COUNT IV**
**WRONGFUL TERMINATION**
***(Against the Defendant Red Clay Consolidated School District)***

89.    Plaintiff repeats and realleges the allegations of the paragraphs 1 through 88 as if specifically set forth herein.

90.    Defendant violated 14 *Del. C.* § 1410 by basing its termination of Plaintiff on matters and documentation not "properly placed" in Plaintiff's personnel file.

91.    Defendant's unlawful termination of Plaintiff's employment constitutes a continuing wrong for which Plaintiff has no adequate remedy at law to rectify.

**COUNT V**
**BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING**
***(Against the Defendant Red Clay Consolidated School District)***

92.    Plaintiff repeats and realleges the allegations of the paragraphs 1 through 91 as if specifically set forth herein.

93.    Defendant breached the covenant of good faith and fair dealing to Plaintiff by terminating Plaintiff based upon retaliatory motives and by discriminating against him on the basis of his gender.

94.    As a result of Defendant's unlawful gender discrimination, Plaintiff suffered and continues to suffer loss of employment, loss of income, loss of other employment benefits, distress, humiliation, conscious pain, suffering, embarrassment, other emotional harm and damage to his reputation, both personal and professional.

**COUNT VI**
**DEFAMATION**
*(Against Defendant Janay Freebery)*

95.    Plaintiff repeats and realleges the allegations of the paragraphs 1 through 94 as if specifically set forth herein.

96.    Defendant Janay Freebery defamed Plaintiff in that she publicized false statements about Plaintiff to third parties who understood the defamatory content of the communication and such communications maligned Plaintiff in his profession and damaged his personal and professional reputation.

97.    These communications by Defendant Freebery directly and proximately resulted in Plaintiff's loss of employment, loss of income, loss of other employment benefits, and he has suffered and continues to suffer distress, humiliation, great expense, embarrassment and damages to his reputation, both personal and professional.

**WHEREFORE**, Plaintiff respectfully requests that this Court enter a judgment against the Defendants Red Clay Consolidated School District and Janay Freebery in his favor for damages suffered due to Defendant's actions, including, but not limited to, back pay, front pay, benefits (both retroactively and prospectively), compensatory damages, punitive damages, attorney's fees, the cost of this litigation, pre- and post-judgment interest and such other further relief as this Honorable

Court deems just and proper. Plaintiff also requests that this Honorable Court grant Plaintiff

equitable relief by restoring him to his previous position of physical education teacher at Skyline

Middle School, ordering that the District grant him tenure (that he would have received in October

2004) and restore all seniority that he would have accumulated up to the date of rehire.


MARGOLIS EDELSTEIN

Jeffrey K. Martin, Esquire (#2407)
Timothy J. Wilson, Esquire (#4323)
1509 Gilpin Avenue
Wilmington, DE 19806
Telephone (302) 777-4680
Facsimile (302) 777-4682
twilson@margolisedelstein.com
Attorneys for the Plaintiff

Dated: June 22, 2005