LEXSEE 2000 DEL. SUPER. LEXIS 90

**ROBERT E. BLOSS, Plaintiff, v. VANCE V. KERSHNER and LABWARE, INC., a
Delaware Corporation, Defendants.**

**C.A. No. 93C-04-282 CHT**

**SUPERIOR COURT OF DELAWARE, NEW CASTLE**

*2000 Del. Super. LEXIS 90*

**April 5, 1999, Date Submitted
March 9, 2000, Date Decided**

**NOTICE:** [*1] THIS OPINION HAS NOT BEEN
RELEASED FOR PUBLICATION. UNTIL
RELEASED, IT IS SUBJECT TO REVISION OR
WITHDRAWAL.

**SUBSEQUENT HISTORY:**

As Corrected March 13, 2000.

**DISPOSITION:**

Bloss is entitled to a judgment in the amount of
sixty-five thousand dollars for services rendered in con-
nection with documentation for LabStation prior to being
formally hired.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff employee sued
defendants, his employer and employer's wholly owned
corporation, seeking damages for wrongful termination,
intentional infliction of emotional distress, defamation
and equal participation in the profits of defendant corpo-
ration.

**OVERVIEW:** Plaintiff, a software consultant, sued de-
fendants, a technology developer (defendant) and his
wholly owned corporation, seeking damages for wrong-
ful termination, intentional infliction of emotional dis-
tress, defamation and equal participation in the profits of
defendant corporation. The court entered judgment for
plaintiff for services rendered prior to being formally
employed, but denied his other claims. Plaintiff's subjec-
tive allegations that defendant offered him lifetime em-
ployment were not clear and convincing evidence, mak-
ing their employment relationship at-will. Plaintiff failed
to show that defendants' conduct was in any way fraudu-
lent or deceitful or that defendant breached an implied
covenant of good faith and fair dealing in terminating

plaintiff or with respect to plaintiff's unsupported claim
that defendant promised to share 50 percent of defendant
corporation's profits. Plaintiff's defamation claim failed
for insufficient third party testimony, and his intentional
infliction of emotional distress claim failed since it was
based on the same set of facts as the defamation claim.

**OUTCOME:** Judgment was entered for plaintiff for
services rendered prior to plaintiff's employment, but all
other of plaintiff's claims were denied. Plaintiff's subjec-
tive allegations were insufficient evidence that his em-
ployment was other than at-will or that he was promised
profit-sharing, and his defamation and emotional distress
claims failed for insufficient third-party testimony.

**LexisNexis(R) Headnotes**

*Labor & Employment Law > Employment Relation-
ships > At-Will Employment*
[HN1] In determining the nature of an employment con-
tract, Delaware law provides a heavy presumption that a
contract for employment, unless otherwise expressly
stated, is at-will in nature, with duration indefinite. An
at-will employee is subject to termination with or with-
out cause.

*Labor & Employment Law > Employment Relation-
ships > At-Will Employment*
[HN2] An exception to the at-will doctrine, which pre-
sumes that a contract for employment, unless otherwise
expressly stated, is at-will in nature, is that the em-
ployer's statements and conduct can alter the at-will
status of the employment relationship but only if such
change is stated with a reasonable degree of specificity.

*Labor & Employment Law > Employment Relationships > At-Will Employment*

[HN3] Exceptions to the at-will doctrine, which presumes that a contract for employment, unless otherwise expressly stated, is at-will in nature, include those addressing the implied covenant of good faith and fair dealing. The exceptions falling under the implied covenant of good faith are limited to (1) the public policy exception in which the termination was a violation of a public interest; (2) the employer misrepresented an important fact and the employee relied thereon either to accept a new position or remain in a present one; (3) where an employee was deprived of clearly identifiable compensation related to past service due to the employer's use of superior bargaining power; or (4) the employer falsified or manipulated a record to create fictitious grounds to terminate the employee.

*Torts > Business & Employment Torts > Bad Faith Breach of Contract*

[HN4] An employer acts in bad faith when it induces another to enter into an employment contract through actions, words, or the withholding of information, which is intentionally deceptive in some way material to the contract.

*Torts > Defamation & Invasion of Privacy > Defamation Actions*

[HN5] Generally, the elements of defamation are: (1) defamatory communication; (2) publication; (3) the communication refers to the plaintiff; (4) a third party's understanding of the communication's defamatory character; and (5) injury.

*Torts > Damages > Damages Generally*
*Torts > Defamation & Invasion of Privacy > Slander*

[HN6] Generally, defamation is not actionable without special damages. However, slander per se does not require proof of damages. Delaware recognizes four categories of slander that does not require special damages and they are statements that: (1) malign a person in that person's trade, business, or profession; (2) impute a crime; (3) imply that one has a loathsome disease, or (4) impute unchastity to a woman.

*Torts > Defamation & Invasion of Privacy > Common Law Privileges*
*Torts > Defamation & Invasion of Privacy > Slander*

[HN7] With respect to an allegation of slander, Delaware recognizes a qualified privilege of employers to make communications regarding the character, qualifications, or job performance of an employee or former employee to those who have a legitimate interest in such information. The privilege will not be forfeited unless there is excessive publication, use of the occasion for a purpose not embraced within the privilege, or by making a statement which the speaker knows is false.

*Torts > Intentional Torts > Intentional Infliction of Emotional Distress*
*Torts > Defamation & Invasion of Privacy > Defamation Actions*

[HN8] In order to recover a claim for intentional infliction of emotional distress, a plaintiff must prove that he suffered severe emotional distress as a result of some extreme and outrageous conduct by a defendant. Moreover, the plaintiff does not have to prove there is any accompanying bodily harm to succeed on intentional infliction of emotional distress claim. However, an independent action for intentional infliction of emotional distress does not lie where the gravamen of the complaint sounds in defamation.

**COUNSEL:** Melanie Sharp, Esq., of Young, Conaway, Stargatt & Taylor, LLP, DE, Attorney for Plaintiff.

Richard Wier, Jr., Esq., of Richard R. Wier, Jr., P.A., Wilmington, DE, Attorney for Defendants.

**JUDGES:** Haile Alford, J.

**OPINIONBY:** Haile Alford

**OPINION:** ALFORD, J.

This is an action for damages arising out of the February 12, 1993 termination of Plaintiff Robert E. Bloss ("Bloss") by Vance V. Kershner ("Kershner") and LabWare, Inc. ("LabWare"). Bloss is seeking damages for wrongful termination, intentional infliction of emotional distress, defamation and equal participation in the profits of LabWare based upon alleged promises made by Kershner. A trial on this matter was held on March 29, 30, 31, April 1 and April 5, 1999. The following constitutes the Court's findings of fact and conclusions of law.

### I. Findings of Fact

Bloss and Kershner met while Kershner was [*2] employed by the DuPont Company circa March 1988. At the time, Bloss was an independent contractor, a principal of Brandywine Software, Inc. ("BSI"). Despite the fact that the terms of the offer of employment, along with almost every other detail including the initial date of employment, are disputed by the parties, the Court finds that Bloss was offered employment with LabWare, Inc in October, 1988.

Kershner while still employed by DuPont, developed instrument interfacing technology which he called LabStation. DuPont was involved in the exploration of systems that would automate its laboratories. Dr. Dale Crouse ("Crouse"), then an employee of DuPont, had the responsibility for implementing instrument interfacing software initially at DuPont's Chamberworks plant.

Crouse hired Bloss as an independent contractor in connection with the implementation project at the Chamberworks plant. Apparently, Crouse and Bloss looked at numerous laboratory instrument interfacing modalities including LabStation. Although there initially was a question about the ownership of LabStation since Kershner was a DuPont employee, it was established that Kershner had developed the technology on his own time. [*3]

Crouse and Bloss recommended LabStation to DuPont for implementation at Chamberworks, and DuPont adopted that recommendation in mid-1989. Kershner remained a DuPont employee until late 1991. BSI, since 1987 was an approved vendor and an approved independent contractor for DuPont. Apparently, getting such approved status was not an easy task. Sometime in October 1988, Kershner offered Bloss employment with LabWare and asked that LabStation be marketed to DuPont through BSI. It should be noted that LabStation at that time had no documentation, i.e., operator's manuals, development manuals or sales materials. Bloss was also hired by LabWare to develop documentation and sales materials.

Both Kershner and Bloss were excited by the potential of LabWare to be highly successful. Despite claims by Bloss that Kershner offered Bloss a 50% equity interest in LabWare, there is no evidence to support such claim. LabWare has never been other than wholly owned by Kershner. Bloss testified that he was promised an equal share of the profits. According to Bloss, Kershner, as an inducement for Bloss to work for LabWare and to use BSI as the vendor for LabStation, made representations that Bloss would [*4] equally share in the profits. Bloss testified that Kershner said if he made a million, I would make a million. n1 Even before formally becoming a LabWare employee, Bloss was given the title of Vice President and had business cards which reflected this position. At the time Bloss accepted employment with LabWare, he was employed by DuPont to do instrument interfacing worldwide. n2 Bloss was not asked to give up working for DuPont and work exclusively for LabWare until February 1990. However, Bloss worked in the evenings and on weekends for LabWare from October 1988 until February 1990. n3 Bloss estimates that he spent 3,000 hours; and that if he were paid his customary hourly rate, it would be $58.00. n4

n1 Bloss Trial Tr. Vol. 1 at 18-19.

n2 Bloss Trial Tr. Vol. 1 at 19.

n3 Bloss Trial Tr. Vol. 2 at 9.

n4 Bloss Trial Tr. Vol. 1 at 33.

Bloss stated that he worked 6-7 nights a week until 11 p.m. or 12 midnight. He testified that he created sales literature, demonstrated LabStation, made [*5] sales presentations, purchased equipment and created documentation materials including operator's manuals and a 500 page developer's manual. While still a DuPont employee, Bloss sold LabStation software and hardware necessary for its implementation to DuPont through BSI at Kershner's request. BSI invoiced DuPont which then paid BSI. BSI in turn passed the money through to LabWare without charging a fee.

Bloss has testified that in February 1990 he was promised a salary of $75,000 per year, of which $60,000 was for development work and $15,000 was for his executive position, plus benefits; this was, according to Bloss, in addition to the promise of profit sharing. n5 Although Bloss alleges that he and Kershner held themselves out as partners and that Kershner promised him lifetime employment, there is no evidence that Kershner ever offered an equity interest in LabWare to Bloss or any other employee. At times, Bloss apparently interpreted Kershner's alleged representations to mean that an equity interest was being offered. However, Bloss has presented no evidence to support this claim. To the contrary, under cross examination, Bloss admitted that Kershner never offered an equity [*6] interest in LabWare. n6

n5 *Id.* at 45-47.

n6 Bloss Trial Tr. Vol. 2 at 8, 33-34.

Bloss, in addition to his claim to 50% of LabWare's profits, also asserts that he is due monetary compensation for the "sweat equity" he put into LabWare prior to being placed on the payroll. He makes claim to $174,000 he alleges to have invested in LabWare by way of sweat equity. n7

n7 Estimated 3,000 hours @ $58.00 per hour.

The Court finds that Kershner admits Bloss worked on developing documentation for a period of one year on LabStation without pay prior to being officially hired as a LabWare employee. n8 Further, Kershner and Bloss met to discuss Bloss' uncompensated labors prior to being formally employed by LabWare and came to an agreement that $ 65,000 was fair compensation for the hours put in by Bloss on LabStation documentation up until the time he was formally employed by LadWare. n9

n8 *Id* at 64.

[*7]

n9 Kershner Trial Tr. at 80-81.

Bloss further claims that Kershner breached an oral employment contract for employment for life when he fired him. Bloss testified that in October 1988, Kershner told him that "together [they] would promote and develop LabWare and his product LabStation [and] in return, [he] would have a job for life." n10 It was Bloss' understanding that he and Kershner would equally share in the profits due to Kershner's comment that Bloss would make a million if he made a million. n11 Apparently, Bloss took this to mean that they were to be partners. Bloss acknowledges that this October 1988 conversation took place between him and Kershner alone. The October 1988 conversation was the only "offer or representation as to employment with LabWare." n12 Bloss claims that after being fired he was depressed and he had high blood pressure, which he stated he never had before, but was now taking medication for it. n13 Bloss testified that subsequent to termination he was not treated by a physician for any new problems and that the medication he takes for anxiety had been prescribed before he was terminated. n14 Bloss contends that he still suffers from anxiety, sleeplessness, and nightmares. n15 [*8]

n10 Bloss Trial Tr. Vol. 1 at 19.

n11 *Id.*

n12 Bloss Trial Tr. Vol. 2 at 4-5 (quoting the question asked by opposing counsel on cross-examination to which Bloss's first answer "no." Upon further inquiry by opposing counsel, Bloss responded "I was his right-hand man. I had a job for life. I had equal share of the profits. There was nothing else.")

n13 Bloss Trial Tr. Vol. 1 at 103-04.

n14 Bloss Trial Tr. Vol. 2 at 76.

n15 Bloss Trial Tr. Vol. 1 at 104.

Kershner denies that he ever extended an offer of lifetime employment to Bloss. n16 Kershner answered "no" when asked if any term or duration of employment was ever discussed with Bloss. n17 There exists no evidence, other than Bloss' subjective interpretation of Kershner's alleged statements regarding employment, to support his claim that Kershner extended an offer of lifetime employment or 50% of LabWare's profits. The Court finds that Bloss has failed to sustain his burden of proof on these claims. n18

n16 Kershner Trial Tr. at 73.

[*9]

n17 *Id*

n18 Even had Bloss proved his contention regarding 50% of the profits, LabWare was not very profitable between October 1988 and his termination date of February 12, 1993.

From October 1988 until July 1989 Bloss was the only person other than Kershner working for Kershner. In July 1989, LabWare sought to hire employee, Sandy Allem ("Allem") through BSI. From July 1, 1989 through November 15, 1991, at Kershner's request, Allem's work at DuPont was billed at $ 75.00 per hour by BSI. Bloss remitted to LabWare all monies received from DuPont for Allem's work. n19 Allem worked under the supervision of Kershner as he was still employed by DuPont at the time.

n19 Bloss Trial Tr. Vol. 1 at 42.

Bloss states that BSI was not paid the industry standard of 25% of the billings. Bloss further testified that he turned over to LabWare BSI's billings for his time beginning in March 1990 and continuing through November [*10] 1991. Beginning March 1990, Bloss went on LabWare's payroll and began receiving a salary from LabWare payable to BSI. n20

n20 *Id.* at 49-50 (Referencing Plaintiff's Ex. 1)

Bloss also claims compensation is due for his pass through of Brandywine Software billings to LabWare on a dollar for dollar basis without charging a standard industry fee of approximately 25%. Bloss claims that as a result of his not having charged a commission fee for selling LabStation, other equipment and services through BSI he actually made a capital investment in LabWare; amounting to $ 418,770 which includes $ 174,000 sweat equity. n21 He stated that when Kershner reneged on his part of the "bargain" he felt it necessary to raise these items. n22

n21 Bloss Trial Tr. Vol. 1 at 54-55 (Referencing Plaintiff's Ex. 2)

n22 Bloss Trial Tr. Vol. 2 at 57-58.

[*11]

Bloss asserted that he relied on Kershner's promises of lifetime employment and to share equally in LabWare's profits to his detriment by working over an extended period of time without pay and by directly passing through sales and services from BSI to LabWare without charging the industry standard fee of 25% of billings; and by forsaking business opportunities available to BSI in order to develop LabWare along with Kershner.

The Court finds that Bloss failed to prove that he is entitled to be reimbursed for what he alleges is the standard industry fee of 25% of billings passed through BSI to LabWare for 25 LabStations and Sandy Allem's employment compensation. n23 As previously mentioned, Bloss testified that he believes that he is owed these monies because Kershner allegedly reneged on his promises of lifetime employment and 50% of LabWare's profits. Therefore, Bloss, having failed to prove those claims, has also failed to prove any entitlement to a fee of 25% of BSI's billings.

n23 Bloss acknowledges that Kershner paid him $ 15,000 which could be attributed to equipment purchased by BSI for LabWare. See Bloss Trial Tr. Vol 1 at 64-65, 74.

[*12]

Bloss further claims that even if his employment at LabWare is deemed at-will, Kershner breached an implied covenant of good faith and fair dealing. Bloss claims that Kershner used his superior bargaining power to deprive him of compensation for past services rendered in implementing LabWare's business. n24 Bloss asserts that such implied covenant was also breached when Kershner fired him for not relinquishing his right to pursue a legal remedy. n25 Bloss testified that he would only be allowed to continue employment if he gave up his legal claim of monies owed. n26 Bloss claims Bloss was fired for cause and that at no time was Bloss' continued employment conditional upon his dropping any legal claims he might have had. n27 Bloss also claims a breach of a covenant of good faith and fair dealing as it relates to his assertion of lifetime employment and his entitlement to 50% of LabWare's profits.

n24 Bloss Trial Tr. Vol. 1 at 20.

n25 See Id. at 84-87.

n26 See Id.

n27 Kershner Trial Tr. at 15-18, 121-124.

[*13]

Next, Bloss argues that Kershner defamed him by making false statements concerning his competence, work performance, and mental health. According to Bloss, Kershner on February 11, 1993 stated at a meeting at Gallucio's restaurant Bloss was going to be fired from his job at DuPont. n28 Only Bloss and Kershner were present at the February 11, 1993 meeting. n29 However, Bloss claims Kershner made the same comments to others. n30 Bloss testified that, according to Sandy Allem, Kershner called a meeting on January 26, 1993 with all of the employees and told them the following:

[Kershner] told them at DuPont he had-- that DuPont had wanted to fire me, and that [Kershner] went to DuPont and said 'Bob is my main man. You have to keep Bob,' and he told the employees that he saved my butt for that. He also told them that I owed all my success at Dupont to [Kershner]. He also told them that I thought I was better than anyone else in LabWare and that I was above any of the other employees in LabWare, and then they also told them that I was paid $ 292,000 in the last three years, compared to his $ 172,000. n31

Bloss testified that none of the alleged statements Kershner [*14] made about him were true. n32 Bloss further testified that Sandy Allem told him that Kershner at the same meeting also told the team that Bloss' work was poor and Kershner thought he was mentally ill. n33

n28 Bloss Trial Tr. Vol. 1 at 83, 97.

n29 Id. at 83; Bloss Trial Tr. Vol. 2 at 63.

n30 Bloss Trial Tr. Vol. 1 at 97.

n31 Id. at 99.

n32 Id.

n33 Id. at 102-03.

Kershner denies that he told Bloss that DuPont was going to fire him from his job at DuPont and that Kershner had "saved his butt." n34 Kershner also denies making such statements to any of the employees. n35 Kershner testified that though he thought Bloss was out of step with the team he never expressed those thoughts to the team. n36 Kershner denies telling the team that Bloss "saw himself above the team," but felt that Bloss saw himself "separate from the team somehow or other." n37 Kershner further testified that he never told the team that Bloss was mentally ill; his performance was not good; [*15] he was incompetent; nor that he had problems completing tasks at DuPont. n38 Kershner also testified that he did not say to the group that Bloss thought his worth was greater than his (Kershner). n39

n34 Kershner Trial Tr. at 110.

n35 Id. at 112.

n36 Id.

n37 Id. (for clarification the quotation "saw himself above the team" is the question asked by the attorney to which Kershner responded "no," whereas the second quotation was Kershner's direct statement)

n38 Id. at 113, 115.

n39 Id. at 114.

However, Kershner admits that he told the group he had paid Bloss $ 75,000 and that overall he had paid Bloss $ 292,000 versus $ 172,000 he had paid himself. n40 Kershner maintains that he did in fact pay those monies to Bloss. n41 The only other testimony in the record that could possibly support or refute Bloss' defamation claim is that of Sandy Allem. However, Sandy Allem testified via deposition and it is unclear as to what specifically she agreed with or disagreed [*16] with. n42

n40 Id.

n41 Id.

n42 See Sandy Allem Dep. Tr. at 89-102 (May 25, 1994); Sandy Allem Dep. Tr. at 62-68 (Nov. 20, 1998).

Finally, Bloss seeks damages for his claim of intentional infliction of emotional distress. Bloss testified that his reaction to the various things Ms. Allem told him Kershner said about him to the team was his tension was heightened. n43

n43 Bloss Trial Tr. Vol. 1 at 103

II. Conclusions of Law

The Statute of Frauds is inapplicable because the instant employment agreement was for an indefinite duration, and therefore may have been performed within one year. n44

n44 Brandner v. Delaware State Housing Authority, Del. Ch. 605 A.2d 1, 1 (1991) (citing Haveg Corp. v. Guyer, Del. Supr., 58 Del. 535, 211 A.2d 910 (1965)); Peterson v. Beebe Medical Center, Inc., Del. Super., 1992 Del. Super. LEXIS 454, C.A. No. 91C-07-147, Del Pesco, J. (Nov. 13, 1992) (ORDER).

[*17] [HN1]

In determining the nature of an employment contract, Delaware law "provides a heavy presumption that a contract for employment, unless otherwise expressly stated, is at-will in nature, with duration indefinite." n45 An at-will employee is subject to termination with or without cause. n46 [HN2] An exception to the at-will doctrine is that the employer's statements and conduct can alter the at-will status of the employment relationship but only if such change is stated with "'a reasonable degree of specificity.'" n47 [HN3] Other exceptions to the at-will doctrine are those addressing the implied covenant of good faith and fair dealing. n48 The exceptions falling under the implied covenant of good faith are limited to (1) the public policy exception in which the termination was a violation of a public interest; (2) "the employer misrepresented an important fact and the employee relied 'thereon either to accept a new position or remain in a present one'"; (3) where an employee was deprived of clearly identifiable compensation related to past service due to the employer's use of superior bargaining power; or (4) "the employer falsified or manipulated a record to create fictitious grounds to terminate [*18] the employee." n49

n45 *Merrill v. Crothall-American, Inc.,, Del. Supr., 606 A.2d 96, 102 (1992)* (citing *Heideck v. Kent General Hospital, Inc., Del. Supr., 446 A.2d 1095, 1096 (1982))*.

n46 *Heideck, 446 A.2d at 1096; Peterson, 1992 Del. Super. LEXIS 454, *6.*

n47 *Lord v. Souder, Del. Super., 1999 Del. Super. LEXIS 58, *7,* C.A. No. 97C-10-012, Graves, Jr. (Feb. 1, 1999) (quoting *Ayers v. Jacobs & Crumpler, P.A.,* Del. Super., C.A. No. 96C-07-258, Quillen, J. (Dec. 31, 1996) (Let. Op. at 25-26) (citations omitted))

n48 *See E.I. duPont de Nemours and Co., v. Pressman, Del. Supr., 679 A.2d 436 (1996). Ayers* at 11; *Layfield v. Beebe Medical Center, Inc., Del. Super., 1997 Del. Super. LEXIS 472, *1,* C.A. No. 95C-12-007, Graves, J. (Jul. 18, 1997); *Lord, 1999 Del. Super. LEXIS 58, *8.*

n49 *Lord, 1999 Del. Super. LEXIS 58, *8* (quoting *Layfield, 1997 Del. Super. LEXIS 472, *10);* See also *Pressman, 679 A.2d at 442-44*

The Court concludes that Bloss has failed to prove, by clear and convincing evidence that Kershner [*19] offered him lifetime employment. Rather, the employment relationship was at-will. There exists no evidence other than Bloss' subjective interpretation of Kershner's alleged statements regarding employment to support his claim that Kershner extended an offer of lifetime employment. Such statements, without any objective or tangible proofs that such a contract existed between Bloss and Kershner, are simply not enough. Such statements are not enough to alter the presumed at-will relationship. n50

n50 *See Peterson v. Beebe Medical Center, supra* (holding that the words "we trust you will be here until you retire" spoken to an employee when originally hired did not alter the at-will relationship).

Further, the Court concludes that Kershner did not breach an implied covenant of good faith and fair dealing when Bloss was terminated. Although the Supreme Court has found an employer to have breached such a covenant when the employer promised indefinite employment and its intent was to employ on a temporary basis, [*20] n51 this Court finds that Bloss has made no such showing. Neither has Bloss met his burden of proof with respect to a breach of a covenant of good faith and

fair dealing as it might relate to relinquishing a legal claim on the basis of a superior bargaining power on Kershner's part. Bloss put forward no evidence which indicates that he was any less knowledgeable in business than was Kershner.

n51 *Merrill v. Crothall-American, Inc., 606 A.2d 96 at 102.*

The Court concludes that there can be no recovery based upon a breach of the covenant of good faith and fair dealing as it relates to Kershner's failure to fulfill his promise to share 50% of LabWare's profits with Bloss. Bloss has not shown that Kershner's conduct was in any way fraudulent or deceitful. [HN4] n52

An employer acts in bad faith when it induces another to enter into an employment contract through actions, words, or the withholding of information, which is intentionally deceptive in some way material to the contract. n53

[*21]

There was no evidence produced indicating that Kershner's intent was to deceive Bloss.

n52 *See 606 A.2d at 101; Peterson, 1992 Del. Super. LEXIS 454, *13.*

n53 *Merrill, 606 A.2d at 101*

[HN5]

Generally, the elements of defamation are: (1) defamatory communication; (2) publication; (3) the communication refers to the plaintiff; (4) a third party's understanding of the communication's defamatory character; and (5) injury. n54 [HN6] Generally, defamation is not actionable without special damages. n55 However, slander per se does not require proof of damages. n56 Delaware recognizes four categories of slander that does not require special damages and they are statements that: (1) malign a person in that person's trade, business, or profession; (2) impute a crime; (3) imply that one has a loathsome disease, or (4) impute unchastity to a woman. n57 [HN7] Delaware also recognizes a qualified privilege of employers to make communications regarding the character, qualifications, or job performance of an employee or former [*22] employee to those who have a legitimate interest in such information. n58 "The privilege will not be forfeited unless there is excessive publi-

cation, use of the occasion for a purpose not embraced within the privilege, or by making a statement which the speaker knows is false." n59

> n54 *Read v. Carpenter, Del. Super., 1995 Del. Super. LEXIS 251, *7*, C.A. No. 95C-03-171, Quillen, J. (Jun. 8, 1995) (citations omitted).

> n55 *Q-Tone Broadcasting, Co. v. Musicradio of Maryland, Inc., Del. Super., 1994 Del. Super. LEXIS 453*, C.A. No. 93C-09-021, Silverman, J. (Aug. 22, 1994) (Mem. Op. at 5).

> n56 *Id.* at 7. *1994 Del. Super. LEXIS 453, *12.*

> n57 *Id.* ; *Restatement (Second) Torts § 570.*

> n58 *See Stafford v. Air Products and Chemicals, Inc., Del. Super., 1985 Del. Super. LEXIS 1232*, C.A. No. 84C-JL-85, O'Hara, J. (Sept. 5, 1985) (ORDER); *Burr v. Atlantic Aviation Co., Del. Super., 332 A.2d 154, 155 (1974), rev'd on other grounds, Del. Supr., 348 A.2d 179 (1975).*

> n59 *Stafford, 1985 Del. Super. LEXIS 1232, *7 (citations omitted).*

The Court concludes that Bloss has [*23] failed to sustain a claim for defamation. The evidence produced at trial fails to establish a defamatory statement that was made by Kershner to any third party. The alleged defamatory statements, if they have been proven, would amount to slander per se. n60 Kershner denies ever making any defamatory statements to anyone concerning Bloss' competency or work performance. The Court has indicated that Sandy Allem's deposition testimony is at best unclear. The Court does not find anywhere in Ms. Allem's testimony where she comes close to stating she was told by Kershner that Bloss was going to be terminated from his employment at DuPont and Kershner "saved his butt;" or that Bloss was incompetent; or any of the other statements alleged by Bloss. Without testimony from a third party, the whole basis of a defamation claim, Bloss is not entitled to recover for his defamation.

> n60 The statements allegedly made are those which would be considered to malign Bloss' business or profession and he would not have to prove special damages.

[*24] [HN8]

In order to recover a claim for intentional infliction of emotional distress, a plaintiff must prove that he suf-

fered severe emotional distress as a result of some extreme and outrageous conduct by a defendant. n61 Moreover, the plaintiff does not have to prove there is any accompanying bodily harm to succeed on intentional infliction of emotional distress claim. n62 However, the Supreme Court in *Barker v. Huang* n63 held that "an independent action for intentional infliction of emotional distress does not lie where . . . the gravamen of the complaint sounds in defamation." n64

> n61 Restatement (Second) Torts) § 46; *Cummings v. Pinder, Del. Supr., 574 A.2d 843, 845 (1990); Brett v. Berkowitz, Del. Super., 1995 Del. Super. LEXIS 192*, C.A. No. 91C-12-251, Lee, J. (Apr. 13, 1995) (Mem. Op.); *Drainer v. O'Donnell, Del. Super., 1995 Del. Super. LEXIS 229*, C.A. No. 94C-08-062, Alford, J. (May 30, 1995) (Mem. Op.).

> n62 *Cummings, 574 A.2d at 845.*

> n63 *Barker v. Huang, Del. Supr., 610 A.2d 1341 (1992).*

> n64 *See Barker, 610 A.2d at 1351 (1992)*

[*25]

In the case sub judice, the intentional infliction of emotional distress claim is based upon the same statements allegedly made by Kershner to Bloss and other employees. Bloss was specifically asked by his attorney "what was your [Bloss'] reaction to these various things that you were told Mr. Kershner had said about you." n65 Those "various things" are the same defamatory statements Bloss alleges Sandy Allem told him (Bloss) that Kershner made to the team. n66 Therefore, pursuant to *Barker v. Huang*, n67 the Court concludes this claim cannot survive since it is based on the same set of facts as the defamation claim.

> n65 *See* Bloss Trial Tr. Vol. 1 at 103.

> n66 *See Id.* at 97-103.

> n67 *Barker, 610 A.2d at 1351.*

Based on the foregoing, Bloss is entitled to a judgment in the amount of sixty-five thousand dollars ($ 65,000) for services rendered in connection with documentation for LabStation prior to his being formally hired by LabWare in February, 1990

IT IS SO ORDERED. [*26]

Haile Alford, J.

LEXSEE 2005 U.S. APP. LEXIS 22157

**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION; LISA STEPLER v. AVECIA, INC.; Lisa Stepler, Appellant**

**No. 04-3396**

**UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT**

*2005 U.S. App. LEXIS 22157*

**July 12, 2005, Argued
October 13, 2005, Filed**

**NOTICE:** [*1] RULES OF THE THIRD CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**PRIOR HISTORY:** ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE. Dist. Court Civil Action No. 03-CV-00320. District Judge: The Honorable Susan L. Robinson. *Stepler v. Avecia Inc., 2004 U.S. Dist. LEXIS 14955 (D. Del., July 19, 2004)*

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff former employee appealed from a judgment of the United States District Court for the District of Delaware dismissing her claim for intentional infliction of emotional distress (IIED) and granting summary judgment in favor of defendant former employer on the employee's retaliation claim under Title VII of the Civil Rights Act of 1964 and wrongful termination claim under Delaware law.

**OVERVIEW:** The employee alleged that this case should have been analyzed under the Price Waterhouse framework. The court found that the employee's Title VII claims must be analyzed under the McDonnell Douglas burden-shifting framework. Next, the court found that a reasonable jury considering the evidence in the light most favorable to the employee-- including the employee's performance reviews, management's increased scrutiny of her, the tension with her co-workers, the memorandum of April 23, 2001, and the termination letter -- could conclude that there was a causal link between the employee's protected activities and the employer's decision to fire her. Next, the court agreed with the district court's analysis that the employee's IIED

claim was barred. The court reasoned that for a complaint to survive a motion to dismiss, there must be more than a mere allegation that there was an intentional injury; there must be facts alleged which, if true, show deliberate intent to bring about an injury.

**OUTCOME:** The court affirmed the dismissal of the IIED claim and the entry of summary judgment in favor of the employer on the wrongful termination claim. However, the court reversed the entry of summary judgment in favor of the employer on the retaliation claim and remanded for further proceedings.

**LexisNexis(R) Headnotes**

*Labor & Employment Law > Discrimination > Disparate Treatment > Burden Shifting Analysis*
[HN1] Under the Price Waterhouse framework, the burden of production and the risk of non-persuasion are shifted to the defendant, and the defendant must show that even if discrimination was a motivating factor in the adverse employment decision, it would have made the same employment decision regardless of its discriminatory animus. This framework only applies, however, where the employee can show direct evidence that an illegitimate criterion was a substantial factor in the decision.

*Labor & Employment Law > Discrimination > Title VII*
[HN2] 42 U.S.C.S. § 2000e-2(m) does not reach retaliation claims.

*Labor & Employment Law > Discrimination > Retaliation*

2005 U.S. App. LEXIS 22157, *

[HN3] Under the McDonnell Douglas framework, a plaintiff is first required to make out a prima facie case of retaliation by establishing (1) that she engaged in a protected activity, (2) that she suffered an adverse employment action, and (3) that there was a causal link between her protected activity and the adverse employment action. If plaintiff successfully made out a prima facie case, defendant has to point to evidence in the summary judgment record that was sufficient, if believed, to support a finding that plaintiff was not discharged because of her protected activity. If defendant meets this burden, plaintiff is required to prove that unlawful retaliation was a determinative cause of her firing.

*Labor & Employment Law > Employment Relationships > At-Will Employment*
[HN4] The general rule in Delaware is that employees are employed "at will" and may be dismissed at any time without cause. The general rule does not apply, however, in the following four situations: (i) where the termination violated public policy; (ii) where the employer misrepresented an important fact and the employee relied thereon either to accept a new position or remain in a present one; (iii) where the employer used its superior bargaining power to deprive an employee of clearly identifiable compensation related to the employee's past service; and (iv) where the employer falsified or manipulated employment records to create fictitious grounds for termination.

*Labor & Employment Law > Employment Relationships > At-Will Employment*
*Labor & Employment Law > Wrongful Termination > Public Policy*
[HN5] In order to make out a claim of a public policy violation, a plaintiff must satisfy a two-part test: (i) the employee must assert a public interest recognized by some legislative, administrative or judicial authority and (ii) the employee must occupy a position with responsibility for advancing or sustaining that particular interest.

*Torts > Business & Employment Torts > Wrongful Termination*
[HN6] In 2004 the Delaware legislature amended *Del. Code Ann. tit. 19, § 710 et seq.*, which prohibits discrimination in employment practices, in order to clarify that this statute was the "sole remedy" for an aggrieved employee to the exclusion of all other remedies. *Del. Code Ann. tit. 19, § 712(b) (2005).*

*Labor & Employment Law > Employment Relationships > At-Will Employment*
[HN7] If the employer did not actually falsify or manipulate employment records, then it does not matter if the employer gave a false rationale for termination.

*Workers' Compensation & SSDI > Administrative Proceedings*
[HN8] Under Delaware law, the general rule is that the worker's compensation administrative process is the exclusive remedy for an employee who suffers a work-related accident causing personal injury or death. *Del. Code Ann. tit. 19, § 2304 (2005).* However, the Delaware Supreme Court has held that claims that involve a true intent by the employer to injure the employee fall outside of the Workers' Compensation Act and remain separately actionable as common law tort claims. Thus, for a complaint to survive a motion to dismiss, there must be more than a mere allegation that there was an intentional injury; there must be facts alleged which, if true, show deliberate intent to bring about an injury. In other words, an employee must allege facts that, if true, would show that the employer intended to injure her. It would not be enough to allege facts showing that the employer intended to do an action and that the worker was injured as a result of that action. Specific intent is required.

COUNSEL: PHILLIP B. BARTOSHESKY (ARGUED), Biggs and Battaglia, Wilmington, Del., Counsel for Appellant.

GINGER D. SCHRODER (ARGUED), Schroder, Joseph & Associates LLP, Buffalo, N.Y.; JENNIFER C. JAUFFRET, Richards, Layton & Finger, Wilmington, DE, Counsel for Appellee.

JUDGES: Before: ALITO, BECKER, and GREENBERG, Circuit Judges.

OPINION:

OPINION OF THE COURT

PER CURIAM:

Lisa Stepler, a former laboratory technician for Avecia, Inc. ("Avecia") sued Avecia for retaliation under *Title VII of the Civil Rights Act of 1964*, wrongful termination under Delaware law, and intentional infliction of emotional distress under Delaware law. The District Court dismissed Stepler's claim for intentional infliction of emotional distress and granted summary judgment in favor of Avecia on Stepler's retaliation and wrongful termination claims. We affirm the dismissal [*2] of the

claim for the intentional affliction of emotional distress and the entry of summary judgment in favor of Avecia on the wrongful termination claim. However, we reverse the entry of summary judgment in favor of Avecia on the retaliation claim and remand for further proceedings.

I.

Stepler asserts that this case should have been analyzed under the framework of *Price Waterhouse v Hopkins, 490 U.S. 228, 104 L. Ed. 2d 268, 109 S. Ct. 1775 (1989)*. n1 [HN1] Under that framework, the "burden of production and the risk of non-persuasion are shifted to the defendant," and the defendant must show "that even if discrimination was a motivating factor in the adverse employment decision, it would have made the same employment decision regardless of its discriminatory animus." *Armbruster v. Unisys Corp., 32 F.3d 768, 778 (3d Cir. 1994)*. This framework only applies, however, where the employee can show "*direct evidence* that an illegitimate criterion was a substantial factor in the decision." *Price Waterhouse, 490 U.S. at 276* (O'Connor, J., concurring in the judgment) (emphasis added); see also *Walden v. Georgia-Pacific Corp., 126 F.3d 506, 513 (3d Cir. 1997)* [*3] We have carefully considered the evidence on which Stepler relies in this case, and while the question is close we conclude that she did not meet the "direct evidence" standard.

> n1 [HN2]  *42 U.S.C. § 2000e-2(m)* does not reach retaliation claims. *Woodson v. Scott Paper Co., 109 F.3d 913, 934 (3d Cir.)*, cert. denied, *522 U.S. 914, 139 L. Ed. 2d 230, 118 S. Ct. 299 (1997)*.

Stepler's Title VII claims must be analyzed under the burden-shifting framework established by *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973)*, and its progeny. [HN3] Under this framework, Stepler was first required to make out a prima facie case of retaliation by establishing (1) that she engaged in a protected activity, (2) that she suffered an adverse employment action, and (3) that there was a causal link between her protected activity and the adverse employment action. *Farrell v. Planters Lifesavers Co., 206 F.3d 271, 279 (3d Cir. 2000)* If Stepler [*4] successfully made out a prima facie case, Avecia had to point to evidence in the summary judgment record that was sufficient, if believed, to support a finding that Stepler was not discharged because of her protected activity. See *St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506-507, 125 L. Ed. 2d 407, 113 S. Ct. 2742 (1993)*. If Avecia met this burden, Stepler was required to prove that unlawful retaliation was a determinative cause of her firing. See *McDonnell Douglas, 411 U.S. at 802-803*.

Stepler clearly satisfied the first two prongs of the prima facie case standard. Her complaints about a hostile work environment and retaliation were protected activities, and her firing by Avecia obviously was an adverse employment action. Whether she proffered sufficient evidence to meet the third prong of the prima facie case standard is less clear due to the gap of almost one year between her initial complaint and her termination, but a gap of this magnitude is not conclusive and can be outweighed by a "pattern of harassment" or a "pattern of antagonism" in the intervening period. See *Woodson v. Scott Paper Co., 109 F.3d 913, 920 (3d Cir. 1997)*; see also [*5] *Robinson v. Southeastern Pennsylvania Transp. Auth., 982 F.2d 892, 894-95 (3d Cir. 1993)*. A reasonable jury considering the evidence in the light most favorable to Stepler -- including Stepler's performance reviews, management's increased scrutiny of her, the tension with her co-workers, the memorandum of April 23, 2001, and the termination letter -- could conclude that there was a causal link between Stepler's protected activities and Avecia's decision to fire her. We thus conclude that Stepler made out a prima facie case.

Avecia's proffered reasons for Stepler's termination were poor work performance and disruptive behavior, but a reasonable jury considering the evidence in the light most favorable to Stepler, and drawing all inferences in Stepler's favor, could conclude otherwise. Particularly noteworthy are the references in both the April 23 memo and the May 4, 2001, termination letter to Stepler's "intense focus upon alleged harassment [and] retaliation." App. 264, 371.

III.

Conversely, there are no issues of fact precluding summary judgment in favor of Avecia on Stepler's state law claim for breach of the covenant of good faith and fair dealing.

[HN4] The general [*6] rule in Delaware is that employees are employed "at will" and may be dismissed at any time without cause. See *Merrill v. Crothall-American, Inc., 606 A.2d 96, 103 (Del. 1992)*. The general rule does not apply, however, in the following four situations:

> (i) where the termination violated public policy;
>
> (ii) where the employer misrepresented an important fact and the employee relied "thereon either to accept a new position or remain in a present one";

(iii) where the employer used its superior bargaining power to deprive an employee

of clearly identifiable compensation related to the employee's past service; and

(iv) where the employer falsified or manipulated employment records to create fictitious grounds for termination.

*Lord v. Souder*, 748 A.2d 393, 400 (Del. 2000) (citing *E.I. DuPont de Nemours and Co. v. Pressman*, 679 A.2d 436, 442-44 (Del. 1996)). Stepler claims that Avecia's actions fit into either the first or fourth category. She contends that the first category fits because being fired for opposition to sexual harassment and retaliation violates public policy, and she argues that the fourth [*7] category fits because she was subjected to false criticisms of her work in her performance evaluation, false claims that she was using work time to study, and false claims that she was fired for behavioral and performance issues.

[HN5] In order to make out a claim of a public policy violation, a plaintiff must satisfy a two-part test: "(i) the employee must assert a public interest recognized by some legislative, administrative or judicial authority and (ii) the employee must occupy a position with responsibility for advancing or sustaining that particular interest." *Lord*, 748 A.2d at 401 (citing *Pressman*, 679 A.2d at 441-42). To satisfy the first part, Stepler relies on the Delaware Supreme Court's decision in *Schuster v. Derocili*, 775 A.2d 1029 (Del. 2001), which recognized a cause of action for breach of the covenant of good faith and fair dealing where the employee alleged that she was terminated following sexual harassment in the workplace. But [HN6] in 2004 the Delaware legislature amended *19 Del. C. § 710 et seq.*, which prohibits discrimination in employment practices, in order to clarify that this statute [*8] was the "sole remedy" for an aggrieved employee "to the exclusion of all other remedies." *19 Del. C. § 712(b)* (2005). In fact, the synopsis of the Senate Bill expressly states disagreement with the Delaware Supreme Court's decision in Schuster:

> This bill confirms that Chapter 7 is the exclusive and sole remedy for employment discrimination claims, requiring initial processing of all such claims with the Department of Labor for review and action. This bill effectively re-establishes the exclusive remedy put in question by

the decision in *Schuster v. Derocili*, 775 A.2d 1029 (2001).

Delaware Bill Summary, 2004 Reg. Sess. S.B. 154. Moreover, when the bill is read in light of the sponsor statement, which "confirms" and "re-establishes" the pre-existing rule "put in question by" Schuster, it is clear that the 2004 Amendment is meant to be retroactive. Thus Stepler has not asserted a recognized public interest, and Avecia's actions do not fit into the first category.

Nor do they fit into the fourth category: falsification or manipulation of employment records to create fictitious grounds for termination. Even if we assume [*9] that Stepler was subjected to false criticisms of her work performance and false claims that she was using work time to study, there is no evidence that these particular criticisms and claims were the grounds for Stepler's termination. And even if we assume that Avecia falsely claimed that Stepler was fired for behavioral and performance issues, this is not the kind of falsehood specified in the fourth category, which provides that an employer violates the covenant of good faith and fair dealing when it "falsifie[s] or manipulate[s] employment records to create fictitious grounds for termination." *Lord*, 748 A.2d at 400. [HN7] If the employer did not actually falsify or manipulate employment records, then it does not matter if the employer gave a false rationale for termination. See *Williams v. Caruso*, 966 F. Supp. 287, 291 (D. Del. 1997) ("Nothing in Pressman suggests an employer who gives an employee a false reason for termination is subject to liability under the implied covenant of good faith and fair dealing. Pressman only held culpable the manufacture of grounds for dismissal, not the statement of a false reason for dismissal.") [*10] (emphasis in original); see also *Geddis v. University of Delaware*, 40 Fed. Appx. 650, 654 (3d Cir. 2002) (unpublished) (noting that the employee did not claim his supervisor "intentionally created 'fictitious negative information' about him in order to get him fired" and thus the conduct at issue did not fit the fourth Pressman category) (quoting *Schuster*, 775 A.2d at 1040).

IV.

[HN8] Under Delaware law, the general rule is that the worker's compensation administrative process is the exclusive remedy for an employee who suffers a work-related accident causing personal injury or death. See *19 Del. Code Ann. § 2304* (2005). However, the Delaware Supreme Court has held that "claims that involve a true intent by the employer to injure the employee fall outside of the Workers' Compensation Act and remain separately actionable as common law tort claims." *Rafferty v. Hartman Walsh Painting Co.*, 760 A.2d 157, 159 (Del. 2000) (emphasis added); see also *Showell v. Langston*,

*2003 Del. Super. LEXIS 95, No. Civ. A. 02C-01-016, 2003 WL 1387142, at *3 (Del. Super. Mar. 05, 2003)* (citing Rafferty). Thus, "for a complaint [*11] to survive a motion to dismiss, there must be more than a mere allegation that there was an intentional injury; there must be facts alleged which, if true, show deliberate intent to bring about an injury." *Rafferty, 760 A.2d at 160.* In other words, an employee must allege facts that, if true, would show that the employer intended to injure her. It would not be enough to allege facts showing that the employer intended to do an action and that the worker was injured as a result of that action. Specific intent is required.

Stepler cites Rafferty and argues that her claim for intentional infliction of emotional distress is not barred. In a Memorandum Order of April 28, 2004, the District Court rejected Stepler's argument. We agree with the District Court's analysis.

We therefore affirm the District Court's order of summary judgment in favor of Avecia on Stepler's claims under Delaware law, but we reverse the District Court's order granting summary judgment in favor of Avecia on Stepler's retaliation claim, and we remand the case for further proceedings.

LEXSEE 1998 DEL. CH. LEXIS 7

**ROBERT J. HENRY, Plaintiff, v. THE DELAWARE LAW SCHOOL OF WIDENER UNIVERSITY, INC., a Delaware Corporation, and WIDENER UNIVERSITY, INC., a Delaware Corporation, Defendant.**

**Civil Action No. 8837**

**COURT OF CHANCERY OF DELAWARE, NEW CASTLE**

*1998 Del. Ch. LEXIS 7*

**December 8, 1997, Date Submitted**
**January 8, 1998, Date Decided**

**SUBSEQUENT HISTORY:** [*1]

Date Revised January 12, 1998. Released for Publication by the Court January 16, 1998.

**DISPOSITION:**

Defendants' motion for summary judgment granted with respect to each and every claim of the complaint. All other pending motions denied.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff professor brought an action against defendant law school for breach of an employment contract and libel arising out of a decision of the law school tenure committee recommending denial of the professor's applications for promotion and tenure. The professor sought an order granting him tenured status, back pay, and other relief. The law school filed a motion for summary judgment.

**OVERVIEW:** The court initially noted that the passage of time due to the professor's lack of diligence had foreclosed the remedy of ordering reconsideration. The professor's breach of contract claim was based on an allegation that the tenure review process was sufficiently tainted to result in the law school's breach of the implied covenant of good faith and fair dealing inherent in his employment contract and its tenure policy. However, the court found that the law school substantially complied, in good faith, with its procedures for considering the professor's application for tenure, and the court refused to substitute its opinion for the deliberative and reasoned decision of the law school. Because the professor had failed to raise a material issue of fact, the law school was entitled to judgment as a matter of law on the contract claims. The court also granted summary judgment on the

libel claim because the statements at issue, made during the meeting of the tenure committee, although uncomplimentary, did not amount to defamation. Further, the court found that a qualified privilege existed with regard to the statements, and that the professor failed to show abuse of the privilege.

**OUTCOME:** The court granted the law school's motion for summary judgment with respect to every claim in the complaint. All other pending motions were denied.

**LexisNexis(R) Headnotes**

*Evidence > Procedural Considerations > Inferences & Presumptions*
*Civil Procedure > Summary Judgment > Summary Judgment Standard*
[HN1] In reviewing a motion for summary judgment, the court examines the record in order to determine whether or not there is a genuine issue of material fact. Additionally, in evaluating the record the court views the facts in a light most favorable to the nonmoving party, accepting as true, however, evidence uncontroverted by the record. The role and purpose of summary judgment motions is to dispose of claims or defenses which are factually unsupported by the record. The moving party is entitled to judgment as a matter of law, therefore, if the nonmoving party fails to make a sufficient showing on an essential element of his case and on which he has the burden of proof at trial.

*Contracts Law > Contract Interpretation > Good Faith & Fair Dealing*
[HN2] In order to protect the reasonable expectations of parties to a contract, a duty of good faith and fair dealing

1998 Del. Ch. LEXIS 7, *

is implied therein. This covenant is breached when the conduct of the employer constitutes an aspect of fraud, deceit or misrepresentation.

*Torts > Defamation & Invasion of Privacy > Libel*
*Civil Procedure > Summary Judgment > Summary Judgment Standard*
[HN3] In order to make out a prima facie case of libel, the plaintiff must show by a preponderance of the evidence that (i) the statement was defamatory, and (ii) there was an unprivileged communication to a third party. In the context of a motion for summary judgment, however, defendants are not entitled to judgment in their favor if there are genuine issues of material fact as to either of these two elements.

*Torts > Defamation & Invasion of Privacy > Defamation Actions*
[HN4] A defamatory communication is defined as one that tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him.

*Torts > Defamation & Invasion of Privacy > Defamation Actions*
[HN5] Liability for defamation will not attach unless the plaintiff establishes an unprivileged communication of the statements to a third party.

*Torts > Defamation & Invasion of Privacy > Defamation Actions*
*Torts > Defamation & Invasion of Privacy > Qualified Privileges*
[HN6] Under the law of defamation, liability does not attach to a defamatory statement if the statement is privileged. A qualified privilege extends to communications made between persons who have a common interest for the protection of which the allegedly defamatory statements are made. Additionally, the qualified privilege protects statements disclosed to any person who has a legitimate expectation in the subject matter.

*Torts > Defamation & Invasion of Privacy > Qualified Privileges*
[HN7] A qualified privilege must be exercised with good faith, without malice and absent any knowledge of falsity or desire to cause harm. The benefit of the qualified privilege may be forfeited if it is abused.

**COUNSEL:**

Edward M. Luria, Esquire, Wilmington, Delaware; Attorney for Plaintiff.

Stephen P. Casarino, Esquire and Diane M. Willette, Esquire, of CASARINO, CHRISTMAN & SHALK, Wilmington, Delaware; Attorneys for Defendants.

**JUDGES:** Stephen P. Lamb, Vice Chancellor.

**OPINIONBY:** Stephen P. Lamb

**OPINION:**

MEMORANDUM OPINION

LAMB, Vice Chancellor

I. INTRODUCTION

This is an action for (i) breach of an employment contract and (ii) libel brought by the plaintiff, Robert J. Henry, against the defendants, the Widener University School of Law, Inc. (the "Law School") n1 and Widener University, Inc., its parent corporation. The complaint arises out of a February 1984, decision of the Law School Tenure Committee recommending denial of the plaintiff's applications for promotion and tenure. Plaintiff seeks an order granting him tenured status, back pay and other relief. Additionally, the plaintiff seeks monetary damages flowing from the alleged defamatory statements made by certain [*2] members of the Tenure Committee while reviewing his applications. Pending decision are the defendants' motion for summary judgment and the plaintiff's motion to transfer to Superior Court. I grant the defendants' motion for summary judgment and do not reach the merits of the motion to transfer.

> n1 When the plaintiff filed this action in 1987 the Law School went by the name Delaware Law School. At some later point the name was changed to Widener University School of Law.

II. PROCEDURAL HISTORY

Before discussing the facts, it is important to review the procedural history of this case and the nature of the record presented on the motion for summary judgment.

The complaint, seeking extraordinary equitable relief, was filed nearly three years after the initial decision to deny tenure and almost two years after the plaintiff learned that the Tenure Committee had reaffirmed its decision on remand from a University-wide appellate committee.

Plaintiff waited until 1994--ten years after the initial denial--before [*3] noticing a single deposition and until

1996 before actually conducting one. Plaintiff deposed two witnesses on three dates in 1996 and 1997. Other key fact witnesses were never deposed. The two most important witnesses, Professors Humphreys and Schlagman, were not deposed and have died. Plaintiff himself resisted giving a deposition from 1989 (when one was first noticed) until 1994, when he finally appeared.

In August 1997, the Court ordered that discovery be completed by September 30, 1997, in contemplation of a November trial. In response, the plaintiff chose to conduct no further depositions. On October 8, 1997, the Court held a pre-trial scheduling conference at which time it was determined to vacate the trial date and schedule consideration of a defendants' motion for summary judgment. The Court entered an order scheduling the filing and disposition of the motions now pending decision and expressly gave the plaintiff leave to conduct whatever further depositions he felt were needed in connection therewith. Plaintiff chose not to pursue such discovery and has so advised the Court. n2

> n2 Plaintiff did, belatedly, request several further depositions in connection with the trial, should there be one, and has moved to compel the same. At oral argument, the plaintiff's counsel made clear his position that those depositions were not sought in connection with the motion for summary judgment. Rather, the plaintiff seeks such discovery only because the Court, at the October 8, 1997 scheduling conference, instructed the plaintiff's counsel that it was disinclined to tolerate discovery-type examination of hostile witnesses at trial.

[*4]

Due to the paucity of discovery, the record on this motion for summary judgment is sparse. Defendants have submitted verified answers to three sets of interrogatories, which include as exhibits the most basic documentation relating to the plaintiff's tenure application and its denial. They also submit an excerpt taken from the plaintiff's deposition testimony, a copy of the Law School's tenure policy, and the plaintiff's employment contract dated June 1, 1983.

In answer to the motion, the plaintiff has submitted excerpts of the three depositions taken, a copy of the 1981-82 Law School Faculty manual, a memorandum proposing amendments to the Law School's tenure policy, his administrative appeal from the denial of tenure and various related correspondence, minutes and memoranda. Many of these are submitted without authentication, but also without objection from defendants. n3

> n3 Attached as Exhibit 36 to the plaintiff's appendix is a document consisting of a copy of a September 20, 1995 letter from plaintiff's counsel addressed to then former Professor Schlagman enclosing an affidavit prepared by plaintiff's counsel for Mr. Schlagman's signature. The letter and draft affidavit are marked up with a confusing, incomplete, and often contradictory set of notes purportedly made by Mr. Schlagman. The affidavit is unsigned. Because Mr. Schlagman is dead and was never questioned about either the underlying events or this draft affidavit, the defendants properly object to its consideration by the Court, and it will be given no weight. The document does not qualify as an admission of a party-opponent, as Mr. Schlagman was no longer employed by the Law School in 1995. Moreover, the document does not appear to satisfy any hearsay exception for its admission. Even if it were admissible nothing therein materially aids the plaintiff in resisting summary judgment.

[*5]

Plaintiff has also submitted a brief affidavit the purpose of which is (i) to refute or contradict certain observations made in the Tenure Committee's report which were said to reflect negatively on the plaintiff's professionalism, and (ii) to explain why he waited from May of 1985, when he certainly knew the Tenure Committee had reaffirmed its recommendation, until February of 1987 to initiate this action.

In short, the history of this case is one of inactivity and lack of diligence. Consequently, the record before the Court consists largely of the written record of actions taken by the Tenure Committee and the University appellate committee, and the defendants' interrogatory answers describing the actions taken by those groups. As discussed, *infra,* the record shows that the defendants substantially complied, in good faith, with the procedures for considering Mr. Henry's application for tenure.

III. FACTS

In the fall of 1983, the plaintiff, Robert J. Henry, was in his sixth year of teaching at the Law School. The Tenure Policy of the Law School required full-time faculty members to apply for tenure during their sixth academic year of service, or be deemed to have waived consideration [*6] for tenure.

On February 8, 1984, the Promotion and Tenure Committee ("Tenure Committee") of the Law School met to consider three applications for promotions to Associate Professor, along with the plaintiff's applications

for promotion and tenure. According to the minutes, the following faculty members were present: Esther F. Clark, (chair), Larry D. Barnett, Dean Robert J. D'Agostino, Edward J. Damich, Richard H. Humphreys, J. Kress, Dean Thomas J. Reed, Herbert S. Schlagman, Ridgely Scott, Edward C. Smith and Dean Arthur Weeks.

As the first order of business, the Tenure Committee expelled Dean Weeks from the meeting for disclosing, to non-committee members, confidential discussions that took place during committee meetings. Professor Scott also left the meeting before discussion began regarding the plaintiff's applications. The minutes from the meeting do not reflect the actual discussions regarding the plaintiff's applications. The substance of what the Committee discussed, however, was detailed in a letter Professor Clark sent to Dean Anthony Santoro of the Law School dated March 12, 1984 informing him that the Tenure Committee had voted to recommend denial of the plaintiff's [*7] applications for both promotion and tenure.

The letter summarized the Tenure Committee's findings regarding the plaintiff's teaching and professional behavior, scholarship, and community service, as outlined in the Tenure Policy. As part of the evaluation process, members of the Tenure Committee were required to audit the plaintiff's classes. At the meeting to review the plaintiff's applications, Professors Schlagman and Humphreys, who were assigned in the ordinary rotation of committee members to visit the plaintiff's classes, reported to the Tenure Committee their observations of the plaintiff's teaching ability. Neither their comments nor any quotations were attributed directly to them in the letter; however, the letter did include the substance of their report. Specifically, with regard to the plaintiff's teaching ability the letter stated:

> the Committee has concluded that Professor Henry is lacking in achievement in [his teaching and professional behavior]. This conclusion is based upon classroom observation, and common student complaints. Professor Henry lectures with great speed. It is difficult for the students to take notes. In fact, most of them tape his lectures [*8] so they can transcribe them later. It is difficult for a student to get his attention to either ask a question or make a comment. There is apparently no dialogue in his classroom.

Plaintiff's libel claim is based on the statements made by Professors Schlagman and Humphreys to the Tenure

Committee as well as those communicated in the letter to Dean Santoro.

Section Eight of the Tenure Policy prescribes the procedure for appealing a Tenure Committee decision to recommend denial of an application for tenure. Section 8.1 provides that the Tenure Committee shall notify the tenure candidate in writing of the decision to recommend denying tenure as well as the reasons for their recommendation. Section 8.2 provides that the candidate may appeal the Tenure Committee's decision to the University Council Faculty Affairs Committee (the "University Committee"), however, the burden of persuasion is on the appellant. Subject to the right to appeal to the Academic Committee of the Board of Trustees, which is the ultimate review body, the University Committee was authorized to: remand to the Tenure Committee for reconsideration with appropriate instructions or grant any other just relief consistent [*9] with the tenure guidelines.

On February 10, 1984 Professor Clark sent a letter to the plaintiff informing him that the Tenure Committee voted to recommend denial of both his application for tenure and his application for promotion to associate professor. Professor Clark sent a full report of the Tenure Committee's actions to Dean Santoro (with a copy to plaintiff) by letter dated March 12, 1984. The plaintiff appealed the Tenure Committee's decision on or about September 26, 1984. The substance of the appeal was that his professional behavior was no worse, and in fact met a higher standard, than six of the Committee members who had been tenured before him. Included with many of his arguments, the plaintiff accused a number of Tenure Committee members of crimes and unethical conduct. Additionally, the plaintiff argued that Dean Weeks had been improperly expelled from the Tenure Committee meeting, thus preventing him from presenting information that would have reflected favorably upon the plaintiff's qualifications.

In the meantime, the plaintiff had begun seeking other employment. He did remain at the Law School to teach a summer session in 1984, and he also taught the fall semester [*10] in 1984. In a letter dated November 27, 1984, and in response to a request by the plaintiff, Dean Santoro granted the plaintiff a leave of absence for the 1985 spring semester. In the letter, Dean Santoro noted that the plaintiff's appeal would continue and that he would be able to return as a full-time faculty member if the Board of Trustees granted him tenure.

In response to the plaintiff's appeal, Professor Marguerite Barbiere, Chair of the University Committee, sent Professor Clark a memorandum requesting that the Tenure Committee reconsider the decision to deny tenure. The decision to remand the matter to the Tenure Com-

mittee reportedly followed a determination that "due process was not afforded in the decision rendered in relation to the teaching capabilities" of the plaintiff, a "determination [which] was made based on lack of documentation and the ambiguous presentation in the materials concerning the teaching abilities of the candidate."

The Tenure Committee reconvened on January 30, 1985 to address the matters remanded to it. The result of that meeting was a letter addressed to Professor Barbiere and dated January 31, 1985, outlining the manner in which the plaintiff's [*11] teaching abilities had been reviewed and explaining that no contemporaneous written documentation was made with the evaluation, since the Tenure Policy did not require reviews to be in writing.

While all of the committee members originally voting on the plaintiff's tenure application were present at the meeting, the reconsideration was made by only Dean Reed and Professor Barnett. Several committee members abstained from the reconsideration process on remand due to the allegations made by the plaintiff in his appeal. As noted in the letter to Professor Barbiere, the available members of the Committee made no changes in their original decision, rather, they reiterated and clarified the reasons for their initial determination.

Thereafter, in February of 1985 the University Committee evidently accepted the report on remand from the Tenure Committee. There is some dispute as to when and how the plaintiff was notified of the Tenure Committee's decision on remand or the University Committee's final decision. Although the plaintiff denies receiving any written notice, he admits speaking to Professor Scott in May of 1985 at which time he received oral notice of the action on remand. Further, [*12] the plaintiff admits that, on advice of counsel, he did not request a written copy of the decision until after he filed this lawsuit. Plaintiff and his lawyer decided to pursue the matter informally, through intermediaries.

- Instead of acting on the oral notice of the decision on remand by contacting the Tenure Committee, the University Committee, the Board of Trustees, or even the Dean of the Law School, the plaintiff waited nearly two years after the University Committee approved the Tenure Committee's remand consideration before filing this lawsuit on February 5, 1987. At no point before filing the lawsuit did the plaintiff seek to invoke the Court's power by way of an application for injunctive relief.

## IV. DISCUSSION

### 1. Standard of Review

When reviewing the facts of this case I must do so within the confines of [HN1] a motion for summary judgment. As such I will examine the record in order to determine whether or not there is a genuine issue of material fact. *Battista v. Chrysler Corp., Del. Super., 454 A.2d 286, 290 (1982).* Additionally, in evaluating the record I will view the facts in a light most favorable to the nonmoving party, accepting as true, however, evidence [*13] uncontroverted by the record. *Id.* The role and purpose of summary judgment motions is to dispose of claims or defenses which are factually unsupported by the record. *See Celotex Corp. v. Catrett, 477 U.S. 317, 323, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986)* (stating burden on moving party may be discharged by showing there is absence of evidence to support nonmoving party's case). The moving party is entitled to judgment as a matter of law, therefore, if the nonmoving party fails to make a sufficient showing on an essential element of his case and on which he has the burden of proof at trial. *Id.*

### 2. Introduction

Widener University and the Law School are private institutions. Therefore whatever "due process" issues may exist in this case are not of a constitutional dimension. That is, the plaintiff's claim that the defendants did not follow their own written procedures in evaluating his application for tenure raises only contract-based issues, not federal or state constitutional ones. It should also be noted that the plaintiff does not assert that the Law School refused to grant him tenure based on his race, religion, sex, or national origin. Thus, no federal or [*14] state anti-discrimination laws are implicated here.

The alleged breach of contract is itself limited in nature. Plaintiff does not allege that his employment contract gave him a contractual right to be tenured. In fact, the plaintiff had no such right under the terms of the employment contract or the Tenure Policy which specifically provided that: "The granting of tenure is a privilege, i.e., not a right accruing in due course merely from length of service." Instead, the plaintiff's breach of contract claim is that the review process was sufficiently tainted to result in the defendants' breach of the implied covenant of good faith and fair dealing inherent in his employment contract and the Tenure Policy. It is on the basis of this, procedurally based claim, that plaintiff Henry seeks to establish his entitlement to reinstatement with tenure and back pay.

Due to the private character of the Law School and the unique set of privileges and responsibilities which attach to an award of tenure made to a university professor, serious questions arise whether there are any set of circumstances Henry could show which would be sufficient to warrant the extraordinary relief he seeks as a remedy [*15] for breach of the implied covenant of good faith and fair dealing. Henry cites no case in which a court, in a like situation, has so substituted its own

judgment of a plaintiff's tenure qualifications for that of a tenure committee of a law school or other university body.

There was a remedy available to Henry if this action had been filed seasonably and prosecuted diligently, assuming he was able to prove his claimed breach of the implied covenant of good faith and fair dealing. The Court could then have ordered the Law School and the University to reconsider the plaintiff's application for tenure. Given the extraordinary passage of time and Henry's lack of diligence in prosecuting his claim, even this remedy would now appear to be difficult, if not impossible, to fashion. Among other reasons, the plaintiff has not taught anywhere for more than a decade, and the Law School and its faculty are substantially different than they were in 1984.

In any case, as discussed *infra,* the plaintiff's claim for breach of contract cannot withstand the motion for summary judgment. Thus, no remedy is appropriate. Nevertheless, it must be added that the fact that the plaintiff's lack of diligence [*16] may have deprived him of the ability to obtain the lesser remedy of reconsideration can hardly justify his demand for the substantially greater remedy of reinstatement with tenure and back pay.

3. Fair Process

After reviewing the record on this motion for summary judgment, I conclude it establishes that the defendants substantially complied with the Tenure Policy, n4 that Henry has failed to raise a material issue of fact in this regard, and thus, that the defendants are entitled to judgment as a matter of law on the plaintiff's contract claims.

n4 For the purposes of this motion for summary judgment, defendants concede the Tenure Policy was incorporated into the plaintiff's employment contract.

Both parties agree that *Baker v. Lafayette College ("Baker I"), Pa. Super., 350 Pa. Super. 68, 504 A.2d 247 (1986), aff'd, 516 Pa. 291, 532 A.2d 399 (1987)* is the most pertinent authority. No Delaware cases have been found concerning university tenure or non-retention decisions. In *Baker I,* an [*17] assistant professor appealed his non-reappointment to the President of Lafayette College and, in accordance with the faculty handbook, requested the creation of an advisory committee. After a review, the committee recommended that new evaluations be conducted of the assistant professor's work. The President of the College refused to order new evaluations

and denied the appeal. The Board of Trustees affirmed that decision. The Pennsylvania Superior Court initially noted the College's duty to evaluate the plaintiff in good faith. *See 504 A.2d at 255* (stating duty to evaluate in good faith consistent with general duty set forth in *Restatement (Second) of Contracts § 205*). The court then affirmed the trial court's granting of summary judgment in favor of the College, finding that "the College complied fully with the evaluation and appeal provisions of the contract." *Baker I* at 256. The court refused to become engaged, under the guise of a review of the college's "good faith," in a reexamination of "the merits of the College's decision or to apply some sort of negligence standard to the myriad of 'sub-decisions' involved, such as how much weight to give certain facts or how much investigation [*18] into a particular allegation was warranted." *Id.* The court explained its reluctance as follows:

> The evaluation of the performance of a college professor and of his or her suitability to the educational needs, goals and philosophy of a particular institution necessarily involves many subjective, nonquantifiable factors. The assessment of these factors is best performed by those closely involved in the life of the institution, not by judges. . . . As a matter of sound public policy, an institution of higher learning should be free to make such decisions. We believe that engrafting a right to judicial second-guessing of the soundness of [those decisions] would hamper this decision-making freedom.

*504 A.2d at 257*

Delaware case law also recognizes the general proposition that, [HN2] in order to protect the reasonable expectations of parties to a contract, a duty of good faith and fair dealing is implied therein. *Pierce v. International Ins. Co. of Ill., Del. Supr., 671 A.2d 1361, 1366 (1996)* (citing *Merrill v. Crothall-American, Inc., Del. Supr., 606 A.2d 96 (1992)).* This covenant is breached when the conduct of the employer constitutes an aspect of fraud, deceit [*19] or misrepresentation. *Merrill* at 101 (quoting *Magnan v. Anaconda Indus., Inc., Conn. Super. Ct., 37 Conn. Supp. 38, 429 A.2d 492 (1980)* (quoting *A. John Cohen Ins. v. Middlesex Ins., Co., Mass. App. Ct., 8 Mass. App. Ct. 178, 392 N.E.2d 862 (1979))).*

Applying *Baker I* and *Pierce* to the pending motion, I have evaluated the circumstances surrounding the Ten-

ure Committee's actions as well as those of the appeal process and have determined that no material issue of fact exists about the defendants' substantial, good faith, compliance with the provisions of Henry's employment contract and the Tenure Policy.

Plaintiff relies on the following alleged procedural deficiencies in order to illustrate his contention that the procedures afforded him breached the defendants' duty of good faith and fair dealing:

> 1. The Faculty Manual does not list "professional behavior" as a criteria to be considered when reviewing a tenure application and the Tenure Policy was not properly changed to include such a criteria.

> 2. Defendants failed to provide the plaintiff with written notice of the Tenure Committee's final determination to recommend denying him tenure, therefore [*20] he did not have knowledge of the reasons for denying him tenure. As a result, he could not effectively make any appeal to the appropriate university committee. Further, the plaintiff was never notified by the President of the University of any final action by the Board of Trustees concerning the plaintiff's tenure application as required by the Tenure Policy.

> 3. The response letter sent by the Tenure Committee on remand did not supplement the record nor provide extra documentation as required by the University Committee, rather it simply reviewed the documents already sent to the University Committee despite the existence of audiotapes which refute the findings regarding the plaintiff's teaching abilities.

> 4. Defendants failed to look at student evaluations in assessing the plaintiff's teaching abilities in contravention of the Tenure Policy.

> 5. The original decision of the Tenure Committee was not signed by each participating member as required by the Tenure Policy.

> 6. Per Dean Grant's 1981 memorandum, the requisite number of Tenure Committee members did not visit at least two of the plaintiff's classes.

> 7. The required quorum did not exist when the Tenure [*21] Committee convened to reconsider the plaintiff's tenure application and the Tenure Committee acted without first asking the Board of Trustees for direction.

I will address these seriatim.

a. Professional Behavior

Plaintiff contends that the Faculty Manual does not list professional behavior as a criteria for consideration of his applications. However, the plaintiff must concede that § 5 of the Tenure Policy utilized by the Tenure Committee provides for an evaluation of the candidate's "ethics, demeanor in class, interaction with students and faculty, and spirit of co-operation in furthering school policies, judged by the standards of accepted professional behavior." Plaintiff argues that (i) the Faculty Manual contains the only criteria to be considered for tenure and that professional behavior is not among those listed, and (ii) the Tenure Policy utilized by the Tenure Committee (and which lists professional behavior as a criteria) was not officially adopted. Both of these contentions must fail.

The Faculty Manual merely states that factors to be considered by the Tenure Committee "in addition to" teaching ability, scholarship, and services, should be included in its [*22] written policies. Thus, the Tenure Committee was free to decide what factors it will employ when making tenure decisions as long they are made a part of its written policy. That committee's inclusion of a reference to "professional behavior" among the criteria to be used in evaluating the qualifications for tenure of a professional is hardly surprising. Indeed, appropriate professional behavior would appear to be a prerequisite to an appointment as a tenured law professor.

Finally, in response to the summary judgment motion, the plaintiff has concocted an argument that the Tenure Committee used the wrong Tenure Policy in considering the plaintiff's application, although it was the policy in use at the time and known to the plaintiff at the time he made his application. Briefly, the argument is that there is not a clear record establishing that this policy was ever adopted by the appropriate University authorities. This argument was not raised in Henry's administrative appeal, was not alleged in his complaint, and, therefore, has been waived. It will not be considered at this remote date.

b. Written notice of final determination

1998 Del. Ch. LEXIS 7, *

While the record does not establish that Henry received [*23] written notice of the decision on remand to deny him tenure, the plaintiff admits Professor Scott gave him verbal notice of the Tenure Committee's decision as early as May of 1985. Further, the plaintiff concedes that, on the advice of counsel, he chose not to ask for written confirmation. Rather, the plaintiff sought an informal resolution of the matter through intermediaries. Having made that tactical choice, the plaintiff cannot now be heard to complain that a more formal record does not exist.

While it may be true the plaintiff was not notified of any "final action" taken by the Board of Trustees (although there is some dispute as to this) it is unclear what, if any, final action the Board was required to take regarding the plaintiff's applications. Section Eight of the Tenure Policy provides for the right to appeal to the Academic Committee of the Board of Trustees. The record does not indicate whether an appeal was taken to that committee, and the plaintiff has failed to introduce any evidence affirmatively showing he in fact made such an appeal.

c. Procedure on remand to Tenure Committee

Plaintiff asserts that the University Committee directed the Tenure Committee to create [*24] additional documentation to add to the record. This is not so. Rather, the University Committee only asked for clarification on the issue of the plaintiff's teaching ability. This is evidenced by the University Committee's action approving the Tenure Committee's original decision after receiving the response letter addressed to Professor Barbiere. As in *Baker I*, this court will not become enmeshed in the "myriad of 'sub-decisions' involved, such as how much weight to give certain facts." *Baker I* at 256.

d. Student reviews

I find the failure to look at the evaluations was not a significant departure from the guidelines in the Tenure Policy. First, there were questions raised during the Tenure Committee's deliberation about comments made by the plaintiff to his students when the student evaluations were handed out. Plaintiff disputes the accuracy of the comments attributed to him but does not dispute that he made suggestive remarks. Moreover, Henry's application was not singled out by the Tenure Committee's decision not to review the student evaluations. On the contrary, the committee decided not to look at any student evaluations for the academic year. In the circumstances, [*25] this issue does not raise a material question of fact about the defendants' satisfaction of their implied contractual duties of good faith and fair dealing.

e. Signatures on Tenure Committee Report

The report of the Tenure Committee was signed by the Chair of the committee, Professor Clark. Thus, I find the omission of the signatures of the other participants inconsequential. There is no evidence to suggest that the report did not reflect the decision of the Committee as a whole.

f. Attendance of Committee member at class

Plaintiff's allegation that the Tenure Committee did not follow proper procedures because Professors Schlagman and Humphreys failed to attend at least two classes each is also without merit. The memorandum from Dean Grant to the Tenure Committee relied on by the plaintiff merely makes several suggestions regarding the tenure and promotion review procedures. As the memorandum states, however, these were merely suggested procedures. Again, the plaintiff has failed to introduce any evidence indicating that these suggestions were ever adopted by the Tenure Committee as part of their written procedures. Even if the plaintiff did provide evidence demonstrating that [*26] these procedures were adopted, the record indicates the Tenure Committee substantially complied with the suggested procedures, and therefore the plaintiff's allegation that he was not afforded fair process must again fail. Moreover, the absence of testimony from Professors Schlagman and Humphreys about how they conducted their visits to the plaintiff's classes is the result of the plaintiff's lack of diligence and, thus, must weigh in favor of the conclusion that the procedures they adopted were adequate to the task.

g. Presence of quorum on remand

Finally, the plaintiff argues that the required quorum did not exist when the Tenure Committee reconsidered his tenure application. The minutes of the meeting on remand show that there was in fact a quorum when the meeting convened. Due to the fact that the plaintiff, in his appeal, had accused several members of the Committee with criminal or unethical behavior, those members felt obliged to recuse themselves from participating in the remand proceedings. Additionally, due to a personal animosity toward the plaintiff, another member recused himself from the reconsideration process, leaving only two members to act on remand. Nevertheless, [*27] because there was a quorum present at the beginning of the meeting, it is appropriate to regard the act of those members not disabled from acting as the legal act of the Committee. *See, e.g., 8 Del. C. § § 141(b), 144(b)*. In addition, far from evidencing committee bias, these facts tend to show that the committee acted fairly and impartially.

After considering the record, as a whole, and the plaintiff's allegations regarding the review of his applications, I conclude the defendants acted substantially in

accordance with the Tenure Policy both initially and with regard to the appeal process. Having determined that the defendants acted in good faith in reviewing and ultimately rejecting the plaintiff's applications this Court will not review the defendants' factual findings and substitute its opinion for the deliberate and reasoned decision of the University. No procedure is fool proof, and precisely for this reason, institutions such as the defendants institute appeal procedures in order to correct any wrongs committed earlier in the review process. *See, e.g., Baker v. Lafayette College ("Baker II"), 516 Pa. 291, 532 A.2d 399 (Pa. 1987).* Because the Law School and the [*28] University followed their own procedures, as prescribed in the Tenure Policy, in good faith, Counts I and II must necessarily fail.

### 2. Libel

The essence of the plaintiff's claim for libel, formed in Count III, is that Professor Schlagman's and Humphreys' statements to the Tenure Committee regarding the plaintiff's teaching abilities were defamatory, and as such were libelous as a matter of law. [HN3] In order to make out a *prima facie* case of libel, the plaintiff must show by a preponderance of the evidence that (i) the statement was defamatory, and (ii) there was an unprivileged communication to a third party. In the context of this motion for summary judgment, however, the defendants are not entitled to judgment in their favor if there are genuine issues of material fact as to either of these two elements.

### A. Defamatory Statements

Plaintiff must first show the defamatory character of the statement(s) he is relying upon. The Restatement (Second) of Torts defines [HN4] a defamatory communication as one that "tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Restatement* [*29] *(Second) of Torts § 559* (1977); *Spence v. Funk, Del. Supr., 396 A.2d 967 (1978).*

Even viewing the evidence in light of a motion for summary judgment, Professors Schlagman's and Humphreys' statements (as summarized in the Tenure Committee's written report) still do not amount to defamation. While the statements were uncomplimentary about the plaintiff's teaching abilities, they do not rise to a level sufficiently derogatory so as to injure his reputation or deter others from associating with him. *Andres v. Williams, Del. Supr., 405 A.2d 121, 122 (1979).* The statements at issue were to the effect that (i) the plaintiff lectured with great speed, (ii) it was difficult for students to get his attention, (iii) it was difficult for students to take notes, and (iv) there was no dialogue in his classes. These statements, while uncomplimentary, amount to

nothing more than critical comments regarding the plaintiff's teaching performance, and as such are not defamatory as a matter of law.

### B. Unprivileged Communication

Even assuming the statements were defamatory, [HN5] liability will not attach unless the plaintiff establishes an unprivileged communication of the statement(s) to [*30] a third party. Plaintiff has introduced no evidence establishing an unwarranted communication of the statements at issue to anyone other than personnel of the University and the Law School who were involved in either the initial tenure application evaluation or the appeal process that ensued. In order for the plaintiff to meet his burden of proof, therefore, he must establish that communication of the statements to these individuals was unwarranted and as such constituted an unprivileged communication.

[HN6] Under the law of defamation, liability does not attach to a defamatory statement if the statement is privileged. A qualified privilege "extends to communications made between persons who have a common interest for the protection of which the allegedly defamatory statements are made." *Pierce v. Burns, Del. Supr., 55 Del. 166, 185 A.2d 477, 479 (1962)* (citing *Restatement (Second) of Torts § 593*). Additionally, the qualified privilege protects statements disclosed to any person who has a legitimate expectation in the subject matter. *Burr v. Atlantic Aviation, Del. Super., 332 A.2d 154, 155 (1974), rev'd on other grounds, 348 A.2d 179 (1975).*

In the ordinary course, Professors [*31] Schlagman's and Humphreys' statements appear to fall within those class of statements which are entitled to the qualified privilege protection. The statements were discussed only within the confines of the Tenure Committee meeting. Further, the report the Tenure Committee prepared was sent only to those individuals involved in either the initial tenure application review and decision process, or the appeal process.

Making the determination as to whether or not to grant an individual tenure necessarily involves reviewing and evaluating the qualifications, both positive and negative, of the tenure applicant. In order for the Tenure Committee to properly perform this function, they must be free to discuss openly an individual's application without fear of reprisals if something uncomplimentary is said of the individual. Absent the freedom to relay information integral to the evaluation process, it is difficult to imagine how the Tenure Committee could adequately perform its function. The same is equally true for relaying the Tenure Committee's recommendation, of a particular tenure application, to the proper University and Law School personnel. In this regard it is important

to note [*32] that the Tenure Guidelines specifically require the Tenure Committee to forward a written report containing the results of the vote and a summary of the points raised during the meeting, "whether favorable or unfavorable," to the Dean. Again, if the Tenure Committee was unable to make a report of its findings, neither the University nor the Law School could properly act on tenure applications, whether favorably or unfavorably.

Nor was the qualified privilege forfeited. [HN7] A qualified privilege must be exercised "with good faith, without malice and absent any knowledge of falsity or desire to cause harm." *Burr* at 181. The benefit of the qualified privilege may be forfeited if it is abused. *See Battista v. Chrysler Corp., Del. Super., 454 A.2d 286, 291 (1982)* (stating privilege forfeited by excessive or improper publication, use for a purpose not embraced by privilege, or making statements speaker knows are false). Because I find a qualified privilege existed with regard to the statements, the plaintiff bears the burden of showing an abuse of the privilege by producing evidence indicating actual malice, knowledge of falsity, or a desire to cause harm. *See Burr* at 181 (stating [*33] that abuse of privilege is factual question unless evidence is insufficient to raise factual question). I note again, however, that the existence of critical or disparaging statements is not sufficient in and of itself to constitute an abuse of the qualified privilege.

Plaintiff has utterly failed to meet his burden in opposing this motion for summary judgment as to Count III. During the course of this ten year litigation, the plaintiff failed to depose either Professor Schlagman or Professor Humphreys. These two individuals were the ones who made the allegedly defamatory statements to the Tenure Committee and as such are the only ones with personal knowledge as to the reasons behind or motivations for making the statements. The failure to obtain or preserve the testimony of either man must weigh against the plaintiff's claims. Furthermore, no other facts are before the Court sufficient to deprive the defendants of the qualified privilege. A motion for summary judgment will be granted where, as here, there are no disputed questions of material fact.

## V. CONCLUSION

For all of the foregoing reasons, the defendants' motion for summary judgment is granted with respect to each and every [*34] claim of the complaint. All other pending motions are denied.

Stephen P. Lamb

Vice Chancellor

LEXSEE 2002 U.S. APP. LEXIS 25269

**WILLIAM R. HOWARD, Appellant v. KAREN DEKLINSKI; GARY SMITH; JOHN DUNN; JOHN CONNOLLY; SUSAN WERTZ; ROGER FICKES; ABILITECH INC.; DEPARTMENT OF CONSERVATION AND NATURAL RESOURCES**

No. 01-4171

**UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT**

*2002 U.S. App. LEXIS 25269*

**October 31, 2002, Submitted Under Third Circuit LAR 34.1(a)**
**November 12, 2002, Filed**

**NOTICE:** [*1] RULES OF THE THIRD CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**PRIOR HISTORY:** On Appeal from the United States District Court for the Middle District of Pennsylvania. (D.C. No. 00-cv-01649). District Judge: Hon. Sylvia H. Rambo.

**DISPOSITION:** Affirmed.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff employee sued defendants, a corporation, individuals, and the employee's employer, under *42 U.S.C.S. § 1983,* asserting, among others, a claim of defamation regarding communications from the individuals and the corporation to the employer. The United States District Court for the Middle District of Pennsylvania granted summary judgment for the individuals and the corporation on this claim, and the employee appealed.

**OVERVIEW:** The employee was a manager who had contact with employees at a call center where the corporation's telephone operators worked. An investigation of a sexual harassment complaint by a call center employee led to such allegations against the employee. Defendant individuals working for the corporation provided documentation regarding the charges and additional concerns about the employee's conduct to defendant individuals working for the employer. The harassment charges led to the employee's suspension and demotion. The court of appeals upheld the district court's decision. The employee contended that the corporation and individuals abused the conditional privilege for defamatory statements because they were motivated by malice and because the information published to the employee's supervisor went beyond the scope of the initial sexual harassment inquiry. However, the employee proffered no evidence whatsoever of actual malevolence on their part. A report included many complimentary statements regarding the employee's work, indicating a lack of malice. Remarks about concerns with the employee's conduct were privileged; they related to the purpose of proper operation of the call center.

**OUTCOME:** The court of appeals affirmed the decision of the district court.

**LexisNexis(R) Headnotes**

*Civil Procedure > Summary Judgment > Burdens of Production & Proof*
*Civil Procedure > Summary Judgment > Summary Judgment Standard*
[HN1] A court of appeals' review of a district court's grant of summary judgment is plenary and the court must affirm summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. The court of appeals reviews the facts in the light most favorable to the non-moving party. That party must, however, point to specific facts demonstrating that a genuine issue exists for trial, and may not rest upon entirely unsupported allegations. *Fed. R. Civ. P. 56(e)*

2002 U.S. App. LEXIS 25269, *

*Torts > Defamation & Invasion of Privacy > Qualified Privileges*
[HN2] Under Pennsylvania law, a publication that might otherwise be defamatory is subject to a conditional privilege if the publisher reasonably believes that the recipient shares a common interest in the subject matter and is entitled to know. The privilege may, however, be waived by abuse, which occurs when a publication of misinformation: (1) is actuated by malice or negligence; (2) is made for a purpose other than that for which the privilege is given; (3) is made to a person not reasonably believed to be necessary for the accomplishment of the purpose of the privilege; or (4) includes defamatory matter not reasonably believed to be necessary for the accomplishment of the purpose.

*Torts > Defamation & Invasion of Privacy > Qualified Privileges*
[HN3] Under Pennsylvania defamation law, although a conditional privilege may be forfeited if the author of the defamatory communication is motivated solely by spite or ill-will against the plaintiff and not by a desire to benefit a common legitimate objective through full disclosure, where the defendant reasonably believes in the necessity of the communication, his or her remarks remain subject to the privilege.

*Torts > Defamation & Invasion of Privacy > Qualified Privileges*
[HN4] Under Pennsylvania defamation law, a court will uphold a conditional privilege where the evidence fails to demonstrate as a matter of law that the publication resulted from intentional, reckless, or wanton conduct and was not a good faith judgment.

*Torts > Defamation & Invasion of Privacy > Qualified Privileges*
[HN5] Under Pennsylvania defamation law, there is no abuse of a conditional privilege in the communication of possible misconduct to those with an employment interest in the plaintiff's activities, who were entitled to know of the defendant's suspicions.

**COUNSEL:** For William R. Howard, Appellant: Andrew J. Ostrowski, Harrisburg, PA.

For Karen Deklinski, Gary Smith, John Dunn, Roger Fickes, Department of Conservation and Natural Resources, Appellees: Linda S. Lloyd, Office of Attorney General of Pennsylvania, Harrisburg, PA.

For John Connolly, Susan Wertz, Abilitech Inc, Appellees: Kimberly A. Boyer, Marshall, Dennehey, Warner, Coleman & Goggin, Philadelphia, PA. Robert G. Hanna, Jr., Marshall, Dennehey, Warner, Coleman & Goggin, Harrisburg, PA.

**JUDGES:** Before: SLOVITER, FUENTES, Circuit Judges and FULLAM, * District Judge.

> * Hon. John P. Fullam, Senior Judge, United States District Court for the Eastern District of Pennsylvania, sitting by designation.

**OPINIONBY:** Dolores K. Sloviter

**OPINION:**

OPINION OF THE COURT

SLOVITER, Circuit Judge.

The appellant, William R. Howard, brought this action under [*2] *42 U.S.C. § 1983,* asserting, among others, a claim of defamation regarding communications from Defendants John Connolly, Susan Wertz and Abilitech, Inc. (hereafter "the Abilitech Defendants") to Howard's employer, the Pennsylvania Department of Conservation and Natural Resources (hereafter "the DCNR"). On April 11, 2001, the District Court granted a motion to dismiss all counts against the Abilitech Defendants excepting the state law defamation claim. On October 4, 2001, after determining that Howard failed to establish a question of material fact, the District Court granted summary judgment for the Abilitech Defendants on the remaining claim. See Memorandum and Order, Howard v. Deklinski, Civ. No. 00-1649 (M.D. Pa. Oct. 4, 2001). That Order is the subject of this appeal.

Howard asserts, as he did before the District Court, that the Abilitech Defendants abused the conditional privilege by which the communications were otherwise protected because those Defendants were motivated by malice and because the information conveyed went beyond that relevant to the investigation of sexual harassment which was the genesis of the inquiry into Howard's conduct. [*3] Because we conclude that the District Court correctly applied the law, and that there are no genuine issues of material fact as to either the existence of malice or the Abilitech Defendants' exceeding the scope of the conditional privilege, we will affirm.

I.

In 1998 and 1999, Howard was employed by the DCNR as a manager in the Bureau of State Parks and served as project manager for the State Park Reservation and Revenue System. His responsibilities necessitated interaction with the employees at a park system reserva-

tions call center staffed by the Pennsylvania Institute for the Blind and Handicapped, pursuant to its contract with the DCNR. Abilitech, as subcontractor, employed disabled individuals to serve as telephone operators at the call center.

In September 1999, Defendant Susan Wertz, an Abilitech employee and office manager of the call center, received a sexual harassment complaint from a female employee at the call center regarding Jiles Clugh, a male employee. In the course of her investigation of the complaint, Wertz learned that Howard was present during and participated in some alleged incidents of sexual harassment. She reported her findings, including specific [*4] allegations against Howard made by the employees interviewed, to her supervisor, Defendant John Connolly. Connolly then met with Howard's immediate supervisor at the DCNR, Defendant Gary Smith, and provided him with Wertz's report as well as a supplemental document prepared by Connolly. This supplemental document included additional concerns regarding Howard's conduct while at the call center, including unprofessional behavior and possible inebriation, as well as concerns regarding his participation in incidents of sexual harassment. Following an investigation by the DCNR, Howard was notified that based on his participation "in a pattern of sexual misconduct/sexual harassment directed at female employees at the Abilitech call center," he was being suspended for five days and demoted. Howard appealed the disciplinary acts to the State Civil Service Commission which conducted a hearing and concluded that good cause existed for the DCNR's imposition of disciplinary action. Howard then filed this action with the District Court. The District Court concluded that:

> [the Abilitech] Defendants have established, and Plaintiff has conceded, that the communication of information about [*5] Plaintiff by Defendant Wertz to Defendant Connolly and by Defendant Connolly to Commonwealth Defendant Smith was published in the context of a conditionally privileged occasion. Moreover, Plaintiff has failed to raise an issue of fact as to the abuse of the conditional privilege. The information was not actuated by malice or negligence; was not made for a purpose other than that for which the privilege was given; was not made to any persons not reasonably believed to be necessary for the accomplishment of the purpose of the privilege; and did not include defamatory matter not reasonably believed to be necessary for the accomplishment of the purpose. Accordingly, Plaintiff has failed to

raise an issue of fact for trial as to the abuse of a conditional privilege.

Oct. 4, 2001 Memorandum at 13-14. Howard timely appealed the District Court's October 4, 2001 grant of summary judgment regarding his defamation claim against the Abilitech Defendants.

## II.

We exercise jurisdiction under *28 U.S.C. § 1291.* [HN1] Our review of the District Court's grant of summary judgment is plenary and we must affirm summary judgment if there is no genuine issue of material [*6] fact and the moving party is entitled to judgment as a matter of law. See, e.g., *Matczak v. Frankford Candy and Chocolate Co., 136 F.3d 933, 936 (3d Cir. 1997).* We review the facts in the light most favorable to the non-moving party. See *Beers-Capitol v. Whetzel, 256 F.3d 120, 130 n 6 (3d Cir. 2001).* That party must, however, point to specific facts demonstrating that a genuine issue exists for trial, and may not rest upon entirely unsupported allegations. See *Fed. R. Civ. P. 56(e); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)* n1

> n1 See also *id. at 249* (noting that a factual dispute is "genuine" only if there is a sufficient evidentiary basis to allow a reasonable fact finder to return a verdict for the non-moving party). Appellant's assertion that "it is outside the province of a court to decide whether or not a defendant" has abused a conditional privilege reflects a fundamental misunderstanding of the law. See Brief of Appellant at 14.

[*7]

## III.

[HN2] A publication that might otherwise be defamatory is subject to a conditional privilege "'if the publisher reasonably believes that the recipient shares a common interest in the subject matter and is entitled to know.'" *Miketic v. Baron, 450 Pa. Super. 91, 675 A.2d 324, 330 (Pa. Super. 1996)* (quoting *Daywalt v. Montgomery Hosp., 393 Pa. Super. 118, 573 A.2d 1116, 1118 (Pa. Super. 1990))* n2 The privilege may, however, be waived by abuse, which occurs when a publication of misinformation (1) is actuated by malice or negligence; (2) is made for a purpose other than that for which the privilege is given; (3) is made to a person not reasonably believed to be necessary for the accomplishment of the purpose of the privilege; or (4) includes defamatory matter not reasonably believed to be necessary for the ac-

complishment of the purpose. *Elia v. Erie Ins. Exch.*, *430 Pa. Super. 384, 634 A.2d 657, 661 (Pa. Super. 1993)* n3 As discussed above, Howard contends that the Abilitech Defendants abused the conditional privilege because they were motivated by malice and because the information published to his supervisor went beyond the [*8] scope of the initial sexual harassment inquiry. The burden is on the plaintiff to demonstrate that the privilege has been abused. See *42 Pa. Cons. Stat. Ann. § 8343(a)*.

n2 See also *Garvey v. Dickinson College, 763 F. Supp. 796, 798 (M.D. Pa. 1991)* (noting that Pennsylvania courts recognize a conditional privilege which applies if "'the circumstances are such as to lead . . . persons having a common interest in a particular subject matter correctly or reasonably to believe that facts exist which another sharing such common interest is entitled to know'") (quoting *Gaiardo v. Ethyl Corp., 697 F. Supp. 1377, 1383 (M.D. Pa. 1986)), Restatement of Torts (2d) § 596 (1977)*.

n3 For purposes of summary judgment, the District Court proceeded as though the information published constituted misinformation as the parties did not put the question at issue. The Court noted, however, that the presumption did not constitute a binding factual determination.

**IV.**

Howard asserts [*9] that the Abilitech Defendants' communications were motivated by a desire to remove him in an effort to conceal their own mismanagement of the call center and that they conducted their investigation in a biased fashion. He does not contend that the Abilitech Defendants falsely reported the results of the employee interviews or that they had reason to believe that the information conveyed to Howard's supervisor was false or inaccurate. Rather, Howard is apparently relying on the subjective malice which he asserts may be inferred from the Abilitech Defendants' supposed antipathy toward him as a result of alleged disagreement regarding administrative matters.

Howard has proffered no evidence whatsoever of actual malevolence on the part of the Abilitech Defendants. See October 4, 2001 Memorandum at 8-10 (noting that Connolly's report included many complimentary statements regarding Howard's work, indicating a lack of malice, and that Howard fails to identify any incidents of hostility or malice toward him or any basis for inferring that the investigation was biased).

Moreover, [HN3] although the conditional privilege may be "forfeited if the author of the defamatory communication is motivated [*10] *solely* by spite or ill-will against the plaintiff and not by a desire to benefit a common legitimate objective through full disclosure," *Garvey, 763 F. Supp. at 798* (emphasis added), where the defendant reasonably believes in the necessity of the communication, his or her remarks remain subject to the privilege. See id. [HN4] (upholding conditional privilege where evidence failed to demonstrate as a matter of law that the publication "resulted from 'intentional, reckless, or wanton conduct and was not a good faith judgment'") (quoting *Beckman v. Dunn, 276 Pa. Super. 527, 419 A.2d 583, 588 (Pa. Super. 1980)); Beckman, 419 A.2d at 588* (holding that where publication was not excessive in the scope of material communicated or extent of circulation, and was made for a proper purpose, the fact that it may have been inspired, in part, by resentment or indignation at conduct of person defamed does not constitute abuse of the privilege); *Gutman v. TICO Ins. Co., 1998 U.S. Dist. LEXIS 8438, 1998 WL 306502, *7 (E.D. Pa. 1998)* (noting, in discussion of alleged abused of conditional privilege based on malice, that malice "is defined under Pennsylvania's [*11] defamation precedents as 'a wrongful act, done intentionally without cause or excuse'") (quoting *Simms v. Exeter Architectural Prods., Inc., 916 F. Supp. 432, 436 (M.D. Pa. 1996)* (citation omitted)) n4 Compare *Rockwell v. Allegheny Health, Educ. & Research Found., 19 F. Supp. 2d 401, 408-409 (E.D. Pa. 1998)* (finding conditional privilege inapplicable where defendant's statements were not "consistent with the interest related to a conditional privilege" and plaintiff "pled numerous facts demonstrating a systematic and continuous pattern of activity by [defendant] to harm his professional reputation") n5 with *Daywalt, 573 A.2d at 1119* (affirming summary judgment, finding employee failed to demonstrate abuse of conditional privilege where record did not reflect any animus toward employee before incident, defendant "made an effort to ascertain the truth of the matter," and defendant had reasonable cause for believing truth of published allegations).

n4 Cf. *New York Times Co. v. Sullivan, 376 U.S. 254, 279-80, 11 L. Ed. 2d 686, 84 S. Ct. 710 (1964)* (requiring actual malice defined as knowledge of falsity or reckless disregard in order to overcome First Amendment privilege in defamation action brought by public figure); *Buker v. Blake, 1986 U.S. Dist. LEXIS 19213, 1986 WL 11440, * 2 (E.D. Pa. 1986)* ("To show malice [to obviate the conditional privilege] for the purposes of a defamation action, the plaintiff must demonstrate that the defendant made the defamatory

communication with the knowledge that it was false or with reckless disregard of whether it was false.") (citing *Raffensberger v. Moran, 336 Pa Super. 97, 485 A.2d 447, 453 (Pa. Super. 1984))*

[*12]

> n5 The Court concluded that defendant's statements "demonstrated disregard for . . . truthfulness" and that "accordingly [those statements] were beyond the confines of any claims of privilege . . . ." *19 F. Supp.2d at 409*

We therefore agree with the District Court that the evidence raises no disputed issue of material fact as to the presence of malice on the part of the Abilitech Defendants

## V.

Howard alleges that substantial portions of the Abilitech Defendants' report to his supervisor did not concern allegations relevant to charges of sexual harassment and therefore were outside the conditional privilege. However, as the trial court correctly observed, the Abilitech Defendants' privilege extends not only to the purpose of preventing workplace harassment, but also to Abilitech's and the DCNR's shared purpose of ensuring proper operation of the call center in accordance with their contract. n6 Because all of the conduct at issue was alleged to have taken place in the context of Howard's supervision of that operation, and related to Howard's job performance and interaction with other employees, [*13] it is clear that any potentially defamatory information in the reports pertained to that privileged purpose. See *Garvey, 763 F. Supp at 798* (communication to prospective employer, providing fair account of em-

ployment performance, including "account of circumstances which caused [plaintiff] some difficulty and perhaps detracted from his job performance," were "clearly conditionally privileged"); *Daywalt, 573 A.2d at 1118-1119* (finding [HN5] no abuse of privilege in communication of possible misconduct to those with an employment "interest in [plaintiff]'s activities," who were "entitled to know of [defendant]'s suspicions").

> n6 See generally *Miketic, 675 A.2d at 329* (upholding privilege as to communication of incidents involving employee and supervisor, noting that proper occasion giving rise to conditional privilege exists when "(1) some interest of the person who publishes defamatory matter is involved; (2) some interest of the person to whom the matter is published or some other third person is involved; or (3) a recognized interest of the public is involved") (citing *Keddie v. Pennsylvania State Univ., 412 F. Supp 1264 (M.D. Pa 1976)* (citations omitted)). The Miketic Court concluded that the publishers and recipient of communications about the employee's performance shared a common interest giving rise to a conditional privilege. *675 A.2d at 330*

[*14]

## VI.

For the reasons set forth above, we will affirm the decision of the District Court.

/s/ Dolores K. Sloviter

Circuit Judge