## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| RICHARD WILCOXON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| | ) C.A. No.05-524 (SLR) |
| v. | ) |
| | ) **JURY TRIAL DEMANDED** |
| RED CLAY CONSOLIDATED | ) |
| SCHOOL DISTRICT BOARD OF | ) |
| EDUCATION, and JANAY FREEBERY, | ) |
| | ) |
| Defendants. | ) |
| | ) |

## PLAINTIFF'S ANSWERING BRIEF TO DEFENDANT'S MOTION TO DISMISS

MARGOLIS EDELSTEIN
Jeffrey K. Martin, Esquire (DE #2407)
Timothy J. Wilson, Esquire (DE #4323)
MARGOLIS EDELSTEIN
1509 Gilpin Avenue
Wilmington, DE 19806
(302) 777-4680
Attorneys for Plaintiff

Dated: February 10, 2006

# TABLE OF CONTENTS

**Document**                                                            **Page No.**

TABLE OF CITATIONS ……………………………………………………   iii

NATURE AND STAGE OF THE PROCEEDINGS ……………………….   1

SUMMARY OF ARGUMENT ………………………………………...…   1

STATEMENT OF FACTS ……………………………………………..   3

ARGUMENT ………………………………………………………………   17

I.      Standard on a Motion to Dismiss ……………………………...….   17

II.     Plaintiff's First Amendment Claim Must Survive
        Because It Regards a Matter of Public Concern………………………   17

III.    Plaintiff May Properly Raise an Issue of Wrongful………………….   20
        Termination in This Court

IV.     Plaintiff's Claim for Breach of Covenant
        of Good Faith and Fair Dealing is Proper
        Because it is Based Upon His Exercise
        of Free Speech, and Not Solely on Discrimination…………………….   21

V.      Conditional Privilege Does Not Attach
        to Defendant Freebery's Defamatory Statements
        Because She Acted with Malice……………………………………   22

CONCLUSION ……………………………………………………………..   24

# TABLE OF CITATIONS

| <u>Cases</u> | <u>Page No.</u> |
|---|---|
| *Morse v. Lower Merion School District*, 132 F.3d 902, 906 (3rd Cir. 1997) | 17 |
| *Adkins v. Rumsfeld*, 389 F.Supp.2d 579, 584 (D. Del. 2005) | 17, 19 |
| *Golub v. Hilb, Rogal & Hobbs Co.*, 379 F. Supp. 2d 639, 642 (D. Del. 2005) | 17 |
| *Baldassare v. New Jersey*, 250 F.3d 188, 194 (3d Cir. 2001) | 17, 19 |
| *Connick v. Myers*, 461 U.S. 138, 147 – 48 (1983). | 17 |
| *Holder v. City of Allentown*, 987 F.2d 188, 195 (3d Cir. 1993) | 18 |
| *McHugh v. Bd. Of Edu. Of the Milford Sch. Dist.*, 100 F.Supp.2d 231 (D. Del. 2000) | 18 |
| *Connick v. Myers*, 461 U.S. 138, 149 (1983) | 19 |
| *Adkins*, 389 F.Supp.2d at 586 | 19 |
| *Lloyd v. Jefferson,* 53 F.Supp.2d 643, 664 (D. Del. 1999) | 19 |
| *Boyce v. Alexis I. DuPont School Dist.*, 341 F. Supp. 678, 683 (D. Del. 1972) | 20 |
| *McCoy v. Sussex County Vocational-Technical School District*, 1998 De. Ch. LEXIS 171 (Del. Ch. 1998). | 21 |
| *Schuster v. Derocili*, 775 A.2d 1029 (Del. 2001) | 22 |
| *Durig v. Woodbridge Bd. of Educ.*, 1992 Del. Super. LEXIS 404 (Del. Super. 1992) | 22 |
| *Burr v. Atlantic Aviation Corp.*, Del. Supr., 348 A.2d 179, 181 (1975) | 22 |

**Statutes, Acts & Rules**                                                    **Page No.**

42 U.S.C. § 2000e(2) ………………………………………….                           1

14 Del. C. § 1410 …………………………………………………1,10, 14,15,16,20

## NATURE AND STAGE OF THE PROCEEDINGS

Plaintiff, Richard Wilcoxon (hereinafter "Plaintiff" or "Mr. Wilcoxon"), a former teacher at Skyline Middle School in the Red Clay Consolidated School District (hereinafter "Red Clay"), filed this action on July 22, 2005. Against Defendant Red Clay, he alleged violations of his rights under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e(2), the First Amendment to the United States Constitution, discrimination under 14 *Del. C.* § 1410, and a common law claim of breach of the implied covenant of good faith and fair dealing. In addition to his claims against Red Clay, Mr. Wilcoxon also lodged a claim of defamation against Red Clay employee, Defendant Janay Freebery (hereinafter "Ms. Freebery").

Red Clay and Ms. Freebery Answered the Complaint on September 15, 2005 and then filed the present Motion to Dismiss on Counts III, IV, V, and VI. on December 9, 2005. This is Plaintiff's Answering Brief in response.

## SUMMARY OF ARGUMENT

1.     Plaintiff's exercise of free speech was rooted in his concern for the safety of the children for whom Ms. Freebery bore primary responsibility and whom she routinely left unattended. It also pertained to matters of violations of school policy. Finally, it pertained to the wrongdoing and potential breach of trust on the part of another public employee that would be relevant in evaluating that employee's performance. Because these issues are matters of public concern, Mr. Wilcoxon's speech is protected by the First Amendment.

2.     Mr. Wilcoxon's claim for wrongful termination must survive because Defendants failed to give him proper notice of his termination under the Teacher Termination Statute.

3.    In Delaware, a claim for breach of the covenant of good faith and fair dealing is proper when the underlying termination is in retaliation for exercising one's right to free speech guaranteed by the First Amendment to the United States Constitution.

4.    Ms. Freebery's defamatory statements about Mr. Wilcoxon are not protected by a conditional privilege because when making such statements she acted with malice.

## STATEMENT OF FACTS

Unless otherwise indicated, all facts set forth herein are taken directly from the Complaint, as is appropriate on a Motion to Dismiss. Key points will be reiterated in this Statement of Facts, but all the allegations of the Complaint should be considered as incorporated by reference.

Mr. Wilcoxon began working for Defendant Red Clay Consolidated School District at Skyline Middle School in Pike Creek, Delaware in October of 2002.    During the fall and into the winter of 2002, Mr. Wilcoxon team-taught[1] with a long-term substitute who was filling in for a female physical education teacher, Janay Freebery. In early 2003, Ms. Freebery returned to work at Skyline. Ms. Freebery had been out of work the previous fall on sabbatical. After her return, she and Mr. Wilcoxon team-taught some of their Physical Education classes together.

Immediately after her return to work Ms. Freebery was frequently tardy in getting to work and often absent during class time. The extra work and responsibility caused by her absences fell to Mr. Wilcoxon. Initially, Mr. Wilcoxon said nothing to Ms. Freebery or to anyone else regarding her absence from class during the 2002-2003 school year. His silence was due in part to his status as a new teacher. Simply stated, he did not want to rock the boat, nor did he want to come across as someone who was not a team-player.

His silence was also attributable to his sympathy for Ms. Freebery. She had just returned from sabbatical and he knew that she was struggling with her recent divorce and her role as a single mother.    Therefore, he felt that he could carry the burden until Ms. Freebery had a chance to become accustomed to her new roles and responsibilities.    The 2002-2003 school-year ended without incident.

---

[1] Team-teaching is a style of teaching whereby two teachers teach a large group of children a single subject.  The idea behind team-teaching is that the two teachers combined knowledge will provide a more meaningful learning experience for the students.

In the fall of 2003, Mr. Wilcoxon and Ms. Freebery again were scheduled to team-teach. They conducted morning duty[2] at the beginning of each school day and again taught some of their physical education and health classes together. With respect to morning duty, Ms. Freebery arrived late virtually every day. This placed an unfair burden on Mr. Wilcoxon because this required him to supervise two groups of students. There were some mornings during this time that Ms. Freebery did not arrive until morning duty was over.

Ms. Freebery also frequently left their classroom during regular class time. Again, this forced Mr. Wilcoxon to supervise and teach her portion of the class. Essentially, Mr. Wilcoxon was solely responsible for the safety and the supervision a class double the normal size. The proffered reasons for Ms. Freebery's absences were not legitimate reasons for a teacher to leave her class. For instance, she routinely met with boyfriend, Bruce Hannah, at school for breakfast during class time. In addition to inappropriately occurring during class time, these rendezvous were direct violations of the District's policy because Mr. Hannah did not follow proper sign-in procedures. Other reasons that Ms. Freebery gave for being absent from or leaving during the middle of a class was to work on her Master's Degree project or to watch her daughter's swim lessons. There were many times when Ms. Freebery abandoned her class and did not even tell Mr. Wilcoxon that she was leaving – thereby leaving her students with no supervision.

As the weeks progressed, Ms. Freebery's absences continued to increase in frequency and duration. In response, sometime in October 2003 Mr. Wilcoxon explained to Ms. Freebery how unfair he thought it was for her to continually impose the responsibilities of the class on him and that he would appreciate it if she would show up on time and stay in the class as she was required.

---

[2] In addition to teaching their regularly scheduled classes, each teacher is assigned a morning duty. Mr. Wilcoxon and Ms. Freebery's assignment was to run the Student Leader Program.

4

Shortly after this conversation, other teachers at the school began to tell Mr. Wilcoxon that Ms. Freebery was spreading a rumor to the staff and administration that he was difficult to work with. Concerned with Ms. Freebery's motives, as well as the safety of the children who were supposed to be under Ms. Freebery's supervision, Mr. Wilcoxon sought advice from two senior members of the teaching staff, Linda Filer ("Ms. Filer") and Tom Karpinski ("Mr. Karpinski"), regarding a course of action for him to take with respect to Ms. Freebery's absences from class.

Ms. Filer and Mr. Karpinski counseled Mr. Wilcoxon to keep a written journal of times and dates of Ms. Freebery's absences and other pertinent information about Ms. Freebery's actions and inactions. Mr. Wilcoxon hoped that such a record could protect him in the event that one of Ms. Freebery's students was injured while she was absent from class and in response the District would seek to impose discipline upon Mr. Wilcoxon in response. Mr. Wilcoxon took his mentors' advice and began to record Ms. Freebery's absences and actions in a journal which he kept locked in his office.

On December 15, 2003, Mr. Wilcoxon was ill and reported off from work. During his absence, Frank Rumford ("Mr. Rumford"), acting Assistant Principal and close friend of Ms. Freebery, entered Mr. Wilcoxon's locked office, went into his desk and removed the journal containing the documentation of Ms. Freebery's actions and absences. Mr. Rumford then turned the journal over to Ms. Freebery, who in turn gave it to her close friend, the Acting Principal of Skyline Middle School, Janet Basara ("Ms. Basara").

Mr. Rumford telephoned Mr. Wilcoxon at home and informed him that he had gone into his office in an effort to locate Mr. Wilcoxon's student list for Mr. Wilcoxon's substitute. Mr. Rumford reported that he did not find the student list but did find the journal. Mr. Rumford claimed that he did not read the journal and simply turned it over to Ms. Freebery, ostensibly so she

5

could determine if it was information that would be helpful to Mr. Wilcoxon's substitute. Mr. Rumford's justification for going into Mr. Wilcoxon's locked office is dubious due to the fact that Mr. Rumford had access to Mr. Wilcoxon's student list on his own computer.

Up until this point in his career, Mr. Wilcoxon had never had a bad performance review and had never been subject to any discipline. Mr. Wilcoxon returned to work the next day, December 16, 2003. During his scheduled planning period, he left school to run an errand. When he returned, he found a Post-it note in the teachers' sign-out book stating, "Rich, Janet [Basara] needs to see you." The note was in Ms. Freebery's handwriting. Mr. Wilcoxon promptly went to see Ms. Basara.

The topic of this meeting with Ms. Basara was the journal that had come into Ms. Basara's possession via her close personal friends, Frank Rumford and Janay Freebery. Mr. Wilcoxon explained to Ms. Basara his reasons for keeping the journal. However, instead of indicating that she would investigate Ms. Freebery's tardiness and absences from class, Ms. Basara verbally reprimanded *Mr. Wilcoxon*. In addition, Ms. Basara demanded to know who advised Mr. Wilcoxon to keep the journal. She stated that she needed this information to conduct an investigation. Fearing that Ms. Basara would retaliate against his mentors, Mr. Wilcoxon revealed only Ms. Filer's name to prevent being accused of insubordination. Later that day, Ms. Filer and Mr. Wilcoxon met with Mr. Rumford to ensure that Mr. Rumford would not reveal to Ms. Freebery Ms. Filer's role as advisor to Mr. Wilcoxon. Ms. Filer threatened to file a complaint with Mr. Orga if her name was revealed.

On December 17, 2003, Ms. Basara called Mr. Wilcoxon into her office for a meeting. The purpose of the meeting was to attempt to coerce Mr. Wilcoxon to reveal who had advised him to record Ms. Freebery's absences. During the meeting, in an apparent attempt to get Mr. Wilcoxon

to tell her who advised him to keep the journal, Ms. Basara told Mr. Wilcoxon all the different ways that she and Ms. Freebery could find out this information. Ms. Basara also made the comment that they needed to have another meeting to determine how Mr. Wilcoxon and Ms. Freebery could finish the rest of this school year working together. Mr. Wilcoxon questioned why she limited her statement to "the rest of this school year." Ms. Basara replied, "You're not tenured are you?" Mr. Wilcoxon took this as a direct threat to his career and understood it to mean that he had better not pursue this matter any further.

Later that day, Mr. Wilcoxon was unexpectedly called into another meeting. In attendance were Ms. Freebery, Mr. Rumford, and Ms. Basara. During this meeting Ms. Freebery took control and repeatedly demanded to know the identities of the individuals who advised him to keep the journal. Again, Mr. Wilcoxon refused to reveal them. After asking Mr. Wilcoxon this question four separate times, and in apparent realization that she was not going to get an answer, Ms. Freebery falsely accused Mr. Wilcoxon of making inappropriate comments to her and threatened to file a sexual harassment complaint against him. Mr. Wilcoxon steadfastly denied any and all inappropriate statements. Ms. Freebery's accusations about Mr. Wilcoxon were false and made with malice, they were publicized to third parties, it regarded and damaged Mr. Wilcoxon's personal and professional reputation, and ultimately he suffered financial damages by virtue of being terminated from his employment.

Article 4:4.1 of the collective bargaining agreement between the District and the Red Clay Education Association Affiliate of NCCEA-DSEA-NEA, Inc. ("collective bargaining agreement"), holds in pertinent part:

> If an employee is required to appear before the Board or an agent thereof concerning a matter which could adversely affect his/her continued employment, salary or any increments, he/she will be given *prior written notice and specific reasons for such meeting or*

> *interview at least forty-eight (48) hours in advance*. Any topic not
> included in the letter will not be covered at said meeting unless
> agreed to by the employee; if not agreed it will be discussed at a later
> date after proper notice has been given. The employee will also be
> *notified in writing of any additional persons who will be present*.
> An employee required to appear in this instance will be *entitled to
> have an Association representative of his/her choice present* to
> advise and to represent him/her during such meeting or interview . . .
> . (emphasis added).

This December 17, 2003 meeting was held in direct contravention of the collective
bargaining agreement in that Mr. Wilcoxon was not given forty-eight hours notice of the meeting;
not informed in writing of the specific reason for the meeting; not informed in writing of the
individuals who would be in attendance at the meeting; and, not permitted to have an Association
representative of his/her choice present to advise and to represent him during the meeting.
Because the meeting violated the terms of the collective bargaining agreement any subsequent
disciplinary actions based upon that which occurred at the meeting should have been prohibited.

Mr. Wilcoxon was very troubled by Ms. Freebery's false statements. So much so that after
school concluded that day, Mr. Wilcoxon again met with Mr. Rumford and Ms. Basara to make a
complaint about her false accusations and threats against him. He related that Ms. Freebery had
*never* expressed any concern over *anything* that Mr. Wilcoxon had said to her prior to her
knowledge that he was keeping the journal – suggesting that this was her way of getting back at
him. He then asked what it was that he allegedly said that had offended Ms. Freebery. He got no
answer. In fact, both Mr. Rumford and Ms. Basara indicated that Ms. Freebery was not
uncomfortable with anything that Mr. Wilcoxon had said until the journal was found. Ms. Basara
assured Mr. Wilcoxon that he was not in any sort of trouble and that Ms. Freebery's accusations
were not a formal complaint.

Mr. Wilcoxon informed Ms. Basara that Ms. Freebery brought up the topic of sex routinely in the course of conversation with Mr. Wilcoxon. He related exact stories that he could not possibly have known without Ms. Freebery telling him. Ms. Freebery received no reprimand or discipline of any sort.

On January 22, 2004, Mr. Wilcoxon received a letter in his school mailbox at 11:30 a.m. stating that he needed to report to Ms. Basara's office after school for a meeting – essentially giving Mr. Wilcoxon three hours notice of the meeting... There was no mention of the topic of the meeting or any other persons who would be present at the meeting. After receiving this notice, Mr. Wilcoxon asked Ms. Basara if the topic of the meeting warranted union representation. She responded that "it might." Mr. Wilcoxon contacted both of the union representatives who worked in his building and requested that they attend the meeting with him, but because of the short notice they were unable to attend the meeting.

Mr. Wilcoxon notified Ms. Basara of his inability to secure union representation. She responded that he was to attend the meeting without representation because she had already arranged for other individuals to be present at the meeting. This was the first time that Mr. Wilcoxon was notified that other individuals would be present. The other individuals who were in attendance were Frank Rumford and Bob Bartoli.

At this January 22, 2004 meeting, contrary to Ms. Basara's prior assurances during the meeting of December 17 2003 that Mr. Wilcoxon was not in trouble, she presented Mr. Wilcoxon with a disciplinary letter that concluded that he had made inappropriate comments about Ms. Freebery. Because Mr. Wilcoxon disagreed with the conclusions in the letter, Mr. Wilcoxon refused to sign it. He then informed Ms. Basara that before the meeting proceeded any further, he

9

wanted to have a union representative present. Ms. Basara refused his request and instructed him
not to leave until he received two other disciplinary letters.

The second letter imposed on Mr. Wilcoxon during the January 22, 2004 meeting alleged
that his emergency lesson plans[3] did not include a class list or bell schedule. However, when he
requested to see the emergency lesson plan so that they could specifically show him its
shortcomings, he was told that they did not have them. The third letter given to Mr. Wilcoxon
during the January 22, 2004 meeting concluded that he did not sign up for after school bus duties
and, as a result, other teachers and administrators had to make up for his absences. However,
anytime that Mr. Wilcoxon missed the 10:00 a.m. deadline to sign up, either he would call himself
or ensure that another teacher called the bus company personally to make sure the students had a
ride home.

On January 7, 2004 a female teacher made an error signing up for bus duty, for the after-
school activity busses, and as a result, numerous students were crowded onto buses and there was a
lot of concern that the students would not all fit on the busses. Unlike Mr. Wilcoxon, this teacher
was given no discipline for her error. This meeting was held in direct contravention of the
collective bargaining agreement in that Mr. Wilcoxon was not given forty-eight hours notice of the
meeting; not informed in writing or otherwise of the specific reason for the meeting; not informed
in writing or otherwise of the individuals who would be in attendance at the meeting; and, not
permitted to have an Association representative of his choice present to advise and to represent him
during the meeting. Because the January 22, 2004 meeting violated the terms of the collective
bargaining agreement, the disciplinary letters were not "properly placed" in Mr. Wilcoxon's

---

[3] These are plans the teacher creates but stores in the main office in case the teacher is unable to come to school for
some emergency reason. They include instructions on everything a substitute would need to know to run the teacher's
class in his or her absence.

personnel file and therefore could not be used as a basis for any termination of Mr. Wilcoxon's employment according to 14 *Del. C.* § 1410.

These disciplinary letters were given to Mr. Wilcoxon in retaliation for exercising his First Amendment right to free speech in keeping the journal and for making a valid workplace complaint to Ms. Basara that Ms. Freebery had lodged a false complaint of sexual harassment against him. Based upon her actions and the surrounding factual circumstances, Ms. Basara was laying the groundwork to terminate Mr. Wilcoxon.

Shortly after this meeting, Mr. Wilcoxon called Anthony Orga ("Mr. Orga"), Director of Secondary Education for the District, to set up a meeting to discuss his concerns about how he was being treated at Skyline Middle School. The meeting took place on February 25, 2004. During the meeting Mr. Wilcoxon informed Mr. Orga of everything that had happened that year with Ms. Basara, Ms. Freebery and Mr. Rumford and the unfair treatment that he was receiving at Skyline. Mr. Wilcoxon also wrote Mr. Orga a number of letters regarding the same topics. Mr. Orga never responded to Mr. Wilcoxon on this issue.

Prior to his December 17, 2003 meeting, Ms. Perez contacted Mr. Rumford regarding the organization of a student-teacher basketball game. Mr. Rumford asked Mr. Wilcoxon to return her call and work with her to organize the game. In response, Mr. Wilcoxon made the initial contact with Ms. Perez to get the effort started. Then the issue with the journal arose and Mr. Wilcoxon heard nothing further about the event.

On January 29, Mr. Wilcoxon received a memo in his box, addressed to all of the staff, from Mr. Rumford, Ms. Freebery and Ms. Basara regarding the upcoming game. Ms. Freebery was not one of the original faculty members contacted. When Mr. Wilcoxon questioned Ms. Basara why he had been replaced on the organizing team by Ms. Freebery, Ms. Basara responded that

there had been just "too many hands in the soup" and he could still help with the game if he wanted to do so.

Because nobody in the District was responding to his concerns, and with nowhere else to turn, Mr. Wilcoxon filed a Charge of Discrimination, alleging gender discrimination, with the Department of Labor on February 22, 2004. Upon information and belief, the District became aware of Mr. Wilcoxon's filing with the Department of Labor in mid to late March 2004.

On April 21, 2004, Ms. Basara entered Mr. Wilcoxon's classroom and informed him that she was going to conduct an unannounced observation.[4] This was the first time that Ms. Basara had spoken to Mr. Wilcoxon in over a month – presumably since she was notified of his filing with the Department of Labor. Had Mr. Wilcoxon had any advanced warning that he was going to be subject to an observation, he would have objected to Ms. Basara conducting the observation due to her animus toward him.

Immediately after the observation, Mr. Wilcoxon called Mr. Orga because he felt that Ms. Basara's objectivity was tainted due her knowledge that Mr. Wilcoxon had filed a Charge of Discrimination against the District – due in large part to Ms. Basara's own actions, and also due to her expressed anger over Mr. Wilcoxon keeping the journal. The result of the observation was overwhelmingly negative. This was the first negative observation that Mr. Wilcoxon had ever received.

Ms. Basara's unannounced observation and the corresponding poor review of his effectiveness was conducted in retaliation against Mr. Wilcoxon for filing his Charge of

---

[4] An observation is where an administrator observes a class noting the teacher's effectiveness and the students' responses. Based upon these observations, the administrator makes a subjective determination if the teacher is effective or not. If the teacher is deemed not effective he or she is put on an Individual Improvement Plan designed to correct the alleged deficiencies. If the teacher does not meet the Individual Improvement Plan, he or she can be terminated. There are two types of observations: announced and unannounced. An announced observation is where the teacher is aware beforehand that he or she will be observed and the teacher and administrator meet ahead of time to discuss the lesson plan and activities. An unannounced observation is where the administrator shows up at the teacher's classroom with no advanced notice or preliminary discussion with the teacher to be observed.

Discrimination with the Department of Labor, for his workplace complaints to Mr. Orga, for exercising his First Amendment right to free speech and for making a workplace complaint to Ms. Basara that Ms. Freebery had lodged a false complaint of sexual harassment against him. Based upon her actions and the surrounding factual circumstances, Ms. Basara was laying the groundwork to terminate Mr. Wilcoxon.

Having not heard back from Mr. Orga, Mr. Wilcoxon wrote another letter to him communicating his misgivings about Ms. Basara's objectivity and carbon copied the Superintendent of the District. He requested that the letter be stricken from his personnel file. Mr. Orga responded that there was no evidence that Ms. Basara had done anything improper and therefore, the poor observation would remain in his personnel records.

On May 5, 2004, Ms. Basara called Mr. Wilcoxon into another surprise meeting. This time, in an effort to give an illusion of fairness, Ms. Basara had taken the liberty of securing union representation for Mr. Wilcoxon.    She had retained the services of Tom Meade, a union representative who also happened to be a friendly associate of Ms. Basara. This individual was present to act ostensibly on Mr. Wilcoxon's behalf. He was not chosen by Mr. Wilcoxon.

The disciplinary letter that Mr. Wilcoxon received at this meeting addressed a situation where Mr. Wilcoxon had allegedly failed to secure a small sum of money properly and the money was stolen out of his desk. Two other female teachers, Patty Root and Marilyn Morgan, also failed to secure money and had it stolen from their desks during this same school year, but neither received a disciplinary letter.

This meeting was held in direct contravention of the collective bargaining agreement in that Mr. Wilcoxon was not given forty-eight hours notice of the meeting; informed in writing or otherwise of the specific reason for the meeting; informed in writing or otherwise of the individuals

13

who would be in attendance at the meeting; and, was not permitted to have an Association representative *of his choice* present to advise and to represent him during the meeting. Because the meeting violated the terms of the collective bargaining agreement, the disciplinary letters were not "properly placed" in Mr. Wilcoxon's personnel file and therefore could not be used as a basis for any termination of Mr. Wilcoxon's employment according to 14 *Del. C.* § 1410.

The May 5, 2004 meeting that was held, and the letter that was given to Mr. Wilcoxon was discriminatory against Mr. Wilcoxon based upon his gender and was in retaliation for filing his Charge of Discrimination with the Department of Labor, for his workplace complaints to Mr. Orga, for exercising his First Amendment right to free speech and for making a workplace complaint to Ms. Basara that Ms. Freebery had lodged a false complaint of sexual harassment against him. Based upon her actions and the surrounding factual circumstances, Ms. Basara was laying the groundwork to terminate Mr. Wilcoxon.

On May 11, 2004 a union representative contacted Mr. Wilcoxon to inform him that he was to meet once again with Mrs. Basara, *that day.* At this meeting, Mr. Wilcoxon was given another disciplinary letter. The letter stated that Plaintiff's lesson plans were inappropriate. Ms. Freebery, a female, used the very same lesson plans as did Mr. Wilcoxon. However, her lesson plans were not deemed inappropriate and she received no negative consequences for her lesson plans. Other female teachers at Skyline Middle School, including an unnamed female teacher and Linda Filer have never had the lesson plans reviewed.

Again, this meeting was held in direct contravention of the collective bargaining agreement in that Mr. Wilcoxon was not given forty-eight hours notice of the meeting; not informed in writing or otherwise of the specific reason for the meeting; and, not permitted to have an Association representative *of his choice* present to advise and to represent him during the meeting. Because the

May 11, 2004 meeting was held in violation of the collective bargaining agreement, the disciplinary letters were not "properly placed" in Mr. Wilcoxon's personnel file and therefore could not be used as a basis for any termination of Mr. Wilcoxon's employment according to 14 *Del. C.* § 1410. This meeting was held, and the disciplinary letter that given to Mr. Wilcoxon were discriminatory against Mr. Wilcoxon based upon his gender and was in retaliation for filing his Charge of Discrimination with the Department of Labor, for his workplace complaints to Mr. Orga, for exercising his First Amendment right to free speech and for making a workplace complaint to Ms. Basara that Ms. Freebery had lodged a false complaint of sexual harassment against him.

Contrary to this meeting was the fact that Mr. Wilcoxon earned a grade of "exemplary" for instructional planning on his Performance Appraisal for 2003. Based upon her actions and the surrounding factual circumstances, Ms. Basara was continuing to lay the groundwork to terminate Mr. Wilcoxon.

On May 14, 2004, Mr. Wilcoxon was again called into Ms. Basara's office, where once again, Ms. Basara had taken the liberty of securing union representation for Mr. Wilcoxon. Hence this individual was not a representative of Mr. Wilcoxon's choosing. Mr. Wilcoxon objected to the meeting because he had not been given forty-eight hours notice but Ms. Basara proceeded with the meeting regardless. Ms. Basara handed Mr. Wilcoxon a letter stating that the District would not renew his contract for the ensuing school year.

At that point, Mr. Wilcoxon requested the reasons for the non-renewal. In response, he was sent a letter dated May 18, 2004 stating that he was terminated because of poor lesson plans, poor classroom management and for making inappropriate comments. However, at the Non-Renewal Hearing, July 28, 2004, Dr. Andrzejewski acknowledged that two of the reasons should not be

considered because there was no conclusive evidence of inappropriate comments or poor lesson plans.

Once again, this May 14 meeting was held in direct contravention of the collective bargaining agreement in that Mr. Wilcoxon was not given forty-eight hours notice of the meeting; not informed in writing or otherwise of the specific reason for the meeting; not informed in writing or otherwise of the individuals who would be in attendance at the meeting; and, not was not permitted to have an Association representative of his/her choice present to advise and to represent him during the meeting. Because this meeting violated the terms of the collective bargaining agreement, the termination has no effect and is therefore a nullity. 14 *Del. C.* § 1410.

Mr. Wilcoxon's termination violated 14 *Del. C.* § 1410 because the termination was based upon information not "properly placed" in Mr. Wilcoxon's personnel file prior to the notice of termination. The termination of Mr. Wilcoxon was conducted was discriminatory against Mr. Wilcoxon based upon his gender and was in retaliation for filing his Charge of Discrimination with the Department of Labor, for his workplace complaints to Mr. Orga, for exercising his First Amendment right to free speech and for making a workplace complaint to Ms. Basara that Ms. Freebery had lodged a false complaint of sexual harassment against him.

On June 9, 2004, Mr. Wilcoxon filed another Charge of Discrimination with the Delaware Department of Labor alleging that he had been retaliated against for filing his original Charge of Discrimination. Contrary to one of the stated reasons for his termination, "poor classroom management," on June 10, 2004, Mr. Wilcoxon received his yearly performance appraisal and was given an "effective" rating for his classroom management.

But for his unlawful termination at the close of the 2003 – 2004 school-year, Mr. Wilcoxon would have become a tenured school teacher in October 2004.

## ARGUMENT

### I.     Standard on a Motion to Dismiss

On a motion to dismiss, this Court is required to accept as true all of the allegations in the Complaint and all reasonable inferences that can be drawn therefrom, and view them in the light most favorable to Mr. Wilcoxon. *Morse v. Lower Merion School District*, 132 F.3d 902, 906 (3rd Cir. 1997). For the motion to dismiss to be granted, it must appear to a certainty that no relief could be granted under any set of facts which could be proved. *Morse*, 132 F.3d at 906. "The burden of demonstrating that the plaintiff has failed to state a claim upon which relief may be granted rests on the [defendant]." *Adkins v. Rumsfeld*, 389 F.Supp.2d 579, 584 (D. Del. 2005). The allegations in the Complaint must be accepted as true and all reasonable inferences must be drawn in the plaintiff's favor. *Golub v. Hilb, Rogal & Hobbs Co.*, 379 F. Supp. 2d 639, 642 (D. Del. 2005).

### II.     Plaintiff's First Amendment Claim Must Survive Because It Regards a Matter of Public Concern

"Public employers cannot silence their employees simply because they disapprove of the content of their speech. *Baldassare v. New Jersey*, 250 F.3d 188, 194 (3d Cir. 2001). Public employees have "a constitutional right to speak on matters of public concern without fear of retaliation." *Id.* Whether or not the employee's speech is a matter of public concern is ascertained by examining the "content, form, and context of a given statement." *Connick v. Myers*, 461 U.S. 138, 147 – 48 (1983). "A public employee's speech involves a matter of public concern if it can be fairly considered as relating to any matter of political, social or other concern to the community." *Adkins*, 389 F.Supp.2d at 586 (quoting *Baldassare*, 250 F.3d at 195). "The content of the speech may involve a matter of public concern if it attempts to bring to light actual or potential wrongdoing or breach of public trust on the part of government officials." *Baldassare*, 25 F.3d at

195 (quoting *Holder v. City of Allentown*, 987 F.2d 188, 195 (3d Cir. 1993)) (internal quotations omitted).

In *McHugh v. Bd. Of Edu. Of the Milford Sch. Dist.*, 100 F.Supp.2d 231 (D. Del. 2000), a case very similar to that which is presently before the Court, Plaintiff was the Supervisor of Transportation/Visiting Teacher at Milford School District. He conducted various investigations into bus driver safety issues and the award of the bus driving contracts for the school district. Following his investigations, he forwarded the information to the Superintendent of the School Board. The two members of the school board delayed taking any action on the allegations.

In response, plaintiff brought charges of official misconduct against the two school board members before the school board. Shortly thereafter plaintiff's contract was not renewed. Plaintiff filed suit claiming *inter alia*, that his First Amendment rights had been violated by the district's retaliation against him and that the district had also violated the covenant of good faith and fair dealing by those same actions. Defendants filed a motion for summary judgment based upon, among other things, that plaintiff's speech was not a matter of public concern.

The Court found that plaintiff's speech concerned three primary issues: the safety of the bus driving services provided by the outside contractor, the alleged misconduct of the two school board members for not disciplining the contractor, and the distribution of bus routes between contractors. Defendant contended that these communications were motivated by self-interest as opposed to public concern and therefore were not protected speech. The Court concluded that plaintiff's "statements were addressed to issues of student safety, public officials' alleged malfeasance, and School Board policies, all of which are clearly matters of public concern." *Id.* at 240.

Similarly, in this case, Mr. Wilcoxon's statements contained in his journal pertained to the safety of the children who were being left unattended due to Defendant Freebery's absences,

violations of school policy, as well as misconduct by Defendant Freebery, another public employee. (Compl. at ¶¶ 12 – 17). Like the holding in *McHugh*, these are matters of public, not private concern. These issues are "matters of interest to the community upon which it is essential that public employees be able to speak out freely without fear of retaliatory dismissal." *McHugh,* 100 F.Supp.2d at 241 (quoting, *Connick v. Myers*, 461 U.S. 138, 149 (1983). Moreover, Mr. Wilcoxon's speech related to matters of social and other concern to the community, *Adkins*, 389 F.Supp.2d at 586, namely the safety of the children and the proper functioning of the Skyline Middle School.

While there may have been some motivation and personal interest on Mr. Wilcoxon's part to keep the journal to protect himself in the event of an injury to one of Ms. Freebery's students, the motivation of the employee is not dispositive on the issue as to whether the speech pertained to matters of public concern. *Lloyd v. Jefferson,* 53 F.Supp.2d 643, 664 (D. Del. 1999). Here there is no question that in spite of any alleged personal interest, the subject matter of the speech squarely related to matters of public concern.

The Motion to Dismiss does not address the second condition identified: "the value of the employee's speech must outweigh the government's interest in the effective and efficient fulfillment of its responsibilities to the public." (Def.'s Op. Br. at 8). As a consequence, Mr. Wilcoxon bears no duty to respond herein. Furthermore, any attempt by Defendants to address this prong is improper on their Reply Brief.

**III.    Plaintiff May Properly Raise an Issue of Wrongful Termination in This Court**

Mr. Wilcoxon may properly present his claim for wrongful termination with this Honorable Court. Defendants base their argument that this claim must be dismissed based upon 14 *Del. C.* § 1410 which states:

> A teacher who has not completed 3 years of service in the State and/or has not completed 2 years in the employ of the terminating board [a non-tenured teacher] may, within 7 days of receiving notice of intention to terminate services, request in writing, the reasons(s) for such notice. The board will provide such reasons(s) in writing and a copy of this chapter no later than 5 days after receipt of such a request, provided that the state reason(s) must have either been contained in the teacher's performance appraisal, *and the teacher was provided time to correct any deficiency through an individualized improvement plan or other documented materials properly placed in the teacher's personnel file prior to said notice.* (emphasis supplied)

Red Clay failed to adhere to this statute because the information upon which Mr. Wilcoxon's termination is based was not "properly placed" in his personnel file prior to said notice. In fact, the information was *never* properly placed in his file. (Compl. at ¶¶ 40, 58, 65, 73, and 90).

Defendants attempt to assert that the only procedure due a non-tenured teacher is a conference with the superintendent. "By implication, unless a teacher receives a notice conformable to the statute, his employment must be continued the following year." *Boyce v. Alexis I. DuPont School Dist.*, 341 F. Supp. 678, 683 (D. Del. 1972). Here, Mr. Wilcoxon did not receive notice conformable to the statute. Simply put, the materials were not properly placed in Mr. Wilcoxon's file; therefore he did not receive proper notice.

The conference with the superintendent that Defendants assert is Mr. Wilcoxon's only recourse presumes that notice is proper and only goes to examine the *substantive* reasons for termination. Importantly, such a conference would not address conformity with the notice provisions of the statute.

In fact, the Delaware Chancery Court considered a case very similar to the case *sub judice.* There, a *non-tenured teacher* was terminated for violations which, just like in Mr. Wilcoxon's case, were not properly placed in her personnel file. *McCoy v. Sussex County Vocational-Technical School District*, 1998 De. Ch. LEXIS 171 (Del. Ch. 1998). The Plaintiff in that case, again much like Mr. Wilcoxon, received the reprimand letters at meetings for which she was not given timely notice and without union representation, i.e., the letters were not properly placed. In granting Plaintiff's motion for summary judgment, the Court held, "[i]t is axiomatic that a reprimand letter found to be invalidly issued and, therefore, ordered rescinded cannot be considered "properly placed" in a teacher's personnel file and relied upon to support a decision to terminate the teacher's employment contract." *Id.* at *14.

Significant to the present case is that the McCoy case establishes that where a board violates the statute itself, a non-tenured teacher *is* entitled to file a lawsuit. Otherwise, there would be no accountability for the board and it would have no reason to follow any procedures set forth in the statute. Stated differently, without the ability to file a lawsuit, a school board would be given free rein to terminate teachers in violation of the statute.

IV. **Plaintiff's Claim for Breach of Covenant of Good Faith and Fair Dealing is Proper Because it is Based Upon His Exercise of Free Speech, and Not Solely on Discrimination**

Mr. Wilcoxon's claim for breach of covenant of good faith and fair dealing is based upon two separate claims: discrimination and First Amendment free speech. Here, Defendants cite to a 2005 Third Circuit case wherein it appears as if such a common law claim may no longer attach to a discrimination claim. However, the case and statutory law bear no similar abrogation of such rights when a Plaintiff brings a breach of covenant of good faith and fair dealing in the context of retaliation for exercising his right to free speech under the First Amendment. That is exactly the

basis of Mr. Wilcoxon's claim. (See, Compl. at ¶¶ 41, 52, 59, 66, 74, and 87). Hence with respect to his retaliation claim for violating his right to Free Speech, *Schuster v. Derocili,* 775 A.2d 1029 (Del. 2001) is still good law.

**V.     Conditional Privilege Does Not Attach to Defendant Freebery's Defamatory Statements Because She Acted with Malice**

Defendants' final argument is that Mr. Wilcoxon's defamation claim against Defendant Freebery must be dismissed because she did not abuse her conditional privilege.   "Once a conditional privilege has been established, it must be exercised with good faith, without malice and absent any knowledge of falsity or desire to cause harm." *Durig v. Woodbridge Bd. of Educ.*, 1992 Del. Super. LEXIS 404 (Del. Super. 1992) (quoting, *Burr v. Atlantic Aviation Corp.*, Del. Supr., 348 A.2d 179, 181 (1975)) (internal quotations omitted).   Here, the Complaint alleges that Defendant Freebery made her defamatory remarks about Mr. Wilcoxon with malice. (Compl. at ¶ 27).   Furthermore, given the circumstances – that Ms. Freebery had never made the allegations previously, in conjunction with the fact that that Mr. Wilcoxon had just revealed the specifics of months of Defendant Freebery's teaching malfeasance and wrongful conduct to her superiors – implicates the very real inference that Freebery's statements were in fact made with malice.   In other words, at the time Freebery made the statements she bore significant ill-will toward Mr. Wilcoxon and possessed an intent to injure him.   As a consequence, Defendant Freebery abused the conditional privilege and therefore it does not apply.

Defendants also argue that Mr. Wilcoxon is required to come forward with concrete proof of his defamation claim.   However, this case has not yet even passed the discovery stage.   As is stated above, a motion to dismiss tests the sufficiency of the pleading.   There have been no depositions taken and no written discovery has been answered.   Simply put, it is premature to require a Mr. Wilcoxon to prove his case at this juncture.   As was stated above, a motion to dismiss

merely tests the sufficiency of the allegations.  Here the allegations are more than sufficient to withstand a motion to dismiss.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests this Honorable Court to deny Defendant's Motion to Dismiss.

Respectfully submitted,

MARGOLIS EDELSTEIN

Timothy J. Wilson, Esquire (DE #4323)
1509 Gilpin Avenue
Wilmington, DE 19806
(302) 777-4680 – Telephone
(302) 777-4682 – Facsimile
twilson@margolisedelstein.com
*Attorney for Plaintiff*

Dated: February 10, 2006

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

♦ ♦ ♦ ♦ ♦ ♦ ♦ ♦ ♦ ♦ ♦ ♦ ♦ ♦ ♦ ♦ ♦ ♦ ♦ ♦ ♦ ♦
| | |
|---|---|
| RICHARD WILCOXON, ♦ | |
| ♦ | |
| Plaintiff, ♦ | |
| ♦ | C.A. No. 05-00524 - SLR |
| vs. ♦ | |
| ♦ | **JURY TRIAL DEMANDED** |
| RED CLAY CONSOLIDATED ♦ | |
| SCHOOL DISTRICT, and ♦ | |
| JANAY FREEBERY ♦ | |
| ♦ | |
| Defendants. ♦ | |

♦ ♦ ♦ ♦ ♦ ♦ ♦ ♦ ♦ ♦ ♦ ♦ ♦ ♦ ♦ ♦ ♦ ♦ ♦ ♦ ♦ ♦

## ORDER

AND NOW, TO WIT, this _____ day of _____, 2006, having

considered on Defendants' Motions to Dismiss and/or For Judgment on the Pleadings, the

Plaintiff's opposition thereto and all associated briefing;

IT IS HEREBY ORDERED, Defendants' Motion is hereby **DENIED.**

_____
J.

## CERTIFICATE OF SERVICE

I, Timothy J. Wilson, Esq., hereby certify that on February 10, 2006, I electronically filed a true and correct copy of the foregoing Plaintiff's Answering Brief in Opposition to Defendants' Motion to Dismiss and/or For Judgment on the Pleadings with the Clerk of the Court using CM/ECF, which will send notification of such to the following counsel of record, and further that I caused a copy of same to be delivered to the following counsel of record:

Barry M. Willoughby, Esq.
Michael P. Stafford, Esq.
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE 19899-0391

MARGOLIS EDELSTEIN

Timothy J. Wilson, Esq. (No. 4323)
1509 Gilpin Ave.
Wilmington, DE 19806
(302) 777-4680 – Telephone
(302) 777-4682 – Facsimile
twilson@margolisedelstein.com – Email
*Attorney for Plaintiff*