IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| RICHARD WILCOXON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No. 05-00524 - SLR |
| v. | ) | |
| | ) | TRIAL BY JURY DEMANDED |
| RED CLAY CONSOLIDATED SCHOOL DISTRICT | ) | |
| BOARD OF EDUCATION and JANAY FREEBERY, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DEFENDANTS' OPENING BRIEF IN SUPPORT
## OF THEIR MOTION FOR SUMMARY JUDGMENT

YOUNG CONAWAY STARGATT & TAYLOR, LLP
Barry M. Willoughby, Esquire (No. 1016)
Michael P. Stafford, Esquire (No. 4461)
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE 19899-0391
Telephone: (302) 571-6666; 6553
Facsimile: (302) 576-3345; 3470
Email: bwilloughby@ycst.com; mstafford@ycst.com

Dated:  July 12, 2006

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ............................................................................................................. i

TABLE OF CASES ................................................................................................................... iii

NATURE AND STAGE OF THE PROCEEDINGS ..............................................................1

SUMMARY OF THE ARGUMENT ......................................................................................2

STATEMENT OF FACTS ......................................................................................................4

    A.   Wilcoxon's Previous Employment and Hiring at Red Clay. ...................................4

    B.   Freebery Returns From Maternity Leave in January 2003. .....................................5

    C.   Wilcoxon Begins Keeping a Secret Log. .................................................................6

    D.   Wilcoxon Fails to Contribute to the Team Teaching Effort and His Inappropriate Comments Become More Severe. ..........................................6

    E.   The Log is Discovered When Wilcoxon is Absent and has not Left Lesson Plans, an Attendance List, or a Bell Schedule for the Substitute. ..........................................................................................................8

    F.   Wilcoxon Is Reprimanded. ....................................................................................10

    G.   Wilcoxon Is Unsuccessful in the Classroom Without Freebery's Assistance. ...........................................................................................12

    H.   Union Grievances and Wilcoxon's Charges of Discrimination. ............................14

    I.   Wilcoxon Is not Renewed. ....................................................................................15

STANDARD OF REVIEW ....................................................................................................15

ARGUMENT ..........................................................................................................................17

  I.   DEFENDANT FREEBERY IS ENTITLED TO SUMMARY JUDGMENT ON COUNT VI OF THE COMPLAINT BECAUSE SEXUAL HARASSMENT COMPLAINTS ARE PROTECTED BY A CONDITIONAL PRIVILEGE, AND NO EVIDENCE EXISTS THAT THE PRIVILEGE WAS ABUSED. ................................................17

    A.   Sexual Harassment Complaints Against Co-workers are Conditionally Privileged. ...........................................................................18

B.    Summary Judgment is Appropriate Because Wilcoxon has
No Factual Evidence Demonstrating Either Malice or
Excessive Publication. ...........................................................................19

C.    Freebery's Statements Were Not Published to a Third Party. ...............................21

II.    DEFENDANT IS ENTITLED TO JUDGMENT AS A MATTER
OF LAW ON COUNT III OF THE COMPLAINT BECAUSE
THE LOG DOES NOT INVOLVE A MATTER OF PUBLIC
CONCERN OR, ALTERNATIVELY, BECAUSE STUDENT
SAFETY ISSUES ARE WITHIN THE AMBIT OF WILCOXON'S
DUTIES AS A PUBLIC SCHOOL TEACHER. .......................................................22

A.    The Log Does Not Relate to a Matter of Public Concern. .....................................23

B.    Summary Judgment is Appropriate Because Wilcoxon's Speech
was Made Pursuant to his Official Duties as a Teacher, which
include Student Safety. ..........................................................................24

C.    The Value of Wilcoxon's Speech is Outweighed by its Disruptive Effect. ............25

III.    DEFENDANT IS ENTITLED TO JUDGMENT AS A MATTER
OF LAW ON COUNTS I AND II OF THE COMPLAINT. ....................................27

IV.    SUMMARY JUDGMENT SHOULD BE GRANTED ON PLAINTIFF'S
WRONGFUL TERMINATION CLAIM BASED ON ALLEGED
FAILURE TO COMPLY WITH 14 DEL. C. § 1410(B)............................................31

A.    Plaintiff's Retaliation Claim Is Without Merit.......................................................31

B.    Plaintiff's Claim Under the Collective Bargaining Agreement
Is Without Merit....................................................................................31

1.    The Teacher Tenure Law Does Not Provide that An Asserted
Violation of a Collective Bargaining Agreement Means That
Documentation of a Teacher's Discipline May Not be "Properly
Placed" in His Personnel File. ...........................................................32

2.    Aside From the January 22, 2004 Reprimands, There is Ample
Other Documentation of Performance and Disciplinary Problems
That Were Properly Placed in Plaintiff's Personnel. .........................33

3.    The Collective Bargaining Agreement Was Not Violated, and,
In Any Event, any such Claim has been Waived or Has Been Cured. ...............35

CONCLUSION...................................................................................................37

# TABLE OF CASES

**Page**

**Cases**

Adeniji v. Administration for Children Servs.,
   43 F. Supp. 2d 407 (S.D.N.Y. 1999) ...................................................................................28

Bloss v. Kershner,
   2000 Del. Super. LEXIS 90 (Del. Super. Ct. Mar. 9, 2000)..............................................17

Brasslett v. Cota,
   761 F.2d 827 (1st Cir. 1985) ..............................................................................................21

Bray v. L.D. Caulk Dentsply Int'l.,
   2000 U.S. Dist. LEXIS 11062 (D. Del. July 31, 2000) ......................................................28

Caouette v. OfficeMax, Inc.,
   352 F. Supp. 2d 134 (D.N.H. 2005) ...................................................................................18

Carter v. Del. State Univ.,
   2002 U.S. Dist. LEXIS 3116 (D. Del. Feb. 27, 2002).......................................................28

Celotex Corp. v. Catrett,
   477 U.S. 317 (1986) .....................................................................................................15, 16

Chang v. Michiana Telecasting Corp.,
   900 F.2d 1085 (7th Cir. 1990) ...........................................................................................21

Connick v. Myers,
   461 U.S. 138 (1983) ..............................................................................................22, 23, 25

Conrail v. Railway Labor Exec. Ass'n,
   491 U.S. 299 (1989) ...........................................................................................................35

Cruey v. Gannett Co.,
   76 Cal. Rptr. 2d 670 (Cal. Ct. App. 1998).................................................................18, 19

Cuffee v. Dover Wipes Co.,
   334 F. Supp. 2d 565 (D. Del. 2004) ...................................................................................30

Davis v. Ector County,
   40 F.3d 777 (5th Cir. 1994) ................................................................................................26

Delli Santi,
   88 F.3d at 199 .....................................................................................................................30

Doyle v. United States Sec'y of Labor,
   285 F.3d 242 (3d Cir. 2002) ...............................................................................................27

iii

Ebert v. Office of Info. Sys.,
 1998 U.S. Dist. LEXIS 9100 (D. Del. Jun. 12, 1998) .......................................................16

EEOC v. Metal Serv. Co.,
 892 F.2d 341 (3d Cir. 1990) ..............................................................................................27

Faragher v. City of Boca Raton,
 524 U.S. 775 (1998) ...........................................................................................................18

Ferguson v. E .I. DuPont de Nemours and Co.,
 560 F. Supp. 1172 (D. Del. 1983) ......................................................................................29

Fogarty v. Boles,
 121 F.3d 886 (3d Cir. 1997) ..............................................................................................23

Garcetti v. Ceballos,
 126 S. Ct. 1951 (2006) ...................................................................................2, 22, 23, 24

Garziano v. E.I. Du Pont De Nemours & Co.,
 818 F.2d 380 (5th Cir. 1987) .............................................................................................18

Glass v. Dachel,
 2 F.3d 733 (7th Cir. 1993) .................................................................................................25

Hall,
 152 F. Supp.2d at 550.........................................................................................................29

Henry v. the Delaware Law School of Widener Univ.,
 1998 Del. Ch. LEXIS 7 (Del. Chan. Jan. 8, 1998) ............................................................17

Hilliard v. Morton Bldgs., Inc.,
 195 F. Supp.2d 582 (D. Del. 2002) ....................................................................................28

Holder v. City of Allentown,
 987 F.2d 188 (3d Cir. 1993) ..............................................................................................26

Horowitz v. Fed. Kemper Life Assurance Co.,
 57 F.3d 300 (3d Cir. 1995) ................................................................................................15

Howard v. Deklinski,
 2002 U.S. App. LEXIS 25269 (3d Cir. Nov. 12, 2002) .................................................19, 20

Jones v. Keith,
 2002 U.S. Dist. LEXIS 3365 (D. Minn. Feb. 25, 2002).....................................................18

Jones v. School Dist. of Philadelphia,
 198 F.3d 403 (3d Cir. 1999) ..............................................................................................28

Kinsey v. Salado Indep. Sch. Dist.,
 916 F.2d 273 (5th Cir.), aff'd, 950 F.2d 988 (5th Cir. 1992)..............................................25

iv

Leonard v. Lipsey,
      2006 U.S. Dist. LEXIS 37654 (D. Ohio Jun. 8, 2006) ............................................24, 26, 27

Matsushita Elec. Indus. Co., Ltd. V. Zenith Radio Corp.,
      475 U.S. 574 (1986) ..............................................................................................16

McCoy v. Sussex County Vo. Tech. Sch. Dist.,
      1998 Del. Ch. LEXIS 171 (Del. Ch. Aug. 27, 1998) ..............................................32, 33, 36

McDonnell Douglas Corp. v. Green,
      411 U.S. 792 (1973) ..............................................................................................27, 28, 29

McQuestion v. New Jersey Transit,
      30 F.3d 388 (3d Cir. 1994) ......................................................................................35

Meyers v. Starke,
      420 F.3d 738 (8th Cor. 2005) ..................................................................................16

Miller v. Servicemaster by Reese,
      851 P.2d 143 (Ariz. Ct. App. 1992)..........................................................................18, 20

National Labor Relations Board v. Strong,
      393 U.S. 357 (1969) ..............................................................................................35

Pamintuan v. Nanticoke Mem'l Hosp.,
      1998 U.S. Dist. LEXIS 16764 (D. Del. Oct. 15, 1998) ............................................16

Patterson v. Chicago Ass'n for Retarded Children,
      1997 U.S. Dist. LEXIS 8339 (D. Ill. Jun. 5, 1997) ....................................................25, 26

Pickering v. Board of Educ.,
      391 U.S. 563 (1968) ..............................................................................................25

Pierce v. Burns,
      185 A.2d 477 (Del. 1962)........................................................................................17

Quiroga v. Hasbro, Inc.,
      934 F.2d 497 (3d Cir. 1991) ....................................................................................16, 29

Rankin v. McPherson,
      483 U.S. 378 (1987) ..............................................................................................25

Richards v. City of Wilmington,
      2004 U.S. Dist. LEXIS 4987 (D. Del. Mar. 24, 2004) ............................................15, 16, 29

Robinson v. City of Pittsburgh,
      120 F.3d 1286 (3d Cir. 1997) ..................................................................................30

Schoch v. First Fidelity Bancorporation,
      912 F.2d 654 (3d Cir. 1990) ....................................................................................16

v

Shaner v. Synthes (USA),
    204 F.3d 494 (3d Cir. 2000) .............................................................29

Stiner v. Univ. of Del.,
    243 F. Supp. 2d 106 (D. Del. 2003) ....................................................19

Stinson v. Delaware River Port Authority,
    935 F. Supp. 531 (D.N.J. 1996)..........................................................16

Taylor v. Proctor & Gamble Dover Wipes Co.,
    184 F. Supp.2d 402 (D. Del. 2002) ...............................................16, 30

Texas Dep't of Comm. Affairs v. Burdine,
    450 U.S. 248 (1981) .........................................................................27

Tse v. Ventana Med. Sys., Inc.,
    126 F. Supp. 2d 213 (D. Del. 2000) ....................................................23

Tyler v. City of Mountain Home,
    72 F.3d 568 (8th Cir. 1995) ...............................................................26

Vickers,
    719 N.E. 2d at 1109 ..........................................................18, 19, 20, 21

Vintilla v. U.S.,
    931 F.2d 1444 (11th Cir. 1991) ..........................................................23

Waldron v. SL Indus., Inc.,
    56 F.3d 491 (3d Cir. 1995) ................................................................28

Woodson v. Scott Paper,
    109 F.3d 913 (3d Cir. 1997) ..............................................................29

Wright v. Pepsi Cola Co.,
    243 F. Supp. 2d 117 (D. Del. 2003) ....................................................17

## Other Authorities

Title VII of the Civil Rights Act of 1964 .............................1, 28, 30, 32

42 U.S.C. § 2000e(2)(a)...........................................................................1

14 Del. C. § 1410(b) .....................................................................passim

14 Del. C. §1410.....................................................................................1

Fed R. Civ. P. 56(c) ...............................................................................16

900002.0005

## NATURE AND STAGE OF THE PROCEEDINGS

This action arises under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e(2)(a); the First Amendment of the United States Constitution; the Delaware teacher tenure act, 14 <u>Del. C.</u> §1410; the collective bargaining agreement between the Red Clay Consolidated School District and the union representing its teachers; and Delaware common law relating to defamation.   Plaintiff is seeking general and special compensatory damages, including back pay, front pay benefits.   Plaintiff is also seeking punitive damages, interest, costs, and attorneys' fees.

Plaintiff filed his complaint on July 22, 2005 in the United States District Court for the District of Delaware.  (D.I. 1)  Defendants Red Clay Consolidated School District Board of Education (hereinafter "Red Clay" or "the District") and Janay Freebery ("Freebery"), filed their Answer to the complaint on September 15, 2005. (D.I. 6)  On June 30, 2006, the Court granted in part and denied in part Defendants Motion to Dismiss certain counts of Plaintiff's Complaint.

1

## SUMMARY OF THE ARGUMENT

1.    Defendant Freebery is entitled to judgment as a matter of law on Count VI of the Complaint because her sexual harassment complaint is conditionally privileged and Wilcoxon has failed to adduce any admissible evidence showing that the privilege was abused or waived. Alternatively, Freebery is also entitled to judgment as a matter of law because her sexual harassment complaint was not published to a third party. Under the Delaware Supreme Court's ruling in Schuster v. Derocili, 775 A.2d 1029, 1039 n.56 (Del. 2001), reporting matters such as sexual harassment allegations to a superior is insufficient to state a defamation claim.

2.    Defendant is entitled to judgment as a matter of law on Count III of the Complaint for three separate reasons. First, Wilcoxon's speech does not relate to a matter of public concern. The record, as developed through discovery, clearly shows the inherently personal and private nature of Wilcoxon's speech. Alternatively, assuming Wilcoxon's speech did touch upon a matter of public concern, such as student safety, his First Amendment claims are nonetheless barred by the Supreme Court's recent decision in Garcetti v. Ceballos, 126 S. Ct. 1951 (2006), because he spoke pursuant to his official duties as a public school teacher. In addition, the minimal value of Wilcoxon's speech is clearly outweighed by its disruptive effect. Here, his speech generated controversy and disruption, and so negatively affected his working relationship with Freebery that they were unable to continue team teaching.

3.    Defendant is entitled to judgment as a matter of law on Counts I and II of the Complaint because Wilcoxon has failed to make a prima facie case of either gender discrimination or retaliation for protected activity. With respect to his gender discrimination claim, Wilcoxon has adduced no evidence showing or suggesting that any decision-maker was motivated by discriminatory gender animus. Similarly, there is nothing in the record to

suggest that any of Defendant's legitimate non-discriminatory reasons for the non-renewal of his contract are pretextual.  The same fatal flaw is also terminal to his retaliation claim.

       4.         Defendant is entitled to judgment as a matter of law on Count IV of the Complaint alleging "wrongful discharge under 14 <u>Del.</u> <u>C.</u> § 1410(b).  The retaliation prong of Wilcoxon's Complaint is without merit for the reasons set forth above. In addition, the collective bargaining agreement claim is without merit because Wilcoxon's reading of the collective bargaining agreement is erroneous and, in any event, there is ample documentation of his performance and disciplinary issues, even aside from the challenged reprimands. Further, the alleged technical violation in the collective bargaining agreement does not mean that the reprimands in question must be ignored for purposes of 14 <u>Del.</u> <u>C.</u> § 1410(b). Finally, any alleged violation has been waived or has been cured.

                                           

### STATEMENT OF FACTS

**A.    Wilcoxon's Previous Employment and Hiring at Red Clay.**

Wilcoxon was hired as a Physical Education and Health Teacher at Skyline Middle

School in the Red Clay School District in October 2002 when the teacher who currently held

the position, Frank Rumford ("Rumford"), became the Student Advisor[1] at Skyline. A175;

288. Wilcoxon graduated from the University of Delaware in 1998. A184. Immediately

before his hiring at Red Clay, he worked for the Colonial School District for a period of two

months. A193-94. He previously worked at the Lake Forest School District during the years

1999 through 2002. A192-93. After his graduation from college and prior to his hiring at

Lake Forest, he worked as a substitute in several other school districts and held several other

jobs. A9; 13; 187-192.

Although Red Clay was unaware of his previous employment problems at the time of

his hire, documents received in discovery show that Plaintiff was on an Individual

Improvement Plan ("IIP") while at Lake Forest. A15-16. His contract for the 2002-2003

school year was initially non-renewed. A17. Although Lake Forest later agreed to rehire

him, Wilcoxon accepted employment at Colonial School District. A19. His IIP at Lake

Forest showed that he had problems in instructional planning, organization and management,

instructional strategies, and related responsibilities such as dressing in an inappropriate

manner. A15-16. In addition, Wilcoxon's testimony established that during his college

training he was criticized for poor lessons plans, a problem that he acknowledged continued

during his employment at Lake Forest and Red Clay. A3; 186-87; 215; 7; 220-22.

Wilcoxon's first semester of employment at Skyline included team teaching with a

long-term substitute, Jill Orensky,[2] for the regular Girls' Health and Physical Education

---

[1]  A Student Advisor is a teacher position with quasi-administrative responsibilities.
[2]  Although he taught with her for an entire semester, Mr. Wilcoxon could not remember her
last name. Ms. Freebery, who never personally met the long-term substitute, remembered that
her name was Jill Orensky. A195-96; 301.

Teacher, Defendant Janay Freebery ("Freebery").  Freebery graduated with honors from University of Delaware and was awarded the Woman of Promise Award.  A299.Freebery began teaching health and physical education at Red Clay in 1995, seven years before Wilcoxon's employment started in 2002.  A300.  She is a seasoned, experienced teacher. A335.  She was tenured many years before Mr. Wilcoxon was hired.  A175-76.  Before Wilcoxon's arrival, she successfully team taught with the previous boys health and physical education teachers.  A175-76.

### B.    Freebery Returns From Maternity Leave in January 2003.

Freebery returned to employment in January of 2003 from maternity leave.  A240-41. Unfortunately, Freebery was in the process of a divorce at that time.[3]  A302.  When Freebery returned to Skyline from maternity leave, she was asked to mentor Wilcoxon.  A301; 303. She was advised by then Assistant Principal Janet Basara ("Basara") and Rumford that Plaintiff needed assistance in classroom management, disciplinary procedures, and lessons. A301; 303; 323; 243.

During the first semester she team taught with Wilcoxon (Spring 2003), she found that he did not contribute ideas or suggestions to their classes.  A303-05.  He seemed to lack motivation.  She frequently would have to assist him in classroom teaching by filling in points he missed.  A304-05; 280; 95-97. Wilcoxon also began making inappropriate comments to her during the later part of the year.  A309-15.  She attributed his remarks to his immaturity.  A316.  She believed that she could handle them without the assistance of the administration and that he would cease making such remarks.  A316.

In the Fall of 2003 (the 2003-2004 school year), Wilcoxon and Freebery again team taught some of their classes.  Shortly after the start of the 2003-2004 school year, then Assistant Principal Basara was required to take on the role of Acting Principal at Skyline.

5

A239; 317.  The Principal, Nick Manolakos, was diagnosed with cancer.  A317.  Rumford

became Assistant to the Principal.  A317.

### C.    Wilcoxon Begins Keeping a Secret Log.

According to Wilcoxon's testimony, he began secretly keeping a "log" on Freebery in

November of 2003.  A171.  His undisputed testimony shows that he started keeping the

secret log because he had heard that Freebery said he was "difficult" to work with.  A170-

171.  After becoming a faculty member at Skyline, Wilcoxon began socializing with a small

group of teachers who called themselves the "Insubordinates" or "Exiles."  A166-68; 159.

They would frequently meet after work for drinks.  A169.  During one such meeting at a bar,

one of the "Insubordinates," Linda Filer, suggested that Wilcoxon start the log to "cover his

ass" because of the statements Freebery had made about him.  A170; 164-65.

Although Plaintiff contended in his Complaint that he was keeping the log because of

alleged concerns over "safety," he testified in his deposition, however, that he started the log

to "cover his ass."  The contemporaneous e-mail he wrote said that he did it "truly to protect

[himself]" in the event that issues with his performance were raised as a result of Freebery's

remark.  A207; 102.  The e-mail makes no mention of alleged safety issues.  Likewise, he

never reported any alleged safety or other concerns to the Principal, Assistant Principal or

anyone else in the School District. A206-07; 245; 246; 102.

### D.    Wilcoxon Fails to Contribute to the Team Teaching Effort
####        and His Inappropriate Comments Become More Severe.

Freebery was becoming increasingly concerned over Wilcoxon's inappropriate

comments and unwillingness to contribute to their team teaching effort.  It is undisputed that

before Wilcoxon's log was discovered on December 15, 2003, Freebery told Rumford that

Wilcoxon was making inappropriate remarks to her.  A289-90; 295; 309; 318-19.  Rumford

was not aware of the full extent of the remarks at that time, however, and told her to tell

---

[3]  Unfortunately, Ms. Freebery's now ex-husband unexpectedly left following the birth of

Wilcoxon to stop the remarks "now."  A295; 319.

The Friday before Wilcoxon's journal was discovered, several independent witnesses heard Wilcoxon make inappropriate remarks to and about Freebery.  At a faculty meeting, Wilcoxon received a poinsettia for the holidays.  A326; 329.  He took the poinsettia and said to Freebery, in front of another teacher, Sean Furilla, that he was giving the poinsettia to Freebery because she was "the closest thing to a wife and bitch" he had.  A326; 314-15.  Freebery was shocked and embarrassed.  A327; 314-15.  Furilla chastised Wilcoxon for making such an inappropriate remark.  A327.

Wilcoxon, however, was not content to leave his inappropriate comment there.  Despite the obviously offensive nature of the remark, and Furilla's statement to him, Wilcoxon repeated the remark to Cindy Falgowski in the parking lot as they left school that day.  A329.  As they were walking to their cars, Falgowski said to Wilcoxon, "Rich, I see you won a poinsettia."  A329.  Wilcoxon replied: "Yes, I am giving it to Janay because she is the closest thing to a wife and bitch I have."  A329.  Falgowski was shocked by the remark.  A329.  Previously, she had witnessed another inappropriate statement Wilcoxon made about Freebery.  A329.  Earlier in the year, she heard Wilcoxon say that "Janay is pregnant."  A329; 312-14; 321.  This time Falgowski criticized Wilcoxon's behavior by asking him why he would say such a thing.  A329.  Falgowski was concerned that Wilcoxon's remark could injure Freebery's reputation because she was a young, single mother with a newborn.  A329.  He replied that he said it because she was frequently nauseated.  Falgowski warned Wilcoxon that was not a reason to say Freebery was pregnant. A329.

Still not content with the repetition of his "wife and bitch" comment to Falgowski, Wilcoxon made the statement yet again.  A248-49.  Freebery hosted the holiday faculty party. Wilcoxon attended as did Acting Principal Basara and others.  Wilcoxon again repeated his "wife  and bitch" comment, this time in Basara's presence.  A248-49.  Basara

testified in her deposition that she personally heard Wilcoxon repeat his "wife and bitch"

comment.

> A. I know one of them. I heard it.

> A. He had won a poinsettia at our A-plus drawing for the teachers at a meeting, and that afternoon or the next day we had a faculty party, staff Christmas party at Miss Freebery's house, and he pointed out the poinsettia was there at her class and said he had given it to her because she was the closest thing he had to a wife and a bitch.

> A. He said this to a group of people who were in the foyer as he was pointing to the flower in the foyer. I was standing on the steps. Everybody turned around and moved away. It was an uncomfortable comment.

A248-49.

> ### E.    The Log is Discovered When Wilcoxon is Absent and has not Left Lesson Plans, an Attendance List, or a Bell Schedule for the Substitute.

The next Monday following the faculty party, December 15, 2003,Wilcoxon was out

sick due to an unspecified illness. A181. He failed to leave lesson plans, an attendance list,

or a bell schedule for the substitute as required by school policy. A291; 250-52. Rumford

looked in the folder in the office where such plans were supposed to be kept, only to discover

that the file contained Rumford's own two-year-old lesson plans that he had given Wilcoxon.

A291; 250-52. Not only that, but to make matters worse, Wilcoxon had Rumford's two-year-

old class list (i.e. the students that were there when Rumford taught), and an outdated bell

schedule. A291; 250-52. Disgusted, Rumford proceeded to the gym to help the substitute as

the students arrived for class. A291-92.

Once at the gym, Rumford went into the office looking for lesson plans for the

substitute, a plan book with students names, or something to assist him. A291-92. Rumford

found a note pad on top of Wilcoxon's desk with several pages folder over. A291-292. He

gave the notepad to the substitute and told him to use it to take attendance while he made

plans to cover Wilcoxon's class. A292. Although the first class was a physical education

class that she did not normally team teach with Wilcoxon, Freebery altered her schedule to assist. A292; A306-07. She opened the gym and prepared to start a group activity since there were no lesson plans available for the substitute. A306-07. The substitute gave her the notepad that Rumford found in Wilcoxon's office. A306-07. She was shocked and dismayed at what she saw. A306-07. Wilcoxon had been using the top pages of the notepad to keep a "log" on her. Although she was extremely upset, she continued the class. Later that morning she took the log to the office to Rumford and Basara. A306-07; A332-333.

Rumford called Wilcoxon at home to tell him that Freebery had seen the log. A205. Wilcoxon e-mailed a note to Freebery shortly thereafter in which he admitted that he was keeping the log because he was "angry" and "hurt" over her alleged comments that he was difficult. A205; A102. No where did he mention any concern for student safety. A102.

Freebery met with Basara and Rumford later that day, December 15, 2003. A255. Basara asked Freebery what was going on and to tell her what the problems between her and Wilcoxon. A332-333; A255. It was at that time that Freebery advised Basara that Wilcoxon had been making inappropriate comments to her, some of which were of a sexual nature. A247-248.

On December 16, 2003, when he returned to work, Wilcoxon was told to see Basara and Rumford. A253. At the December 16 meeting, Basara asked Wilcoxon why he kept the log. A256-260. He stated that he was angry at Freebery because of her alleged comment that he was difficult to work with. A254; A256-260. He admitted that he exaggerated and at times falsified information in the log. A256-260; A324-325. Wilcoxon never raised alleged safety concerns. It is likewise undisputed that Wilcoxon never reported any of the alleged incidents with Freebery to Basara. A206. In fact, he testified that he had no intention of doing so unless Freebery got him in trouble for being difficult. A102; 170-171.

The next day, on December 17, 2003, Basara and Rumford scheduled a meeting with Wilcoxon and Freebery. A262. Basara decided to attempt a "conflict resolution" process in

9

the hope that the damage Wilcoxon had done to his professional relationship with Freebery could be repaired. A262; 265-66. Unknown to anyone else, Wilcoxon began secretly tape recording meetings with Basara. A162-163. The first meeting he taped was the meeting on December 17, 2003. A162-163.

It was at this meeting that Wilcoxon became aware that Freebery had informed Basara and Rumford that he was making inappropriate remarks, some of a sexual nature, to her. Complaint ¶26; A234. Basara, Rumford, and Freebery all testified that when she raised the issue, Wilcoxon immediately said that his remarks were made in jest and that Freebery had "opened the door" by telling him that she had once gone to a nude beach with her husband. A263-264; 267; A293-294; 296-297; 263.

While Wilcoxon now denies making these statements, he admits that he reached into his pocket and turned off the tape recorder immediately after Freebery stated that he had made inappropriate remarks. A217. He now claims that it was just a "coincidence" that he turned the recorder off precisely at the point when his reply would have been recorded. A217. He also denies recording over that part of the meeting, but concedes that he later added his own "editorial" comments to the tape recording proclaiming his innocence. A217. Of course, by "coincidence," the editorial comments were added at the precise moment when the tape would have revealed his statements that he made the remarks in "jest" and that Freebery had "opened the door."

### F.    Wilcoxon Is Reprimanded.

Shortly after the December 17, 2003 meeting, school closed until after the new year for the holidays. After consulting with the District office, Basara decided to reprimand Wilcoxon for his inappropriate remarks to Freebery.[4] A334-35. She believed that it was

---

[4] Basara also verbally reprimanded Freebery by advising her that if any of the actions Wilcoxon had alleged did occur, they should not be repeated. A244.

important that a written reprimand be given because Freebery advised her that if Wilcoxon

continued to make such remarks, she would file sexual harassment charges. A268-69.

Basara was also concerned that Wilcoxon had failed to keep emergency lesson plans

on file and that he had an outdated list of students and a two-year-old bell schedule on file.

She originally planned to meet with him on January 20, 2004 for the purpose of giving him

written reprimands. A268. Basara could not meet with Wilcoxon until January 22, however,

because he had taken a vacation to Hawaii. A268. Wilcoxon called in sick for two days at

the end of his vacation. A211. He claims that he did not use the sick time to extend his

vacation, but testified in his deposition that he had no records of any kind showing when he

returned from Hawaii. A211-214. He claimed couldn't even remember for sure which

airline he took. A214.

In order to take his vacation to Hawaii, Wilcoxon took several personal days shortly

before the holiday for Martin Luther King's birthday. A211-213; A103-104. His absence

was therefore planned. A210. Despite having been criticized for the lack of lesson plans as a

result of his unexpected absence on December 15, 2003, however, Wilcoxon left only

rudimentary and unacceptable plans for the substitute who was to cover his physical

education class for three days. The plans appear in the Appendix at A108-109. For the entire

time he was gone, he left the substitute lesson plans for physical education stating as follows:

> Wed 1/14    -  Basketball shoot around
>                -  balls are in cage in supply closet
> Thurs 1/15  -  Repeat Wed.
> Friday 1/16 -  Scooter team handball
>                -  3 on 3 – 1st team that scores stay's on
>                -  make goals out of large cones
>                -  students must pass the ball across half court otherwise throws
>                -  can't score from own side
>                -  a goal is when the ball hits bleachers between the cones

If this is to [sic] hard or not going well, you can shoot around instead.

A107-108.

Although he has been a teacher for a total of seven and a half years, Wilcoxon was unable to say with certainty what should go into a lesson plan when asked at his deposition. A184-185.  Equally important, he conceded that Basara was correct that his lesson plans were inadequate and that there was "some truth" to statements made in the reprimand he received. A220-222; A236.  Wilcoxon admitted that he had been criticized in the past for poor lesson plans.  A186; A215-16.

Wilcoxon also admitted that the reprimand he received on January 22, 2004 for his failure to sign up for after school buses had truth to it.  A218-219; A112. With respect to signing up for student extracurricular buses, he admitted that he forgot to do so, but claimed that he always remembered in time to call the bus company.  A208-09.

### G.    Wilcoxon Is Unsuccessful in the Classroom Without Freebery's Assistance.

As a result of the break-down in the working relationship between Wilcoxon and Freebery, they did not continue team teaching the second semester of the 2003-2004 school year (January 2004 to June 2004).  A233; A271.  On April 21, 2004, Basara conducted an unannounced classroom observation of Wilcoxon. A126-31; A272-277. Observations do not include an overall qualitive rating, instead they include commendations and recommendations for improvement.  By any account, however, the unannounced observation was not positive.  It included several major recommendations and areas for improvement. A279-280.  For example, Wilcoxon had written objectives on the board, but covered them with a screen.  A274.  Some of the students had evidently lost respect for Wilcoxon. Several were whistling when he wasn't looking and "playing a cat and mouse game" with him. A283.  One student was slouching across two desks.  A276.  It was also recommended that Wilcoxon group the students differently and seat them differently so that they could participate in the dialog.  A274-276.  One of the most glaring problems was Wilcoxon's failure to bring the lesson to a closure.  A278; 285-286.

12

Wilcoxon's written rebuttal, A151-152, confirmed many of the problems. He admitted that there was whistling in the class but maintained that he "handled" it by moving from one side of the room to another and threatening to remove any student who was caught. He admitted that he didn't bring the class to closure but claimed that he intended to do so when he finished the unit he was teaching. As Basara noted, however, since Wilcoxon never identified the students by name, his threat to remove a student was ineffective. A276-277; 283-284. Further, when students behave in such a manner when they are aware that the teacher is being observed, it is a clear sign that they have lost respect for the teacher. A26.

Wilcoxon's claim that he would bring the class to closure when the unit was finished A151 also shows that he simply does not understand appropriate teaching strategies. As Basara noted, each class needs to be brought to closure. It is not acceptable to wait until the unit is finished, that could occur weeks or days later. A285-286. No grievance was filed challenging the observation.

After his observation, Wilcoxon again received a reprimand for inadequate lesson plans. When Basara asked him for his lesson plans after the observation, Wilcoxon at first delayed submitting them and stated they were home. A224. As pointed out earlier, it is undisputed that upon Wilcoxon's arrival at Skyline, Rumford gave him a plan book for the health classes he taught as a guide to assist him. A172-173; 225-226. It later turned out that Wilcoxon failed to update the plans during the entire time he was at Skyline, other than a few markings apparently designed to refer to state teaching standards. A197; 198-203. In fact, two years later, when Basara asked for his lesson plans, he placed a piece of masking tape on the cover of Rumford's plan book, wrote "Wilcoxon's Plan Book" on it, and gave it to Basara. A197; 28-94.

However, as Basara explained, Wilcoxon's reliance on dated lesson plans developed by a prior teacher is simply unacceptable. Instead, he should do his own lesson plans:

> He should be spending time thinking about what lesson needs

13

to be learned, what is the objective, and how am I going
to reach that and what can I use and take a look at the
lessons -- the materials that were there and decide if
he wanted to use them or not.

A282.   Basara noted that Wilcoxon had been "using someone else's [lesson] plans for two

years" yet failed to "take the time to improve the plans in any way…"  A282.

He also had an incident in which he failed to secure money students collected for the

American Heart Association.  A227-230; 133.

Wilcoxon's year-end performance appraisal was not satisfactory overall.  A281; 156-

158.  Wilcoxon was rated as being unsatisfactory in instructional planning and related

responsibilities.  A281.

H.    **Union Grievances and Wilcoxon's Charges of
Discrimination.**

Wilcoxon alleges in his Complaint that Red Clay violated the applicable collective

bargaining agreement with the teachers' union because he was not given 48 hours notice of

the meetings on December 17, 2003 and January 22, 2004.  Principals and Assistant

Principals meet with teachers all the time concerning disciplinary and performance issues.

The collective bargaining agreement has never been construed to apply to meetings at the

building level.  A332.  The union has never taken a case to arbitration contending that it is

applicable. A332.

The record also shows that Wilcoxon was not required to respond to the discipline

when he met with Basara on January 22, 2004.  He was simply informed of the reasons for

discipline and advised that he could take the reprimands to his union representative. A270.

The union filed grievances concerning several of the reprimands, but declined to take any of

them to arbitration. A204-205; 237.

Wilcoxon filed a Charge of Discrimination with the Department of Labor on

February 24, 2004.  A118.  This was the first instance in which he claimed that he had been

subjected to gender discrimination in connection with the reprimands he received on January

22, 2004. He has produced no proof in discovery that his gender (male) was in fact the reason for the reprimands he received. He subsequently filed a retaliation charge on June 9, 2004 when his contract was not renewed. A155. There is likewise no evidence that Wilcoxon suffered retaliation for a filing a charge of discrimination.

### I.  Wilcoxon Is not Renewed.

On May 14, 2004, Wilcoxon, an untenured teacher, was informed that his contract would not be renewed. A150. Wilcoxon requested the reasons for this decision, and was told it was for poor lesson planning, poor classroom management, and his inappropriate interaction with staff. A154.

He received a letter from Diane Dunmon setting forth the reasons for his non-renewal. A154.In accordance with Delaware law, he also received a hearing before the Superintendent of the Red Clay School District on July 28, 2004. A231-232. The issues he raised were aired and found to be without merit.

For the reasons that follow, summary judgment should be granted on all counts of Plaintiff's complaint.

### STANDARD OF REVIEW

Summary judgment shall be granted if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." See Fed R. Civ. P. 56(c) see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Facts are "material," and disputes "genuine," only if "'evidence exists from which a rational person could conclude that the position of the person with the burden of proof is correct.'" Richards v. City of Wilmington, 2004 U.S. Dist. LEXIS 4987, *8 (D. Del. Mar. 24, 2004) (quoting Horowitz v. Fed. Kemper Life Assurance Co., 57 F.3d 300, 302 n.1 (3d Cir. 1995)).

In an action brought under Title VII, a defendant is entitled to summary judgment when it demonstrates either that: "(1) the plaintiff is unable to establish a prima facie case of discrimination; or (2) if the plaintiff can establish a prima facie case, the plaintiff cannot produce sufficient evidence from which a fact finder could infer that the defendant's legitimate, nondiscriminatory reason for [taking adverse employment action against] plaintiff was a pretext." Pamintuan v. Nanticoke Mem'l Hosp., 1998 U.S. Dist. LEXIS 16764, *41 (D. Del. Oct. 15, 1998) (citing Stinson v. Delaware River Port Authority, 935 F. Supp. 531, 539 (D.N.J. 1996)). Put another way, if the non-moving party fails to sufficiently establish an essential element of his case with respect to which he bears the burden of proof, summary judgment shall be granted in favor of the moving party. Ebert v. Office of Info. Sys., 1998 U.S. Dist. LEXIS 9100, *9 (D. Del. Jun. 12, 1998) (citing Celotex, 477 U.S. at 322). Further, the non-movant may not "rest upon mere allegations, general denials, or…vague statements." Quiroga v. Hasbro, Inc., 934 F.2d 497, 500 (3d Cir. 1991) Schoch v. First Fidelity Bancorporation, 912 F.2d 654, 657 (3d Cir. 1990) ("unsupported allegations in [a non-movant's] memorandum and pleadings are insufficient to repel summary judgment").

To defeat a summary judgment motion, Rule 56(c) requires the non-moving party to:

> do more than simply show that there is some metaphysical doubt as to the material facts.…In the language of the Rule, the non-moving party must come forward with 'specific facts showing that there is a genuine issue for trial.'… Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is 'no genuine issue for trial.'

Matsushita Elec. Indus. Co., Ltd. V. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) see also Meyers v. Starke, 420 F.3d 738, 744 (8th Cor. 2005) (mere scintilla of evidence insufficient to defeat summary judgment); Taylor v. Proctor & Gamble Dover Wipes Co., 184 F. Supp.2d 402, 408 (D. Del. 2002) ("mere scintilla of evidence in support of non-moving party is insufficient"); Richards, 2004 U.S. Dist. LEXIS 4987 at *9 ("There must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue.").

16

Measured against this standard, all Wilcoxon's claims contained in the Complaint fail as a matter of law.


## ARGUMENT

**I.    DEFENDANT FREEBERY IS ENTITLED TO SUMMARY JUDGMENT ON COUNT VI OF THE COMPLAINT BECAUSE SEXUAL HARASSMENT COMPLAINTS ARE PROTECTED BY A CONDITIONAL PRIVILEGE, AND NO EVIDENCE EXISTS THAT THE PRIVILEGE WAS ABUSED.**

The elements required for a defamation cause of action are well-settled under Delaware law.  Five elements are required: "(1) a defamatory communication; (2) publication; (3) the communication refers to the plaintiff; (4) a third party's understanding of the communications defamatory character; and (5) injury." Bloss v. Kershner, 2000 Del. Super. LEXIS 90, *21 (Del. Super. Ct. Mar. 9, 2000).  A statement is defamatory if it is harmful and untrue when made.  Wright v. Pepsi Cola Co., 243 F. Supp. 2d 117, 124 (D. Del. 2003).

Conditional privilege is an affirmative defense to a prima facie case of defamation for statements made in certain contexts.  Pierce v. Burns, 185 A.2d 477, 479 (Del. 1962); Henry v. the Delaware Law School of Widener Univ., 1998 Del. Ch. LEXIS 7, *30 (Del. Chan. Jan. 8, 1998) ("Under the law of defamation, liability does not attach to a defamatory statement if the statement is privileged.").  "A qualified privilege 'extends to communications made between persons who have a common interest for the protection of which the allegedly defamatory statements are made.'" Id.  The conditional privilege may, however, be abused or waived "by (1) excessive or improper publication; (2) the use of the occasion for a purpose not embraced within the privilege; or (3) making a statement which the speaker knows is false." Mem. Op. at 23.  Assuming the conditional privilege applies, the plaintiff bears the burden of demonstrating that it was abused or waived.  Henry, 1998 Del. Ch. LEXIS 7 at *32-33; see also Vickers v. Abbott Lab., 719 N.E.2d 1101, 1110 (Ill. App. Ct. 1999).

Here, Freebery is entitled to judgment as a matter of law because her allegedly defamatory statements are conditionally privileged and Wilcoxon has not met his burden of coming forward with evidence that the privilege was abused or waived. Alternatively, Freebery is also entitled to judgment as a matter of law because her statements were not published to a third party under Delaware law applicable to workplace comments.

**A.      Sexual Harassment Complaints Against Co-workers are Conditionally Privileged.**

Numerous courts across the nation have held that employees' reports of sexual harassment to management are conditionally privileged. See e.g., Garziano v. E.I. Du Pont De Nemours & Co., 818 F.2d 380, 387-88 (5th Cir. 1987) (recognizing that state and federal laws "condemn sexual harassment as a matter of public policy" and that protecting sexual harassment complaints with a conditional privilege is crucial, "because public policy dictates that employees must be protected from workplace sexual harassment."); Caouette v. OfficeMax, Inc., 352 F. Supp. 2d 134, 143 (D.N.H. 2005) (employee sexual harassment complaints protected by a qualified privilege); Jones v. Keith, 2002 U.S. Dist. LEXIS 3365, *12-13 (D. Minn. Feb. 25, 2002); Vickers, 719 N.E. 2d at 1109 ("there is a definite general public interest in eradicating sexual harassment in the workplace"); Cruey v. Gannett Co., 76 Cal. Rptr. 2d 670, 677-78 (Cal. Ct. App. 1998); Miller v. Servicemaster by Reese, 851 P.2d 143, 145 (Ariz. Ct. App. 1992).[5]  These courts have recognized that, absent such protection, sexual harassment complainants would be "'handcuffed' by a fear of defamation liability." Vickers, 719 N.E.2d at 1109 (quoting Faragher v. City of Boca Raton, 524 U.S. 775, 806 (1998)); Jones, 2002 U.S. Dist. LEXIS 3365 at *13 ("Employees should not be intimidated from reporting sexual harassment by the specter of a defamation lawsuit… Defamation litigation must not be allowed to undermine the public policy of eliminating sexual

---

[5] As the Delaware Supreme Court has held, "Delaware's public policy should be interpreted to encourage every employee to resist sexual harassment and to combat it vigorously." Schuster v. Derocili, 775 A.2d 1029, 1039 n.56 (Del. 2001).

harassment from the workplace."); <u>Cruey</u>, 76 Cal. Rptr. 2d at 678 (complaints of sexual harassment are privileged because "[t]o hold otherwise would have a chilling effect on an employee's right to be free from sexual harassment and discrimination in the workplace by exposing the employee to the risk of litigation as a consequence to seeking enforcement of this right."). Of course, this Court has already expressed its concern over this issue as well. Mem. Op. at 24.

Here, although no Delaware court has apparently addressed whether complaints of sexual harassment are conditionally privileged, this Court should join the numerous other courts across the country which have found that they are so protected. Doing so effectuates the important state and federal public policy interests weighing in favor of eradicating sexual harassment from the workplace, and in encouraging victims to report such unacceptable conduct. Allowing Wilcoxon's defamation claim against Freebery to proceed seriously threatens to undermine the very vigorous resistance to workplace sexual harassment that is the goal of both state and federal public policy, and which the Delaware Supreme Court sought to encourage in <u>Schuster</u>. Indeed, Wilcoxon's defamation claim involves the very sort of "handcuffing" the <u>Vickers</u> court feared. Wilcoxon's claim against Freebery is plainly designed to harass and intimate an innocent victim.

**B.    Summary Judgment is Appropriate Because Wilcoxon has No Factual Evidence Demonstrating Either Malice or Excessive Publication.**

As this Court has previously noted "[a] conditional privilege may be lost if abused or waived," and "must be exercised with good faith, without malice and absent any knowledge of falsity or desire to cause harm.'" Mem. Op. at 23 (quoting <u>Stiner v. Univ. of Del.</u>, 243 F. Supp. 2d 106, 115 (D. Del. 2003)). Although "the question of whether a privilege has been abused by malice or intent to harm ordinarily is a factual question for the jury," <u>Stiner</u>, 243 F. Supp. 2d at 116, it is within the province of the court in appropriate circumstances. <u>See e.g.</u>, <u>Howard v. Deklinski</u>, 2002 U.S. App. LEXIS 25269, *6 n.1 (3d Cir. Nov. 12, 2002) (noting

19

that "Appellant's assertion that 'it is outside the province of a court to decide whether or not a defendant' has abused a conditional privilege reflects a fundamental misunderstanding of the law."). Indeed, "once a defendant has established a qualified privilege, the plaintiff must come forward with actual evidence creating an issue of fact" in order to survive summary judgment. Vickers, 719 N.E.2d at 1110.

Defendant Freebery is entitled to judgment as a matter of law on Count VI of the Complaint because the Plaintiff cannot meet his burden of showing that the conditional privilege was abused in any fashion, such as by, for example, excessive or improper publication, or malice. Cf. Miller, 851 P.2d at 146 ("[s]ince there is no factual evidence indicating malice or excessive publication, this court can dispose of the issue. Accordingly, we find that summary judgment was properly granted because there were no facts indicating that the conditional privilege was abused."). At the summary judgment stage, Wilcoxon cannot merely rest upon the conclusory and self-serving allegations contained in his Complaint. See e.g. Vickers, 719 N.E.2d at 1112 ("When 'determining whether factual issues exist for purposes of a summary judgment motion,' the court of review 'must ignore personal conclusions, opinions and self-serving statements and consider only facts admissible in evidence.'"). Instead, he bears the burden of coming forward with evidence demonstrating "a factual basis that would entitle [him] to judgment." Id.; see also Howard, 2002 U.S. App. LEXIS 25269 at *6 (noting that plaintiff must "point to specific facts demonstrating that a genuine issue exists for trial, and may not rest upon entirely unsupported allegations."). Here, no such factual basis exists. With discovery concluded, Wilcoxon is left with nothing more than the unsupported allegations initially contained in his Complaint.

Simply put, Wilcoxon has *no evidence* indicating that the conditional privilege was abused. With respect specifically to a claim of excessive publication, the undisputed record shows that Freebery's statements were raised in a meeting with Rumford (the Assistant to the Principal) and Basara (the Acting Principal) as part of Basara and Rumford's investigation of

20

a workplace dispute. Moreover, as noted above, Wilcoxon's mere characterizations of Freebery's motivations as having been malicious (Complaint ¶27) are insufficient. Instead, Wilcoxon must point to factual evidence that would entitle him to judgment on this issue.

Although Wilcoxon now denies making inappropriate comments, some of which were of a sexual nature, his mere denial does not establish that Freebery acted with malice. As the Seventh Circuit has noted, in the defamation context, "[w]hen liability depends on mental states" the plaintiff bears the burden of showing "that the speaker had a forbidden state of mind." Chang v. Michiana Telecasting Corp., 900 F.2d 1085, 1090 (7th Cir. 1990); Brasslett v. Cota, 761 F.2d 827, 841 (1st Cir. 1985) ("The question of malice is a subjective inquiry into the speaker's actual state of mind…"). It can hardly be said that Freebery acted with malice in light of the fact that the undisputed record shows that several others, Basara, Rumford, Furilla, and Falgowski, in addition to herself, witnessed the inappropriate remarks, including Wilcoxon's particularly offensive "wife and bitch" comment. In this regard, the instant matter is similar to that in the Vickers case, where the plaintiff, like Wilcoxon, also denied making the remarks at issue. 719 N.E.2d at 1111. The plaintiff's mere denial, however, was insufficient to defeat summary judgment, because he failed to "provide any concrete evidence to support the notion that Abbott employees fabricated stories about him." Id.

### C. Freebery's Statements Were Not Published to a Third Party.

A related, but alternate, basis for granting Freebery summary judgment on Count VI of the Complaint is the absence of proof of the publication of the allegedly defamatory remarks to a third-party, a necessary element of any defamation claim.

Defendant Freebery simply reported to her superiors remarks that Wilcoxon made. In Schuster the Delaware Supreme Court found that reporting employment performance issues to a superior is insufficient to state a defamation claim because under Delaware law there is

no publication of an alleged defamatory statement made to superiors concerning workplace issues:

> [W]e find that Schuster's claim necessarily fails because it lacks publication, a necessary element to support a claim of slander. The statements were made solely in the presence of Schuster and her supervisors. There is no evidence in the record that these statements were published to any third party.

Schuster, 775 A.2d at 1040Wilcoxon's claim therefore fails for the same reasons as Schuster's- Freebery's allegedly defamatory remarks were not published to a third party.

## II.    DEFENDANT IS ENTITLED TO JUDGMENT AS A MATTER OF LAW ON COUNT III OF THE COMPLAINT BECAUSE THE LOG DOES NOT INVOLVE A MATTER OF PUBLIC CONCERN OR, ALTERNATIVELY, BECAUSE STUDENT SAFETY ISSUES ARE WITHIN THE AMBIT OF WILCOXON'S DUTIES AS A PUBLIC SCHOOL TEACHER.

In Count III of his Complaint, Wilcoxon alleges that the District violated the free speech clause of the First Amendment[6] by retaliating against him for "documenting Ms. Freebery's actions, for voicing his concerns over events that occurred at Skyline Middle School and for objecting to wrongful accusations and discipline lodged against him." (Complaint ¶ 87).

The court must engage in a three-step analysis to determine whether Wilcoxon's speech warrants constitutional protection.  As the Court previously explained:

> First, the court determines whether the employee spoke as a citizen or an employee.  Garcetti v. Ceballos, 126 S. Ct. 1951 (2006).  Second, the court determines whether, in light of the content, form and context of the entire record, the speech touched on matters of public concern.  Connick v. Myers, 461 U.S. 138, 146 (1983).  Third, the value of the employee's speech must outweigh "the government's interest in the effective and efficient fulfillment of its responsibilities to the public."  Id. at 150.

Mem. Op. at 12.  The determination as to whether the plaintiff can establish the later two steps is a legal issue for the Court to resolve.  Connick, 461 U.S. at 148 n.7. "[I]n the absence

---

[6] The First Amendment provides, in relevant part, that "Congress shall make no law . . . abridging the freedom of speech, . . . ."  U.S. Const. Amend. I.

of protected speech, a public employee may be discharged even if the action is unfair, or the reasons 'are alleged to be mistaken or unreasonable.'"  Fogarty v. Boles, 121 F.3d 886, 889 (3d Cir. 1997) (quoting Connick 461 U.S. at 146).

Defendant is entitled to judgment as a matter of law on Wilcoxon's First Amendment claim for three reasons.  First, fully-developed record shows that the log does not relate to a matter of public concern.  Second, assuming that the log does relate to a matter of public concern, summary judgment is still appropriate because the safety of school children is within the duties and job responsibilities of a public school teacher.  Therefore, Wilcoxon's speech is that of an employee and, consistent with Garcetti, his speech does not insulate him from discipline.  Third, assuming that the log relates to a matter of public concern and that Wilcoxon spoke as a citizen, rather than as a public employee, the value of the speech in the instant matter is extremely limited and is outweighed by the disruption to the school and to the team-teaching relationship between Wilcoxon and Freebery that it caused.

### A.    The Log Does Not Relate to a Matter of Public Concern.

The fully-developed record shows that the log concerned Wilcoxon's own personal grievances towards Freebery.[7]  Wilcoxon testified that his purpose in keeping the journal was to protect himself from possible future disciplinary action.  Indeed, he has characterized his own motivation in keeping the journal as being to "cover his ass."  A207; A102.

While his complaint claims that he was concerned about safety issues, there is no factual basis to support this claim.  First, by his own admission, the purpose of the journal

---

[7] The Court previously denied Defendant's Motion to Dismiss on this issue, finding that the journal did relate to a matter of public concern.  While such a holding was appropriate based on the allegations outlined in the Complaint, the factual record has now been developed and it demonstrates the essentially private nature of the journal and Wilcoxon's purpose in keeping it.  Moreover, the Court is not barred by the law of the case doctrine from revisiting this issue in light of the developed record on summery judgment.  See e.g. Tse v. Ventana Med. Sys., Inc., 126 F. Supp. 2d 213, 222 (D. Del. 2000) ("The law of the case doctrine does not preclude a grant of summary judgment in favor of a defendant whose motion to dismiss had previously been denied."); Vintilla v. U.S., 931 F.2d 1444, 1447 (11th Cir. 1991) (stating

was to "protect" himself from future disciplinary action.  A102.  Second, none of his

contemporary documentation even mentions safety concerns.  Further, Wilcoxon never raised

any concerns over students safety or instruction with Basara, Rumford, or anyone else in the

District.  A206-07; A102.  Thus, any claim that Wilcoxon kept the journal out of a concern

for his students is nothing more than a post hoc justification in an attempt to cloak log with

the protections of the Constitution.

As many courts have recognized, however, public employees cannot constitutionalize

all employment disputes.  Leonard v. Lipsey, 2006 U.S. Dist. LEXIS 37654, *13 (D. Ohio

Jun. 8, 2006) ("Put simply, though public employees retain free speech rights, the First

Amendment does not empower them to constitutionalize all employment disputes.").  Here,

Wilcoxon's speech involved a purely personal internal dispute with a fellow teacher- not a

matter of public concern.

> **B.      Summary Judgment is Appropriate Because Wilcoxon's**
> **Speech was Made Pursuant to his Official Duties as a**
> **Teacher, which include Student Safety.**

Alternatively, assuming Wilcoxon's speech is a matter of public concern, Defendant

is entitled to judgment as a matter of law because the log constitutes employee speech under

the U.S. Supreme Court's recent decision in Garcetti.  As this Court previously observed,

under Garcetti, "a public employee's speech is protected if he speaks 'as a citizen on a matter

of public record'" but is *not* protected if the employee's speech is "pursuant to their official

duties."  Mem. Op. at 13 (quoting Garcetti, 126 S. Ct. 1951).

There is no dispute that Wilcoxon was not employed to monitor the comings and

goings of his fellow teachers.  Although there is no contemporaneous documentation

showing that Wilcoxon kept the log because of concerns about student safety, he claimed in

his Complaint that the one purpose in keeping the journal was to document Freebery's

---

that because an "initial motion to dismiss was not a final judgment," the court was "free to
reconsider its ruling… at the summary judgment stage").

absences out of a concern for "student safety." As a public school teacher, however, Wilcoxon stands "*in loco parens*" to the students at Skyline. He was therefore duly bound to look out for their welfare. If Wilcoxon's speech is truly motivated by a concern for student safety, then it is part of his official duties as a teacher. Patterson v. Chicago Ass'n for Retarded Children, 1997 U.S. Dist. LEXIS 8339, *3 (D. Ill. Jun. 5, 1997) (noting that teachers' job responsibilities include "ensuring the safety of the students" in their classes).

  **C. The Value of Wilcoxon's Speech is Outweighed by its Disruptive Effect.**

  In the alternative, assuming for the sake of argument that Wilcoxon's speech did involve a matter of public concern, and that he was speaking as a citizen, Defendant is nonetheless entitled to judgment as a matter of law on Count III of the Complaint because his alleged speech cannot survive the balancing required by Connick; Pickering v. Board of Educ., 391 U.S. 563 (1968) and their progeny. Pickering identified five factors as appropriate in determining whether First Amendment rights outweigh the government's interest. These factors are: (1) the closeness of the relationship between the employer and the employee and the need for personal loyalty or confidence; (2) the effect of the speech on discipline by the employee's immediate supervisors; (3) its effect on harmony among the employee's co-workers; (4) its effect on the employee's job performance; and (5) its impact on the general operation of the employer's enterprise. Id. at 570-73, see also Rankin v. McPherson, 483 U.S. 378, 388 (1987).[8] In applying the Pickering test, the Third Circuit has taught that courts should look to the "extent to which the . . . speech . . . disrupts working of the office . . .," as well as whether "the employee uses the public speech [simply] to resolve an essentially private grievance." Holder v. City of Allentown, 987 F.2d 188, 195 (3d Cir.

---

[8] The factors identified in Pickering are not, however, exclusive. Kinsey v. Salado Indep. Sch. Dist., 916 F.2d 273, 279 n.6 (5th Cir.), aff'd, 950 F.2d 988 (5th Cir. 1992) ("We do not suggest that the factors enumerated in Pickering and its progeny are meant to be exclusive of all others. Each individual set of facts may suggest new avenues of analysis."); Glass v.

1993);  Cf. Davis v. Ector County, 40 F.3d 777, 783-84 (5th Cir. 1994) (Inquiry centers on

"(1) whether the speech was likely to generate controversy and disruption; (2) whether [it]

impeded the general operation of the department; and (3) whether the speech affected the

working relationships necessary to the proper functioning of [the] administration.").

 Here, Wilcoxon's "speech," his keeping of the "log" on Freebery, disrupted the

working environment and was likely to generate controversy. Wilcoxon recognized this

himself.  He not only kept the lot secret, but also confirmed in an email after its discovery

that he knew it had harmed his relationship with Freebery.  As a result of discovery of the

log, Freebery and Wilcoxon ceased team-teaching during the second semester of the 2003-

2004 school year.  The teaching relationship between Freebery and Wilcoxon was

irretrievably broken.  See e.g. Tyler v. City of Mountain Home, 72 F.3d 568, 570 (8th Cir.

1995) (Employer need not wait for actual disruption to occur in working relationships before

taking action).

 Wilcoxon's "safety concern" argument suffers from another fatal flaw.  If Wilcoxon

were concerned about student safety, keeping his log secret until a student is injured hardly

protects the students.  At best, under such circumstances, the log could be used to help

Wilcoxon escape discipline, "CMA" as he admitted.  After the fact disclosure of the log

hardly advances any public concern about student safety.  Indeed, Wilcoxon's "CMA"

approach is itself contrary to public policy.  If he were genuinely concerned about student

safety, rather than protecting himself from discipline, he was obligated to disclose the log and

the alleged improper conduct, not keep it secret.  Patterson, supra.

 The minimal value of Wilcoxon's speech is comparable to that of the plaintiff in

Leonard.  In that case, the court found that "the overwhelming majority" of the plaintiff's

---

Dachel, 2 F.3d 733, 742 (7th Cir. 1993) (collecting cases containing various statements of the
Pickering test).

                    

remarks did not relate to matters of public concern. Leonard, 2006 U.S. Dist. LEXIS 37654 at

*13.  Furthermore, according to the court:

> Even if her allegations have merit, those complaints are simply not matters of public
> concern, but internal affairs. The only potential matters of public concern Leonard
> raises were the volleyball incident and the staff member's smoking indoors. There is
> no evidence any particular harm came to either inmate in either case. Indeed, Leonard
> only alleges these two, minor, isolated incidents, not a pattern of behavior or set of
> policies. Without more, neither outweigh the defendants' interest in effectively
> operating the juvenile facility.

Id.  Here, the same reasoning applies to Wilcoxon's speech, and leads to the same

conclusion.  Even if Wilcoxon did raise matters of public concern, the value of his speech

was minimal.  As with Leonard, there is absolutely no evidence that any child ever came to

any harm due to any of the circumstances outlined in Wilcoxon's log, nor how the keeping of

the log could have prevented the harm.  Simply put, the minimal value of Wilcoxon's speech

does not outweigh the District's interest in effectively operating it's schools, an interest that

was disrupted by the form and content of Wilcoxon's speech.  As such, judgment as a matter

of law is appropriate under the balancing step of the First Amendment analysis.

## III.    DEFENDANT IS ENTITLED TO JUDGMENT AS A MATTER OF LAW ON COUNTS I AND II OF THE COMPLAINT.

Count I of the Complaint raises a claim of disparate treatment discrimination based

on gender.  Disparate treatment discrimination cases involve claims of outright

discrimination based on a statutorily prohibited characteristic.  See Doyle v. United States

Sec'y of Labor, 285 F.3d 242, 253 (3d Cir. 2002) In a disparate treatment case the plaintiff

must establish that he was in fact treated less favorably, or discriminated against, based on a

prohibited characteristic.  See EEOC v. Metal Serv. Co., 892 F.2d 341, 347 (3d Cir. 1990) (a

disparate treatment violation is made out only when an individual is shown to have been

singled out and treated less favorably than others similarly situated on the basis of an

impermissible criterion); see also Texas Dep't of Comm. Affairs v. Burdine, 450 U.S. 248,

252-53 (1981) McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973); Jones v.

School Dist. of Philadelphia, 198 F.3d 403, 410-11 (3d Cir. 1999)  In other words, a plaintiff

must prove that the decision makers involved were subjectively motivated by animus against

a protected characteristic when the decision in question was made.

To establish a prima facie case of discrimination under Title VII, Plaintiff must

satisfy the burden-shifting test established by McDonnell Douglas Corp. v. Green, supra.

Specifically, Plaintiff must first establish a prima facie case by showing that: (1) he is a

member of a protected class; (2) he was qualified for the position; and (3) he was subject to

an unfavorable employment action "under circumstances that give rise to an inference of

unlawful discrimination." Carter v. Del. State Univ., 2002 U.S. Dist. LEXIS 3116, *17 (D.

Del. Feb. 27, 2002) (quoting Waldron v. SL Indus., Inc., 56 F.3d 491, 494 (3d Cir. 1995)).

When offering proof of circumstances that give rise to an inference of unlawful

discrimination, "Plaintiff may attempt to meet this burden by presenting evidence that non-

members of the protected class were treated more favorably than he was." Hilliard v. Morton

Bldgs., Inc., 195 F. Supp.2d 582, 587 n.2 (D. Del. 2002) Here, none of the evidence in the

record is sufficient to establish a prima facie case.  Instead, Wilcoxon's allegations of

discrimination fall far short of the required standard.

As this Court has noted: "[s]peculation alone cannot establish a *prima facie* case of

discrimination." Bray v. L.D. Caulk Dentsply Int'l., 2000 U.S. Dist. LEXIS 11062, *15 (D.

Del. July 31, 2000).  Although Wilcoxon levies the heavy accusation that "Defendant

intentionally and maliciously discriminated against [him] on the basis of his gender (male),"

Complaint ¶81, his evidence in that regard consists of precisely the type of speculative

generalities unsupported by specific facts which is insufficient to defeat a summary judgment

motion.  Adeniji v. Administration for Children Servs., 43 F. Supp. 2d 407, 423 (S.D.N.Y.

1999).

In the instant matter, the evidence shows that Wilcoxon had numerous performance

and disciplinary difficulties. Wilcoxon has failed to develop evidence to "cast sufficient

doubt" on Red Clay's legitimate non-discriminatory reasons for its actions "to permit a reasonable fact finder to conclude that [these] reasons are fabricated" and that the real motivations for the District's conduct were discriminatory based on his gender (male).  Hall, 152 F. Supp.2d at 550.  The sole basis for Wilcoxon's claim of gender discrimination appears to be that he is a male and that Basara is a female.  Wilcoxon's claims constitute the very kind of "mere allegations, general denials or… vague statements" that this Court, and others, have frequently found insufficient to avoid summary judgment.  Quiroga, 934 F.2d at 500.  As such, summary judgment on his Title VII gender discrimination claim is appropriate.

In addition to his claim of gender discrimination, Wilcoxon also alleges, in Count II of his Complaint, that he was retaliated against for protected activity under Title VII - namely having filed a Charge of Discrimination with the Delaware Department of Labor.  To establish a prima facie case of retaliation, Wilcoxon must prove that:  "(1) that [he] engaged in a protected activity; (2) that [his] employer took adverse action against [him] either after, or contemporaneously with, [his] protected activity; and (3) that there is a causal connection between the protected activity and the employer's adverse action."  Richards, 2004 U.S. Dist. LEXIS 4987 at *15 (citing Woodson v. Scott Paper, 109 F.3d 913, 920 (3d Cir. 1997) "To show the requisite causal link, the plaintiff must present evidence sufficient to raise the inference that [his]protected activity was the likely reason for the adverse action."  Id. (quoting Ferguson v. E .I. DuPont de Nemours and Co., 560 F. Supp. 1172, 1200 (D. Del. 1983)  Once the plaintiff has established a prima facie case, the defendant can offer a legitimate, non-discriminatory explanation for its actions; in other words, the familiar McDonnell Douglas burden shifting framework is utilized, and the plaintiff can offer evidence showing that the defendant's rational is merely a pretext.  Id.  However, "the plaintiff's 'ultimate burden in a retaliation case is to convince the fact finder that retaliatory intent had a 'determinative effect' on the employer's decision."  Id. (quoting Shaner v. Synthes (USA), 204 F.3d 494, 501 (3d Cir. 2000)).  Here, judgment as a matter of law is appropriate

29

on Wilcoxon's retaliation claim.  See e.g.  Cuffee v. Dover Wipes Co., 334 F. Supp. 2d 565,

575 (D. Del. 2004) (granting summary judgment on retaliation claim).

     In the instant matter, Wilcoxon has failed to meet the third element of the prima facie

case because he has not demonstrated a causal connection between the non-renewal of his

contract and any protected activity under Title VII.  As noted above, the record demonstrates

that administrators at Skyline began voicing concerns over Wilcoxon's behavior towards

Freebery, his classroom management, his lesson planning, and other matters that ultimately

formed the basis for the decision not to renew his contract long before any Title VII protected

activity.  Wilcoxon's initial Charge of Discrimination charge was filed February 24, 2004,

and received by the District on March 12, 2004!  A233; A118; A235; A155.  Concerns over

his performance and disruptive actions were expressed before and after the Charge was

received.  See A334-5; A337.[9]

     Finally, even if the Court determines that Wilcoxon has established a prima facie case

of retaliation, summary judgment is still appropriate because Red Clay has articulated

legitimate, non-discriminatory reasons for its actions.  Wilcoxon has failed to present any

evidence suggesting these reasons are mere pretexts.  Plaintiff has "the burden of presenting

evidence from which a reasonable jury could conclude either that the articulated reason is a

pretext for the retaliation or that a discriminatory reason more likely motivated the

employer." Robinson v. City of Pittsburgh, 120 F.3d 1286, 1302 (3d Cir. 1997) (quoting

Delli Santi, 88 F.3d at 199 Taylor, 184 F. Supp. 2d at 418 ("Plaintiff must cast sufficient

doubt on these reasons in order to establish that they are a pretext for retaliation").

---

[9] As Dunmon notes in her statement, the May 11, 2004 reprimand was *not* the first instance
wherein Wilcoxon had been reprimanded for his inadequate lesson planning. A336.  Indeed,
evidence obtained from Wilcoxon's previous employer, the Lake Forest School District,
shows that Wilcoxon's difficulties with drafting adequate lesson plans long pre-date his
arrival in the Red Clay School District. A3, 7. As noted above, Wilcoxon was on an IIP for,
among other reasons, poor instructional planning.  A15-16.

**IV.    SUMMARY JUDGMENT SHOULD BE GRANTED ON PLAINTIFF'S WRONGFUL TERMINATION CLAIM BASED ON ALLEGED FAILURE TO COMPLY WITH 14 DEL. C. § 1410(B).**

This Court's June 30, 2006 Memorandum Opinion denied defendant's Motion to Dismiss Plaintiff's wrongful termination claim based on the allegations pled in the Complaint.  With the complete record now before the Court, Defendant Red Clay Consolidated School District respectfully requests that the Court grant summary judgment on this claim because the facts taken in the light most favorable to the Plaintiff fail to state a claim.

**A.    Plaintiff's Retaliation Claim Is Without Merit.**

Based on the Court's previous opinion, summary judgment on the retaliation prong of plaintiff's wrongful discharge claim may be granted if the Court concludes that summary judgment is appropriate on  Plaintiff's First Amendment and Title VII retaliation claims.  For the reason set forth, above, with respect to those claims, Defendant believes there is no genuine issue of material fact with respect to the Plaintiff's claims for retaliation under the First Amendment or Title VII.  Accordingly summary judgment should be granted.

**B.    Plaintiff's Claim Under the Collective Bargaining Agreement Is Without Merit.**

Wilcoxon bases his wrongful termination claim exclusively on an alleged violation of Article 4:4.1 of the collective bargaining agreement between Red Clay and the Teachers Association.  That provision of the Agreement has been quoted at length elsewhere, including at page 20 of the Court's Memorandum Opinion of June 30, 2006.  In a nutshell, Wilcoxon contends that he should have received a statement from the District after the January 22, 2004 meeting with Basara in which he received three reprimands stating why he did not receive 48 hours' notice of the meeting.  Wilcoxon claims that the failure to provide a statement of the reasons for waiving the 48-hour notice means that the three reprimands were not "properly

placed" in his personnel file within the meaning of 14 Del. C. § 1410(b). Wilcoxon's

contention is without merit for several reasons.

First, assuming (arguendo) that Article 4:4.1 of the collective bargaining agreement

applies to the January 22, 2004 meeting (and it does not), it does not follow that the

reprimands were not properly placed in Plaintiff's personnel file under 14 Del. C. § 1410(b).

Second, even aside from the three reprimands Wilcoxon received on January 22,

2004, there is other substantial documentation of his performance and disciplinary problems

in Wilcoxon's personnel file.

Third, Plaintiff is incorrect that Article 4:4.1 was violated and, in any event, the

failure to file a timely grievance and/or to take the issue to arbitration waives or estops him

from asserting this claim.  Further, any alleged technical violation was cured by the grievance

hearing on the three reprimands during which he was represented by his union.

> **1.     The Teacher Tenure Law Does Not Provide that
> An Asserted Violation of a Collective Bargaining
> Agreement Means That Documentation of a
> Teacher's Discipline May Not be "Properly
> Placed" in His Personnel File.**

As the Court has pointed out in its June 30, 2004 Memorandum Opinion, Delaware

law does not define the meaning of "properly placed" in 14 Del. C. § 1410(b).  Nothing in the

law suggests that an alleged violation of a collective bargain agreement, let alone an asserted

technical violation of a notice provision, means that documents a teacher undisputedly

received and responded to are not "properly placed" in his file.

While Wilcoxon will no doubt rely on McCoy v. Sussex County Vo. Tech. Sch. Dist.,

1998 Del. Ch. LEXIS 171 (Del. Ch. Aug. 27, 1998), McCoy does not aid Plaintiff's case.

That case, of course, not only involved a different collective bargaining agreement but also

entirely different circumstances.  Unlike the present case, a grievance concerning an

employee reprimand went to binding arbitration. The arbitrator issued a binding decision

finding that the reprimand letter on which the school district relied was not based on just

32

cause and ordered the defendant to rescind it. The Court specifically noted that, unlike the

present circumstances, there were no other documents supporting the non-renewal of the

teacher. McCoy, 1998 Del. Ch. LEXIS 171 at *14-16.

> **2.    Aside From the January 22, 2004 Reprimands,
> There is Ample Other Documentation of
> Performance and Disciplinary Problems That
> Were Properly Placed in Plaintiff's Personnel.**

As noted above, the documentation of Wilcoxon's performance problems included

not only three reprimands on January 22, 2004, but also several other items. He received

three observations during the 2003-2004 school year: November 19, 2003, February 12,

2004, and April 21, 2004. He also received other disciplinary action for his lesson plans, an

amended reprimand dated March 8, 2004 for his inappropriate comments, a reprimand for

lack of security, and a poor year-end performance evaluation. There is no contention that

Article 4:4.1 was violated in connection with any of this documentation, nor that it was not

"properly placed" in Wilcoxon's personnel file under 14 Del. C. § 1410(b).

Basara testified that Wilcoxon's November 19, 2003 observation was generally

acceptable but included several specific recommendations for improvement. The observation

was announced. It is also notable that Wilcoxon was team teaching a class with Freebery.

The observation is replete with references to the assistance Freebery provided Wilcoxon

throughout the lesson. Importantly, although the observation commended Wilcoxon for

"planning a lesson" that fit the standard, it later became known that, in fact, Wilcoxon was

using Rumford's two-year-old lesson book. He admits that he never updated Rumford's

plans and continued to use them. Even then, Wilcoxon failed to "write the performance

indicator on the board *for each day's lesson* to help the students focus on the main idea."

(emphasis added) A95-96. Basara also noted that:

> As this was an introductory lesson, there were no higher
> level questions. I would expect that in future lessons in
> this unit, those type of questions would be included.

33

A95-96.

The February 12, 2004 observation took place in the physical education class. Wilcoxon had the students play "scooter ball." The observation was not notable for its commendations or recommendations.

Wilcoxon's final evaluation was on April 21, 2004. It was an unannounced observation of a health class. At that point, Wilcoxon was no longer team teaching with Freebery and did not have her assistance. It is not disputed that Wilcoxon received a copy of that observation and it was placed in his personnel file. In addition, he wrote a rebuttal to the observation that confirmed many of the concerns Basara raised.

The April 21, 2004 observation showed, among other things, that Wilcoxon had difficulty in classroom management including a high noise level, off-task behavior, whistling by students, one student slouching over two desks, and poor classroom organization. Basara also noted that the directions Wilcoxon provided were not clear, that he should have used a different approach to student group activity, that he should have used a different approach for having students present the information from their group activity, and given advance notice that one of them would be required to report the group activity to the class. Basara's observation further observed that the whistling in class was "a cat and mouse game at the teacher's expense." Another glaring problem was Wilcoxon's failure to bring the class to closure. In his rebuttal statement,Wilcoxon admits his students were whistling during his presentation. Wilcoxon also admits his failure to bring the class to closure.

Following the observation on April 21, 2006, Basara asked Wilcoxon for a copy of his lesson plans. Wilcoxon delayed in giving the plans to Basara and then gave her Rumford's plan book with piece of masking tape over it with the words "Wilcoxon's Plan Book" written on it. He was issued a written reprimand on May 11, 2004 for failing to prepare and maintain up-to-date lesson plans.

Wilcoxon also received reprimands for failing to adequately secure funds collected by students for their American Heart Association Hopes for Heart Campaign. The union did not grieve this reprimand.  He also received a year-end performance appraisal.

Accordingly, aside from the three reprimands the union challenges under the collective bargaining agreement Article 4:4.1, there is more than adequate documentation of plaintiff's poor performance and discipline issues that were "properly placed" in his personnel file in accordance 14 Del. C. § 1410(b).

### 3. The Collective Bargaining Agreement Was Not Violated, and, In Any Event, any such Claim has been Waived or Has Been Cured.

The Court noted in its June 30, 2006 Memorandum Opinion that Article 4:4.1 does not apply to informal discussions between a Principal and a teacher.  As Basara testified, Principals and Assistant Principals meet with teachers every day.  Plaintiff apparently contends that Article 4:4.1 was violated because he did not have a union representative at the December 17, 2003 conflict resolution meeting.  The record is clear that at no time in that meeting nor any point thereafter did Wilcoxon submit a written request for a statement of the reasons for not giving 48-hours notice.

Wilcoxon also contends that the January 22, 2004 meeting violated Article 4:4.1 because three reprimands were delivered to him that day.  Basara and Wilcoxon both noted that the discussion of the reprimands would follow when he spoke to his union representative.  It is undisputed that Article 4:4.1 of the Agreement has never been applied in such circumstances.  As a result, the Association has never raised any such issue in arbitration.  A332.  The application of the past practice here is therefore consistent with the school district's approach. See Conrail v. Railway Labor Exec. Ass'n, 491 U.S. 299, 311-312 (1989) (noting importance of post-practice and union acquiescence in interpreting collective bargaining agreement);  National Labor Relations Board v. Strong, 393 U.S. 357, 365 (1969); McQuestion v. New Jersey Transit, 30 F.3d 388, 392 (3d Cir. 1994).

35

Wilcoxon suffered no prejudice.  Unlike McCoy, there is no contention that anything Wilcoxon said or did at the January 22, 2004 meeting was used against him or resulted in discipline in any way.  In fact, as noted above, all that happened at the January 22, 2004 meeting was that Wilcoxon received the reprimands to take to his union representative. Wilcoxon himself has already admitted that he believed that his job was in jeopardy so he was secretly taping his conversations with Basara, including the January 22, 2004 meeting. He is in no position to claim prejudice.

Further, he did not raise the issue until after the meeting was concluded and he was already in communication with his union about filing a grievance.  The grievance that was filed concerning the reprimands focused on the reprimand for inappropriate comments, not on Wilcoxon's failure to prepare adequate lesson plans and failure to sign up for after school buses for students.  The grievance from the January 22, 2004 reprimands was based on Article 4:6 of the Agreement, claiming that Mr. Wilcoxon had not been reprimanded for just cause, not on Article 4:4.1.

With respect to the reprimand for inappropriate comments that was the focus of the grievance, that reprimand was in fact amended on March 8, 2004.  It was given to Wilcoxon and his union representatives and it was placed in his personnel file as the result of the grievance.[10]  The March 8, 2004 amended reprimand, therefore, is the operative document.  It remains unaffected by any alleged violation of the Article 4:4.1 of the Agreement on January 22, 2004, since Wilcoxon received it and it was placed in his personnel file as the result of the grievance process itself.

---

[10]   As noted in Mr. Wilcoxon's deposition, the amended reprimand reflected his initial statements on December 17, 2003 meeting that Freebery had "opened the door" for inappropriate remarks and that he made the remarks in jest.

Any contention under Article 4:4.1 has also been waived.  During the grievance process, the District denied the attempt to file an untimely amendment to the grievance at level II.  A333.  This decision was affirmed at Level III.  Arbitration was not requested. Accordingly, Plaintiff has failed to establish that reprimands that he received on January 22, 2004 were given him in violation of the collective bargaining agreement.

### CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court grant summary judgment on all Counts of Plaintiff's Complaint.

Respectfully submitted,

YOUNG CONAWAY STARGATT & TAYLOR, LLP


  /s/ Barry M. Willoughby
Barry M. Willoughby, Esquire (No. 1016)
Michael P. Stafford, Esquire (No. 4461)
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware  19899-0391
Telephone: (302) 571-6666; 6553
Facsimile: (302) 576-3345; 3470
Email: bwilloughby@ycst.com; mstafford@ycst.com
Attorneys for Defendants

Dated: July 12, 2006

### CERTIFICATE OF SERVICE

I hereby certify that on July 12, 2006, I electronically filed a true and correct copy of the foregoing Defendants' Opening Brief In Support of Their Motion for Summary Judgment and Order with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record, and I further certify that a copy of such Defendants' Opening Brief in Support of Their Motion for Summary Judgment and Order will be hand delivered to the following counsel of record on July 13, 2006 to:

> Jeffrey K. Martin, Esquire
> Timothy James Wilson, Esquire
> Margolis Edelstein
> 1509 Gilpin Avenue
> Wilmington, DE  19806

YOUNG CONAWAY STARGATT & TAYLOR, LLP

/s/ Barry M. Willoughby
Barry M. Willoughby, Esquire (No. 1016)
Michael P. Stafford, Esquire (No. 4461)
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware  19899-0391
(302) 571-6666; (302) 576-3345
bwilloughby@ycst.com; mstafford@ycst.com
Attorneys for Defendants

Dated:  July 12, 2006