1

```
            IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF DELAWARE
RICHARD WILCOXON,              )
                               )
             Plaintiff,        )
                               )   Civil Action
  v.                           )   No. 05-524-SLR
                               )
RED CLAY CONSOLIDATED SCHOOL   )
DISTRICT BOARD OF EDUCATION,   )
and JANAY FREEBERY,            )
                               )
             Defendants.       )
```

Deposition of RICHARD WILCOXON taken pursuant to notice at the law offices of Young, Conaway, Stargatt & Taylor, 1000 West Street, Wilmington, Delaware, beginning at 9:05 a.m. on Thursday, May 4, 2006, before Eleanor J. Schwandt, Registered Merit Reporter and Notary Public.

APPEARANCES:

       TIMOTHY J. WILSON, ESQ.
       MARGOLIS EDELSTEIN
         1509 Gilpin Avenue
         Wilmington, Delaware  19801
         for the Plaintiff

       BARRY M. WILLOUGHBY, ESQ.
       YOUNG, CONAWAY, STARGATT & TAYLOR
         1000 West Street - 17th Floor
         Wilmington, Delaware  19801
         for the Defendants

ALSO PRESENT:
       DEBORAH COLES, Paralegal
       CHRISTINE SMITH
       DIANE DUNMON
       JANAY FREEBERY



WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
(302) 655-0477

**W&F**
**WILCOX & FETZER LTD.**
Registered Professional Reporters



A161

Richard Wilcoxon

5

1      A.    Okay.

2      Q.    What did you do to prepare for the deposition?

3      A.    I met with Mr. Wilson yesterday afternoon.   I

4   reviewed the complaint.   I looked over one of the

5   observations.   And I listened to one of the audio tapes.

6      Q.    And what kind of audio tape is this?

7      A.    This is an audio tape of some of the meetings I

8   had.

9      Q.    You taped meetings?

10      A.    Yes, I did.

11            MR. WILLOUGHBY:   And has that been produced?

12            MR. WILSON:   In our responses we said that

13   the audio tapes are available for your copying if you

14   want them.

15            MR. WILLOUGHBY:   Well, we request they be

16   produced immediately.

17   BY MR. WILLOUGHBY:

18      Q.    When did you start doing audio tapes of meetings?

19      A.    On, I guess first day was December 17th of 2003,

20   I guess it was.   I'm trying to think which year it was.

21   After documentation was found on the 15th, the 16th I met

22   with Jan Basara, and I was uncomfortable with how the

23   meeting went, so I felt very exposed, and I felt like

24   this whole thing was going to be turned around on to me.

**W&F**

Richard Wilcoxon

6

1    Q.    You thought your job was in jeopardy?

2    A.    I was concerned that that could be the direction

3  it went, yes.

4    Q.    All right.  So you started making audio tapes at

5  this point?

6    A.    Yes.

7    Q.    Did you inform any of the people that you were

8  taping, that you were making audio tapes?

9    A.    No, I did not.

10    Q.    So you did that secretly?

11    A.    Yes.

12    Q.    At that point were you represented by a lawyer?

13    A.    No, I was not.

14    Q.    When did you first contact a lawyer?

15    A.    I first talked to Jeff Taschner of DSEA that

16  March, I guess it was.

17    Q.    March of 2004?

18    A.    Was it two -- my last year teaching I guess, 2000

19  -- yes, 2004.

20    Q.    Was he representing you individually or

21  representing the organization?

22    A.    I don't understand.

23    Q.    Mr. Taschner, was he representing you

24  individually or was he representing DSEA?

Richard Wilcoxon

11

1    Q.    Yes.

2    A.    That morning -- on the first conversation was

3    that morning.  I knocked on the door and asked Jan Basara

4    if I could have the log back.

5    Q.    That was the log you were keeping on Janay?

6    A.    Yes.  She responded, "Yes, I'll get it to you

7    later."

8            Then next meeting was also that morning.

9    Miss Basara called me into her office and wanted to talk

10   to me about all the ways Miss Freebery could find out

11   that Miss Filer was the one who advised me to keep the

12   log.  The day before Miss Filer and I had approached Mr.

13   Rumford, because Miss Basara had left, and Miss Filer

14   made very clear that if Miss Freebery found out that she

15   was the one who gave me the advice that she would file a

16   complaint with Mr. Orga because her name should not come

17   out.

18   Q.    Wait a second.  Ms. Filer didn't want her name to

19   come out?

20   A.    Yes, to Miss Freebery.

21   Q.    And Ms. Filer gave you the advice to start

22   keeping a log on Ms. Freebery?

23   A.    Yes.

24   Q.    And she did that at a bar after work?



WILCOX & FETZER LTD.
Registered Professional Reporters

Richard Wilcoxon

12

1    A.    Yes.

2    Q.    Go ahead.  Tell me what you remember about the

3   conversation.

4    A.    The next one, Miss Basara was telling me the ways

5   Miss Filer could find out about the -- I'm sorry -- Miss

6   Freebery could find out that Miss Filer's name was the

7   person who gave it to me, and she was stating that people

8   could have seen her go into the cafeteria and pull Mr.

9   Rumford out, or saw myself and Miss Filer talking to Mr.

10  Rumford, talking to Mr. Rumford outside the cafeteria,

11  she could find out that way.

12              In that conversation I asked Miss Basara I

13  said, "I may be overreacting, I may be reading too much

14  into this, but both you and Mr. Rumford have come to me

15  and said we need to have a meeting later that day to see

16  how Miss Freebery and I could work together for the rest

17  of this year.  You both have stated the rest of this

18  year.  Maybe I'm reading too much into it, but why do you

19  say it that way?"

20              And her response was, "Well, you are not

21  tenured, are you?"

22    Q.    So at that point you had the belief that she was

23  going to not renew your employment?

24    A.    Yes.



Richard Wilcoxon

22

1    A.   No.

2    Q.   Do you remember asking her if she had sex with

3  Bruce Hannah yet?

4    A.   No.

5    Q.   You didn't say that?

6    A.   No.

7    Q.   Now, you were socializing with a group of

8  teachers called the Insubordinates; is that correct?

9    A.   No.

10    Q.   You weren't?

11    A.   No.  There is not a group of teachers that were

12  called that.  We didn't call ourselves insubordinates.

13  There was a group of teachers I socialized with.

14    Q.   You didn't call yourselves the Insubordinates?

15    A.   No.

16    Q.   Okay.

17    A.   Only term I heard referred to is the Exiles.

18    Q.   The Exiles?

19    A.   That's the only term I ever heard it referred to.

20  And I didn't use that term.  That was used by another

21  person who is a part of the group.  I never referred to

22  it as the Insubordinates.

23             (Wilcoxon Deposition Exhibit 1 was marked

24  for identification.)

Richard Wilcoxon

23

1    Q.   I've handed you what has been marked as

2  Exhibit 1.  Do you recognize that document?

3    A.   I don't recognize it.  It doesn't mean I didn't

4  get it;

5    Q.   Well, it is an e-mail, correct?

6    A.   Yes.

7    Q.   You are one of the recipients, correct?

8    A.   Yes.

9    Q.   And can you read, it says, "Subject:  Meeting -

10  Farewell," can you read the document after that?

11    A.   Do you want me to read it out loud?

12    Q.   Yes.

13    A.   "The 'meeting' of the Insubordinates is being

14  advertised as starting around 6 p.m. on Tuesday due to

15  the schedule of one of the schedulers."

16    Q.   Hold on one second.  At the top it says addressed

17  to "Fellow Insubordinates," correct?

18    A.   Yes.

19    Q.   You are telling us you never heard that term

20  before?

21    A.   I never referred to it and the people who I'm

22  close to in the group never referred to it.  I mean,

23  there is one person in the group refers to it as the

24  Exiles.  I never had a name for the group.  It is just a

W&F

WILCOX & FETZER LTD.
Registered Professional Reporters

A167

Richard Wilcoxon

24

1   group of friends.

2      Q.    And the people on the "to" line, are they the

3   group of friends you are referring to?

4      A.    Yes.

5      Q.    Includes Linda Filer?

6      A.    Yes.

7      Q.    Okay.  Why don't you keep reading the e-mail?

8      A.    "However, Fellow Insubordinates, in keeping with

9   our attitudes and behaviors, the meeting can begin

10  without him.  We can perform such duties as begin

11  drinking, terrorizing the neighborhood, begin drinking,

12  writing names in snow" --

13     Q.    Slow down.

14     A.    "Write names in the snow, begin drinking" --

15     Q.    Read slower, please.

16     A.    "Begin drinking, eating munchies, and continue

17  drinking.  I should have the refrigerator cleared out of

18  unnecessary items (such as my food) so that you can put

19  your beer supply on ice by 4:30 or so.  We will just

20  beginning the honoring without him."

21     Q.    Do you know who the person who is being referred

22  to for the "Special Meeting - Farewell" is?

23     A.    No, I don't.

24     Q.    Did you attend this farewell meeting?



Richard Wilcoxon

25

1    A.    I might have.  I couldn't tell you, to be honest.

2    Q.    Do you know who the message is from?

3    A.    Yes, Marilyn, I can't think of her last name.

4    Q.    And this was the group of people that you

5    socialized with at work at Skyline?

6    A.    Some of them are, yes.

7    Q.    Did you frequently go out for drinks after work?

8    A.    About every other Friday.

9    Q.    And was it one of those Friday meetings that

10   Linda Filer said to you that you should keep a book on

11   Janay Freebery?

12   A.    I don't know if it was then or not.  It was at a

13   time I was talking to Linda Filer about --

14   Q.    You told me earlier it was at a bar, earlier in

15   this deposition.  So you are correcting that now?  You

16   are saying it wasn't at a bar?

17   A.    I don't know where it was.

18   Q.    So you don't remember where it was?

19   A.    No.

20   Q.    Could it have been at a bar?

21   A.    It could have been.  It very well could have

22   been.

23   Q.    Who else was present when that conversation took

24   place?



WILCOX & FETZER LTD.
Registered Professional Reporters

A169

Richard Wilcoxon

28

1    Q.    Tell me about the conversations in the second

2   school year at Skyline when Ms. Filer suggested that you

3   keep the log on Ms. Freebery.

4    A.    She came to me and said that she was just getting

5   out of a meeting.  I don't know what meeting it was for.

6   I don't remember at this time.  And Miss Freebery made a

7   comment to the whole group that I was difficult to work

8   with, and that Mr. Rumford was part of that group as

9   well.

10           And so at that point I thought, I said,

11   "Well, if I'm difficult to work with, I'm covering her

12   classes when she is late, I'm covering when she is out,

13   how can I be considered difficult to work with."  She

14   said, "That's why you should keep the log."  And so,

15   again, that's when I did start keeping the log.

16    Q.    Did you go to Ms. Freebery and tell her you heard

17   she made these comments?

18    A.    No, I did not.

19    Q.    So you just decided to secretly keep the log?

20           MR. WILSON:  Object to the form.

21    A.    Yes.

22    Q.    And that log was for your own use, correct?  It

23   wasn't something you were taking to the district?  It was

24   for your own protection, as you said?

**W&F**

WILCOX & FETZER LTD.
Registered Professional Reporters

A170

Richard Wilcoxon

29

1    A.   Well, I would take it to the district if things

2  happened.  As Miss Freebery complained to Mr. Rumford, if

3  it went to my supervisors, her and Miss Basara, and my

4  job became in jeopardy because she said I was difficult

5  to work with or something happened to the kids and I was

6  poised in that situation, then it would be something I

7  would share with the district.

8    Q.   Only in those circumstances would you bring it to

9  somebody's attention in the district?

10    A.   Yes.

11    Q.   Did you tell somebody, any of the administrators

12  or principals that you were keeping it so you would have

13  leverage?

14    A.   No.

15    Q.   You never made that kind of remark either?

16    A.   No.

17    Q.   When was it you started keeping the log?

18    A.   In November.

19    Q.   Of what year?

20    A.   I believe it was 2003.  Yes, 2003.

21    Q.   So how long was the conversation, how long before

22  that was the conversation with Ms. Filer at the bar where

23  she suggested you start taking, keeping this log?

24    A.   It was the previous spring, so I guess six



Richard Wilcoxon

35

1   the file with the lesson plans?

2       A.   Yes.

3       Q.   Now, those lesson plans when you were at Skyline,

4   they were basically copies of plans that Mr. Rumford had

5   done, correct?

6       A.   No, that's not correct.

7       Q.   Did you write your own plans?

8       A.   Yes.

9       Q.   You are saying the plans that were on file were

10  plans you wrote yourself?

11      A.   Yes.

12      Q.   So you didn't get a notebook --

13      A.   I -- oh, yes, for emergency plans, yes, they were

14  my writing.

15      Q.   Did you get a notebook from Mr. Rumford with his

16  lesson plan book when you went to work at Skyline?

17      A.   Not for emergency plans.

18      Q.   Okay.  Well, tell me about that notebook first.

19      A.   When I arrived at Skyline they were about ready

20  to start health lessons, because I didn't start until

21  October.  Mr. Rumford gave me his lesson plan books and

22  said, "These are the lessons we use for health.  All the

23  work sheets are locked in the cabinet inside the health

24  room.  This is the key."

Richard Wilcoxon

36

1    Q.    And did you use that as, basically, your lesson

2  plans for the two years you were at Skyline?

3    A.    For health we team taught, so all lesson plans

4  were used by both Miss Freebery and myself, or in that

5  case it was the long-term sub, who I do not remember her

6  name.

7    Q.    After you stopped teaching with Ms. Freebery did

8  you continue to use those plans?

9    A.    Yes, I did.

10   Q.    Mr. Rumford's plans?

11   A.    Yes.

12   Q.    Now, you said you had other emergency plans that

13  you wrote?

14   A.    Emergency plans were separate from lesson plans.

15   Q.    And tell me about what the difference is.

16   A.    Emergency plans are locked on file and they are

17  only to be used when you are out.  The lesson plans are

18  lesson plans we use every day of teaching.  Every day we

19  should have a lesson plan.

20   Q.    Well, were the emergency plans to tell the

21  substitute what to teach?

22   A.    Yes.

23   Q.    And are you saying you wrote those yourself?

24   A.    Yes.



A173

Richard Wilcoxon

39

1   complained to the office that she should not be charged a

2   day since she did not call out."

3       Q.   Did you ever talk with Ms. Freebery about that

4   incident?

5       A.   No.

6       Q.   What is the next entry?

7       A.   "Mid-September - Janay was late and missed her

8   1st class.  Her girls stayed in the locker room

9   unsupervised.  Janay arrived the start of her 2nd class."

10      Q.   And you don't know what date that was?

11      A.   No, I don't.  I was outside with my kids, and a

12  girl came outside and said, "What are you doing?"  And I

13  said, "We are finishing up soccer.  Why aren't you with

14  your class?"  And she said, "Miss Freebery isn't there."

15  And I said, "You need to go up to the office and let the

16  office know."

17      Q.   You don't remember the date?

18      A.   No, I don't.

19      Q.   Did you ever have a conversation with Miss

20  Freebery about that?

21      A.   No, I did not.  I don't think.

22      Q.   Prior to the December 17 conversation with Ms.

23  Basara, did you ever tell her about these incidents?

24      A.   No, I did not.



WILCOX & FETZER LTD.
Registered Professional Reporters

Richard Wilcoxon

42

1    Jahlil probably asking an inappropriate question, and I

2    felt Miss Freebery was overly harsh in her response.

3        Q.   Did you tell Ms. Freebery that?

4        A.   I don't think so.

5        Q.   Now, this was your second year at Skyline,

6    correct?

7        A.   Yes.

8        Q.   And how long had you been teaching at that point?

9        A.   Overall?

10       Q.   Yes.

11       A.   I had spent three years at Lake Forest School

12   District and up until the October 4, I came to Skyline.

13   I was at Colonial?  Was it Colonial?  George Reed Middle

14   School.

15       Q.   So how many years is that?

16       A.   Up to this point?

17       Q.   Yes.

18       A.   That was my fifth year.

19       Q.   How long had Ms. Freebery been teaching?

20       A.   I don't know.  I believe nine.

21       Q.   And she was tenured?

22       A.   Yes.

23       Q.   And she had been teaching that class for a number

24   of years with Mr. Rumford?

**W&F**
WILCOX & FETZER LTD.
Registered Professional Reporters

Richard Wilcoxon

43

1    A.   Yes, that's correct.

2    Q.  All right.  Let's go back.  So November 14 says

3  what?

4    A.  "Left a health class 20 minutes early saying she

5  'needed to work on her master's thesis,' leaving me with

6  all the kids."

7    Q.  What did you say when that happened?  Did you say

8  anything to her about that?  Did you have a conversation?

9    A.  I don't recall.

10    Q.  So you are saying she just told you she was

11  leaving and you didn't agree to continue with the class?

12    A.  Well, obviously, I was going to continue with the

13  class.

14    Q.  Did you agree that she could leave early and you

15  would cover the class?

16    A.  I may have said that -- I don't recall.

17    Q.  You don't recall?

18    A.  I may have said that, I don't recall.

19    Q.  But you wrote it down here as something she did

20  inappropriately?

21    A.  Yes.

22    Q.  Did you tell her you thought it was

23  inappropriate?

24    A.  I don't think so.



Richard Wilcoxon

44

1    Q.    Okay.  November 17, what does that say?

2    A.    "Came into the In-service 15 minutes late."

3    Q.    What is that next to it in parens?

4    A.    It says "tally (15)."

5    Q.    What does that mean?

6    A.    I started keeping a tally of how late she was.

7    Q.    So you started keeping a record of how many

8    minutes late she was?

9    A.    Yes, that's correct.

10   Q.    And did you tell Ms. Freebery that she was late

11   that day?

12   A.    I don't know if I told her that day, no.

13   Q.    Did you tell Ms. Basara about any of these

14   conversations prior to the December 17 meeting?

15   A.    No, I did not.

16   Q.    All right.  What does the November 19 entry say?

17   A.    "Left before our last class.  Started to go to

18   bathroom.  Did not return until 2:25.  Said she was

19   talking to Becky Perse in the hall."

20   Q.    Did you mention to Ms. Freebery you thought there

21   was something inappropriate about this?

22   A.    I'm sure I did.

23   Q.    At the time?

24   A.    Yes.



Richard Wilcoxon

45

1    Q.   What do you remember saying?

2    A.   I could not tell you word for word.  I'm sure I

3  said something about, where were you, it shouldn't take

4  that long.

5    Q.   Do you remember that or are you saying you are

6  sure?

7    A.   I'm sure I talked to her about it.  I do not

8  remember exactly what I would have said.

9    Q.   Well, do you remember, do you have a conscious

10 recollection of saying something?

11   A.   Yes.

12   Q.   And what is --

13   A.   I believe I did.

14   Q.   Well, that's a different thing, whether you have

15 a conscious recollection or you believe you would have.

16 I'm asking if you have a conscious recollection of saying

17 something.

18   A.   No, I don't.

19   Q.   So you think you would have, but you don't really

20 remember?

21   A.   Correct.

22   Q.   Let's go to the next entry, November 24.

23   A.   "Late - arrived at 8:05.  Missing student leaders

24 and volleyball sign-ups."



WILCOX & FETZER LTD.
Registered Professional Reporters

A178

Richard Wilcoxon

48

1    next page, it says, "Left building to go to the bank

2    during planning," on the top of the next page.  I'm

3    thinking when I wrote this down, the Bruce situation

4    happened earlier, and left building was later that same

5    day.

6        Q.   So you crossed out that entry you started to make

7    so you could keep the entries in order?

8        A.   Yes.

9        Q.   Let's go to the next page, which is Bates

10   numbered C00760.  And start at the top of the page, tell

11   me the date and what the entries are there.

12       A.   Says "November 24th continued.  Left building to

13   go to the bank during planning (did not sign out) did not

14   return until 10:45 (22 minutes after class started.)"

15       Q.   Is your running total in here somewhere?

16       A.   I don't see it on that.

17       Q.   Did you say anything to Ms. Freebery about that?

18       A.   I do not recall.

19       Q.   Is there any reason why she couldn't leave the

20   building during her planning period?

21       A.   No.

22       Q.   Didn't you leave the building frequently during

23   your planning period?

24       A.   Yes.



A179

Richard Wilcoxon

50

1    done during class time, could be done at planning periods

2    or other things.

3        Q.    Did you tell her that?

4        A.    No, I did not.

5        Q.    Next entry?

6        A.    "Arrived at 6:22 for choice open house (teachers

7    were supposed to arrive at 6:00 p.m.) leaving me to set

8    up everything.

9        Q.    What did you have to set up?

10       A.    We had students come in and play volleyball

11   games.  I set the volleyball nets.  I had to get the

12   jerseys for the students.  I had to get the students

13   organized.

14       Q.    Did you tell Ms. Freebery that you believe that

15   what she had done was inappropriate?

16       A.    I do not recall.

17       Q.    What is the next entry?

18       A.    "Spent 30 plus minutes of choice open house

19   talking to a former student - ignoring parents and others

20   in the gym.

21       Q.    Do you know who the former student was?

22       A.    I have no clue.

23       Q.    And do you think it was inappropriate for her to

24   talk to a former student?



WILCOX & FETZER LTD.
Registered Professional Reporters

Richard Wilcoxon

54

1    Q.    What is the next entry?

2    A.    "11/26 - arrived at 7:50 - missed student leaders

3    and 1st period had started."  We were on a half-day

4    schedule.

5    Q.    Is that now your running total is an hour and 25?

6    A.    Yes.

7    Q.    Now, were you angry when you were keeping this?

8    Were you upset?

9    A.    I may have been frustrated.

10    Q.    Did you tell Janay or anybody else that you were

11    angry and hurt about the comments she had made?

12    A.    Not about the comments, no.  I talked to her.  I

13    was thinking more frustrated because I was required to do

14    extra work because she was --

15    Q.    Did you ever tell her that?

16    A.    Yes, I did.

17    Q.    Did you ever tell her that you were angry and

18    hurt about her comments?

19    A.    No, I did not.

20    Q.    Did you ever send her an e-mail about the

21    situation?

22    A.    What Frank Rumford told me, called me at home

23    when I was out sick on December 15th of 2003, he said

24    that Janay had the log, and I sent her an e-mail,

Richard Wilcoxon

57

1    top of the desk.  It wasn't in a drawer or a file cabinet

2    or anything else.

3        Q.   Let's continue looking at the log.  I think you

4    were up to November 26.

5        A.   "November 26 - arrived at 7:50 - missed student

6    leaders and 1st period had started (half-day schedule.)"

7        Q.   That's your tally at that point, is an hour and

8    25 minutes?

9        A.   Yes.

10       Q.   We don't have the original.  You were keeping

11   this tally as you were going along?

12       A.   Yes.

13       Q.   Did you tell Ms. Freebery about this concern?

14       A.   Did I tell her I was concerned about her being

15   late?

16       Q.   On November 26 you said she arrived at 7:50,

17   missed students, etcetera.  Did you raise that issue with

18   her at that time?

19       A.   I do not recall.

20       Q.   All right.  What is the next entry?

21       A.   "Left during 1st planning - returned at 9:23 - 5

22   minutes late for class."

23       Q.   Did you tell her about that concern?

24       A.   I do not recall.  I do not recall.



Richard Wilcoxon

65

"He stayed through class."

1

2     Q.    The time of the planning period?

3     A.    The time when I returned after planning period.

4     Q.    So in this case you wrote down the time that you

5  returned?

6     A.    Correct.

7     Q.    He stayed through class?

8     A.    Mm-hmm.

9     Q.    Did you raise any of these issues with Ms.

10  Freebery at the time?

11     A.    No, I did not.

12     Q.    What is the next entry?  "Left"?

13     A.    "Left 12:05 during class (without telling me) and

14  returned at 12:26."

15     Q.    Was the guest speaker still teaching?

16     A.    Yes.  She was there the entire day.

17     Q.    For this entire day neither one of you were

18  actually teaching the class, correct?

19     A.    That's correct.

20     Q.    All right.  What is the next entry?

21     A.    "After 2nd planning, Janay arrived at 1:23

22  claiming" -- I can't read what I wrote there.

23     Q.    Class, is it, began?

24     A.    "Class began," probably, "at 1:11."

**W&F**

WILCOX & FETZER LTD.
Registered Professional Reporters

A183

Richard Wilcoxon

94

1    University of Delaware?

2        A.    I have two degrees from University of Delaware.

3    One I graduated in January of '96, and the other one,

4    1998, I think.

5        Q.    What was the degree in in 1996?

6        A.    Ag. business management.

7        Q.    Did you go back to school for an education degree

8    after that?

9        A.    Yes, health and phys-ed degree.

10       Q.    Did you work in between?

11       A.    No, I did not.

12       Q.    So after you graduated you continued on for

13   another two years to get a bachelor's degree in

14   education?

15       A.    That's correct.

16       Q.    Did you student teach as part of that process,

17   the University of Delaware?

18       A.    Yes.

19       Q.    What were you taught about how you go about

20   making lesson plans and things like that when you were at

21   the university?  What training did you receive when you

22   were an education major concerning how to make lesson

23   plans?

24       A.    It was a part of a number of our classes.



Richard Wilcoxon

95

1    Q.    What do you remember being trained to do?

2    A.    Start with learning objectives, based on learning

3    objectives and what you want the student to walk away

4    with.  Create the activities.

5    Q.    Slow down.

6    A.    I'm sorry.

7    Q.    Start with the learning objectives.

8    A.    Mm-hmm.

9    Q.    Okay.  Create the activities?

10   A.    Create activities that fill those -- fulfill

11   those learning objectives.

12   Q.    What else?

13   A.    I don't know what you are asking me.

14   Q.    What were you trained when you were an education

15   major to do on how you go about making a lesson plan?

16   A.    Like I said, start with the learning objectives.

17   State standards came in after I graduated.  They became

18   -- so I didn't learn about those there, but they became

19   the learning objectives.  You create a lesson plan that

20   fulfills what you want the students to walk away with by

21   creating those activities.

22   Q.    That's it?

23   A.    You would have an opening for the students, to

24   get them prepared for the lesson, and a conclusion to



Richard Wilcoxon

96

1   wrap up.

2      Q.   What else?

3      A.   I'm unsure.

4      Q.   Did you receive any training on how you

5   transition into a new school as a new teacher, what steps

6   you should take as a new teacher at a school?

7      A.   No.

8      Q.   Do you remember being criticized when you were at

9   the University of Delaware about your ability to prepare

10  lesson plans?

11     A.   No.  I don't recall that.

12     Q.   Could it have happened?

13     A.   Possible.

14           (Wilcoxon Deposition Exhibit 3 was marked

15  for identification.)

16     Q.   This is Exhibit 3.  Have you seen that before?

17     A.   I'm sure I have.

18     Q.   Go over to the third page, which at the bottom,

19  it has an entry basically from your law firm saying the

20  law firm name and then a Bates number 0566.  Looking down

21  at the fifth paragraph, can you read into the record what

22  that says?

23     A.   "Three areas of difficulties surfaced during

24  Richard's student teaching:  1, difficulty in writing a

Richard Wilcoxon

97

1   detailed lesson plan; 2, difficulty giving clear, concise

2   explanations and directions, 3, difficulty achieving

3   effective transitions from one activity to another.  This

4   lack in detail in writing and speaking interfered with

5   the lesson pacing, children's time on task and maximum

6   learning time."

7       Q.    So now do you recall being criticized for your

8   ability to do lesson plans?

9       A.    I don't recall it, but, I mean, I just read it,

10  so it happened.

11      Q.    Tell me about your employment history after you

12  graduated from University of Delaware with your education

13  degree.

14      A.    I moved to Virginia.  I worked as a substitute

15  teacher.  I also worked for a county camp with kids.  I

16  worked for an organization to help battered women and

17  educated youth on violence.

18      Q.    What organization was that?

19      A.    Avalon, I believe it was called.

20      Q.    It was in Williamsburg, Virginia?

21      A.    That's correct.

22      Q.    Did you work at the YMCA?

23      A.    While I was in college I did.

24      Q.    That was while you were in college?



Richard Wilcoxon

98

1      A.    That was while I was in college, yes.

2      Q.    And did you work at St. Mark's High School?

3      A.    I have substituted there after I did my student

4   teaching there.

5      Q.    After you did what?

6      A.    I did my student teaching at St. Mark's, and they

7   asked me to substitute for them.

8      Q.    Who was your supervisor at St. Mark's?

9      A.    Tony Glenn.

10     Q.    What were your duties as a substitute teacher at

11  St. Mark's?

12     A.    From day one I ran one class completely.  I took

13  it over.  And gradually throughout my time there I took

14  over the rest of the classes.

15     Q.    What class was it that you took over?

16     A.    Phys-ed.

17     Q.    Was your education degree specialized in phys-ed

18  and health?

19     A.    Yes.

20     Q.    What were the classes that you took over at St.

21  Mark's?

22     A.    Freshman phys -- freshman, sophomore and senior

23  phys-ed classes.

24     Q.    Did you do lesson plans when you were there?



Richard Wilcoxon

99

1    A.    Yes.

2    Q.    Did you produce them in this case?

3    A.    No:

4    Q.    Do you still have them?

5    A.    Probably not.  I can look, but probably not.

6    Q.    What did you do at the YMCA?

7    A.    I was a youth sports coordinator.

8    Q.    What did you do there?

9    A.    I ran the youth sports for basketball, flag

10   football.  I did soccer with the kids.

11   Q.    Who was your supervisor?

12   A.    David Dill.

13   Q.    Did you teach or have any duties at the York

14   County Public Schools?

15   A.    I did some substitute teaching.

16   Q.    Do you know when that was, what years?

17   A.    It would be the spring of, I want to say spring

18   of '99, but that may not be the right year.

19   Q.    Did you apply for full-time teaching positions

20   after you graduated?

21   A.    Yes.

22   Q.    Where was the first full-time teaching position

23   you got?

24   A.    My first full-time one I got was at Chipman

WILCOX & FETZER LTD.

Richard Wilcoxon

100

1    School in Lake Forest School District.

2       Q.   Do you remember what year that was?

3       A.   1998, the fall.

4       Q.   Did you graduate in the fall of '98 or spring of

5    '98?

6       A.   I graduated in winter.

7       Q.   Of?

8       A.   I want to say it was '98.  Maybe -- January '98

9    commencement.

10      Q.   So when did you start full-time teaching at Lake

11   Forest?

12      A.   I'm sorry.  I have to think back.  I'm sorry.

13   I'm getting confused on the years.

14      Q.   Let's mark this at the next exhibit, please.

15               (Wilcoxon Deposition Exhibit 4 was marked

16   for identification.)

17      A.   I graduated --

18      Q.   Wait.

19      A.   Sorry.

20      Q.   I have marked as Exhibit 4 what appears to be

21   your application for employment at the Red Clay School

22   District; is that correct?

23      A.   Yes, that's correct.

24      Q.   Is the writing on this document a copy of your



Richard Wilcoxon

101

1    handwriting?

2        A.    That's correct.

3        Q.    And at that point you lived in Georgetown,

4    Delaware?

5        A.    Yes.

6        Q.    It says 24 Fairway.  I'm not sure what the --

7        A.    24 Fairway East.

8        Q.    How long had you lived at that address?

9        A.    That's my parents' home.

10       Q.    Were you married at this point?

11       A.    Yes.

12       Q.    Did you actually live at your parents' home while

13   you were married?

14       A.    For a short time, while we were looking for a

15   house in Newark.

16       Q.    Were you living there when you made this

17   application to Red Clay on July 3rd, 2001?

18       A.    I would have to look.  I don't have that -- I

19   don't remember off the top of my head.

20       Q.    Where else did you live in Georgetown?

21       A.    This is the only place I lived in Georgetown.

22       Q.    What?

23       A.    This is the only house I've ever lived in in

24   Georgetown.



Richard Wilcoxon

102

1      Q.   Let's go through your application.  Teaching

2   experience, you show first teaching at the Chipman Middle

3   School in Lake Forest School District, correct?

4      A.   Yes.

5      Q.   And you taught middle school health?

6      A.   Yes.

7      Q.   And that says you began in August of 1999,

8   correct?

9      A.   That's right.

10     Q.   And that says through the present, which would be

11  July 3rd, 2001, correct, the date of this application?

12     A.   I'm trying to -- I'm trying to remember when I

13  went to the high school.  I taught at Lake Forest High

14  School, so that's why I'm trying think.

15     Q.   What was --

16     A.   I also taught at Lake Forest High School.  I'm

17  trying to think which school I was at at that time.

18     Q.   Well, this is your application.  At the time you

19  filled it out --

20     A.   July 1st of -- yes, that's correct.  I was at the

21  high school fall 2001-2002, I was at the high school.

22     Q.   How many years were you at the middle school?

23     A.   From '99 until 2001.

24     Q.   And you were then at the high school for?



Richard Wilcoxon

103

1      A.    One year.

2      Q.    For one year?

3      A.    Yes.

4      Q.    Were you a tenured teacher?

5      A.    Yes, I received my tenure.

6      Q.    When did you receive that?

7      A.    August of I guess it would be 2002.

8      Q.    And then you left Lake Forest to move to Newark?

9      A.    We had already moved to Newark.  I was driving

10  down to Lake Forest High School every day from Newark.

11     Q.    And you were looking for positions in New Castle

12  County?

13     A.    Yes.

14     Q.    Where else did you look besides Red Clay?

15     A.    Christina.  I want to say it is Colonial, but I'm

16  not sure that's the school district name.  New Castle

17  County Votech I have applied at.

18     Q.    Where else?

19     A.    I probably applied at Middletown at the time.  I

20  don't know.

21     Q.    And did you receive any offers of employment

22  besides the employment offer at Red Clay?

23     A.    Yes.

24     Q.    Where was that?


WILCOX & FETZER LTD.

A193

Richard Wilcoxon

104

1    A.    George Reed Middle School, and I believe that's

2  Colonial School District.

3    Q.    What were you teaching there?

4    A.    Health.

5    Q.    And that would have been in September of 2002?

6    A.    Yes.

7    Q.    Then you left George Reed in October of 2002 to

8  go to Red Clay?

9    A.    That's correct.

10    Q.    Why did you leave the job you just started at

11  Colonial to go to Red Clay?

12    A.    I wanted to get back to teaching phys-ed, and

13  Colonial indicated I would teach phys-ed, but when I got

14  there they changed their structure.  I was strictly a

15  health teacher.

16    Q.    Were you told that you had any teaching problems

17  at the time you were at George Reed in the Colonial

18  School District?

19    A.    No.

20    Q.    Who was your supervisor there?  Who were the

21  principals at George Reed?

22    A.    Principal was Angela Guy, I believe her name was.

23    Q.    How do you spell her last name?

24    A.    G-U-Y, I believe.  I'm not a hundred percent

**W&F**

WILCOX & FETZER LTD.

A194

Richard Wilcoxon

106

1      Q.    How did you come to know about a position at Red

2  Clay?

3      A.    They called me.

4      Q.    Do you remember who called you?

5      A.    I do not.

6      Q.    Do you remember interviewing?

7      A.    Yes.

8      Q.    Who did you interview with?

9      A.    Dr. Nick Manolakos.  Frank Rumford was in the

10  interview.

11      Q.    Did you have an understanding as to why there was

12  a position available?

13      A.    Yes, Mr. Rumford had left phys-ed and was moving

14  up to a student activities person.

15      Q.    Did you meet Ms. Freebery at that point?

16      A.    I do not remember.

17      Q.    Do you know if she was teaching in that fall

18  semester of 2002 and 2003?

19      A.    She was not.

20      Q.    She was on maternity leave?

21      A.    I guess so.

22      Q.    Who did you teach with when you arrived at Red

23  Clay?

24      A.    There was a long-term sub.



Richard Wilcoxon

107

1    Q.   Do you know the name?

2    A.   All I can remember is name was Jill.  I can't

3    remember the rest of it.

4    Q.   Were you team teaching with her?

5    A.   We did some team teaching, yes, for health.

6    Q.   For the health classes?

7    A.   Yes.

8    Q.   How many health classes did you have when you

9    were at Red Clay the first year, in 2002/2003?

10   A.   Number wise, how many health classes?

11   Q.   Yes.

12   A.   I guess it would be ten, five each semester.

13   Q.   And how many phys-ed classes did you have?

14   A.   Same number, phys-ed -- health was a part of the

15   phys-ed curriculum.  It was the same students.

16   Q.   So you had five classes to teach each semester?

17   A.   I believe that's right.  Five or six.

18   Q.   Was it combined health and phys-ed class?

19   A.   Yes.

20   Q.   So when was it that you would be teaching on your

21   own instead of team teaching during that first semester

22   in the fall of 2002?

23   A.   The majority of the phys-ed classes.

24   Q.   You would be teaching?



Richard Wilcoxon

117

1    A.    I may have.

2          (Wilcoxon Deposition Exhibit 8 was marked

3    for identification.)

4    Q.    Do you recognize Exhibit 8?

5    A.    Yes.

6    Q.    And what is it?

7    A.    It was the plan book Frank Rumford handed to me

8    for health.

9    Q.    What you did was put a piece of tape across it

10   and put "Wilcoxon's Plan Book"?

11   A.    I did that when Miss Basara asked for it, I

12   believe is when I did that.

13   Q.    Before that it was --

14   A.    A plan book.

15   Q.    A plan book.  When she asked you for a copy of

16   your plan book, you took a piece of tape and put across

17   the first page and wrote "Wilcoxon's Plan Book"?

18   A.    She asked to see the health plan.  I said, "Do

19   you want the phys-ed as well?"  Because they were on my

20   computer, because I wrote the lesson plans and saved them

21   on my computer.

22   Q.    With respect to this plan book, is it correct

23   that you, when she asked you for the plan book, you just

24   took a piece of tape and wrote your name on it?

Richard Wilcoxon

120

1   phys-ed.

2      Q.   How many male teachers how many female teachers?

3      A.   There was two male.  I believe there was only one

4   female.

5      Q.   And it says your salary will be predicated on a

6   Bachelors degree with zero years of experience.  Do you

7   know why that is?

8      A.   I have no idea.

9      Q.   Did you have experience when you began at

10  Colonial?

11     A.   Yes.  Lake Forest, Chipman, I had forwarded that

12  I worked for them.  Up to Colonial yet, I don't know.

13     Q.   Did you ever have any discussion with anybody

14  about the fact that you were listed as having zero years

15  of experience?

16     A.   I may have.  I do not recall.

17     Q.   Do you recall what your salary was at Colonial?

18     A.   I do not.

19     Q.   Do you recall what your starting salary was at

20  Red Clay?

21     A.   I do not.

22     Q.   Do you know if one was higher than the other?

23     A.   I do not.

24     Q.   Do you have a ballpark for what your figure for

Richard Wilcoxon

121

1    what your salary was when you were at Red Clay?

2        A.   38.  I'm guessing.  I don't know.  If you are

3    asking for a ballpark.

4        Q.   38 is your recollection.

5             All right.  Before we took the break I asked

6    you to go through Exhibit 8 and identify where in there

7    your handwriting appears.  So have you done that?

8        A.   Yes.

9        Q.   And have you found some locations?

10       A.   Yes.

11       Q.   Down at the lower left-hand corner of this

12   document you will see what we call a Bates number.  It

13   begins with C and then has some numbers after that.

14       A.   Okay.

15       Q.   Can you tell me what Bates number you have found

16   your handwriting on this document?

17       A.   00338.

18       Q.   00338.  All right.  Where on this page does your

19   handwriting appear?

20       A.   At the top, the state standards, the AOD 1.2, 2--

21       Q.   Slow down for me a second.

22       A.   I'm sorry.

23       Q.   The top of the document?

24       A.   Top of the document.



A199

Richard Wilcoxon

122

1    Q.    Okay.

2    A.    Right next to "Health" and "Alcohol" in

3    parenthesis there is an AOD 1.2, coma, 2, coma, 3, coma

4    4, coma 5.  Below that is a "PA:4."

5    Q.    Is that your handwriting?

6    A.    Yes.

7    Q.    Is anything else on that page your handwriting?

8    A.    No, there is not.

9    Q.    Okay.  What other pages on this document did you

10   find your handwriting?

11   A.    00344.

12   Q.    That's at the top of the page again?

13   A.    It is at the top of the page again, by

14   "Health-Drugs" it says "AOD: 2, 3, 4, 5," then it says

15   "6th grade only, 1.1, 1.3, 1.4," and it says "PA:4."

16   Q.    Is there anything else on that page that's your

17   handwriting?

18   A.    Yes, on Wednesday, the 8th grade is crossed out,

19   over that it says "Review homework, Group Activity:  Here

20   comes the joint homework:  Face the facts."

21   Q.    Anything else on this page your handwriting?

22   A.    No.

23   Q.    Now, at the top of that page, the material you

24   read first, why did you add that?

Richard Wilcoxon

123

1    A.   Those are the forms indicators for health class.

2    Q.   For the state?

3    A.   Yes.

4    Q.   When did you add that; do you know?

5    A.   Probably at the beginning of 2003.

6    Q.   Do you remember?

7    A.   No, I don't.  I'm giving you an estimate.

8    Q.   Okay.  And the prior page that we read where you

9    had similar writing, that was also added because of the

10   state standards?

11   A.   Yes.

12   Q.   Where else on this document has your handwriting?

13   A.   There is no tag on this page.

14   Q.   Is it after the ones you just --

15   A.   Yes.  It is further back.  The page after C00355,

16   the very next page.

17   Q.   355?

18   A.   355.

19        MR. WILSON:  I think it does have the Bates

20   number.  It is just in a different location.

21   A.   I'm sorry.  It says "356."  I'm sorry.  It does

22   have it in a different location.

23   Q.   Okay.  Where on this page does your handwriting

24   appear?



Richard Wilcoxon

124

1      A.    Again at the top it says "Health-Tobacco, TOB:

2    1, "2, 3, 4, INJ:1."

3      Q.    Okay.

4      A.    In addition, I circled the movies down there at

5    the bottom, on Thursday's date.

6      Q.    The circle is your handwriting?

7      A.    Yes, I circled the movies because I was getting

8    other films to replace those.

9      Q.    But the rest of that was Mr. Rumford's

10    handwriting?

11      A.    Correct.

12      Q.    Within the circle?

13      A.    Correct.

14      Q.    All right.  What else?

15      A.    I marked it, but I don't see it now.  That may be

16    it that I found in my quick review.

17      Q.    Well, in quick review --

18      A.    When I looked through it.

19      Q.    Do you need more time to look further?

20      A.    When I flipped page by page, those are the ones

21    that jumped out at me and I saw quickly.

22      Q.    Why don't we take some time.  I want you to go

23    through it again and make sure you have identified

24    everything that you think is your handwriting.

Richard Wilcoxon

125

1      MR. WILSON:   Take your time.

2      Q. ' Take your time.

3      A.   My writing is also on C00348.

4      Q.   348, okay.

5      A.   Again, on Thursday it says "PI: EH 2, 3, 4, (8th

6   only 1.2.)  Also by the quiz it says "IJ 10, IJ 2, IJH

7   2."

8      Q.   That's on Friday?

9      A.   Friday, yes.

10     Q.   And nothing else on that page is your

11  handwriting?

12     A.   That's correct.

13     Q.   What does PI mean?

14     A.   PI is performance indicator.  It is part of the

15  state standards.

16     Q.   At the bottom it says, is it IJ?

17     A.   IJ.

18     Q.   All right.  Did you find anything else that's --

19     A.   No, I did not.

20     Q.   So those are the only markings you have been able

21  to find on this plan book that are your handwriting?

22     A.   Yes.

23     Q.   Did you ever tell anybody in a grievance process

24  that you didn't think you should have the burden of

Richard Wilcoxon

126

1    redoing lesson plans?

2        A.   No, I did not.

3        Q.   So that's another misstatement people are making

4    about you?

5        A.   Yes.

6        Q.   When was the last time you spoke to Rudy Norton

7    at DSEA?

8        A.   I'm unsure.  I don't recall.

9        Q.   Was it within the last year?

10       A.   Probably.  I haven't talked to him in a long

11   time.

12       Q.   When was the last time you spoke to anybody at

13   DSEA about this case?

14       A.   I believe I sent an e-mail to Jeff Taschner to

15   let him know the conciliation did not work out.  I think

16   that was the last thing I did.

17       Q.   Was there ever an arbitration brought for any of

18   your allegations against the school district?

19       A.   No, there was not.

20       Q.   So DSEA declined to bring an arbitration on your

21   behalf?

22       A.   Instead they put me in contact with Mr. Wilson to

23   represent me.

24       Q.   My question is:  Did they agree to put any of

Richard Wilcoxon

127

1   your claims against the school district into arbitration?

2       A.   Initially they did and then they changed -- they

3   did not go forward with that.

4                   (Wilcoxon Deposition Exhibit 10 was marked

5   for identification.)

6       Q.   Have you read it?

7       A.   Yes.

8       Q.   Okay.  Can you identify what it is?

9       A.   I sent it when Mr. Rumford contacted me and said

10  Miss Freebery saw my log, she was very upset.  I was home

11  sick and I sent her an e-mail.

12      Q.   So this is Exhibit 10, and it is an e-mail from

13  you to Janay Freebery, Janay Jack at the time?

14      A.   Yes.

15      Q.   And it says "Sent:  Monday, December 15, 2003 at

16  10:27 a.m."?

17      A.   Correct.

18      Q.   So how long was it after you spoke with Mr.

19  Rumford about him finding the legal pad was it that you

20  sent this e-mail?

21      A.   Not very long.

22      Q.   Well, how long is not very long?

23      A.   I can't recall exact times.  When I was called,

24  but I was called -- I was out sick that morning and I was

Richard Wilcoxon

129

1    Q.    Correct?

2    A.    I did not say that.

3    Q.    You never said that?

4              MR. WILSON:   Object to the form.

5    A.    I did not say that.

6    Q.    Anybody that said that is making it up?

7    A.    Correct.

8    Q.    So you wrote this e-mail to Janay.  And I'm not

9    going to ask you to read it word for word.  Looking at

10   the last sentence in the first paragraph, that says you

11   never showed it to anyone; is that correct?

12   A.    That's correct.

13   Q.    And you never did?

14   A.    I never did.

15   Q.    That was accurate?

16   A.    That's correct.

17   Q.    Going down to the second paragraph, middle of the

18   paragraph it says a teacher came to you and said that Ms.

19   Freebery had said that Frank will just have to deal with

20   Rich.  He is just too hard to get along with.  Who was

21   that teacher?

22   A.    Linda Filer.

23   Q.    And it says, "Or something along those lines."

24   So that's not an exact quote?

Richard Wilcoxon

130

1    A.   Correct.

2    Q.   It says, "They also advised me to start keeping a

3 log to CMA (cover my ass)."  Who is the "they"?

4    A.   Linda Filer.

5    Q.   Linda Filer is a "they"?

6    A.   As I said before, Tom Karpinski also was part of

7 that conversation.

8    Q.   So was it referring to both --

9    A.   It was actually referring to Linda.  "They"

10 referring to the same person who told me this statement.

11 They were the ones who told me that statement.

12    Q.   Wouldn't that be "she" as one person?

13    A.   Maybe I mistyped it.

14    Q.   So you are not referring to Mr. Karpinski in

15 that?

16    A.   I was not.

17    Q.   It was a cover my ass log, correct?

18    A.   Correct.

19    Q.   And that was for the reasons we have gone through

20 earlier in the deposition?

21    A.   Correct.

22    Q.   Then it says, "I was really hurt, angry and

23 concerned," so it is fair to say that you were angry?

24    A.   When I heard that those statements were made,

Richard Wilcoxon

132

1    for identification.)

2      Q.   Are you done reading it?

3      A.   Yes.

4      Q.   This is Exhibit 11.  Do you recognize that?

5      A.   Yes.

6      Q.   What is it?

7      A.   It is an e-mail I wrote to Mr. Norton and his

8    response to me.

9      Q.   This is after you contacted Mr. Norton, who is

10   with DSEA, as a grievance representative, correct?

11     A.   Correct.

12     Q.   Going down to the bottom of the page.

13     A.   Okay.

14     Q.   Where it says "The 2nd letter"?

15     A.   Mm-hmm.

16     Q.   Can you read that into the record, please.

17     A.   "The 2nd letter states that I have kept students

18   after school several times --

19     Q.   Slow down.

20     A.   I'm sorry.  "The 2nd letter states that I have

21   kept students after school several times and forgot to

22   sign up for busses.  Well this is stretching the truth.

23   I have forgotten to sign up before Janay causes the

24   busses in at 10:00 a.m. but I have always remembered in

Richard Wilcoxon

133

1    time to call in my extra numbers before my activities
2    started"."
3        Q.   So you do agree that on some occasions you forgot
4    to make the calls about the busses?
5        A.   By 10:00 a.m. I forgot to sign up the numbers.
6        Q.   Looking over at page 2 of this, see item 4 there?
7        A.   Yes.
8        Q.   You say, "And finally, is everything I say to you
9    strictly confidential? Because there is something I want
10   to talk to you about but I don't want anyone else at all
11   to know about yet." What was that?
12       A.   I do not recall.
13       Q.   You don't know what it was?
14       A.   I don't recall.
15       Q.   Well, you have no clue as to what you were
16   referring to in that statement?
17       A.   This e-mail was January 23rd, 2004. I don't
18   recall what I was thinking at that time.
19       Q.   You have no idea what you were referring to that
20   was so important that you didn't want anyone else to know
21   about it?
22            MR. WILSON:  Object.
23       A.   I can make guesses, but I don't recall.
24       Q.   What is your best recollection?



Richard Wilcoxon

134

1       A.   As I said, I don't recall.  I would be guessing.

2       Q.   What is your best guess?

3       A.   My guess would probably be the tapes, would be my

4   best guess, looking back at this time.

5       Q.   The tapes that you were starting in December?

6       A.   Yes.

7       Q.   But you don't have a recollection of that?

8       A.   I don't know if that's what I was referring to.

9       Q.   Did you ever tell Mr. Norton that, in fact, you

10  had made some comments to Ms. Freebery that might be

11  inappropriate?

12      A.   No, I did not.

13      Q.   Did you tell Mr. Norton about your trip to

14  Hawaii?

15      A.   I might have.  I do not recall.

16      Q.   Tell me about your trip to Hawaii.  When did you

17  start planning that?

18      A.   Whenever I turned in my request for personal

19  days.  I don't know what day that -- when that was.

20      Q.   That's when you started planning it?

21      A.   Yes.  My parents called me.  My aunt had a time

22  share and she was not going to be able to use.

23      Q.   Go ahead.

24      A.   And that's when I started planning it.

**W&F**

WILCOX & FETZER LTD.
Registered Professional Reporters

A210

Richard Wilcoxon

135

1    Q.    How long were you out there?

2    A.    I believe it was five days.

3    Q.    Did you take any sick time as part of the time

4  you were away?

5    A.    Not as part of the time I was away.  I got sick

6  when I came back.

7    Q.    So you weren't in Hawaii during either of the two

8  sick days that you took?

9    A.    That's correct.

10   Q.    Were you en route back?

11   A.    No.

12   Q.    So you made a trip to Hawaii for a total of five

13  days?

14   A.    That's correct.

15   Q.    And how long does it take to make a flight to

16  Hawaii?

17   A.    I have no idea.

18   Q.    Do you know what day you left on?

19   A.    I believe it was Saturday, or it was a Wednesday.

20  I don't remember where the weekend fell.  I planned it

21  around a weekend, so I could take the weekend.

22   Q.    And do you know what day you came back?

23   A.    Again, it would either be a Sunday or a

24  Wednesday.

W&F

WILCOX & FETZER LTD.
Registered Professional Reporters

A211

Richard Wilcoxon

136

1          Is that correct?  I planned around the

2    weekend.  I was either leaving on the weekend or I was

3    coming back on the Sunday of that weekend.

4        Q.   Let's mark this as the next document.

5             (Wilcoxon Deposition Exhibit 12 was marked

6    for identification.)

7        Q.   Have you looked at the document?

8        A.   Yes.

9        Q.   This is Exhibit 12?

10       A.   Mm-hmm.

11       Q.   I'm going to represent to you the second page is

12   a printout of the times you were out and the call-in that

13   you made to SDS concerning the need for a substitute, and

14   the first page we put together recording that information

15   on a calendar.

16       A.   Okay.

17       Q.   Okay.  So this SDS information shows you called

18   out for three personal days on Tuesday, January 13th.

19   Are you saying that's when you decided --

20       A.   No, I didn't call out.  I turned in the letter --

21   to take personal days you have to get approval from the

22   district.  And whenever I turned in that document to get

23   approval from the district is when I started planning.

24   It was not the day before.  It is when I turned in that

Richard Wilcoxon

137

1  letter.

2      Q.   Why did you wait until the day before to call SDS

3  about substitute?

4      A.   Because it wasn't approved until the day before,

5  is when I received the letter back saying my personal

6  days had been approved for those following days.

7      Q.   Have you produced that letter?

8      A.   I don't have that letter.

9      Q.   When was the last time you saw it?

10     A.   Probably when I received it.

11     Q.   When was it, to your recollection, the date or

12  the month when you started planning the trip to Hawaii?

13     A.   My guess would be December.  It wasn't very long

14  before we left.

15     Q.   December of 2000 --

16     A.   '3.

17     Q.   Who else was with you on the trip to Hawaii?

18     A.   My parents and my uncle.

19     Q.   How long did they stay?

20     A.   They stayed for another couple weeks.  They were

21  gone for a total of two weeks.

22     Q.   Do you have any of your records with your airline

23  receipts, things like that?

24     A.   No.



WILCOX & FETZER LTD.
Registered Professional Reporters

A213

Richard Wilcoxon

138

1    Q.    What agency did you use to schedule your airfare,

2    etcetera?

3    A.    I couldn't tell you.  I honestly don't know.

4    Q.    What airline did you fly?

5    A.    I'm making a guess it is USAir, but I don't know

6    for sure.

7    Q.    You don't remember which airline you flew?

8    A.    No.

9    Q.    You think it might have been USAir?

10    A.    It could possibly be USAir.  I don't know.

11    Q.    Could it be somebody else?

12    A.    It could be.

13    Q.    So you don't have any of the documentation

14    concerning your trip to Hawaii?

15          MR. WILSON:  Object to form.

16    A.    No, I do not.

17    Q.    No receipts?

18          MR. WILSON:  Object.

19    A.    No.

20    Q.    Credit card bills?

21          MR. WILSON:  Object to form.

22    Q.    Anything?

23    A.    No.

24    Q.    What caused you to get sick when you came back on

Richard Wilcoxon

140

1

2  BY MR. WILLOUGHBY:

3     Q.   Did you discuss your testimony with your attorney

4  over the lunch break?

5     A.   No, I did not.

6     Q.   We have marked Exhibit 13 and given that to you.

7  Have you seen that before?

8     A.   Yes.

9     Q.   Let me ask you to look at the last page, Bates

10  number 0413.

11    A.   Okay.

12    Q.   Under recommendations, can you read what is

13  listed as a recommendation?

14    A.   "Make certain your plans are detailed and well

15  developed.  One or two-word entries in your plan book is

16  unacceptable."

17    Q.   So that's a reference to your lesson plans when

18  you were at Lake Forest?

19    A.   That's correct.

20    Q.   Did you during the course of the time you were

21  employed at Skyline ever ask Ms. Freebery to go to the

22  Big Kahuna with you?

23    A.   Yes, I did.

24    Q.   Tell me about that.

W&F

WILCOX & FETZER LTD.
Registered Professional Reporters

A215

Richard Wilcoxon

141

1    A.    Myself and another teacher were trying to get a

2  group of teachers to go together to see a band who was

3  playing.

4    Q.    When was that?

5    A.    I don't remember.

6    Q.    Did you ever ask her to go to any other social

7  function with you?

8    A.    I don't think so, but I may have.

9    Q.    Did you ever ask her to do anything just the two

10 of you?

11   A.    I don't think so.

12   Q.    You might have?

13   A.    I don't recall ever asking her.

14   Q.    You don't remember?

15   A.    Right.

16   Q.    Okay.  We are going to listen to a tape that your

17 attorney produced of the meeting where you say that you

18 stopped the tape because it was running out.

19   A.    That's correct.

20              (Tape playing.)

21   Q.    We can stop it.  So just at the point where Ms.

22 Freebery makes comments about you making comments about

23 her personal life and that sort of thing you decided to

24 shut the tape off; is that correct?

WILCOX & FETZER LTD.
Registered Professional Reporters

Richard Wilcoxon

142

1      A.   I was afraid the tape was running out.  Our time

2   of the meeting was almost over.  I knew the tape was only

3   a half hour long, and I was turning it off --

4      Q.   Is it correct you shut the tape off at the point

5   where she made the comments that you were making

6   inappropriate remarks to her about her personal life;

7   isn't that true?

8      A.   It was right after, yes.

9      Q.   And you are saying that's just coincidence that

10   you shut it off then?

11      A.   That's correct.

12      Q.   Now, after that you made a comment on the tape,

13   that's on the tape we have.  When did you make that

14   comment?

15      A.   After my class that day.  We left.  I had to go

16   teach my class.  And after that class I made that

17   comment.

18      Q.   Did you record over anything when you made that

19   comment?

20      A.   I don't believe so.

21      Q.   Is it possible you did?

22      A.   I highly doubt it, but I'm not going to say it is

23   impossible.  I just hit record again right after.

24      Q.   Why don't you play the rest of the statement.

Richard Wilcoxon

149

1    that the obligations were untrue.

2         Q.  ' Any other reasons?

3         A.    I felt it didn't show my side of the story.

4    There was a number of reasons.

5         Q.    What was your side of the story?

6         A.    That those comments did not happen.

7         Q.    That's the whole side of your story?

8         A.    Yes, that it comes as retaliation for me keeping

9    a log.  That she made the statements I made as

10   retaliation for me keeping a log.

11        Q.    "She" being Ms. Freebery?

12        A.    Yes, Miss Freebery.

13        Q.    Looking at 17, which deals with the busses, do

14   you see that?.

15        A.    Yes.

16        Q.    You signed that one?

17        A.    Yes.

18        Q.    Does that mean you agree the comments are

19   accurate?

20        A.    I agree they are somewhat accurate.

21              Also, I had asked for the meeting to stop so

22   I can get union representation, and Miss Basara did not

23   allow that to happen.  She said not until you get the

24   last two letters.  At that point I just wanted to talk to

Richard Wilcoxon

150

1   a union rep, so I wanted to move the meeting along.

2      Q.   The first one you refused to sign?

3      A.   That's correct.

4      Q.   You said it was inaccurate.  The second one you

5   signed apparently because you thought there was some

6   truth to the statement; is that correct?

7      A.   There was some truth in that statement, yes.

8                (Wilcoxon Deposition Exhibit 18 was marked

9   for identification.)

10     Q.   Have you read Exhibit 18?

11     A.   Yes.

12     Q.   Was that the third reprimand you received?

13     A.   Yes.

14     Q.   On the 22nd of January?

15     A.   Yes.

16     Q.   And this one deals with your substitute teacher

17  plans, correct?

18     A.   Correct.

19     Q.   And you signed that one as well?

20     A.   Yes.

21     Q.   So does that indicate that there was some

22  accuracy to these as well?

23     A.   No.  I also -- as I said for the last one, at

24  that point I wanted to talk to a union rep, and wanted to

Richard Wilcoxon

152

1    A.   Yes.

2    Q.   But despite that feeling you signed both of the

3  next two?

4    A.   That's correct, because I wanted to get to the

5  phone and talk to my union rep.

6    Q.   Attached to that are these lesson plans that Ms.

7  Basara is referring to in the reprimand?

8    A.   I believe so.

9    Q.   Now, the second page, which is Bates number

10  00171, is that in your handwriting?

11    A.   171?

12    Q.   C00171, the second page of Exhibit 18?

13    A.   Yes.

14    Q.   Is that in your handwriting?

15    A.   Yes, it is.

16    Q.   What does that say?

17    A.   "Basketball shoot around - balls are in a cage in

18  supply closet."

19    Q.   Is there a date on that?

20    A.   Yes, Wednesday, 1/14.

21    Q.   So that was the plan for Wednesday, 1/14?

22    A.   Yes.

23    Q.   "Basketball shoot around - balls are in the cage

24  in supply closet"?

Richard Wilcoxon

153

1    A.    Correct.

2    Q.    Thursday, the 13th, what does it say?

3    A.    "Repeat Wednesday."

4    Q.    So for Thursday we are repeating what is above

5    it?

6    A.    That's correct.

7    Q.    What does Friday, the 14th --

8    A.    Says 16th, it looks like.

9    Q.    16th?

10   A.    "Scooter team handball - 3 on 3 - 1st team to

11   score stays on - make goals out of large cones - students

12   must pass the ball across half court, otherwise turnover

13   - can't score from own side - a goal is when the ball

14   hits the bleachers between the cones."

15   Q.    Keep reading.

16   A.    "If this is to hard or not going well, you can

17   shoot around instead."

18   Q.    Okay.  Read the rest of it.

19   A.    That was it.

20   Q.    That's it?

21   A.    Yes.

22   Q.    So these were your lesson plans for three full

23   days when you were out?

24   A.    Correct.

Richard Wilcoxon

154

1    Q.    Now, is there a learning objective listed on here

2    anywhere?

3    A.    No, there is not.

4    Q.    Is there any description of how you are going to

5    get to a learning objective from these plans?

6    A.    No, there is not.

7    Q.    Basically, this is how you play a couple of

8    games, right?

9    A.    Correct.

10    Q.    Okay.  And are you saying that this is an

11    adequate lesson plan as far as you are concerned?

12    A.    Not completely, no.

13    Q.    And that is your handwriting on that?

14    A.    That is correct.

15    Q.    The next page, 00172, is that your handwriting?

16    A.    Yes.

17    Q.    And what is that?

18    A.    It is a letter to the sub.

19    Q.    And can you read what it says?

20    A.    "Dear Sub, Thank you for your assistance.  If any

21    of the kids give you any problems, please leave a note

22    about them.  I am leaving you both TOR slips (to get a

23    student out of the room if they are a problem) and SBR

24    forms (if behavior is so bad you feel an administrator

Richard Wilcoxon

169

1    A.    That's correct.

2    Q.    And when was it that the team teaching between

3    yourself and Ms. Freebery stopped?

4    A.    This was the first semester.

5    Q.    The spring of 2004?

6    A.    That's correct.

7    Q.    And did it stop in January or did it stop sooner

8    than that?

9    A.    When the semester started, I guess it would be

10   January or whatever.

11   Q.    Was there any time during January where you team

12   taught?

13   A.    I do not think so.

14   Q.    So for the whole spring semester you were on your

15   own?

16   A.    That's correct.

17   Q.    And you were using the lesson plans for health

18   that Mr. Rumford gave you?

19   A.    That's correct.

20   Q.    What lesson plans were you using for the physical

21   education part of it?

22   A.    The plans I wrote.

23   Q.    Where are those plans?

24   A.    They were on my school computer.

Richard Wilcoxon

178

1    Q.    And C00243?

2    A.    That's correct.

3    Q.    How many times did she ask you for the lesson

4    plans before you sent this in?

5    A.    Once.

6    Q.    Well, the lesson plan was, the observation was on

7    April 21, and you gave this to her looks like

8    approximately two weeks later.  What was the reason for

9    the delay?

10    A.    As I said, she didn't ask for one that day.

11    Q.    When did she ask for them?

12    A.    Like I said, I guess approximately a week later.

13    I do not remember the exact date.

14    Q.    Well, why did it take a week to get back to her

15    when she asked for the lesson plans?

16    A.    Again, I don't remember the exact date when she

17    asked for them, so I don't know if it was a week.  I'm

18    giving you guesses.  I'm sorry.

19    Q.    So you don't remember when she asked you for it?

20    A.    No, I don't.

21    Q.    Okay.  Now, when a principal does an observation

22    of the teacher, is there a post-observation conference?

23    A.    Yes, there is.

24    Q.    What happens in the post-observation conference?

Richard Wilcoxon

181

1    Q.    What does the next line say?

2    A.    "On May 5th, 2004, I asked to see it for a second

3    time.  You copied four pages and put it in my mailbox on

4    May 6, 2004.  To this date, I have not seen your lesson

5    plan book."

6    Q.    Is that accurate?

7    A.    I had talked to her ahead of time and said, "Do

8    you want the book or do you want copies of the page for

9    health?"  And she said, "Copies would be fine."

10    Q.    So what you gave her in response to her request

11    on May 5th was what has previously been marked as

12    Exhibit 26?

13    A.    That's correct.

14    Q.    All right.  And what does the next paragraph say?

15    A.    "My concern is that the pages that you gave me

16    were lessons that Frank Rumford wrote more than two years

17    ago."

18    Q.    Stop there.  Is it accurate that the pages that

19    you had given her were lesson plans Mr. Rumford had

20    written two years ago?

21    A.    Correct.

22    Q.    Okay.

23    A.    "He shared these with you to guide and assist you

24    as a new teacher.  You have only inserted the standards



Richard Wilcoxon

182

1    on some of his lessons.  Is unacceptable" --

2        Q.    Let me stop you one second.  I'm sorry.  You only

3    inserted the standards on some of the lessons.  Is that

4    the writings on these documents we referred to earlier

5    that was in your handwriting?

6        A.    The standards, yes.

7        Q.    She is accurate, that's the only writing that's

8    on here?

9        A.    No.  I altered one of the assignments as well, we

10   talked about previously.

11       Q.    Just the one?

12       A.    Yes.

13       Q.    Go ahead.  She says, "It is unacceptable"?

14       A.    "It is unacceptable that after two years of

15   teaching health and physical education at Skyline, you

16   have not developed, adapted, adjusted, or improved upon

17   lessons handed to you as a guide."

18       Q.    Do you agree with that remark?

19       A.    No, I don't.

20       Q.    So you think it was just fine for you to keep

21   using Mr. Rumford's two-year-old lesson plans?

22       A.    For health we were team teaching.  I was told

23   those were the lesson plans.  I talked to people I had

24   seen teaching with, those were the lesson plans they

Richard Wilcoxon

185

1    mailbox, to meet me that day.

2        Q.   She gave it to you in advance, even though the

3    normal process is to give it to you at the conference?

4        A.   That's correct.

5        Q.   And then you read it over and asked for a

6    postponement of the meeting so you could talk to your

7    union representative?

8        A.   Yes.

9        Q.   And she agreed to that?

10       A.   Yes.

11       Q.   And then you had the meeting later that week?

12       A.   Yes.

13               (Wilcoxon Deposition Exhibit 29 was marked

14   for identification.)

15       Q.   Do you recognize Exhibit 29?

16       A.   Yes.

17       Q.   What does this deal with?

18       A.   It is a letter, I was written up for not securing

19   a student's Hoops for Hearts money.

20       Q.   Hoops for Hearts?

21       A.   It is a fundraiser.  Yes.

22       Q.   What is Hoops For Hearts?

23       A.   It is a fundraiser for the American Heart

24   Association.

Richard Wilcoxon

186

1    Q.   And students bring in cash or checks as a

2  contribution?

3    A.   That's correct.

4    Q.   And you were responsible for collecting the cash

5  and checks?

6    A.   That's correct.

7    Q.   And what happens with the cash?

8    A.   I collected the envelopes.  And I went up to the

9  cafeteria to get my lunch.  After the class, I returned,

10  the envelope was torn open.  One of the envelopes, just

11  one of them was torn open and the cash was missing.

12    Q.   Where had you left the envelope?

13    A.   On the front table in the multi-purpose room.

14    Q.   On the front table in the multi-purpose room?

15    A.   That's correct.

16    Q.   And why didn't you secure the cash, take it to

17  your office and lock the door or do something else?

18    A.   Honestly, I had been taking it back to my class,

19  back to my office in between each class, and at that time

20  I had forgotten about it.

21    Q.   So this memo is accurate, that the money that was

22  under your control was stolen?

23    A.   Yes.

24    Q.   Looking at the second full paragraph, can you



Richard Wilcoxon

187

1   read that into the record, again, slowly, the first

2   sentence.

3       A.   "Twice this school year I have reminded staff of

4   the importance of securing personal items and cash

5   collected from students."

6       Q.   Is that accurate?

7       A.   I do not recall.  I do not recall.  It could be.

8       Q.   Could be, okay.  Go ahead.  First?

9       A.   "First, we had a serious incident where a person

10  broke into our building and I held an emergency meeting

11  to notify staff and reminded everyone to lock their

12  valuables at all times."

13      Q.   Is that accurate?

14      A.   Yes, it is.

15      Q.   What is next?

16      A.   "Second, at our March faculty meeting, I reminded

17  staff to lock all money associated with SSA Power Card

18  fundraiser in their rooms until it could be brought to

19  the office and looked in the school safe."

20      Q.   Is that accurate?

21      A.   I do not recall.

22      Q.   So it could be accurate?  You just don't

23  remember?

24      A.   That's correct.



Richard Wilcoxon

188

1    Q.   And so that was another written reprimand you

2   received in the second semester of the 2003-2004 school

3   year?

4    A.   That's correct.

5    Q.   Now, again, at that point when you left the cash

6   unattended in the multi-purpose room, you knew your job

7   was in jeopardy and you believed it to be in jeopardy?

8    A.   Correct.

9    Q.   But you left it there anyway?

10    A.   Correct.

11                (Wilcoxon Deposition Exhibit 30 was marked

12   for identification.)

13    Q.   Do you recognize Exhibit 30?

14    A.   Yes.

15    Q.   Is this a typed version of the log that you had

16   been keeping?

17    A.   Yes.  This is what I referred to previously.

18    Q.   This is the one that was on your --

19    A.   Home computer.

20    Q.   -- home computer?

21    A.   That's correct.

22    Q.   And this stops at February 23rd?

23    A.   Correct.

24    Q.   Correct?



WILCOX & FETZER LTD.
Registered Professional Reporters

Richard Wilcoxon

194

1    A.    Yes, it is.

2    Q.    Do you agree with Mr. Orga's statement that the

3    educational system is an area of accountability?

4    A.    Yes, I do.

5    Q.    Do you agree all educators are being asked to

6    reach higher standards?

7    A.    Yes, I do.

8    Q.    And that's something that's happened not only in

9    Delaware but really across the country?

10    A.    Yes.

11    Q.    That includes observations that are both

12    announced and unannounced?

13    A.    Yes.

14    Q.    Is there any specific thing, way in which you

15    believe Ms. Basara had violated DPAS guidelines for

16    observations?

17    A.    I do not know the DPAS guidelines here.

18    Q.    Do you know of any way that she violated the

19    collective bargaining agreement by doing unannounced

20    observation?

21    A.    No, she did not.

22              (Wilcoxon Deposition Exhibit 34 was marked

23    for identification.)

24    Q.    Do you recognize Exhibit 34?

Richard Wilcoxon

195

1    A.    Yes, I do.

2    Q.    And what is it?

3    A.    It is the letter saying my contract would not be
4    renewed.

5    Q.    And it is dated May 14, 2004?

6    A.    That's correct.

7    Q.    Did you request a meeting with the superintendent
8    concerning the reasons for your nonrenewal?

9    A.    Yes, I did.  I requested a letter.

10   Q.    A letter.

11   A.    And then the next step was a meeting.

12              (Wilcoxon Deposition Exhibit 35 was marked
13   for identification.)

14   Q.    Who did you send your letter to asking for your
15   reasons for nonrenewal?

16   A.    The superintendent of the school district.  I was
17   advised to by my union.

18   Q.    They had a formal letter, didn't they, they gave
19   nontenured teachers to send in, the DSEA?

20   A.    I do not have any recollection of that.  I
21   believe that's where I got this information, but I don't
22   recall that's what it was.

23   Q.    You don't know whether or not they have a form
24   letter that they use for nonrenewals of nontenured



**WILCOX & FETZER LTD.**
Registered Professional Reporters

A232

Richard Wilcoxon

197

1    A.   I do not have recall directly what I said.

2    Q.   Do you recall what any of the school district

3 representatives said?

4    A.   No, I do not.

5    Q.   So you don't recall what they said?

6    A.   No, I do not.

7           (Wilcoxon Deposition Exhibit 36 was marked

8 for identification.)

9    Q.   Do you recognize Exhibit 36?

10    A.   Yes, I do.

11    Q.   What is that?

12    A.   It is the complaint I filed with the Department

13 of Labor.

14    Q.   And what was the date that you filed this charge

15 with the Department of Labor?

16    A.   It says down in the corner February 24th, '04.

17    Q.   And is it correct that the district didn't

18 receive the charge until some time later?

19    A.   Yes.

20    Q.   And is that on or about March 12th?

21    A.   It is in the middle of March.

22    Q.   Do you have any independent knowledge of when

23 they received it?

24    A.   No, I do not.

Richard Wilcoxon

198

1      Q.   And you claim in this charge that you are the

2   victim of gender bias, being male?

3      A.   Yes.

4      Q.   Let me go to the page marked C00775.  Do you see

5   that?  The top of the page --

6      A.   Yes.

7      Q.   -- "Remedy Information," item number 7?

8      A.   Yes.

9      Q.   You write, "I want to keep my job"?

10     A.   Yes.

11     Q.   So at that point you already believed that you

12  would not be renewed?

13     A.   That's correct.

14     Q.   And that was based on the comments that Ms.

15  Freebery made about you making inappropriate

16  sexually-related remarks to her?

17     A.   That's correct.

18     Q.   Let's look at page C00777.  Do you see item

19  number 4?

20     A.   Yes, I do.

21     Q.   So you are saying in there that, in fact, it was

22  Ms. Freebery who brought up the sexually-related comments

23  to you?

24     A.   Yes.

Richard Wilcoxon

206

1    for identification.)

2    BY, MR. WILLOUGHBY:

3        Q.    Do you recognize Exhibit 37?

4        A.    Yes, I do.

5        Q.    And that's dated June 9th, 2004?

6        A.    That's correct.

7        Q.    And this is the charge of retaliation you filed

8    with the Department of Labor, the EEOC?

9        A.    That's correct.

10        Q.    It says that you filed a charge on February 24th,

11    and the respondent received the charge on March 12th,

12    correct?

13        A.    Yes.

14        Q.    How do you know that date?

15        A.    There was a letter that was sent to me that said

16    they mailed it out to the respondents.  I don't know if

17    they received it on March 12th or sent it out.  I don't

18    know where that date came from exactly.

19        Q.    Isn't it fair to say that the negative treatment

20    that you received began, you claim you received began

21    after the log you were keeping on Ms. Freebery came out?

22        A.    It got worse.

23        Q.    So it is true that once that came out, in your

24    mind, you were being threatened with termination and

Richard Wilcoxon

213

1    termination, no.

2        Q.    Do you agree it occurred sometimes?

3        A.    I'm sure there is times.

4        Q.    Do you believe there was inappropriate

5    interaction with staff?

6        A.    No, I do not.

7        Q.    At no time?

8        A.    No.

9        Q.    What about lack of proper student lesson plans,

10   do you agree there were times when that was accurate?

11       A.    There may be times.

12                   (Wilcoxon Deposition Exhibit 42 was marked

13   for identification.)

14       Q.    Do you recognize Exhibit 42?

15       A.    Yes, I do.

16       Q.    And what is that?

17       A.    I believe it is a document Mr. Norton typed up,

18   I'm not sure, about the grievance hearing.

19       Q.    Would you agree that the association position,

20   that first entry after the hearing date and who is

21   present, that accurately summarizes the association's

22   position?

23       A.    Yes.

24       Q.    And do you agree that the administrative response

Richard Wilcoxon

216

1              MR. WILSON:  Okay.

2              MR. WILLOUGHBY:  For today.

3              (Recess taken.)

4              MR. WILLOUGHBY:  That's all I have for

5    today.  We have agreed we are going to come back, if

6    necessary, after the review of the tapes.

7              MR. WILSON:  Okay.

8              MR. WILLOUGHBY:  Do you have questions?

9              MR. WILSON:  I have very briefly a few

10   questions.

11                      EXAMINATION

12   BY MR. WILSON:

13        Q.   Mr. Wilcoxon, early in the deposition Mr.

14   Willoughby asked you when you were testifying about the

15   taping of the meetings and the journal if you thought

16   that was disloyal and you said something to the extent of

17   it might be disloyal.  Did you feel you owed loyalty to

18   Janet Basara?

19        A.   No.

20        Q.   Did you feel you owed loyalty to Miss Freebery?

21        A.   No.

22        Q.   Did you feel you owed loyalty to Mr. Rumford?

23        A.   No.

24        Q.   Who did you feel you owed loyalty to?

**W&F**