IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| RICHARD WILCOXON, | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No. 05-524 (SLR) |
| | ) | |
| v. | ) | JURY TRIAL DEMANDED |
| | ) | |
| RED CLAY CONSOLIDATED | ) | |
| SCHOOL DISTRICT BOARD OF | ) | |
| EDUCATION, and JANAY FREEBERY, | ) | |
| | ) | |
| Defendants. | ) | |

### VERIFICATION OF DIANE L. DUNMON

Pursuant to 28 U.S.C. § 1746, I, Diane L. Dunmon, hereby submit the following declaration under penalty of perjury:

1.    I am employed as the Deputy Superintendent of the Red Clay School District.

2    My job responsibilities include the ultimate oversight of the District's Human Resources functions as well as management of labor relations on behalf of the District with the union representing the teachers in the Red Clay Consolidated School District, the Red Clay Education Association, and other unionized employees.

3.    I have over nineteen (19) of experience in personnel matters and labor relations. I regularly deal with issues concerning the employment, renewal or non-renewal, and termination of teachers and staff.

1

061778 1003

A331

4.    Excerpts from the collective bargaining agreement between the School District and the Association during the period 2002- 2004 are attached hereto as Exhibit A. I was personally involved in its negotiation as well as the negotiation of predecessor agreements.

5.    Article 3 of the Agreement provides that the Association may file grievances on behalf of affected members. The grievance process includes three Levels. The Association also has the right to take certain non-statutory matters to non-binding arbitration in accordance with Article 3:6 of the Agreement.

6.    Article 4:4.1 of the Agreement addresses the circumstances in which an employee may request union representation in connection with meetings with District officials. It has never been construed as being applicable to meetings between a Principal or Assistant Principal in which they are attempting to resolve conflicts between two teachers in an effort to allow them to continue to team teach. Likewise, it does not apply when a Principal is simply delivering written reprimands to a teacher based on conduct that has previously occurred. The only grievance the Association has filed on this issue was the amended grievance it attempted to file at Level II in the Wilcoxon matter, as set forth below. The Association has never taken a case to arbitration alleging that this Article applies to building level meetings.

7.    Mr. Wilcoxon received three written reprimands on January 22, 2004, copies of which are attached hereto as Exhibits B, C, and D, respectively. The union filed a grievance alleging a violation of Article 4:6 of the Agreement alleging that Mr. Wilcoxon was not reprimanded for just cause. In accordance with the grievance procedure in the Agreement, a meeting was held between the building Principal, Janet Basara, and the Association's representative, Rudolf Norton, concerning the reprimands. The January 22, 2004 reprimand for Mr. Wilcoxon's inappropriate remarks to Ms. Freebery was later amended as a result of the

2

A332

hearing on the grievance to reflect Mr. Wilcoxon's statements that Ms. Freebery had allegedly "opened the door" to his inappropriate remarks and that he made the statements in jest. The amended reprimand dated March 8, 2004 is attached here to as Exhibit E and is in Mr. Wilcoxon's personnel file.

8.      Subsequent to the Level I hearing referred to above, the union attempted at Level II to amend the grievance to raise for the first time an issue under Article 4:4.1, as set forth in Exhibit F. The School District did not accept the amendment because it was presented at Level II.

9.      A grievance hearing was held on April 5, 2004. The District responded to the grievance at Level II on April 15, 2004 and at Level III on May 24, 2004, as set forth in Exhibit G. The District's Level II response stated, among other things, as follows:

> Since Article 4:4.1 was added at Level II, this response will only address Article 4:6 as this was the only article presented at Level I.

The Level III decision affirmed the decision at Level II.

10.     I am personally involved with decisions concerning whether a teacher should be continue employment at the conclusion of the school year. Under Delaware law, a school district must notify a teacher by May 15 of any school year of its intention to terminate said teacher's services at the end of such school year. 14 Del. C. § 1410(a). A teacher becomes tenured if they are employed in a public school district in the state for three years, two of which are in the employing school district. Once a teacher is tenured, he or she may not be terminated except for one or more of the following reasons:  Immorality, misconduct in office, incompetency, disloyalty, neglect of duty, willful and persistent insubordination, a reduction in force in the number of teachers required as a result of decreased enrollment or a decrease in

061778 1003

A333

education services. 14 Del. C. § 1411. In other words, unless there is a reduction in force, a tenured teacher may only be terminated for the reasons specified in the statute.

11.    It is therefore very important that the District determine whether a non-tenured teacher meets its expectations and standards before tenure is extended. Non-tenured teachers are therefore subject to more observations than tenured teachers, so that the District can make a determination concerning their fitness for tenure. The observations are an important part of the decision-making process on the renewal or non-renewal of non-tenured teachers.

12.    As Deputy Superintendent of the Red Clay Consolidated School District, it is my responsibility to make determinations on the renewal or non-renewal of non-tenured teachers. I consider the views and opinions of the building principals and assistant principals, the view of the Red Clay School District Human Resource Manager, Debra Davenport, as well as my own judgment and experience. I consider, among other things, the observations and evaluations the teacher has received, the teacher's disciplinary record, and whether in my view the teacher is of the kind and quality that the District wishes to retain on a permanent basis, subject only to dismissal for statutory reasons.

13.    It is important to the School District that only quality teachers are retained and become tenured. Accordingly, teachers are scrutinized in the year in which they are eligible for tenure to insure that they have the qualities and characteristics that the District expects before it extends them an offer of reemployment that will result in their receipt of tenure.

14.    I am personally acquainted with the facts and circumstances concerning the non-renewal of Mr. Wilcoxon in 2004. The Acting Principal of Skyline Middle School, Janet Basara, consulted with me on issues that arose with Mr. Wilcoxon during the 2003-2004 school

061778 1003

A334

year. These issues included the written reprimands referred to in Paragraph 7 above, as well as other disciplinary issues and questions concerning his performance.

15.   Mr. Wilcoxon received three observations during the school year. These are attached as Exhibit H. The observation instrument used in the Red Clay School District is a form approved by the Delaware Department of Education. Observations during the school year are both announced and unannounced. The instrument does not include an overall qualitative rating such as "Satisfactory, Unsatisfactory", or the like. Instead, the instrument focuses on the commendations and recommendations for improvement.

16.   Mr. Wilcoxon's observations reflect significant need for improvement of teaching skills, particularly when he was no longer team teaching health with Ms. Freebery, a seasoned tenured teacher. Ms. Basara performed an unannounced observation of Mr. Wilcoxon on April 21, 2004 (Exhibit H). That observation established Mr. Wilcoxon had significant difficulty in classroom management and instructional methods. The observation showed that some of the students had apparently lost respect for Mr. Wilcoxon and he did not reflect the teaching ability that is consistent with the expectations of the Red Clay School District. This observation was provided to Mr. Wilcoxon and placed in his personnel file in accordance with Red Clay School District personnel practices. There has been no arbitration or other determination that the observation of April 21, 2004 or any other observation was not proper. It should also be noted that Mr. Wilcoxon's request to extend his post-observation discussion with Ms. Basara so that he could discuss the observation with his union representative was granted. See Exhibit I.

17.   Other issues that arose with Mr. Wilcoxon in 2004 included his written reprimand dated May 11, 2004 for failing to prepare and update his lesson plans. A copy of that

A335

reprimand is attached as Exhibit J. The Association filed a grievance claiming that the School

District violated Article 4:6 of the Agreement concerning "just cause" for discipline. There was

no contention that Article 4:4.1 or any other section of the Agreement was violated.

18.    The grievance documents concerning the reprimand of Mr. Wilcoxon on

May 11, 2004 for inadequate lessons plans are collectively attached as Exhibit K. As noted

above, this was not the first time Mr. Wilcoxon was reprimanded for inadequate lesson plans.

As Mr. Wilcoxon has now admitted, the plans he left when out of school on a planned absence

on January 14, 2004 through January 16, 2004 are on their face inadequate. The Association did

not appeal the School District's Level III response denying the grievance to arbitration. The

May 11, 2004 reprimand was provided to Mr. Wilcoxon and is in Mr. Wilcoxon's personnel file.

There has been no arbitration or other determination that this reprimand was not properly placed

in his file, nor that it should be removed.

19.    Mr. Wilcoxon also received a written reprimand dated May 5, 2004 for

failing to secure money that students raised for the American Heart Association's "Hoops for

Hearts" fundraising attached as Exhibit L. While I considered this a relatively minor incident, it

did suggest a lack of attention to detail and a lack of judgment. No grievance was filed with

respect to that reprimand. It was provided to Mr. Wilcoxon and placed in his personnel file.

There has been no arbitration or other determination that this reprimand was not properly placed

in his file, nor that it should be removed.

20.    As noted above, I consulted with Ms. Basara concerning whether

Mr. Wilcoxon should be renewed at the end of the 2003-2004 school year and sought input from

Debra Davenport. If he were renewed, I was aware that he would receive tenure. In reviewing

all the facts and circumstances, I determined that Mr. Wilcoxon was not a teacher who was of

6

sufficient quality that he should be retained and extended tenure. As a result, Mr. Wilcoxon was placed on the list of non-tenured teachers who were recommended to the Board for non-renewal. The Board approved the decision to non-renew Mr. Wilcoxon's employment at its May, 2004 meeting. See Exhibit M.

21. In accordance with District procedures, Mr. Wilcoxon received a letter from Debra Davenport dated May 14, 2004 advising him of the Board's decision not to renew his employment. A copy of that letter is attached hereto as Exhibit N.

22. After Mr. Wilcoxon requested a statement of the reasons for his non-renewal, I sent him a letter dated June 1, 2004 stating the reasons for his non-renewal. That letter is attached as Exhibit O. The reasons for his non-renewal were in no part motivated by his gender (male) or a desire to "retaliate" against Mr. Wilcoxon for any reason. An objective review of the facts shows that Mr. Wilcoxon failed to prepare adequate lessons plans, demonstrated poor classroom management, and engaged in inappropriate interaction with staff.

23. Mr. Wilcoxon requested a hearing before the Superintendent of the Red Clay School District in accordance with Delaware law. A non-renewal hearing was held. The Superintendent upheld the decision not to renew his contract. A copy of that decision is attached hereto as Exhibit P.

I, Diane L. Dunmon, declare under penalty of perjury that the foregoing is true and correct.

DIANE L. DUNMON

Dated: July 12, 2006

7

061778 1003

A337

EXHIBIT A

# A G R E E M E N T

### BETWEEN THE

## RED CLAY CONSOLIDATED SCHOOL DISTRICT
## BOARD OF EDUCATION

### AND THE

## RED CLAY EDUCATION ASSOCIATION
## AFFILIATE OF NCCEA-DSEA-NEA, INCORPORATED

### September 1, 2002 through August 31, 2005

C00037

A339

# ARTICLE 2
## NEGOTIATION OF AGREEMENT

2:1    This Agreement will be for a period as specified in the Duration of Agreement Article; and negotiations concerned with the terms of this Agreement will not be reopened during that time except by mutual written agreement of the parties.

2:2    Neither party in any negotiations will have any control over the selection of the negotiating representatives of the other party.

2:3    The parties mutually pledge that their representatives will be clothed with all necessary power and authority to make proposals, consider proposals, and make counter-proposals in the course of negotiations. However, the Board negotiating team will not have the authority to bind the Board, and all agreements will be subject to final approval of the Board of Education.

2:4    This Agreement incorporates the entire understanding of the parties on all matters which were or could have been the subject of negotiation. During the term of the Agreement, neither party will be required to negotiate with respect to any such matter whether or not covered by this Agreement and whether or not within the knowledge or contemplation of either or both of the parties at the time they negotiated or executed this Agreement.

2:5    This Agreement will not be modified in whole or in part by the parties except by an instrument in writing duly executed by both parties.

2:6    The parties agree to enter into negotiations over a successor Agreement pursuant to and consistent with Chapter 40, Title 14, Delaware Code. Such negotiations will begin no later than six (6) months prior to the expiration of this Agreement.

2:7    Any agreement so negotiated will be reduced to writing, be submitted for ratification by the Association and approval by the Board, and be signed by the President of the Association, the Chairperson of the Professional Negotiations Committee of the Association, the President of the Board, and the Executive Secretary of the Board.

# ARTICLE 3
## GRIEVANCE PROCEDURE

3:1    <u>Definition</u>

3:1.1    A grievance will be defined as a written claim by an employee that the terms of this Agreement, official written policy of the Board of Education, or written administrative rules and regulations relating to salaries, employee benefits, and/or working conditions have been violated, misinterpreted, or misapplied resulting in the abridgement of rights granted to the employee by such documents. A grievance may also be defined as a written claim by the Association that the terms of this Agreement, official written policy of the Board of Education, or written administrative rules and regulations relating to salaries, employee benefits, and/or working conditions have been violated, misinterpreted, or misapplied resulting in the abridgement of rights granted to the Association by such documents.

3:1.2    A grievant is the employee, employees, or Association that files a grievance as provided for under this Agreement.

2

A340

3:1.3    A class grievance is a grievance filed by the Association which asserts an effect on a group or class of employees.

3:1.4    Days as used in this Article refer to employee work days; however, when a grievance is submitted between May 1 and September 1, days will refer to calendar days.

3:2    Purpose - The purpose of this procedure is to provide an alternative to existing means of resolving concerns over matters specified in this Agreement which affect employees of the District. Both parties agree that these proceedings, if utilized, will be kept confidential, except that the Board will provide the Association with copies of all grievances and written decisions at each level.

3:3    Timeliness

3:3.1    No grievance may be changed after its formal presentation; however, the grievance may be amended with respect to cited provision following the decision rendered at Level One of the grievance procedure and will be considered timely filed if resubmitted at Level One within ten (10) days of the initial response.

3:3.2    All grievances should be processed as rapidly as possible; the number of days indicated at each level will be considered a maximum, and every effort will be made at each level to expedite the process. The time limit specified may, however, be extended by mutual written agreement.

3:3.3    Failure at any level of this procedure to communicate the decision on a grievance within the specified time limits will constitute authority for the grievant to proceed to the next level. Failure at any level of this procedure to appeal a grievance to the next level within the specified time limits will be deemed to be acceptance of the decision rendered at that level.

3:3.4    If a grievance is a class grievance or concerns rights of the Association, the grievance will commence at a level appropriate to the occasion giving rise to the grievance.

3:4    Line of Grievance

3:4.1    The line of grievance which an employee will follow in processing a written grievance is:

    (a)    Building principal or immediate supervisor

    (b)    Director of Human Resources or designee

    (c)    Superintendent or designee

    (d)    Arbitration - Advisory

3:5    Specific Procedure

3:5.1    The grievant is encouraged to meet with the principal or his/her immediate supervisor or applicable District office personnel with the objective of resolving the matter informally.

C00043

3

A341

3:5.2      Level One – The grievant will set forth his/her grievance in writing as provided in Section 3:4 within fifteen (15) days from the date the employee was aggrieved. Within ten (10) days of receipt of the written grievance, the principal or other immediate supervisor will communicate in writing to the grievant his/her decision and the reason for the decision.

3:5.3      Level Two – The grievant, not later than five (5) days after being notified that the decision has been rendered may appeal the decision to the Director of Human Resources or designee. The basis for the employee's continued dissatisfaction will be delineated. The Director of Human Resources or designee may hold an informal grievance hearing within ten (10) days after receiving the grievance. A decision in writing will be rendered to the grievant within five (5) days of the hearing.

3:5.4      Level Three – If the grievant is not satisfied with the disposition of the grievance at Level Two, he/she may, within five (5) days after being notified that the decision has been rendered, appeal the decision to the Superintendent or designee.

     The basis for the employee's continued dissatisfaction will be delineated. The Superintendent or designee will hold an informal grievance hearing within ten (10) days after receiving the grievance. The Superintendent or designee will communicate the decision in writing to the grievant within five (5) days after the date of the hearing.

3:6      Level Four – Submission to Arbitration – Advisory – The decision of the Superintendent or designee will finally determine the matter unless the Association within ten (10) days of the Superintendent's decision submits a demand for arbitration to the American Arbitration Association. The request will state in reasonable detail the nature of the dispute and the remedy requested. The parties will then be bound by the rules and procedures of the American Arbitration Association in the selection of an arbitrator. The Association will represent the grievant at the arbitration level.

3:7      Redirecting Principles

     No claim by an employee or the Association will constitute an arbitrable matter or be processed through arbitration if it pertains to:

     (a)      A matter where a specific method of remedy or appeal is prescribed by law; (e.g., the Fair Dismissal Act) and/or by this Agreement.

     (b)      Any rule or regulation of the State Department of Education.

     (c)      Any matter which according to law is either beyond the scope of Board authority or which is illegal for the Board to delegate.

     (d)      Dismissal or discharge of an employee or nonrenewal of an employee's contract.

     Items (a) through (d) above, although not arbitrable, will be appealable through the grievance procedure to the Board within fifteen (15) days of the Superintendent's decision which will at its option hold a hearing concerning the matter or determine the matter on the basis of the written records. The Board will render its decision within thirty (30) days of the date of the filing of the appeal to the Board.

C00044

A342

3:8     Arbitrability

3:8.1   If the Superintendent or designee disagrees as to the arbitrability of the dispute, the Superintendent may request a conference to discuss the issue of arbitrability and seek to resolve the differences between the parties.

3:8.2   If the disagreement over arbitrability persists, the arbitrator appointed under the procedures set forth herein will rule upon the question of arbitrability prior to hearing the merits of the dispute in question. The same arbitrator will schedule a second meeting to hear the dispute on its merits if the dispute is judged to be arbitrable.

3:9     Procedure

3:9.1   The arbitrator selected will hold hearings promptly and will issue a recommendation not later than thirty (30) workdays from the date of the close of the hearings or, if oral hearings have been waived, then from the date the final statements and proofs on the issues are submitted. The arbitrator's recommendation will be in writing and will set forth the findings of fact, reasoning, and conclusions on the issues submitted. The arbitrator will be without power or authority to make any recommendation which requires the commission of an act prohibited by law or which violates this Agreement and will confine the opinion to the particular issue submitted. The arbitrator's decision will be advisory and will be submitted to the Board and Association. The Board will accept or reject the arbitrator's decision and such decision will be the final resolution.

3:9.2   The arbitrator, in the written opinion, will not amend, modify, nullify, ignore, or add to the provisions of the Agreement. The opinion must be based solely and only upon his/her interpretation of the meaning or application of the express relevant language of the Agreement.

3:10    Cost of Arbitration

3:10.1  The cost for the services of the arbitrator, including per diem expenses, if any, and actual and necessary travel, subsistence expenses, and the cost of the hearing room will be borne equally by the Board and the Association. Any other expenses incurred will be paid by the party incurring same.

3:11    Miscellaneous

3:11.1  Commencing with Level One of the Grievance Procedure, the grievant may be represented by a representative selected or approved by the Association or his/her own choosing.

3:11.2  If the grievant does not choose to be accompanied and represented by an Association grievance representative, the Association will have the right to be present and to state its views at all levels of the grievance procedure. This will not apply when the grievance involves matters of personal, embarrassing, and confidential nature and the grievant specifically requests, in writing, that the Association not be present.

3:11.3  If the employee elects to be represented, he/she must still be present at any level of the grievance procedure where his/her grievance is to be discussed, except that he/she need not be present where it is mutually agreed that no facts are in dispute and when the sole question is the interpretation of this Agreement.

A343

3:11.4   Where grievance proceedings are mutually scheduled by the parties during school time, persons proper to be present will suffer no loss of pay. In the event that a dispute arises as to whether a person is proper to be present at the grievance, such dispute will be subject to resolution through the grievance procedure.

3:11.5   No documents, communications, and records which are developed in connection with the processing of a grievance will be filed in the District's file pertaining to the employee.

3:11.6   It is understood that employees will, during and notwithstanding the pendancy of any grievance, continue to observe all assignments and applicable rules and regulations of the District until such grievance and any effect thereof will have been fully determined.

3:11.7   A form for filing grievances will be prepared jointly by the Association and the Administration, reproduced by the Administration and distributed to the Association so as to facilitate operation of the grievance procedure. The appropriate form will be used for filing a grievance at each level of the procedure.

3:11.8   Hearings at any level of the grievance procedure may be waived by mutual agreement of the parties.

3:11.9   Level One grievance decisions accepted by individual employees which appear in conflict with this Agreement may be grieved by the Association beginning with Level Two.

## ARTICLE 4
## EMPLOYEE RIGHTS

4:1   Employees have the right to join any organization for their professional or economic improvement; but membership in or an obligation to pay any dues, fees, assessments or other charges to any specific organization will not be required as a condition of employment.

4:2   The parties will not discriminate against, interfere with, restrain or coerce employees in the right to organize or to join or to participate in lawful Association activities or to refrain from so doing.

4:3   Nothing contained herein will be construed to deny or restrict to any employee such rights as may be held under Delaware School Laws or other applicable laws.

4:4   Employee Appearance with Administration/Agent of Board

4:4.1   If an employee is required to appear before the Board or an agent thereof concerning a matter which could adversely affect his/her continued employment, salary or any increments, he/she will be given prior written notice and specific reasons for such meeting or interview at least forty-eight (48) hours in advance. Any topic not included in the letter will not be covered at said meeting unless agreed to by the employee; if not agreed, it will be discussed at a later date after proper notice has been given. The employee will also be notified in writing of any additional persons who will be present. An employee required to appear in this instance will be entitled to have an Association representative of his/her choice present to advise and to represent him/her during such meeting or interview. Informal discussion with an employee by any member of the administrative staff pertaining to the employee's performance at his/her work location

6

C00046

A344

will not be precluded by the preceding language of this section; however, if as a result of such informal discussion, the employee perceives that the matter discussed could in the future adversely affect his/her continued employment, salary, or increments, the administrator will, upon written request, give the employee reasons in writing for the necessity of waiving the forty-eight (48) hours' written notice prescribed above. This section does not apply to terminations due to declining enrollments and/or to a reduction in education services.

4:4.2    Where an administrator asserts an immediate need to interview an employee regarding the facts of a school related situation, the 48-hour notice for such a meeting required in 4:4.1 shall not apply if the following conditions are observed.

    (a)    The topic of the interview is limited to determining the pertinent facts of the situation.

    (b)    That, if possible, prior to the interview, or where not, immediately thereafter, the administrator notifies the Superintendent or designee of the intent to conduct such an interview. The Superintendent or designee will notify the Association president as soon as possible, but within one (1) working day, of the administrator's intent.

    (c)    The employee is extended the opportunity to bring an Association representative of his/her choosing if time permits. If that is not possible, the employee may be accompanied by an available bargaining unit member of his/her choosing.

4:5    Any suspension of an employee by the Board of Education pending the disposition of charges will be with full pay and benefits. Where an employee is suspended for disciplinary reasons and that suspension is not revoked through the grievance procedure, said employee upon exhausting the grievance procedure will have deducted from his/her paycheck an amount of pay equal to the number of days of said suspension.

4:6    No employee will be disciplined, reprimanded or reduced in pay except for just cause. Any such action will be conducted with due regard for privacy.

4:7    The teacher will have the responsibility for determining grades within the grading policy of the District. Only the principal or his/her superiors will have the right to change a grade and will (1) if an employee is available within a reasonable amount of time, consult with the teacher before making the change, (2) as soon as possible, inform the teacher in writing of his/her right to file a disclaimer of responsibility for the grade; and, (3) provide in writing a reason if requested for the grade change, one copy to be given to the teacher. Whenever any grade change appears, it will be initialed by the person making the change.

4:8    Students will not be transferred to or from an employee's classroom without appropriate notice. Information concerning a student transfer will be provided to the classroom teacher on a need-to-know basis.

4:9    When a parent desires a conference with an employee, the employee will schedule the conference at a mutually agreeable time. When the parent indicates a desire to attend such a conference with a community representative or with a legal representative, then

the employee will so advise the building administrator who will then be responsible for scheduling and attending such a conference. With respect to such conferences, the employee will have the right to bring an Association representative or a representative of the employee's choice to the meeting.

When a parent brings a community representative or legal representative to a conference without prior notice to the employee, and in the event the building administrator feels a meeting is required at that time, the employee will be given at least a thirty (30) minute delay before the start of the conference if the employee requests an Association representative to be present.

If the Association representative is not present and the conduct or language of the parent and/or community representative becomes foul and/or abusive, the building administrator will terminate the conference at the employee's request.

### ARTICLE 5
### EMPLOYEE - ADMINISTRATION LIAISON

5:1     Building Liaison Committee

5:1.1   Association representatives will meet normally on a monthly basis with the building principal to review and to discuss school problems and practices, including the building budget. The Association representatives and the Administration will exchange agendas at least twenty-four (24) hours in advance of the normal monthly meeting.

5:1.2   This committee will consist of one (1) member for every twenty (20) (or major fraction thereof) employees in the building, but will have no fewer than two (2) members. The building administrator may invite other administrators and/or other staff members of his/her choice, depending upon the topic(s) to be discussed. Where the building principal is bringing a member of the district administrative staff to speak to the committee, the employees will have the right to have an Association representative present at such meeting.

5:2     District Liaison Committee

5:2.1   The Association President and an individual or individuals of his/her choice will meet with the Superintendent and an individual or individuals of his/her choice on a monthly basis in order to discuss the administration of this Agreement and other concerns which affect employees.

### ARTICLE 6
### NO STRIKE - LOCKOUT PROVISION

6:1     Both parties recognize the desirability of continuous and uninterrupted operation of the instructional program during the normal school year and the avoidance of disputes which threaten to interfere with such operation. Since the parties have established a comprehensive procedure under which unresolved disputes may be settled, the parties have removed the basic cause of work interruptions during the period of this Agreement.

8

C00048

A346

# EXHIBIT B

Mar. 4. 2005  1:55PM                                No. 1696    P. 29



**RED CLAY CONSOLIDATED
SCHOOL DISTRICT**

Robert J. Andrzejewski, Ed.D.
*Chief Executive Officer*

Administrative Offices
2916 Duncan Road
Wilmington, DE 19808

**SKYLINE
MIDDLE SCHOOL**
2900 Skyline Drive
Wilmington, Delaware 19808

(302) 454-3410
Fax (302) 454-3541

Nick T. Manolakos, Ed.D.
*Principal*

Janet Basara
*Assistant Principal*

To: Rich Wilcoxon
From: Janet Basara   1/29/04
Date: January 20, 2004
RE: Meeting on December 17, 2003

On December 17, 2003, we met to discuss a series of events that occurred between you and a female staff member. In our conversation, we discussed the inappropriate remarks, some of a sexual nature, you made to her. I told you at that time, such comments were unacceptable and were to stop immediately.

In addition, I want to inform you that if any further inappropriate comments are made, the District will take disciplinary action. You should also be aware that the staff member has indicated she will file sexual harassment charges, if this continues.

Please be advised that you need to maintain a professional relationship and cease all sexual remarks.

Margolis Edelstein
Wilcoxon v. Red Clay
0212

_____        _____
Signature indicates receipt, not necessarily agreement        Date

*Refused to sign* (Basara)   1/22/04

The Red Clay Consolidated School District does not discriminate on the basis of race, color, national origin, religion, sex, age, or disability in its programs, activities or employment practices as required by Title VI, Title IX and Section 504. The district coordinator of compliance is: Administrator of Human Resources Development. RCCSD, 2916 Duncan Road, Wilmington, DE 19805 (301) 652-0653.

A348

EXHIBIT C



*HR*

**RED CLAY CONSOLIDATED SCHOOL DISTRICT**

Robert J. Andrzejewski, Ed.D
Chief Executive Officer

Administrative Offices
2916 Duncan Road
Wilmington, DE 19808

SKYLINE
MIDDLE SCHOOL
2900 Skyline Drive
Wilmington, Delaware 19808

(302) 454-3410
Fax (302) 454-3541

Nick T. Manolakos, Ed.D.
Principal

Janet Basara
Assistant Principal

To: Rich Wilcoxon
From: Janet Basara
Date: January 22, 2004
RE: Substitute Plans

You took three personal days on January 14, 15, and, 16. The plans you left for your substitute were completely inadequate (see attached). In addition, you did not leave a class list or bell schedule for your substitute to follow. This caused hardship for Mr. Rumford and me as we tried to assist your substitute. This is unacceptable, especially since you knew you would be absent.

This is not the first time this has happened. In December, you were out sick and did not leave class lists or a bell schedule. That day, your lack of responsibility caused Mr. Rumford and Ms. Freebery to disrupt their schedules to assist your substitute. At that time, I informed you of the problem and told you that it was unacceptable.

In addition, you were absent requesting sick time January 20 and 21 following three personal days. You had no emergency plans available because those plans were used in December when you were absent without substitute plans. Your emergency plans were not replaced.

Not having emergency plans is unacceptable. In September, you were directed to prepare three days of emergency plans. You are to update your file by Monday, January 26, 2004 with three days of lesson plans for an unexpected absence. Furthermore, it is your responsibility to continually updated them once they are used or become outdated and an current class list and bell schedule must be included.

_____    1/22/04
Signature acknowledges receipt, not necessarily agreement    Date

C00170

The Red Clay Consolidated School District does not discriminate on the basis of race, color, national origin, religion, sex, age, or disability in its programs, activities or employment practices as required by Title VI, Title IX and Section 504. The district coordinator of compliance is: Administrator of Human Resources Development, RCCSD, 2916 Duncan Road, Wilmington, DE 19808 (302) 683-6662.

A350

Wed 4/4  Basketball shoot around
- Balls are in cage in supply closet
Thurs 4/5  Repeat Wed.
Fri 4/6  Scooter team handball
- 3 on 3 - 1st team that scores stays on
- make goals out of large cones
- Students must pass the ball across half court
  otherwise turnover
- can't score from own side
- a goal is when the ball hits barriers between the
  cones

If this is to harder not going well, you
can shoot around instead.

C00171

I almost forgot. Each morning you have 2 duties. From 7:30 to 7:45 you need to be in the gym with student leaders. 2 of these students put up the flag. From 7:50-8:05 you have a reading group in the Multi. The students books are under the tv in this room.

Dear Saby,

Thank you for your assistance. If any of the kids give you any problems, please leave a note about them. I am leaving you both TOR slips (to get a student out of the room if they are a problem) and SBR forms (if behavior is so bad you feel an administrator needs to see the student ie fighting). Also I have left a note on the locker room door telling students to report directly to the gym. Students are to put their books on the bleachers next to the doors. The student have been told to wear sneakers in order to participate. If you have any questions, please see Ms. Rexford in the main office or Ms. Freebery, the female PE Teacher. The lesson plans are on the bottom of this and the next page. To take attendance, have the students sign in on the pages of this pad. Thank you again...

Richard Wilcoxen

All equipment needed is in storage closet on the left under the table.

C00172

A352

EXHIBIT D



**RED CLAY CONSOLIDATED SCHOOL DISTRICT**

Robert J. Andrzejewski, Ed.D.
Chief Executive Officer

Administrative Offices
2916 Duncan Road
Wilmington, DE 19808

SKYLINE
MIDDLE SCHOOL
2900 Skyline Drive
Wilmington, Delaware 19808

(302) 454-3410
Fax (302) 454-3541

Nick T. Manolakos, Ed.D.
Principal

Janet Basara
Assistant Principal

To: Rich Wilcoxon
From: Janet Basara
Date: January 20, 2004  1/22/04
RE: Bus sign up

In order to have enough busses to accommodate all of the after school students, it is critical that you sign up each day you keep students after school for activities. You have forgotten several times. I am requesting that you to make signing up for busses a regular part of your daily routine for the safety of the students who need to ride the busses home.

_Richd Wilcox_                                    _1/22/04_
Signature acknowledges receipt, not necessarily agreement        Date

Margolis Edelstein
Wilcoxon v. Red Clay
0301

The Red Clay Consolidated School District does not discriminate on the basis of race, color, national origin, religion, sex, age, or disability in its programs, activities or employment practices as required by Title VI, Title IX and Section 504. The district coordinator of compliance is: Administrator of Human Resources Development, RCCSD, 2916 Duncan Road, Wilmington, DE 19808 (302) 683-6602.

A354

# EXHIBIT E

SKYLINE MIDDLE SCH          4648941          03/09/04  09:20am  P. 004



**RED CLAY CONSOLIDATED
SCHOOL DISTRICT**

Robert J. Andrzejewski, Ed.D.
Chief Executive Officer

Administrative Offices
2916 Duncan Road
Wilmington, DE 19808

**SKYLINE
MIDDLE SCHOOL**
2900 Skyline Drive
Wilmington, Delaware 19808

(302) 454-3419
Fax (302) 454-3541

Nick T. Manolakos, Ed.D.
Principal

Janet Basara
Assistant Principal

To:    Richard Wilcoxon
From:  Janet Basara
Date:  January 13, 2004, Revised March 8, 2004
Re:    Meeting on December 17, 2003



On ~~December 17, 2003~~, you, Frank Rumford, Assistant to the Principal, and I met to discuss a series of events that were brought to my attention by Janny Freebery. I informed you that she came to my office on December 15, 2003 and expressed her concerns that you had made inappropriate remarks to her, some of a sexual nature. Your immediate response to Mr. Rumford and me was that Janay had "opened the door" to those comments, thereby acknowledging that something improper had been said. I told you at that time, such comments were unacceptable and were to stop immediately.

In order to make you aware, I also informed you that Ms. Freebery had indicated that she would file sexual harassment charges, if inappropriate sexual comments continued.

Please be advised that you need to maintain a professional relationship and cease all inappropriate remarks.

_____       _____
Signature indicates receipt, not necessarily agreement with the contents.    Date

The Red Clay Consolidated School District does not discriminate on the basis of race, color, national origin, religion, sex, age, or disability in its programs, activities or employment practices as required by Title VI, Title IX and Section 504. The Social Coordinator of compliance is Administrator of Human Resources Development, RCCSD, 2916 Duncan Road, Wilmington, DE 19808 (302) 651-2612.

Margolis Edelstein
Wilcoxon v. Red Clay
0293

A356

EXHIBIT F

Mar. 4. 2005  1:53PM                                          No.1696   P. 12

03/23/2004   16:12   RED CLAY SCHOOL DIST HUMAN RES → 93660287          NO.222   D03

Feb 11 04 04:39a   DSEA                          3023660287          p. 2

RED CLAY CONSOLIDATED SCHOOL DISTRICT
WILMINGTON, DELAWARE

CERTIFICATED PERSONNEL GRIEVANCE FORM - LEVEL I
(To be submitted within 15 days of alleged violation)

Grievant: Richard Wilcoxon          Date of alleged violation: 2/22/2004
Building: Skyline                   Contract article & section violated: 416
Assignment: Teacher                 Board policy section violated:
                                    Administrative rule or regulation violated:

( x ) Check if grievant desires representation
      by the Association.

Description of grievance and statement of adverse effect caused by the alleged violation:
See Attached

Remedy Sought:
See Attached

Grievance signature:            _____          Date _____
Date received:    3/11/04       Administrator's Signature     3/10/04

Date and time of hearing, if any:   3/3/04  2:50 pm
Administrator's decision:           See attached                    See Wed. 3/10/04

Administrator's signature:                            Date

GRIEVANCE APPEAL - LEVEL II
(To be submitted not later than 5 days after the grievant or Association has been notified that the previous
decision has been rendered)

Reason for appeal of Level I decision:   See Attached
Grievant's signature:                                      Date     3/15/04
Date Received:    3/15/04      Administrator/designee signature:
Date and time of hearing, if any:   4/1/04 @ 3:00
Administrator's decision:

Administrator's signature:                            Date

GRIEVANCE APPEAL - LEVEL III
(To be submitted not later than 5 days after the grievant or Association has been notified that the previous
decision has been rendered)
Reason for appeal of Level III decision:

Grievant's signature:                                      Date
Date Received:                Admin./designee signature:
Date and time of hearing, if any:
Administrator's decision:

Administrator's signature:                            Date

NOTE:    One copy of this form must be sent to Grievant, Association President, Director of Personnel Services, and
         one copy is to be retained by Administrator.

RCCSD
Human Resources
2004 MAR 22  A 10:03

Margolis Edelstein
Wilcoxon v. Red Clay
0195

A358

Attachment to Grievance

*Reasons for Appeal to Level 2: Richard Wilcoxon*

This grievance is being appealed to Level 2 because the administrator has
not only violated the "just cause" provision of 4:6, she has also violated
the forty-eight (48) hour prior notification right and the right to
representation found in 4:4.1 of the Collective Bargaining Agreement.
The great injustice of these violations is that the principal ordered the
employee to a meeting (December 17, 2003) knowing that he was going
to be accused of wrong doing later and knowing that she would
reprimand him later. Of greater injustice is the fact that she refused to let
him have representation at the meeting where he was going to be accused
of wrong doing even though he told her that he needed representation.
Now that he has grieved the letter of reprimand citing hearsay and no
direct knowledge of wrong doing by the administrator, she has responded
to his grievance by telling him what he said at the meeting after having
stripped him of the right to representation knowing that he would not be
able to defend himself when only she, her assistant Frank Rumsford, and
the accuser were present.

**The Association is amending its original remedy and is requesting
that all memos handed to the Grievant on 12/17/2003 be withdrawn
and destroyed.**

RCCSD
Human Resources
2006 MAR 22 · A 10:03

Margolis Edelstein
Wilcoxon v. Red Clay
0198

EXHIBIT G

04/30/2004   13:52   RED CLAY SCHOOL DIST HUMAN RES → 93660287      NO.382   006

Date:  April 15, 2004

To:    Rudy Norton

From:  Debra Davenport

RE:    Level II Grievance Response

----------------------------------------------------------------

Hearing date: April 5, 2004
Attending:  Rudy Norton, Richard Wilcoxon, and Debra Davenport

**Grievant's Position**
    The union alleges Article 4:6 has been violated.  An amendment to the grievance presented at the hearing alleges a violation of Article 4:4.1.
On January 22, 2004, the grievant was notified to meet with the administrator. The Grievant was not given 48 hours notice and was denied representation.

**Remedy Sought**
All memos handed to the Grievant on 1/22/2004, be withdrawn and destroyed.

**Response**
Since Article 4:4.1 was added at Level II, this response will only address Article 4:6 as this was the only article presented at Level I.

The purpose of the meeting was to hand Grievant memos that documented three (3) different incidents that had occurred in a relatively short period.  The Grievant was at no time denied representation and in fact, according to the Grievant, he had attempted on the afternoon of the meeting to find an available representative to attend the meeting with him.

The Grievant did attend the meeting even though he was unable to find an available representative.  The Grievant did not request the meeting be rescheduled.

The investigation of the incident revealed; the two administrator's present at the meeting, stated the Grievant was given the opportunity by the administrator to leave with the letters and consult his union representative.  It is the grievant did not leave with the letters at the invitation of the administrator.

- The memo date 1/13/2004 and revised on 3/8/2004 after the Level I hearing will not be withdrawn.  The memo is a report by the offended party of remarks you may have made.  It is the district's obligation to document this type of information from an offended individual and make the offender aware of the allegation.

Confidential

Margolis Edelstein
Wilcoxon v. Red Clay
0245

A361

- The memo dated 1/22/2004 addressed your not signing up for after school buses.  You had requested specific dates these incidents occurred. This information was subsequently shared with you.

- The memo dated 1/22/2004 addresses the inadequacy of your emergency plans. The memo points out the unacceptable portions of your emergency plans.  This observation by the administrator is a legitimate observation for the administrator to make and share with the grievant.

The memos received by the Grievant will not be withdrawn.

. Grievance denied

Cc:    D. Dunmon

Margolis Edelstein
Wilcoxon v. Red Clay
0246

Confidential

A362

Red Clay Consolidated School District
Teacher Grievance
Level III

Hearing Date:    May 24, 2004

Present:    Richard Wilcoxon
Rudy Norton
Diane L. Dunmon

Article(s) Grieved: 4:6 and 4:4.1

Administrative Response:

After reviewing all of the documentation, as well as the Union's arguments, I
concur with the Level II response.

EXHIBIT H

RCCSD
Human Resources

**LESSON ANALYSIS***

Teacher ____Mr. Wilcoxon_____    Date of Observation ___April 21, 2004_____

2004 MAY 10 P 1 13

Subject Area ___Health___ Grade ___7th Grade___ Time ___9:02-9:40___

Number of Students _38_ Announced ___ Unannounced __X__ Status _Non-Tenured_

Below is a summary of information form the lesson observation. The comments are designed to provide feedback to the teacher regarding strengths and areas for growth. The appraiser shall write a concise narrative which focuses on the categories described in the Policy for Appraising Teachers and Specialists

## DESCRIPTION OF LESSON:

The objectives of the lesson were stated as "how the tobacco companies get you to buy their products." The standards were written on the board, but the video screen was down and covered them so the students could not refer to them. The activities (Review HW, Advertising, HW) were listed and visible. The lesson involved students working in groups of four to answer questions about magazine ads about tobacco products. A group member presented findings to the class. Homework from the previous day was reviewed at the opening of class and homework for this day was given out at the end of class.

## NARRATIVE:

Students were seated every other seat in the multipurpose room for this health lesson about advertising of tobacco products. Mr. Wilcoxon took attendance and told the students to hand in their homework in the front box if they had not done so.

At 9:03, Mr. Wilcoxon reviewed the homework by asking students to remember the answers they had turned in. They figured out the price of smoking cigarettes at a pack a day for a week, a month, a year, and 3 years. Then they discussed what they could buy with that money. They suggested they would buy DVD player, skates, dirt bike, etc. Without a conclusion to that discussion, Mr. Wilcoxon reminded the students that yesterday they talked about the short and long term effects of smoking and today they would discuss how tobacco companies get them to buy their products. He asked for ideas. One boy said they advertise on TV. Mr. Wilcoxon asked him when he saw an ad on TV. He shrugged. Mr. Wilcoxon then told him ads on TV became illegal in 1969. He restated the question, and students suggested they had seen ads on billboards, magazines, posters in gas stations, sporting events, and by word of mouth. Mr. Wilcoxon nodded with each response. He mentioned that it is odd that tobacco companies advertise at sporting events when smoking negatively affects athletes. He added that movies show people smoking and if the name brand is seen on the screen, the advertisers paid for that privilege. He also noted that tobacco companies pay to have their name on buildings, such as the Phillip Morris Lodge.

Next, Mr. Wilcoxon explained the activity they were to complete during the rest of the class period. They would work in groups of four to read an ad and answer the questions on the ditto. He then read the questions aloud and clarified words such as slogan and target audience. At 9:15, he passed out the ads and the students re-grouped themselves. The majority of students moved to one side of the room. They were not directed by the teacher to spread out. After two minutes, they were told to begin working on Ditto 7.2 (attached).

C00231

A365

Students were talking softly at first, working on the questions. Very quickly it got loud. Some of the noise came from students stating answers to group members who were seated four desks away and some came from students laughing inappropriately. At 9:25, CJ was laying across two desks. He had not been working in a group. Some groups finished before others and there was no direction for what to do when done. Eventually, Mr. Wilcoxon told the class, "I know some of you are done, just wait for the others." He repeatedly asked the class to be quiet and finally warned them they would have to move back to their original seats if they did not quiet down. They did.

Then Mr. Wilcoxon asked the groups to share their answers. He had not previously mentioned this expectation to the class. The groups decided who was going to report and the first presenter was called on. He read answers from the paper. He did not project his voice from his seat, and I was unable to hear his responses. He held up the article, but I could not see what it was from my seat. A boy whistled. Mr. Wilcoxon looked around and said, "Gentlemen." From the other side of the room, another student whistled. "Stop that," the teacher said. A third person whistled, and he ignored it. He asked the presenter questions about his report. There was a fourth whistle and then a fifth. Mr. Wilcoxon said, "If you whistle again, you'll be sent out. I've asked you to stop." The students were smirking, but not laughing out loud.

Mr. Wilcoxon moved on and asked students to put the ads up front when they finished. CJ reported and held up his article. Again, I could not hear or see the ad. He was about three rows in front of me. As he presented, I counted seven students off-task talking and one more person whistled softly.

Patrick gave his report at 9:34 and 11 students were talking, three were tapping on the desk and floor. At 9:35, another student presented. 12 students were talking, two were turned around, and 2 were stretching. Mr. Wilcoxon told them to "stop talking and turn around." The distractions seemed to be taking attention away from the presenter and the lesson.

The class got into a short discussion on the target group of a *Sports Illustrated* ad. The reporter thought the target was 20 – 30 year olds. Mr. Wilcoxon and others said younger people also read that magazine, and the target group would be a wider audience.

At 9:36, the students were generally off-task, not paying respectful attention to the presenters. At 9:38 a student made a popping sound. The teacher moved to the area. The same sound came from the other side. He moved over there. At 9:39, a clicking sound started on one side and moved to the other.

Mr. Wilcoxon told the class to hand in all of the ads and they would finish hearing reports tomorrow. He explained the homework and said it would be easy if they paid attention today. They were to look in any magazine and find three ads for tobacco products. Then they were to copy the Surgeon General's warning from the article to hand in. He told them there were six different warning they could find. Then they were to make up one warning of their own. He handed out the homework ditto (attached). Students were talking during the directions. One boy had a question and Mr. Wilcoxon said, "Stop talking. He is three feet away from me, and I can't even hear him." There was one last whistle. The student received their homework and left.

C00232

A366

## COMMENDATIONS/RECOMMENDED AREAS FOR GROWTH/COMMENTS:

Clearly writing and stating the standard is a critical element of effective teaching. It was attempted in this lesson, but not completely successful. Behind the video screen, the standard was written as "Influences on tobacco use." Mr. Wilcoxon stated the standard was "How tobacco companies get you to buy their products." While there was a whole class discussion on various ad locations and then an analysis of magazine advertisements, the lesson did not connect how the ads were an influence on a person's tobacco use. I recommend Mr. Wilcoxon enlist such connections from the students to ensure they have understood the standard. Having the standard out from behind the screen may have emphasized it as the point of discussion.

*[handwritten in left margin: Students need to know]*

Mr. Wilcoxon should be commended for planning a group assignment, but more careful thought needs to go into the procedures of such activities. For example, when students move to their groups, areas in the room should be assigned. Most of the students ended up on one side of the room. They talked loudly so their teammates could hear them. If some groups were directed to the other areas of the multipurpose room, they could have completed the task using lower voices and been less distracting to others. In addition, making activity expectations known in the beginning would have resulted in a more effective presentation by the students. The students did not know they were going to have to present their information and did not prepare to speak on behalf of the group. Complete, clear directions would have corrected this. Finally, pacing of the lesson may have contributed to some of the behavior problems that surfaced. It appeared that many students were finished early and no direction was provided for what to do when they were done. This needs to be considered whenever there is a group or independent activity. Therefore, I recommend Mr. Wilcoxon plan more thoroughly for group activities.

Off-task behavior was inappropriate. Mr. Wilcoxon made attempts to stop the whistling, popping, clicking, and talking, but it was not successful. It appeared that the students were "playing a cat-and-mouse game" at the teacher's expense. This disrespectful behavior needs prompt remediation. This is the first time I have observed Mr. Wilcoxon without a team teacher present. I recommend he find ways to encourage appropriate and respectful behavior.

When attempting to control misbehavior, I recommend Mr. Wilcoxon follow through on consequences. When Mr. Wilcoxon said he would move students back to their original seats if the group did not quiet down, he did not follow through when the talking started up again. In addition, he should not threaten to do what cannot be done. For example, he stated that he would send out the offending whistler, but he did not know who was whistling. That makes the consequence impossible to follow through on. Employing both of these strategies would most likely result in students knowing that he means what he says. They would then be more likely to respond appropriately.

When Mr. Wilcoxon asks students to report information to the class, I recommend they stand in the front and face the class. The multipurpose room is large and voices need to be projected to be heard. Standing in front would most likely have resulted in speaker being heard, the article being seen, and the class being attentive. Several of the ELA standards involve speaking. I recommend Mr. Wilcoxon support those grade specific standards and

C00233

A367

performance indicator. To do so, I recommend he read the performance indicators for skills students need to develop to become competent speakers.

In a heterogeneous class, assigning students to groups based on their abilities and needs is advantageous. For example, a student who reads poorly could have been assigned to work with a strong reader. Differentiation based on individual needs should be considered in planning activities. I recommend Mr. Wilcoxon group students to support differentiated instruction.

A variety of activities and strategies were used in this lesson. There was a review of homework, whole class discussion, a group activity, and a presentation to the class. Mr. Wilcoxon should be commended for mixing strategies in this lesson.

The lesson was not brought to closure. Closure involves going back to the standard and/or performance indicator at the end of lesson to check for understanding. I recommend Mr. Wilcoxon close lessons properly.

Mr. Wilcoxon should be commended for encouraging student-student interactions. The groups of four did work together on the activity during part of the allotted time.

No technology was used during this lesson.

Students were asked recall and higher order questions. Question 5 and 6 on the ditto were higher thinking questions. Some discussion was held pertaining to these. I would recommend more attention be given to such higher order thinking skills.

The teacher and appraiser shall sign the Lesson Analysis to indicate that it has been reviewed and discussed, not that the teacher agrees with the Lesson Analysis. Further, the teacher/specialist may submit additional information on a TEACHER/SPECIALIST APPRAISAL RESPONSE FORM, within fifteen (15) working days of the date of the teacher's signature on the Lesson Analysis. Place an (X) in the box below to indicate your desire to submit additional information and to receive a Teacher/Specialist Appraisal Response Form. The Teacher/Specialist Appraisal Response Form shall be appended to this Lesson Analysis and shall become part of the appraisal record.

Teacher's Signature/Date                    Appraiser's Signature/Date

☑ Additional information will be submitted by the teacher within fifteen (15) working days on a Teacher/Specialist Appraisal Response Form.

S4-34

C00234

A368

3                                              75        7

# TOBACCO FOR SALE



Name _____    Date _____    Period _____

 With your group, answer the following questions about an advertisement for a tobacco product.

1. What's the name of the product?

2. What type of tobacco is being sold?

3. Is there a slogan? If so, what is it?

4. What are the selling strategies used in this ad?

5. Your advertisement may have a "warning." Why do you think the tobacco company put the warning on the advertisement?

6. Who do you think is the audience for your advertisement? How can you tell?

© ETR Associates

C00235

| | |
|---|---|
| ☐ | I read and followed directions. |
| ☐ | My ideas are clear and complete. |
| ☐ | My handwriting is readable |
| ☐ | I did my share of group work. |

*Comprehensive Health for the Middle Grades*

A369

# THE SURGEON GENERAL SAYS... (SA-29)

**DIRECTIONS:** Look in magazines that advertise cigarettes and list the various Surgeon General's warnings on the cigarette packs below. Make up your own warning in the space provided.



Name _____

Date _____

©1993 by The Center for Applied Research in Education

C00236

A370

# Skyline Middle School
# Red Clay Consolidated School District
## Lesson Analysis

Teacher:   Rich Wilcoxon            Date of Observation:  February 12, 2004

Subject Area:    Physical Education      Grade:    6th     Time:    10:26 – 11:05 am

No. of Students:    34    Announced:        Unannounced:   X  Status:    Non-Tenured

## DESCRIPTION OF LESSON:

Students reported directly to the locker room to prepare their wearing apparel for the physical education activity. From the locker room, the entered the gymnasium and immediately got into one of the four squad formations. Students lined up on the painted lines on the gymnasium floor. Upon Mr. Wilcoxon's arrival, he selected a student to lead a series of warm-up and stretching exercises. Mr. Wilcoxon took attendance by visually checking each squad and also made verbal checks with students pertaining to the attendance of students not in class.

Next, Mr. Wilcoxon had his students take a seat on the bleachers. He reminded the of the health schedule for the following week. He stated that the scooter game that they started yesterday would be continued today and gave a review of the rules. Mr. Wilcoxon made reference to the state standards that were posted in the locker room area. He promoted student dialogue by asking students what part of the body were they working on. Students mentioned a "burn" in their legs. Two teams were selected to start the "round-robin". Three players from each team started the first game. A student from each of the two teams was selected to get three scooters for their team members. Mr. Wilcoxon refereed the games and kept a verbal score for each team. The winner of each game remained on the floor to compete against the next team. Teams rotated their players in groups of three. One student did not participate and sat on the bleachers. In some instances, students were not sure of the rule pertaining to "slipping-off the scooter" during possession of the ball, when carrying the ball across the centerline and defensive strategies.

After a few rounds of games, Mr. Wilcoxon provided some feedback. He conducted a short discussion regarding the merits of playing defensively.

At the end of the class period, Mr. Wilcoxon had his students return to their squad positions. His closure involved a review of the standards addressed. Students mentioned teamwork, communicate and sportsmanship. Mr. Wilcoxon helped students to understand that what was mentioned were standards but not the specific one for this class. He asked how many students felt the burn in their legs. Student voiced a mixture of yes and no responses. Also a conclusion was made that if teams play defense, they have a better chance to win. Students were then dismissed to the locker room.

## CATEGORY I. INSTRUCTIONAL PLANNING:

The lesson was focused on the State Standards for Physical Education. The practice of placing the written

1

Margolis Edelstein
Wilcoxon v. Red Clay
0107

A371

standards in the locker room was an established routine. Reference to the standards was included in the teacher's presentation of the planned activity. The scooters were incorporated within game to engage students in the strengthening of the large leg muscles. The scope and sequence of the lesson was established by making the connections from the previous day's activity in which students learned the rules of the game and were provided practice. The activity for the day observed focused on students engaged in the activity throughout the class period.

## CATEGORY II. ORGANIZATION AND MANAGEMENT OF CLASSROOM:

Students reported directly to the locker room, changed their clothing and immediately reported to the gymnasium. Dividing the class into squads helped with the transition between the two separate areas. Squads helped in the organization of the students to enable an efficient and effective visual check for attendance, focusing students' attention, make-up of teams and preparing for the closure of the lesson and dismissal. Provisions for the storage and distribution of the scooters provided easy accessibly. Cones and the bleachers were used as the goals for each team. During the play activity, Mr. Wilcoxon refereed the students and positioned himself so that he was able to "keep an eye" on all of the students. The rotation of teams enable the large number of students to participate even with the consideration of only six students at any given time were actively engaged on the court.

## CATEGORY III. INSTRUCTIONAL STRATEGIES:

Reviews of the rules of the game and the standards for the lesson were verbally explained. Students had the opportunity to actively participate and demonstrate their skills in playing the game. Inclusions of more demonstrations, guided practice or modeling would have increased the level of understanding of the rules and effective defensive plays. Feedback did occur towards the last quarter of the class period when Mr. Wilcoxon explained the merits of defensive plays.

## CATEGORY IV. TEACHER/STUDENT INTERACTION:

Interactions were positive, encouraging and supportive between the teacher and students and among students to students. Methods to organize students in a fashion that provided opportunities for all students to actively participate were used. All students were treated fairly as far as when there were rule infractions and feedback on their abilities. Student dialogue was encouraged and incorporated during discussions.

## CATEGORY V. EVALUATION OF STUDENT PERFORMANCE:

Mr. Wilcoxon was actively engaged in observing his students throughout the class period. Feedback was referenced to how teams played and not necessarily on individuals. He did help students to understand that when teams used defensive strategies, there was a stronger likelihood that they would win the game.

## COMMENDATIONS/RECOMMENDATIONS/AREAS FOR GROWTH/COMMENTS:

Mr. Wilcoxon is to be commended for his organizational planning such as in his preparation for the lesson, setting up the gymnasium, use of squads, posting of the standards, rotation of players and taking attendance. References to the standards were used in the presentation of the lesson and also included in the closure of the lesson.    Reviews of the rules of the game were covered prior to having the students starting the activity.

3

Incorporating more concrete examples would increase student understanding. In the example when students started to play defensively, it would have been a good idea to have students do a demonstration for all students to see. Also, during the explanation of the rules of the game, students could be used to model the skills or correctness of the plays.

Connections were evident from the beginning of the lesson with the previous day's lesson and also incorporated in the closure of the lesson. To get a more reliable response to the question posed to the students at the end of the class period, he may want to consider having a show of hands as to how many felt the burn.

Having the student who did not participate be the scorekeeper would make him more inclusive in the lesson rather than sitting out for the entire period. Additionally, it would help Mr. Wilcoxon with the management of a scoring device that could be seen by all players throughout the entire game.

The teacher and appraiser shall sign the Lesson Analysis to indicate that it has been reviewed and discussed, not that the teacher necessarily agrees with the Lesson Analysis. Further, the teacher may submit additional information on a teacher/specialist appraisal response form, within fifteen (15) working days of the date of the teacher's signature on this Lesson Analysis. Place an (x) in the box below to indicate your desire to submit additional information and receive a Teacher/Specialist Appraisal Response Form. The Teacher/Specialist Appraisal Response Form shall be appended to this Lesson Analysis and shall become part of the appraisal record.

_____          _____
Teacher's Signature/Date                 Appraiser's Signature/February 19, 2004

☐ Additional information will be submitted by the teacher within fifteen (15) working days on a Teacher/Specialist Appraisal Response Form.

Margolis Edelstein
Wilcoxon v. Red Clay
0109

3

A373

B-7

Cap life

## LESSON ANALYSIS*

Teacher __Rich Wilcoxon_____    Date of Observation __November 19, 2003_____

Subject Area _Health_ Grade ____6th Grade____    Time _8:20 – 9:00_____

Number of Students___ Announced __✓__ Unannounced _____ Status _Tenured____

Below is a summary of information form the lesson observation. The comments are designed to provide feedback to the teacher regarding strengths and areas for growth. The appraiser shall write a concise narrative which focuses on the categories described in the Policy for Appraising Teachers and Specialists.

## DESCRIPTION OF LESSON:
This lesson was the first of a unit on drugs. Two PIs were specifically addressed:
- 1.4 Possible risks of taking medicines, and
- 2.1 Benefits of not using alcohol and other drugs.

Students took individual time to think about the good and bad uses of drugs, discussed their thoughts as a whole group, and then were given a related homework assignment to complete.

## NARRATIVE:
This class of 40 students met in the multipurpose room for a Health lesson. Two teachers, Mr. Wilcoxon and Ms. Freebery, team-taught the heterogeneous group. As students entered the room, they sat in assigned seats, and prepared materials for the day. They were quiet and did not play with the squeaky desks (which is an annoying problem in that room). The teachers handed back a quiz and homework. Students quickly and quietly came to the front to get their papers and returned to their seats. Ms. Freebery directed the students to organize all of the alcohol papers together to study for the mid-term.

Mr. Wilcoxon went over the answers to the quiz by reading the questions and calling on students to answer. Since many answers were acceptable, lots of students were given the opportunity to contribute. Mr. Wilcoxon praised answers and complimented the class for doing an excellent job on the quiz. Ms. Freebery asked the class why they thought they did so well. They answered they "paid attention, studied, and had notes for the open book test." Ms. Freebery told them that being organized helped them, and they should continue to keep their work in the folder and organized.

At 8:31, Mr. Wilcoxon told the class that today they would begin studying drugs. He handed out a worksheet and instructed the students to write why people use drugs and why they don't. "What does 'not using' drugs mean?" "You attain," a student answered. "Almost." "Abstain," another offered. He asked them to write at least three reasons on each side. Ms. Freebery reminded them that drugs could be Tylenol, prescriptions, and crack. She wrote two titles on the board and made columns. Mr. Wilcoxon walked around checking workers, praising, and assisting as necessary. 100% of the students were working on the paper.

C00152

A374

Mr. Wilcoxon called on students to tell why people use drugs and Ms. Freebery listed them on the board. Answers included, "Like the effects, doctor tells them to use them, peer pressure, feel better, and rebel against parents." Reasons not to use drugs included, "Side effects, jail, someone in the family did it, causes illness, makes you delusional, allergic reactions, religious beliefs, want to be a good role model." Mr. Wilcoxon rephrased their ideas and praised them for good thinking. He reminded them that they should add any answers to their papers they did not think of on their own.

Next Mr. Wilcoxon said they would talk about three different kinds of drugs and define them. Rx means prescription – Doctor prescribes, or writes a note for it. A student asked if a doctor could prescribe marijuana. Mr. Wilcoxon explained that 5 states used to allow that but the federal law changed and now they can't. He said the law stated that there were other medicines that worked safely to do what marijuana was being used for. Ms. Freebery wrote the definition on the board. Secondly, OTC, over the counter, drugs were defined, discussed, and differentiated from prescription drugs.

The discussion turned to safe use of medicines versus abuse. Abuse was defined and students shared examples of abuse, or using drugs in the wrong way or overusing them. One student shared that she knew a girl who bought sleeping pills, took them and never woke up. Ms. Freebery acknowledged that she knew her too, and it was very, very sad. Mr. Wilcoxon shared that his roommate took Nyquil to fall asleep each night. While Nyquil is a good medicine, his roommate abused it by using in improperly.

"What's the difference between medicine and illegal drugs?" Mr. Wilcoxon asked. Discussions centered on helping versus hurting you. He asked for more. A student defined drugs as anything you put in your body that causes it to change. "Good. So what's a medicine?" Eventually, students concluded that all medicines are drugs but not all drugs are medicines.

At 8:55, Mr. Wilcoxon handed out the days' homework. As he did, he reviewed the definitions and distinctions made in the lesson. Students volunteered answers as he assessed their understanding. When all students had the homework paper, he explained it had two sides and gave brief directions. The bell rang and he dismissed the students.

## COMMENDATIONS/RECOMMENDED AREAS FOR GROWTH/COMMENTS:

Mr. Wilcoxon should be commended for planning a lesson that fit the standard. The materials addressed the specific performance indicator he intended to teach.

I recommend Mr. Wilcoxon write the performance indicator on the board for each day's lesson to help the student focus on the main idea.

*For use with Group 3 as described in the Addendum to the Policy for Appraising Teachers and Specialists.
S4-33

C00153

A375

Mr Wilcoxon should be commended for working as a team with Ms. Freebery  Their natural flow was easy to follow.  Although they have worked together for less than a year, proper planning was evident as the lesson was smooth.

Mr. Wilcoxon should be commended for setting up good classroom procedures.  The routines established were simple and consistent with good organization.  Students understood the expectations and their behavior was excellent.

Mr. Wilcoxon mixed individual thinking time and whole class discussion strategies for an effective class.  Students thought about answers and then contributed good answers that stayed on the topic.  With this topic, it would have been easy to be mislead from the objective, but that did not happen.

Mr. Wilcoxon should be commended for quickly assessing student's understanding at the end of the class to be sure his performance indicators were met.  I would recommend extending that to properly close the lesson.  Restate the objectives and tell what the next lesson will be.  The purpose of closure is to remind the students where they started, what they learned, and what they will be learning in the future.  It provides an important mindset for the material covered.

Mr. Wilcoxon should be commended for maintaining students' on-task behavior.  Students were involved, participated, and reflective during the entire class.

As this was an introductory lesson, there were no higher-level questions.  I would expect that in future lessons in this unit, those type questions would be included.

*Nice lesson, Rich.  You were clear and guided the students to understand the terms you would be using in this unit.  The students were respectful and responsive.  Keep up the good work.*

The teacher and appraiser shall sign the Lesson Analysis to indicate that it has been reviewed and discussed, not that the teacher agrees with the Lesson Analysis. Further, the teacher/specialist may submit additional information on a TEACHER/SPECIALIST APPRAISAL RESPONSE FORM, within fifteen (15) working days of the date of the teacher's signature on the Lesson Analysis. Place an (X) in the box below to indicate your desire to submit additional information and to receive a Teacher/Specialist Appraisal Response Form. The Teacher/Specialist Appraisal Response Form shall be appended to this Lesson Analysis and shall become part of the appraisal record.

Teacher's Signature/Date                    Appraiser's Signature/Date

_Mr Rich Wilcoxon_ 11/25/03     _James Brasure_ 11/21/03

☐ Additional information will be submitted by the teacher within fifteen (15) working days on a Teacher/Specialist Appraisal Response Form.

S4-34

C00154

# EXHIBIT I

To: Mrs. Janet Basara
From: Richard Wilcoxon
Date: April 26, 2004
RE: Post-Observation Meeting

I received your memo today in my mailbox at the end of my first planning period. The memo asked me to meet with you today to discuss the observation you conducted last week either during my first planning period or at 12:30. I am requesting that this meeting be postponed for 48 hours until Wednesday, April 28th, to allow me time to speak with my union representatives. Thank you.

4/26/04    5:30 pm
This is a post-observation conference. I have meetings scheduled all day Tuesday and Wednesday. I can meet Thursday morning or Friday afternoon. Please let me know when it will be convenient for you.

Janet

Friday at 12:30 sounds good. Thank you for your understanding.

Richard

Margolis Edelstein
Wilcoxon v. Red Clay
0302

A378

EXHIBIT J

**MEMO**

To:    Richard Wilcoxon
From:  Janet Basara
Date:  May 11, 2004
RE:    Lesson Plans

At our post-observation conference on April 26, 2004, I asked to see your plan book. At that time you indicated that you did not have it because you had left it at home. On May 5, 2004, I asked to see it for a second time. You copied four pages and put it in my mailbox on May 6, 2004. To this date, I have not seen your lesson plan book.

My concern is that the pages that you gave me were lessons that Frank Rumford wrote more than two years ago. He shared these with you to guide and assist you as a new teacher. You have only inserted the standards on some of his lessons. It is unacceptable that after two years of teaching health and physical education at Skyline, you have not developed, adapted, adjusted, or improved upon lessons handed to you as a guide.

_____          _____
Signature indicates receipt of memo, not necessarily agreement with the contents.          Date

Margolis Edelstein
Wilcoxon v. Red Clay
0290

A380

EXHIBIT K

May 25  2004  9:43AM                                              No 0418   P. 2

## RED CLAY CONSOLIDATED SCHOOL DISTRICT
### WILMINGTON, DELAWARE

### CERTIFICATED PERSONNEL GRIEVANCE FORM - LEVEL I
(To be submitted within 15 days of alleged violation)

Grievant:    Richard Wilcoxon
Building:    Skyline Middle
Assignment:  Teacher

( x ) Check if grievant desires representation
      by the Association.

Date of alleged violation:              5/11/2004
Contract article & section violated:    4:6
Board policy section violated:
Administrative rule or regulation violated:

Description of grievance and statement of adverse effect caused by the alleged violation:
The grievant has received a letter of reprimand in regard to his lesson plans. The lesson plans are the same as have been used by him
and a fellow teacher and the plans were approved by the administration.

Remedy Sought:
The letter of reprimand dated May 11, 2004 will be withdrawn and destroyed.

Grievant's signature:
Date received:          5/25/04                     Admin/designee's signature:              Date:    5/24/2004

Date and time of hearing, if any:
Administrator's decision:

Administrator's signature: _____   Date: _____

### GRIEVANCE APPEAL - LEVEL II
(To be submitted not later than 5 days after the grievant or Association has been notified that the previous
decision has been rendered)

Reason for appeal of Level I decision:
Grievant's signature:                                              Date:
Date Received:                          Admin./designee's signature:
Date and time of hearing, if any:
Administrator's decision:

Administrator's signature: _____   Date: _____

### GRIEVANCE APPEAL - LEVEL III
(To be submitted not later than 5 days after the grievant or Association has been notified that the previous
decision has been rendered)
Reason for appeal of Level II decision:

Grievant's signature:                                              Date:
Date Received:                          Admin./designee's signature:
Date and time of hearing, if any:
Administrator's decision:

Administrator's signature: _____   Date: _____

NOTE:    One copy of this form must be sent to Grievant, Association President, Director of Personnel Services, and
         one copy is to be retained by Administrator.

C00259

A382

Mar. 4. 2005  2:04PM                              No.1697   P. 10

06/07/2004   16:05   RED CLAY SCHOOL DIST HUMAN RES → 93660287        NO.515   002
Jun. 7. 2004  1:36PM                              No.0483   P. 2

SKYLINE MIDDLE SCH   4548541        06/07/04  01:03pm  P  002

366-0287
Ms Reeve

## RED CLAY CONSOLIDATED SCHOOL DISTRICT
### WILMINGTON, DELAWARE

#### CERTIFICATED PERSONNEL GRIEVANCE FORM - LEVEL I
(To be submitted within 15 days of alleged violation)

Grievant:  Richard Wilkins          Date of alleged violation:  5/11/2004
Building:  Skyline Middle           Contract article & section violated:  4:6
Assignment:  Teacher                Board policy section violated:
                                    Administrative rule or regulation violated:

(x) Check if grievant desires representation
    by the Association.

Description of grievance and statement of adverse effect caused by the alleged violation:
This grievant has received a letter of reprimand in regard to his lesson plans. The lesson plans are the same as have been used by him
and a fellow teacher and the plans were approved by the administration.

Remedy Sought:
The letter of reprimand dated May 11, 2004 will be withdrawn and destroyed.

Grievant's signature: _____    Date: 5/24/2004
Date received:                         Admin/designee's signature: _____  5/26/04

Date and time of hearing, if any:  5/27/04  @ 2:45 p.m.
Administrator's decision:
Request to remove letter from file will not
be granted.

Administrator's signature:  Denis Baines    Date: 6/3/04
See Attached

#### GRIEVANCE APPEAL - LEVEL II
(To be submitted not later than 5 days after the grievant or Association has been notified that the previous
decision has been rendered)

Reason for appeal of Level I decision:  Decision at Level I unacceptable
Grievant's signature: _____   Date: 6/7/04
Date Received:  6/7/04   Admin/designee's signature: _____
Date and time of hearing, if any:  6/15/04  @ 2:30
Administrator's decision:

_____

Administrator's signature: _____   Date: _____

#### GRIEVANCE APPEAL - LEVEL III
(To be submitted not later than 5 days after the grievant or Association has been notified that the previous
decision has been rendered)
Reason for appeal of Level III decision:

Grievant's signature: _____   Date: _____
Date Received:                         Admin/designee's signature: _____
Date and time of hearing, if any:
Administrator's decision:

_____

Administrator's signature: _____   Date: _____

NOTE:  One copy of this form must be sent to Grievant, Association President, Director of Personnel Services, and
       one copy is to be retained by Administrator.

Margolis Edelstein
Wilcoxon v. Red Clay
0222

A383

RECEIVED

'04 JUL -2 AM 8: 49

DIANE L. DUNMON
ASSISTANT SUPERINTENDENT
ADMINISTRATIVE SERVICES

**Date:** July 1, 2004

**To:** Rudy Norton

**From:** Debra Davenport

**RE:** Level II Grievance Response

------------------------------------------------------------

**Hearing date: June 15, 2004**
**Attending:    Rudy Norton, Richard Wilcoxon, and Debra Davenport**

**Grievant's Position**
   The union alleges Article 4:6 has been violated.

**Remedy Sought**
The letter of reprimand dated May 11, 2004 be withdrawn and destroyed.

**Response**
The building administrator had requested to see lesson plans for a class taught on April 21, 2004.   What was discovered by the administrator was the grievant was using plans given to the grievant by another teacher two years previous.

The grievant presented the lesson plans in question at the hearing. The grievant acknowledges the plans were given to him by another teacher.   Updates to the lesson plans were pointed out by the grievant.   There were no substantial or significant changes made by the grievant to the lesson plans.

The lesson plans given to the grievant should have been used as a guideline to create his lesson plans.  It is expected that educators are using their own training, knowledge and skills when teaching classes and doing lesson plans.

There is no evidence the letter of reprimand were given without just cause.
Grievance denied.

Cc:    D. Dunmon

C00305

Confidential

A384

07/01/2004    13:45    RED CLAY SCHOOL DIST HUMAN RES → 93660287    NO.666    P02

RECEIVED SKYLINE MIDDLE SCH    4648541    06/07/04  01:05pm  P. 022

04 JUL -6 PM 2: 28

DIANE L. DUNMON
ASSISTANT SUPERINTENDENT
ADMINISTRATIVE SERVICES

366-0287
Ms. Roew

**RED CLAY CONSOLIDATED SCHOOL DISTRICT**
**WILMINGTON, DELAWARE**

**CERTIFICATED PERSONNEL GRIEVANCE FORM – LEVEL I**
(To be submitted within 15 days of alleged violation)

Grievant:  Richard Wilcoxon
Building:  Skyline Middle
Assignment:  Teacher

Date of alleged violation:  5/11/2004
Contract article & section violated:  4:6
Board policy section violated:
Administrative rule or regulation violated:

( x ) Check if grievant desires representation
by the Association.

Description of grievance and statement of adverse effect caused by the alleged violation:
The grievant has received a letter of reprimand in regard to his lesson plans. The lesson plans are the same as have been used by him and a fellow teacher and the plans were approved by the administration.

Remedy Sought:
The letter of reprimand dated May 11, 2004 will be withdrawn and destroyed.

Grievant's signature:  _____  Date:  5/24/2004
Date received:  _____  Admin./designee's signature: _____  Date:  5/27/04

Date and time of hearing, if any:  5/27/04    2:45 pm
Administrator's decision:  Request to remove letter from file will not be granted

Administrator's signature:  See Attached    Jenis Bacca    Date:  6/3/04

**GRIEVANCE APPEAL – LEVEL II**
(To be submitted not later than 5 days after the grievant or Association has been notified that the previous decision has been rendered)

Reason for appeal of Level I decision:  **Decision at Level I unacceptable**
Grievant's signature:  _____  Admin./designee's signature: _____  Date:  6/7/04
Date Received:  _____
Date and time of hearing, if any:
Administrator's decision:

Administrator's signature:  Debra Davenport    Date:  7/1/04

**GRIEVANCE APPEAL – LEVEL III**
(To be submitted not later than 5 days after the grievant or Association has been notified that the previous decision has been rendered)

Reason for appeal of Level II decision:  **Decision at Level II is unacceptable.**
Grievant's signature:  _____  Admin./designee's signature: _____  Date:  7/2/04
Date Received:  _____
Date and time of hearing, if any:
Administrator's decision:

Administrator's signature:  _____  Date:  _____

NOTE:    One copy of this form must be sent to Grievant, Association President, Director of Personnel Services, and one copy is to be retained by Administrator.

C00309

A385

Red Clay Consolidated School District
RCEA
Grievance
Level III

Hearing Date: July 28, 2004
Present: Richard Wilcoxon, Rudy Norton, Diane Dunmon

The Association Position: Mr. Wilcoxon was improperly reprimanded in a memo from the acting principal. The May 11, 2004 memorandum was inaccurate and not warranted. Both teachers in the physical education department were using the same lesson plans when they were team teaching. These were lessons given to them from Mr. Rumford, the previous teacher in the department. Further, the other teacher was using the same lessons and she was not reprimanded. The administrator did not ask for his lesson plans at the post-observation conference and Mr. Wilcoxon never told her that they were at home.

There were some issues when Mr. Wilcoxon was working with a long term substitute and so when the other teacher returned from leave, he expressed an interest in making changes. He was told no, but admits that the lessons worked much better with the teacher back from leave because of her disciplinary style and control of the class. He did add the standards to the plans that they were using.

He doesn't believe that he should have the burden of reworking these lessons since it was a team teaching situation. At the end of January he was given a note from the other teacher telling him that she had secured separate rooms for the two of them to teach independently.

The Administrative Response: At the level II hearing, Mr. Wilcoxon did not complain to the hearing officer that the information was inaccurate and that he was never asked for his lesson plans at the times indicated in the memo. His one complaint was that he had never been asked for them before. If the information in the memo was inaccurate, why wasn't this an issue at both the level I and level II hearings? The contract also requires that lesson plans will be available to administrators at all times.

Mr. Wilcoxon indicates that he did want to change the lessons at an earlier date since they didn't work well for him independent of his team teaching partner. It seems reasonable that once this teacher was left to teach his class on his own, that modifications to the plans would be a necessity in order to conduct class. Although there may be a basic structure to the lessons, each teacher has a different teaching style and each class has different learning styles.

Grievance Denied.

Diane F. Dunmon

C00310

A386

# EXHIBIT L

MEMO

To:     Richard Wilcoxon
From:   Janet Basara
Date:   May 5, 2004
Re:     Lack of security

Per your student referral dated April 22, 2004 and in our discussion on April 30, 2004, you explained that $49.00 cash was taken from an envelope turned in to you on April 22, 2004. On this date, many students, including Edwin Karpov, gave you money as their fundraising efforts for *Hoops for Heart*. You acknowledged that it was stolen when you went to lunch and left the cash and checks in the unlocked multipurpose room. You also acknowledged that you did not secure the money in the available locked cabinet in the room, nor did you take it with you. Mr. Rumford investigated, but no one saw a student enter the room, and he was unable to determine who stole the money.

Twice this school year I have reminded staff of the importance of securing personal items and cash collected from students. First, we had a serious incident where a person broke into our building and I held an emergency meeting to notify staff and reminded everyone to lock their valuables at all times. Second, at our March faculty meeting, I reminded staff to lock all money associated with SSA Power Card fundraiser in their rooms until it could be brought to the office and locked in the school safe.

This failure to follow procedures is totally unacceptable and borders on insubordination. You are responsible for replacing the cash that was stolen. Any future problems of this nature will result in further disciplinary action.

_____
This signature indicates receipt and not necessarily agreement with the contents.

_____
Date

cc:  Personnel file

Margolis Edelstein
Wilcoxon v. Red Clay
0286

A388

# EXHIBIT M

RED CLAY CONSOLIDATED SCHOOL DISTRICT



# STAFFING REPORT

SUBMITTED BY

Debra Davenport and Diane L. Dunmon

May 12, 2004

# RESOLUTION CONCERNING REDUCTION IN THE NUMBER OF TEACHERS REQUIRED AS A RESULT OF DECREASED ENROLLMENT AND/OR DECREASE IN EDUCATIONAL SERVICES

**WHEREAS**, the Red Clay Consolidated School District ("The District") projects a change in enrollment and/or a change/decrease in educational services for the 2004-2005 school year; and

**WHEREAS**, the projected change in enrollment will change the funds available to the District and cause a reduction in the number of certificated, non-administrative personnel ("teachers/nurses"); and

**WHEREAS**, the Board has reviewed and approved a report dated May 12, 2004, which sets forth the names of the teachers/nurses to be terminated in accordance with the agreement; therefore, be it

**RESOLVED:**

First, that the teachers/nurses on the report dated May 12, 2004, reviewed and approved by the Board in Executive Session shall be given written notice, on or before May 15, 2004, of the Board's intention to terminate their respective services at the end of the 2003-2004 school year.

Secondly, that the teachers/nurses on the report dated May 12, 2004, reviewed and approved by the Board in Executive Session shall also be notified that their names will be placed on the recall list pursuant to the Recall Procedures as stated in the negotiated Agreement.

A391

# REDUCTION IN FORCE



**Elementary**

REDACTED

| | |
|---|---|
| Baltz | 8-26-03 |
| Warner | 8-26-03 |
| Shortlidge | 9-2-03 |
| Lewis | 10-23-03 |
| Skyline | 11-3-03 |

**Counselor**

REDACTED

| | |
|---|---|
| Richardson Park LC | 8-28-02 |
| Warner | 11-28-02 |

**Reading**

REDACTED

| | |
|---|---|
| Mote (½) | 6-10-92 |

**English**

REDACTED

| | |
|---|---|
| Conrad | 8-26-03 |

**Music**

REDACTED

| | |
|---|---|
| Stanton | 8-27-03 |

**Physical Education**

REDACTED

| | |
|---|---|
| Marbrook | 8-26-03 |
| Warner | 9-22-03 |

A392

# RESOLUTION CONCERNING TERMINATION OF TENURED AND NON-TENURED TEACHERS

**WHEREAS,** the Board, based upon the recommendation of staff, has concluded that it intends to terminate the respective services of the tenured and non-tenured teachers on the report dated May 12, 2004, reviewed and approved in Executive Session; therefore, be it

**RESOLVED,** that the tenured and non-tenured teachers listed on the report shall be given written notice on or before May 15, 2004, that the Board intends to terminate their respective services as teachers at the end of the 2003-2004 school year and their names will not be placed on the recall list.

A393

Revised 5-12-04

# NON-RENEWAL
# TENURED



English
REDACTED    Conrad    8-30-00

Library
REDACTED    Baltz    9-1-70

# NON-RENEWAL
# NON-TENURED TEACHERS



Mathematics
REDACTED    Dickinson    1-30-02

Social Studies
REDACTED    McKean    8-27-02

Special Education
REDACTED    Conrad    8-26-03

Physical Education
Wilcoxon, Richard.    Skyline    10-21-02

A394

# RESOLUTION CONCERNING TERMINATION
# DUE TO LACK OF CERTIFICATION

**WHEREAS,** the Board, based upon the recommendation of staff, has concluded that it intends to terminate the respective services of teachers due to lack of certification on the report dated May 12, 2004, reviewed and approved in Executive Session; therefore, be it

**RESOLVED,** that the teachers listed on the Lack of Certification report shall be given written notice on or before May 15, 2004, that the Board intends to terminate their respective services as teachers at the end of the 2003-2004 school year and their names will not be placed on the recall list.

A395

# NON-RENEWAL
# LACK OF CERTIFICATION

| Name | Subject | Location |
|---|---|---|
| REDACTED | Music | Conrad |
| | Elementary | Shortlidge |
| | Kindergarten | Lewis |
| | Drama | Cab Calloway |
| | Middle Level Mathematics | Conrad |
| | Special Education | Richardson Park LC |
| | Family Consumer | Conrad |
| | Elementary | Lewis |
| | Special Education | Meadowood |
| | Special Education | Richardson Park |
| | Counselor | Lewis |
| | English | Stanton |
| | Mathematics | Dickinson |
| | Elementary | Warner |
| | Special Education | TRLC/PACE |
| | Physical Education | AI DuPont High |
| | General Science | Stanton |
| | Special Education | Conrad |
| | Mathematics | Dickinson |
| | Elementary | Lewis |
| | Bilingual Social Studies | Conrad |
| | Bilingual | Conrad |
| | Special Education | Dickinson |

A396

# CONDITION OF EMPLOYMENT

It is recommended that the Board change the following contracts from temporary to regular effective May 13, 2004.

| Name | Subject/Area | Location |
|---|---|---|
| REDACTED | Mathematics | Dickinson |
| | Bilingual Science | AI DuPont High |
| | Social Studies | AI DuPont High |
| | ESL | Marbrook |
| | Special Education | Meadowood |
| | Special Education | Meadowood |
| | Special Education | Dickinson |
| | Business | AI DuPont High |

A397

# CONDITION OF EMPLOYMENT

It is recommended that the Board extend the following temporary contracts through June 30, 2005.

| REDACTED | Subject/Area | Location |
|---|---|---|
| | Intervention Specialist | Linden Hill |
| | Mathematics | Al DuPont Middle |
| | Physical Science | McKean |
| | Business | Cab Calloway |
| | Physical Science | McKean |

A398

# EXHIBIT N



May 14, 2004

<u>CERTIFIED. MAIL .- RETURN. RECEIPT. REQUESTED</u>

**RED CLAY CONSOLIDATED SCHOOL DISTRICT**

Robert J. Andrzejewski, Ed.D.
*Superintendent*

Administrative Offices
2916 Duncan Road
Wilmington, DE 19808

Human Resources

(302) 683-6656
FAX (302) 636-8778

Debra Davenport
*Manager*

Debra.Davenport@redclay.k12.de.us

Mr. Richard Wilcoxon
220 Wharton Drive
Newark, DE 19711

Dear Mr. Wilcoxon:

I have been directed by the Red Clay Consolidated School District's Board of Education to notify you that the Board intends to terminate your services as a teacher, effective at the end of the 2003-04 school year pursuant to Title 14, Chapter 14 of the Delaware Code (copy enclosed).

As a non-tenured teacher, you are not entitled to a hearing before the Board under Title 14, Chapter 14 of the Delaware Code.

Your name will not be placed on the recall list for the Red Clay Consolidated School District.

A letter will be sent from the Benefits Office regarding the continuation of your benefits and disposition of your pension contributions.

On behalf of the Board, I wish to thank you for your services.

Very truly yours,

Debra Davenport
Manager

DD/DLD/z
Enclosures
Non-Tenured Non-Renew Performance 2004

Margolis Edelstein
Wilcoxon v. Red Clay
0321

The Red Clay Consolidated School District does not discriminate on the basis of race, color, national origin, religion, sex, age, or disability in its programs, activities or employment practices as required by Title VI, Title IX and Section 504. The district coordinator of compliance is: Administrator of Human Resources Development, RCCSD, 1916 Duncan Road, Wilmington, DE 19808 (302) 683-6661.

A400

# EXHIBIT O

06/21/04  15:14 FAX 3023687095        KINKO'S NEWARK                                    ☑005



**RED CLAY CONSOLIDATED
SCHOOL DISTRICT**

Robert J. Andrzejewski, Ed.D.
*Superintendent*

Administrative Offices
2916 Duncan Road
Wilmington DE 19808

Diane L. Dunmon
*Assistant Superintendent
Administrative Services*

(302) 693-5012
FAX (302) 636 0774

June 1, 2004

Mr. Richard Wilcoxon
220 Wharton Drive
Newark, DE 19711

Dear Mr. Wilcoxon:

The Superintendent is in receipt of your letter of May 18, 2004,
requesting reasons for your termination. The reasons include poor classroom
management, inappropriate interaction with staff and lack of proper student
lesson plans.

Very truly yours,

*Diane L. Dunmon*

Diane L. Dunmon
Assistant Superintendent
Administrative Services

DLD/z

Pc:   Rudy Norton, DSEA
      Human Resources

Margolis Edelstein
Wilcoxon v. Red Clay
0082

The Red Clay Consolidated School District does not discriminate on the basis of race, color, national origin, religion, sex, age, or disability in
its program, activities or employment practices as required by Title VI, Title IX and Section 504. The district coordinator of compliance is:
Administrator of Human Resources Development, RCCSD, 2916 Duncan Road, Wilmington, DE 19808 (303) 683-6623.

A402

EXHIBIT P





AUG 10 2004

Non-Renewal Hearing
July 28, 2004

**D CLAY CONSOLIDATED
SCHOOL DISTRICT**

>bert J. Andrzejewski, Ed.D.
*Superintendent*

Administrative Offices
2916 Duncan Road
Wilmington, DE 19808

(302) 683-6604
Fax (302) 636-8774

Present:     Robert J. Andrzejewski, Ed.D.
Diane L. Dunmon
Richard Wilcoxon
Rudy Norton

Mr. Wilcoxon and his representative indicated that for more than $1\frac{1}{2}$ years there were no problems with regard to observations and then suddenly, there were issues. The point was made that it was not reasonable for Mr. Wilcoxon to go from effective to ineffective in such a short period of time. Although he was accused of inappropriate interactions with another staff member, there is no <u>conclusive</u> evidence that anything untoward occurred between Mr. Wilcoxon and a staff member. The concern that lesson plans for Health were not up-to-date should not be an issue since both Physical Education and Health teachers use the same plans received from Frank Rumford.

Mr. Wilcoxon indicated that he had team-taught health since he began teaching at Skyline Middle School two years ago. His observations, during this time, were done in this type of setting until approximately mid-school year of 2003-2004. At that time, he was no longer team-teaching and was required to teach health independently to his own students. It is not unreasonable to believe that classroom management skills would be different when only one teacher is present rather than two. With Mr. Wilcoxon solely responsible for managing the classroom, the dynamics during a lesson can change dramatically. Mr. Wilcoxon has responsibility to prepare lessons for his students that are appropriate and up-to-date. In this situation the evaluation is based upon Mr. Wilcoxon's performance and Mr. Wilcoxon's performance alone. Besides lesson analysis Mr. Wilcoxon was also given memoranda from the building administration indicating concerns and expectations. Based upon this information, the decision to non-renew his contract is upheld.

*Robert J. Andrzejewski*

Margolis Edelstein
Wilcoxon v. Red Clay
0572

The Red Clay Consolidated School District does not discriminate on the basis of race, color, national origin, religion, sex, age, or disability in its programs, activities or employment practices as required by Title VI, Title IX and Section 504. The district coordinator of compliance is: Administrator of Human Resources Development, RCCSD, 2916 Duncan Road, Wilmington, DE 19808 (302) 683-6662.

A404

## CERTIFICATE OF SERVICE

I hereby certify that on July 12, 2006, I electronically filed a true and correct copy of the foregoing Appendix to Defendants' Opening Brief In Support of Their Motion for Summary Judgment and Order with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record, and I further certify that a copy of such Appendix to Defendants' Opening Brief in Support of Their Motion for Summary Judgment and Order will be hand delivered to the following counsel of record on July 13, 2006 to:

> Jeffrey K. Martin, Esquire
> Timothy James Wilson, Esquire
> Margolis Edelstein
> 1509 Gilpin Avenue
> Wilmington, DE  19806


YOUNG CONAWAY STARGATT & TAYLOR, LLP


/s/ Barry M. Willoughby
_____
Barry M. Willoughby, Esquire (No. 1016)
Michael P. Stafford, Esquire (No. 4461)
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware  19899-0391
(302) 571-6666; (302) 576-3345
bwilloughby@ycst.com; mstafford@ycst.com
Attorneys for Defendants


Dated:  July 12, 2006