Richard Wilcoxon

150

1    a union rep, so I wanted to move the meeting along.

2        Q.    The first one you refused to sign?

3        A.    That's correct.

4        Q.    You said it was inaccurate.  The second one you

5    signed apparently because you thought there was some

6    truth to the statement; is that correct?

7        A.    There was some truth in that statement, yes.

8                    (Wilcoxon Deposition Exhibit 18 was marked

9    for identification.)

10       Q.    Have you read Exhibit 18?

11       A.    Yes.

12       Q.    Was that the third reprimand you received?

13       A.    Yes.

14       Q.    On the 22nd of January?

15       A.    Yes.

16       Q.    And this one deals with your substitute teacher

17   plans, correct?

18       A.    Correct.

19       Q.    And you signed that one as well?

20       A.    Yes.

21       Q.    So does that indicate that there was some

22   accuracy to these as well?

23       A.    No.  I also -- as I said for the last one, at

24   that point I wanted to talk to a union rep, and wanted to

Richard Wilcoxon

151

1    end this meeting so I could get to a union rep, and Miss

2    Basara said we need to get the rest of those letters

3    before I could leave.

4        Q.    Why didn't you put refuse to sign if you thought

5    it was inaccurate?

6        A.    Because I wanted to get out of there, get the

7    meeting over with, and go talk to my union rep.

8        Q.    How much longer does it take to put refuse to

9    sign and sign your name?

10       A.    When I refused to sign the last one there was a

11   whole lot of conversation about it.

12       Q.    What was the conversation?

13       A.    About why it was inaccurate, about why I should

14   sign it.

15       Q.    About what?

16       A.    About how, why, from their standpoint, why the

17   letter was accurate, why I should sign it, why I felt it

18   was inaccurate and wouldn't sign it.

19       Q.    So at that point, when you got the first one --

20       A.    Mm-hmm.

21       Q.    -- didn't that reinforce your feeling from

22   December, that you were not going to be renewed?

23       A.    Yes, it did.

24       Q.    And you got two more, that same meeting?

Richard Wilcoxon

152

1    A.    Yes.

2    Q.    But despite that feeling you signed both of the

3  next two?

4    A.    That's correct, because I wanted to get to the

5  phone and talk to my union rep.

6    Q.    Attached to that are these lesson plans that Ms.

7  Basara is referring to in the reprimand?

8    A.    I believe so.

9    Q.    Now, the second page, which is Bates number

10  00171, is that in your handwriting?

11    A.    171?

12    Q.    C00171, the second page of Exhibit 18?

13    A.    Yes.

14    Q.    Is that in your handwriting?

15    A.    Yes, it is.

16    Q.    What does that say?

17    A.    "Basketball shoot around - balls are in a cage in

18  supply closet."

19    Q.    Is there a date on that?

20    A.    Yes, Wednesday, 1/14.

21    Q.    So that was the plan for Wednesday, 1/14?

22    A.    Yes.

23    Q.    "Basketball shoot around - balls are in the cage

24  in supply closet"?

Richard Wilcoxon

153

1    A.    Correct.

2    Q.    Thursday, the 13th, what does it say?

3    A.    "Repeat Wednesday."

4    Q.    So for Thursday we are repeating what is above

5    it?

6    A.    That's correct.

7    Q.    What does Friday, the 14th --

8    A.    Says 16th, it looks like.

9    Q.    16th?

10    A.    "Scooter team handball - 3 on 3 - 1st team to

11    score stays on - make goals out of large cones - students

12    must pass the ball across half court, otherwise turnover

13    - can't score from own side - a goal is when the ball

14    hits the bleachers between the cones."

15    Q.    Keep reading.

16    A.    "If this is to hard or not going well, you can

17    shoot around instead."

18    Q.    Okay.  Read the rest of it.

19    A.    That was it.

20    Q.    That's it?

21    A.    Yes.

22    Q.    So these were your lesson plans for three full

23    days when you were out?

24    A.    Correct.

Richard Wilcoxon

154

1    Q.    Now, is there a learning objective listed on here

2    anywhere?

3    A.    No, there is not.

4    Q.    Is there any description of how you are going to

5    get to a learning objective from these plans?

6    A.    No, there is not.

7    Q.    Basically, this is how you play a couple of

8    games, right?

9    A.    Correct.

10    Q.    Okay.  And are you saying that this is an

11    adequate lesson plan as far as you are concerned?

12    A.    Not completely, no.

13    Q.    And that is your handwriting on that?

14    A.    That is correct.

15    Q.    The next page, 00172, is that your handwriting?

16    A.    Yes.

17    Q.    And what is that?

18    A.    It is a letter to the sub.

19    Q.    And can you read what it says?

20    A.    "Dear Sub, Thank you for your assistance.  If any

21    of the kids give you any problems, please leave a note

22    about them.  I am leaving you both TOR slips (to get a

23    student out of the room if they are a problem) and SBR

24    forms (if behavior is so bad you feel an administrator

Richard Wilcoxon

155

1    needs to see the student, i.e. fights, etcetera.)  Also I

2    have left a note on the locker room door telling students

3    to report directly to the gym.  Students are to put their

4    books on the bleachers next to the doors.  The students

5    have been told to wear sneakers in order to participate.

6    If you have any questions, please see Mr. Rumford in the

7    main office or Ms. Freebery, the female PE teacher.  The

8    lesson plans are on the bottom of this and the next page.

9    To take attendance, have students sign in on the pages of

10   this pad.  Thank you again.  Richard."

11        Q.   Is there something below that?

12        A.   It says, "equipment needed is in storage closet

13   on the left" -- it is cut off.  I can't see it.

14             MR. WILLOUGHBY:  Do you have better copies

15   of these?

16             MR. WILSON:  I don't know.

17   BY MR. WILLOUGHBY:

18        Q.   Now, is it right, is it correct that the order

19   that this was left for the substitute was that page 3 was

20   on top of page 2?

21        A.   No.

22        Q.   Page 2 was on top of page 3?

23        A.   Oh, I'm sorry.  I'm sorry.

24        Q.   You left, page 3 is a note?

Richard Wilcoxon

156

1      A.    Yes, page 3 was on top.

2      Q.    Right.  And then you attached page 2 to it?

3      A.    Correct.

4      Q.    At the top of the page it says, "I almost

5  forgot."

6      A.    Yes.

7      Q.    You have, "Each morning you have 2 duties.  From

8  7:30 to 7:45" --

9      A.    Yes.

10      Q.    -- "you need to be in the gym with the student

11  leaders."

12      A.    Yes.

13      Q.    "2 of these students put up the flag."

14      A.    That is correct.

15      Q.    "From 7:30 to" --

16      A.    I guess that would be "7:50."?

17      Q.    -- "you have a reading group in the Multi."  That

18  means the multi-purpose room?

19      A.    That's correct.

20      Q.    "The student's books" --

21      A.    -- "are under the TV in this room."

22      Q.    Did you tell the sub what they were supposed to

23  be reading out of the books?

24      A.    No, I didn't.

Richard Wilcoxon

157

1    Q.    Did you tell them what the lesson objective was,

2    anything like that?

3    A.    No.

4    Q.    Did you file grievances or did the union file

5    grievances over this warning for the lesson plans?

6    A.    I had asked Mr. Norton to.  I believe he wanted

7    to focus on the sexual harassment allegations instead.

8    Q.    So was it correct that was the only one you filed

9    a grievance about or the union filed a grievance about?

10   A.    That's correct.

11            (Wilcoxon Deposition Exhibit 19 was marked

12   for identification.)

13   Q.    Do you recognize Exhibit 19?

14   A.    Yes.

15   Q.    And that's something you wrote to Janet Basara on

16   February 14, 2003?

17   A.    Correct.

18   Q.    That was a little more than two weeks later?

19   A.    Correct.

20   Q.    And the first thing you did was tell Ms. Basara

21   that you didn't want her to use your nickname?

22   A.    That's correct.

23   Q.    And that was because why again?

24   A.    Because I felt it was very informal.

Richard Wilcoxon

158

1    Q.    Didn't other people call you Rich?

2    A.    In informal settings, yes.

3    Q.    Had she called you Rich in the past?

4    A.    She might have.

5    Q.    Now, at this point you knew your job was on the

6    line, right?

7    A.    I assumed it was.

8    Q.    Did you think it was good judgment to tell Ms.

9    Basara that she shouldn't use your nickname?

10   A.    I don't see a problem with that.

11   Q.    Okay.  This is your rebuttal to the allegations

12   that you had forgotten to sign up for school bus

13   activities?

14   A.    Yes.

15         (Wilcoxon Deposition Exhibit 20 was marked

16   for identification.)

17   Q.    Have you read Exhibit 20?

18   A.    Yes.

19   Q.    And this you delivered to Ms. Basara on, well, it

20   is dated January 26.  When did you give it to her?

21   A.    I believe it was probably the same day as the

22   other one.  Which was, what, 14th?

23   Q.    Do you --

24   A.    I'm not a hundred percent sure.  I believe it was

WILCOX & FETZER LTD.
Registered Professional Reporters

A-0158

Richard Wilcoxon

159

1    the 14th.

2        Q.    Of February?

3        A.    Yes.

4        Q.    Now, in here you refer to lesson plans have been

5    left in your mailbox?

6        A.    Yes.

7        Q.    Is that the plan that's the second page of

8    Exhibit 18?

9        A.    Correct.

10       Q.    C00171?

11       A.    Correct.

12       Q.    Correct.

13                    (Wilcoxon Deposition Exhibit 21 was marked

14   for identification.)

15       Q.    Do you recognize Exhibit 21?

16       A.    Yes.

17       Q.    What is it?

18       A.    I wrote this to Miss Basara, and copied it to my

19   union rep, and is asking for the reasons to waive 48-hour

20   notice.

21       Q.    Had you consulted with Mr. Norton before you sent

22   this?

23       A.    I probably had, yes.

24       Q.    Did he assist you in preparing this?

Richard Wilcoxon

160

1    A.    I doubt it.

2    Q.    Why do you say that?

3    A.    I don't remember help in writing the letter.

4    Q.    Did you discuss the contract with him?

5    A.    On several occasions, yes.

6              (Wilcoxon Deposition Exhibit 22 was marked

7    for identification.)

8    Q.    Do you recognize Exhibit 22?

9    A.    I do not recognize it, but I probably have seen

10   it.

11   Q.    Isn't that Ms. Basara's response to your --

12   A.    It looks like, yes.

13   Q.    -- Exhibit 21?

14   A.    It looks that way, yes.

15   Q.    And she cites the article of the contract?

16   A.    Yes.

17   Q.    And she tells you there that a principal can meet

18   with a teacher at any time?

19   A.    Yes.

20   Q.    And she attaches the applicable portion of the

21   contract, does she not, the next two pages?

22   A.    Yes.

23   Q.    And as we established earlier, the union declined

24   to take this grievance to arbitration, correct?

161

1       A.    Correct.

2                    (Wilcoxon Deposition Exhibit 23 was marked

3    for identification.)

4       Q.    Do you recognize Exhibit 23?

5       A.    Mm-hmm.

6       Q.    And that's Ms. Basara's response to your note

7    about your lesson plans?

8       A.    Correct.

9       Q.    And she says she is going to address you as

10   Richard, correct?

11      A.    That's correct.

12      Q.    Can you read the second full paragraph?

13      A.    The second one.

14      Q.    Yes.  Slowly.

15      A.    "In your February 12th letter, you have asserted

16   that it is acceptable to use a legal pad to have students

17   sign in when you are absent."

18      Q.    Let me stop you there.  Did you think that's an

19   appropriate way to take attendance?

20      A.    That was the method that I was told Mr. Rumford

21   was using when he went to my office and removed the legal

22   pad, he was giving it to a substitute to sign in.

23      Q.    On that one day?

24      A.    On that day, yes.

Richard Wilcoxon

162

1     Q.    So you are saying you inferred from that that

2  that would be appropriate to be used on all days; is that

3  what you are saying?

4     A.    Yes.

5     Q.    Okay.  And then what does she say?

6     A.    "This is unacceptable."

7     Q.    What else has she written?

8     A.    "In our discussion on January 22nd, 2004, I

9  explained that a substitute has no way of knowing who

10  might be cutting class without a class list."

11     Q.    Did she say that to you on January 22nd?

12     A.    I do not recall her ever saying that.

13     Q.    You are saying you think she didn't say it?

14     A.    I don't recall.

15     Q.    She might have said it to you?

16     A.    She might have said it.

17     Q.    What is the second or third full paragraph,

18  begins "Secondly," can you read that?

19     A.    "Secondly, you have asserted that you had

20  emergency plans on file in the office with class lists

21  and a bell schedule.  Mr. Rumford pulled them to use when

22  you were out sick and informed you of this."

23     Q.    Let me stop you.  Did he inform you he had pulled

24  this information, emergency plans from the file?

Richard Wilcoxon

163

1    A.    No, he did not.

2    Q.    So that's not true?

3    A.    That's not true.

4    Q.    That's just false?

5    A.    That's false.

6    Q.    Okay.  What does the next sentence say?

7    A.    "There were no class lists."

8    Q.    Let me stop you.

9    A.    I asked to see my emergency plans to show them

10   there was, and that's when they said they could not

11   find -- the ones I had they could not find.

12   Q.    Well, if they weren't there, how could they find

13   them?

14   A.    They were there.

15   Q.    So you are saying this is an untrue statement?

16   A.    I asked to see my entire emergency lesson plan

17   folder.  They said they could not find the folder.  With

18   the plans, the class schedules, everything.

19   Q.    So you are saying you put the class lists in

20   there?

21   A.    Yes.

22   Q.    All right.  The next sentence, read what that

23   says.

24   A.    "The bell schedule was outdated by two years.  It

Richard Wilcoxon

164

1    is your responsibility to update them after use."

2        Q.    Was it accurate that the bell schedule was

3    outdated by two years?

4        A.    No.

5        Q.    So it is another false statement?

6        A.    Yes.

7        Q.    Just made up?

8              MR. WILSON:   Object to form.

9        A.    Yes.

10       Q.    Do you agree it is your responsibility to keep

11   the bell schedules updated?

12       A.    Yes.

13       Q.    Did you keep a copy of the emergency plans that

14   you claim were on file with the principal's office?

15       A.    The first set, no, I did not.

16       Q.    The subject referred in this Exhibit 23?

17       A.    No, I did not.  That's why I made a note in my

18   letter to Miss Basara, stating I would keep a copy of my

19   lesson plans I was turning in.

20       Q.    As of this point you didn't keep any copies of

21   what you had given the office for your emergency plans,

22   bell schedule or your class lists?

23       A.    No.

24       Q.    Okay.

165

1              (Wilcoxon Deposition Exhibit 24 was marked

2       for identification.)

3          Q.   Do you recognize Exhibit 24?

4          A.   Yes, I do.

5          Q.   This is the response to your request for more

6       information about your failure to sign up for busses?

7          A.   Correct.

8          Q.   And can you read the second full paragraph?

9          A.   "You have asked for dates when you did not sign

10      up for the after school activity busses on time.  On

11      December 15th, 2003, I issued a memo to the entire staff

12      to remind them of the procedures.  On December 17th, 2003

13      and January 5th, 2004 you had not signed up by 1:00 and

14      other staff members, Ms. Freebery and Mr. Rumford, called

15      Sutton to order additional busses."

16         Q.   Is Sutton the bus company?

17         A.   Yes, it is.

18         Q.   Is this accurate?

19         A.   In part.  On January 5th I called Sutton.  I got

20      the number from Mr. Rumford to make the phone call to

21      call for additional busses.

22         Q.   What time was that?

23         A.   I do not know.

24         Q.   Was it after 1:00 p.m.?

Richard Wilcoxon

166

1      A.    I know it was after a 10:00 a.m. deadline.    I

2    know it was much later than that.

3      Q.    Much later than a 10:00 a.m. deadline?

4      A.    Yes.

5      Q.    And otherwise it is accurate?

6      A.    On December 17th I don't know who called for

7    busses.   I don't know if I called or somebody else did.

8    And I know I talked to my union rep --

9      Q.    You called your union rep?

10     A.    I called my union rep and talked to him about

11   this letter.

12     Q.    Slow down.

13     A.    And I said when I talked to him even that I knew

14   on January 5th this letter was slightly inaccurate, that

15   I made the call to Sutton.   On December 17th I have no

16   idea, I can't remember if I made the call or if somebody

17   else made the call.

18     Q.    So you have no way of disputing that on December

19   17th you had not signed up for the busses by 1:00 p.m.?

20     A.    No, because even in February that year I couldn't

21   remember, so I'm not going to remember now.

22     Q.    You've got no way to dispute the accuracy of

23   this?

24     A.    Right.

Richard Wilcoxon

167

1    Q.    Correct?

2    A.    Correct.

3              (Wilcoxon Deposition Exhibit 25 was marked

4    for identification.)

5    Q.    Do you recognize this exhibit?

6    A.    Yes, I do.

7    Q.    25.

8    A.    Yes, I do.

9    Q.    What is it?

10   A.    It is an observation done on April 21st by Miss

11   Basara.

12   Q.    And part of her job as acting principal was to

13   observe teachers, correct?

14   A.    That is correct.

15   Q.    And this was an unannounced observation?

16   A.    Yes.

17   Q.    And is there anything wrong with the principal

18   doing an unannounced observation?

19   A.    No.

20   Q.    This is her write-up of what she observed in the

21   class?

22   A.    Yes.

23   Q.    Do you agree that there were students whistling

24   during the course of your lesson?

Richard Wilcoxon

168

1    A.    They were, I believe it was three students.    She

2    reports multiple.

3    Q.    Well, there were three.    You say multiple is not

4    three?

5    A.    I believe, I believe she put in here there was

6    more, but I don't remember.

7    Q.    Well --

8    A.    I haven't reviewed this.

9    Q.    There were at least three students whistling?

10   A.    Yes.

11            MR. WILSON:    Do you want to take time to

12   read that?    If he is going to ask you questions about it

13   you might as well review it.

14            MR. WILLOUGHBY:    Why don't we take a

15   five-minute break.    We have been here for about an hour.

16            (Recess taken.)

17   BY MR. WILLOUGHBY:

18   Q.    Did you have a chance to look at Exhibit 25?

19   A.    Yes, I did.

20   Q.    And that's an observation done of your teaching

21   by Janet Basara?

22   A.    That's correct.

23   Q.    And at that point for this evaluation you were

24   teaching by yourself, correct?

Richard Wilcoxon

169

1    A.    That's correct.

2    Q.    And when was it that the team teaching between

3    yourself and Ms. Freebery stopped?

4    A.    This was the first semester.

5    Q.    The spring of 2004?

6    A.    That's correct.

7    Q.    And did it stop in January or did it stop sooner

8    than that?

9    A.    When the semester started, I guess it would be

10    January or whatever.

11    Q.    Was there any time during January where you team

12    taught?

13    A.    I do not think so.

14    Q.    So for the whole spring semester you were on your

15    own?

16    A.    That's correct.

17    Q.    And you were using the lesson plans for health

18    that Mr. Rumford gave you?

19    A.    That's correct.

20    Q.    What lesson plans were you using for the physical

21    education part of it?

22    A.    The plans I wrote.

23    Q.    Where are those plans?

24    A.    They were on my school computer.

Richard Wilcoxon

170

1      Q.    And did you produce them in this litigation?

2      A.    I didn't have access to my school computer.

3      Q.    Did you have copies of them anywhere?

4      A.    I don't think so.

5      Q.    So you are tape recording people.  You are

6    thinking that people are setting you up for nonrenewal.

7    And you know one of the issues is lack of lesson plans,

8    correct?

9      A.    Correct.

10     Q.    But you didn't keep copies of them?

11           MR. WILSON:  Object to the form.

12     A.    I left them on my school computer.

13     Q.    So you didn't keep copies of them?

14           MR. WILSON:  Object to the form.

15     A.    That's correct.

16     Q.    Do you agree with this analysis, lesson analysis

17   done by Ms. Basara?

18     A.    No, I do not.

19     Q.    Do you think the whole thing is inaccurate or do

20   you think just parts are inaccurate?

21     A.    I think the majority of it is inaccurate.

22     Q.    Well, some things she compliments you on and some

23   things she says were not acceptable?

24     A.    That's correct.

171

1    Q.    So you are saying that the parts she compliments

2    you are accurate and the other parts are inaccurate?

3    A.    That's not what I'm saying.

4    Q.    What are you saying?

5    A.    I'm saying parts of it is are accurate but the

6    majority are not.

7    Q.    Tell me what parts you think are accurate.  Just

8    go through page by page and identify the paragraphs

9    rather than reading the entire document into the record.

10   A.    The first paragraph of the narrative, that is

11   correct.

12   Q.    The description of the lesson, is that accurate?

13   A.    I'm sorry, I skipped that.

14              Not completely.

15   Q.    What is inaccurate about that?

16   A.    The objective is not how tobacco companies get

17   you to buy their products.

18   Q.    What was the objective?

19   A.    I believe students will learn how influences --

20   influences will affect their choices on smoking or

21   something along those lines.

22   Q.    Was this a lesson plan that you had written or

23   one of Mr. Rumford's?

24   A.    It is one he had written.

Richard Wilcoxon

172

1    Q.  All right.  You don't remember exactly what the

2  objective was?

3    A.  No, I do not.

4    Q.  But you think what is described here is

5  inaccurate?

6    A.  Yes.

7    Q.  Okay.  Anything else in that description of the

8  lesson that you think is inaccurate?

9    A.  No, I think the rest of it is accurate.

10   Q.  Let's go to the next heading, "Narrative."  The

11  first paragraph under that, is that accurate?

12   A.  Yes.

13   Q.  What about the second paragraph beginning, it

14  says "At 9:03"?

15   A.  Again, parts of it are accurate.

16   Q.  What is inaccurate?

17   A.  What is inaccurate?

18   Q.  Yes.

19   A.  The part where it says "Without a conclusion to

20  the discussion."

21   Q.  I'm sorry, where are we now?

22   A.  I'm sorry.  That's the start of the fifth

23  sentence.  I feel I did conclude that activity.

24   Q.  It says there wasn't a conclusion?

173

1       A.    Yes, "Without a conclusion to the discussion."

2       Q.    How did you conclude the discussion?

3       A.    As I wrote in my rebuttal, that I stated -- I

4    don't remember exactly what I stated.  I read that

5    yesterday to prepare for this.  But I wrote exactly how I

6    concluded.  I don't remember off the top of my head.

7       Q.    You don't remember how you concluded it?

8       A.    Not off the top of my head, no, I don't.

9       Q.    And of course, this is from two years ago as

10   well?

11      A.    Yes.

12      Q.    So you are saying you have enough of a

13   recollection of this observation to remember that it is

14   inaccurate that you didn't conclude the lesson?

15      A.    As I stated, I read my rebuttal or attached

16   letter to this.

17      Q.    And that's why you remember?

18      A.    Last night.  Yes.

19      Q.    All right.  What else is inaccurate in that

20   second paragraph under "Narrative"?

21      A.    I don't recall anything else being inaccurate.

22      Q.    The bottom paragraph under "Narrative" beginning

23   with "Next," why don't you read that, just go through the

24   bottom of that first page and tell me if there is

1    anything there that's inaccurate.

2    A.    I don't believe -- on the fifth sentence says,

3    "The majority of students moved to one side of the room."

4    I don't believe that.  Again, in me rebuttal, that's the

5    only way I'm remembering this, is that the students were

6    more equally distributed.

7    Q.    All right.  Going over to the second page, which

8    is C00228, starting with the top paragraph on that page,

9    it begins with "Students were talking softly at first,"

10   can you read that and tell me what is inaccurate, if

11   anything.

12            Go ahead.

13   A.    The third sentence says, "CJ was laying across

14   two desks."  The desks are attached to the chairs in that

15   room.  A student couldn't lay across two desks.

16   Q.    The desks are attached to the chairs.

17   A.    Yes.  It comes right here, so if a student were

18   to lay across it, it is almost -- they couldn't lay

19   across two seats without standing up and laying down on

20   them.  It says, "CJ was laying across two desks."

21   Q.    Two desks?

22   A.    The desks are attached here.

23   Q.    You are saying he couldn't be laying across?

24   A.    If there is one right here and another one is way

175

1    over here, that's a large gap for a student to make.

2        Q.    You remember that because you read that in your

3    rebuttal?

4        A.    That's correct.  That's going to be my answer for

5    all of these, I read that last night.  I don't have -- I

6    don't have a clear memory of everything that happened in

7    that room that day.

8        Q.    So you don't have an independent recollection

9    other than anything that's in your rebuttal?

10       A.    The only independent --

11       Q.    Go ahead.

12       A.    -- remembrance I had was that she repeatedly

13   mentioned students were whistling, and said that I did

14   not -- she stated I do not know who they were.

15              First, she couldn't -- she didn't know that

16   because she never asked me if I knew who they were.  I

17   moved and stood next to one of them, and when a next --

18   when another student whistled, I looked directly at him

19   and I said, "If you keep this up, you are leaving the

20   room."  And that's the only independent recollection I

21   have of this lesson.

22       Q.    So everything else that you agree or disagree

23   with would be in your rebuttal?

24       A.    That's correct.

Richard Wilcoxon

176

1    Q.    Did Ms. Basara ask you for your lesson plans on

2    that day?

3    A.    No, she did not.

4    Q.    Did she ask you for your lesson plans for that

5    day at any point?

6    A.    She eventually did, yes.  I think it was later

7    that week.

8    Q.    And did you say they were at home?

9    A.    No, I did not.

10   Q.    What did you say?

11   A.    I asked her, "Do you want all my PE lessons, as

12   well as my health lessons, or do you want just the health

13   lessons?"

14              She said, "Just the health lessons."

15              And I said, "Do you want a copy?  Do you

16   want the book?"

17              And she said that a copy would be fine.  So

18   I made a copy of those lessons and put them in her

19   mailbox.

20   Q.    You said what?

21   A.    I made a copy of those lessons and put them in

22   her mailbox.

23              (Wilcoxon Deposition Exhibit 26 was marked

24   for identification.)

Richard Wilcoxon

177

1    Q.   Do you recognize Exhibit 26?

2    A.   Yes.

3    Q.   Is that the document that you put in Ms. Basara's

4    mailbox --

5    A.   Yes.

6    Q.   -- concerning your health plan book?

7    A.   That's correct.

8    Q.   Your health plan lessons?

9    A.   That's correct.

10   Q.   And the second page of that document, which is

11   C00240, that's an excerpt out of --

12   A.   That big plan book, yes.

13   Q.   -- the big plan book we looked at earlier?

14   A.   Yes.

15   Q.   This document, this page C00240, is a copy of a

16   lesson plan written by Mr. Rumford?

17   A.   That is correct.

18   Q.   And the same thing with the next page, C00241?

19   A.   Except for the few comments I added, like we

20   talked about before, out of the big plan book, yes.

21   Q.   Except for those items you mentioned?

22   A.   Yes.

23   Q.   And same thing for C00242?

24   A.   That's correct.

178

1      Q.   And C00243?

2      A.   That's correct.

3      Q.   How many times did she ask you for the lesson

4    plans before you sent this in?

5      A.   Once.

6      Q.   Well, the lesson plan was, the observation was on

7    April 21, and you gave this to her looks like

8    approximately two weeks later.  What was the reason for

9    the delay?

10     A.   As I said, she didn't ask for one that day.

11     Q.   When did she ask for them?

12     A.   Like I said, I guess approximately a week later.

13   I do not remember the exact date.

14     Q.   Well, why did it take a week to get back to her

15   when she asked for the lesson plans?

16     A.   Again, I don't remember the exact date when she

17   asked for them, so I don't know if it was a week.  I'm

18   giving you guesses.  I'm sorry.

19     Q.   So you don't remember when she asked you for it?

20     A.   No, I don't.

21     Q.   Okay.  Now, when a principal does an observation

22   of the teacher, is there a post-observation conference?

23     A.   Yes, there is.

24     Q.   What happens in the post-observation conference?

179

1    A.   It is when I get that document we just read back,
2  to read over and review.
3    Q.   So that's the first time you have actually seen
4  the document?
5    A.   Is at the post -- yes.
6    Q.   That's Exhibit 25?
7    A.   That's correct.
8    Q.   All right.  What takes place in the
9  post-observation?
10   A.   You discuss what the observation says, what was
11 saw -- what was seen by the administrator, differences of
12 opinion about what took place in the classroom.
13   Q.   What else is discussed?  Is that it?
14   A.   Pretty much.
15              (Wilcoxon Deposition Exhibit 27 was marked
16 for identification.)
17   Q.   Have you looked at Exhibit 27?
18   A.   Yes.
19   Q.   What is that?
20   A.   It is a letter Miss Basara wrote about my lesson
21 plans.
22   Q.   Can you read what it says?
23   A.   Sure.  "At our post-observation conference on
24 April 26, 2004, I asked to see your plan book."

Richard Wilcoxon

180

1    Q.   Let's stop there.  Now, is that accurate?

2    A.   No, it is not.

3    Q.   She didn't ask to see your plan book at the

4    post-observation conference?

5    A.   No, she didn't.

6    Q.   She is making that up?

7    A.   As far as I recall, yes.

8    Q.   Well, could she have asked for it and you just

9    don't recall?

10   A.   I do not believe she asked for it.  As far as I

11   recall, she did not ask for it.

12   Q.   You are not saying that it is absolutely certain

13   that she didn't?

14   A.   No, I'm not.

15   Q.   Read the next line.

16   A.   "At that time you indicated that you did not have

17   it because you left it at home."

18   Q.   Is that accurate?

19   A.   No, it is not.

20   Q.   You never said that you didn't have it because

21   you left it at home?

22   A.   No, I didn't.

23   Q.   So she is making that up?

24   A.   That's correct.

Richard Wilcoxon

181

1    Q.    What does the next line say?

2    A.    "On May 5th, 2004, I asked to see it for a second

3    time.  You copied four pages and put it in my mailbox on

4    May 6, 2004.  To this date, I have not seen your lesson

5    plan book."

6    Q.    Is that accurate?

7    A.    I had talked to her ahead of time and said, "Do

8    you want the book or do you want copies of the page for

9    health?"  And she said, "Copies would be fine."

10   Q.    So what you gave her in response to her request

11   on May 5th was what has previously been marked as

12   Exhibit 26?

13   A.    That's correct.

14   Q.    All right.  And what does the next paragraph say?

15   A.    "My concern is that the pages that you gave me

16   were lessons that Frank Rumford wrote more than two years

17   ago."

18   Q.    Stop there.  Is it accurate that the pages that

19   you had given her were lesson plans Mr. Rumford had

20   written two years ago?

21   A.    Correct.

22   Q.    Okay.

23   A.    "He shared these with you to guide and assist you

24   as a new teacher.  You have only inserted the standards

Richard Wilcoxon

182

1    on some of his lessons.  Is unacceptable" --

2        Q.    Let me stop you one second.  I'm sorry.  You only

3    inserted the standards on some of the lessons.  Is that

4    the writings on these documents we referred to earlier

5    that was in your handwriting?

6        A.    The standards, yes.

7        Q.    She is accurate, that's the only writing that's

8    on here?

9        A.    No.  I altered one of the assignments as well, we

10   talked about previously.

11       Q.    Just the one?

12       A.    Yes.

13       Q.    Go ahead.  She says, "It is unacceptable"?

14       A.    "It is unacceptable that after two years of

15   teaching health and physical education at Skyline, you

16   have not developed, adapted, adjusted, or improved upon

17   lessons handed to you as a guide."

18       Q.    Do you agree with that remark?

19       A.    No, I don't.

20       Q.    So you think it was just fine for you to keep

21   using Mr. Rumford's two-year-old lesson plans?

22       A.    For health we were team teaching.  I was told

23   those were the lesson plans.  I talked to people I had

24   seen teaching with, those were the lesson plans they

Richard Wilcoxon

183

1    wanted to use.

2        Q.    People you were team teaching with?

3        A.    Yes.

4        Q.    Being whom?

5        A.    First it was Jill, the long-term sub.  When Miss

6    Freebery returned, I communicated to her that the lesson

7    plans I didn't think worked very well.  She informed me

8    they worked well for nine years and they will continue to

9    work.  I should try it with her before we made changes.

10       Q.    You stopped team teaching with her in January

11   2004, correct?

12       A.    That's correct.

13       Q.    And you believe that your job was in jeopardy?

14       A.    That's correct.

15       Q.    And you had been previously written up for not

16   having acceptable lesson plans?

17       A.    That's correct.

18       Q.    And you didn't do anything to rewrite these

19   health plans after that?

20       A.    That's correct.

21       Q.    Okay.

22                    (Wilcoxon Deposition Exhibit 28 was marked

23   for identification.)

24       Q.    Do you recognize Exhibit 28?

Richard Wilcoxon

184

1    A.    Yes.

2    Q.    And what is it?

3    A.    I wrote a letter to Miss Basara to ask her to

4    postpone the post-observation meeting to give me time to

5    talk to my union rep.

6    Q.    Did you talk to your union rep during that time?

7    A.    Yes, I did.

8    Q.    Was that Mr. Norton?

9    A.    Yes, it was.

10    Q.    What did you discuss?

11    A.    I discussed that I was -- I actually talked to

12    him previously, before I had ever seen the write-up,

13    saying I was concerned about Miss Basara writing it up,

14    and we continued that conversation, and I told him I had

15    gotten the document back that we looked at previously --

16    I don't remember what number it was -- and wanted to

17    review that with him ahead of time.  So we talked about

18    what was on that document.

19    Q.    Well, that was Exhibit 25?

20    A.    Yes.

21    Q.    The lesson --

22    A.    Yes.

23    Q.    You are saying you already received this?

24    A.    I believe Miss Basara gave that to me in my

Richard Wilcoxon

185

 1   mailbox, to meet me that day.

 2      Q.   She gave it to you in advance, even though the

 3   normal process is to give it to you at the conference?

 4      A.   That's correct.

 5      Q.   And then you read it over and asked for a

 6   postponement of the meeting so you could talk to your

 7   union representative?

 8      A.   Yes.

 9      Q.   And she agreed to that?

10      A.   Yes.

11      Q.   And then you had the meeting later that week?

12      A.   Yes.

13                (Wilcoxon Deposition Exhibit 29 was marked

14   for identification.)

15      Q.   Do you recognize Exhibit 29?

16      A.   Yes.

17      Q.   What does this deal with?

18      A.   It is a letter, I was written up for not securing

19   a student's Hoops for Hearts money.

20      Q.   Hoops for Hearts?

21      A.   It is a fundraiser.   Yes.

22      Q.   What is Hoops For Hearts?

23      A.   It is a fundraiser for the American Heart

24   Association.

Richard Wilcoxon

186

1    Q.    And students bring in cash or checks as a

2    contribution?

3    A.    That's correct.

4    Q.    And you were responsible for collecting the cash

5    and checks?

6    A.    That's correct.

7    Q.    And what happens with the cash?

8    A.    I collected the envelopes.  And I went up to the

9    cafeteria to get my lunch.  After the class, I returned,

10   the envelope was torn open.  One of the envelopes, just

11   one of them was torn open and the cash was missing.

12   Q.    Where had you left the envelope?

13   A.    On the front table in the multi-purpose room.

14   Q.    On the front table in the multi-purpose room?

15   A.    That's correct.

16   Q.    And why didn't you secure the cash, take it to

17   your office and lock the door or do something else?

18   A.    Honestly, I had been taking it back to my class,

19   back to my office in between each class, and at that time

20   I had forgotten about it.

21   Q.    So this memo is accurate, that the money that was

22   under your control was stolen?

23   A.    Yes.

24   Q.    Looking at the second full paragraph, can you

Richard Wilcoxon

187

1    read that into the record, again, slowly, the first

2    sentence.

3        A.    "Twice this school year I have reminded staff of

4    the importance of securing personal items and cash

5    collected from students."

6        Q.    Is that accurate?

7        A.    I do not recall.  I do not recall.  It could be.

8        Q.    Could be, okay.  Go ahead.  First?

9        A.    "First, we had a serious incident where a person

10   broke into our building and I held an emergency meeting

11   to notify staff and reminded everyone to lock their

12   valuables at all times."

13       Q.    Is that accurate?

14       A.    Yes, it is.

15       Q.    What is next?

16       A.    "Second, at our March faculty meeting, I reminded

17   staff to lock all money associated with SSA Power Card

18   fundraiser in their rooms until it could be brought to

19   the office and looked in the school safe."

20       Q.    Is that accurate?

21       A.    I do not recall.

22       Q.    So it could be accurate?  You just don't

23   remember?

24       A.    That's correct.

Richard Wilcoxon

188

1       Q.    And so that was another written reprimand you

2   received in the second semester of the 2003-2004 school

3   year?

4       A.    That's correct.

5       Q.    Now, again, at that point when you left the cash

6   unattended in the multi-purpose room, you knew your job

7   was in jeopardy and you believed it to be in jeopardy?

8       A.    Correct.

9       Q.    But you left it there anyway?

10       A.    Correct.

11              (Wilcoxon Deposition Exhibit 30 was marked

12   for identification.)

13       Q.    Do you recognize Exhibit 30?

14       A.    Yes.

15       Q.    Is this a typed version of the log that you had

16   been keeping?

17       A.    Yes.   This is what I referred to previously.

18       Q.    This is the one that was on your --

19       A.    Home computer.

20       Q.    -- home computer?

21       A.    That's correct.

22       Q.    And this stops at February 23rd?

23       A.    Correct.

24       Q.    Correct?

Richard Wilcoxon

189

1    A.   Correct.

2    Q.   Did you make any notes after that?

3    A.   I do not believe so.

4    Q.   Why did you stop?

5    A.   We were no longer team teaching. I did not see

6 Miss Freebery, so I did not know any of the information

7 that I had been keeping.

8    Q.   Well, looking at the third page, C00190, from

9 then on, from January 5 on, you have two pages of notes,

10 and you had already stopped team teaching, correct?

11    A.   Correct.

12    Q.   So for January, most of February, you were

13 keeping these notes?

14    A.   That's correct.

15    Q.   And then you just stopped?

16    A.   Yes.

17    Q.   And your explanation is that you weren't seeing

18 her any longer so you decided to stop?

19          MR. WILSON:  Object to the form.

20    A.   As far as my recollection, that is the reason I

21 stopped taking the notes.

22    Q.   Did you give these notes to anybody at the school

23 district?

24    A.   No, I did not.

190

1      Q.    Do you have anymore notes about what happened

2   with any of the issues in this case besides these notes?

3      A.    No, I do not.

4      Q.    And are these the ones that you said earlier you

5   had e-mailed to your attorney?

6      A.    Yes.

7      Q.    And there is nothing else that you have at home

8   or any place else that are either typewritten or

9   handwritten notes concerning the facts in issue here?

10     A.    I do not believe so, no.

11                (Wilcoxon Deposition Exhibit 31 was marked

12  for identification.)

13     Q.    Do you recognize this letter?

14     A.    Yes, I do.

15     Q.    And you sent it to Mr. Ortega?

16     A.    Mr. Orga, yes, I did.

17     Q.    Orga, I'm sorry.  And the purpose of this was to

18  try to get Mr. Rumford in trouble?

19     A.    The purpose was to continue to express concerns

20  that I had about the administration, as it says in the

21  first paragraph.

22     Q.    So at this point now you are sending the Director

23  of Secondary Education a letter criticizing the Assistant

24  Principal that you reported to?

Richard Wilcoxon

191

1    A.    Yes.

2    Q.    Why did you want to do this?

3    A.    It is factual.  Again, I wanted them to know that

4  I have additional concerns about the administration.  We

5  had to have a meeting where I gave him another note that

6  expressed my initial concerns.  This was some additional

7  concerns I had.

8    Q.    What did you want Mr. Ortega to do -- Orga?

9              (Discussion off the record.)

10   A.    I asked him to investigate the matter.  That's

11  it.  I didn't ask anything else.

12             (Wilcoxon Deposition Exhibit 32 was marked

13  for identification.)

14   Q.    Do you recognize Exhibit 32?  This is a letter

15  you sent to Mr. Orga?

16   A.    Yes, it is.

17   Q.    It says you had a conversation with him on

18  February 25?

19   A.    Yes.

20   Q.    Do you remember that conversation?

21   A.    Yes.

22   Q.    Do you have an independent recollection of any

23  notes?

24   A.    Yes, I handed him a note at that meeting.

192

1    Q.    No.  Do you have an independent recollection of

2    what took place at that conference, separate from any

3    notes or letter that you have?

4    A.    I have vague recollection.

5    Q.    Tell me what you remember.

6    A.    I discussed my concern about the letters that had

7    been put about the alleged sexual harassment, about the

8    lesson plans, and I discussed with him my concerns that I

9    felt that they were going to come after me for this, that

10   there was jeopardize -- putting my job at risk,

11   jeopardizing my job.

12   Q.    So in that February 25th meeting in 2004 you told

13   Mr. Orga that, in fact, you thought that you would be

14   non-renewed because of the allegations?

15   A.    Yes, I thought it was heading that way.

16   Q.    I'm sorry?

17   A.    I thought it was heading that way.

18   Q.    And on the second page of this document, can you

19   read that into the record?

20   A.    "Without ever seeing the written narrative of

21   this observation, I am asking that it not be included in

22   my personnel file.  I am also asking for a written

23   response to my request" --

24   Q.    Slow down.

Richard Wilcoxon

193

1    A.    I apologize.  "I'm also asking for a written

2    response to my request and would appreciate a response to

3    the letter I left with you at our meeting back in

4    February.  Thank you."

5    Q.    So you hadn't even seen the observation report

6    that is Exhibit 25, and you are already writing to the

7    Director of the Secretary of Education, asking that it

8    not be included in your personnel file?

9    A.    That is correct.

10                (Wilcoxon Deposition Exhibit 33 was marked

11   for identification.)

12   Q.    Do you recognize Exhibit 33?

13   A.    Yes, I do.

14   Q.    And that's a response of Mr. Orga?

15   A.    Yes, it is.

16   Q.    To your letter that was Exhibit 32?

17   A.    Yes.

18   Q.    Dated April 22nd, correct?

19   A.    That's correct.

20   Q.    Now, in the second paragraph he says that Ms.

21   Basara would be remiss if she didn't do observations.  Do

22   you agree with that?

23   A.    Yes.

24   Q.    Isn't that part of her job?

Richard Wilcoxon

194

1     A.    Yes, it is.

2     Q.    Do you agree with Mr. Orga's statement that the

3  educational system is an area of accountability?

4     A.    Yes, I do.

5     Q.    Do you agree all educators are being asked to

6  reach higher standards?

7     A.    Yes, I do.

8     Q.    And that's something that's happened not only in

9  Delaware but really across the country?

10     A.    Yes.

11     Q.    That includes observations that are both

12  announced and unannounced?

13     A.    Yes.

14     Q.    Is there any specific thing, way in which you

15  believe Ms. Basara had violated DPAS guidelines for

16  observations?

17     A.    I do not know the DPAS guidelines here.

18     Q.    Do you know of any way that she violated the

19  collective bargaining agreement by doing unannounced

20  observation?

21     A.    No, she did not.

22             (Wilcoxon Deposition Exhibit 34 was marked

23  for identification.)

24     Q.    Do you recognize Exhibit 34?

Richard Wilcoxon

195

1    A.    Yes, I do.

2    Q.    And what is it?

3    A.    It is the letter saying my contract would not be

4    renewed.

5    Q.    And it is dated May 14, 2004?

6    A.    That's correct.

7    Q.    Did you request a meeting with the superintendent

8    concerning the reasons for your nonrenewal?

9    A.    Yes, I did.  I requested a letter.

10   Q.    A letter.

11   A.    And then the next step was a meeting.

12           (Wilcoxon Deposition Exhibit 35 was marked

13   for identification.)

14   Q.    Who did you send your letter to asking for your

15   reasons for nonrenewal?

16   A.    The superintendent of the school district.  I was

17   advised to by my union.

18   Q.    They had a formal letter, didn't they, they gave

19   nontenured teachers to send in, the DSEA?

20   A.    I do not have any recollection of that.  I

21   believe that's where I got this information, but I don't

22   recall that's what it was.

23   Q.    You don't know whether or not they have a form

24   letter that they use for nonrenewals of nontenured

Richard Wilcoxon

196

```
 1  teachers?

 2      A.   No, I don't.

 3      Q.   Do you know of other teachers who were not

 4  tenured who were nonrenewed in 2004?

 5      A.   I am unsure.  I don't recall at this time.

 6      Q.   Do you know any of them?

 7      A.   I don't recall any at this time.

 8      Q.   Do you recognize Exhibit 35?

 9      A.   Yes, I do.

10      Q.   What is that?

11      A.   After talking to Rudy Norton, my union

12  representative, he told me to write this letter to Dr.

13  Andrzejewski to get the reasons for my nonrenewal,

14  termination.

15      Q.   And did you have a meeting with Dr. Andrzejewski

16  at some point after that?

17      A.   Yes.

18      Q.   Who was present?

19      A.   Myself, Rudy Norton, Dr. Andrzejewski and Miss

20  Dunmon.

21      Q.   Did you speak at that meeting?

22      A.   Somewhat, but I probably let my union

23  representative speak at the meeting.

24      Q.   What did you say?
```

Richard Wilcoxon

197

1      A.    I do not have recall directly what I said.

2      Q.    Do you recall what any of the school district

3    representatives said?

4      A.    No, I do not.

5      Q.    So you don't recall what they said?

6      A.    No, I do not.

7                (Wilcoxon Deposition Exhibit 36 was marked

8    for identification.)

9      Q.    Do you recognize Exhibit 36?

10     A.    Yes, I do.

11     Q.    What is that?

12     A.    It is the complaint I filed with the Department

13   of Labor.

14     Q.    And what was the date that you filed this charge

15   with the Department of Labor?

16     A.    It says down in the corner February 24th, '04.

17     Q.    And is it correct that the district didn't

18   receive the charge until some time later?

19     A.    Yes.

20     Q.    And is that on or about March 12th?

21     A.    It is in the middle of March.

22     Q.    Do you have any independent knowledge of when

23   they received it?

24     A.    No, I do not.

Richard Wilcoxon

198

1      Q.    And you claim in this charge that you are the

2  victim of gender bias, being male?

3      A.    Yes.

4      Q.    Let me go to the page marked C00775.  Do you see

5  that?  The top of the page --

6      A.    Yes.

7      Q.    -- "Remedy Information," item number 7?

8      A.    Yes.

9      Q.    You write, "I want to keep my job"?

10     A.    Yes.

11     Q.    So at that point you already believed that you

12  would not be renewed?

13     A.    That's correct.

14     Q.    And that was based on the comments that Ms.

15  Freebery made about you making inappropriate

16  sexually-related remarks to her?

17     A.    That's correct.

18     Q.    Let's look at page C00777.  Do you see item

19  number 4?

20     A.    Yes, I do.

21     Q.    So you are saying in there that, in fact, it was

22  Ms. Freebery who brought up the sexually-related comments

23  to you?

24     A.    Yes.

Richard Wilcoxon

199

1    Q.   Not vice versa?

2    A.   That's correct.

3    Q.   And you never made any sexually-related remarks

4  to her at any time?

5    A.   No, I did not.

6    Q.   Looking over at the next page, item 10.  That's

7  your handwriting on there, correct?

8    A.   That's correct.

9    Q.   Can you read that, the response to item 10?

10    A.   To number 10?

11    Q.   Yes.

12    A.   "She did only after the documentation I kept on

13  her was given to her by my assistant principal."

14    Q.   So "she" in that sentence is Ms. Freebery?

15    A.   That's correct.

16    Q.   At the time you filed this charge did you have an

17  attorney representing you?

18    A.   No, I did not.

19    Q.   Were you working with DSEA representatives?

20    A.   I was working with Mr. Norton, yes.

21    Q.   Did Mr. Norton tell you to file this charge?

22    A.   Yes, he did.

23    Q.   Why did he say to file the charge?

24    A.   I do not recall exactly the reasons.