

**WILCOX & FETZER LTD.**



## In the Matter Of:

# Wilcoxon

## v.

# Red Clay Consolidated School District

## C.A. # 05-524-SLR

---

## Transcript of:

## Frank Rumford

## May 25, 2006

---

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

A-0249

```
 1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF DELAWARE
 2
        RICHARD WILCOXON               : CIVIL ACTION
 3                    Plaintiff        :
                                       :
 4          -v-                        :
                                       :
 5      RED CLAY CONSOLIDATED          :
        SCHOOL DISTRICT BOARD OF       : NO. 05-524-SLR
 6      EDUCATION, and JANAY           :
        FREEBERY                       :
 7                    Defendants       :
 8              Deposition of FRANK RUMFORD, taken before
        Elaine Gallagher Parrish, Registered Professional
 9      Reporter, at 1509 Gilpin Avenue, Wilmington, Delaware on
        May 25, 2006, commencing approximately at 1:15 p.m.
10
        APPEARANCES:
11
                    TIMOTHY J. WILSON, ESQ.
12                  Margolis Edelstein
                      1509 Gilpin Avenue
13                    Wilmington, Delaware 19806
                      for the Plaintiff,
14
                    BARRY M. WILLOUGHBY, ESQ.
15                  Young Conaway Stargatt & Taylor, LLP
                      P.O. Box 391
16                    The Brandyine Building
                      1000 West Street, 17th Floor
17                    Wilmington, Delaware 19801
                      for the Defendants.
18
        ALSO PRESENT:
19
                    DEBORAH COLES, Paralegal
20                  RICHARD WILCOXON
                    JANAY FREEBERY
21                  DIANE DUNMON
22
23                  WILCOX & FETZER
            1330 King Street - Wilmington, Delaware 19801
24                  (302)655-0477
```

A-0250

Wilcoxon
Frank Rumford

v.

C.A. # 05-524-SLR

Red Clay Consolidated School District
May 25, 2006

**Page 2**

1    FRANK RUMFORD,
2  having been first duly sworn according to law, was
3  examined and testified as follows:
4  BY MR. WILSON:
5    Q.  Good afternoon, Mr. Rumford.  We met previously,
6  but for the record my name is Tim Wilson and I'm
7  Mr. Wilcoxon's attorney in his lawsuit against Red Clay
8  Consolidated School District and Miss Freebery.  I am
9  just going to go over a couple instructions prior to
10  starting so we know how we're going to proceed here.
11  First I am going to be asking you questions pertaining
12  to this lawsuit and when you respond please do so
13  verbally.  That way the Court Reporter can take down
14  your responses.  Obviously it's difficult for her to
15  take down head nods and things of that nature.
16        As you know, you have just been sworn in,
17  your testimony is under oath, so you must answer
18  truthfully just as if you were in court.  If you don't
19  hear a question or don't understand it, let me know and
20  I will ask it again or explain it.  Please let me finish
21  asking the question before you answer, and I will let
22  you finish your answer before I ask another question.
23  That way we keep the transcript clear.
24        If at any time you come to realize that a

**Page 3**

1  statement you made is incorrect or inaccurate, please
2  let me know and you will be permitted to clarify the
3  record.
4        You can not talk or confer with your
5  attorney during the deposition, either in here or during
6  breaks.
7        If at any time you need a break, just let
8  me know and we'll accommodate you.
9        Do you understand these instructions?
10  A.  Yes.
11  Q.  Are you taking any medications today that would
12  impair your ability to give truthful testimony?
13  A.  I am not.
14  Q.  Have you ever been deposed before?
15  A.  Never.
16  Q.  Where were you born, sir?
17  A.  Wilmington, Delaware.
18  Q.  What year?
19  A.  1959.
20  Q.  And the specific date?
21  A.  August 8th.
22  Q.  What's your address?
23  A.  2743 Tanager Drive, Brookmeade II, Wilmington,
24  Delaware.

**Page 4**

1  Q.  How long have you lived there?
2  A.  Eight years.
3  Q.  Do you own?
4  A.  Yes.
5  Q.  Have you ever been charged with a crime?
6  A.  I have not.
7  Q.  Did you serve in the military?
8  A.  No.
9  Q.  Have you ever been sued in your individual
10  capacity?
11  A.  No.
12  Q.  Have you ever sued somebody else?
13  A.  No.
14  Q.  Have you ever been treated or had counseling for
15  alcohol problems?
16  A.  No.
17  Q.  Drug problems?
18  A.  No.
19  Q.  You went to college, correct?
20  A.  Correct.
21  Q.  Where did you go?
22  A.  West Chester State College.
23  Q.  And did you graduate?
24  A.  I did.

**Page 5**

1  Q.  And what year did you graduate?
2  A.  1981.
3  Q.  With what degree?
4  A.  Bachelor of Science in health and physical
5  education.
6  Q.  Have you done any graduate work?
7  A.  I have.
8  Q.  Where at?
9  A.  Wilmington College.
10  Q.  Any degree?
11  A.  Master of Education.
12  Q.  And what year?
13  A.  '97.
14  Q.  Any other degrees?
15  A.  That's it.
16  Q.  Okay.  Did you graduate with honors with either
17  of these degrees?
18  A.  The Master's I believe is honors.
19  Q.  Okay.  Do you recall what it was or --
20  A.  I don't.
21  Q.  Are you presently employed by Red Clay
22  Consolidated School District?
23  A.  That's correct.
24  Q.  Okay.  Just from here on out if I refer to Red

A-0251

2 (Pages 2 to 5)

Wilcoxon                                    v.                Red Clay Consolidated School District
Frank Rumford                        C.A. # 05-524-SLR                          May 25, 2006

Page 6

1  Clay, it means Red Clay Consolidated School District,
2  okay?
3     A.  That's fine.
4     Q.  And what is your job title, sir?
5     A.  Currently?
6     Q.  Yes.
7     A.  Acting assistant principal.
8     Q.  And what does that mean?
9     A.  That means I have not been approved by the Board
10  as an assistant principal.
11    Q.  Okay.  How long have you held that position?
12    A.  I want to say a year and a half.  At the
13  conclusion of this school year it will be a year and a
14  half.
15    Q.  Okay.  So you started at the end of 2000 --
16    A.  5.  No.  January, 2005, in that area, October,
17  2005, finished that school year.
18    Q.  Okay.
19    A.  And this whole school year.
20    Q.  And what title did you hold before that?
21    A.  Before that I was assistant to the principal.
22    Q.  Okay.  And what's the difference between acting
23  assistant principal and assistant to principal?
24    A.  Certification.  Assistant to does not have

Page 7

1  certification as a principal.
2     Q.  Okay.  And what years did you hold that
3  position?
4     A.  I want to say end -- approximately a year prior
5  to that, six months to a year prior to that.
6     Q.  So during the 2003-2004 school year were you --
7  did you hold this position?
8     A.  I believe so, yes.
9     Q.  Okay.  And prior to that?
10    A.  The position was called student advisor.
11    Q.  Okay.  In total how long have you worked for Red
12  Clay?
13    A.  16 years.
14    Q.  What did you do to prepare for today's
15  deposition?
16    A.  Read the deposition and --
17    Q.  Mr. Wilcoxon's deposition?
18    A.  Correct, and met with Mr. Willoughby.
19    Q.  When did you meet with Mr. Willoughby?
20    A.  I believe it was Thursday of last week and
21  Tuesday of this week.
22    Q.  Did you review any documents?
23    A.  We did.
24    Q.  Do you recall which ones?

Page 8

1     A.  A whole stack of them.
2     Q.  Do you have any specific recollection of any
3  particular ones?
4     A.  I recall -- are you speaking specifically about
5  a document?  There was a stack this tall.
6     Q.  So you don't have a specific recollection --
7     A.  No.
8     Q.  -- about any particular documents?
9     A.  No, we reviewed quite a few.
10    Q.  Okay.  Did you listen to the tapes that were
11  made by Mr. Wilcoxon --
12    A.  I did.
13    Q.  -- of your meetings?  And did you do that when
14  you met with Mr. Willoughby?
15    A.  That's correct.
16    Q.  Did you talk to anybody other than
17  Mr. Willoughby to prepare for the deposition?
18    A.  No.
19    Q.  Have you spoken to anybody in general about this
20  lawsuit?
21    A.  My wife.
22    Q.  Anybody else?
23    A.  No.
24    Q.  Miss Freebery?

Page 9

1     A.  No.
2     Q.  Miss Basara?
3     A.  No.  At the meetings with Mr. Willoughby, yes.
4     Q.  And that's all, no other conversations besides
5  that?
6     A.  Right.
7     Q.  Okay.  Did Mr. Wilcoxon and Miss Freebery team
8  teach during the 2002-2003 school year?
9     A.  That's correct.
10    Q.  Okay.  And did they teach phys ed and health?
11    A.  That's correct.
12    Q.  And you team taught for a period of time with
13  Miss Freebery, correct?
14    A.  That's correct.
15    Q.  And when was that?
16    A.  '96 to 2002, approximately six years, I think.
17    Q.  Okay.  So did Mr. Wilcoxon take over team
18  teaching with her right after you stopped team teaching?
19    A.  When I became student advisor.
20    Q.  When you team taught did you become friends with
21  Miss Freebery?
22    A.  Correct.
23    Q.  Were you friends outside of work?
24    A.  No.

A-0252                                    3 (Pages 6 to 9)

Wilcoxon                                    v.          Red Clay Consolidated School District
Frank Rumford                     C.A. # 05-524-SLR                      May 25, 2006

Page 10

1    Q.  Did you ever do anything together outside of
2  work?
3    A.  Outside -- yes.
4    Q.  Okay.  What types of stuff did you do?
5    A.  When the -- when we would have in-services a
6  group of teachers would go to lunch.
7    Q.  Okay.  Who would be in that group?
8    A.  Oh, could be anywhere from ten to 12 teachers.
9    Q.  Was Miss Basara in that group?
10   A.  No.
11   Q.  During the 2002-2003 school year were you aware
12 of any tension between Miss Freebery and Mr. Wilcoxon?
13   A.  2002-2003.  I don't think that was the -- no.
14   Q.  Were you aware of any personal problems Miss
15 Freebery was having during that 2002-2003 school year?
16   A.  Yes.
17   Q.  And what were they?
18   A.  Her marriage was breaking up.
19   Q.  Anything else?
20   A.  Not that I recall.
21   Q.  Did that have any impact on her professional
22 duties?
23   A.  It did not.
24   Q.  Are you aware of any problems that Miss Freebery

Page 11

1  was having in her professional life during that school
2  year?
3    A.  I am not.
4    Q.  During that school year are you aware of Miss
5  Freebery being disciplined for any reason?
6    A.  I am not.
7    Q.  Are you aware of Mr. Wilcoxon being disciplined
8  for any reason during that school year?
9    A.  2002-2003?
10   Q.  Yes.
11   A.  I am not.
12   Q.  Okay.  We'll move on to the 2003-2004 school
13 year and that's the year you were assistant to the
14 principal?
15   A.  Correct.
16   Q.  Correct?  And Mr. Wilcoxon and Miss Freebery
17 team taught that year together as well, right?
18   A.  That's correct.
19   Q.  And prior to December of that year were you
20 aware of any tension between Miss Freebery and
21 Mr. Wilcoxon?
22   A.  Prior to December?  I would say no.
23   Q.  Were you aware of any problems that Miss
24 Freebery was having with her personal life during the

Page 12

1  2003-2004 school year?
2    A.  Just that her marriage was broken up.
3    Q.  Did she speak to you about that during that
4  school year?
5    A.  I would say yes.
6    Q.  Did she relay what type of an impact that was
7  having on her life?
8    A.  I don't -- no.
9    Q.  Was it making her personal life more difficult?
10   A.  She didn't tell me that.
11   Q.  Was it making her professional life more
12 difficult?
13   A.  It was not.
14   Q.  She also had just recently had a child at that
15 time, correct?
16   A.  Right about the same time that her marriage
17 broke up, yes.
18   Q.  Did she ever relate to you that the birth of
19 this child was making her duties as a teacher -- putting
20 some stress on her duties as a teacher?
21   A.  She never said those words, no.
22   Q.  Okay.  Well, did she say anything similar to
23 that?
24   A.  No.

Page 13

1    Q.  That being a mother was making being a teacher
2  more difficult?
3    A.  Did she say that exactly?  No.
4    Q.  Did she infer that?
5    A.  She did not infer that.
6    Q.  Did she say anything similar to that?
7    A.  Not that I'm aware of.
8    Q.  Okay.  Are you aware of any problems that Miss
9  Freebery was having with her professional life during
10 the 2003-2004 school year?
11   A.  I am not.  During -- you're saying during the
12 whole school year?
13   Q.  Yes.
14   A.  With her professional life.
15   Q.  Yes.
16   A.  Yes.
17   Q.  Okay.  What was that?
18   A.  At one point in time she shared with me that
19 Mr. Wilcoxon was making inappropriate comments.  That
20 was in December, I believe.
21   Q.  Anything else?
22   A.  That's it.
23   Q.  Was it early December, late December?
24   A.  Mid December.

A-0253

4 (Pages 10 to 13)

Wilcoxon                                    v.        Red Clay Consolidated School District
Frank Rumford                        C.A. # 05-524-SLR                    May 25, 2006

Page 14

1    Q.  Was it at about the time that the journal --
2    that you found the journal?
3    A.  Prior.
4    Q.  How much prior?
5    A.  I don't recall.
6    Q.  Did she tell you what he said?
7    A.  No.  If I can correct that, I don't recall that
8    she did.
9    Q.  Okay.  Did she tell you how many inappropriate
10   comments he made?
11   A.  She did not.
12   Q.  Did you ask her what he said?
13   A.  No, I did not.
14   Q.  Where were you when she made these comments?
15   A.  Front lobby of Skyline Middle School, trophy
16   case area in front of the office, outside the office.
17   Q.  You're absolutely certain this happened before
18   the journal --
19   A.  Correct.
20   Q.  -- came to light?
21   A.  Absolutely certain.
22   Q.  During that school year was Miss Freebery
23   disciplined for any reason?
24   A.  During the school year?  I believe she received

Page 15

1    a verbal reprimand.
2    Q.  For what?
3    A.  Some of the allegations that were in the
4    journal.
5    Q.  But she was given no disciplinary letter?
6    A.  Not that I'm aware of.  Not that I recall.
7    Q.  Do you know if she was observed during that
8    school year as far as lesson analysis?
9    A.  She would have to have been observed.
10   Q.  But to your knowledge, your own personal
11   knowledge, you don't know --
12   A.  No.  Well, Red Clay requires observations of
13   teachers.  So personally, no, but . . .
14   Q.  Prior to December of that year were you aware
15   from any source that Miss Freebery arrived late for her
16   morning duty?
17   A.  I was not.
18   Q.  Is it Red Clay or Skyline Middle School policy
19   that when a teacher arrives late he or she is supposed
20   to report in or sign in or anything like that?
21   A.  If the teacher is going to be late common
22   courtesy, professionalism would be to call in, say I'm
23   going to be late.
24   Q.  But once you get there there is nothing you have

Page 16

1    to do?
2    A.  No.
3    Q.  Okay.  Whenever you would call in to let them
4    know you're late, who would you call?
5    A.  The office secretary.
6    Q.  And what happens then?  What does the office do?
7    A.  Would relay the message to, if the coverage was
8    needed, to an appropriate -- we have a system of
9    coverage.
10   Q.  Is there a policy at Skyline Middle School that
11   pertains to visitors at the school?
12   A.  There is.
13   Q.  And what's that?
14   A.  Visitors need to report to the office and state
15   their business.  They receive a visitor's pass.  They
16   sign in.
17   Q.  When they state their business does it have to
18   be some sort of legitimate business or can it just be to
19   visit somebody?
20   A.  It could -- well, we have parents come in to
21   visit students.  We have parents come in to visit
22   classrooms.  So, yeah, there has to be a legitimate
23   business involving the school.
24   Q.  What about boyfriends to visit girlfriends?

Page 17

1    A.  Not that I'm aware of.  I don't think there is a
2    policy on that.
3    Q.  And is the person required to sign out when he
4    leaves?
5    A.  That's correct.  They return the visitor's pass.
6    Q.  Okay.  Is the teacher responsible for that
7    visitor when the visitor is there?
8    A.  I would say yes.
9    Q.  So if the visitor fails to sign in or sign out,
10   is that the teacher's responsibility?
11   A.  Well, in the situation if you're talking about a
12   parent coming in to visit a student, usually they
13   contact the office, I would say that would be the
14   administrator's responsibility to make sure that happens
15   and to inform the teacher that a parent is coming in to
16   observe their class or watch their child in the class.
17   So in that case -- in that instance I would say it's the
18   administrator -- the person that took the call to make
19   certain that the parent signed in.
20   Q.  What about in the case of a personal friend
21   visiting one of the teachers?
22   A.  They should -- they still sign in.  Who's
23   responsible for them signing in?  I would imagine it's
24   -- I would say it's the teacher's.

A-0254                    5 (Pages 14 to 17)

Wilcoxon
Frank Rumford

v.

C.A. # 05-524-SLR

Red Clay Consolidated School District
May 25, 2006

Page 18

1    Q.   Do you know who Bruce Hannah is?
2    A.   I do.
3    Q.   And who is he?
4    A.   He is married, I think currently married to Miss
5    Freebery.
6    Q.   Were they married during the 2003-2004 school
7    year?
8    A.   2000 -- no.  I don't believe so.
9    Q.   Did they have a relationship at that time?
10   A.   I --
11   Q.   Were they friends?
12   A.   Yeah.  Yes.
13   Q.   Did you see him at the Skyline Middle School
14   during the 2002-2003 school year?
15   A.   I don't recall.
16   Q.   What about the 2003-2004 school year?
17   A.   I don't recall.  I thought I saw him sometimes
18   after school, intramurals.
19   Q.   Were you ever informed by Mr. Wilcoxon that
20   Mr. Hannah was not following the proper sign-in
21   procedures?
22   A.   I was never informed.
23   Q.   Okay.  You were assigned as Mr. Wilcoxon's
24   mentor, correct?

Page 19

1    A.   I don't think I was assigned.  I think I chose
2    to be.
3    Q.   Okay.  When did that start?
4    A.   When he started.
5    Q.   Does Red Clay or Skyline have a policy on
6    teachers leaving class while class is in session?
7    A.   Yes.
8    Q.   What is that policy?
9    A.   They need to -- they should not leave class.
10   They should be supervising their students.
11   Q.   What's the appropriate response if a teacher
12   does leave class during class hours?
13   A.   In which there are students present?
14   Q.   Yes.
15   A.   They would be reprimanded.
16   Q.   In what way?
17   A.   Well, I'm not sure of the procedure.  I have
18   never been involved in that sort of situation but I'm
19   sure there would be a reprimand.
20   Q.   Sir, are you saying there is no set guidelines
21   as to how discipline is to be carried out at Skyline?
22   A.   What I'm saying is I'm not -- I'm not aware of
23   what it is.  I'm saying there is -- when the safety of
24   students is involved that is a serious breach.

Page 20

1    Q.   In the context of team teaching, would it be
2    improper for one of the teachers to leave class without
3    telling the other teacher?
4    A.   It would be improper.
5    Q.   Were you ever made aware prior to December, 2003
6    that Miss Freebery left her classes?
7    A.   I was not.
8    Q.   If a teacher is going to be out of class for an
9    extended period of time are they required to get that
10   leave approved?
11   A.   That's correct.
12   Q.   And are you the person that would approve?
13   A.   I could.
14   Q.   During the 2003-2004 school year did you ever
15   approve Miss Freebery leaving class for an extended
16   period of time?
17        MR. WILLOUGHBY:  What do you mean by
18   extended?
19        MR. WILSON:  More than half hour.
20        THE WITNESS:  I don't recall.
21   BY MR. WILSON:
22   Q.   What about during the 2002-2003 school year?
23   A.   I don't recall.  I don't think that year I could
24   -- I don't think I -- I think that would be -- would

Page 21

1    have been an -- one of the other administrators.  I was
2    in a student advisor role, but, still, if they told me I
3    could pass it along to an administrator if they couldn't
4    be found, but I don't recall that, that she asked me.
5    Q.   Do you ever keep personal things in your desk,
6    prescriptions, notes from your wife, any type of
7    personal effects?
8    A.   Prescriptions, no.  Notes from my wife, no.
9    Q.   Things that you would consider private?
10   A.   Yes.  Certainly.
11   Q.   Do you believe that a teacher has some
12   expectation of privacy in his desk?
13        MR. WILLOUGHBY:  You're talking about
14   inside, not on top of?
15        MR. WILSON:  Inside.
16        THE WITNESS:  Certainly.
17   BY MR. WILSON:
18   Q.   What about on top of the desk?
19   A.   Do they have privacy on top of their desk?
20   Q.   An expectation of privacy?
21   A.   Sure.
22   Q.   And you're aware of the journal that
23   Mr. Wilcoxon kept on the comings and goings, for lack of
24   a better term, on Miss Freebery, correct?

Wilcox & Fetzer, Ltd.          Professional Court Reporters          (302)655-0477

Wilcoxon
Frank Rumford

v.

C.A. # 05-524-SLR

Red Clay Consolidated School District
May 25, 2006

Page 22

1    A. I'm aware.
2    Q. And you actually found this journal, correct?
3    A. I did.
4    Q. And where did you find it?
5    A. On top of the desk in the phys ed teacher's
6    office.
7    Q. Can you tell me how this all came about, how you
8    came to find the journal?
9    A. On, I want to say, December 15th Mr. Wilcoxon
10   had called in sick. I was made aware of it late in the
11   morning when classes were about to begin. I don't know
12   who made me aware of it, but immediately went to the
13   emergency -- with the substitute to the emergency plans
14   in the main office. Opened the drawer, pulled out
15   lesson plans that said PE, in fact they had my name on
16   it, I believe. I opened them up and they were out of
17   date. The bell schedule wasn't even correct. There
18   were -- the class lists weren't correct. I searched
19   through the rest of it thinking I had the wrong one.
20   Couldn't find it.
21            Took the substitute down to the PE
22   teacher's office, opened the door, went in looking for
23   plan book. Plan book was not on top of the desk. There
24   was a notepad similar to the one you have in front of

Page 23

1    you laying upside down on the top of the desk. I took
2    that and I told the substitute here, this will get you
3    started and have students sign in. He took that, went
4    upstairs to cover the class that was coming in.
5    Q. Okay. When you gave him the notebook did you
6    read what was in the notebook?
7    A. I did not.
8    Q. Okay. How would the notebook get him started?
9    A. It's a blank pad for students to sign in on.
10   That would tell us who's in the class. It would not
11   tell us who's not in the class. So this teacher was
12   blind in the students that belonged in the class. Only
13   the students that showed up would have signed in.
14   Q. Couldn't you have printed a class list from your
15   computer, couldn't you have taken roll that way?
16   A. I could have but in time we -- we had to get
17   that class going. A professional teacher would have had
18   appropriate plans for the substitute in case of a
19   last-minute callout.
20   Q. So why didn't you print the class list?
21   A. Because I -- that wasn't my responsibility to do
22   that. I tried to get that -- I went above and beyond
23   trying to find grade book and bell schedule which
24   weren't available. At that point in time, here, just

Page 24

1    take this, it will get you started.
2    Q. Okay. Did Mr. Wilcoxon tell you that he was
3    leaving a notepad in his mailbox for the substitute to
4    take attendance on?
5    A. On which date are we talking? On that date, the
6    15th?
7    Q. Yes.
8    A. He did not.
9    Q. And during your mentoring with Mr. Wilcoxon you
10   showed him this technique of taking attendance on a
11   notepad, correct?
12        MR. WILLOUGHBY: He showed Mr. Wilcoxon?
13        MR. WILSON: Yes.
14        MR. WILLOUGHBY: And you're saying he told
15   Mr. Wilcoxon that was an appropriate way to take
16   attendance, is that what you're saying?
17        MR. WILSON: Yes.
18        MR. WILLOUGHBY: You can answer the
19   question.
20        THE WITNESS: That is not an appropriate
21   way to take attendance and I never showed him that that
22   was.
23   BY MR. WILSON:
24   Q. Do you ever take attendance that way?

Page 25

1    A. Myself personally? No. I was prepared.
2    Q. Were you disciplined for taking the notebook off
3    of Mr. Wilcoxon's desk?
4    A. I was not.
5    Q. Were you counseled for that?
6    A. I was not.
7    Q. Did you give the notebook to Miss Freebery?
8    A. I did not.
9    Q. Did you tell her about it?
10   A. I told her that I -- what I had done as far as
11   the grade or how to take -- how I had given the
12   substitute a pad to take attendance.
13   Q. Do you know how this notebook came into Miss
14   Freebery's possession?
15   A. I assume the substitute.
16   Q. But you don't know?
17   A. I don't know.
18   Q. How did you get into Mr. Wilcoxon's office?
19   A. I have a key.
20   Q. And other than Mr. Wilcoxon's door there is no
21   other means in his office to lock anything up, is there?
22   A. There is.
23   Q. And how is that?
24   A. There is a closet there.

A-0256

Wilcoxon
Frank Rumford

v.

C.A. # 05-524-SLR

Red Clay Consolidated School District
May 25, 2006

Page 26

1    Q.   And you can lock that closet?
2    A.   I did when I taught there.
3         MR. WILLOUGHBY:  Do you want a glass of
4    water or anything?
5         THE WITNESS:  No.  I'm good.
6    BY MR. WILSON:
7    Q.   When did you first discuss the journal with Miss
8    Freebery?
9    A.   The 15th of December, that day.
10   Q.   How much longer was it after you gave the
11   notebook to the substitute that you discussed this with
12   her?
13   A.   I would say an hour later.
14   Q.   What did she say?
15   A.   Hour and a half.  She told me that he was
16   keeping track of her comings and goings and things that
17   she was doing.
18   Q.   Was she mad?
19   A.   She was crying.
20   Q.   Where did this occur?
21   A.   She called me and I'm assuming from her office
22   to mine.
23   Q.   And prior to this date Miss Freebery had never
24   made, to your knowledge, Miss Freebery had never made

Page 27

1    any official complaint about the alleged inappropriate
2    comments, correct?
3    A.   I have --
4         MR. WILLOUGHBY:  Repeat the question.
5         MR. WILSON:  Can you read that back?
6         (Record read.)
7         MR. WILLOUGHBY:  All right.
8         THE WITNESS:  Official, no.
9    BY MR. WILSON:
10   Q.   Was it improper for Mr. Wilcoxon to keep this
11   journal?
12   A.   I think so.
13   Q.   Why is that?
14   A.   If there were problems with the staff member it
15   should have been brought to the administration.  What
16   Mr. Wilcoxon had said to us is he was doing it to cover
17   his own ass.
18   Q.   Why would he need to cover his own ass?
19   A.   I don't know.
20   Q.   He didn't say?
21   A.   He did say.  He said that he -- that I had heard
22   in comments made by Miss Freebery where he was difficult
23   to work with.
24   Q.   Okay.  And did Miss Freebery ever go to the

Page 28

1    administration and bring this to their attention?
2    A.   Not that I'm aware of.
3    Q.   So if she did, in fact, say this, that was
4    improper as well, correct?
5    A.   If she said -- I don't know if she said it or
6    not.
7    Q.   But if she did it would be improper, right?
8    A.   Would it be improper for her to -- your question
9    is would it be improper for her to say that Mr. Wilcoxon
10   was difficult to work with?
11   Q.   Yes.
12   A.   I would say no.
13   Q.   But it is improper for him to record her comings
14   and goings?
15   A.   I would agree.
16   Q.   Okay.  Can you tell me what the difference is?
17   A.   The difference is that he's secretly keeping
18   track of what she's doing.  Bring it to the
19   administration's attention if she's doing something
20   improper.  His comment was made, according to him, that
21   I had heard it, and I had not heard it.  So I don't know
22   if the comment was made or not.
23   Q.   But if Miss Freebery is making this comment to
24   other teachers and not making it to Mr. Wilcoxon or the

Page 29

1    administration, couldn't that be viewed as secret
2    comments?
3         MR. WILLOUGHBY:  Are you saying she's
4    saying it to a third party and that's a secret comment,
5    is that what you're saying?
6         MR. WILSON:  Yeah.
7         MR. WILLOUGHBY:  Okay.
8         THE WITNESS:  I don't think it's secret if
9    she's making it public to a group of teachers.
10   BY MR. WILSON:
11   Q.   Okay.
12   A.   I don't know.  That's how I feel.
13   Q.   If Mr. Wilcoxon showed the book to another
14   teacher then that would be okay then?
15   A.   It would not.
16   Q.   I'm having a hard time understanding why -- what
17   the difference is between one person communicating to
18   another person that somebody is difficult to work with,
19   not bringing that issue to the administration's
20   attention, and when another teacher has a problem with a
21   teacher just writing it down?
22   A.   One is hypothetical and one is not, correct?
23   Q.   I'm asking you to assume that it's true that she
24   was saying that.

Wilcoxon
Frank Rumford

v.

C.A. # 05-524-SLR

Red Clay Consolidated School District
May 25, 2006

Page 30

1    A.   Then it's -- I haven't had this situation, if
2    it's unprofessional then it's unprofessional.  I was not
3    made aware of it.  You're making a hypothetical as
4    opposed to a reality.
5    Q.   You said you had heard it.
6    A.   I said I had not heard it.  I had not heard the
7    comment by Mr. Wilcoxon.
8    Q.   No.  Had you heard the comment by Miss Freebery
9    that Mr. Wilcoxon was difficult to work with?
10   A.   I did not.  I did not hear that comment.  That's
11   why Mr. Wilcoxon said he was covering his ass.
12   Q.   Okay.
13   A.   Because an administrator had heard it.
14   Q.   Okay.  On December 16th, that would be the day
15   after you found the journal, correct?
16   A.   That would be correct.
17   Q.   Was there a meeting with you, Miss Freebery and
18   Miss Basara?
19   A.   I would say there was.
20   Q.   Okay.  Where was that meeting?
21   A.   In the assistant principal's office of Miss
22   Basara.
23   Q.   Are you the only people that were there?
24   A.   In the meeting?

Page 31

1    Q.   Yes.
2    A.   Basara, Freebery and myself.
3    Q.   And Mr. Wilcoxon?
4    A.   No, I don't think Mr. Wilcoxon was there on the
5    16th.
6    Q.   Okay.  Can you tell me what happened at that
7    meeting?
8    A.   I think we had a discussion on what had
9    happened.  There was several meetings over that short
10   period of time.
11   Q.   Okay.  When you say you had a discussion over
12   what had happened, are you talking about the journal or
13   are you talking about the alleged inappropriate
14   comments?
15   A.   I think both.
16   Q.   And did you decide on a course of action to
17   take?
18   A.   With Miss Freebery in the room?
19   Q.   Yes.
20   A.   I don't -- no.  I don't think, no, we didn't
21   decide on a course of action at that time.
22   Q.   If Miss Freebery wasn't in the room did you
23   decide on a course of action?
24   A.   I believe we discussed that we would bring them

Page 32

1    both together.
2    Q.   And that was you and Miss Basara made that
3    decision?
4    A.   That's correct.
5    Q.   And did you bring them together that day?
6    A.   We did not.
7    Q.   Are you sure?
8    A.   I believe it was the 17th.
9    Q.   All right.  So who was at the meeting on the
10   17th?
11   A.   Mr. Wilcoxon, Miss Freebery, myself and Miss
12   Basara.
13   Q.   Was there a union representative there?
14   A.   There was not.
15   Q.   Do you know why?
16   A.   I don't know why.
17   Q.   When was Mr. Wilcoxon notified of the meeting?
18   A.   I don't know.
19   Q.   What was said at the meeting?
20   A.   We discussed the journal and we discussed
21   inappropriate comments.
22   Q.   Okay.  What did -- tell me about the discussion
23   about the journal.  Did Miss Basara say anything about
24   the journal?

Page 33

1    A.   I'm sure she did.
2    Q.   Do you recall what she said?
3    A.   No, not specifics other than we tried to resolve
4    the situation so that they could work together.
5    Q.   Okay.  In general do you recall what she said?
6    A.   Well --
7    Q.   Or is that your answer?
8    A.   That's my answer.
9    Q.   Okay.  Do you recall what Mr. Wilcoxon said
10   about the journal?
11   A.   That he was doing it because he had heard that
12   Miss Freebery had made comments in my presence that he
13   was difficult to work with.
14   Q.   What did Miss Freebery say about the journal?
15   A.   She said, what I recall, there were -- there
16   were many inaccuracies in it.  It wasn't true.
17   Q.   Did she admit to being late?
18   A.   On occasion.
19   Q.   So she just said there were many inaccuracies?
20   She didn't say there were all inaccurate, correct?
21   A.   She didn't use the word all.
22   Q.   Now, did you say anything about the journal at
23   this meeting?
24   A.   I think -- I think what I recall is basically we

Page 34

1    went over how it came into how I got a hold of it, what
2    led up to it on the 15th.
3        Q.   Okay.  With regard to the inappropriate
4    comments, do you recall in general what Miss Basara said
5    about that?
6        A.   I want to say that if those comments are being
7    made they need to stop.
8        Q.   Do you recall what Miss Freebery said?
9        A.   In regard to?
10       Q.   The inappropriate comments?
11       A.   She's the one that laid the inappropriate
12   comments out.
13       Q.   She said at that meeting what the comments were?
14       A.   Yeah.
15       Q.   And what were those comments?
16       A.   I can't remember specifics.  Regarding Bruce,
17   her body, I believe.  That's all.  I -- there were a lot
18   related to those two.
19       Q.   Did Mr. Wilcoxon deny making the comments?
20       A.   He did.
21       Q.   Did anything else happen at this meeting?  Was
22   there a resolution as to how they could continue to work
23   together?
24       A.   A resolution, no.  But I think we hoped that

Page 35

1    they or my hope was they walked out with an
2    understanding that we need to move forward and hopefully
3    this will be put behind them.
4        Q.   And was it put behind them?
5        A.   It was not.
6        Q.   Why is that?
7        A.   It didn't get resolved.
8        Q.   Can you explain that?
9        A.   I just feel -- trust.  The trust that was there
10   before wasn't there after.
11       Q.   At that meeting did Miss Basara attempt to get
12   Mr. Wilcoxon to reveal who told him to keep the diary?
13       A.   I don't believe it was at that meeting.
14       Q.   Okay.  What meeting do you think that was at?
15       A.   The day before, the 16th.
16       Q.   The 16th?
17       A.   Uh-huh.
18       Q.   And at that meeting she did attempt to get him
19   to --
20       A.   I believe so.  Yes.
21       Q.   Do you know why it was so important to know who
22   advised him to do that?
23           MR. WILLOUGHBY:  Wait a second.  You said
24   so important.  That's a different question.

Page 36

1    BY MR. WILSON:
2        Q.   Do you know why she wanted to know?
3        A.   Because Mr. Wilcoxon had said he was advised to
4    keep the journal.  Miss Basara asked who advised you.
5        Q.   Why is that relevant?
6        A.   I don't know why it's relevant.  Somebody is
7    giving him bad information I guess.
8        Q.   Did Miss Basara ask Mr. Wilcoxon who advised
9    him to keep the journal?
10       A.   On the 16th?
11       Q.   Yes.
12       A.   I don't -- I have no idea.
13       Q.   At any point?
14       A.   She may have in the 17th meeting.
15       Q.   Okay.  At a meeting like the one that occurred
16   on the 17th, is it appropriate for one teacher to
17   question another teacher on issues that you're trying to
18   resolve?
19       A.   I have not been in another meeting like that, so
20   -- there was an interchange between the two of them.  It
21   wasn't a question.  She wasn't -- he wasn't -- he wasn't
22   being grilled or anything like that.  They were
23   exchanging.
24       Q.   Did he ask her questions?

Page 37

1        A.   I don't think he -- I don't think he asked her
2    questions but he spoke to her.
3        Q.   Did you read the journal?
4        A.   I would say yes, I did.
5        Q.   Were there things in there that concerned you?
6        A.   Yes.
7        Q.   Was there any investigation into -- into some of
8    those things that were contained in the journal?
9        A.   Investigation as far as speaking to the teacher,
10   yes.
11       Q.   Anything other than speaking to the teacher?
12       A.   Not that I'm -- not from my standpoint, not that
13   I was involved in.
14       Q.   In any of these meetings that you were present
15   at did Miss Basara ever make a statement to Mr. Wilcoxon
16   regarding the fact that he was not tenured?
17       A.   It -- a question -- I think she questioned
18   whether he was tenured or not.
19       Q.   Okay.  And why did she ask that question, do you
20   know?
21       A.   Because Mr. Wilcoxon thought he was going to be
22   fired because of this or not renewed.
23       Q.   So what did Mr. Wilcoxon say, do you recall?
24       A.   Specifically, no.  Generally he was asking is

Wilcoxon                                                           Red Clay Consolidated School District
Frank Rumford                        v.                            May 25, 2006
                               C.A. # 05-524-SLR

Page 38

1  this, you know, is this going to affect me as a teacher
2  or my position here or renewal of the con -- something
3  in that vein.
4     Q.  And her response was, you're not tenured?
5     A.  She asked that question of him.
6     Q.  So she asked the question in response to his
7  question?
8     A.  Right.
9     Q.  Okay.  Was that the only meeting that you were
10 in attendance on December 17th?
11    A.  I think there was another meeting that afternoon
12 with Mr. Wilcoxon, myself and Miss Basara.
13    Q.  Okay.  What happened at that meeting?
14    A.  Mr. Wilcoxon stated that he was upset about what
15 had happened in the earlier meeting.
16    Q.  Who called this meeting?
17    A.  I believe Mr. Wilcoxon.
18    Q.  Okay.  And why was he upset -- did he say why he
19 was upset over the earlier meeting?
20    A.  The allegations.
21    Q.  Okay.  Is this when the you're not tenured
22 question --
23    A.  No.
24    Q.  -- came up?  That was at the previous meeting?

Page 39

1     A.  No, that -- I think that happened on the 16th.
2  I can't remember.  I don't think that happened until --
3     Q.  Fair enough.  Fair enough.  Okay.  Did -- when
4  Mr. Wilcoxon raised his issues about his concerns did
5  Miss Basara give him any assurances that nothing was
6  going to happen?
7     A.  This is the afternoon -- you're talking about
8  the afternoon meeting?
9     Q.  Yes.
10    A.  I believe from what I heard on the tape was she
11 was not trying to, I believe the quote was gunning for
12 him.
13    Q.  Did at this meeting did Miss Basara ask him who
14 gave him the journal again?
15    A.  Who gave him the journal?
16    Q.  Or who advised him to keep the journal?
17    A.  I don't think that -- that happened only at one
18 meeting.
19    Q.  Okay.  Did Mr. Wilcoxon ever come to you
20 personally and deny making the comments?
21        MR. WILLOUGHBY:  Are you saying at any
22 point?
23        MR. WILSON:  Yes.
24        THE WITNESS:  Not that I recall.

Page 40

1  BY MR. WILSON:
2     Q.  Did he ever tell you that he thought this was
3  Miss Freebery's way of getting back at him for keeping
4  the journal?
5     A.  Not that I recall.
6     Q.  At one of these meetings did Mr. Wilcoxon state
7  that Miss Freebery brought up the topic of sex with him?
8     A.  Can you ask that again?
9     Q.  At any of these meetings did Mr. Wilcoxon ever
10 say that Miss Freebery brought up the topic of sex to
11 him?
12    A.  He did.
13    Q.  And do you recall what he said that she had
14 said?
15    A.  I don't recall what he said she said, but he
16 used the term she opened the door as though there was a
17 conversation regarding sex or comments and that because
18 she had made those comments it was now okay for him to
19 say what he said.
20    Q.  Okay.  Now, I believe you testified that in one
21 of these meetings Miss Basara said to Mr. Wilcoxon if
22 you made these comments you're not to make them any
23 more, correct?
24    A.  Correct.

Page 41

1     Q.  And was a similar direction given to Miss
2  Freebery when Mr. Wilcoxon accused her of making
3  comments?
4     A.  I don't think he accused her and said she made
5  comments other than the open the door.
6     Q.  Okay.  So that --
7     A.  So --
8     Q.  Go ahead and finish.
9     A.  Go ahead.
10    Q.  So when he said the opened the door comment that
11 wasn't explored any further?
12    A.  I don't recall.  I don't -- that was his defense
13 to what she had said.
14    Q.  Okay.  On January 22nd, 2004, there was another
15 meeting with Mr. Wilcoxon?
16    A.  Excuse me.  What was the date again?
17    Q.  January 22nd, 2004.
18    A.  Okay.
19    Q.  Do you recall that meeting?
20    A.  I do not.  Not the date.
21    Q.  Do you recall a meeting where Mr. Wilcoxon was
22 given three disciplinary letters?
23    A.  I do.
24    Q.  I'll represent to you that the record reflects

A-0260

Wilcox & Fetzer, Ltd.          Professional Court Reporters          (302)655-0477

Wilcoxon                          v.          Red Clay Consolidated School District
Frank Rumford              C.A. # 05-524-SLR                    May 25, 2006

Page 42

1   that this was on January 22nd, 2004.
2          Do you know if Mr. Wilcoxon was given
3   48-hours prior notice of this meeting?
4   **A. I do not know if he was.**
5   Q.   Did Mr. Wilcoxon have a union representative
6   with him at that meeting?
7   **A. He did not, not that I'm -- not that I recall.**
8   Q.   Who was at that meeting?
9   **A. I want to say Mr. Wilcoxon, myself and Miss**
10  **Basara.**
11  Q.   Was Mr. Bartoli there, too?
12  **A. He was at one of the meetings. I don't know if**
13  **that was one -- if that was where the letters were**
14  **given.**
15  Q.   Okay. At this meeting one of the letters given
16  to Mr. Wilcoxon was for inappropriate comments, correct?
17  **A. At one of the meetings, or at that meeting?**
18  Q.   I'll just show you the letter.
19         (Rumford Deposition Exhibit No. Rumford-1
20  was marked for identification.)
21  BY MR. WILSON:
22  Q.   Okay. You can read that and let me know when
23  you're done.
24  **A. I'm finished.**

Page 43

1   Q.   Does this refresh your recollection as to when
2   the meeting was?
3   **A. January 20th.**
4   Q.   And then there is some handwriting off to the
5   right that says 1-22-04, JB, correct?
6   **A. Correct.**
7   Q.   Would that be indicative that the meeting was
8   moved from January 20th to the 22nd?
9   **A. That would be correct.**
10  Q.   Okay. All right. Is this -- is this a letter
11  that refers to inappropriate comments made by
12  Mr. Wilcoxon?
13  **A. It is.**
14  Q.   And it references the December 17th meeting,
15  correct?
16  **A. It does.**
17  Q.   And is this a disciplinary letter?
18  **A. It is.**
19  Q.   Okay. So the meeting on December 17th did lead
20  to some discipline imposed on Mr. Wilcoxon, correct?
21         MR. WILLOUGHBY: I object. I don't think
22  that follows. You can answer.
23         MR. WILSON: Barry, I think you're coaching
24  your witness when you say things like that.

Page 44

1          MR. WILLOUGHBY: I think you're asking
2   trick questions.
3          MR. WILSON: You can object to the form of
4   the question, but you can't say objection, I don't think
5   that follows because then your witness is going to say I
6   don't think that follows. That's inappropriate.
7          MR. WILLOUGHBY: I think it's inappropriate
8   for you to ask trick questions.
9          MR. WILSON: It's not a trick question.
10         MR. WILLOUGHBY: You tried to do that a
11  couple times in this deposition.
12         MR. WILSON: It's not a trick question.
13         MR. WILLOUGHBY: Or in the earlier one.
14         MR. WILSON: It references December 17th
15  and he got disciplined from the discussion that happened
16  on the 17th.
17         MR. WILLOUGHBY: Now you're making a
18  representation I don't agree with.
19         MR. WILSON: That's what I was asking
20  about.
21         MR. WILLOUGHBY: If you want to ask that
22  question, that's a different question.
23         MR. WILSON: I did ask the question.
24         MR. WILLOUGHBY: I don't think you asked it

Page 45

1   that way. My objection stands.
2   BY MR. WILSON:
3   Q.   Okay. Did the meeting of December 17th result
4   in discipline of Mr. Wilcoxon?
5   **A. It did.**
6   Q.   And after this letter was given to Mr. Wilcoxon
7   did he request union representation?
8   **A. Not to me. He may have to Miss Basara. I**
9   **don't --**
10  Q.   Do you recall him requesting union
11  representation?
12  **A. I don't.**
13  Q.   Okay. Do you recollect Mr. Wilcoxon getting two
14  other disciplinary letters at this meeting?
15  **A. I do.**
16  Q.   Was one of them for substitute plans?
17  **A. I believe so.**
18  Q.   And was the other one for a violation of school
19  bus duty?
20  **A. I believe that's -- it's calling in buses. I**
21  **don't know if it's called bus duty. Had to do with**
22  **buses.**
23  Q.   Okay. Do you recall a faculty basketball game
24  during the 2003-2004 school year?

A-0261           12 (Pages 42 to 45)

Wilcoxon
Frank Rumford

v.

C.A. # 05-524-SLR

Red Clay Consolidated School District
May 25, 2006

Page 46

1    A. Yes.
2    Q. Okay. And initially you and Mr. Wilcoxon were
3    supposed to organize the game, correct?
4    A. Initially, no.
5    Q. Okay.
6    A. I was delegating.
7    Q. Okay. So you were in charge initially?
8    A. SSA was in charge. They brought it to my
9    attention and I gave it to the -- to Rich and Miss
10   Freebery because as the phys ed teacher before I
11   organized it with Miss Freebery.
12   Q. All right. So the original team was you, Miss
13   Freebery and Mr. Wilcoxon?
14   A. I delegated it to them, yes.
15   Q. Okay. What part of it did you delegate to
16   Mr. Wilcoxon?
17   A. Setting it up, running it, help -- getting it
18   organized, same with Miss Freebery.
19   Q. So they were supposed to work together on this?
20   A. Together or with in conjunction with the SSA
21   person who I think at that time was June Perez.
22   Q. And the initiation of this, did it occur before
23   the discovery of the journal?
24   A. I don't think so. I think it happened -- this

Page 47

1    takes place in usually late winter or had in the past.
2    Q. When you delegated it to Miss Freebery and
3    Mr. Wilcoxon did Miss Freebery object to working with
4    Mr. Wilcoxon on this?
5    A. She did not.
6    Q. Did Mr. Wilcoxon make the initial calls to Miss
7    Perez to begin the organization of the --
8    A. I don't know. I don't know.
9    Q. At some point was Mr. Wilcoxon eliminated from
10   the team of organizers for the game?
11   A. No, but the -- he didn't -- he wasn't proceeding
12   forward with any of the -- I don't know if he was
13   contacting Miss Perez or not, but it was getting late
14   and it wasn't getting set up.
15   Q. Okay. So did you stop communicating with
16   Mr. Wilcoxon on this?
17   A. I believe Miss Freebery was getting the work
18   done.
19   Q. Okay. So did you stop communicating with
20   Mr. Wilcoxon on this?
21   A. I don't know if I stopped communicating with him
22   directly but it needed to get done and she was getting
23   it done along with Miss Perez.
24   Q. Did you ever approach Mr. Wilcoxon and ask him

Page 48

1    what he was doing with regard to the basketball game?
2    A. I don't recall doing that, no.
3    Q. So any -- let me just show you the document.
4    Mark that as 2.
5    (Rumford Deposition Exhibit No. Rumford-2
6    was marked for identification.)
7    BY MR. WILSON:
8    Q. Okay. Have you had a chance to read this?
9    A. Yeah.
10   Q. All right. At the top it says, to all staff
11   from Janet Basara, Frank Rumford and Janay Freebery;
12   Mr. Wilcoxon's name is not on there, correct?
13   A. Correct.
14   Q. And do you know why his name is not on there?
15   A. I don't believe he was doing anything to assist.
16   Q. So was there ever a decision made to take him
17   off the team or off the organizational --
18   A. I don't think there was a decision made. It was
19   these people were the ones that were taking lead.
20   Q. During the 2003-2004 school year did any of your
21   responsibilities include performing lesson analysis?
22   A. Did not.
23   Q. That's going to save us some time. Okay. Do
24   you ever recall a teacher having money stolen from them

Page 49

1    at school that they were collecting for a school
2    function or event.
3    Let me ask you first, do you recall
4    Mr. Wilcoxon having money stolen from him?
5    A. I do.
6    Q. Okay. Was that during the 2003-2004 school
7    year?
8    A. I believe it was. 2002-2003?
9    Q. 2003-2004?
10   A. Correct.
11   Q. And do you recall the specifics of that?
12   A. It was hoops, a Hoops For Heart, American Heart
13   Association fundraiser, apparently the money was left in
14   the multi-purpose room unsecured and one or several
15   students had their money taken that had turned it in.
16   Q. And was Mr. Wilcoxon disciplined for this?
17   A. I believe he received a letter reprimand.
18   Q. Do you recall another teacher in this timeframe
19   having money stolen?
20   A. I believe the school nurse did.
21   Q. Do you recall if she was disciplined?
22   A. She was not, not that I'm aware of anyway.
23   Q. Okay. Let me take a short break, talk to Rich
24   and then we should be about done.

A-0262

13 (Pages 46 to 49)

Wilcoxon
Frank Rumford

v.

C.A. # 05-524-SLR

Red Clay Consolidated School District
May 25, 2006

Page 50

1    (Recess taken.)
2  BY MR. WILSON:
3    Q.  Everybody ready?  All right.  I just have real
4  quick follow-up.  With regard to the locked closet in
5  Mr. Wilcoxon's office, that's not a keyed lock, correct?
6    A.  It is not a key lock.
7    Q.  There is just a place to put like a padlock or a
8  combination lock?
9    A.  That's correct.
10       MR. WILSON:  Okay.  I have nothing further.
11  BY MR. WILLOUGHBY:
12    Q.  I have a few questions.  Let's start with the
13  question of locks.  In the multi-purpose room where
14  Mr. Wilcoxon left the money unsecured are there any
15  locking cabinets or locations in there?
16    A.  There are two.
17    Q.  Okay.  Tell me about those.
18    A.  There are two five and a half foot cabinets in
19  there where health test material was stored, one on
20  either -- next to either door that leads into the room.
21    Q.  And they're locked?
22    A.  They're a key lock.
23    Q.  So if Mr. Wilcoxon wanted to he could have
24  locked the money there?

Page 51

1    A.  That's correct.
2    Q.  Okay.  You were asked some questions early on in
3  the deposition about a teacher leaving the room during
4  class, and you made comment to the effect that that
5  wouldn't be a proper procedure to leave the students
6  unsupervised?
7    A.  That's correct.
8    Q.  When you were being asked those questions were
9  you assuming there was a single teacher in the class?
10    A.  That's correct.
11    Q.  What happens when you have a team teaching
12  situation, are there occasions when one teacher might
13  leave the room for some reason?
14    A.  That's correct, and usually they communicate.
15    Q.  And what about situations like that where there
16  is a guest speaker, would it be any reason why one
17  teacher could not leave the room when there is a guest
18  speaker there?
19    A.  It would not be a reason why they could not.
20    Q.  You were asked at one point that during the
21  2003-2004 school year did Miss Freebery prior to the
22  December 15th incident make any official complaints of
23  any inappropriate comments, do you remember that
24  question?

Page 52

1    A.  I do.
2    Q.  You also talked about having a discussion with
3  her, I think you said at a trophy case?
4    A.  Lobby area.
5    Q.  And that was prior to December 15th?
6    A.  Yes.
7    Q.  Can you give us a little more detail on what
8  Miss Freebery said to you about the comments
9  Mr. Wilcoxon was making and what you said back?
10    A.  Miss Freebery said that Mr. Wilcoxon was making
11  inappropriate comments to her and my response to her was
12  you need to tell him to stop.
13    Q.  Okay.  And that was prior to December 15th?
14    A.  That's correct.
15    Q.  Did you ever overhear any comments by
16  Mr. Wilcoxon regarding Miss Freebery being pregnant?
17    A.  I do not.
18    Q.  When at the meeting on December 17th there was a
19  conversation that was a dispute resolution-type
20  conversation and during that meeting did Miss Freebery
21  discuss inappropriate remarks that Mr. Wilcoxon made?
22    A.  She did.
23    Q.  Do you recall the pregnancy issue coming up
24  during that conversation?

Page 53

1    A.  It did.
2    Q.  There was testimony earlier about Mr. Wilcoxon
3  making a comment to Miss Basara and to others about Miss
4  Freebery being the closest thing to a wife and bitch
5  that he had.  Do you recall that being discussed at any
6  point?
7    A.  I do.
8    Q.  When those remarks were made what did
9  Mr. Wilcoxon say?
10    A.  I believe he denied them.
11    Q.  Did he make any remarks about you said opening
12  the door at one point?
13    A.  He did say that.
14       MR. WILSON:  Objection.  Asked and
15  answered.
16  BY MR. WILLOUGHBY:
17    Q.  Right.  Can you take us through what he said
18  when those remarks were made and what else he said?
19    A.  When the initial comments were made by Miss
20  Freebery in that meeting Mr. Wilcoxon replied to Miss
21  Freebery that, and Miss Basara and myself, that she had
22  opened the door with comments made by him to her -- by
23  her to him.
24    Q.  And did he refer to anything in particular?

A-0263

14 (Pages 50 to 53)

Wilcoxon                                          Red Clay Consolidated School District
Frank Rumford                  v.                 May 25, 2006
                          C.A. # 05-524-SLR

Page 54

1    A.  He did not.
2    Q.  Did he say anything else about what his intent
3    was with respect to the comments he had made?
4    A.  Intent, no.
5    Q.  Did he say anything about joking, things like
6    that?
7    A.  He did say I was just kidding, yes.
8    Q.  And you listened to the tape of that meeting,
9    correct?
10   A.  I did listen.
11   Q.  Okay.  And was that part of the conversation on
12   the tape?
13   A.  The inappropriate comments?
14   Q.  His response when Miss Freebery mentioned
15   inappropriate comments?
16   A.  I did not hear it.
17   Q.  Did he turn the tape off at that point?
18   A.  He did.
19   Q.  Did you listen to any other tapes of
20   conversations that Mr. Wilcoxon secretly made other than
21   that one day?
22   A.  I believe I did.
23   Q.  Okay.  What others did you listen to?
24   A.  I believe it was the day before.

Page 55

1    Q.  Okay.  Any others besides that?
2    A.  Not that I recall.
3    Q.  You were asked some questions about a teacher
4    being expected to call in if they're going to be late?
5    A.  Correct.
6    Q.  Now what time is the teacher supposed to be at
7    the school?
8    A.  At that time I think it was -- it's changed.  I
9    believe it was 7:35 they had to be there.
10   Q.  What time did the students come in?
11   A.  That's when the students had to come in.  So
12   ten, 15 minutes earlier than that they had to be in.
13   Q.  So if a teacher was going to be a minute or two,
14   five minutes late but the students wouldn't be there
15   would they be expected to call in?
16   A.  No.
17   Q.  If they were going to be late when students were
18   arriving, would they be expected to call in?
19   A.  That's correct.
20   Q.  And what would you and the administration do if
21   you got a call like that?
22   A.  We have a coverage plan where we would assign
23   teachers that don't have duties to cover until that
24   teacher arrives.

Page 56

1    Q.  When you were teaching did you ever have to
2    cover for another teacher who was late?
3    A.  Yes, I did.
4    Q.  To your knowledge did Miss Freebery ever have to
5    do that when she taught there?
6    A.  Certainly.
7    Q.  Go back to the stolen money issue and you were
8    asked about the school nurse, do you remember that?
9    A.  I do.
10   Q.  Where was the money kept and how was it secured
11   for the school nurse?
12   A.  I believe she kept it in that instance in the, I
13   don't know what you call it, in the box where the
14   medication is that's locked.
15   Q.  So in that case was the money locked up?
16   A.  It was locked up.
17       MR. WILLOUGHBY:  Okay.  That's all I have.
18   BY MR. WILSON:
19   Q.  I just have a couple follow-ups.  Okay.  When
20   Mr. Willoughby asked you about the team teaching
21   scenario where a teacher leaves the room, and you said
22   it's okay if there is communication, correct --
23   A.  Correct.
24   Q.  -- between the two teachers.  What if there is

Page 57

1    no communication, is that proper?
2    A.  Well, no.  It wouldn't be proper.  It wouldn't
3    -- it wouldn't be proper for one teacher just to walk
4    out on the other.
5    Q.  Okay.  And in the scenario with the guest
6    speaker, you said that it would be okay for one teacher
7    to leave, would it be okay for that teacher to leave
8    for, say, the whole class period?
9    A.  It would be okay if there was communication is
10   what I believe I said.
11   Q.  Okay.  And you stated that you had covered for
12   teachers that arrived late in the past, correct?
13   A.  Sure.
14   Q.  Did you ever cover for Miss Freebery?
15   A.  I don't believe so.
16   Q.  When you team taught with Miss Freebery was she
17   ever late?
18   A.  Wow, maybe a couple times.  But so was I.
19       MR. WILSON:  All right.  I have nothing
20   further.
21       MR. WILLOUGHBY:  Okay.  That's all I have.
22   We're going to read and sign.  Okay.  You're done.
23       (Whereupon the Deposition concluded at
24   approximately 2:30 p.m.)

Wilcoxon                                  v.          Red Clay Consolidated School District
Frank Rumford                     C.A. # 05-524-SLR                      May 25, 2006



Page 58

1                   I N D E X

2

DEPONENT: FRANK RUMFORD                    PAGE

3

Examination by Mr. Wilson          2
4   Examination by Mr. Willoughby        50
Examination by Mr. Wilson         56
5

E X H I B I T S
6

FRANK RUMFORD DEPOSITION EXHIBITS       MARKED
7

1 1/20/04 - 1/22/04 letter to Rich Wilcoxon
8   From Janet Basara              42
9   2 2/26/04 letter to all staff from Janet
Basara, Frank Rumford and Janay Freebery   48
10
11
12  ERRATA SHEET/DEPONENT'S SIGNATURE     PAGE 59
13  CERTIFICATE OF REPORTER          PAGE 60
14
15
16
17
18
19
20
21
22
23
24

Page 60

1   State of Delaware)
)
2   New Castle County)
3        CERTIFICATE OF REPORTER
4        I, Elaine G. Parrish, Registered
Professional Reporter and Notary Public, do hereby
5   certify that there came before me on the 25th day of
May, 2006, the deponent herein, FRANK RUMFORD, who was
6   duly sworn by me and thereafter examined by counsel for
the respective parties; that the questions asked of said
7   deponent and the answers given were taken down by me in
stenotype notes and thereafter transcribed into
8   typewriting under my direction.
9        I further certify that the foregoing is a
true and correct transcript of the testimony given at
10  said examination of said witness.
11        I further certify that I am not counsel,
attorney, or relative of either party, or otherwise
12  interested in the event of this suit.
13
14        Elaine G. Parrish
15        Certification No. 170-RPR
16        (Expires January 31, 2009)
17

DATED:   June 1, 2006
18
19
20
21
22
23
24

Page 59

1
2        REPLACE THIS PAGE
WITH THE ERRATA SHEET
3        AFTER IT HAS BEEN
COMPLETED AND SIGNED
4        BY THE DEPONENT.
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

A-0265

Wilcox & Fetzer, Ltd.          Professional Court Reporters          (302)655-0477



**WILCOX & FETZER LTD.**



## In the Matter Of:

# Wilcoxon

## v.

# Red Clay Consolidated School District

## C.A. # 05-524-SLR

---

### Transcript of:

### Janet Basara

### May 25, 2006

---

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

Page 1

1          IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF DELAWARE

2
     RICHARD WILCOXON                : CIVIL ACTION
3                    Plaintiff        :
                                      :
4          -v-                        :
                                      :
5    RED CLAY CONSOLIDATED            :
     SCHOOL DISTRICT BOARD OF        : NO. 05-524-SLR
6    EDUCATION, and JANAY             :
     FREEBERY                         :
7                    Defendants       :
8                    Deposition of JANET BASARA, taken before
     Elaine Gallagher Parrish, Registered Professional
9    Reporter, at 1509 Gilpin Avenue, Wilmington, Delaware on
     May 25, 2006, commencing approximately at 9:05 a.m.
10
     APPEARANCES:
11
                    TIMOTHY J. WILSON, ESQ.
12                  Margolis Edelstein
                      1509 Gilpin Avenue
13                    Wilmington, Delaware 19806
                      for the Plaintiff,
14
                    BARRY M. WILLOUGHBY, ESQ.
15                  Young Conaway Stargatt & Taylor, LLP
                      P.O. Box 391
16                    The Brandyine Building
                      1000 West Street, 17th Floor
17                    Wilmington, Delaware 19801
                      for the Defendants.
18
     ALSO PRESENT:
19
                    RICHARD WILCOXON
20                  DIANE DUNMON
                    JANAY FREEBERY
21
22
23                  WILCOX & FETZER
          1330 King Street - Wilmington, Delaware 19801
24                  (302)655-0477

A-0267

Wilcoxon
Janet Basara

v.

C.A. # 05-524-SLR

Red Clay Consolidated School District
May 25, 2006

Page 2

1   JANET BASARA,
2   having been first duly sworn according to law, was
3   examined and testified as follows:
4   BY MR. WILSON:
5   Q.  Good morning, Miss Basara.
6   A.  Good morning.
7   Q.  Am I pronouncing your name right?
8   A.  Yes.
9   Q.  Basara?
10  A.  Basara.
11  Q.  Okay.  We met earlier this morning when you came
12  in, but once again my name is Tim Wilson and I'm
13  Mr. Wilcoxon's attorney in his lawsuit against Red Clay
14  Consolidated School District and Janay Freebery.  Just
15  for clarification, if I mention Red Clay it refers to
16  Red Clay Consolidated School District, okay?
17  A.  Uh-huh.
18  Q.  Do you understand that?
19  A.  Yes.
20  Q.  I'd like to go over a couple instructions before
21  we start the deposition just so you know how it's going
22  to proceed.  I am going to be asking you questions
23  pertaining to this lawsuit and when you respond you need
24  to do so verbally.  The Court Reporter can't take down

Page 4

1   A.  Yes.
2   Q.  Are you taking any medications today that could
3   impair your ability to testify truthfully?
4   A.  No, but I have a very sore throat and I'm
5   sucking on lozenges if that's all right.
6   Q.  That's fine with me.  Have you ever been deposed
7   before?
8   A.  Never.
9   Q.  Where were you born?
10  A.  Wilmington, Delaware.
11  Q.  And what's your birth date?
12  A.  1-3-53.
13  Q.  And your address?
14  A.  209 Barberry Drive, Wilmington, Delaware, 19808.
15  Q.  How long have you lived there?
16  A.  Almost 20 years.
17  Q.  Do you own?
18  A.  Yes.
19  Q.  Have you ever been charged with a crime?
20  A.  Never.
21  Q.  Did you serve in the military?
22  A.  No.
23  Q.  Have you ever been sued in your individual
24  capacity?

Page 3

1   head nods and it's difficult for her to take down
2   uh-huhs and unh-unhs.  So let's try to make it as clear
3   as possible.
4        As you know, you have just been sworn in
5   and your testimony is under oath, so you must answer
6   truthfully just as if you were in court.  If you don't
7   hear a question or don't understand, let me know and
8   I will rephrase it or explain it to you.
9   A.  Uh-huh.
10  Q.  Please let me finish asking the question before
11  you answer, and I will let you finish answering before I
12  ask a question so we can have a clear transcript.  If at
13  any time you come to realize that a statement you made
14  is incorrect or inaccurate, please let me know and
15  you'll be permitted to clarify the record.  You can not
16  talk or confer with your attorney during the deposition
17  either in here or during breaks unless it pertains to a
18  matter of privilege and Mr. Willoughby will certainly
19  chime in if it does.
20        If at any time you need to take a break,
21  for any reason, let me know and then we'll do that,
22  okay?
23  A.  Yes.
24  Q.  Do you understand these instructions?

Page 5

1   A.  Never.
2   Q.  Have you ever sued someone else?
3   A.  No.
4   Q.  Have you ever been treated for or had counseling
5   for alcohol problems?
6   A.  Never.
7   Q.  Drug problems?
8   A.  Never.
9   Q.  Did you go to college?
10  A.  Yes.
11  Q.  Where did you go?
12  A.  University of Delaware, Wilmington College and
13  Widener.
14  Q.  Okay.  Did you get a degree from University of
15  Delaware?
16  A.  Yes.
17  Q.  In what?
18  A.  Bachelor of Education.
19  Q.  And what year?
20  A.  Um, '73, '74.
21  Q.  And Wilmington College, did you get a degree?
22  A.  I got certification for administration at
23  Wilmington College.
24  Q.  When did that certification occur?

A-0268

2 (Pages 2 to 5)

Wilcoxon
Janet Basara

v.

C.A. # 05-524-SLR

Red Clay Consolidated School District
May 25, 2006

Page 6

1    A. I don't remember exactly.
2    Q. Okay. What about Widener?
3    A. Master's Degree.
4    Q. And was that Widener here in Delaware or in
5    Pennsylvania?
6    A. Widener in -- in Pennsylvania.
7    Q. Chester?
8    A. Yes. They came here and presented a program but
9    it was -- that's where the teachers were from.
10    Q. Did you get a degree from Widener?
11    A. Yes.
12    Q. And what was that?
13    A. Master's Degree.
14    Q. Master's in education?
15    A. Yes.
16    Q. Were any of the degrees you earned earned with
17    honors?
18    A. All of them.
19    Q. And what honors did you receive?
20    A. Baccalaureate -- I forget what they call that
21    when you get --
22        MR. WILLOUGHBY: Cum Laude.
23        THE WITNESS: Cum Laude, that's it.
24    BY MR. WILSON:

Page 7

1    Q. Congratulations.
2    A. Thank you.
3    Q. And was that for the Bachelor's of Education?
4    A. Yes.
5    Q. And for the Master's?
6    A. Yes.
7    Q. Both Cum Laude?
8    A. Yes.
9    Q. Are you presently employed by Red Clay?
10    A. Yes.
11    Q. And what is your job title?
12    A. Right now I'm the assistant principal at
13    Brandywine Springs Elementary.
14    Q. And how long have you held that position?
15    A. A year.
16    Q. So are we talking this current school year?
17    A. Uh-huh. Yes.
18    Q. Okay. And where were you before that?
19    A. Skyline Middle School as the assistant
20    principal.
21    Q. And how long did you serve in that capacity?
22    A. Four years.
23    Q. And --
24    A. I think four years, yes.

Page 8

1    Q. At one point you were the acting principal,
2    correct?
3    A. Correct.
4    Q. And when was that?
5    A. 2002-2003 school year. Is that right?
6        MR. WILLOUGHBY: I think it was 2003-2004.
7        THE WITNESS: 2003-2004 school year.
8    BY MR. WILSON:
9    Q. Okay. In your role as assistant principal at
10    Skyline, did you perform functions such as disciplining
11    employees on behalf of the School Board?
12    A. As an assistant principal?
13    Q. Yes?
14    A. No.
15    Q. What about as acting principal?
16    A. Yes.
17    Q. What did you do to prepare for today's
18    deposition?
19    A. I refreshed my memory by reading over some of my
20    notes that I had taken at the time, knowing that it was
21    two years -- two years ago.
22    Q. Your own personal notes?
23    A. Yes.
24        MR. WILLOUGHBY: I want to be clear, that

Page 9

1    these are notes that you prepared for counsel, if I'm
2    thinking of the same notes?
3        THE WITNESS: Yes.
4    BY MR. WILSON:
5    Q. Did you review any notes that you didn't prepare
6    for the lawsuit?
7    A. That I did not prepare? I'm not sure what you
8    mean.
9    Q. Well, Mr. Willoughby just clarified that the
10    notes that you reviewed you did in preparation for the
11    lawsuit.
12    A. Back in 2003, the whole time that this was going
13    on I just jotted notes to remind myself what happened.
14    Q. Did you do so at any attorney's request?
15    A. No, not then.
16    Q. Did you do so in anticipation of a lawsuit?
17    A. Not really.
18    Q. Okay. I don't think that qualifies.
19        MR. WILLOUGHBY: We may be talking about
20    two different sets of notes then. That's fine.
21    BY MR. WILSON:
22    Q. Have you provided those notes to Mr. Willoughby?
23    A. Yes.
24    Q. Did you meet with Mr. Willoughby prior to the

Wilcox & Fetzer, Ltd.          Professional Court Reporters          (302)655-0477

Wilcoxon                          v.              Red Clay Consolidated School District
Janet Basara              C.A. # 05-524-SLR                         May 25, 2006

Page 10

1  deposition?
2  **A. This deposition?**
3  Q. Yes.
4  **A. Yes.**
5  Q. And when was that?
6  **A. Yesterday. No. Yesterday, two days ago.**
7  **Tuesday. Today is Thursday. Tuesday, and one day last**
8  **week.**
9  Q. Approximately how long did you meet with him?
10 **A. A day and a half, total.**
11 Q. Other than the notes that you spoke of did you
12 review any other documents?
13 **A. Yes.**
14 Q. Do you recall what those documents were?
15 **A. The documents that Richard presented to you.**
16 Q. Anything specific that you can recall?
17 **A. A lot of documents. The letters, in particular.**
18 Q. The discipline letters?
19 **A. Yes. The observations, and his performance**
20 **appraisal.**
21 Q. Anything else that you recall?
22 **A. No.**
23 Q. Okay. Did you review Mr. Wilcoxon's deposition
24 transcript?

Page 11

1  **A. Yes.**
2  Q. Did you listen to the tapes that Mr. Wilcoxon
3  recorded of your meetings?
4  **A. We tried to but they were really unintelligible.**
5  **And I think we only listened to one, and I understand**
6  **there were maybe four.**
7  Q. Did you speak to anybody other than
8  Mr. Willoughby to prepare for this deposition?
9  **A. No.**
10 Q. Did you talk to anybody in general about the
11 lawsuit?
12 **A. No.**
13 Q. You haven't talked to Miss Freebery about the
14 lawsuit?
15 **A. Never.**
16 Q. Mr. Rumford?
17 **A. No, although he was in the deposition -- or the**
18 **preparation for the deposition.**
19 Q. Was Miss Freebery in that preparation?
20 **A. No.**
21 Q. Okay. You're aware that Mr. Wilcoxon and Miss
22 Freebery team taught during the 2002 through 2003 school
23 year, correct?
24 **A. Right.**

Page 12

1  Q. And what subjects did they team teach?
2  **A. PE and health.**
3  Q. Can you give me a brief explanation as to how
4  team teaching works?
5  **A. Usually they plan together, when teachers team**
6  **teach they plan together, help each other prepare**
7  **materials and whatnot, work together sometimes in the**
8  **same room. In the gym they would -- they could be**
9  **separated because there was a divider or they could**
10 **leave the divider open and do a coed, and in health they**
11 **work together in a multi-purpose room which was our**
12 **auditorium which was a little smaller than an auditorium**
13 **but they would put both classes together and teach**
14 **health.**
15 Q. Okay. Prior to this school year Miss Freebery
16 had been on sabbatical, correct?
17 **A. Yes.**
18       MR. WILLOUGHBY: I object. I'm not sure
19 that she was on sabbatical. She was on maternity leave.
20       MR. WILSON: Well, she just answered yes.
21       THE WITNESS: Well, maternity leave.
22       MR. WILLOUGHBY: You got to be clear in the
23 question. That's why I objected.
24       THE WITNESS: She was on maternity leave.

Page 13

1  She had a baby.
2  BY MR. WILSON:
3  Q. Was she out the whole year?
4  **A. Half a year.**
5  Q. During the 2002-2003 school year were you aware
6  of any tension between Miss Freebery and Miss Wilcoxon?
7  **A. Is that the year this all started?**
8       MR. WILLOUGHBY: He's referring to the
9  first year when she came back from maternity leave.
10 BY MR. WILSON:
11 Q. The first year they would have team taught
12 together.
13 **A. No. There was not a problem that I was aware**
14 **of.**
15 Q. How long have you known Miss Freebery?
16 **A. Since I started working at Skyline.**
17 Q. When was that?
18 **A. What -- do I know what year -- I really don't**
19 **remember what year. Let's see, it would be 2001, I**
20 **think 01-02 school year, maybe.**
21 Q. So for about five or six years --
22 **A. Uh-huh.**
23 Q. -- is that approximate? Are you a personal
24 friend of Miss Freebery's?

Wilcoxon                                                          Red Clay Consolidated School District
Janet Basara                          v.                          May 25, 2006
                          C.A. # 05-524-SLR

Page 14

1  A.  No, I am not.
2  Q.  Do you ever socialize with her out of work?
3  A.  I have never.
4  Q.  Never gone to lunch?
5  A.  No, I didn't.
6  Q.  Out for drinks?
7  A.  No.
8  Q.  Ever been to her house?
9  A.  Only for Christmas parties which she held for
10 the staff.
11 Q.  Parties or party?
12 A.  I believe there may have been two. There was a
13 baby shower, and the Christmas party that I remember.
14 Q.  Other than those two instances you haven't done
15 anything with Miss Freebery outside of work?
16 A.  No, I have not.
17 Q.  Were you aware of any problems that Miss
18 Freebery was having in her personal life during the
19 2002-2003 school year?
20 A.  Yes.
21 Q.  And what were those?
22 A.  She had just separated from her husband, was
23 getting a divorce and had just had a baby.
24 Q.  Did that have an impact on her professional

Page 15

1  duties?
2  A.  No, it did not.
3  Q.  In no way?
4  A.  Not that I was aware of.
5  Q.  What about during the 2003-2004 school year, are
6  you aware of any problems that Miss Freebery was having
7  with her personal life?
8  A.  With her personal life?
9  Q.  Yes.
10 A.  Not really.  Things were settled down and she
11 was doing better as far as I knew.  She was dating.  She
12 was adjusting to being a single mother.
13 Q.  Who was she dating?
14 A.  Um, Bruce was one and I don't know if there was
15 another.
16 Q.  Was that Bruce Hannah?
17 A.  Uh-huh.
18 Q.  You say there was another one, too?
19     MR. WILLOUGHBY:  If you know the answer.
20     THE WITNESS:  I don't know who the other
21 person was.  I know there was another gentleman who was
22 dating her at one point.
23 BY MR. WILSON:
24 Q.  Okay.  Getting back to the 2002-2003 school

Page 16

1  year, did Miss Freebery have any issues with her
2  professional life during that school year?
3  A.  Not that I was aware of until we saw the
4  documentation.
5  Q.  And what documentation was that?
6  A.  The one that Richard was keeping on her. He had
7  never brought that to my attention, so I was not aware
8  that anything had happened.
9  Q.  I'm talking 2002-2003 school year?
10 A.  Oh, that's the year before?
11 Q.  I believe so, yes.
12 A.  Okay.  No, none.
13 Q.  During that same school year, 2002-2003, was
14 Mr. Wilcoxon disciplined for any reason?
15 A.  No.
16 Q.  Was Miss Freebery observed during that school
17 year, 2002-2003?
18 A.  She would have been either by myself or the
19 principal.
20 Q.  Who was the principal then?
21 A.  Dr. Manolakas.
22 Q.  Do you recall the results of those observations?
23 A.  No, I do not.
24 Q.  During that school year were there any problems

Page 17

1  with Mr. Wilcoxon performing his duties?
2  A.  Do you mean that were in writing or just that
3  indicated there might be issues?
4  Q.  Anything that you were aware of?
5  A.  He had issues with classroom control. He sent
6  students out of class quite a bit to be disciplined. He
7  was working with Frank Rumford and Frank was mentoring
8  him trying to help him get control; lesson plans, help
9  him with lesson plans, things like that.
10 Q.  So, is it inappropriate to send students out of
11 the class if you're having problems with them?
12 A.  Not inappropriate.  If you're having a
13 discipline problem you would send them out to a timeout
14 room.  I just remember that there were a lot coming out
15 of Mr. Wilcoxon's room.
16 Q.  Okay.
17 A.  And that's when you're comparing a staff of 40,
18 40 teachers or so, he had a large number.
19 Q.  Is it possible that that could be an issue of
20 the makeup of the students in his class as opposed to
21 Mr. Wilcoxon?
22 A.  As opposed to him?
23 Q.  Yes.
24 A.  No, all the teachers had the same students. I

A-0271                    5 (Pages 14 to 17)

Page 18

1  mean other teachers had the same students that he had.
2  Q.  So the classes remained the same as they went
3  from subject to subject to subject?
4  A.  No.
5  Q.  So the makeup of the classes were different?
6  A.  He taught sixth, seventh and eighth graders.
7  Q.  Right.
8  A.  And other teachers taught sixth, seventh and
9  eighth graders. Yes, the makeup would be different in
10  his class and others classes. They all moved.
11  Q.  So it is possible that it could be a function of
12  the makeup of the class. In other words, it could be
13  possible that he had a larger share of bad apples in his
14  class than did other teachers?
15  A.  I don't know how to answer that.
16  Q.  Is it possible?
17  A.  I want to say that there were other teachers who
18  taught the same children and didn't have to send as many
19  students out of class.
20  Q.  But you just testified that the makeup wasn't
21  the same?
22  A.  Correct.
23  Q.  So it is possible that there were more bad kids
24  in one class as opposed to another, even though they

Page 19

1  were the same students in the same grades?
2  A.  I don't think the kids are bad kids. The kids
3  need discipline. The kids need direction. They need
4  instruction.
5  Q.  Okay. Let me rephrase it then. It is possible
6  that there are -- were more kids in Mr. Wilcoxon's class
7  that were discipline problems as opposed to other
8  classes?
9  A.  A student would be a discipline problem in any
10  class or could be a discipline problem in any class. So
11  it's a matter how the teacher handles those discipline
12  problems, if they eventually get control of those
13  students and understand the student and work with the
14  student. So any student is a potential problem.
15  Q.  Okay. If there is a total of five discipline
16  problems in the sixth grade?
17       MR. WILLOUGHBY: Is this a hypothetical
18  question?
19       MR. WILSON: Yes.
20       MR. WILLOUGHBY: Okay.
21  BY MR. WILSON:
22  Q.  In every other class that a teacher teaches
23  there is one of those students in the class and in
24  Mr. Wilcoxon's class there is all of five, wouldn't it

Page 20

1  stand to reason that he would have to send more students
2  out for discipline than the teachers that only had one
3  student that had a discipline problem?
4       MR. WILLOUGHBY: Can you repeat that again,
5  make sure I understand it? This is a hypothetical and
6  you're saying there is five discipline problems?
7       MR. WILSON: Yes.
8       MR. WILLOUGHBY: In the whole school or the
9  grade or something?
10       MR. WILSON: In the one grade.
11       MR. WILLOUGHBY: Okay. Go ahead. Tell me
12  it again.
13       MR. WILSON: Can you read it back?
14       (Record read.)
15       THE WITNESS: I think that is just too
16  hypothetical to even answer. It depends on the teacher.
17  BY MR. WILSON:
18  Q.  So in your opinion it doesn't depend on the
19  students at all?
20  A.  No. It depends -- the students can be a problem
21  when they're together. Certain student combinations are
22  not good combinations. What a teacher needs to do is
23  separate those students out in their class in order to
24  make it work.

Page 21

1  Q.  Okay. You mention that Mr. Wilcoxon was being
2  mentored by Frank Rumford?
3  A.  Yes.
4  Q.  Were there other teachers at the school that had
5  mentors?
6  A.  Yes. Every new teacher had a mentor.
7  Q.  Other than this issue that you identified with
8  Mr. Wilcoxon, were there any other issues with him
9  during the 2002-2003 school year?
10  A.  There were a few parent phone calls but nothing
11  that was extraordinary.
12  Q.  Was there any forms of discipline imposed on
13  Mr. Wilcoxon during that year?
14  A.  No. What we try to do is work with new
15  teachers, help them figure out how to control their
16  class better, what strategies would work, separate the
17  two, don't put them on the same team, that's what you
18  do. As an administrator it's your job to work with the
19  teacher and help them to get over whatever issues
20  they're having to make them a better teacher, and new
21  teachers often have problems.
22  Q.  Okay. Was Mr. Wilcoxon observed during that
23  school year?
24  A.  Yes.

A-0272

Page 22

1    Q.  Were any of the observations negative?
2    A.  Not that I know of.  There were a few
3    recommendations in them.  So I don't know exactly what
4    you mean by negative, but they did have recommendations.
5    Q.  Well --
6    A.  A --
7    Q.  I'm sorry.  When there is a poor lesson analysis
8    received by a teacher --
9    A.  Uh-huh --
10   Q.  -- then, correct me if I'm wrong, they're put on
11   an IIP, correct?
12   A.  Not necessarily.
13   Q.  Okay.
14   A.  That would be after repeated problems that are
15   not changing I'd do that.
16   Q.  Okay.  Was Mr. Wilcoxon put on an IIP that year?
17   A.  No, he was not.  Again, our goal was to work
18   with Mr. Wilcoxon and not to admonish him but to try to
19   get him to be successful.
20   Q.  With respect to most other teachers, when
21   they're observed, are there recommendations on their
22   observation results?
23   A.  That varies greatly with the teacher.
24   Q.  So sometimes there is no recommendations?

Page 23

1    A.  Yes, sometimes there are no recommendations.
2    Q.  All right.  I'd like to move on to the 2003-2004
3    school year.  Mr. Wilcoxon and Miss Freebery team taught
4    again during that year, correct?
5    A.  Yes.
6    Q.  And this was the year you were acting principal?
7    A.  In October.
8    Q.  And did they team teach PE and health again?
9    A.  Yes.
10   Q.  Anything else?
11   A.  No.
12   Q.  Prior to December of the 2003-2004 school year
13   were you aware of any tension between Miss Freebery and
14   Mr. Wilcoxon?
15   A.  No, I was not.
16   Q.  Okay.  From here on out I just want you to
17   assume I'm talking about the 2003-2004 school year.
18   A.  Okay.
19   Q.  Just so, you know, I don't have to say it a
20   million times.
21   A.  Okay.
22   Q.  During that school year was Miss Freebery
23   disciplined for any reason?
24   A.  You mean a verbal, possible verbal reprimand?

Page 24

1    Q.  Yes.  Any type of discipline?
2    A.  Yes.
3    Q.  Okay.  For what?
4    A.  The things that Rich -- Richard put on the
5    documentation, he had not brought that to my attention,
6    but when it was found I spoke to Miss Freebery and at
7    that point Rich had already said, I'm sorry, Richard,
8    had already said that he had exaggerated, he had written
9    it in anger and some of it was not true.  So when I
10   spoke to Miss Freebery I said verbal reprimand, whatever
11   was true, whatever part of that is true, it needs to
12   stop.
13   Q.  Okay.  Did you do any investigation into what
14   was true and what was not true?
15   A.  We talked about that together as a group.
16   Q.  Okay.  With Mr. Wilcoxon?
17   A.  Yes.
18   Q.  Okay.  When did he tell you that he exaggerated?
19   A.  In that meeting.
20   Q.  And what date was that meeting?
21   A.  There were a lot of meetings on the 15th, 16th
22   and 17th.  We had a lot of in and out, in and out, and
23   we were trying to figure out what exactly happened.
24   Q.  Okay.  Was the meeting that he allegedly said

Page 25

1    that he exaggerated, was Miss Freebery in that meeting?
2    A.  I think that was the meeting but I can't tell
3    you for sure.  We tried to listen to the tape but it was
4    too staticky.
5    Q.  Was Miss Freebery observed during that school
6    year?
7    A.  I don't think I did an observation on her but
8    she would have been observed.
9    Q.  Why do you say she would have been?
10   A.  Every teacher gets observed every year.
11   Q.  How many times?
12   A.  Once, twice.  Once or twice.  A non-tenured
13   teacher would get observed more than a tenured teacher.
14   So I'm assuming, although I don't know for sure, that
15   Janay would have had one.
16   Q.  What determines if a tenured teacher gets
17   observed once or twice?
18   A.  The policy is that they would get one
19   observation one year and two observations the second
20   year, and then a performance appraisal.  Am I right on
21   that?
22          MR. WILLOUGHBY:  You can't -- you have to
23   give your best recollection.
24          THE WITNESS:  That's what I think it is.

Wilcoxon
Janet Basara

v.

C.A. # 05-524-SLR

Red Clay Consolidated School District
May 25, 2006

Page 26

1  BY MR. WILSON:
2    Q.   So it's a two-year cycle?
3    A.   It is. And it's usually one per year because of
4  time, it just takes a long time to do them.
5    Q.   Are you aware of any negatives or
6  recommendations on Miss Freebery's observations from
7  that year?
8    A.   No, I am not aware of any.
9    Q.   Were you aware from any source that Miss
10  Freebery arrived late for morning duty at any time
11  during that school year?
12    A.   I was not until Richard made his documentation.
13    Q.   If she had been late for morning duty would she
14  have been required to sign in anywhere?
15    A.   If she was late?
16    Q.   Yeah.
17    A.   No, we didn't have a sign-in in the morning for
18  teachers.
19    Q.   So they could just come in whenever they wanted?
20    A.   No. They were due in before the students. 7:30
21  the teachers needed to be in the building; 7:45 the
22  students came in.
23    Q.   How do you keep track of teachers that came in
24  late?

Page 27

1    A.   We assumed they were there for the kids,
2  otherwise the kids would tell us there is no teachers
3  here and that has happened. We have a very professional
4  staff. It wasn't like we had to keep track of them.
5    Q.   If a teacher does come in late, is -- strike
6  that.
7    A.   If a teacher --
8        MR. WILLOUGHBY:   There is no question
9  pending. Let him ask you a question.
10  BY MR. WILSON:
11    Q.   If the teacher is going to be in late, is she
12  required to call in and report in that she's going to be
13  late?
14    A.   Yes.
15    Q.   Okay.
16    A.   So we could get coverage for the class.
17    Q.   And who is the teacher supposed to call?
18    A.   The secretary.
19    Q.   Is a record kept of this?
20    A.   No record kept, no. We just find a person to
21  cover the class at that time.
22    Q.   Okay. So if a teacher comes in late and doesn't
23  call in, then they would be in violation of the policy,
24  correct?

Page 28

1    A.   Yes.
2    Q.   And if Miss Freebery came in late and didn't
3  call, then she would have violated the policy, correct?
4    A.   I don't know if you would call it a policy or a
5  procedure. It was in order to make sure the students
6  were covered.
7    Q.   It would have been a violation of the rules?
8    A.   Practice.
9    Q.   Practice. Okay. Okay. What's the appropriate
10  form of discipline for an instance such as this that a
11  teacher doesn't call in but is late?
12    A.   Typically what I would do is talk with the
13  person, find out what's going on, work with them, and
14  ask that it not happen again.
15    Q.   What would happen if it did happen again?
16    A.   If it happened repeatedly there would be a
17  written reprimand.
18    Q.   Is a written reprimand, is that a letter that's
19  put in an employee's file?
20    A.   Yes.
21    Q.   Is this a form of discipline?
22    A.   Yes.
23    Q.   As the acting principal if you get reports like
24  this, is it your duty to investigate the report?

Page 29

1    A.   Yes. Except that any teacher could say anything
2  about another teacher. So that doesn't make it true.
3    Q.   Exactly.
4    A.   And what I asked Richard to do was to tell me if
5  it happened again and he never did. So I assumed it
6  never happened again.
7    Q.   How would you, if a teacher does say something
8  about another teacher, you said it doesn't necessarily
9  make it true, how do you determine if it's true or not?
10    A.   Well, we sit down and have a fact-finding, have
11  a conflict resolution and we have to make some decisions
12  on what did happen, who said what. It's a conference.
13    Q.   So it's just based on your determination of the
14  credibility of the people there?
15    A.   No. It's what they said. What they said
16  happened.
17    Q.   Okay. What if one person says one thing and
18  another person says another thing?
19    A.   Are you insinuating the comments from Richard
20  about --
21    Q.   I'm not insinuating anything.
22    A.   Well, then that's very hypothetical. It's hard
23  to say -- to answer that question.
24    Q.   Well, I mean you do have a policy for resolving

Wilcoxon
Janet Basara

v.

C.A. # 05-524-SLR

Red Clay Consolidated School District
May 25, 2006

Page 34

1    Q.   During that whole school year?
2    A.   Uh-huh.
3    Q.   Just to bring flowers?
4    A.   If even that, yes, maybe two times, brought her
5    flowers, left them in the office.
6    Q.   What about 2003-2004 school year?
7    A.   I don't remember if I saw Bruce in the building.
8    I don't remember if it happened.  I don't.
9    Q.   What about the other guy that you can't remember
10   his name during 2002-2003?
11   A.   Never met him.
12   Q.   How did you know she was dating someone else?
13   A.   I don't know.
14   Q.   Okay.  And were you informed by Mr. Wilcoxon
15   that Mr. Hannah was not following the proper sign-in
16   procedures?
17   A.   Not until he wrote his document.
18   Q.   And that was in December, correct?
19   A.   Yes, but until that point he had never said a
20   word.
21   Q.   Were you informed by Mr. Wilcoxon that
22   Mr. Hannah was frequently at the school to see Miss
23   Freebery?
24   A.   Not until he -- we found the documents.  He

Page 35

1    never said a word.
2    Q.   So you testified you only saw him there two or
3    three times?
4    A.   Uh-huh.
5         MR. WILLOUGHBY:  That was in 2002-2003.
6    She said she wasn't sure about 2003-2004.
7    BY MR. WILSON:
8    Q.   Okay.  Getting back to 2003-2004, how many times
9    did you see him?
10   A.   I don't know.
11   Q.   Five?
12   A.   No.  I don't know if I even saw him once.
13   Q.   Okay.  So if it was true that he was there
14   frequently and you never saw him, that would probably
15   mean he wasn't signing in, correct?
16   A.   No, it would mean I'm busy.  I don't sit in the
17   office and watch who is coming and going.  I'm
18   disciplining students.  I'm in classrooms doing
19   observations.  I'm in the cafeteria.  I'm in assemblies
20   working with teachers, meeting with parents.  So, no, I
21   don't sit and watch who comes and goes.
22   Q.   Did you speak to Miss Freebery about
23   Mr. Wilcoxon's allegations about Mr. Hannah eating
24   breakfast there?

Page 36

1    A.   Yes.
2    Q.   And what did she say?
3    A.   I talked to her about the whole set of
4    documentations.  At that point Richard had already said
5    he exaggerated and some of it wasn't true, and that he
6    wrote it in anger.  And so I said to her anything that
7    is on here needs to stop, if any of this is happening it
8    needs to stop.  And I said the same thing to Richard,
9    that he needed to let me know if it continued and he
10   never told me that it did.  He never brought it back to
11   my attention.  I had to assume that it stopped.
12   Q.   So, if you have a conversation with a teacher
13   and it's been reported they're doing something wrong,
14   and you say don't do it again, they don't do it again,
15   then nothing further happens, correct?
16   A.   Correct.
17   Q.   Okay.  Did you ever see Mr. Hannah eating
18   breakfast at school?
19   A.   No.
20   Q.   With Miss Freebery?
21   A.   No.
22   Q.   Does Skyline or Red Clay have a policy on
23   teachers leaving their class while class is in session?
24   A.   Teachers would not leave a class unsupervised.

Page 37

1    Q.   So does that mean if you have to leave to go to
2    the restroom or something you have to get a teacher to
3    come cover for you?
4    A.   Yes.
5    Q.   In the context of team teaching, would it be
6    improper for a teacher to leave a class without telling
7    the other teacher that she was leaving?
8    A.   I guess that would be between the two teachers
9    and what they normally worked out.
10   Q.   Were you ever made aware that Miss Freebery left
11   her classes?
12   A.   No, not until the documentation.  It was never
13   mentioned before.
14   Q.   If a teacher is going to leave their class for
15   an extended period of time, are they required to get
16   that leave approved?
17   A.   Yes.
18   Q.   And who does the approval?
19   A.   Myself, principal or assistant principal.
20   Q.   During the 2002-2003 school year did Miss
21   Freebery ever have an extended leave approved?
22   A.   I don't know which year it was but I know one
23   year one time she asked to go watch her daughter in a
24   swimming session.

A-0276

10 (Pages 34 to 37)

Wilcoxon                                    v.                    Red Clay Consolidated School District
Janet Basara                      C.A. # 05-524-SLR                              May 25, 2006

Page 30

1   these things, correct?
2   **A.  Conflict resolution.**
3   Q.  So I'm saying if you have one person saying one
4   thing and another person saying another thing how do you
5   resolve that conflict?
6          MR. WILLOUGHBY:  You're concluding in your
7   hypothetical she has no outside information herself,
8   like she's heard comments --
9          MR. WILSON:  Well, I'm trying to find out
10  does she base it on outside information.
11         MR. WILLOUGHBY:  I think that's what her
12  problem is.  I think you're giving her a hypothetical
13  that just says it's only he says she says, versus the
14  fact that she has confirmation confirming information
15  from the outside.
16         MR. WILSON:  But she can tell me that.
17         MR. WILLOUGHBY:  Well, to me the question
18  is just said he said, she said.
19         MR. WILSON:  Right.  And I said how do you
20  resolve that.
21         MR. WILLOUGHBY:  I want to make sure your
22  question was broad enough to include outside information
23  she had.
24         THE WITNESS:  I would look for

Page 31

1   confirmation.  I would investigate in some way.  I would
2   try to figure out what things I can figure out and what
3   I will not be able to figure out.  If things were said
4   in private then I might not be able to figure that out.
5   If in this case with coming in to the gym a minute or
6   two late, that would be coming in a side door that I
7   wouldn't have seen her come in the front door to see, her
8   gym locker room was down below.
9   BY MR. WILSON:
10  Q.  Earlier you mentioned Miss Freebery's
11  boyfriends, in particular Bruce Hannah?
12  **A.  Uh-huh.**
13  Q.  Was there a policy at Skyline Middle School
14  during either of the two years in question, 2003 -- 2002
15  through 2003 or 2003 through 2004, that pertained to
16  visitors at the school?
17  **A.  If there is a visitor at the school they must**
18  **sign in in the morning or sign in when they come in and**
19  **sign out.  The sign-in is in the office.**
20  Q.  And are records kept of this?
21  **A.  Not that are left any more.  We leave them there**
22  **for a year and then they go.**
23  Q.  If a teacher receives a visitor without proper
24  sign-in and sign-out is the teacher subject to any type

Page 32

1   of discipline?
2          MR. WILLOUGHBY:  Are you saying the teacher
3   because the visitor didn't sign?
4          MR. WILSON:  The teacher.
5          MR. WILLOUGHBY:  Okay.  You can answer
6   that.
7          THE WITNESS:  No, not that I have ever had
8   to do before.
9   BY MR. WILSON:
10  Q.  What would happen if a visitor didn't sign in?
11  **A.  Well, I would ask them to sign in.  If I knew**
12  **there was a visitor in the building I would go get the**
13  **visitor and bring them down to sign in.**
14  Q.  Would you talk to the teacher that the visitor
15  was visiting and inform them that they need to tell
16  their visitors to sign in?
17  **A.  Again, that's pretty hypothetical.  I mean there**
18  **could be people whose husbands come in to see them,**
19  **whose children come in to see them during the day.**
20  Q.  They don't have to sign in?
21  **A.  Well, they would sign in.  That would be the**
22  **normal procedure but I can't say that that's never**
23  **happened that somebody didn't come in at 3 o'clock to**
24  **see a teacher.**

Page 33

1   Q.  Are teachers typically permitted to eat
2   breakfast during class hours?
3   **A.  No.**
4   Q.  Why not?
5   **A.  It would be unprofessional.**
6   Q.  And what would be your response if you got a
7   report that a teacher was doing that?
8   **A.  You should be teaching, not eating breakfast.**
9   Q.  So you just have a verbal conversation with
10  them?
11  **A.  Again, any time I would do any sort of**
12  **disciplining on any issue it would be verbal until it**
13  **became a repeated problem then it would be a written**
14  **reprimand.  It didn't ever get to that -- I mean it**
15  **rarely got to that.  Most people just stopped, if there**
16  **was a problem.**
17  Q.  During the 2002-2003 school year did you ever
18  see Bruce Hannah at school?
19  **A.  He brought her flowers a couple times into the**
20  **main office.**
21  Q.  So did you see him any other times?
22  **A.  No.**
23  Q.  So two, maybe three times?
24  **A.  Uh-huh.**

A-0275

Wilcox & Fetzer, Ltd.          Professional Court Reporters          (302)655-0477

Page 38

1    Q.  And was she team teaching with Mr. Wilcoxon at
2 the time?
3    A.  Yes.
4    Q.  Would have Mr. Wilcoxon been notified of this?
5    A.  By her.
6    Q.  So you wouldn't have given any notification?
7    A.  No. No. Normally the procedure would be if a
8 teacher is going to leave or is asking permission to
9 leave, they usually come to us with a plan. I'd like to
10 go see this or I'd like to do that or I have a doctor's
11 appointment and so and so is going to cover my class.
12    Q.  Okay. Are there records of this?
13    A.  I doubt it. Not now.
14    Q.  When did Miss Freebery first come to you with
15 her complaints about the alleged inappropriate comments
16 that Mr. Wilcoxon had made to her?
17    A.  The day that she saw that he was documenting her
18 and she came up in tears and said she couldn't believe
19 that he would do that because she had put up with so
20 much and didn't want to get him in trouble for all the
21 things that he had been saying to her and here he is
22 documenting her. She was in shock and she was upset and
23 she said he had been making inappropriate comments.
24    Q.  What did she say that he had said?

Page 39

1    A.  At that particular meeting or in general those
2 three days?
3    Q.  At any time.
4    A.  Okay. In general during those three days
5 eventually when she calmed down we asked the question,
6 what has he said. And at that time she stated several
7 comments that he had made, some of them of a sexual
8 nature. She looked really good in those pants, made her
9 feel uncomfortable. She had asked Bruce -- he had said
10 something to Bruce about congratulations, you're a daddy
11 again. She had said -- he had said something to some
12 teachers that she was pregnant because she had to keep
13 going to the bathroom, and all of this was inappropriate
14 to her and she had asked him to stop and he kept it up.
15    Q.  When did she ask him to stop?
16    A.  Each time. According to her. I wasn't there.
17    Q.  Do you know when the comments were made?
18    A.  When he made those comments to her?
19    Q.  Yes.
20    A.  I know one of them. I heard it.
21    Q.  Okay. Which one was that?
22    A.  He had won a poinsettia at our A-plus drawing
23 for the teachers at a meeting, and that afternoon or the
24 next day we had a faculty party, staff Christmas party

Page 40

1 at Miss Freebery's house, and he pointed out the
2 poinsettia was there at her class and said he had given
3 it to her because she was the closest thing he had to a
4 wife and a bitch.
5    Q.  And he said this directly to you?
6    A.  He said this to a group of people who were in
7 the foyer as he was pointing to the flower in the foyer.
8 I was standing on the steps. Everybody turned around
9 and moved away. It was an uncomfortable comment.
10    Q.  Okay. You have mentioned a couple times about
11 the notes that Mr. Wilcoxon kept on Miss Freebery?
12    A.  Uh-huh.
13    Q.  I am going to refer to that as a journal, okay?
14    A.  Okay.
15    Q.  And I mean obviously you're aware of the
16 journal, correct?
17    A.  Yes. Uh-huh.
18    Q.  And at some point you came into possession of
19 the journal, correct?
20    A.  Yes.
21    Q.  Can you tell me how that happened?
22    A.  Janay brought it upstairs the morning that it
23 was found.
24    Q.  And upstairs means to your office?

Page 41

1    A.  Yeah. I'm sorry, yes.
2    Q.  And what did she say?
3    A.  She couldn't believe that he was doing this, why
4 would he write all these lies, why would he do this?
5 What was his point? She had put up with so much from
6 him and she couldn't believe that he was going to do
7 something like this. Why was he trying to do this? She
8 had absolutely no idea.
9    Q.  What did she think he was trying to do?
10    A.  We didn't know. Why would you keep a log like
11 that? It didn't make any sense.
12    Q.  Did she say how she got the journal?
13    A.  Yes.
14    Q.  How did she get the journal?
15    A.  Mr. Wilcoxon was absent that day, called in
16 sick. He did not have lesson plans and Mr. Rumford went
17 to try to find lesson plans. If a teacher is absent
18 they often leave them on their desk. We have emergency
19 plans in our file. When Mr. Rumford looked for those
20 they were outdated by two years, so they couldn't be
21 used. He went downstairs into Mr. Wilcoxon's office
22 hoping that he had left plans on his desk. He didn't.
23 But there was a notepad there. The substitute was with
24 Mr. Rumford, and he said here, just get kids to sign in

Wilcoxon                                                    Red Clay Consolidated School District
Janet Basara                    v.                         May 25, 2006
                            C.A. # 05-524-SLR

Page 42

1  at this point, we have kids coming in, so sign the kids
2  in and we'll get something going here. So he had to
3  talk to Miss Freebery about getting a lesson and what
4  was going to happen with the kids that day. There were
5  no plans.
6     Q.  So you thought those were lesson plans?
7     A.  No, he took the book to get the kids to sign in.
8  Teachers should have a class list so that a substitute
9  would know who is supposed to be in class, otherwise you
10 could have half your class missing and you'd not even
11 know it.
12    Q.  Okay. Wouldn't Mr. Rumford have access to the
13 class list on his computer?
14    A.  Not on -- he might have been able to pull that
15 up eventually but, as I said, I have never seen a
16 teacher not leave plans in some form.
17    Q.  Okay.
18    A.  And you need a class list. So it would be
19 assumed it would be on your desk. You have a record
20 book where you keep grades, that could have been on his
21 desk and that would be the quickest way to find out.
22    Q.  So if --
23    A.  You're looking for lesson plans, you're looking
24 for bell schedule, you're looking for class list. You

Page 43

1  need those all to be together. For somebody to pull
2  those together when the students are coming in takes
3  time. It would be assumed it would be on the desk or in
4  a mailbox for the substitute.
5     Q.  So I don't understand if he got this information
6  for the substitute how it ended up with Miss Freebery?
7     A.  Because she was the other teacher in the room.
8  They were team teaching at that point in the same gym.
9     Q.  If they were team teaching wouldn't Miss
10 Freebery have lesson plans --
11    A.  No. She had her list of students, he had his.
12 In the gym they could draw the door. But without a
13 substitute there -- without a lesson plan there then I'm
14 assuming, and you can ask Mr. Rumford, he was looking
15 for some direction on what the kids were working on,
16 what they were doing so they could continue.
17    Q.  But it wouldn't have been Miss Freebery's
18 obligation to teach Mr. Wilcoxon's class?
19    A.  No, it would not. No.
20    Q.  How did she end up with the notebook?
21    A.  He took the notebook, had the students sign in,
22 and then told the substitute to give them to Miss
23 Freebery and that way we could figure it if anybody was
24 missing, any students that cut class, everybody was

Page 44

1  there or not.
2     Q.  How could you have figured that out?
3     A.  With his record book. We wouldn't be able to
4  figure it out that day unless we were going to go
5  through a lot of trouble to do that.
6     Q.  Why would it have been Miss Freebery's
7  responsibility to figure that out?
8     A.  It wouldn't have been her responsibility
9  necessarily but she was available. She was there
10 and . . .
11    Q.  But the substitute was available, too, correct?
12    A.  Uh-huh.
13    Q.  Couldn't the substitute double-check the list?
14    A.  I suppose it could happen that way.
15        MR. WILLOUGHBY:  What list are you
16 referring to?
17        THE WITNESS:  There wasn't a list at that
18 point. That was the problem.
19 BY MR. WILSON:
20    Q.  Then how can you -- maybe I missed something
21 then. I'm trying to figure out why Miss Freebery got
22 the notebook.
23    A.  You'll have to ask Mr. Rumford. All I know is
24 she did have the notebook. I'm not sure what that whole

Page 45

1  series of -- that sequence was about.
2     Q.  As a teacher does Mr. Wilcoxon have a right to
3  keep a journal in his desk?
4     A.  Does he have a right to? I suppose he does.
5     Q.  Okay. Does the teacher have certain rights to
6  privacy in their desks?
7        MR. WILLOUGHBY:  In their desks or on top
8  of their desks?
9  BY MR. WILSON:
10    Q.  Either.
11    A.  The -- we have a set of keys that would open any
12 room and we would need to do that in an emergency and
13 the case that somebody didn't leave lesson plans, in the
14 case that we're looking for a lost item, so the gym has
15 the -- for the gym office which was his, there is a key
16 for the spare -- for the administrators to go in,
17 custodians go in.
18    Q.  So is your answer no, that a teacher doesn't
19 have a certain right to privacy to items that they leave
20 in or on their desk?
21        MR. WILLOUGHBY:  Is that a legal question
22 you're saying?
23        MR. WILSON:  I'm asking her just from her
24 perspective as a acting principal.

A-0278

Wilcox & Fetzer, Ltd.            Professional Court Reporters            (302)655-0477

Wilcoxon                                                    Red Clay Consolidated School District
Janet Basara                    v.                                         May 25, 2006
                          C.A. # 05-524-SLR

Page 46

1        MR. WILLOUGHBY: You can answer the best
2   you can.
3        THE WITNESS: Say the question again.
4   BY MR. WILSON:
5        Q.  Does a teacher have a certain right to privacy
6   in things that he leaves in or on his desk?
7        A.  Every teacher has a locked file cabinet or
8   closet where they would keep valuables.  I have never
9   come across a situation, so it's hard for me to say
10  hypothetically, privacy and your desk, you're at school,
11  you're at work, you're in Red Clay, that's their
12  building, you know that a teacher or custodian -- I'm
13  sorry, an administrator or custodian could go in there
14  any time.  So private. . .
15       Q.  Would you be offended if somebody went in your
16  desk and started looking?
17       MR. WILLOUGHBY: I'll object.  You're
18  saying in the desk.  This is something on top of the
19  desk.
20       MR. WILSON: Even on top, if somebody went
21  to your desk and starting rifling through your papers
22  and through your books.
23       MR. WILLOUGHBY: You're saying
24  hypothetical, right?  You're not saying for some

Page 47

1   business reason they went to look for something, you're
2   saying hypothetically they went into her desk and,
3   quote, rifled it, is that what you're asking?
4        MR. WILSON: That's what I'm asking.
5        THE WITNESS: Now there are times when if I
6   had not been in the building and there were meetings, I
7   would send someone in and say look on my desk, it's the
8   yellow folder on the right or whatever, if they're
9   looking for a paper.
10  BY MR. WILSON:
11       Q.  But if you didn't instruct them to do that?
12       A.  That is -- that's just -- I can't say.  I don't
13  have anything private in my desk that I don't want
14  somebody to see.
15       Q.  So your answer is no?
16       A.  My answer would be I wouldn't expect to see
17  anything that's supposed to be private and kept from
18  everybody.
19       Q.  Okay.  So can you answer my question?
20       A.  Not really.  Say it again.  Let me try it again.
21       Q.  Does the teacher have a right to privacy for
22  things that they keep in or on top of their desk?
23       A.  Again, I have to say that every teacher has a
24  locked space.  I guess if you're keeping something

Page 48

1   private you would want it in a locked space, you would
2   want it in your locked desk or your locked closet.
3        Q.  So your answer is no?
4        A.  No.
5        MR. WILLOUGHBY: It's correct that your
6   answer is no, correct?
7        THE WITNESS: Correct.
8        MR. WILLOUGHBY: Just didn't want the yes
9   and no to get confused on the transcript.
10  BY MR. WILSON:
11       Q.  When Miss Freebery gave you the journal did she
12  request that you do something about it?
13       A.  No.  She was just crying and in shock and
14  disbelief and saying these are lies and why would he do
15  this.
16       Q.  Is there a rule or policy against keeping a
17  journal like this?
18       MR. WILLOUGHBY: I object.  It's been asked
19  and answered.  You can answer again.
20       MR. WILSON: I don't think I did ask that.
21       MR. WILLOUGHBY: I think you did but she
22  can answer again.
23       THE WITNESS: No, not a rule or policy.
24  What I told Mr. Wilcoxon was, or asked him was, why

Page 49

1   didn't you just talk to her?  If she was coming in late
2   and that was bothering you why didn't you say something?
3   If she was asking you to do something you didn't want to
4   do why didn't you just say something to her?  You saw
5   her every day.  Why wouldn't you just speak to her about
6   that?  Why would you keep a log?  Especially then tell
7   me that the log is fabricated in some way, that it's
8   exaggerated and that some parts aren't even true.  What
9   would be the point of that?  So this log, that's what
10  I'm saying, that this log didn't make a whole lot of
11  sense.
12  BY MR. WILSON:
13       Q.  Okay.  But there is no rule against it?
14       A.  No.
15       Q.  All right.  And you requested a meeting with
16  Mr. Wilcoxon that day, correct?
17       A.  It would have been the following day, the 16th.
18       Q.  The following day?
19       A.  The following day.
20       Q.  And that was December 16th?
21       A.  Yes.  He was absent the 15th and that's what
22  started all of that.
23       Q.  Okay.
24       MR. WILSON: I'd like to have this marked.

Wilcoxon                          v.              Red Clay Consolidated School District
Janet Basara              C.A. # 05-524-SLR                        May 25, 2006

Page 50

1     (Basara Deposition Exhibit No. Basara-1 was
2   marked for identification.)
3         MR. WILLOUGHBY: I just want to say for the
4   record this is the first time we have seen this note and
5   the first time that Miss Freebery has had a chance to
6   see it. She says it's not her writing.
7         MR. WILSON: I wasn't going to ask Miss
8   Freebery if it was her writing.
9         MR. WILLOUGHBY: Well, I know, but you made
10  a representation --
11        MR. WILSON: Well, Barry, I think right now
12  you're getting to the point where you're coaching your
13  witness.
14        MR. WILLOUGHBY: I think it's inappropriate
15  for you to make representations like that.
16        MR. WILSON: I made no representations at
17  all.
18        MR. WILLOUGHBY: You did, in your
19  pleadings, and then withhold this document from us.
20        MR. WILSON: I didn't withhold it. I told
21  Debbie I would give it to you.
22        MR. WILLOUGHBY: I think it's
23  inappropriate.
24        MR. WILSON: It was included in our

Page 51

1   production but it was illegible.
2         MR. WILLOUGHBY: All we got, no, it wasn't
3   legible, it was totally black, what we got, but we asked
4   for it and we're first seeing it now. Your
5   representation throughout the case was this was Janay's
6   handwriting and it's not.
7         MR. WILSON: How do you know it's not?
8         MR. WILLOUGHBY: I just asked her.
9         MR. WILSON: Right, and you're coaching
10  your witness.
11        MR. WILLOUGHBY: I think it's
12  inappropriate.
13        THE WITNESS: I think it's the secretary's.
14  And I believe this happened when Rich was -- Richard,
15  I'm sorry, was out the morning of the 16th, he left the
16  building during his first plan, which was when I wanted
17  to speak to him. This looks like one of the secretaries
18  who wrote that. I don't know where she put it, in his
19  mailbox, perhaps. I'm not sure where it was found.
20  BY MR. WILSON:
21    Q. So it's your testimony that this is not Miss
22  Freebery's writing?
23    A. It doesn't look like her writing. It looks like
24  a secretary.

Page 52

1    Q. Did you instruct your secretary to tell
2   Mr. Freebery -- or Mr. Wilcoxon that --
3    A. When he came in I asked her to say when you --
4   if you see him come in, let him know I need to talk to
5   him. So I guess she took it upon herself to put a note
6   in his box.
7    Q. Okay. Did he come to see you that day?
8    A. Yes, we did talk on the 16th.
9    Q. Okay. Who was at that meeting?
10   A. Mr. Rumford and myself.
11   Q. Do you want to take a break?
12   A. No, I'm fine.
13        MR. WILLOUGHBY: We'll take just about five
14  minutes.
15        MR. WILSON: Yeah. That's good.
16        MR. WILLOUGHBY: We can't discuss the
17  testimony.
18        THE WITNESS: Okay.
19        (Recess taken)
20  BY MR. WILSON:
21    Q. Are you ready, Miss Basara?
22    A. Yes.
23        MR. WILSON: Are you ready, Barry?
24        MR. WILLOUGHBY: Yes. Sure. Go ahead.

Page 53

1   BY MR. WILSON:
2    Q. Okay. We'll get back to the December 16th
3   meeting in a second, but I just wanted to go back and
4   touch on something that you testified to earlier.
5        Can I have this marked as Basara-2?
6        (Basara Deposition Exhibit Basara-2 was
7   marked for identification.)
8   BY MR. WILSON:
9    Q. Okay. Can you look at that and let me know when
10  you're done?
11   A. All right.
12   Q. Okay. Can you tell me what this is?
13   A. It's a performance appraisal for Richard's first
14  year.
15   Q. Okay. And that is the 2002-2003 school year,
16  correct?
17   A. Yes.
18   Q. Okay. And you testified earlier that he had
19  issues with his management of the classroom?
20   A. In that particular year?
21   Q. Yes.
22   A. The things that I was seeing were discipline
23  issues where he was sending students out of the class
24  referred for discipline, timeout room, writing students

A-0280          14 (Pages 50 to 53)

Wilcoxon
Janet Basara

v.

C.A. # 05-524-SLR

Red Clay Consolidated School District
May 25, 2006

Page 54

1  up for misbehavior.
2  Q.  Okay. And under Roman Numeral II, organization
3  and management of classroom, what was Mr. Wilcoxon's --
4  A.  Effective.
5  Q.  -- grade?
6  A.  Effective.
7  Q.  It's not needs improvement?
8  A.  Correct.
9  Q.  All right. Back to the December 16th meeting --
10  A.  Uh-huh.
11  Q.  -- you said Mr. Rumford was at the meeting; you
12  were at the meeting?
13  A.  Uh-huh.
14  Q.  Mr. Wilcoxon was at the meeting?
15  A.  Yes.
16  Q.  Was anybody else?
17  A.  No.
18  Q.  There was no union representative at the
19  meeting?
20  A.  No.
21  Q.  How much notice of the meeting was Mr. Wilcoxon
22  given?
23  A.  I don't know.
24  Q.  Was it that day?

Page 55

1  A.  Yes. Well, it would have been the day before,
2  somebody would have -- Mr. Rumford had said to him we'll
3  talk about this tomorrow. We have to talk about this
4  tomorrow.
5  Q.  I thought you testified Mr. Wilcoxon wasn't at
6  school?
7  A.  He wasn't. It was in an e-mail or a phone call.
8  I think Mr. Rumford called him to tell him that the
9  documentation had been found.
10  Q.  Okay.
11  A.  And that we'll need to talk about it.
12  MR. WILLOUGHBY: I want to be clear, which
13  meeting are we talking about now?
14  MR. WILSON: December 16th.
15  MR. WILLOUGHBY: December 16th?
16  MR. WILSON: Yes.
17  THE WITNESS: And then he was not there
18  during his first planning period which would have been
19  the time that we would have expected to be able to talk
20  to him.
21  BY MR. WILSON:
22  Q.  Was the notice of the meeting in writing?
23  A.  No, but typically it isn't in writing.
24  Q.  Why is that?

Page 56

1  A.  Because we talk to teachers all day long. We
2  have meetings with teachers and parents and students all
3  day long.
4  Q.  And what did you discuss at the meeting?
5  A.  The documentation, and in that particular
6  meeting I think Michael was to just figure out what this
7  was, why he was keeping it, what were the problems that
8  he now was having with Miss Freebery, where this all
9  came from, totally out of the blue, shock to us. We
10  didn't know that this was a problem. He had never
11  mentioned it, never.
12  Q.  What did he say the problems were?
13  A.  He said that he had overheard her talking about
14  him, that she had said that he was difficult to work
15  with, and that he -- he got advice from somebody to
16  document everything that he could, just to cover his
17  ass. Those were his words.
18  Q.  And that's why he started keeping the journal?
19  A.  Yes.
20  Q.  Did you ask him who told him to start keeping
21  the journal?
22  A.  Yes. Along with a whole lot of other questions
23  about why he kept the journal; why did he feel he had to
24  cover himself; who would recommend to document rather

Page 57

1  than just speak to her.
2  Q.  Okay. Why was it important that you find out
3  who?
4  A.  It wasn't important.
5  Q.  Okay. You said why he kept the journal, what
6  did he answer when you asked him that?
7  MR. WILLOUGHBY: Objection. Asked and
8  answered.
9  BY MR. WILSON:
10  Q.  You can answer.
11  MR. WILLOUGHBY: You can answer again, if
12  you want but --
13  THE WITNESS: Okay. Say the question
14  again, please.
15  BY MR. WILSON:
16  Q.  You said that you asked him why he kept the
17  journal?
18  A.  Uh-huh. And he said he had overheard -- someone
19  had told him that he was difficult -- that he was -- I'm
20  sorry. Someone had told him that they heard Janay say
21  that he was difficult to work with, and he talked to a
22  group of friends and someone advised him to cover his
23  ass.
24  Q.  Had you read the journal prior to this meeting?

A-0281

15 (Pages 54 to 57)

Wilcoxon                                          v.                Red Clay Consolidated School District
Janet Basara                              C.A. # 05-524-SLR                            May 25, 2006

Page 58

1    MR. WILLOUGHBY: Just to be clear, this is
2  December 16th?
3        MR. WILSON: December 16th.
4        THE WITNESS: Then I would have seen it on
5  the 15th.
6  BY MR. WILSON:
7    Q.  And you read the allegations in the journal?
8    A.  Yes.
9    Q.  And had you met with Miss Freebery prior to this
10  meeting?
11   A.  Yes.
12   Q.  Was Mr. Rumford at that meeting?
13   A.  Yes.
14   Q.  What happened at that meeting?
15   A.  Well, there were several meetings on the 15th,
16  16th and 17th. So the meeting that I had with Janay was
17  to clarify what had happened, if any of this was true,
18  if any of -- what was going on with this, and basically
19  she said no, this was -- this was fabricated. This
20  wasn't true. Why was he lying? Why would he do all of
21  this? She put up with so much. She was trying not to
22  get him into trouble and to deal with it herself, and so
23  she never said a word about the things that he was
24  saying to her, so she just couldn't understand it.

Page 59

1    Q.  So she denied everything that was in the
2  journal?
3    A.  Uh-huh. And then in the meeting when we had
4  Mr. Wilcoxon he agreed, he wrote it in anger, he
5  exaggerated and some of the stuff was not true. Those
6  were his words.
7    Q.  Did Miss Freebery ever admit to you that she was
8  often late?
9    A.  No. No.
10   Q.  Never?
11   A.  She did not admit that she was often late, no.
12  Whether she came in a couple minutes late, she didn't --
13  we didn't get into that, but she was never late when the
14  kids were there and that was on the paper.
15   Q.  That's what she said?
16   A.  Yes.
17   Q.  Did you do any further investigation into that?
18   A.  Well, how could I?
19   Q.  I don't know. Could you talk to the students
20  perhaps? Did you talk to the students?
21   A.  No.
22   Q.  Why not?
23   A.  What would I say to a student? Did you see Miss
24  Freebery come in late? I wouldn't go to a student over

Page 60

1  that, especially after Mr. Wilcoxon said that it was
2  fabricated and it was exaggerated.
3    Q.  He said everything in the journal was
4  fabricated?
5    A.  He agreed that there were exaggerations, he
6  wrote it in anger, and that some of it was not even
7  true.
8    Q.  Did you ask him specifically --
9    A.  Yes.
10   Q.  -- the things that weren't true?
11   A.  Yes.
12   Q.  What did he say?
13   A.  In particular he pointed out that she -- he had
14  said something on the journal about she --
15   Q.  I'll tell you what. Why don't we look at the
16  journal and that might help you go through it a little
17  better.
18   A.  Okay.
19   Q.  I apologize. I was here by myself last night so
20  I still have your sticker on there.
21       MR. WILLOUGHBY: Why don't you just refer
22  to it as Wilcoxon-1?
23       MR. WILSON: Off the record.
24       (Discussion held off the record.)

Page 61

1        (Basara Deposition Exhibit Basara-3 was
2  marked for identification.)
3        THE WITNESS: This one in particular --
4        MR. WILLOUGHBY: Wait. Are you ready now?
5        THE WITNESS: I'm just saying on one in
6  particular that I was looking for.
7  BY MR. WILSON:
8    Q.  Okay.
9    A.  He said -- he wrote --
10       MR. WILLOUGHBY: Let's get to the right
11  page. Bates number is 00760?
12       THE WITNESS: Yes.
13  BY MR. WILSON:
14   Q.  And what's the date of the --
15   A.  It is the third little bullet down under
16  November 24th continued.
17   Q.  Okay.
18   A.  Arrived at 6:22 for choice open house. Teachers
19  were supposed to arrive at 6 p.m. leaving me to set up
20  everything, and that in particular Janay said I had set
21  everything up beforehand and you know it. It was all
22  ready before I left. You know that. Why would you
23  write that? And he said yes, that's true.
24   Q.  Okay. So he fabricated this one?

A-0282

16 (Pages 58 to 61)

Wilcoxon                                    v.          Red Clay Consolidated School District
Janet Basara                        C.A. # 05-524-SLR                    May 25, 2006

Page 62

1   A. Uh-huh.
2   Q. Any others?
3   A. That was the one I remember off the top of my
4   head.
5   Q. Okay. Can you go through and read this and tell
6   me the other ones?
7   A. As far as lates, he said yes, he was
8   exaggerating.
9   Q. Well, how about the very first one, September
10  8th: Janay was so late to school she missed her first
11  two classes, first planning and half of third class?
12  A. Yeah. I asked her about that. She said she
13  didn't remember. I didn't remember that. I mean if she
14  had missed classes we would have had to have a
15  substitute or she would have called in.
16  Q. It says the office called a sub in for her?
17  A. Okay.
18  Q. So did he admit to fabricating this?
19  A. I don't know that -- I can't remember which
20  specific ones he did except for that one in particular I
21  did remember, but I can't tell you which ones he said
22  were and were not, but he generally admitted that this
23  was not the whole truth and so then that becomes really
24  hard to say that any of it is true. He said he wrote it

Page 63

1   in anger, and he was upset with her because she had said
2   he was difficult to work with.
3   Q. But you didn't endeavor to find out which ones
4   were fabricated and which ones were exaggerated and
5   which ones were true, correct?
6   A. Well, we were talking about the whole paper.
7   Q. Uh-huh.
8   A. The whole log. He admitted - and I think I have
9   said this about four times now - he admitted that there
10  were fabrications in here.
11  Q. Right.
12  A. That this was exaggerated. So then the whole
13  thing becomes --
14  Q. Did you ask him if anything in here was true?
15  A. He was -- he was saying that generally what she
16  was doing was coming in late. She said she wasn't. It
17  becomes he said she said. If he had told me this I
18  would have been able to go down and look, if need be, or
19  to talk to her about it, which is what I would have
20  done, or talked to him.
21  Q. So this was an instance of he said she said?
22  MR. WILLOUGHBY: Are you talking about the
23  stuff in the log?
24  MR. WILSON: Yeah, during this meeting and

Page 64

1   the stuff in the log.
2   THE WITNESS: That's two questions. He
3   said, she said is on here. He admitted that this had
4   fabrications and exaggerations.
5   BY MR. WILSON:
6   Q. Okay.
7   A. That's it.
8   Q. Okay. So you didn't endeavor to find out if any
9   of this was true?
10  MR. WILLOUGHBY: I think it's been asked
11  and answered.
12  MR. WILSON: If she can answer.
13  THE WITNESS: I don't know how many more
14  times I have to say that.
15  MR. WILLOUGHBY: She's been through this.
16  THE WITNESS: He admitted that this was not
17  truthful.
18  MR. WILSON: That nothing in here was true?
19  He said nothing in here was true?
20  THE WITNESS: He said he exaggerated. He
21  wrote it in anger. So what -- what would you want me to
22  do with that I guess? What do you want me to do with
23  it? He admitted that it wasn't truthful. And I asked
24  him at that point, please tell me if it happens again.

Page 65

1   BY MR. WILSON:
2   Q. Why would it be up to him to see if it happens
3   again? Is that --
4   A. Would you like me to stand in her doorway and
5   wait for her to come in every morning?
6   Q. Was that his job, though?
7   A. No, but he was the one taking offense at it. He
8   was the one claiming this all happened.
9   Q. Well, if he said the whole thing was a big lie
10  then why did you tell him if it happens again, let me
11  know?
12  A. Because if it happened again I would want to
13  know.
14  Q. But according to your testimony he said that it
15  never happened in the first place?
16  MR. WILLOUGHBY: That's not what she said.
17  You're twisting her testimony.
18  MR. WILSON: I don't think so.
19  THE WITNESS: Yes, you are. I did not say
20  that --
21  BY MR. WILSON:
22  Q. Okay. What did you say?
23  A. I said that he admitted --
24  MR. WILLOUGHBY: Wait. Hold it. We have

A-0283                  17 (Pages 62 to 65)

Wilcoxon
Janet Basara

v.

C.A. # 05-524-SLR

Red Clay Consolidated School District
May 25, 2006

Page 66

1   been over this about ten times. I am going to let you
2   answer one more time and that's it. Go ahead.
3            MR. WILSON: What I'm trying to find out if
4   she thought anything in here was the truth. She said
5   no.
6            MR. WILLOUGHBY: She's already answered
7   that.
8            MR. WILSON: She said no.
9            MR. WILLOUGHBY: She didn't say there was
10   nothing in here that wasn't true.
11           MR. WILSON: Yes, she did. She said no --
12           THE WITNESS: I didn't know what would be
13   true. He said that he exaggerated, that he fabricated
14   and that he wrote it in anger.
15   BY MR. WILSON:
16       Q.   And my next questioning to you was why didn't
17   you try to find out what was true in here and then you
18   said because it's all exaggeration and fabrication?
19           MR. WILLOUGHBY: That's not what she said.
20   That's not what she said. She said what do you want me
21   to do, go down and stand by the door and watch.
22           MR. WILSON: No. I asked her if she --
23           MR. WILLOUGHBY: Well, the record says what
24   it says.

Page 67

1            MR. WILSON: Yes, it will.
2            MR. WILLOUGHBY: Why don't you go back and
3   find it then?
4            (Record read.)
5   BY MR. WILSON:
6       Q.   Let me see if I can clarify it. Did you think
7   any of this in here was true?
8       A.   I didn't know. He wrote it.
9       Q.   Okay. Did you ask him if anything in there was
10   true?
11       A.   I don't remember that specific question. On --
12   I just don't remember that question.
13       Q.   Would you agree that some of the things that are
14   in here are pretty serious if they are true?
15       A.   Yes.
16       Q.   Do you recall asking Mr. Wilcoxon if any of
17   those things were true, any of the ones that you would
18   have viewed to be serious?
19       A.   I don't remember asking him that specifically.
20       Q.   Which ones would you consider serious? What
21   about on the first page, Bates number C00759, the second
22   bullet point where it says, "mid September, Janay was
23   late and missed her first class. Her girls stayed in
24   the locker room unsupervised. Janay arrived at the

Page 68

1   start of second class."
2            Would you view that as --
3       A.   Extremely serious, yes. Students would have
4   been unsupervised.
5       Q.   And you don't recall if you asked Mr. Wilcoxon
6   about that?
7       A.   No, and I don't know how that would have
8   happened without students letting us know that that
9   happened. So I had questioned whether there was a group
10   of students unsupervised for a whole period.
11       Q.   What about the next one, November 13th, verbally
12   attacked --
13       A.   Jahlil Akil.
14       Q.   -- Jahlil Akil for an inappropriate question,
15   would you view that as serious?
16       A.   That looked like a big exaggeration, one of the
17   exaggerations perhaps. Verbally attacked wasn't really
18   her style to attack kids.
19       Q.   Did you ask Mr. Wilcoxon about that?
20       A.   I can't say that I asked him about anything in
21   there specifically like that.
22       Q.   How about November 19th, left before our last
23   class started to go to the bathroom, did not return
24   until 2:25. Is that serious?

Page 69

1       A.   Left before our last class started. That would
2   have been serious. That would have been a whole class
3   period.
4       Q.   November 24th, not the first bullet point but
5   the second bullet point, Bruce Hannah came in during
6   first class, ate breakfast in front of the kids, yelled
7   at kids while the TV was being hooked up. She was
8   demeaning. Witnessed by Mike Ruth.
9            Is that serious?
10       A.   Yes. If she was eating breakfast during class
11   it would be very serious.
12       Q.   Did you talk to Mike Ruth about that?
13       A.   No.
14       Q.   Why not?
15       A.   To tell you the truth I didn't even really
16   remember that Mike Ruth was any part of a witness to
17   this.
18       Q.   Who is Mike Ruth?
19       A.   A teacher in the school. I'm not sure how Mike
20   would know that because he had the same schedule as
21   Janay.
22       Q.   On the next page, 11-25 --
23       A.   Can I say again that Mike had the same schedule
24   as Janay, so if he was down there and witnessed that he

Wilcoxon                                                  Red Clay Consolidated School District
Janet Basara                        v.                    May 25, 2006
                              C.A. # 05-524-SLR

Page 70

1  wasn't in his class. That made me wonder if that was
2  even a possibility.
3     Q. But you didn't think it was worth even going to
4  talk to Mike about it?
5     A. No, I didn't ask Mike.
6     Q. On the next page, November 25th, Bruce brought
7  breakfast in for her and she ignored class completely,
8  is that serious?
9     A. Yes. If it happened it would be serious.
10    Q. On the next page marked C00761, 12-5, Bruce
11 arrived at 10:05 and stayed the remainder of the day.
12 Would there be any reason for a teacher's boyfriend --
13    A. No.
14    Q. -- to stay the whole day?
15    A. No.
16    Q. So would that be serious?
17    A. Yes.
18    Q. All right. And so then on December 17th you had
19 another meeting? We can put this away now.
20    A. Well, except that --
21       MR. WILLOUGHBY: Go ahead.
22       THE WITNESS: I made a blanket statement to
23 Janay, if any of this is true, if any part of this is
24 true, it needs to stop. It was a verbal reprimand, if

Page 71

1  you want to say, that if any of this, even though we
2  knew from his statements that there were exaggerations
3  and untruths in here, they had been pointed out and
4  agreed to, I said to Janay if there is any part of this
5  it needs to stop.
6  BY MR. WILSON:
7     Q. Okay. And if something similar happened then --
8     A. I asked Rich.
9     Q. -- you would take some disciplinary steps?
10    A. Yes.
11    Q. And nothing like that ever happened?
12    A. Never did.
13    Q. So there was no discipline instituted?
14    A. No. The verbal reprimand would be discipline.
15    Q. Okay. So that's what she got was a verbal
16 reprimand?
17    A. Yes. For any of it possibly happening. It was
18 very broad and general, and that was it. There was no
19 proof because he had admitted that it was exaggerated
20 and written in anger.
21    Q. All right. Then you had another meeting on
22 December 17th, 2003, correct?
23    A. Uh-huh. Yes.
24    Q. And who was at that meeting?

Page 72

1     A. Four of us: Mr. Wilcoxon, Miss Freebery, myself
2  and Mr. Rumford; and the purpose of that meeting was
3  conflict resolution.
4     Q. Okay. Did Mr. Wilcoxon have a union
5  representative of his choice there?
6     A. No.
7     Q. Was he given 48-hours notice of the meeting?
8     A. He doesn't need 48-hours notice.
9     Q. Why is that?
10    A. Because that's if he's going to a district level
11 meeting, not an in-school meeting.
12    Q. Was he given the notice in writing, notice of
13 the meeting in writing?
14    A. I don't remember.
15    Q. Do you know how much time he was given, how much
16 notice he was given before the meeting started?
17    A. I don't know.
18    Q. What happened at this meeting?
19    A. At this meeting my goal was to help the two of
20 them able to work together, to get past this whole
21 issue, and to make it clear what has been said to each
22 of them about each of them so that they both --
23 everybody was on the same page, and to make it clear
24 that it shouldn't happen again.

Page 73

1     Q. All right. Did Miss Freebery say anything at
2  this meeting?
3     A. Yes.
4     Q. What did she say?
5     A. She talked about the comments that he had made,
6  that they were offensive.
7     Q. Is this the first time you heard about it?
8     A. No. The 15th.
9     Q. Okay. Did you tell Mr. Wilcoxon what the
10 comments were?
11    A. Miss Freebery did.
12    Q. She did? And what did she say the comments
13 were?
14       MR. WILLOUGHBY: I think this has been
15 asked and answered a long time ago in the deposition.
16       MR. WILSON: That's what Miss Freebery said
17 in the initial meeting on the 16th. Were they the same
18 comments on the 17th?
19       THE WITNESS: Yes.
20 BY MR. WILSON:
21    Q. Did Mr. Wilcoxon deny the comments?
22    A. No. Actually he acknowledged it.
23    Q. How did he acknowledge it?
24    A. He said, oh, I was just joking, and she opened

Page 74

1   the door. She started talking about when she went on
2   her honeymoon she was on a nude beach, so I thought it
3   was okay. To me that was an acknowledgment that he had
4   said something and that he knew what we were talking
5   about, what she was talking about.
6       Q. Did Miss Freebery demand to know who advised him
7   to keep the journal?
8       A. No.
9       Q. Did you?
10      A. No demands.
11      Q. Did you ask?
12      A. A request, yes, but that was at an earlier
13  meeting, I believe when it was just Mr. Wilcoxon there.
14      Q. Did Miss Freebery make a request at this meeting
15  to know who told him to keep the journal?
16      A. I believe that she asked.
17      Q. Did Mr. Wilcoxon tell her?
18      A. No.
19      Q. Did he say why not, why he wouldn't tell her?
20      A. He wouldn't say why not, no.
21      Q. Did this upset Miss Freebery?
22          MR. WILLOUGHBY: Did what upset Miss
23  Freebery?
24          MR. WILSON: That he refused to tell her

Page 75

1   who told him to keep the journal.
2           THE WITNESS: Minor issue, minor compared
3   to everything else that was going on, absolutely.
4   BY MR. WILSON:
5       Q. Okay. Did you make a statement to Mr. Wilcoxon
6   that you needed to figure out how he and Miss Freebery
7   could finish out the year together?
8       A. I said we have got a long year, we need to
9   figure out how to make this work, and it was December,
10  so it was a long year, and there was huge tension and
11  great upset on both parts. He was very, very upset.
12  She was very, very upset, and so I said, yeah, we got a
13  long year, we got to figure out how to make this work.
14      Q. And did Mr. Wilcoxon ask you about this
15  statement?
16      A. Later he did.
17      Q. Okay. And did you respond you're not tenured,
18  are you?
19      A. No, well, that comment was made in there
20  somewhere. But when he asked me why did I say that, he
21  said maybe I'm reading too much into this, but you said
22  we have a long year, and I said, Rich, yeah, you're
23  reading too much into it. We do have to get this year
24  -- we have a lot of time left this year and you're both

Page 76

1   very, very upset. That's what I was talking about.
2   Summer is a break and you come back and you're
3   refreshed. Hopefully that would have happened.
4       Q. So how did the tenured comment come into play?
5       A. I believe he asked me if this was going to be a
6   problem because he was non-tenured and I said you're
7   non-tenured, just acknowledging you're non-tenured and
8   actually I wasn't sure that he was non-tenured at that
9   point because I knew he had some time in at other
10  schools, didn't really think about it that much.
11      Q. Did you begin consider terminating Mr. Wilcoxon
12  at that time?
13      A. No. Again, my job was to try to work with him,
14  work with Janay, to get that relationship working
15  again because it was very broken at that point, and I
16  had two teachers in the same space trying to work
17  together and that was going to be very hard on the
18  students, and I didn't want to see that happen.
19      Q. Okay. So that was the first meeting on December
20  17th, correct?
21      A. Yes. With -- well, there were many meetings on
22  the 15th and 16th.
23      Q. Okay.
24      A. The 17th meeting with all of us, that's where

Page 77

1   that -- well, I don't even know when he said that. He
2   didn't say that there. I think he said that after
3   school that day. He came back in, met with Mr. Rumford
4   and I at one point and said I feel sick, I feel sick to
5   my stomach. I know that she just made accusations in
6   front of my supervisors. I know where that can lead. I
7   have researched this or I have experience with this. He
8   said something along the line that he knew what this --
9   what this meant. He did. I didn't know what he was
10  talking about at that point.
11      Q. Okay. Did he deny making the comments at this
12  after-school meeting on December 17th?
13      A. I don't remember. At that point he was more
14  concerned with my comment about we have a long year
15  ahead of us. He took -- he interpreted that as at the
16  end of the year he wasn't going to be there. That was
17  not my intention.
18      Q. At the after-school meeting on December 17th did
19  he tell you that he thought that this was Miss
20  Freebery's way of getting back at him for keeping the
21  journal?
22      A. No. I don't remember that. And by that point
23  he had already said she opened the door. And he said it
24  in front of three people.

Wilcoxon
Janet Basara

v.

C.A. # 05-524-SLR

Red Clay Consolidated School District
May 25, 2006

Page 78

1  Q. Okay. And can you tell me again what he said
2  that she said to him. I know you said something about a
3  nude beach, is that correct?
4      MR. WILLOUGHBY: With respect to the
5  opening the door comment?
6  BY MR. WILSON:
7  Q. What comments Miss Freebery made to him?
8  **A. That opened the door?**
9  Q. That opened the door, yes.
10 **A. She had been on her honeymoon and she had been**
11 **on a nude beach. Later Mr. Rumford told me that he**
12 **heard that story, too, and it never led him to make any**
13 **remarks that were embarrassing or offensive to Miss**
14 **Freebery.**
15 Q. Okay.
16 **A. Other people also said they heard that comment,**
17 **that story.**
18 Q. Did he say she had made any other comments?
19 **A. No, did he not.**
20 Q. He never said to you that Miss Freebery's mother
21 told her that she should have sex with Mr. Hannah --
22 **A. No.**
23 Q. -- so he'd cut her grass?
24     MR. WILLOUGHBY: Let him finish the

Page 79

1  question.
2      THE WITNESS: No, he did not tell me that.
3  BY MR. WILSON:
4  Q. He didn't tell you that Miss Freebery said to
5  him Bruce cut my grass and I didn't even have to have
6  sex with him?
7  **A. He did not tell me that. I do not remember that**
8  **comment. I read that in the deposition.**
9  Q. Okay. So that was the after-school meeting on
10 December 17th?
11 **A. Yes.**
12 Q. And we have already talked about one other
13 meeting on December 17th, that was the first meeting?
14 **A. The one with all four of us, yes.**
15 Q. And there was a meeting in the middle, too,
16 correct?
17 **A. I don't remember. Who was that meeting with?**
18 Q. I was going to ask you that question.
19 **A. I don't remember that. I know at the end of the**
20 **day Mr. Wilcoxon came in and he was -- he truly was**
21 **upset and felt that there was some process that was in**
22 **place that I was not aware of that but he apparently was**
23 **aware of and that was the next conversation I remember.**
24 Q. All right. Let me take a short break and talk

Page 80

1  to Rich and see if we can figure out what was going on
2  with the second meeting.
3      (Recess taken.)
4  BY MR. WILSON:
5  Q. Everybody ready? All right. Miss Basara, I
6  think I got this cleared up now. Did you have a meeting
7  with Mr. Wilcoxon, just you two, that day or a
8  discussion on December 17th?
9  **A. I don't remember just meeting with the two of**
10 **us.**
11 Q. Okay.
12 **A. I was calling Frank in on the meetings, so he --**
13 **if he stopped in, I don't remember it.**
14 Q. Okay. With regard to the meeting where Mr.
15 Rumford and Miss Freebery were also present, could have
16 anything that was to be discussed at that meeting
17 adversely affect Mr. Wilcoxon's employment at Red Clay?
18 **A. At that particular time? No.**
19 Q. And did you make a statement to Mr. Wilcoxon to
20 that effect?
21 **A. Yes. I told him look, we're not trying to fire**
22 **you, Rich. We need you guys to work this out.**
23 Q. Okay. And there was another meeting on January
24 22nd, 2004?

Page 81

1  **A. Yes.**
2  Q. Correct? And do you recall who was at that
3  meeting?
4  **A. Mr. Rumford, Mr. Bartoli, myself, and**
5  **Mr. Wilcoxon.**
6  Q. Who is Mr. Bartoli?
7  **A. He was the -- he was a retired administrator who**
8  **was assigned to Red Clay to help with observations when**
9  **Mr. -- or Dr. Manolakas went out sick.**
10 Q. Did Mr. Wilcoxon have a union representative
11 with him at that meeting?
12 **A. No, he didn't.**
13 Q. All right. I'd like to mark this exhibit as 4.
14     (Basara Deposition Exhibit Basara-4 was
15 marked for identification.)
16 BY MR. WILSON:
17 Q. Okay. Have you had a chance to review that?
18 **A. Yes.**
19 Q. Is that your handwriting?
20 **A. Yes.**
21 Q. And what's the date on that?
22 **A. 1-22.**
23 Q. Do you recall -- so does that mean you gave him
24 this memo?

A-0287

21 (Pages 78 to 81)

Page 82

1  A.  Uh-huh.
2  Q.  On 1-22?
3  A.  Yes.
4  Q.  Do you recall about what time?
5  A.  I don't remember what time.
6  Q.  Okay.  Is there any mention of the specific
7  reason for the meeting on this?
8  A.  Nope.
9  Q.  Is there any indication of who would be present?
10  A.  No.
11  Q.  Okay.  At this meeting on January 22nd
12  Mr. Wilcoxon was given some disciplinary letters,
13  correct?
14  A.  Yes.
15  Q.  Okay.  I'd like to have this marked.
16      (Basara Deposition Exhibit Basara-5 was
17  marked for identification.)
18  BY MR. WILSON:
19  Q.  Have you had a chance to review that?
20  A.  Yes.
21  Q.  And at the top it states from Janet Basara,
22  correct?
23  A.  Uh-huh.
24  Q.  Are those your initials next to it?

Page 83

1  A.  Yes.
2  Q.  And the date says January 20th, 2004?
3  A.  Correct.
4  Q.  And in handwriting beside it it says 1-22-04?
5  A.  Correct.
6  Q.  JB?
7  A.  Yes.
8  Q.  Is that your writing?
9  A.  Yes.  Do you want to know why?
10  Q.  Yes.
11  A.  He was out of school for three days previous to
12  the 20th.  The 20th he was expected to be back in
13  school, and so when I wrote the letters I planned to
14  meet with him on the 20th but he was absent two
15  additional days and so I had to wait two more days to
16  the 22nd to have our meeting.
17  Q.  Okay.  And what was he being disciplined for
18  with this letter?
19  A.  This letter was a statement that we had met, we
20  talked, that there were comments made.  This was a
21  documentation of the meeting that we had the meeting.
22  In addition, Miss Freebery was going to press charges if
23  it happened again, and so I felt it was important that
24  he have that in writing should another comment be made

Page 84

1  so that there would be no misunderstanding that he had
2  been warned that if these comments continued she was
3  going to press charges.
4  Q.  Okay.  And this letter references the December
5  17th, 2003 meeting, correct?
6  A.  Yes.  Right.
7  Q.  So there was some discipline that came out of
8  that December 17th meeting, correct?
9  A.  This is just a statement that we had the meeting
10  and that those comments needed to be stopped.
11  Q.  Okay.  And if the comments --
12  A.  Continued there would be action.
13  Q.  And if they stopped there would be no further
14  action?
15  A.  Right.  She was not pressing charges at that
16  time.
17  Q.  So this letter is not a form of discipline?
18  A.  Yes, it is.
19  Q.  Okay.
20  A.  It's a statement of what happened, and what was
21  discussed.
22  Q.  All right.  And when you presented -- was this
23  the first letter you gave to Mr. Wilcoxon at that
24  meeting?

Page 85

1  A.  Yes.  Yes.
2  Q.  When you presented him with this letter did he
3  request a union representative?
4  A.  Yes.
5  Q.  Was he provided one?
6  A.  No.  What I told him was that at this time I'm
7  meeting with him as a principal with a teacher and he
8  could receive the letters and then go directly to his
9  representative and talk to them and then we would meet
10  again, but all I was doing was giving him the letters at
11  that point.  He did not need to make any comments
12  whatsoever.  I wasn't asking him to comment.
13  Q.  So you told him he couldn't have a union
14  representative?
15  A.  I just said, all I'm going to do is give you the
16  letters.  You can take them directly to your
17  representative or you can call Mr. Norton, you can do
18  whatever you need and then we'll deal with that.  But
19  this was just a matter of getting the letters to him
20  which could have been mailed or put in his mailbox but I
21  was handing them to him.
22  Q.  Okay.  I'd like to mark another exhibit.
23      (Basara Deposition Exhibit Basara-6 was
24  marked for identification.)

A-0288

Wilcoxon
Janet Basara

v.

C.A. # 05-524-SLR

Red Clay Consolidated School District
May 25, 2006

Page 86

BY MR. WILSON:
1
2    Q.  All right. Miss Basara, you're free to read
3    this whole thing if you want, but I can let you know
4    that the questions I am going to be asking you will
5    pertain to article 4, beginning on page six and going
6    into page seven where it says 4:4.1?
7    A.  Uh-huh. Uh-huh.
8    Q.  Okay. What is this?
9    A.  This is the contract.
10   Q.  Okay. And on the cover of this it says
11   September 1st, 2002?
12   A.  Uh-huh.
13   Q.  Through August 31st, 2005?
14   A.  Correct.
15   Q.  Is this the effective date of the agreement?
16   A.  Yes.
17   Q.  Okay. Are you familiar with this document?
18   A.  Yes.
19   Q.  Turning to the section that I referenced, 4:4.1,
20   do you believe you violated any part of this section by
21   virtue of your meeting with Mr. Wilcoxon?
22   A.  No, I do not.
23   Q.  And why not?
24   A.  Because the Board means the district level. A

Page 87

1    principal can meet with a teacher at any time. If he
2    was being called before the Board at a district level he
3    needs 48 hours notice and a rep.
4    Q.  Actually it says a Board or an agent thereof?
5    A.  Uh-huh. Which would be a district level person
6    or the Board.
7    Q.  Okay.
8    A.  The Board of --
9    Q.  Go ahead.
10   A.  Red Clay School Board.
11   Q.  Didn't you state at the beginning of your
12   deposition that you acted on behalf of the Board?
13       MR. WILLOUGHBY: We're not representing
14   that. You're asking for a legal conclusion at this
15   point that trying to interpret the contract from her.
16   She said she was an acting principal.
17       MR. WILSON: Right.
18       MR. WILLOUGHBY: I never remember her
19   saying anything like that.
20       MR. WILSON: I think she did.
21       MR. WILLOUGHBY: I don't.
22   BY MR. WILSON:
23   Q.  Did you say that?
24   A.  I don't remember saying that.

Page 88

1    Q.  So now it's your testimony that you don't
2    remember?
3        MR. WILLOUGHBY: First of all, I object. I
4    think you're twisting things around and trying to apply
5    things to a contract that you definitely have a
6    technical legal meaning on and trying to twist her
7    language into saying that she says she's not acting as
8    an administrator in the district. She's obviously
9    acting as an administrator in the district. She
10   doesn't mean she's an agent of the Board for this
11   section of the contract. She's already told you what
12   her understanding of the contract is.
13       THE WITNESS: And I sought advice on that.
14   I asked district personnel does this -- what does this
15   mean, and I was told that this meant if it was a
16   district level meeting where his -- where any of these
17   issues were going to come up, he had 48-hours notice
18   from that. But that a principal can meet with a teacher
19   at any time, otherwise we'd never get anywhere.
20   BY MR. WILSON:
21   Q.  Okay. What about at the bottom of the page six,
22   the last sentence where it says in formal discussion
23   with an employee by any member of - I can't even read
24   that.

Page 89

1    A.  I can't either.
2    Q.  Pertaining to the employee's performance at
3    his/her work location will not be precluded by the
4    preceding language of this section. However, if as a
5    result of such informal discussion employee perceives
6    that the matter discussed in the future could adversely
7    affect his or her continued employment, salary, or
8    increments, the administrator will, upon written
9    request, give the employee reasons in writing for the
10   necessity of waiving the 48-hours written notice
11   prescribed above.
12       Is that what that says?
13   A.  Yes. I don't know what it means really.
14   Q.  Okay. So you wouldn't interpret this language
15   as -- of this informal discussion that they identify
16   as a discussion with -- at your level with a teacher?
17       MR. WILLOUGHBY: I object, first of all,
18   because she's not a lawyer, but the language says upon
19   written request. So you haven't laid a foundation to
20   say this would even be applicable. The employee has to
21   make a written request. That's what it says. So if you
22   want to lay some foundation questions about whether or
23   not he asked in writing for someone there, then that's
24   fine, but . . .

Wilcoxon
Janet Basara

v.

C.A. # 05-524-SLR

Red Clay Consolidated School District
May 25, 2006

---

Page 90

1  BY MR. WILSON:
2    Q.  Did Mr. Wilcoxon state to you that he wanted a
3  union representative?
4    **A.  Yes.**
5        MR. WILLOUGHBY:  I think it's been asked
6  and answered.
7  BY MR. WILSON:
8    Q.  Did he have the opportunity to give you a
9  written request?
10   **A.  I wasn't asking him to discuss this. I was**
11  **simply giving him the letters. A discussion would**
12  **follow.**
13   Q.  But it did lead to discipline, correct?
14   **A.  At that time we didn't know where it was going**
15  **to lead.**
16   Q.  But didn't you testify that the letter was a
17  disciplinary letter?
18       MR. WILLOUGHBY:  She said the letter was
19  discipline but that's not what she said. You're
20  twisting her language again.
21       MR. WILSON:  So it led to discipline.
22       MR. WILLOUGHBY:  She didn't say that. She
23  said there was a meeting and subsequently he was
24  disciplined but she didn't say the meeting is what led

---

Page 91

1  to the discipline.
2  BY MR. WILSON:
3    Q.  Was Mr. Wilcoxon disciplined at this meeting?
4        MR. WILLOUGHBY:  December 17 or January?
5  BY MR. WILSON:
6    Q.  January 22nd?
7    **A.  He was given three letters. He was given three**
8  **letters. He wasn't asked to discuss it. He wasn't**
9  **asked to explain it. I assumed that would come in a**
10  **meeting with his rep after he had a chance to talk to**
11  **him. How could he talk to him without the letters in**
12  **his hand?**
13   Q.  So he received disciplinary letters at this
14  meeting?
15   **A.  Yes.**
16   Q.  Okay. All right. After you gave him the letter
17  regarding the inappropriate comments, you gave him a
18  letter regarding his lesson plans, correct, or
19  substitute plans?
20   **A.  May I add something about this 48 hours?**
21       **MR. WILLOUGHBY:  No.**
22       MR. WILSON:  Sure. Go ahead.
23       MR. WILLOUGHBY:  He's asked you to go ahead
24  now. If there is a pending question you can answer it,

---

Page 92

1  but you generally don't just make comments unless he
2  asks you a question.
3        THE WITNESS:  Okay. I'll withdraw the
4  comment.
5  BY MR. WILSON:
6    Q.  Okay. Can I have that marked?
7        (Basara Deposition Exhibit Basara-7 was
8  marked for identification.)
9  BY MR. WILSON:
10   Q.  Let me know when you're done reviewing this
11  document.
12   **A.  Okay.**
13   Q.  Is this the second letter you gave Mr. Wilcoxon?
14   **A.  Yes.**
15   Q.  And this is because his lesson plans were
16  completely inadequate?
17   **A.  Correct.**
18   Q.  Okay. When did you determine they were
19  completely inadequate?
20   **A.  When I saw them.**
21   Q.  And was that when Mr. Wilcoxon was absent?
22   **A.  Yes.**
23   Q.  The day that Mr. Rumford found the journal?
24   **A.  No.**

---

Page 93

1    Q.  No?
2    **A.  This was another -- the second time.**
3    Q.  Okay. When does this pertain to?
4    **A.  This was when he went to Hawaii.**
5    Q.  And what's an approximation of what month that
6  was?
7    **A.  January 14th, 15th and 16th.**
8    Q.  What was wrong with his lesson plans then?
9    **A.  Did you see them?**
10   Q.  No.
11   **A.  You didn't see the plans?**
12   Q.  I may have, but you can explain to me.
13       MR. WILLOUGHBY:  I think you should see
14  them if you want her to explain them. They're marked in
15  the deposition over there. If you want her to give a
16  global response without seeing them, she can.
17       MR. WILSON:  If she can just give me a
18  general idea of what was wrong with them, I'll be happy
19  with that.
20       THE WITNESS:  It said shoot around
21  basketball for day one. Day two, repeat day one. Those
22  are inadequate plans. There was not a class list,
23  again, which is what started all this in the first
24  place, nor a bell schedule.

A-0290

24 (Pages 90 to 93)

Wilcoxon
Janet Basara

v.

C.A. # 05-524-SLR

Red Clay Consolidated School District
May 25, 2006

Page 94

1  BY MR. WILSON:
2    Q.  He got one more letter that day, correct?
3    A.  Yes.
4    Q.  Mark this 8.
5        (Basara Deposition Exhibit Basara-8 was
6  marked for identification.)
7        THE WITNESS:  All right.
8  BY MR. WILSON:
9    Q.  Okay.  Is this the third letter that you gave
10 him that day?
11   A.  Yes.
12   Q.  Okay.  What does this pertain to?
13   A.  There were after-school activities every day at
14 Skyline, and whoever was keeping students was supposed
15 to sign up in the morning putting the number of students
16 that they would be keeping that would need a city bus or
17 a suburban bus.  It was broken into two sections.  The
18 purpose of that was so that we had enough buses to take
19 the students home who were staying after school.  Some
20 days we needed two buses, sometimes three, sometimes
21 four, depending on how many activities there were after
22 school.  If teachers did not sign up then we would not
23 know that there were activities.  It was Miss Freebery's
24 responsibility to check that during her first planning

Page 95

1  period and call in for the buses.  That was the routine.
2  Teachers had been asked to please remember to do that,
3  and he continued to forget.  He asked Mr. Rumford how do
4  I remember to do this?  I keep forgetting.
5    Q.  Had you talked to him about this prior to giving
6  him this letter?
7    A.  I gave two notices to the staff.
8    Q.  Did you talk to Mr. Wilcoxon personally?
9    A.  I believe two notices to the whole staff should
10 suffice.  And I believe I did talk to him besides that,
11 that the buses are important, you have got to sign up
12 for the buses, especially since he often kept as many as
13 50 students for an activity.  That's an entire bus.
14   Q.  Was he the only person who failed to do this?
15   A.  The only person ever in the whole time at
16 Skyline?
17   Q.  No.  In the school year 2003-2004?
18   A.  I couldn't say that he would be the only one.
19 The first step would be to remind people and that's why
20 we did the letters to everybody, or the reminder to
21 everybody.
22   Q.  Do you recall giving a letter such as this to
23 anybody else?
24   A.  No.

Page 96

1    Q.  During that school year?
2    A.  No.  But I did verbally tell some people.
3    Q.  Did you verbally tell some people more than
4  once?
5    A.  No.  Never more than once.  Once was enough.
6    Q.  Are you sure you talked to Mr. Wilcoxon?
7    A.  I don't want to say a hundred percent I did but
8  I believe that I did.  I believe there was a
9  conversation about the buses.  But I don't remember
10 exactly when it was.
11   Q.  Do you recall a student faculty basketball game
12 during the 2003-2004 school year?
13   A.  Yes.
14   Q.  Okay.  Initially Mr. Wilcoxon and Mr. Rumford
15 were supposed to organize this game, correct?
16   A.  And a parent, Mrs. Perez.
17   Q.  Who is Mrs. Perez?
18   A.  She's a parent and she also works in the
19 in-school suspension.  She was actually in charge.
20   Q.  Okay.  And Mr. Wilcoxon made the initial calls
21 to Mrs. Perez to get the organization of the game going,
22 didn't he?
23   A.  I don't know.
24   Q.  The organization of this game when it first

Page 97

1  started began before the issue with the journal arose,
2  correct?
3    A.  Again, I don't know.  I don't know when that
4  started.  I think it would be after because I think that
5  was in the spring.
6    Q.  Was Miss Freebery initially on the team to
7  organize this game?
8    A.  I honestly don't know.  This was being organized
9  by the family committee of the SSA or PTO group.
10   Q.  What does SSA --
11   A.  Student Support Association.  It was a
12 Parent-Teacher Organization and they had a family
13 committee and this was a family night to have the
14 basketball game with the staff and students.
15   Q.  All right.  I'd like to have this marked.  I
16 guess we're up to 9 now.
17       (Basara Deposition Exhibit Basara-9 was
18 marked for identification.)
19       THE WITNESS:  Okay.
20 BY MR. WILSON:
21   Q.  Do you recall getting this e-mail?
22   A.  I don't really remember but it does say it came
23 to me and I do believe -- I don't remember the wording
24 of all of this but I believe that I sent him a response

A-0291

25 (Pages 94 to 97)

Wilcoxon                                    v.            Red Clay Consolidated School District
Janet Basara                        C.A. # 05-524-SLR                    May 25, 2006

Page 98

1  to the effect that no, you can be on the committee, we
2  need all the help we can get.
3      Q.  But why is it Mr. Wilcoxon was taken off the
4  committee?
5      A.  I don't know.
6      Q.  It wasn't your decision?
7      A.  No.
8      Q.  Do you know whose decision it was?
9      A.  I don't know.  I didn't even know he was taken
10  off.
11     Q.  Well --
12     A.  Obviously that's what he's saying in here.
13     Q.  Let's mark this one, too, then.
14          (Basara Deposition Exhibit Basara-10 was
15  marked for identification.)
16          THE WITNESS:  Well, I didn't write this.
17  Oh, okay.  This date was changed to go with the
18  referendum because we wanted to bring in parents to
19  vote.
20  BY MR. WILSON:
21     Q.  Okay.  What is this?
22     A.  I don't know.  This looks like a sign-up.  I
23  didn't write this.
24     Q.  But it says from you, Frank Rumford and Janay

Page 99

1  Freebery?
2      A.  Uh-huh.
3      Q.  Would you agree that those are the primary
4  actors for the organization of this game?
5      A.  Well, I wasn't a part of this at all.  I didn't
6  get involved in this piece of it, although I was doing a
7  lot of other activities for the referendum night.
8      Q.  And Mr. Wilcoxon's name isn't on there, is it?
9      A.  Correct.  This is just a request for anybody
10  that wants to join, help us out.
11     Q.  Okay.  As acting principal you were required to
12  perform observations of teachers, correct?
13     A.  Correct.
14     Q.  All right.  I'd like to go over some of the
15  lesson analysis.
16     A.  Okay.
17          (Basara Deposition Exhibit Basara-11 was
18  marked for identification.)
19  BY MR. WILSON:
20     Q.  Let me know when you have had time to look over
21  that.
22     A.  Okay.  I remember this.  Okay.
23     Q.  What is this?
24     A.  This was an observation where he was team

Page 100

1  teaching with Miss Freebery.
2      Q.  Okay.  And what's the date on this?
3      A.  November 19th, 2003.
4      Q.  Okay.  And on the third page of this --
5      A.  If I could also add, it is an announced
6  observation.  If you see the check at the top.
7      Q.  Uh-huh.
8      A.  Okay.
9      Q.  On the third page, the one that's marked at the
10  bottom 0103?
11     A.  Uh-huh.
12     Q.  Is that your signature?
13     A.  Yes.
14     Q.  Okay.  Then there is some language in italics
15  above the signature lines?
16     A.  Uh-huh.
17     Q.  What does that say?
18     A.  Nice -- nice lesson, Rich.  You were clear and
19  guided the students to understand the terms you would be
20  using in this unit.  The students were respectful and
21  responsive.  Keep up the good work.
22     Q.  Okay.  Was this a favorable observation?
23     A.  This was a good observation.  There were a
24  couple of suggestions in there, recommendations.

Page 101

1      Q.  But overall favorable?
2      A.  Yes.  There was a recommendation on 0102, that
3  he write his performance indicators on the board to help
4  the students focus on the main idea, that's part of an
5  effective lesson, and also to try to get to some higher
6  level questions, there were none, and that was my
7  suggestion or recommendation, that he try to get those
8  included into the unit.
9      Q.  Okay.  Now.  Here is the next one.
10          (Basara Deposition Exhibit Basara-12 was
11  marked for identification.)
12          THE WITNESS:  Okay.  Now this lesson I
13  haven't seen.  Okay.
14  BY MR. WILSON:
15     Q.  Okay.
16     A.  That's the first time I saw that one.
17     Q.  Okay.  Can you identify what this is?
18     A.  Mr. Bartoli did a lesson analysis.
19     Q.  Okay.  And again, can you tell us who
20  Mr. Bartoli is?
21     A.  He was the retired principal who came in to help
22  out with observations.
23     Q.  On the second page, there is a number of boxes,
24  the bottom one?

A-0292              26 (Pages 98 to 101)

Wilcoxon
Janet Basara

v.

C.A. # 05-524-SLR

Red Clay Consolidated School District
May 25, 2006

Page 102

1    **A. Uh-huh.**
2    Q. Commendations, recommendations, areas for
3    growth, comments?
4    **A. Uh-huh.**
5    Q. States Mr. Wilcoxon is to be commended for his
6    organizational planning such as his preparation for the
7    lesson, setting up the gymnasium, use of squads, posting
8    of the standards, rotation of players and taking
9    attendance. References to the standards were used in
10   the presentation of the lesson and also included in the
11   closure of the lesson. Reviews of the rules of the game
12   were covered prior to having the students starting the
13   activity.
14       Is that what that says?
15   **A. Yes. I would hope that he would put his**
16   **standards on because that was the recommendation that I**
17   **made in his other observation.**
18   Q. So based on your review of this, is this a good
19   observation by Mr. Bartoli?
20       MR. WILLOUGHBY: You didn't ask her to --
21   BY MR. WILSON:
22   Q. Did you look over the entire document?
23   **A. Yes, there were three recommendations, one**
24   **commendation.**

Page 103

1    Q. Okay. Overall was this a good --
2    **A. Acceptable.**
3    Q. And you referred to the last one as an announced
4    observation, and on the front page of this there is a X
5    beside --
6    **A. Unannounced, correct.**
7    Q. -- unannounced. So is this an unannounced
8    observation?
9    **A. Correct, and it was PE rather than health,**
10   **totally different setting.**
11   Q. How so?
12   **A. One is in the gym, students are being active,**
13   **and the other one was in an auditorium-type setting**
14   **called the multi-purpose room where students were doing**
15   **written work, reading, discussion, small group work.**
16   Q. And as of February 12th, 2004 Mr. Wilcoxon was
17   no longer team teaching with Miss Freebery, was he?
18   **A. Probably not by then. Absolutely not.**
19   Q. Okay. I'd like to have that marked as 13.
20       (Basara Deposition Exhibit Basara-13 was
21   marked for identification.)
22   BY MR. WILSON:
23   Q. Okay. Can you review that and let me know when
24   you're finished?

Page 104

1    **A. Uh-huh. I think there is a page missing. There**
2    **is a page missing.**
3    Q. What page?
4    **A. It would have been the one before the signature**
5    **page.**
6    Q. Okay. Do you recall what was on that page?
7    **A. It would have been my recommendations and**
8    **commendations and more of what happened in class, I**
9    **suppose.**
10       MR. WILLOUGHBY: Here is, I got . . .
11       Do you want to mark that one as the next
12   one so we have the page? What number are we up to?
13       MR. WILSON: Okay. I'll just get some
14   copies of this made.
15       MR. WILLOUGHBY: If you just want to mark
16   it as the next exhibit, I got copies here.
17       MR. WILSON: You do?
18       MR. WILLOUGHBY: Yes. What number are we
19   on?
20       MR. WILSON: This would be 14.
21       (Basara Deposition Exhibit Basara-14 was
22   marked for identification.)
23   BY MR. WILSON:
24   Q. Off the record.

Page 105

1    (Discussion held off the record.)
2    THE WITNESS: Okay.
3    BY MR. WILSON:
4    Q. Okay. You have been handed two exhibits, one
5    was exhibit 13 and one is exhibit 14. When you were
6    handed 13 you indicated that one page was missing and
7    Mr. Willoughby was kind enough to supply one with all
8    the pages intact. So I am going to ask you about
9    exhibit 14, okay?
10   **A. Okay.**
11   Q. And can you tell us what this is?
12   **A. This is a lesson analysis, unannounced, in**
13   **health which was in the multi-purpose room.**
14   Q. And is that your signature on --
15   **A. Yes.**
16   Q. -- the third page -- excuse me, fourth page?
17   **A. Uh-huh. Yes.**
18   Q. So you conducted this --
19   **A. Yes.**
20   Q. -- analysis?
21   **A. Yes.**
22   Q. Did Mr. Wilcoxon receive unsatisfactory grades
23   on this lesson analysis?
24   **A. Well, there is no term for that.**

A-0293

27 (Pages 102 to 105)

Wilcoxon
Janet Basara

v.

C.A. # 05-524-SLR

Red Clay Consolidated School District
May 25, 2006

Page 106

1    Q.  Okay.  Let me rephrase it.  Is this an
2    unsatisfactory lesson analysis?
3        A.  There were parts of it that were unsatisfactory.
4    They're stated in the recommendations.
5        Q.  Okay.  And what is that?
6        A.  Do you want me to read them all?
7        Q.  Well, you can just mention them if you can.
8        A.  Mr. Wilcoxon had written an objective on the
9    board but the screen was pulled down so the kids
10   couldn't see what he wrote up there, so I was basing
11   what his objective was on what he said rather than what
12   he wrote, and I felt that it wasn't clear enough
13   compared to what it should have been, what it could have
14   been, that that piece is critical, and that's been
15   stated in previous observations.
16       Q.  Okay.  Is that it?
17       A.  Oh, no.  I recommended in here that he do more
18   careful planning when he does a group assignment.  The
19   students were allowed to just pick their own groups and
20   move wherever they wanted.  Having been a classroom
21   teacher myself I know you need to give some direction to
22   that.  Oftentimes you would want to put students
23   together who could work well together, for example a
24   high rating student with a lower rating student, and you

Page 107

1    look for those differences in order to help students
2    help each other.  There didn't appear to be anything
3    like that going on.  Students were able to pick whoever
4    they wanted to work with, which is fine, that happens
5    from time to time also.
6            He said that they could move to their
7    groups, and everybody moved over to the same side except
8    for two groups, one behind and one to the side.  That
9    clustered so many kids together that they then became
10   loud in trying to talk to each other.  Again, we're in
11   an auditorium, kind of a horse-shoe shape, and one
12   group, the groups were lining themselves this way, chair
13   one, two, three and four.  So when partner one is
14   talking to partner four he has to yell.  So had he
15   thought that through a little bit he might have put them
16   in a group of four so that they could have talked to one
17   another in a lower voice.  But he had what, 34 students
18   in there?  38 students, and so in forming groups my
19   suggestion was that he think it through a little bit
20   more, and make those kinds of directions clear to the
21   students.
22           He also had not told the students initially
23   that they were going to be making a presentation.  If
24   students know they're going to make a presentation then

Page 108

1    they need to be prepared who is going to speak on their
2    behalf and what is that person going to say, to stand up
3    and do that.  He did not give that direction in the
4    beginning of the lesson but as everybody returned to
5    their seats then he said okay, so I want to have
6    somebody come up and tell us what you did.
7            There was a serious issue with noises where
8    the students were whistling and one student started on
9    one side of the room making a whistle sound and when
10   Mr. Wilcoxon looked that way another student on the
11   other side of the room whistled and when he looked over
12   that way another student made a whistle somewhere else,
13   so he was trying to figure out who was doing what.  And
14   that seemed to the students were embarrassing him.  That
15   doesn't happen normally.
16       Q.  Okay.
17       A.  That went on for quite a bit.  He did attempt to
18   stop that by saying everybody -- by saying to the whole
19   group, you need to stop, stop that.  And then at one
20   point he said if you do that again you're going to get
21   sent out but he did not look at a particular student
22   when he said that.  He just said it in general.  Well,
23   if you don't know who is doing it how are you going to
24   send them out and the kids know that.  So then that

Page 109

1    becomes a threat that you can't follow through on which
2    undermines your authority.
3        Q.  Now, this --
4            MR. WILLOUGHBY:  I don't think she was
5    done.
6            MR. WILSON:  Okay.
7            THE WITNESS:  No, there is more.
8    BY MR. WILSON:
9        Q.  Okay.
10       A.  Let's see.  Clearer directions was in here as a
11   recommendation that the students have all the
12   information, such as you're going to need to report out,
13   pick a person to report for your group.  That needed to
14   be clearer.
15           Off task, when attempting to control . . .
16   When students close an activity or when he closes an
17   activity for the day, then you should revisit the
18   standard, what was it you were trying to teach the
19   students, and then you want them to tell you that in
20   that -- in the reporting out you would expect to hear
21   the students got what they were supposed to learn, and
22   there was no connection there.  And I recommended that
23   he try to have closure match up with the performance
24   indicators.  I suggested heterogenous groupings was a

A-0294

28 (Pages 106 to 109)

Wilcoxon                              v.        Red Clay Consolidated School District
Janet Basara                    C.A. # 05-524-SLR                May 25, 2006

Page 110

1  great idea. I'm glad that he tried to group students
2  because that's a good way to learn, but that it would
3  have been more effective if he put highs with lows or
4  one behavior problem in a group or something like that,
5  some way that you differentiate based on some individual
6  need.
7       This lesson was not brought to closure.
8  And, again, higher order thinking questions were
9  encouraged. He had two in the lesson and I was
10 suggesting that he put more, which is similar to what I
11 had said in the other one.
12 Q. Is that it?
13 A. I think so.
14 Q. Okay. Did he do anything good?
15 A. Yes.
16 Q. Okay. Can you tell me that?
17 A. He varied the activities. He had some whole
18 group discussion. He did review what he had done the
19 day before. You want to mix it up a little bit. Kids
20 can't sit there for 45 minutes and listen, so he did
21 have them try group activities. To have them present
22 out to the class was a good idea. It just wasn't
23 executed in a good way. It could have been improved.
24 Having students work together in groups of four was a

Page 111

1  good idea so that they could talk through and more
2  people can share in that way, so those were compliments.
3       Let's see. The activities that he had were
4  good. The discussion that he had about news articles or
5  magazine articles and how they tried to get you to buy
6  cigarettes, that was a good lesson to have so the kids
7  can understand the influences.
8       I didn't feel that he really made that
9  point and that was a suggestion in here, in that there
10 was a discussion early on in this lesson, what could you
11 buy with the money that you saved from cigarettes. If
12 you didn't buy cigarettes, how much money would you save
13 in a year and what could you buy, and then it dropped
14 and it was sort of -- would have been a lot better if
15 you then came to the conclusion as a group or
16 individuals came to the conclusion then we shouldn't
17 smoke, then we're wasting our money, but that was a
18 piece that just -- it just fell because it didn't get
19 concluded.
20 Q. Okay. Are you done?
21 A. Yes.
22 Q. Okay. Would you view this as an acceptable
23 observation?
24 A. Not particularly.

Page 112

1  Q. Unacceptable?
2  A. Unacceptable. Lots of way to improve, and after
3  two years I wouldn't expect to see the same -- these
4  kinds of problems.
5  Q. Had he had an unacceptable observation prior to
6  this?
7  A. Just what we read, there were recommendations in
8  there, in the first one that I did.
9  Q. But those were acceptable?
10 A. They were relatively acceptable. The first one
11 was with a team teacher. The team teacher was Miss
12 Freebery was keeping classroom control as he was
13 teaching. She was adding in pieces that he forgot
14 during that team teaching time. This time he was on his
15 own for the first time.
16 Q. Well, he was on his own with Mr. Bartoli,
17 correct?
18 A. In the gym. In the gym. A different set.
19 Q. Okay. And when Miss Freebery would get observed
20 when they were team teaching she would have the benefit
21 of Mr. Wilcoxon's presence, too, as well, correct?
22 A. I suppose. I can't say I observed her with
23 that. I don't remember that.
24 Q. Did you observe Miss Freebery during this school

Page 113

1  year?
2  A. During that school year it was probably not my
3  -- she wasn't on my list, I don't think. We split the
4  teachers that we would observe.
5  Q. Who split the teachers?
6  A. Mr. Bartoli and I. It would have been
7  Dr. Manolakas and I, so Mr. Bartoli took over
8  Mr. Manolakas's list.
9  Q. Why did Mr. Wilcoxon get observed by both you
10 and Mr. Bartoli?
11 A. I asked him to go in and do an observation.
12 Q. Why did you do that?
13 A. Well, because I thought we needed an extra
14 observation or we should have some extra observations on
15 him because he was having some issues but he did a
16 relatively good job in the gym.
17 Q. After the issue with the journal came up was
18 there some sort of animus between you and Mr. Wilcoxon?
19 A. No, not that I know of, although he claims there
20 was.
21 Q. Okay. So from your perspective everything
22 seemed normal?
23 A. Yes.
24 Q. You communicated with him --

A-0295

29 (Pages 110 to 113)

Wilcoxon
Janet Basara

v.

C.A. # 05-524-SLR

Red Clay Consolidated School District
May 25, 2006

Page 114

1   A. Yes.
2   Q. -- just as much as you always had?
3   A. Yes.
4   Q. Okay. We're going to mark another one.
5       (Basara Deposition Exhibit Basara-15 was
6   marked for identification.)
7   Q. Can you tell me what this is?
8   A. Performance appraisal for the end of the year.
9   Q. For the end of the school year 2003-2004?
10  A. Correct.
11  Q. And is that your signature on the last page?
12  A. Yes.
13  Q. Okay. Just briefly can you identify the areas
14  where Mr. Wilcoxon received effective -- the categories
15  that Mr. Wilcoxon was rated effective?
16  A. That was organization and management, barely but
17  effective, instructional strategies, student-teacher
18  interactions, and evaluations of student performances.
19  Q. And what categories was he graded as
20  unsatisfactory?
21  A. Instructional planning and related
22  responsibilities.
23  Q. Okay.
24  A. What goes into this is the observations, letters

Page 116

1   BY MR. WILSON:
2   Q. With regard to the lack of proper student lesson
3   plans, if you look at his performance appraisal, exhibit
4   number 15, didn't he rate effective there?
5   A. This one?
6   Q. Yes.
7   A. No. Unsatisfactory. Instructional planning.
8   Q. Okay. What's the difference between
9   instructional planning and instructional strategies?
10  A. Strategies would be small groups, whole group,
11  using a ditto or a movie as opposed to a discussion,
12  differentiating instruction are the strategies that you
13  use.
14  Q. Okay.
15  A. Instructional planning is that you can write a
16  lesson plan, that you include the elements of an
17  effective plan, and you have substitute plans on hand,
18  and you plan.
19  Q. Okay. Classroom management is a reason for
20  termination as well, correct?
21  A. Yes.
22  Q. And on his performance appraisal under number
23  two, organization and management of classroom, he
24  received an effective grade?

Page 115

1   and anything that -- this is a whole -- a whole series
2   of things that would go into this. When you do a lesson
3   analysis it's one day, one lesson. When you do a
4   performance appraisal it includes everything that's
5   happened.
6   Q. Okay.
7       (Basara Deposition Exhibit Basara-16 was
8   marked for identification.)
9   BY MR. WILSON:
10  Q. You have been handed what's been marked exhibit
11  16. Can you tell me what that is?
12  A. This looks like a letter that was sent to
13  Mr. Wilcoxon from Miss Dunmon, Assistant Superintendent.
14  Q. Okay. And does it set forth the reasons for his
15  termination?
16  A. Yes.
17      MR. WILLOUGHBY: You have said termination.
18  You mean nonrenewal?
19      MR. WILSON: It says termination on the
20  letter.
21      MR. WILLOUGHBY: Okay.
22      THE WITNESS: The reasons include poor
23  classroom management, inappropriate interaction with
24  staff, and lack of proper student lesson plans.

Page 117

1   A. That's right. But it was weak. If you ever
2   have a class that is making you look foolish in front of
3   an administrator that's very weak.
4   Q. But it's marked effective, is it not?
5   A. Because I was including other observations in
6   order to be fair. If I took only one observation then
7   that wouldn't have been fair to him. So I was including
8   all of his observations, and when he was in the gym he
9   had relatively good control on that day. When he was in
10  with a team teacher he had control on that day. But he
11  did have problems with sending a lot of students out and
12  he did have problems on that one observation. So it was
13  weak but it wasn't something that I felt was completely
14  ineffective.
15  Q. Okay. And for the other reason, inappropriate
16  interaction with staff, do you know what that refers to?
17  Strike that.
18      Does that refer to the incident with Miss
19  Freebery?
20  A. I didn't write the letter, so I think you'd have
21  to ask Miss Dunmon.
22  Q. Did you have input into this?
23  A. No, I didn't.
24  Q. Are you, other than that instance, are you aware

A-0296    30 (Pages 114 to 117)

Wilcoxon                         v.              Red Clay Consolidated School District
Janet Basara                 C.A. # 05-524-SLR              May 25, 2006

Page 118

1  of any other inappropriate interaction with the staff
2  for Mr. Wilcoxon?
3    A.  No, I'm not aware of any.
4    Q.  Okay.  I'd like to refer back to the letter from
5  the January 22nd meeting.
6        MR. WILLOUGHBY:  Which one?
7        MR. WILSON:  Let me find it here.  It would
8  be exhibit 5.  Okay.  The second paragraph reads:  In
9  addition, I want to inform you that if any further
10  inappropriate comments are made the district will take
11  disciplinary action, correct?
12        THE WITNESS:  Right.
13  BY MR. WILSON:
14    Q.  And when I asked you earlier if he made any
15  further inappropriate comments you stated that he had
16  not?
17    A.  Not that I was aware of.
18    Q.  And I also asked you if he made no further
19  comments no disciplinary action would be taken, correct?
20    A.  Say that again.
21    Q.  I also asked you that if he did not make any
22  further inappropriate comments that no disciplinary
23  action would be taken against him?
24    A.  Well, okay.  He made -- I'm sorry.  Say it

Page 119

1  again.  I want to be clear on what you're saying.
2    Q.  Okay.  I asked you earlier, I said based on this
3  letter you said to him that if he stopped what he was
4  doing --
5    A.  Uh-huh.
6    Q.  -- and made no further inappropriate comments,
7  that no further disciplinary action would be taken
8  against him?
9    A.  Based on this one thing, yes.
10    Q.  Right.
11    A.  If it was no other issues coming out, if there
12  were no other issues with him as a teacher, this was a
13  minor piece of the problem.  There was a bigger -- there
14  was a bigger problem.  He was not a good teacher and
15  that's why he was non-renewed.  He was a non-tenured
16  teacher who was not pulling his weight, who was not
17  doing lesson plans, who was not correcting, and he had
18  this issue along with others.
19    Q.  But you told him there would be no further
20  discipline and then here he is he gets terminated for
21  inappropriate interaction with the staff?
22        MR. WILLOUGHBY:  Again, you're looking for
23  a legal conclusion.  The letter says what it says.  It
24  says includes.  We can argue about that later on but I

Page 120

1  think it's inappropriate.
2        MR. WILSON:  To your knowledge there was no
3  further inappropriate interaction, correct?
4        MR. WILLOUGHBY:  That's been asked and
5  answered but you can answer again.
6        THE WITNESS:  Yes.  But that was not the
7  one reason that he was fired.  He was not not renewed
8  because of one thing.
9  BY MR. WILSON:
10    Q.  Okay.
11    A.  It was a series of things.
12    Q.  So he was terminated for classroom management
13  which he received an effective grade in?
14    A.  Which was very weak.
15    Q.  But he still received an effective grade,
16  correct?
17    A.  On that one record, yes, but on his observation
18  he had issues.
19    Q.  Are you aware of any other teacher that has ever
20  been terminated on their -- when they get an effective
21  grade on their final performance appraisal?
22    A.  I don't.  I don't see those.  That wouldn't be
23  something I'd have knowledge of.
24    Q.  With regard to the lesson plans, didn't

Page 121

1  Mr. Wilcoxon and Miss Freebery use the same lesson
2  plans?
3    A.  He used Mr. Rumford's lesson plans that Mr.
4  Rumford and Miss Freebery planned together.
5    Q.  Okay.  And did she use those plans, too?
6    A.  Yes, but she had adjusted her plans.
7  Mr. Wilcoxon claimed that they were identical but they
8  were not.
9    Q.  Okay.
10    A.  I investigate that.
11    Q.  Had he made any adjustments to his plans?
12    A.  A few.
13    Q.  What adjustments had Miss Freebery made?
14    A.  Miss Freebery?
15    Q.  Yes.
16    A.  She had crossed out some videos that were not as
17  effective as she wanted, put in a different one that she
18  had found.  Lots of changes through hers, crossing out
19  and adding.  So it appeared to me, as I'm looking at
20  them, that when she did a lesson and didn't like
21  something she changed it, or before she did it she would
22  change it and write that in.
23    Q.  And when Mr. Rumford used Mr. Wilcoxon's plans
24  were they effective then?

A-0297                    31 (Pages 118 to 121)

Wilcoxon
Janet Basara

v.

C.A. # 05-524-SLR

Red Clay Consolidated School District
May 25, 2006

Page 122

1  A. Backwards.
2     MR. WILLOUGHBY: Wait. Okay. You said
3  when Mr. Rumford used Mr. Wilcoxon's plans.
4  Mr. Wilcoxon never wrote any plans.
5  BY MR. WILSON:
6  Q. When Mr. Rumford used his own plans? I'm sorry.
7  A. Yes. That was two years prior and he would have
8  adjusted his plans as he went along, too.
9  Q. But there were adjustments to Mr. Wilcoxon's as
10 well?
11 A. He had added in the number of the performance of
12 indicators. That didn't say a whole lot. Normally
13 you'd expect that -- you could write those in as long as
14 you know what they are and you're using them on a
15 regular basis. So he added those in to a few lessons
16 that I saw. I didn't see everything.
17 Q. So if he had changed some of the videos --
18 A. Uh-huh.
19 Q. -- his would have been effective as well?
20 A. No, I'm not saying that. I'm saying that his
21 lesson plans that he handed to me were in Mr. Rumford's
22 writing. He was given those lesson plans the first year
23 that he came in order to be a guide for him so that he
24 would have an idea of what the program was. As a new

Page 123

1  teacher you would expect to get some kind of help and
2  that was a lot of help. He took those plans and used
3  them as his own for two years and didn't change much
4  other than a little thing here or there.
5  Q. Is it relevant that they were in Mr. Rumford's
6  handwriting or just that they were Mr. Rumford's plans?
7  A. It is relevant. You would expect a teacher is
8  going to write their own lesson plans.
9  Q. Okay. So if he had just copied Mr. Rumford's in
10 his own handwriting?
11 A. That wouldn't make it any better technically.
12 Technically he should be doing his own lesson plans. He
13 should be spending time thinking about what lesson needs
14 to be learned, what is the objective, and how am I going
15 to reach that and what can I use and take a look at the
16 lessons -- the materials that were there and decide if
17 he wanted to use them or not.
18 Q. So was the issue that they were ineffective
19 plans or that he didn't do them himself?
20 A. The issue was that he was using someone else's
21 plans for two years and didn't take the time to improve
22 the plans in any way really.
23 Q. Okay. This is the last issue I am going to hit.
24 Was Mr. Wilcoxon disciplined for a theft of money from

Page 124

1  his desk?
2  A. Yes.
3  Q. In April, 2004 --
4  A. Not his desk, no.
5  Q. Where was the money taken from?
6  A. In the multi-purpose room.
7  Q. Okay. Can you tell me about that?
8  A. Yes. He said that money was taken from a
9  fundraiser that he was collecting money for. There was
10 cash and checks that he left that on the table in the
11 multi-purpose room with the doors unlocked and went to
12 lunch, and someone came in and took the money, took the
13 cash. I believe it was $49.
14 Q. And how was Mr. Wilcoxon disciplined?
15 A. I believe there was a letter. I don't remember.
16 Was there -- I don't know if there was a letter or not,
17 honestly.
18 Q. In the two years, 2002-2003, 2003-2004, had any
19 other teachers had money stolen from them?
20 A. Yes.
21 Q. Did they get letters as well?
22 A. No.
23 Q. Why not?
24 A. Did he get a letter? He may have. I don't know

Page 125

1  if he even got a letter on that.
2  Q. Okay. Did they get letters?
3  A. We made announcements that teachers need to lock
4  any fundraisers or money that they are collecting, they
5  need to lock it because it could be taken. Any student
6  could walk in and take it, and in his case it was -- it
7  was just unbelievable that you would leave cash on a
8  table and go to lunch and leave it open where anybody
9  could get in, and literally anybody could have gotten in
10 there.
11 Q. Who else had money stolen during that timeframe?
12 A. The nurse.
13 Q. What's her name?
14 A. Miss Root.
15 Q. How much money did she have stolen?
16 A. Several hundred dollars.
17 Q. What were the circumstances?
18 A. It was in a locked cabinet. It was in with the
19 medicine and it had a large bar down the front of that
20 to keep the doors locked and a lock on it. There were
21 three students in the area that morning and so we could
22 narrow down the search to three students. We did send
23 out a memo, was anybody else out of class at 8 o'clock
24 to the whole staff, got some responses back, and we were

A-0298

32 (Pages 122 to 125)