**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| RICHARD WILCOXON, | ) | |
| Plaintiff, | ) | C.A. No.05-524 (SLR) |
| v. | ) | **JURY TRIAL DEMANDED** |
| RED CLAY CONSOLIDATED SCHOOL DISTRICT BOARD OF EDUCATION, and JANAY FREEBERY, | ) | |
| Defendants. | ) | |

**PLAINTIFF'S ANSWERING BRIEF IN RESPONSE TO DEFENDANT'S OPENING BRIEF IN SUPPORT OF SUMMARY JUDGMENT**

Jeffrey K. Martin, Esquire (DE #2407)
Timothy J. Wilson, Esquire (DE #4323)
MARGOLIS EDELSTEIN
1509 Gilpin Avenue
Wilmington, DE 19806
(302) 777-4680
Attorneys for Plaintiff

Dated: August 2, 2006

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| RICHARD WILCOXON,<br><br>Plaintiff,<br><br>v.<br><br>RED CLAY CONSOLIDATED SCHOOL DISTRICT BOARD OF EDUCATION, and JANAY FREEBERY,<br><br>Defendants. | C.A. No.05-524 (SLR)<br><br>**JURY TRIAL DEMANDED** |

**CERTIFICATE OF SERVICE**

I, Timothy J. Wilson, Esq., hereby certify that on August 2, 2006, I electronically filed a true and correct copy of the foregoing ***Plaintiff's Answering Brief in Response to Defendant's Motion for Summary Judgment*** with the Clerk of the Court using CM/ECF, which will send notification of such to the following counsel of record, and further that I caused a copy of same to be delivered to the following counsel of record:

Barry M. Willoughby, Esq.
Michael P. Stafford, Esq.
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE 19899-0391

MARGOLIS EDELSTEIN

Timothy J. Wilson, Esq. (No. 4323)
1509 Gilpin Ave.
Wilmington, DE 19806
(302) 777-4680 – Telephone
(302) 777-4682 – Facsimile
*Attorney for Plaintiff*

# TABLE OF CONTENTS


Page No.

TABLE OF CITATIONS .......... iv

NATURE AND STAGE OF THE PROCEEDINGS .......... 1

SUMMARY OF ARGUMENT .......... 2

STATEMENT OF MATERIAL FACTS .......... 4

ARGUMENT .......... 13

I. STANDARD OF REVIEW .......... 13

II. NO CONDITIONAL PRIVLEGE ATTACHES TO DEFENDANT FREEBERY'S DEFAMATORY COMMENTS .......... 14

a. *Conditional Privilege Does Not Apply Because Freebery's Comments Were Made with Malice and Such an Inquiry is a Matter Properly Left to the Jury* .......... 14

b. *The Comments Alleged to Have Been Made by Mr. Wilcoxon, Including the "Wife and Bitch" Comment Do Not Constitute Sexual Harassment Which Nullifies Any Alleged Conditional Privilege* .......... 16

c. *Ms. Freebery's Comments Were Published to Third Parties* .......... 18

III. PLAINTIFF'S FIRST AMENDMENT CLAIM MUST SURVIVE BECAUSE IT PERTAINS TO MATTERS OF PUBLIC CONCERN .......... 18

a. *The Issue of Whether the Log is a Matter of Public Concern is Barred by the Doctrine of Res Judicata* .......... 19

b. *Keeping the Journal On Ms. Freebery's Dereliction of Her Duties Was Not Made Pursuant to Mr. Wilcoxon's Official Duties as a Teacher, Nor Was Keeping a Journal Regarding Student Safety* .......... 21

c. *Mr. Wilcoxon's Speech is Not Outweighed by Any Disruptive Effect Because Any Disruption Was the Result of the Actions of Red Clay* .......... 23

**Page No.**

IV. ISSUES OF MATERIAL FACT PRECLUDE GRANTING RED CLAY'S MOTION ON MR. WILCOXON'S DISCRIMINATION AND RETALIATION CLAIMS........................................ 24

a. *The Record Contains Material Issues of Fact that Preclude Summary Judgment on Mr. Wilcoxon's Discrimination Claim* ......................... 24

b. *The Temporal Proximity of Red Clay's Retaliatory Actions Against Mr. Wilcoxon, Coupled with the Frequency and Extent of Same Preclude Summary Judgment* ........................................................ 25

V. MR. WILCOXON WAS TERMINATED IN VIOLATION OF THE TEACHER TERMINATION STATUTE, 14 *DEL. C.* § 1401 *et seq*.................................. 27

a. *Red Clay Terminated Mr. Wilcoxon Based Upon Documented Materials Not "Properly Placed" in His Personnel File Prior to His Notice of Termination in that the Documented Materials Were the Result of Disciplinary Meetings Held: (1) without forty-eight (48) hours advance notice; (2) without providing prior written notice for the specific reasons of such meetings; (3) without notice of additional persons who would be present at such meetings; and (4) without an Association representative of his choice present to advise and to represent him during such meetings*.......................... 27

b. *Mr. Wilcoxon was Terminated For Performance Reasons Without the Benefit of His Statutory Right to Correct Those Deficiencies Through An Individualized Improvement Plan*......................... 32

CONCLUSION ............................................................ 34

**TABLE OF CITATIONS**

**Cases** **Page No.**

Adickes v. S.H. Kress & Co.,
398 U.S. 144, 157 (1970)..................................................14

Anderson v. Liberty Lobby, Inc.,
477 U.S. 242, 255 (1986)..................................................13,14

Baldassare v. New Jersey,
250 F.3d 188, 194 (3d Cir. 2001)..................................................18,19

Burr v. Atlantic Aviation Corp.,
Del. Supr., 348 A.2d. 179, 181 (1975)..................................................15

Collier v. Target Stores Corp.,
2005 U.S. Dist. LEXIS 6262, 19-20 (D. Del. 2005)..................................................25, 26

Connick v. Myers,
461 U.S. 138, 147 – 48 (1983)..................................................19

Day v. Borough of Carlisle,
2006 U.S. Dist. LEXIS 46434 (M. D. PA 2006)..................................................22

Durig v. Woodbridge Bd. Of Educ.,
1992 Del. Super. LEXIS 404 (Del. Super. 1992)..................................................15

Farrell v. Planters Lifesavers Co.,
206 F.3d 271, 280 (3d Cir. 2000)..................................................25

Ferguson v. E. I. Du Pont de Nemours & Co.,
560 F. Supp. 1172, 1199 (D. Del. 1983)..................................................16

Hedberg v. Rockford Stop-N-Go, Inc.,
1999 U.S. App. LEXIS 32026 (7th Cir. 1999)..................................................17

Holder v. City of Allentown,
987 F.2d 188, 195 (3d Cir. 1993)..................................................19

Horowitz v. Fed. Kemper Life Assurance Co.,
57 F.3d 300, 302 n.1 (3d Cir. 1995)..................................................13

Kachmar v. SunGard Data Sys., Inc.,
109 F.3d 173, 177 (3d Cir. 1997)..................................................26

Kodrea v. City of Kokomo,
2006 U.S. Dist. LEXIS 42327 (S.D. IN 2006)..................................................22

**Cases** **Page No.**

Kriss v. Sprint Communications Co.,
58 F.3d 1276, 1281 (8th Cir. 1995)....................................................17

Lloyd v. Jefferson,
53 F.Supp.2d 643, 664 (D. Del. 1999)....................................................21

Logan v. Commerical Un. Ins. Co.,
96 F.3d 971, 978 (7th Cir. 1996)....................................................13

MacDonald v. Delta Air Lines, Inc.,
94 F.3d 1437, 1440 (10th Cir. 1996)....................................................13

McCoy v. Sussex Co. Vo-Tech Sch. Dist.,
1998 Del. Ch. LEXIS 171, *14 (Del. Ch. 1998)........................14, 27, 28, 29, 30, 31

McHugh v. Bd. Of Edu. Of the Milford Sch. Dist.,
100 F.Supp.2d 231 (D. Del. 2000)....................................................19, 20, 21

Pa. Coal Ass'n v. Babbitt,
63 F.3d 231, 236 (3d Cir. 1995)....................................................14

Pierce v. Burns,
185 A.2d 477, 479 (Del. Supr. 1962)....................................................15

Richards v. City of Wilmington,
2004 U.S. Dist. LEXIS 4987 (D. Del. 2004)....................................................17

Rodgers v. Monumental Life Ins. Co.,
289 F.3d 442, 448 (6th Cir. 2002)....................................................13

Schuster v. Derocili,
775 A.2d 1029 (Del. 2001)....................................................18

Seiner v. The University of Delaware,
243 F.Supp.2d 106, 116 (D.Del. 2003)....................................................15

Troy Chemical Corp. v. Teamsters Union Local No. 408,
37 F.3d 123, 126 (3d Cir. 1994)....................................................13

**Unreported Cases** **Tab No.**

Collier v. Target Stores Corp.,
2005 U.S. Dist. LEXIS 6262, 19-20 (D. Del. 2005)....................1

Day v. Borough of Carlisle,
2006 U.S. Dist. LEXIS 46434 (M. D. PA 2006)....................2

Durig v. Woodbridge Bd. Of Educ.,
1992 Del. Super. LEXIS 404 (Del. Super. 1992)....................3

Hedberg v. Rockford Stop-N-Go, Inc.,
1999 U.S. App. LEXIS 32026 (7th Cir. 1999)....................4

Kodrea v. City of Kokomo,
2006 U.S. Dist. LEXIS 42327 (S.D. IN 2006)....................5

McCoy v. Sussex Co. Vo-Tech Sch. Dist.,
1998 Del. Ch. LEXIS 171, *14 (Del. Ch. 1998)....................6

Richards v. City of Wilmington,
2004 U.S. Dist. LEXIS 4987 (D. Del. 2004)....................7

**Statutes, Acts & Rules**

14 Del. C. § 1401....................31

14 Del. C. § 1410....................26, 27, 29, 30, 31, 32

14 Del. C. 1414....................31

*Harper and James, Law of Torts*, § 5.29; *Restatement of Torts*, § 619 (2)....................15

**NATURE AND STAGE OF THE PROCEEDINGS**

Plaintiff, Richard Wilcoxon is a former health and physical education teacher at Skyline Middle School in the Red Clay Consolidated School District. He was terminated by Defendant, Board of Education of the Red Clay Consolidated School District ("Red Clay") on May 18, 2004 following discipline imposed upon him in violation of 14 *Del. C.* § 1410. Mr. Wilcoxon filed a lawsuit against Red Clay on July 22, 2005 claiming wrongful termination and discrimination and retaliation based upon his gender.

Red Clay filed a Motion to Dismiss to Complaint. That Motion was denied on June 30, 2006. *Wilcoxon v. Red Clay Consolidated School District Board of Edu.*, 2006 U.S. Dist. LEXIS 45294 (D. Del. June 30, 2006).

On July 12, 2006 Red Clay filed an Opening Brief in Support of its Motion for Summary Judgment. Mr. Wilcoxon filed his Opening Brief in Support of his Motion for Partial Summary Judgment on July 13, 2006. This is Mr. Wilcoxon's Answering Brief in Opposition to Red Clay's Motion for Summary Judgment.

## SUMMARY OF ARGUMENT

**I. STANDARD OF REVIEW**

**II. NO CONDITIONAL PRIVLEGE ATTACHES TO DEFENDANT FREEBERY'S DEFAMATORY COMMENTS**

a. *Conditional Privilege Does Not Apply Because Freebery's Comments Were Made with Malice and Such an Inquiry is a Matter Properly Left to the Jury*

b. *The Comments Alleged to Have Been Made by Mr. Wilcoxon, Including the "Wife and Bitch" Comment Do Not Constitute Sexual Harassment Which Nullifies Any Alleged Conditional Privilege*

c. *Ms. Freebery's Comments Were Published to Third Parties*

**III. PLAINTIFF'S FIRST AMENDMENT CLAIM MUST SURVIVE BECAUSE IT PERTAINS TO MATTERS OF PUBLIC CONCERN**

a. *The Issue of Whether the Journal is a Matter of Public Concern is Barred by the Doctrine of Res Judicata*

b. *Keeping the Journal On Ms. Freebery's Dereliction of Her Duties Was Not Made Pursuant to Mr. Wilcoxon's Official Duties as a Teacher, Nor Was Keeping a Journal Regarding Student Safety*

c. *Mr. Wilcoxon's Speech is Not Outweighed by Any Disruptive Effect Because Any Disruption Was the Result of the Actions of Red Clay*

**IV. ISSUES OF MATERIAL FACT PRECLUDE GRANTING RED CLAY'S MOTION ON MR. WILCOXON'S DISCRIMINATION AND RETALIATION CLAIMS**

a. *The Record Contains Material Issues of Fact that Preclude Summary Judgment on Mr. Wilcoxon's Discrimination Claim*

b. *The Temporal Proximity of Red Clay's Retaliatory Actions Against Mr. Wilcoxon, Coupled with the Frequency and Extent of Same Preclude Summary Judgment*

**V. MR. WILCOXON WAS TERMINATED IN VIOLATION OF THE TEACHER TERMINATION STATUTE, 14 *DEL. C.* § 1401 *et seq.***

*a.* *Red Clay Terminated Mr. Wilcoxon Based Upon Documented Materials Not "Properly Placed" in His Personnel File Prior to His Notice of Termination in that the Documented Materials Were the Result of Disciplinary Meetings Held: (1) without forty-eight (48) hours advance notice; (2) without providing prior written notice for the specific reasons of such meetings; (3) without notice of additional persons who would be present at such meetings; and (4) without an Association representative of his choice present to advise and to represent him during such meetings*

*c.* *Mr. Wilcoxon was Terminated for Performance Reasons Without the Benefit of His Statutory Right to Correct Those Deficiencies Through an Individualized Improvement Plan*

## STATEMENT OF MATERIAL FACTS

Mr. Wilcoxon began working for Defendant Red Clay Consolidated School District at Skyline Middle School in Pike Creek, Delaware in October of 2002. During the fall and into the winter of 2002, Mr. Wilcoxon team-taught[1] with a long-term substitute who was filling in for a female physical education teacher, Janay Freebery. (B-0036, B-0107, B-0231). In early 2003, Ms. Freebery returned to work at Skyline. Ms. Freebery had been out of work the previous fall on maternity leave. After her return, she and Mr. Wilcoxon team-taught some of their Physical Education classes together.

Following her return to work, Ms. Freebery was frequently tardy in getting to work and often absent during class time. (B-0038 – B-0040, B-0044 – B-0045, B-0258 pg 33, B-0312 – B-0316 pgs 38-40, 44-45). Concerned about this issue, Mr. Wilcoxon sought advice from two senior members of the teaching staff, Linda Filer ("Ms. Filer") and Tom Karpinski ("Mr. Karpinski"), regarding a course of action for him to take with respect to Ms. Freebery's absences from class. (B-0025 – B-0026).

Ms. Filer and Mr. Karpinski counseled Mr. Wilcoxon to keep a written journal of times and dates of Ms. Freebery's absences and other pertinent information about Ms. Freebery's actions and inactions. (B-0025 – B-0026, B-0033). Mr. Wilcoxon took his mentors' advice and began to record Ms. Freebery's absences and actions in a journal which he kept locked in his office. (B-0025 – B-0026, B-0033).

On December 15, 2003, Mr. Wilcoxon was ill and reported off from work. (B-0256 pg 22). During his absence, Frank Rumford ("Mr. Rumford"), acting Assistant Principal, entered Mr. Wilcoxon's locked office, went into his desk and removed the

journal containing the documentation of Ms. Freebery's actions and absences. (B-0033, B-0069, B-0256 pgs 22-23, 25, B-0257 pg 26, B-0277 pgs 40-41, B-0278 pg 44). Mr. Rumford then turned the journal over to a substitute teacher who gave it to Ms. Freebery, who in turn gave it to the Acting Principal of Skyline Middle School, Janet Basara ("Ms. Basara"). (B-0235 pgs 22-24). Ms. Basara acted on behalf of Red Clay in disciplinary matters pertaining to Skyline teachers and therefore acted as an agent of Red Clay. (B-0269 pg 8).

Up until this point in his career, Mr. Wilcoxon had never had a bad performance review and had never been subject to any discipline. (B-0431). Mr. Wilcoxon returned to work the next day, December 16, 2003. (B-0279, pg 49). During his scheduled planning period, he left school to run an errand. When he returned, he found a Post-it note in the teachers' sign-out book stating, "Rich, Janet [Basara] needs to see you." (B-0311)

The topic of this meeting with Ms. Basara was the journal that had come into Ms. Basara's possession via, Frank Rumford and Janay Freebery (B-0054 – B-0055). Mr. Wilcoxon explained to Ms. Basara his reasons for keeping the journal. (B-0014, B-0281 pg 56-57). However, instead of indicating that she would investigate Ms. Freebery's tardiness and absences from class, Ms. Basara verbally reprimanded *Mr. Wilcoxon*. (B-0282 pg 59, B-0284 pg 69)

On December 17, 2003, Ms. Basara called Mr. Wilcoxon into her office for a meeting. (B-0285 pgs 71-72). The purpose of the meeting was to attempt to coerce Mr. Wilcoxon to reveal who had advised him to record Ms. Freebery's absences. (B-0281 pgs 56-57). During the meeting, Ms. Basara made a comment that Mr. Wilcoxon and Ms.

[1] Team-teaching is a style of teaching whereby two teachers teach a large group of children a single subject. The idea behind team-teaching is that the two teachers combined knowledge will provide a more

Freebery needed to have another meeting to determine how Mr. Wilcoxon and Ms. Freebery could finish the rest of this school year working together. (B-0286 pg 75). Mr. Wilcoxon questioned why she limited her statement to "the rest of this school year."(B-0286 pg 75) Ms. Basara replied, "You're not tenured are you?" (B-0260 pg 38-39, B-0286 pg 75-76). Mr. Wilcoxon took this as a direct threat to his career and understood it to mean that he had better not pursue this matter any further or he would be terminated. (B-0286 pg 77).

Later that day, Mr. Wilcoxon was unexpectedly called into another meeting. In attendance were Ms. Freebery, Mr. Rumford, and Ms. Basara. (B-0014). During this meeting Ms. Freebery took control and repeatedly demanded to know the identities of the individuals who advised him to keep the journal. (B-0014, B-0286 pg 74-75). Again, Mr. Wilcoxon refused to reveal them. (B-0014). After asking Mr. Wilcoxon this question four separate times, and in apparent realization that she was not going to get an answer, Ms. Freebery falsely accused Mr. Wilcoxon of making inappropriate comments to her and threatened to file a sexual harassment complaint against him. (B-0014, B-0285 pg 73). Mr. Wilcoxon steadfastly denied any and all inappropriate statements. (B-0015).

Article 4:4.1 of the collective bargaining agreement between the District and the Red Clay Education Association Affiliate of NCCEB-DSEB-NEA, Inc. ("collective bargaining agreement"), holds in pertinent part:

> If an employee is required to appear before the Board or an agent thereof concerning a matter which could adversely affect his/her continued employment, salary or any increments, he/she will be given ***prior written notice and specific reasons for such meeting or interview at least forty-eight (48) hours in advance***. Any topic not included in the letter will not be covered at said meeting unless

meaningful learning experience for the students.

> agreed to by the employee; if not agreed it will be discussed at a later date after proper notice has been given. The employee will also be ***notified in writing of any additional persons who will be present***. An employee required to appear in this instance will be ***entitled to have an Association representative of his/her choice present*** to advise and to represent him/her during such meeting or interview . . . . (emphasis added). (B-0328)

This December 17, 2003 meeting was held in direct contravention of the collective bargaining agreement in that Mr. Wilcoxon was not given forty-eight hours notice of the meeting; not informed in writing of the specific reason for the meeting; not informed in writing of the individuals who would be in attendance at the meeting; and, not permitted to have an Association representative of his/her choice present to advise and to represent him during the meeting. (B-0285 pgs 71-72; B-0431 – B-0432). Because the meeting violated the terms of the collective bargaining agreement any subsequent disciplinary actions based upon that which occurred at the meeting should have been prohibited.

Mr. Wilcoxon was very troubled by Ms. Freebery's false statements. (B-260 pg 38, B-286 pg 77). So much so that after school concluded that day, Mr. Wilcoxon again met with Mr. Rumford and Ms. Basara to make a complaint about her false accusations and threats against him. (B-0286, pg. 77). He related that Ms. Freebery had *never* expressed any concern over *anything* that Mr. Wilcoxon had said to her prior to her knowledge that he was keeping the journal – suggesting that this was her way of getting back at him. (B-0015). He then asked what it was that he allegedly said that had offended Ms. Freebery. He got no answer. In fact, both Mr. Rumford and Ms. Basara indicated that Ms. Freebery was not uncomfortable with anything that Mr. Wilcoxon had

said until the journal was found (B-0285 pg 73). Ms. Basara assured Mr. Wilcoxon that he was not in any sort of trouble and that Ms. Freebery's accusations were not a formal complaint. (B- 0286 pgs 76-77).

Mr. Wilcoxon informed Ms. Basara that Ms. Freebery brought up the topic of sex routinely in the course of conversation with Mr. Wilcoxon. (B-0198). He related exact stories that he could not possibly have known without Ms. Freebery telling him. Ms. Freebery received no reprimand or discipline of any sort.

On January 22, 2004, Mr. Wilcoxon received a letter in his school mailbox at 11:30 a.m. stating that he needed to report to Ms. Basara's office after school for a meeting – essentially giving Mr. Wilcoxon three hours notice of the meeting (B-0304, B-0320). There was no mention of the topic of the meeting or any other persons who would be present at the meeting. (B-0304). After receiving this notice, Mr. Wilcoxon asked Ms. Basara if the topic of the meeting warranted union representation. She responded that "it might." Mr. Wilcoxon contacted both of the union representatives who worked in his building and requested that they attend the meeting with him, but because of the short notice they were unable to attend the meeting. (B-0304).

Mr. Wilcoxon notified Ms. Basara of his inability to secure union representation. She responded that he was to attend the meeting without representation because she had already arranged for other individuals to be present at the meeting. This was the first time that Mr. Wilcoxon was notified that other individuals would be present. The other individuals who were in attendance were Frank Rumford and Bob Bartoli. (B-0287 pg 81).

At this January 22, 2004 meeting, contrary to Ms. Basara's prior assurances during the meeting of December 17 2003 that Mr. Wilcoxon was not in trouble, she presented Mr. Wilcoxon with a disciplinary letter that concluded that he had made inappropriate comments about Ms. Freebery. (B-0302). Because Mr. Wilcoxon disagreed with the conclusions in the letter, Mr. Wilcoxon refused to sign it. (B-0319). He then informed Ms. Basara that before the meeting proceeded any further, he wanted to have a union representative present. (B-0290). Ms. Basara refused his request and instructed him not to leave until he received two other disciplinary letters. (B-0149, B-0288, pg 85).

The second letter imposed on Mr. Wilcoxon during the January 22, 2004 meeting alleged that his emergency lesson plans[2] did not include a class list or bell schedule. (B-0303). However, when he requested to see the emergency lesson plan so that they could specifically show him its shortcomings, he was told that they did not have them. (B-0163). The third letter given to Mr. Wilcoxon during the January 22, 2004 meeting concluded that he did not sign up for after school bus duties and, as a result, other teachers and administrators had to make up for his absences. (B-0429).

The third letter given to Mr. Wilcoxon during the January 22, 2004 meeting concluded that he did not sign up for after school bus duties and, as a result, other teachers and administrators had to make up for his absences. (B0291, pg. 94).

This meeting was held in direct contravention of the collective bargaining agreement in that Mr. Wilcoxon was not given forty-eight hours notice of the meeting (B-0431 – A0432); not informed in writing or otherwise of the specific reason for the meeting (B-0431 – A0432); not informed in writing or otherwise of the individuals who

would be in attendance at the meeting (B-0431 – A0432); and, not permitted to have an Association representative of his choice present to advise and to represent him during the meeting. (B-0288 pg 82, B-0320, B-0431 – B-0432).

Because the January 22, 2004 meeting violated the terms of the collective bargaining agreement, the disciplinary letters were not "properly placed" in Mr. Wilcoxon's personnel file and therefore could not be used as a basis for any termination of Mr. Wilcoxon's employment according to 14 *Del. C.* § 1410.

On May 5, 2004, Ms. Basara called Mr. Wilcoxon into another surprise meeting. (B-0431). This time, in an effort to give an illusion of fairness, Ms. Basara had taken the liberty of securing union representation for Mr. Wilcoxon. (B-0224 – B-0025). She had retained the services of Tom Meade, a union representative. (B-0224 – B-0025). This individual was present to act ostensibly on Mr. Wilcoxon's behalf. He was not chosen by Mr. Wilcoxon. (B-0431 – B-0432).

The disciplinary letter that Mr. Wilcoxon received at this meeting addressed a situation where Mr. Wilcoxon had allegedly failed to secure a small sum of money properly and the money was stolen out of his desk. (B-0305 – B-0306). However, two other female teachers, Patty Root and Marilyn Morgan, also failed to secure money and had it stolen from the desks during this same school year but neither received a disciplinary letter. (B-0298, pgs 123-125). This meeting was held in direct contravention of the collective bargaining agreement in that Mr. Wilcoxon was not given forty-eight hours notice of the meeting (B-0431 – B-0432); informed in writing or otherwise of the specific reason for the meeting (B-0431 – B-0432); informed in writing or otherwise of

---

[2] These are plans the teacher creates but stores in the main office in case the teacher is unable to come to school for some emergency reason. They include instructions on everything a substitute would need to

the individuals who would be in attendance at the meeting (B-0431 – A0432); and, was not permitted to have an Association representative *of his choice* present to advise and to represent him during the meeting. (B-0431 – B-0432). Because the meeting violated the terms of the collective bargaining agreement, the disciplinary letters were not "properly placed" in Mr. Wilcoxon's personnel file and therefore could not be used as a basis for any termination of Mr. Wilcoxon's employment according to 14 *Del. C.* § 1410.

On May 11, 2004 a union representative contacted Mr. Wilcoxon to inform him that he was to meet once again with Mrs. Basara, *that day*. At this meeting, Mr. Wilcoxon was given another disciplinary letter. The letter stated that Plaintiff's lesson plans were inappropriate. (B-0305).

Again, this meeting was held in direct contravention of the collective bargaining agreement in that Mr. Wilcoxon was not given forty-eight hours notice of the meeting; not informed in writing or otherwise of the specific reason for the meeting; and, not permitted to have an Association representative *of his choice* present to advise and to represent him during the meeting. (B-0431 –B-0432). Because the May 11, 2004 meeting was held in violation of the collective bargaining agreement, the disciplinary letters were not "properly placed" in Mr. Wilcoxon's personnel file and therefore could not be used as a basis for any termination of Mr. Wilcoxon's employment according to 14 *Del. C.* § 1410.

On May 14, 2004, Mr. Wilcoxon was again called into Ms. Basara's office, where once again, Ms. Basara had taken the liberty of securing union representation for Mr. Wilcoxon. Hence this individual was not a representative of Mr. Wilcoxon's choosing.

---

know to run the teacher's class in his or her absence.

(B-0431 – A0432). Ms. Basara handed Mr. Wilcoxon a letter stating that the District would not renew his contract for the ensuing school year. (B-0308).

At that point, Mr. Wilcoxon requested the reasons for the non-renewal. In response, he was sent a letter dated May 18, 2004 stating that he was terminated because of poor lesson plans, poor classroom management and for making inappropriate comments. (B-0308). Mr. Wilcoxon was never placed on an individual improvement plan. (B-0431 – B-0432).

Once again, this May 14 meeting was held in direct contravention of the collective bargaining agreement in that Mr. Wilcoxon was not given forty-eight hours notice of the meeting (B-0431 – B-0432); not informed in writing or otherwise of the specific reason for the meeting (B-0431 – B-0432); not informed in writing or otherwise of the individuals who would be in attendance at the meeting (B-0431 – B-0432); and, not was not permitted to have an Association representative of his/her choice present to advise and to represent him during the meeting. (B-0431 – B-0432). Because this meeting violated the terms of the collective bargaining agreement, the termination has no effect and is therefore a nullity. 14 *Del. C.* § 1410.

Mr. Wilcoxon's termination violated 14 *Del. C.* § 1410 because the termination was based upon information not "properly placed" in Mr. Wilcoxon's personnel file prior to the notice of termination.

But for his unlawful termination at the close of the 2003 – 2004 school-year, Mr. Wilcoxon would have become a tenured school teacher in October 2004.

## ARGUMENT

### I. STANDARD OF REVIEW

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment "shall be rendered" where "the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law." Fed. R. Civ. P. 56(c).

A fact is material if it might affect the outcome under the governing substantive law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Material facts are those that could alter the outcome of the case, "and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Fed. Kemper Life Assurance Co.*, 57 F.3d 300, 302 n.1 (3d Cir. 1995). A fact is only material if the "establishment thereof might affect the outcome of the lawsuit under governing substantive law." *Rodgers v. Monumental Life Ins. Co.*, 289 F.3d 442, 448 (6th Cir. 2002); *see also, Logan v. Commercial Un. Ins. Co.*, 96 F.3d 971, 978 (7th Cir. 1996) ("The nonmovant must do more . . . than demonstrate some factual disagreement between the parties; the issue must be 'material.' Irrelevant or unnecessary facts do not preclude summary judgment even when they are not in dispute.").

A material fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *MacDonald v. Delta Air Lines, Inc.*, 94 F.3d 1437, 1440 (10th Cir. 1996); *see also, Troy Chemical Corp. v. Teamsters Union Local No. 408*, 37 F.3d 123, 126 (3d Cir. 1994)(holding that factual issues are not

"genuine" unless a reasonable jury could return a verdict for nonmovant based on nonmovant's submissions). A dispute over a material fact must be "genuine", i.e., the evidence is such "that a reasonable jury could return a verdict in favor of the non-moving party." *Id.*

The court must "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Pa. Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995). In meeting its burden of showing an absence of a genuine issue as to any material fact, "the material [the movant] lodge[s] must be viewed in the light most favorable to the opposing party." *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). "[E]vidence of nonmovant is to be believed and all reasonable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

This case will involve drawing inference from fact. Drawing inferences from fact is a duty reserved for a jury at trial. *See, Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## II. NO CONDITIONAL PRIVLEGE ATTACHES TO DEFENDANT FREEBERY'S DEFAMATORY COMMENTS

### *a. Conditional Privilege Does Not Apply Because Freebery's Comments Were Made with Malice and Such an Inquiry is a Matter Properly Left to the Jury*

Defendants' assert that Mr. Wilcoxon's defamation claim against Defendant Freebery must be dismissed because her defamatory communications were protected by a conditional privilege. "Once a conditional privilege has been established, it must be exercised with good faith, without malice and absent any knowledge of falsity or desire

to cause harm." Durig v. Woodbridge Bd. of Educ., 1992 Del. Super. LEXIS 404 (Del. Super. 1992) (quoting, *Burr v. Atlantic Aviation Corp.*, 348 A.2d 179, 181 (Del. Supr. 1975)) (internal quotations omitted). "[T]he question of whether a privilege has been abused by malice or intent to harm ordinarily is a factual question for the jury." *Seiner v. The University of Delaware*, 243 F.Supp.2d 106, 116 (D. Del. 2003). Moreover,

> [a]s to whether or not an occasion is privileged in the sense that no slander can be committed by an exchange of communications, it is the function of the court to determine this as a matter of law. As to whether or not, however, the statements complained of are made maliciously, that is, with actual ill will toward the object of the statement, or with an improper motive by the person making the statement, the jury is the proper tribunal to determine that fact.

*Pierce v. Burns*, 185 A.2d 477, 479 (Del. Supr. 1962) (citing *Harper and James, Law of Torts*, § 5.29; *Restatement of Torts*, § 619 (2)).

Here, there are material issues of fact as to whether Ms. Freebery made her defamatory remarks about Mr. Wilcoxon with malice. Ms. Freebery made her defamatory comments regarding Mr. Wilcoxon *immediately* following the revelation of Mr. Wilcoxon's journal of Ms. Freebery's month's of teaching malfeasance and wrongful This raises a very real inference that Freebery's statements were in fact made with malice in an attempt to switch the focus of the meeting from her actions and/or inactions to the false wrongful conduct of Mr. Wilcoxon. In other words, at the time Freebery made the statements she bore significant ill-will toward Mr. Wilcoxon and possessed intent to injure him – which ultimately it did by virtue of his being disciplined and terminated in response to her allegations.

As a consequence, the determination of whether Ms. Freebery made the defamatory communications with malice is a question that is properly reserved for the jury.

b. *The Comments Alleged to Have Been Made by Mr. Wilcoxon, Including the "Wife and Bitch" Comment Do Not Constitute Sexual Harassment Which Nullifies Any Alleged Conditional Privilege*

Defendants' incorrectly contend that Ms. Freebery's communications are conditionally privileged because they pertain to her complaint of sexual harassment. In support, § I(B) of Defendants' Opening Brief addresses ad nauseam the "wife and bitch" comment allegedly made by Mr. Wilcoxon. (Defs.' Op. Br. at 19 – 21). Mr. Wilcoxon steadfastly denies making the comment. (B-0016 – B-0017). Nevertheless, such a comment and the surrounding circumstances do not rise to a viable claim of sexual harassment.

The necessary elements for a claim of sexual harassment are:

> first, the employee belongs to a protected group; second, the employee was subjected to unwelcome sexual harassment; third, the harassment was based on sex; fourth, the harassment affected a term, condition or privilege of employment; and fifth, where the employee seeks to hold the employer responsible for the actions of an employee, the employer must have actual or constructive knowledge and failed to take prompt remedial action.

*Ferguson v. E. I. Du Pont de Nemours & Co.*, 560 F. Supp. 1172, 1199 (D. Del. 1983).

At issue here are the second and third elements. First, Red Clay does not allege that Mr. Wilcoxon ever made the comment to Ms. Freebery. Moreover, the record is devoid of any evidence that, even if he made the comment, that there was an intent for the comment to be communicated to Ms. Freebery via a third party. Therefore, the "wife and bitch" comment cannot be the basis of a sexual harassment claim because Ms.

Freebery was not subjected to the comment by Mr. Wilcoxon. Therefore her complaints in that regard are not entitled to qualified immunity.

Secondly, the comments were not of a sexual nature.

> "[T]he word "bitch," ... is not an indication of a general misogynist attitude. Rather, it is a crude, gender-specific vulgarity, which in this case was directed toward only one woman, rather than women in general. (We note the existence of many vulgar epithets that are used only of men that, we believe, would not be indicative of animus against males.) Hence, we do not find Defendant's use of this term to be particularly probative of gender discrimination."

*Kriss v. Sprint Communications Co.*, 58 F.3d 1276, 1281 (8th Cir. 1995), *see also, Hedberg v. Rockford Stop-N-Go, Inc.*, 1999 U.S. App. LEXIS 32026 (7th Cir. 1999)(holding that there is no automatic inference that referring to one as a "bitch" is motivated by gender or is gender-related).

Additionally, the "wife and bitch" comment even if combined with the other comments that that Red Clay alleges were made by Mr. Wilcoxon, did not occur with enough regularity and were not pervasive enough to be considered sexual harassment. "[T]the conduct in question must be severe or pervasive enough to create both an objectively hostile or abusive work environment - an environment that a reasonable person would find hostile," and an environment that the victim-employee subjectively perceives as abusive or hostile." *Richards v. City of Wilmington*, 2004 U.S. Dist. LEXIS 4987 (D. Del. 2004).

Here, there is nothing indicative that Mr. Wilcoxon's alleged comments were objectively hostile, pervasive, or even that Ms. Freebery objected to them – until after the log was revealed. In fact, the allegations by Freebery are that Mr. Wilcoxon made only a few off-color remarks to her, many of which were of a non-sexual nature. This does not

rise to a claim for sexual harassment. As such, Ms. Freebery's communications these comments cannot be considered conditionally privileged.

c. *Ms. Freebery's Comments Were Published to Third Parties*

Defendants assert that there was no publication of Ms. Freebery's defamatory comments to third parties. In support it refers to a Delaware Supreme Court case *Schuster v. Derocili*, 775 A.2d 1029 (Del. 2001).[3] However, that case is distinguishable in that it is limited to "performance-based" issues and does not address allegations of sexual harassment.

Moreover, implicit in the Court's holding in that case is that the communications to one's supervisor in the course of one's employment are protected by a qualified privilege. If, as Red Clay proffers, an employee may make any defamatory comment regarding *any subject* matter regarding another employee to his supervisor it would not be considered to be publicized to a third party, then there would be no exceptions to the qualified privilege. In *Schuster*, there was no mention of the comments made with malice or waiver of any qualified privilege. Consequently, logic demands that the *Schuster* Court based its decision on qualified privilege, although not stated explicitly in those terms.

## III. PLAINTIFF'S FIRST AMENDMENT CLAIM MUST SURVIVE BECAUSE IT PERTAINS TO MATTERS OF PUBLIC CONCERN

"Public employers cannot silence their employees simply because they disapprove of the content of their speech. *Baldassare v. New Jersey*, 250 F.3d 188, 194 (3d Cir.

---

[3] The full citation to this case was neither in the text of the Brief nor in the Table of Citations. To the extent this was not the case to which Red Clay referred, Mr. Wilcoxon reserves the right to amend this Brief to address the correct case.

2001). Public employees have "a constitutional right to speak on matters of public concern without fear of retaliation." *Id.* Whether or not the employee's speech is a matter of public concern is ascertained by examining the "content, form, and context of a given statement." *Connick v. Myers*, 461 U.S. 138, 147 – 48 (1983). "A public employee's speech involves a matter of public concern if it can be fairly considered as relating to any matter of political, social or other concern to the community." *Adkins*, 389 F.Supp.2d at 586 (quoting *Baldassare*, 250 F.3d at 195). "The content of the speech may involve a matter of public concern if it attempts to bring to light actual or potential wrongdoing or breach of public trust on the part of government officials." *Baldassare*, 25 F.3d at 195 (quoting *Holder v. City of Allentown*, 987 F.2d 188, 195 (3d Cir. 1993)) (internal quotations omitted).

*a.* *The Issue of Whether the Journal is a Matter of Public Concern is Barred by the Doctrine of Res Judicata*

Red Clay contends, just as it did in its Motion to Dismiss, that Mr. Wilcoxon's communication is not a matter of public concern. As this has already been addressed by the Court, it is a matter of *res judicata* and the Court need not rule on this issue again. *Wilcoxon v. Red Clay Consolidated School District Board of Edu.*, *supra*. Nevertheless, in the interest of protecting himself, Mr. Wilcoxon restates his argument made in opposition to Red Clay's Motion to Dismiss.

In *McHugh v. Bd. Of Edu. Of the Milford Sch. Dist.*, 100 F.Supp.2d 231 (D. Del. 2000), a case very similar to that which is presently before the Court, Plaintiff was the Supervisor of Transportation/Visiting Teacher at Milford School District. He conducted various investigations into bus driver safety issues and the award of the bus driving contracts for the school district. Following his investigations, he forwarded the

information to the Superintendent of the School Board. The two members of the school board delayed taking any action on the allegations.

In response, plaintiff brought charges of official misconduct against the two school board members before the school board. Shortly thereafter plaintiff's contract was not renewed. Plaintiff filed suit claiming *inter alia*, that his First Amendment rights had been violated by the district's retaliation against him and that the district had also violated the covenant of good faith and fair dealing by those same actions. Defendants filed a motion for summary judgment based upon, among other things, the argument that plaintiff's speech was not a matter of public concern.

The Court found that plaintiff's speech concerned three primary issues: the safety of the bus driving services provided by the outside contractor, the alleged misconduct of the two school board members for not disciplining the contractor, and the distribution of bus routes between contractors. Defendant contended that these communications were motivated by self-interest as opposed to public concern and therefore were not protected speech. The Court concluded that plaintiff's "statements were addressed to issues of student safety, public officials' alleged malfeasance, and School Board policies, all of which are clearly matters of public concern." *Id.* at 240.

Similarly, in this case, Mr. Wilcoxon's statements contained in his journal pertained to the safety of the children who were being left unattended due to Ms. Freebery's absences, violations of school policy by Ms. Freebery, as well as misconduct by Ms. Freebery, another public employee. (B-0029). Like the holding in *McHugh*, these are matters of public, not private concern. These issues are "matters of interest to the community upon which it is essential that public employees be able to speak out freely

without fear of retaliatory dismissal." *McHugh,* 100 F.Supp.2d at 241 (quoting, *Connick v. Myers*, 461 U.S. 138, 149 (1983). Moreover, Mr. Wilcoxon's speech related to matters of social and other concern to the community, *Adkins*, 389 F.Supp.2d at 586, namely the safety of the children and the proper functioning of the Skyline Middle School.

While there may have been some motivation and personal interest on Mr. Wilcoxon's part to keep the journal to protect himself in the event of an injury to one of Ms. Freebery's students, the motivation of the employee is not dispositive on the issue as to whether the speech pertained to matters of public concern. *Lloyd v. Jefferson,* 53 F.Supp.2d 643, 664 (D. Del. 1999). Here there is no question that despite any alleged personal interest, the subject matter of the speech squarely related to matters of public concern.

*b.* *Keeping the Journal Concerning the Safety of the Students and Ms. Freebery's Dereliction of Her Duties Was Not Made Pursuant to Mr. Wilcoxon's Official Duties as a Teacher, Nor Was Keeping a Journal Regarding Student Safety*

Again, Red Clay raises an issue already decided by this Court in its Opinion on Red Clay's Motion to Dismiss. *Wilcoxon v. Red Clay Consolidated School District Board of Edu., supra.*

> Plaintiff's journal containing the absences of a fellow teacher was not written pursuant to his official duties as a teacher. He was not employed to monitor the absences of fellow teachers, and defendants do not allege that he was required to do so.

2006 U.S. Dist. LEXIS 45294 * 19. As a consequence, this issue is not properly before the Court.

Nevertheless, and again in an attempt to protect his interests, Mr. Wilcoxon addresses Red Clay's argument. Red Clay's argument that keeping the journal was

within Mr. Wilcoxon's official duties is preposterous given that Red Clay actually disciplined Mr. Wilcoxon for keeping the journal. This begs the rhetorical question: how can it be within his official duties if he was disciplined for keeping the journal? Obviously it was not a part of his official duties.

What Red Clay fails to bring to the Court's attention, but which the Court has already recognized in its previous Opinion, is that when keeping the journal, Mr. Wilcoxon's concern for the student's safety was rooted in the dereliction of duties of Ms. Freebery. There has been no evidence produced that the recording the comings and goings of another teacher who was reporting late, leaving early, often imposing the supervision of two classes of middle school children in the hands of one teacher, and putting those students in danger is a matter that is within a teacher's duties. In fact, common sense dictates that it is *not* within a teacher's duties. Furthermore, Red Clay has come forward with no evidence that dictates that part of a teacher's job is keeping a journal that records specific events that could affect student safety.

A similar factual scenario was faced by the District Court for the Middle District of Pennsylvania in *Day v. Borough of Carlisle*, 2006 U.S. Dist. LEXIS 46434 (M. D. PA 2006) (attached at Tab X). There, a police officer reported misconduct of fellow officers. The Court held that the police officer, as a Corporal, was not duty bound to report those instances of misconduct.

In another case, *Kodrea v. City of Kokomo,* 2006 U.S. Dist. LEXIS 42327 (S.D. IN 2006)(attached at Tab X), the plaintiff, a recreational programmer for the City Parks Department, reported instances of discrepancies in another employee's time and also an issue regarding a refund that his superior failed to give a client. The court, noting that

there was nothing in plaintiff's job description that required him to monitor or report misconduct, held that a factual issue remained as to whether plaintiff acted as a citizen or as an employee. *Id.* at *26.

Much like the plaintiffs in *Day* and *Kodrea*, Mr. Wilcoxon held no supervisory authority over Ms. Freebery. The record is bare of any policy or job description that required Mr. Wilcoxon to report on whether or not she was putting the safety of the students at risk through her absences. Consequently, viewing the evidence in this case, in a light most favorable to Mr. Wilcoxon, the Court must find that at the very least, due to the absence of any evidence in the record indicating that such actions were within his official duties, there remain material issues of fact in this regard.

c. *Mr. Wilcoxon's Speech is Not Outweighed by Any Disruptive Effect Because Any Alleged Disruption Was Directly Attributable to the Actions of Red Clay*

Finally, Red Clay contends that the disruptive effect of Mr. Wilcoxon's speech outweighed his right to that speech. Ironically, it was not even through *any* of Mr. Wilcoxon's doings that this speech came to light; it was through the subversive actions of the Red Clay representatives that the log was revealed to Ms. Freebery.

In *Kodrea*, the Court held that plaintiff's speech was protected because he voiced his concerns to his immediate supervisors in non-disruptive manner through the appropriate chain of command. Here, Mr. Wilcoxon did not voice his concerns *at all* until Mr. Rumford found the journal and showed it to Ms. Basara and Ms. Freebery. Furthermore, it was Ms. Basara who required Ms. Freebery to be in the meeting when the topic was first broached. Mr. Wilcoxon played no role in *any* disruption of the functioning of the school. To the contrary, it was Mr. Rumford and Ms. Basara who

caused the disruption by permitting the journal to come into Ms. Freebery's hands. If Rumford and Basara had concerns about the disruption the journal would cause, they could have addressed them with Mr. Wilcoxon privately, thereby causing no disruption to the functioning of the school. As a consequence, any disruption that may have occurred was caused by Red Clay itself, and not Mr. Wilcoxon.

## IV. ISSUES OF MATERIAL FACT PRECLUDE GRANTING RED CLAY'S MOTION DISMISSING MR. WILCOXON'S DISCRIMINATION AND RETALIATION CLIAMS

### a. *The Record Conains Issues of Material Fact That Preclude Summary Judgment on Mr. Wilcoxon's Discrimination Claim*

Red Clay argues that Mr. Wilcoxon failed to develop sufficient evidence to cast doubt on Red Clay's "legitimate non-discriminatory reasons for its actions." This statement is ludicrous in light of the fact that Mr. Wilcoxon was cited with absolutely no performance based issues *in his career* until Mr. Rumford discovered the journal. After that, his performance ratings, not surprisingly conducted by Ms. Basara, dropped off significantly.

Red Clay also claims that the sole basis of the discrimination claim is that Ms. Basara is a woman and Mr. Wilcoxon is a man. While Mr. Wilcoxon agrees that Ms. Basara is a female and she discriminated against him, the basis for the discrimination claim is much more extensive. First is the fact that Ms. Freebery is a woman and she incurred, in no way shape or form, the type of treatment that Mr. Wilcoxon received for what are arguably much more serious offenses – namely her being negligent in her duties and putting her students' safety at risk – than that which Mr. Wilcoxon allegedly committed in keeping his private journal.

Secondly, Mr. Wilcoxon was disciplined for lesson plans that were the same lesson plans that Ms. Freebery utilized. (B-0036). Thirdly, Mr. Wilcoxon was disciplined for failing to sign up for bus duty, (B-0291, pg. 94) while a female teacher was not disciplined for the same offense. Fourth, Mr. Wilcoxon received a disciplinary letter for allegedly failed to secure a small sum of money properly in his possession. However, two other female teachers, Patty Root and Marilyn Morgan, also failed to secure money and had it stolen from their desks during this same school year, but neither received a disciplinary letter.

Finally, Mr. Wilcoxon was in fact discriminated against by Ms. Basara because she scrutinized Mr. Wilcoxon's performance at a much higher level than she did other female teachers, including Ms. Freebery. Moreover, Ms. Basara ostracized Mr. Wilcoxon by refusing to speak to him, whereas she freely spoke to Ms. Freebery and other female teachers. All of the above are more than mere allegations and supported by the record in this case.

*b.* *The Temporal Proximity of Red Clay's Retaliatory Actions Against Mr. Wilcoxon, Coupled with the Frequency and Extent of Same Preclude Summary Judgment*

In its effort to have Mr. Wilcoxon's retaliation claim dismissed, Red Clay contends that the protected activity in which Mr. Wilcoxon engaged was filing a Charge of Discrimination with the Delaware Department of Labor. However, Mr. Wilcoxon also engaged in the protected activity of making a valid workplace complaint against Ms. Freebery for the dereliction of her duties long before he ever filed the Charge of Discrimination.

Temporal proximity is sufficient to establish a causal connection when the temporal proximity is unusually suggestive. *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 280 (3d Cir. 2000). "Cases examining causation under Title VII, the ADA, and the ADEA have often focused on the "temporal proximity between the employee's protected activity and the adverse employment action, because this is an obvious method by which a plaintiff can proffer circumstantial evidence 'sufficient to raise the inference that her protected activity was the likely reason for the adverse action." *Collier v. Target Stores Corp.*, 2005 U.S. Dist. LEXIS 6262, 19-20 (D. Del. 2005) (attached at Tab **X**) (quoting *Kachmar v. SunGard Data Sys., Inc.*, 109 F.3d 173, 177 (3d Cir. 1997).

In this case, Red Clay began retaliating against Mr. Wilcoxon *immediately* after his complaints regarding Ms. Freebery's malfeasance. Hence, Red Clay's argument that the retaliation began prior to his filing of the Charge of Discrimination is without merit. Furthermore, Red Clay's retaliation was not just one isolated instance. Viewed in light of his prior "clean record" with Red Clay and the other school districts in which he worked, Red Clay's retaliation was severe and pervasive.

Mr. Wilcoxon has presented a great deal of evidence from which a reasonable jury could conclude that the Red Clay officials penalized him because he made a workplace complaint and exercised his First Amendment rights. Moreover, in light of the fact that Mr. Wilcoxon suffered absolutely no adverse employment actions prior to the complaint and thereafter was deluged with disciplinary warnings, poor performance appraisals and other retaliatory conduct listed above, a sufficient inference is raised that the protected activity, making the workplace complaint, was likely the reason for the adverse employment action.

## V. MR. WILCOXON WAS TERMINATED IN VIOLATION OF THE TEACHER TERMINATION STATUTE, 14 *DEL. C.* § 1401 *et seq.*

The "Teacher Termination Statute," 14 *Del. C.* § 1410, requires that when an untenured teacher requests the reasons for his termination, the Board must provide the reasons in writing and that such reasons "must have either been contained in the teacher's performance appraisal, and the teacher was provided time to correct any deficiency through an *individualized improvement plan* or other documented materials *properly placed* in the teacher's personnel file prior to said notice. § 1410(b)(emphasis added).

*a.* *Red Clay Terminated Mr. Wilcoxon Based Upon Documented Materials Not "Properly Placed" in His Personnel File Prior to His Notice of Termination in that the Documented Materials Were the Result of Disciplinary Meetings Held: (1) without forty-eight (48) hours advance notice; (2) without providing prior written notice for the specific reasons of such meetings; (3) without notice of additional persons who would be present at such meetings; and (4) without an Association representative of his choice present to advise and to represent him during such meetings*

Article 4:4.1 of the collective bargaining agreement between the District and the Red Clay Education Association Affiliate of NCCEB-DSEB-NEA, Inc. ("collective bargaining agreement"), holds in pertinent part:

> If an employee is required to appear before the Board or an agent thereof concerning a matter which could adversely affect his/her continued employment, salary or any increments, he/she will be given ***prior written notice and specific reasons for such meeting or interview at least forty-eight (48) hours in advance***. Any topic not included in the letter will not be covered at said meeting unless agreed to by the employee; if not agreed it will be discussed at a later date after proper notice has been given. The employee will also be ***notified in writing of any additional persons who will be present***. An employee required to appear in this instance will be ***entitled to have an Association representative of his/her choice present*** to

> advise and to represent him/her during such meeting or interview . . . . (emphasis added). (B-0328)

In *McCoy v. Sussex Co. Vo-Tech Sch. Dist.*, 1998 Del. Ch. LEXIS 171, *14 (Del. Ch. 1998), the plaintiff/teacher was given a disciplinary letter at a meeting that was conducted without proper notice, without notice of the subject matter and without proper union representation present in violation of the applicable collective bargaining agreement. *Id.* at *2, *12.

Plaintiff argued that such a disciplinary letter could not serve as a basis for termination in that it was not "properly placed" in her personnel file in violation of § 1410. The Court agreed. It held, "[i]t is axiomatic that a reprimand later found to be invalidly issued and, therefore, ordered rescinded cannot be considered "properly placed" in a teacher's personnel file and relied upon to support a decision to terminate the teacher's employment contract." *Id.* at *14.

Like the teacher in *McCoy*, Mr. Wilcoxon's termination was based upon disciplinary letters not properly placed in his personnel file. He was terminated for poor lesson plans, poor classroom management and for making inappropriate comments. (B-0308). This resulted in disciplinary letters given to Wilcoxon concerning:

(1) for his alleged failure to make proper emergency lesson plans (January 22, 2004 and May 11, 2004 meetings)(B-303, B-428);

(2) poor classroom management (May 5, 2004 meeting)(B-305); and

(3) for making inappropriate comments (December 17, 2003 and January 22, 2004 meetings)(B-0302, B-0303, B-0304, B-0319)

All of these disciplinary letters were not "properly placed" because in one way or the other, they violated the Collective Bargaining Agreement and hence, Article 4:4.1.

In particular, although no letters were placed in his file during the December 17, 2003 meeting, that meeting did *lead* to disciplinary letters placed in his file. Those letters were improperly placed in Mr. Wilcoxon's file during the January 22, 2004 meeting. Therefore, that December 17, 2003 meeting was held in direct contravention of the collective bargaining agreement in that Mr. Wilcoxon was not given forty-eight hours notice of the meeting (B-0281, p.54); not informed in writing of the specific reason for the meeting (B-0281, p. 55); not informed in writing of the individuals who would be in attendance at the meeting (B-0431 – B-0432); not permitted to have an Association representative of his/her choice present to advise and to represent him during the meeting (B-0281, p. 55); and the subject matter of the meeting could, and did, adversely affect his/her continued employment, salary or any increments (B-0285 pg 72). Article 4:4.1. *See, McCoy* (a subsequent meeting where a disciplinary letter was placed in the plaintiff's file could not be the based upon information gained at a prior meeting that was held without proper union representation).

Because the December 17, 2003 meeting violated the terms of the collective bargaining agreement, any subsequent disciplinary actions, taken during the January 22, 2004 meeting, were prohibited and not properly placed in his personnel file.

The disciplinary letters from January 22, 2004, meeting were not properly placed due to violations of 4:4.1 and therefore, § 1410. Again, Mr. Wilcoxon was not given forty-eight hours notice of the meeting, (B-0288 pg 82, B-0320); not informed in writing or otherwise of the specific reason for the meeting, (*Id.*); not informed in writing or otherwise of the individuals who would be in attendance at the meeting (*Id.*); and, not

permitted to have an Association representative of his choice present to advise and to represent him during the meeting. (B-0287 pg. 81, B-0431 – A0432).

Likewise, the disciplinary letters given to Mr. Wilcoxon at the May 5, 2004 meeting were not properly placed pursuant to 4:4.1 and § 1410. He did not have representation of his choice, not given forty-eight hours notice of the meeting, not informed in writing or otherwise of the specific reason for the meeting; and not informed in writing or otherwise of the individuals who would be in attendance at the meeting. Because the meeting violated the terms of the collective bargaining agreement, the disciplinary letters were not "properly placed" in Mr. Wilcoxon's personnel file and therefore could not be used as a basis for any termination of Mr. Wilcoxon's employment according to 14 *Del. C.* § 1410.

Finally, On May 14, 2004, Mr. Wilcoxon was again called into Ms. Basara's office, where Mr. Wilcoxon was presented a letter stating that the District would not renew his contract for the ensuing school year. (B-0308). As was his right, Mr. Wilcoxon requested the reasons for the non-renewal. (B-0430) In response, he was sent a letter dated May 18, 2004 stating that he was terminated because of poor lesson plans, poor classroom management and for making inappropriate comments. (B-0309).

Once again, this May 14 meeting was held in direct contravention of the collective bargaining agreement because it concerned a matter that adversely affected his continued employment, salary and any increments, (B-0308); Mr. Wilcoxon was not given forty-eight hours notice of the meeting, (B-0431 – A0432); not informed in writing or otherwise of the specific reason for the meeting (B-0431 – A0432); not informed in writing or otherwise of the individuals who would be in attendance at the meeting (B-

0431 – A0432); and, not was not permitted to have an Association representative of his/her choice present to advise and to represent him during the meeting. (B-0431 – A0432). Because this meeting violated the terms of the collective bargaining agreement, the termination has no effect and is therefore a nullity. 14 *Del. C.* § 1410.

Red Clay argues that *McCoy* is inapplicable because it involved a different collective bargaining agreement and because the plaintiff in that case went to binding arbitration on her termination. This argument is without merit. In the first place, even assuming the collective bargaining agreement is "different," (Red Clay makes this assumption without evidentiary support), the specific violations of the collective bargaining agreement in *McCoy* are exactly the same as those at issue in Mr. Wilcoxon's case. To restate, in *McCoy*, the plaintiff/teacher was given a disciplinary letter at a meeting that was conducted *without proper notice*, *without notice of the subject matter* and *without proper union representation present* in violation of the applicable collective bargaining agreement. *McCoy*, at *2, *12. As a result, *McCoy* is entirely relevant and applicable to Mr. Wilcoxon's case.

With respect to Red Clay's argument concerning the arbitration held in *McCoy*, it fails to explain what relevance this has to the present case. Red Clay fails to cite to any law that holds that a teacher may not file a lawsuit for wrongful termination without an arbitration hearing taking place. Moreover, the Teacher Termination Statute provides no provision that demands or entitles a teacher to an arbitration hearing. 14 *Del. C.* 1401 *et seq.* In fact, the statutory language holds to the contrary. The teacher is entitled to a hearing in front of the terminating board and thereafter, the statute provides the matter is

subject to appeal to the Superior Court of Delaware.[4] 14 *Del. C.* 1414. Consequently, the absence of an arbitration hearing is of no moment to the applicability of *McCoy* to this case.

Mr. Wilcoxon's termination violated 14 *Del. C.* § 1410 because the termination was based upon information not "properly placed" in Mr. Wilcoxon's personnel file in violation of the Collective Bargaining Agreement prior to the notice of termination.

*b.* *Mr. Wilcoxon was Terminated For Performance Reasons Without the Benefit of His Statutory Right to Correct Those Deficiencies Through an Individualized Improvement Plan.*

As is stated above, according to 14 Del. C. § 1410, for a termination to be proper under the Teacher Termination Statute, disciplinary letters must be properly placed in the teacher's personnel file, *or* with respect to deficiencies in performance the teacher the teacher must be given an opportunity to correct such deficiencies through an individualized improvement plan ("IIP"). Moreover, according to the Policy for Appraising Teachers and Specialists" attached to the Delaware Performance Appraisal System ("DPAS"), to which Red Clay adheres:

> An Individual Improvement Plan ***shall be developed*** when an individual's performance in any category has been appraised as Needs Improvement or Unsatisfactory on a Performance Appraisal. Specific procedures for completing an Individual Improvement Plan are in Supplement 4, Section C.

(B-0395)(emphasis added).

[4] Of course this action is in Federal Court due to Mr. Wilcoxon's Title VII claim.

Mr. Wilcoxon was never placed on an IIP, (B-0431 – A0432) and therefore was not given an opportunity correct any deficiency through such an IIP as § 1410 and the DPAS require. Hence, his employment was terminated in violation of § 1410.

**CONCLUSION**

For the foregoing reasons, Plaintiff Richard Wilcoxon respectfully requests that this Honorable Court deny Red Clay Consolidated School District's Motion for Summary Judgment.

**MARGOLIS EDELSTEIN**

Timothy J. Wilson, Esq. (4323)
1509 Gilpin Avenue
Wilmington, Delaware 19806
Telephone: (302) 777-4680
Facsimile: (302) 777-4682
twilson@margolisedelstein.com
*Attorney for Plaintiff*

DATED: August 2, 2006.