Richard Wilcoxon

51

1    A.    I think parents and others were there to get

2    information.    That was the purpose of Choice Open House

3    and we should be talking to them.

4        Q.    Did you time her conversation?

5        A.    No.    That's why I said "30 plus minutes."    I

6    don't know the exact minutes.

7        Q.    Did you look at your watch when she started the

8    conversation and look at it when it was over so you could

9    keep a record of how long she was talking to the

10    students?

11        A.    I do not recall.    I'm assuming not because I put

12    "30 plus" rather than the exact minute totals.

13        Q.    So this was your estimate?

14        A.    Yes.

15        Q.    You didn't time it in any way?

16        A.    I don't believe so.

17        Q.    What is the next entry?

18        A.    "11/25 - arrived at 7:45 - 15 minutes late."    The

19    tally there is one hour five minutes.

20        Q.    Now, the total time that you think she was late

21    throughout the school year is an hour and five minutes?

22        A.    Since I started keeping the log, yes.

23        Q.    Since you started keeping the log?

24        A.    Yes.

Richard Wilcoxon

52

1    Q.    That's from November 13 to January 25, you have

2    got her total lateness at one hour and five minutes,

3    correct?

4    A.    I listed November 25th.

5    Q.    I'm sorry, November 25th.  And during that period

6    of time your tally showed an hour and five minutes?

7    A.    Yes.

8    Q.    All right.  Did you say anything to her about

9    that?

10    A.    I do not recall.

11    Q.    What is the next entry?

12    A.    She "said she couldn't talk today so I had to

13    teach all the classes - she was going to keep score."

14    Q.    Well, what was that about?

15    A.    I just kept a record of it.

16    Q.    What was significant about it?  Did she have a

17    problem speaking, like laryngitis, something like that?

18    A.    She might have.

19    Q.    Why was that important?

20    A.    I just kept a log of it.

21    Q.    Was that going to help you somehow if she said

22    you were difficult to the administrators, that was going

23    to help prove your case that you weren't?

24    A.    It could be part of a group of things to prove I

Richard Wilcoxon

53

1  wasn't.

2      Q.   The fact she had laryngitis and couldn't speak?

3      A.   That I was actually running the classes during

4  that day, yes, that does look like I was not difficult to

5  work with.

6      Q.   Okay.  What is the next entry?

7      A.   "Bruce brought breakfast in for her at 9:08.  She

8  ignored the class completely."

9           "She ignored the class completely - I was

10  disciplining, teaching, keeping score, etcetera, for both

11  classes while she talked to Bruce."

12     Q.   Is that the same date?

13     A.   Yes.

14     Q.   November?

15     A.   November 25.

16     Q.   Did you say anything to her about this?

17     A.   I do not recall.

18     Q.   And the next entry says what?

19     A.   "Returned from first planning at 10:30 - 4

20  minutes late."

21     Q.   She came to her class four minutes late?

22     A.   Yes.

23     Q.   Did you say anything to her about that?

24     A.   I do not recall.

Richard Wilcoxon

54

1        Q.    What is the next entry?

2        A.    "11/26 - arrived at 7:50 - missed student leaders

3    and 1st period had started."  We were on a half-day

4    schedule.

5        Q.    Is that now your running total is an hour and 25?

6        A.    Yes.

7        Q.    Now, were you angry when you were keeping this?

8    Were you upset?

9        A.    I may have been frustrated.

10       Q.    Did you tell Janay or anybody else that you were

11   angry and hurt about the comments she had made?

12       A.    Not about the comments, no.  I talked to her.  I

13   was thinking more frustrated because I was required to do

14   extra work because she was --

15       Q.    Did you ever tell her that?

16       A.    Yes, I did.

17       Q.    Did you ever tell her that you were angry and

18   hurt about her comments?

19       A.    No, I did not.

20       Q.    Did you ever send her an e-mail about the

21   situation?

22       A.    What Frank Rumford told me, called me at home

23   when I was out sick on December 15th of 2003, he said

24   that Janay had the log, and I sent her an e-mail,

55

1    apologizing that she saw the log.

2        Q.    When was the last time you read that e-mail?

3        A.    When I sent it.

4        Q.    You haven't read it since then?

5        A.    No, I have not.

6        Q.    What was the rest of the conversation with Mr.

7    Rumford that day?

8        A.    He called me to tell me that he had entered my

9    office to look for a class list and found -- and he

10   picked up the note pad to give it to the sub to use that

11   to sign kids in.  He didn't read it.  He had the sub take

12   it to Miss Freebery to see if it was appropriate for him

13   to keep the list.

14       Q.    For the sub?

15       A.    For the sub to keep the notes on for the kids.

16       Q.    What else was said in that conversation?

17       A.    That she was very upset.  That she was giving the

18   log to Miss Basara.  And that we would need to talk about

19   it at a future date.

20       Q.    Now, the notes, were these on the top of the

21   notebook or further inside the notebook somewhere?  Was

22   this the first thing you would see when you would look at

23   the notebook, these notes?

24       A.    Yes.

Richard Wilcoxon

56

1    Q.    These were the top pages?

2    A.    Yes, I believe so.

3    Q.    Do you have the rest of the notebook?

4    A.    At home.

5          Or did I give that to you too?

6          The rest of the notebook is either at home

7    or with Mr. Wilson.

8    Q.    Have you detached the pages that constitute the

9    log from the notebook?

10   A.    I did not detach them.  They were detached when

11   it was returned to me.

12   Q.    And you are saying these were the first thing

13   that were on the pages?

14   A.    I believe so.  If I used a page I would tear it

15   off.  If I used it to keep like a lesson plan or draw up

16   something for class, I usually tore that off.

17   Q.    Did you have it folded over when you left it on

18   your desk, these pages?

19   A.    I may have had it folded over so the last page

20   would be up.  I couldn't tell you for sure.

21   Q.    And you left it on your desk in your office?

22   A.    Mm-hmm.

23   Q.    It was in plain view on your desk?

24   A.    Maybe had a few things over it, but it was on the

Richard Wilcoxon

57

1    top of the desk.  It wasn't in a drawer or a file cabinet

2    or anything else.

3        Q.    Let's continue looking at the log.  I think you

4    were up to November 26.

5        A.    "November 26 - arrived at 7:50 - missed student

6    leaders and 1st period had started (half-day schedule.)"

7        Q.    That's your tally at that point, is an hour and

8    25 minutes?

9        A.    Yes.

10       Q.    We don't have the original.  You were keeping

11   this tally as you were going along?

12       A.    Yes.

13       Q.    Did you tell Ms. Freebery about this concern?

14       A.    Did I tell her I was concerned about her being

15   late?

16       Q.    On November 26 you said she arrived at 7:50,

17   missed students, etcetera.  Did you raise that issue with

18   her at that time?

19       A.    I do not recall.

20       Q.    All right.  What is the next entry?

21       A.    "Left during 1st planning - returned at 9:23 - 5

22   minutes late for class."

23       Q.    Did you tell her about that concern?

24       A.    I do not recall.  I do not recall.

Richard Wilcoxon

58

1    Q.   The next one says what?  It is 12/1?

2    A.   12/1.

3    Q.   What does it say?

4    A.   "Arrived at 7:40," and my tally is one hour

5 thirty-five.

6    Q.   Did you tell her about that concern?

7    A.   I do not recall.

8    Q.   There is some writing to the left-hand side

9 there?

10    A.   "Hour delay schedule, 12/1 - 12/9."

11    Q.   Why is that there?

12    A.   Because we have a different schedule so the

13 amount -- just saying she was late -- she arrived at 7:40

14 does not say how late she was, because it was a different

15 schedule for what she missed.

16    Q.   So you are saying she was late that day when she

17 came at 7:40?

18    A.   Yes, I wrote that down for that day.

19    Q.   How late was she?

20    A.   I would have to say, the hour delay schedule, I

21 don't know.  I don't remember it off the top of my head

22 anymore.

23    Q.   All right.  You just recorded the time she got

24 there?

Richard Wilcoxon

59

1    A.    Yes.

2    Q.    And would you keep your note pad with you when

3  you saw her come in or would you go back and write it

4  down later on?

5    A.    Some of both.  Sometimes I had it with me.

6  Sometimes it would be left in the locker room, as I

7  stated before.

8    Q.    Would you stand there and write things in the

9  notebook when she was present?

10   A.    Sometimes.

11   Q.    But you didn't tell her what you were writing?

12   A.    No.

13   Q.    You didn't tell her about the concerns?

14   A.    Well, I did talk to her about being late.  I just

15 don't recall if it was this day.  I talked to her before

16 I even kept a log.

17   Q.    Let's read the next entry.  It says "very short

18 and a little demeaning."  Read that entry.

19   A.    "Very short and a little demeaning in shouting at

20 kids for not having a pencil."

21   Q.    What does that deal with?

22   A.    I do not recall the exact situation.  By what I'm

23 writing, I'm assuming a kid did not have a pencil and she

24 was not happy and short and demeaning with the student

**W&F**

WILCOX & FETZER LTD.
Registered Professional Reporters

B-0059

Richard Wilcoxon

60

1    who was asking for a pencil or pen.

2        Q.    Do you remember or are you just reading the

3    words?

4        A.    I'm reading and remembering that way.  I don't

5    remember it for sure.  I'm reading the words.

6        Q.    So all you know is what the words here are on the

7    page, correct?

8        A.    Yes.  I don't have a direct recollection.

9        Q.    You have no independent recollection?

10       A.    No.

11       Q.    All right.  The next page, 12/2.  This is all

12   your handwriting, correct?

13       A.    Yes.

14       Q.    The top of the page 3, which is C00761, that's

15   your handwriting as well?

16       A.    Yes.

17       Q.    And 12/2, what does that say?

18       A.    "12/2 arrived at 7:38, (1:43)."

19       Q.    So that's your tally at that point?

20       A.    Yes.

21       Q.    All right.

22       A.    "Left 9:05 to move an overhead from the cafeteria

23   to a class she borrowed it from.  Was gone till 9:29 (end

24   of the 1st class)."

Richard Wilcoxon

61

1    Q.    Did you tell her at that time that you thought

2    there was something inappropriate about any of that?

3    A.    I do not recall.

4    Q.    The next entry on 12/2 says what?

5    A.    "Left school during 1st plan to go watch daughter

6    swim - missed entire class and did not return till after

7    lunch."

8    Q.    Do you know if she had permission to leave school

9    to go watch her daughter swim?

10   A.    I don't believe she did, but I don't know that

11   for sure.

12   Q.    So the people who would know might be the

13   administrators at the school?

14   A.    They might be.

15   Q.    They are the ones she is supposed to get

16   permission from, correct?

17   A.    That's correct.

18   Q.    Did you tell her that you thought it was

19   inappropriate for her to leave school and watch her

20   daughter's swim class?

21   A.    On that day probably not, because I believe that

22   was the day that we had a guest speaker.

23   Q.    Who was the guest speaker?

24   A.    I can't remember her name.  She is from ARC, to

Richard Wilcoxon

62

1    talk about human sexuality.

2        Q.    So on that day, in fact, there was a guest

3    speaker handling the class?

4        A.    Going to be teaching the class, yes.

5        Q.    But you still felt that it was appropriate to,

6    quote, document the fact that she left the class even

7    though there was going to be a guest speaker?

8        A.    That's correct.

9        Q.    And you don't know, because you never asked the

10    administrators in the school, whether or not she had

11    permission to do that?

12        A.    That's correct.

13        Q.    What does the next entry say?

14        A.    "12/5 - Bruce arrived at 10:05 and stayed the

15    remainder of the day."

16        Q.    Where did he stay?  In the class?

17        A.    Yes.

18        Q.    Did you talk to him?

19        A.    I might have.

20        Q.    What were your conversations with him?

21        A.    I don't recall any of the conversation with him.

22        Q.    Did you say anything to him that day about

23    getting Janay pregnant?

24        A.    No, I did not.

Richard Wilcoxon

63

1    Q.   And you never said anything like that to him?

2    A.   No, no.

3    Q.   Nothing remotely similar to that?

4    A.   No.

5    Q.   If he says you did and Janay says you did, they

6    are making it up?

7    A.   I guess so.

8    Q.   If other people overheard you saying that, they

9    are making it up?

10   A.   That's correct.

11   Q.   All right.  Let's do the next entry.

12   A.   "Arrived at 7:46 - had girls waiting for picture

13   to be taken."

14   Q.   You mean her students?

15   A.   Yes.

16   Q.   It says 1:59.  That's your running tally as of

17   December 8?

18   A.   That's correct.

19   Q.   And I assume you didn't say anything to her at

20   that time about this either?

21   A.   I don't recall.

22   Q.   All right.  What does the next entry say?

23   A.   "Left class at 9:00 without talking to me about

24   it - leaving her kids with me and a guest speaker,

64

1    returned at 9:16 and immediately left to talk on her cell

2    phone for 5 minutes."

3        Q.    So there was a guest speaker that day?

4        A.    Yes.

5        Q.    Was that the same --

6        A.    It would be.

7        Q.    The same speaker?

8        A.    It would be.

9        Q.    And you don't remember the speaker's name?

10       A.    I do not remember her name.

11       Q.    So on that date neither one of you were actively

12   teaching; it was the guest speaker who was teaching?

13       A.    Correct.

14       Q.    But you felt that was worthy of documenting?

15       A.    Yes.

16       Q.    The next entry says "left during next class."

17   Can you read that?

18       A.    "Left during next class at 9:50, did not return

19   until dismissal of the class at 10:07."

20       Q.    Was the guest speaker speaking that day?

21       A.    Yes.

22       Q.    What is the next entry?

23       A.    "Bruce was here with her when I returned after a

24   planning period (10:47)."  I guess that was the time.

Richard Wilcoxon

65

1    "He stayed through class."

2        Q.    The time of the planning period?

3        A.    The time when I returned after planning period.

4        Q.    So in this case you wrote down the time that you

5    returned?

6        A.    Correct.

7        Q.    He stayed through class?

8        A.    Mm-hmm.

9        Q.    Did you raise any of these issues with Ms.

10   Freebery at the time?

11       A.    No, I did not.

12       Q.    What is the next entry?   "Left"?

13       A.    "Left 12:05 during class (without telling me) and

14   returned at 12:26."

15       Q.    Was the guest speaker still teaching?

16       A.    Yes.   She was there the entire day.

17       Q.    For this entire day neither one of you were

18   actually teaching the class, correct?

19       A.    That's correct.

20       Q.    All right.   What is the next entry?

21       A.    "After 2nd planning, Janay arrived at 1:23

22   claiming" -- I can't read what I wrote there.

23       Q.    Class, is it, began?

24       A.    "Class began," probably, "at 1:11."

66

1      Q.    And that's all that same day?

2      A.    This is still 12/8, yes.

3      Q.    With the guest speaker or guest teacher?

4      A.    That's correct.

5      Q.    And what is the next entry?

6      A.    "Janay informed me (she did not ask) that

7  tomorrow she would leave during 1st plan and not return

8  until lunch is over (missing her 1st 8th grade class).

9  She was going to go swimming with her daughter."

10     Q.    Do you know if she had permission from the

11  principal of the school to do that?

12     A.    I do not know.

13     Q.    Did you ask her?

14     A.    Ask the principal?

15     Q.    Did you ask Janay?

16     A.    I do not recall.

17     Q.    Did you ask the principal?

18     A.    No.

19     Q.    You just documented that she was leaving to go

20  swimming with her daughter?

21     A.    Yes.

22     Q.    And this was the same day that the guest teacher

23  was there, correct?

24     A.    She informed me she was going the next day.  Yes,

WILCOX & FETZER LTD.
Registered Professional Reporters

B-0066

67

1    this was the same day.

2        Q.    And what does the next entry say?

3        A.    12/9, she called out sick.

4        Q.    Did you have any conversations with her about

5    that, calling out sick?

6        A.    No.

7        Q.    All right.  The next page is now Bates number

8    C00762, starts at the top 12/10.  Can you tell me what

9    that says?

10       A.    "Arrived at 7:40," and my tally says two hours

11   and nine minutes.

12       Q.    So total lateness from November 13 to December 10

13   is two hours and nine minutes?

14       A.    Mm-hmm.

15       Q.    All right.  Did you say anything to her about

16   that at the time?

17       A.    I don't recall.

18       Q.    What is the next entry?

19       A.    "Told me today was the day she was going swimming

20   with her daughter.  Left at 9:45 (did not sign out),

21   missed 8-1," which is how we signify our classes, is our

22   first 8th grade class, "that started at 10:26 until 11:05

23   and returned at 11:46 (late for 8-2)."

24       Q.    How did you know she didn't sign out?  Did you go

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

B-0067

1    up and check the logbook again?

2        A.    Again, either I checked it or I signed out and

3    saw that she was not signed out.

4        Q.    Well, you were going to the trouble of keeping

5    this log.  Did you remember any occasion that you went up

6    and checked to see if she had signed out and you went to

7    look at the office log for that purpose?

8        A.    What is that?  Can you repeat the question?

9        Q.    Well, you were going to all this trouble to keep

10   this log and all the things she was supposedly doing

11   wrong.  Do you remember any occasion you went to the

12   office for the express purpose of seeing she signed out?

13       A.    I might have.  I do not recall specifically.

14       Q.    You might have done that?

15       A.    I might have.

16       Q.    And did you talk to her about that incident on

17   December 10?

18       A.    I do not recall.

19       Q.    The next entry is December 11?

20       A.    Yes.

21       Q.    And read us that entry.

22       A.    "Arrived at 7:48."  I put two hours and 27 was my

23   tally.  Do you want me to go on?

24       Q.    Yes.



Richard Wilcoxon

69

1     A.    "Bruce came in at 9:05 during 2nd exploratory.

2  They ate breakfast in front of the students."

3     Q.    Did you talk to her about that?

4     A.    I do not recall.

5     Q.    Did you talk to Bruce during that time?

6     A.    I do not recall.

7     Q.    That's the last entry in your log?

8     A.    Yes.

9     Q.    Why didn't you make any entries after that?

10     A.    The log was discovered or was taken from my

11  office on 12/15, so I didn't have it in my possession.

12     Q.    Didn't you have other paper and pens?

13     A.    I did.

14     Q.    Did you keep another log?

15     A.    On paper?

16     Q.    Did you write down other so-called incidents that

17  you thought of inappropriate conduct by Ms. Freebery?

18     A.    I did on my computer.

19     Q.    And your computer, did you produce them?

20     A.    I gave them to my attorney, I believe.  I think I

21  sent him an e-mail.

22     Q.    And was your computer at school or at home?

23     A.    It would be at home.

24     Q.    So you would then, after December 15, go home and

1  type on your computer things that you thought she was

2  doing wrong?

3      A.   That's correct.

4      Q.   And you are saying you gave those to your

5  attorney?

6      A.   I believe so.  I sent them in an e-mail to Mya,

7  which I believe is a paralegal.

8              MR. WILLOUGHBY:  I haven't seen those.

9              MR. WILSON:  I'll double check.

10             THE WITNESS:  If you need them I'll --

11  BY MR. WILLOUGHBY:

12     Q.   Why did you start doing it on your computer at

13  home instead of writing it down?

14     A.   Because of the problems that were caused by me

15  keeping the log at school when it was discovered.

16     Q.   Well, couldn't you take the paper home with you?

17     A.   I could have.

18     Q.   But you decided to keep it on your computer after

19  that?

20     A.   Yes, I did.

21     Q.   Were you married at that point or were you --

22     A.   I was divorced at that point.

23     Q.   Divorced.  Were you the only person living in

24  your house at that point?

Richard Wilcoxon

71

1    A.    Yes.

2    Q.    How long did you continue to keep a so-called log

3    on Ms. Freebery?

4    A.    It expanded to more things.  It expanded to the

5    times when I was called in to meet with Janet Basara.  It

6    expanded to more issues.

7    Q.    So these notes on your computer go beyond just

8    keeping the so-called log on Ms. Freebery, correct?

9    A.    Correct.

10    Q.    So they dealt with all of the fall-out that

11    occurred?

12    A.    Correct.

13    Q.    That occurred after the meeting on December 17th?

14    A.    Yes, correct.

15    Q.    And that includes your notes of the conversations

16    with Ms. Basara?

17    A.    Correct.

18    Q.    And other people?

19    A.    Correct.

20    Q.    In addition to the tape recordings you have?

21    A.    Correct.

22              MR. WILLOUGHBY:  We haven't seen any of

23    those so we definitely need to get those during a lunch

24    break or at some point.

72

1    MR. WILSON: I don't even know if we have

2    them, but I'll call and see if we have them.

3    MR. WILLOUGHBY: We may have to reopen the

4    deposition. I've got to see those, as well as hear the

5    audio tapes.

6    Why don't we take about a five-minute break.

7    We have been going about an hour and ten minutes.

8    (Recess taken.)

9    MR. WILSON: All my paralegal did was go

10   through and check her e-mails from Mr. Wilcoxon, and we

11   don't have it there. And I asked her to go through the

12   file and check that, and that's what she is doing now.

13   MR. WILLOUGHBY: You don't have the other

14   log that was referred to in the deposition?

15   MR. WILSON: Not as of the quick check. Mr.

16   Wilcoxon indicated he e-mailed it, and she checked her

17   e-mails from Mr. Wilcoxon and none of those contain the

18   log. She is going to check the file now.

19   MR. WILLOUGHBY: Okay.

20   (Discussion off the record.)

21   BY MR. WILLOUGHBY:

22   Q. Let's talk about the tape recording of people at

23   the school without telling them. What was your practice?

24   Was it to keep it in your pocket? How did you go about

Richard Wilcoxon

73

1    making these secret recordings?

2        A.    In the pocket of a sweatshirt usually a fleece

3    thing that had a pocket in the front.

4        Q.    You had like a fleece sweatshirt?

5        A.    Mm-hmm.

6        Q.    Yes?

7        A.    Yes.  I'm sorry.

8        Q.    You kept it like in a front pocket?

9        A.    Mm-hmm.  Yes.  I'm sorry.

10       Q.    What kind of a tape recorder was it?  Was it the

11   big cassette tapes, small tapes?  What was it?

12       A.    The mini tapes.  The small tapes.  The mini

13   tapes, whatever they are called.

14       Q.    Did you go out and buy the tape recorder for the

15   purpose of making these tapes or did you already have it?

16       A.    I had a tape recorder.  I went out and bought

17   tapes for that reason.

18       Q.    And you did that after your conversation with Mr.

19   Rumford where he told you that your, quote, book or log

20   on Ms. Freebery had been discovered?

21       A.    No.  It was after that, but it was actually after

22   a conversation with Miss Basara on the following day.

23   She called me into the office and basically admonished me

24   for keeping the logs, and I had no right to do it, that

Richard Wilcoxon

74

1    it severely damaged our relationship, I had no right to

2    keep a log on another teacher, that was not my role.   I

3    felt very uncomfortable with the way that conversation

4    went.

5         Q.    Was there anybody else present for that

6    conversation?

7         A.    No, there was not.

8         Q.    It was just you and Ms. Basara?

9         A.    That's correct.

10        Q.    And you did not tape record that?

11        A.    No, I did not.

12        Q.    You started tape recording after that?

13        A.    Yes.

14        Q.    Was that the conversation where she referred to

15   you not being tenured?

16        A.    No.

17        Q.    That was the next day?

18        A.    That was the next day.

19        Q.    Then you went out and bought some tapes for the

20   tape recorder you had?

21        A.    That's correct.

22        Q.    And did you carry it around with you all the

23   time, the tape recorder?

24        A.    When I had the sweatshirt on, most of the time.



Richard Wilcoxon

75

1    It was in the winter, so most of the time.

2        Q.    So you would carry it around in your pocket in

3    case you needed it?

4        A.    I carried it around because that's where it was.

5    I didn't take it out and put it in my desk or anything.

6    I kept it in the pocket.

7        Q.    You didn't tell anybody that you were doing these

8    tape recordings?

9        A.    No.

10                MR. WILSON:    Object to the form.

11       Q.    Did you tell any of the so-called Insubordinates

12   about it?

13       A.    No.

14       Q.    Did you tell any of the people you were referring

15   to as the Exiles about it?

16       A.    No.

17       Q.    So when you would go into a meeting with Ms.

18   Basara or others, would you reach into the sweatshirt and

19   click it on?  Is that what you would do?

20       A.    Yes.

21       Q.    And then when would you click it off?  How long

22   would you leave it on?

23       A.    Until I left the meeting or in one case I stopped

24   it early because I was afraid it was going to run out.

76

1    Q.    You stopped it early during the meeting?

2    A.    Yes.

3    Q.    So you didn't tape record the whole meeting?

4    A.    No.

5    Q.    Which meeting was that?

6    A.    That was the meeting with Miss Basara and Mr.

7    Rumford and Miss Freebery.

8    Q.    Is that the meeting where the conversations

9    occurred about you making inappropriate comments?

10    A.    Yes.

11    Q.    And that was the second meeting you had taped,

12    correct?

13    A.    It was actually the third.

14    Q.    The third.

15    A.    The first meeting I asked for the log back.    The

16    second meeting Miss Basara referred to my tenure.    And

17    that was the third meeting.

18    Q.    So during the course of that meeting in which the

19    comments were made about you making inappropriate

20    remarks, you reached into your sweatshirt and turned off

21    the tape?

22    A.    Yes.

23    Q.    Did you do that before or after the comments were

24    made that you had made inappropriate comments to Miss



WILCOX & FETZER LTD.
Registered Professional Reporters

B-0076

Richard Wilcoxon

77

1    Freebery?

2        A.    After.

3        Q.    And how long after?

4        A.    A few minutes.

5        Q.    Did you click it off before you made any response

6    to the comments?

7        A.    No, because it says on there that I asked her, "I

8    wish you would have told me if you were uncomfortable

9    with anything I said."

10       Q.    You said that?

11       A.    Yes.

12       Q.    But then you turned it off for the rest of the

13   meeting?

14       A.    Sometime in there.  I didn't review that tape

15   before this deposition, so...

16       Q.    So tell me your recollection of the rest of the

17   meeting without the tape, where you turned it off, at

18   what point you turned it off and what was said after

19   that.

20       A.    I said I wish she would have told me.

21       Q.    You said?

22       A.    I said to Miss Basara, or Miss Freebery actually

23   -- let me back up a second.  I'm sorry.

24                 Miss Freebery made the comment that I made

**WILCOX & FETZER LTD.**
Registered Professional Reporters

Richard Wilcoxon

78

1    inappropriate comments to her.  Miss Basara made a

2    statement that she wished Janay hadn't said that because

3    we were making progress and this was setting it back.  I

4    made a comment, "If you were uncomfortable with anything,

5    I wish you would have told me."

6            Then I believe Miss Basara said or somebody

7    along, someone in there said we would have to see how

8    this works out and the meeting was dismissed briefly

9    after that because we had been in there for an entire

10    planning period.

11       Q.   At what point did you turn the tape off?

12       A.   I don't know the exact point.  You mean in my

13    recollection of what was said?

14       Q.   In that meeting, yes.  At what point was the tape

15    turned off?

16       A.   I don't understand how to answer that question.

17    I'm confused.

18       Q.   What was the last comment that you recall being

19    recorded?

20       A.   That I recall being recorded?

21       Q.   Yes.

22       A.   Me making a statement that "I wish you would have

23    told me if I said anything that made you uncomfortable."

24       Q.   That's when you turned it off?



Richard Wilcoxon

79

1    A.    I believe so.  I don't recall.  I didn't review

2  it recently.

3    Q.    So nothing after would have been recorded on the

4  tape because you turned it off?

5    A.    That's correct.

6    Q.    And you say your reason for turning it off was

7  that you were afraid the tape was going to run out?

8              MR. WILSON:  Object to the form.

9    A.    I was afraid the tape was running out, yes.  I

10  was afraid it was going to make a noise when it ran out.

11    Q.    So then the people there would know you were

12  secretly recording them?

13              MR. WILSON:  Object to the form.

14    A.    Correct.

15    Q.    So none of the conversations after you made the

16  statement that you wished Ms. Freebery had told you that

17  you were making remarks that were offensive are on that

18  tape?

19    A.    Correct.

20    Q.    So if you had said --

21    A.    To my recollection.

22    Q.    So if you had said that in the meeting after that

23  that she had opened the door, that wouldn't be on the

24  tape?



80

1    A.    I did not say that.

2    Q.    Well, if other people have a recollection of you

3    saying that, and that it occurred afterwards, it wouldn't

4    be on the tape, correct?

5              MR. WILSON:   Object to the form.

6    A.    That would be correct.

7    Q.    And there was a grievance filed, was there not,

8    over the fact that you received a reprimand for making

9    inappropriate comments?

10    A.    Correct.

11    Q.    And was the wording on that grievance changed at

12    your request?

13    A.    I requested it be removed.

14    Q.    Was there a compromise reached where the wording

15    was changed?

16    A.    It was not a compromise.   That was what --

17    Miss -- somebody decided that's what would be done.   That

18    was the end of my grievance.

19    Q.    And didn't your union representative want the

20    reprimand to say, to include that you had made a comment

21    to the effect that she had opened the door by

22    conversations with you?

23    A.    As far as my conversation with my union rep, that

24    is incorrect.

Richard Wilcoxon

81

1    Q.    Did your union rep say that to the district, as

2  part of the resolution of the grievance?

3    A.    As far as I know, that never happened.

4    Q.    There wasn't a rewriting of the grievance where

5  that was included?

6    A.    There was a grievance letter that was rewritten.

7  My union rep was unhappy -- indicated he was unhappy

8  because they were putting words into my mouth, saying I

9  made this comment.

10   Q.    Wasn't it your union rep's request that that

11 comment be put into the resolution, to the reprimand?

12   A.    As far as my knowledge is, no.

13   Q.    And your union rep was Mr. Norton?

14   A.    Yes, that's correct.

15   Q.    And you don't remember that occurring?

16   A.    I know about the letter that had that language in

17 there.  When I was present Mr. Norton never made that

18 request.  After the letter was received, Mr. Norton

19 indicated to me he was unhappy with the wording, felt it

20 was putting words into my mouth and was not at all

21 pleased with the outcome.

22   Q.    But that addition was made, the quoting you,

23 about saying that she had opened the door, was made at

24 the request of the union?

Richard Wilcoxon

82

1      A.    No.

2      Q.    Who requested it be included then?

3      A.    I don't believe -- as far as I know, no one did.

4   We requested the letter be pulled.  It was rewritten

5   instead.

6      Q.    Well, if it was rewritten, it had to be at the

7   union's request or your request, correct?  Because the

8   school district wouldn't have wanted to rewrite their own

9   letter?

10     A.    As far as the meetings I was involved with and my

11  conversations with Mr. Norton, he never requested that.

12  If he had a conversation outside of when I was present, I

13  do not know that.

14     Q.    Well, let's go back to my earlier question.

15  Isn't it correct that if the grievance were, the

16  reprimand were rewritten by the school district, it would

17  have had to have been at your request or at the request

18  of the union?

19              MR. WILSON:  Object to the form.

20     A.    I have no idea.

21     Q.    Why would the school district rewrite their own

22  letter?

23              MR. WILSON:  Object to the form.

24     A.    Because we were requesting it be pulled

1    completely.  They chose to make a change instead of

2    pulling it.

3        Q.    You are saying you don't think that came from

4    your union representative?

5              MR. WILSON:  Object to the form.

6        A.    As far as I know, it did not.

7        Q.    Did you file a grievance about the change in the

8    letter?

9        A.    I talked to Mr. Norton.  He handed it off to Mr.

10   Taschner.

11       Q.    Did you file a grievance about the change in the

12   reprimand?

13       A.    I talked to Mr. Norton.  He handed it off to Mr.

14   Taschner.  We were in conversations with Mr. Taschner

15   about taking it further.

16       Q.    My question is:  Was there a grievance filed

17   about the change in the wording of the written reprimand?

18       A.    I do not know.

19       Q.    Now, earlier I had asked you about the emergency

20   lesson plans that you say were on file in the office.

21   And you said that they were in your handwriting?

22       A.    Yes.

23       Q.    Did you ever take Mr. Rumford's lesson plans or

24   anybody else's and rewrite them so they would be in your

Richard Wilcoxon

84

1   own handwriting?

2       A.   I made a copy of one of those emergency lessons

3   plans or two of those emergency lesson plans to games

4   that he had used in --

5       Q.   Slow down.

6       A.   I'm sorry.  I apologize.  I may have copied off

7   one of Mr. Rumford's lessons plans in that file, because

8   the game was applicable to my students still.

9       Q.   And rewrote it in your handwriting?

10      A.   Correct.

11      Q.   And then put that in the office as your emergency

12  lesson plan?

13      A.   Correct.

14      Q.   And did you ever retype any of Mr. Rumford's

15  lesson plans during that school year or at any other time

16  and use them as your own, on your computer at home or

17  otherwise?

18      A.   Retype Mr. Rumford's --

19      Q.   Did you ever take a lesson plan he had written

20  and type it out and make that a lesson plan that you said

21  was your own?

22      A.   No.

23      Q.   So you only rewrote it by hand, is my point?

24      A.   Yes.  Or at school.

Richard Wilcoxon

85

1    Q.   I'm sorry, what?

2    A.   Or on the school computer.  We had a computer in

3    my office.  I didn't know if I did my emergency lesson

4    plans by hand or on the computer at school.

5    Q.   That was my question.

6    A.   You said taking it home and all that.

7    Q.   Fair enough.  My question was:  Did you do it at

8    home as far as retyping the plans?

9    A.   No.  It would have been at school.  It would have

10   been done at school.  I'm sorry.

11   Q.   But you did on some occasions take lesson plans

12   that Mr. Rumford had done, type them on the computer at

13   school, and then make them your own plans; is that right?

14   A.   I would have made changes to them to adapt them.

15   But if the plan still was applicable with my students and

16   still fit the state standard, I may have used that

17   activity still.

18   Q.   And you would have typed it up on the school

19   computer and made it your own plan, quote-unquote?

20   A.   Correct.

21   Q.   Prior to coming for the deposition today did you

22   discuss the deposition with anyone other than your

23   attorney?

24   A.   No.

86

 1     Q.    Have you discussed your lawsuit with anyone other

 2   than your attorney and your ex-wife?

 3     A.    My best friend.

 4     Q.    Who is that?

 5     A.    Mark Justice.

 6     Q.    Where does Mr. Justice live?

 7     A.    Georgetown, Delaware.

 8     Q.    Is he a teacher?

 9     A.    He is a state trooper.

10     Q.    State trooper.  Anyone else?

11     A.    I did not discuss in detail, but I made it known

12   to my parents about the lawsuit.

13     Q.    Where do your parents live?

14     A.    Georgetown, Delaware.

15     Q.    Is Mr. Justice a witness to anything?

16     A.    No.

17     Q.    Or you just told him?

18     A.    Just talked to him.

19     Q.    Have you spoken with anybody that you believe is

20   a witness in the case concerning your lawsuit, again

21   excluding any conversation with your attorney?

22     A.    No.

23     Q.    Are you under a doctor's care?

24     A.    No.

87

1    Q.    Have you ever been treated by a psychologist or

2    psychiatrist?

3    A.    I went to several sessions after my divorce.

4    Q.    Who was that?

5    A.    I don't remember his name.  He is located in

6    Peoples Plaza.

7    Q.    You don't remember the person you saw, the name?

8    A.    No.  It was only four sessions, something, and it

9    has been a number of years.

10   Q.    When were you divorced?

11   A.    2002.

12   Q.    Do you remember what month?

13   A.    We were separated in 2002.  The divorce was

14   finalized in 2003, I believe it is September.

15   Q.    September of 2002?

16   A.    September 2003.  I'm sorry.  We were separated in

17   2002.  The divorce became final I believe in September of

18   2003.  I believe that's the date.

19   Q.    And your ex-wife was the one who sought the

20   divorce?

21   A.    Yes.

22   Q.    And what were the reasons she wanted a divorce?

23   A.    I'm unclear.  You will have to talk to her about

24   that.

Richard Wilcoxon

88

1    Q.    You never talked to her about that?

2    A.    I'm still unclear about the reasons.

3    Q.    Well, my question is:  Did you ever talk to her

4    about it?  Did she ever say anything?

5    A.    We talked about things and the conversation was

6    just I'm not happy, that type of thing, so you would have

7    to talk to her about more the reasons.

8    Q.    Was there ever a time when you told people that

9    your ex-wife was afraid of you?

10   A.    There was a situation that happened that I told

11   people about where I felt my ex-wife was trying to make a

12   case, saying she was afraid of me, because she had a

13   friend in another room, and I was sitting across the

14   entire room from her.  She made a statement about, "You

15   are scaring me, Rich."  And I was sitting on the other

16   side of the room.  So I made a statement that I felt, I

17   thought -- I was worried she might be making a claim.

18   Q.    Who did you make that statement to?

19   A.    Several people.

20   Q.    Who do you remember making it, those statements

21   to?

22   A.    I know I talked to my best friend Mark about it.

23   I know I talked to my parents about it.  I probably

24   talked to Miss Freebery about it.

89

1      Q.   Anybody else you remember?

2      A.   No.  I would just be speculating if I named other

3   names.

4      Q.   Did the issue of alcohol use or abuse come up in

5   your treatment with your psychiatrist or psychologist?

6      A.   No.

7      Q.   Has anybody ever told you that you have an

8   alcohol or drinking problem?

9      A.   No.

10      Q.   Did you ever bring alcohol onto the school campus

11   at Skyline in your motor vehicle?

12      A.   No.

13      Q.   So you never had open beer bottles, for example,

14   in your car at that --

15      A.   Absolutely not.

16      Q.   Nobody could have ever seen that because it

17   didn't happen?

18      A.   Never happened.

19      Q.   Have you ever been treated for any kind of drug

20   abuse?

21      A.   No.

22      Q.   Where do you live right now?

23      A.   Newark, Delaware.  220 Wharton Drive, Newark,

24   Delaware.



Richard Wilcoxon

90

1    Q.    220?

2    A.    Wharton Drive.

3    Q.    How long have you lived there?

4    A.    Since September 2003.

5    Q.    2002 or 2003?

6    A.    I believe it was 2003.

7    Q.    After you got divorced?

8    A.    Yes.

9    Q.    Did you live in that house while you were

10   separated from your now ex-wife?

11   A.    No.

12   Q.    Well, I think you told me earlier you were

13   separated in September of 2002.

14   A.    Oh, yes, separated in 2002, I believe it was

15   November.  The divorce was finalized in 2003.

16   Q.    Right.

17   A.    Yes.

18   Q.    So where did you live after you were separated?

19   A.    When I was separated I lived in my house, the

20   house I own with my ex-wife.

21   Q.    Okay.  So you stayed in the house?

22   A.    Yes.

23   Q.    And did she move out?

24   A.    No, she did not.

Richard Wilcoxon

91

| 1 | Q. | So you had separate rooms or something like that? |
| 2 | A. | Yes. |
| 3 | Q. | And then you moved out after the divorce in 2003? |
| 4 | A. | Correct. |
| 5 | Q. | And did she keep the house? |
| 6 | A. | Yes. |

7    Q.    Did you ever tell Ms. Freebery or anybody else

8 that you had to have a witness go with you over to your

9 former residence because your ex-wife was concerned about

10 her safety?

11    A.    No.

12    Q.    Did you ever say anything to that effect?

13    A.    I asked my parents to go with me after the

14 incident I just told you about, just because I was afraid

15 she was trying to make a claim.

16    Q.    In your treatment with the psychologist or

17 psychiatrist was it ever brought up that you are in any

18 way paranoid or anything along those lines?

19    A.    No.

20    Q.    So what was the subject of your treatment with

21 the psychologist you can't remember?

22              MR. WILSON:  I'm going to object to this.

23 This information is privileged between he and his

24 psychiatrist.

Richard Wilcoxon

92

1              MR. WILLOUGHBY:  Well, he is bringing a

2    claim and he is presumably seeking some kind of damages

3    for emotional distress.  I certainly have a right to go

4    into it to find out what the cause of his so-called

5    distress is, unless you are saying he is not making any

6    claim for that.

7              MR. WILSON:  What I'm saying is when he saw

8    the psychiatrist is before all this happened.  He didn't

9    seek psychiatric treatment for anything that happened in

10   this lawsuit.

11             MR. WILLOUGHBY:  Yes, but I still have a

12   right to inquire about any pre-existing condition that

13   could relate to his alleged emotional distress.

14             MR. WILSON:  Okay.  I think you can ask him

15   if there was a diagnosis, but I don't think it is proper

16   to delve into their conversations.

17             MR. WILLOUGHBY:  Well, I think it is if he

18   is making a claim for emotional distress, unless he is

19   waiving that claim.

20             MR. WILSON:  No, he is not waiving that

21   claim.

22   BY MR. WILLOUGHBY:

23      Q.   So my question is:  What was talked about in your

24   conversations?

WILCOX & FETZER LTD.
Registered Professional Reporters

B-0092

Richard Wilcoxon

93

1          MR. WILSON:  I just want to make a running

2    objection to these questions.

3          MR. WILLOUGHBY:  Fair enough.

4          THE WITNESS:  Depression.

5    BY MR. WILLOUGHBY:

6      Q.   What else?

7      A.   I don't remember any other -- anything else.  It

8    has been a long time.

9      Q.   What was the time period that you were seeing

10   this psychologist?

11     A.   December 2002 and probably early January 2003.

12     Q.   And you were at Skyline during that time?

13     A.   Yes.

14     Q.   Do you have any children?

15     A.   No.

16     Q.   Tell me about your educational background.  Where

17   did you go to high school?

18     A.   High school, Sussex Central High School, in

19   Georgetown, Delaware.

20     Q.   What year did you graduate?

21     A.   1991.

22     Q.   Did you go to the University of Delaware?

23     A.   That's correct.

24     Q.   And what year did you graduate from the

Richard Wilcoxon

94

1    University of Delaware?

2        A.    I have two degrees from University of Delaware.

3    One I graduated in January of '96, and the other one,

4    1998, I think.

5        Q.    What was the degree in in 1996?

6        A.    Ag. business management.

7        Q.    Did you go back to school for an education degree

8    after that?

9        A.    Yes, health and phys-ed degree.

10       Q.    Did you work in between?

11       A.    No, I did not.

12       Q.    So after you graduated you continued on for

13   another two years to get a bachelor's degree in

14   education?

15       A.    That's correct.

16       Q.    Did you student teach as part of that process,

17   the University of Delaware?

18       A.    Yes.

19       Q.    What were you taught about how you go about

20   making lesson plans and things like that when you were at

21   the university?  What training did you receive when you

22   were an education major concerning how to make lesson

23   plans?

24       A.    It was a part of a number of our classes.

Richard Wilcoxon

95

1    Q.    What do you remember being trained to do?

2    A.    Start with learning objectives, based on learning

3    objectives and what you want the student to walk away

4    with.  Create the activities.

5    Q.    Slow down.

6    A.    I'm sorry.

7    Q.    Start with the learning objectives.

8    A.    Mm-hmm.

9    Q.    Okay.  Create the activities?

10   A.    Create activities that fill those -- fulfill

11   those learning objectives.

12   Q.    What else?

13   A.    I don't know what you are asking me.

14   Q.    What were you trained when you were an education

15   major to do on how you go about making a lesson plan?

16   A.    Like I said, start with the learning objectives.

17   State standards came in after I graduated.  They became

18   -- so I didn't learn about those there, but they became

19   the learning objectives.  You create a lesson plan that

20   fulfills what you want the students to walk away with by

21   creating those activities.

22   Q.    That's it?

23   A.    You would have an opening for the students, to

24   get them prepared for the lesson, and a conclusion to

Richard Wilcoxon

96

1    wrap up.

2        Q.    What else?

3        A.    I'm unsure.

4        Q.    Did you receive any training on how you

5    transition into a new school as a new teacher, what steps

6    you should take as a new teacher at a school?

7        A.    No.

8        Q.    Do you remember being criticized when you were at

9    the University of Delaware about your ability to prepare

10   lesson plans?

11       A.    No.   I don't recall that.

12       Q.    Could it have happened?

13       A.    Possible.

14             (Wilcoxon Deposition Exhibit 3 was marked

15   for identification.)

16       Q.    This is Exhibit 3.   Have you seen that before?

17       A.    I'm sure I have.

18       Q.    Go over to the third page, which at the bottom,

19   it has an entry basically from your law firm saying the

20   law firm name and then a Bates number 0566.   Looking down

21   at the fifth paragraph, can you read into the record what

22   that says?

23       A.    "Three areas of difficulties surfaced during

24   Richard's student teaching:  1, difficulty in writing a

Richard Wilcoxon

97

1    detailed lesson plan; 2, difficulty giving clear, concise

2    explanations and directions, 3, difficulty achieving

3    effective transitions from one activity to another.  This

4    lack in detail in writing and speaking interfered with

5    the lesson pacing, children's time on task and maximum

6    learning time."

7        Q.   So now do you recall being criticized for your

8    ability to do lesson plans?

9        A.   I don't recall it, but, I mean, I just read it,

10   so it happened.

11       Q.   Tell me about your employment history after you

12   graduated from University of Delaware with your education

13   degree.

14       A.   I moved to Virginia.  I worked as a substitute

15   teacher.  I also worked for a county camp with kids.  I

16   worked for an organization to help battered women and

17   educated youth on violence.

18       Q.   What organization was that?

19       A.   Avalon, I believe it was called.

20       Q.   It was in Williamsburg, Virginia?

21       A.   That's correct.

22       Q.   Did you work at the YMCA?

23       A.   While I was in college I did.

24       Q.   That was while you were in college?

**W&F**

1    A.    That was while I was in college, yes.

2    Q.    And did you work at St. Mark's High School?

3    A.    I have substituted there after I did my student

4    teaching there.

5    Q.    After you did what?

6    A.    I did my student teaching at St. Mark's, and they

7    asked me to substitute for them.

8    Q.    Who was your supervisor at St. Mark's?

9    A.    Tony Glenn.

10    Q.    What were your duties as a substitute teacher at

11    St. Mark's?

12    A.    From day one I ran one class completely.  I took

13    it over.  And gradually throughout my time there I took

14    over the rest of the classes.

15    Q.    What class was it that you took over?

16    A.    Phys-ed.

17    Q.    Was your education degree specialized in phys-ed

18    and health?

19    A.    Yes.

20    Q.    What were the classes that you took over at St.

21    Mark's?

22    A.    Freshman phys -- freshman, sophomore and senior

23    phys-ed classes.

24    Q.    Did you do lesson plans when you were there?

1    A.    Yes.

2    Q.    Did you produce them in this case?

3    A.    No.

4    Q.    Do you still have them?

5    A.    Probably not.  I can look, but probably not.

6    Q.    What did you do at the YMCA?

7    A.    I was a youth sports coordinator.

8    Q.    What did you do there?

9    A.    I ran the youth sports for basketball, flag

10   football.  I did soccer with the kids.

11   Q.    Who was your supervisor?

12   A.    David Dill.

13   Q.    Did you teach or have any duties at the York

14   County Public Schools?

15   A.    I did some substitute teaching.

16   Q.    Do you know when that was, what years?

17   A.    It would be the spring of, I want to say spring

18   of '99, but that may not be the right year.

19   Q.    Did you apply for full-time teaching positions

20   after you graduated?

21   A.    Yes.

22   Q.    Where was the first full-time teaching position

23   you got?

24   A.    My first full-time one I got was at Chipman

Richard Wilcoxon

100

1  School in Lake Forest School District.

2      Q.    Do you remember what year that was?

3      A.    1998, the fall.

4      Q.    Did you graduate in the fall of '98 or spring of

5  '98?

6      A.    I graduated in winter.

7      Q.    Of?

8      A.    I want to say it was '98.  Maybe -- January '98

9  commencement.

10     Q.    So when did you start full-time teaching at Lake

11 Forest?

12     A.    I'm sorry.  I have to think back.  I'm sorry.

13 I'm getting confused on the years.

14     Q.    Let's mark this at the next exhibit, please.

15            (Wilcoxon Deposition Exhibit 4 was marked

16 for identification.)

17     A.    I graduated --

18     Q.    Wait.

19     A.    Sorry.

20     Q.    I have marked as Exhibit 4 what appears to be

21 your application for employment at the Red Clay School

22 District; is that correct?

23     A.    Yes, that's correct.

24     Q.    Is the writing on this document a copy of your