1    claim Ms. Freebery made to you?

2        A.    What is that?

3        Q.    What are the sexually-related comments you claim

4    Ms. Freebery made to you?

5        A.    When we were talking about spring break the first

6    year she was back, her first semester she was back,

7    coming back from spring break, and I said I would like to

8    go to an island.  She talked about she went to Jamaica

9    and spent the day on a nude beach.

10       Q.    And anything else in that conversation?  Did she

11   say anything else?

12       A.    She said -- I asked, I was like, "You?  Really?"

13   She says, "Why not?  No one would see me there."

14       Q.    Anything else in that conversation?

15       A.    No.

16       Q.    Did you ever tell anybody later on that that,

17   quote, opened the door for you making comments to her?

18               MR. WILSON:  Objection to form.

19       A.    No, I did not.

20               MR. WILLOUGHBY:  What?

21               MR. WILSON:  I objected to form.

22   BY MR. WILLOUGHBY:

23       Q.    You never told anybody that that statement by her

24   opened the door, or words to that effect, for you to make

Richard Wilcoxon

202

1    sexually-related remarks to her?

2              MR. WILSON:  Object to form.

3    A.    No.

4    Q.    Were there any other comments that you say that

5    Ms. Freebery made to you that were sexually related?

6    A.    Yes.

7    Q.    What are they?

8    A.    She had told me that her mother was teasing her,

9    she needed to sleep with Bruce to get him to cut her

10   grass.

11   Q.    When was that remark supposedly made?

12   A.    That same spring, but I don't know what month or

13   anything.

14   Q.    And what did you say?

15   A.    I laughed and said, "Your mother said that?"

16   Q.    Did you say anything else?

17   A.    No.

18   Q.    And you never made any other, any sexual remarks

19   to her?

20   A.    No, I did not.

21   Q.    Any other remarks that you claim that she made

22   that were sexually related?

23   A.    She came back and said, "He cut the grass and I

24   didn't sleep with him."

Richard Wilcoxon

203

1    Q.    That same spring?

2    A.    That same spring.

3    Q.    Anything else?

4    A.    Later in the spring she said she did sleep with

5    Mr. Hannah.

6    Q.    How did that conversation come up?

7    A.    I was talking about -- we were talking about them

8    dating and she made a comment that she did sleep with

9    him.

10    Q.    So you had a conversation with her about her

11    dating Bruce?

12    A.    Yes.

13    Q.    And do you know who started the conversation?

14    A.    I do not.

15    Q.    Any other remarks that you claim are sexually

16    related?

17    A.    Not that I recall.

18    Q.    And when was that last remark made?

19    A.    That same spring.

20    Q.    Spring semester 2003?

21    A.    I believe so, yes.

22    Q.    Go to C00787.  In response to item 20 you state

23    that the discipline you are receiving and the expected

24    termination would be because Ms. Freebery is socially

204

1    close to Mrs. Basara and Mr. Rumford?

2        A.    That's correct.

3        Q.    And on what basis do you believe that Miss

4    Freebery is socially close to Mrs. Basara and Mr.

5    Rumford?

6        A.    It was common knowledge throughout the school,

7    after certain functions they would go out and get drinks

8    together.  Mr. Rumford was probably her closest friend in

9    the school.  She was always talking to him.

10       Q.    Mr. Rumford was?

11       A.    Yes.

12       Q.    Okay.  And it is fair to say that because of that

13   social relationship, it is likely that they believed Ms.

14   Freebery and not you?

15       A.    I guess so.

16       Q.    Looking at the response to item 21, it says, "In

17   the two cases I wrote about," do you see that paragraph?

18       A.    Mm-hmm.

19       Q.    What are the incidents, what were you referring

20   to "In the two cases I wrote about"?

21       A.    I do not recall.

22       Q.    Do you know who the female co-worker, the name of

23   the person that you are referring to there?

24       A.    I believe that's to the bus situation, but I'm

1    not a hundred percent sure.

2      Q.    So you don't really know what is being referred

3    to?

4      A.    No, I don't recall.

5             MR. WILLOUGHBY:    There was a note that Mr.

6    Wilcoxon says was put on his door before the meeting on

7    December 17th, and the copy that was produced was nothing

8    but a dark page.  Do you have the original note

9    supposedly --

10            MR. WILSON:    I don't know if we have the

11   original or not.  I can check and see.

12   BY MR. WILLOUGHBY:

13     Q.    Do you have that note, Mr. Wilcoxon, the original

14   note when you were told to speak with Ms. Basara after

15   the log was discovered?

16     A.    Yes.

17     Q.    Is that at home?

18     A.    Yes.

19     Q.    Can you give it to your attorney?

20     A.    Sure.  Unless it is already in the file I left

21   with him.  Otherwise, it is at home.

22            MR. WILLOUGHBY:    In any case, I need a

23   readable copy.  It is just dark.

24            (Wilcoxon Deposition Exhibit 37 was marked

206

1    for identification.)

2    BY MR. WILLOUGHBY:

3        Q.    Do you recognize Exhibit 37?

4        A.    Yes, I do.

5        Q.    And that's dated June 9th, 2004?

6        A.    That's correct.

7        Q.    And this is the charge of retaliation you filed

8    with the Department of Labor, the EEOC?

9        A.    That's correct.

10        Q.    It says that you filed a charge on February 24th,

11    and the respondent received the charge on March 12th,

12    correct?

13        A.    Yes.

14        Q.    How do you know that date?

15        A.    There was a letter that was sent to me that said

16    they mailed it out to the respondents.  I don't know if

17    they received it on March 12th or sent it out.  I don't

18    know where that date came from exactly.

19        Q.    Isn't it fair to say that the negative treatment

20    that you received began, you claim you received began

21    after the log you were keeping on Ms. Freebery came out?

22        A.    It got worse.

23        Q.    So it is true that once that came out, in your

24    mind, you were being threatened with termination and

207

 1    treated badly, correct?

 2        A.    Yes.

 3        Q.    Your charge says that Ms. Basara began to ignore

 4    you on March 4th?

 5        A.    March of '04.

 6        Q.    March of '04.   When is it she began to ignore

 7    you?  Do you know a date or a time?

 8        A.    I don't have an exact time, date.

 9        Q.    When you say she began to ignore you, what does

10    that mean?

11        A.    I would walk by her in the hallway and say hello,

12    and she would walk right by or turn her head and just

13    ignore me completely.

14        Q.    Now, it is correct that you were a nontenured

15    teacher?

16        A.    That's correct.

17        Q.    And if you had been renewed the district would

18    have been required to make you a tenured teacher,

19    correct, under Delaware law?

20        A.    Yes.

21        Q.    So if they were going to not make you a tenured

22    teacher, they had to do that in 2004, correct?

23        A.    That's correct.

24              MR. WILLOUGHBY:  We will take a break.  I

Richard Wilcoxon

208

1   think we are going to finish today, probably in the next

2   45 minutes, maybe less.

3                   (Recess taken.)

4                   (Wilcoxon Deposition Exhibit 38 was marked

5   for identification.)

6   BY MR. WILLOUGHBY:

7       Q.   Do you recognize that document?

8       A.   I believe this is the note I gave to Miss Basara

9   from my doctor when I was out sick.

10      Q.   And it says you were under the doctor's care from

11  the 20th to the 22nd.

12      A.   Okay.

13      Q.   Correct?

14      A.   That's what it says, yes.

15      Q.   You testified earlier you went to see the doctor

16  actually on the 21st; is that correct?

17      A.   I'm trying to look for the calendar.  What number

18  is it?

19      Q.   Exhibit 12.  So the actual date you went to the

20  doctor is the 21st?

21      A.   I believe so, yes.

22      Q.   Do you know what time of day it was?

23      A.   I have no idea.

24                  MR. WILLOUGHBY:  We want to get an



1    authorization to get those records.  Do you have any

2    objection to signing that?

3                    MR. WILSON:  Let me see.

4                    (Wilcoxon Deposition Exhibit 39 was marked

5    for identification.)

6                    MR. WILSON:  Let me talk to my client about

7    this real quick.

8                    MR. WILLOUGHBY:  Okay.

9                    (Brief recess taken.)

10                   MR. WILSON:  I just wanted to give him a

11   chance to look at it.

12                   MR. WILLOUGHBY:  Okay.  Did you sign it?

13                   THE WITNESS:  Not yet.  What is today's

14   date, the 4th?

15                   MR. WILLOUGHBY:  May 4th.

16   BY MR. WILLOUGHBY:

17      Q.   Thank you.  Looking at Exhibit 38, the doctor's

18   note --

19      A.   Mm-hmm.

20      Q.   -- now, are these your regular family doctors?

21      A.   Yes.

22      Q.   And you have been to them in the past for medical

23   treatment?

24      A.   Yes.



Richard Wilcoxon

210

1    Q.    In the note it says that you were able to return

2    to work on January 23rd, but, in fact, didn't you return

3    on the 22nd?

4    A.    Yes, I did.  According to this calendar I did.

5    Q.    So do you know when the actual day was that you

6    were there?

7    A.    No, I do not.

8              (Discussion off the record.)

9    Q.    Can you identify Exhibit 39?

10   A.    It appears to be my phys-ed lessons for a week.

11   Q.    Ms. Basara asked you for phys-ed lessons for a

12   week?

13   A.    I don't recall that, but by reading the note it

14   looks likes that's what she did.

15   Q.    What you gave her was the documents attached to

16   this one, which is C00278?

17   A.    That's correct.

18   Q.    Now, was this the attachment, is that something

19   that you had typed up from Mr. Rumford's lesson plan?

20   A.    No, it is not.

21   Q.    This is something you completely made up?

22   A.    No, it is actually a game from Tony Glenn.

23   Q.    From whom?

24   A.    Tony Glenn, my student -- when I was student

211

1    teaching at St. Mark's.  It is slightly modified because

2    he did a kick over the goals and we don't have football

3    goals to kick it through.  Other than that --

4        Q.   He gave this to you when you were a student

5    teacher?

6        A.   That's correct.

7        Q.   And you turned that in as your lesson plan for

8    the week of May 28th?

9        A.   May 28th, yes.

10       Q.   What year did you student teach at St. Mark's?

11       A.   Fall of '97.

12       Q.   And this was being used then in the spring of

13   2004?

14       A.   The activity was, yes.

15               (Wilcoxon Deposition Exhibit 41 was marked

16   for identification.)

17       Q.   Do you recognize Exhibit 40?

18       A.   Yes, I do.

19       Q.   This is your year-end performance appraisal for

20   2004?

21       A.   Yes, that's correct.

22       Q.   Do you think this is an accurate appraisal of

23   your performance?

24       A.   No, I don't.

Richard Wilcoxon

212

1      Q.    What part do you think is inaccurate, starting

2   with "Instructional Planning" and going down?

3      A.    I wrote a rebuttal at the time, what I thought

4   was inaccurate, and turned it into the district.

5      Q.    Do you recall what you wrote?

6      A.    No, I do not.

7      Q.    So whatever you wrote in that rebuttal is what

8   you think is not accurate?

9      A.    That's correct.

10               (Wilcoxon Deposition Exhibit 41 was marked

11   for identification.)

12      Q.    Do you recognize Exhibit 41?

13      A.    Yes, I do.

14      Q.    What is that?

15      A.    It is the letter that was sent back to me after

16   me requesting my reasons of termination.

17      Q.    And do you agree with the reasons set forth here?

18      A.    Those are the reasons they gave me.

19      Q.    Do you agree they are accurate?

20      A.    No.

21      Q.    Do you think that at any time during your

22   performance during 2003-2004 that you showed poor

23   classroom management?

24      A.    To extent for that to be a reason for

213

1    termination, no.

2        Q.    Do you agree it occurred sometimes?

3        A.    I'm sure there is times.

4        Q.    Do you believe there was inappropriate

5    interaction with staff?

6        A.    No, I do not.

7        Q.    At no time?

8        A.    No.

9        Q.    What about lack of proper student lesson plans,

10    do you agree there were times when that was accurate?

11       A.    There may be times.

12                (Wilcoxon Deposition Exhibit 42 was marked

13    for identification.)

14       Q.    Do you recognize Exhibit 42?

15       A.    Yes, I do.

16       Q.    And what is that?

17       A.    I believe it is a document Mr. Norton typed up,

18    I'm not sure, about the grievance hearing.

19       Q.    Would you agree that the association position,

20    that first entry after the hearing date and who is

21    present, that accurately summarizes the association's

22    position?

23       A.    Yes.

24       Q.    And do you agree that the administrative response

214

1   accurately summarizes the Red Clay School District's

2   response?

3       A.   Where are you asking me to read?  I'm sorry.

4       Q.   Where it says "The Administrative Response."

5       A.   Okay.

6       Q.   Do you agree that that accurately sets forth the

7   administration's position?

8       A.   Now what was your question?  I'm sorry.

9       Q.   With respect to "The Administrative Response" --

10      A.   Mm-hmm.

11      Q.   -- do you agree that this accurately sets forth

12  what their position was?

13      A.   Yes, this could be their position, yes.

14              (Wilcoxon Deposition Exhibit 43 was marked

15  for identification.)

16      Q.   Do you recognize Exhibit 43?

17      A.   I don't know if I have ever seen this document

18  before, but, again, it appears to be about a grievance

19  hearing.

20      Q.   It is a denial.  It is a memo from Debra

21  Davenport, who is the district's HR representative?

22      A.   Okay.

23      Q.   Do you know Debra Davenport?

24      A.   She was just here, wasn't she?  Oh, no.



Richard Wilcoxon

215

1     Q.   That was Diane Dunmon.

2     A.   I believe I met her, yes.

3     Q.   Do you know she holds a position in HR for the

4  district?

5     A.   Okay, yes.

6         (Discussion off the record.)

7     Q.   You are saying you never saw this before?

8     A.   No.

9     Q.   It was never shared with you by DSEA or Mr.

10  Norton?

11     A.   Not the document itself.  I was told my grievance

12  was denied.

13     Q.   And as we have already established, DSEA didn't

14  take any of the grievance that we have discussed to

15  arbitration?

16     A.   That's correct.

17         MR. WILLOUGHBY:  We have agreed we are going

18  to deal with the tapes later on?

19         MR. WILSON:  Yes.

20         MR. WILLOUGHBY:  We may not need to come

21  back.  It just depends what happens when we listen to

22  them.

23         Give me just five minutes.  I just want to

24  talk with Janay and we will be done.

216

1          MR. WILSON:  Okay.

2          MR. WILLOUGHBY:  For today.

3          (Recess taken.)

4          MR. WILLOUGHBY:  That's all I have for

5     today.  We have agreed we are going to come back, if

6     necessary, after the review of the tapes.

7          MR. WILSON:  Okay.

8          MR. WILLOUGHBY:  Do you have questions?

9          MR. WILSON:  I have very briefly a few

10    questions.

11                    EXAMINATION

12    BY MR. WILSON:

13    Q.    Mr. Wilcoxon, early in the deposition Mr.

14    Willoughby asked you when you were testifying about the

15    taping of the meetings and the journal if you thought

16    that was disloyal and you said something to the extent of

17    it might be disloyal.  Did you feel you owed loyalty to

18    Janet Basara?

19    A.    No.

20    Q.    Did you feel you owed loyalty to Miss Freebery?

21    A.    No.

22    Q.    Did you feel you owed loyalty to Mr. Rumford?

23    A.    No.

24    Q.    Who did you feel you owed loyalty to?

1     A.    My students.

2     Q.    Did you feel Miss Basara was loyal to you?

3     A.    No.

4     Q.    In what ways?

5     A.    When my documentation was found, instead of -- I

6  felt very easily she could have said, I will look into

7  this, Richard, or I wish you would have brought these

8  complaints to me, and that could have been the end of it.

9  But she didn't choose to go that route.  Instead, she

10  admonished me for keeping the documentation.

11     Q.    Do you believe Miss Freebery was loyal to you?

12     A.    No.

13     Q.    In what way?

14     A.    I feel like she was kind of using me because I

15  would cover her classes when she left or when she was

16  late.

17     Q.    When you made the tapes, were there times that

18  you were recording that you had no union representation?

19     A.    Yes.

20     Q.    Were you entitled to union representation at that

21  time?

22     A.    Yes.

23     Q.    Were there times when you were recording the

24  tapes that you had union representation but not of your

218

1   choice?

2      A.   Yes.

3      Q.   Were you entitled to union representation of your

4   choice?

5      A.   As far as I know, yes.

6      Q.   Did you make the tapes as a means to protect

7   yourself?

8      A.   Yes.

9      Q.   With respect to the guest speaker that you were

10  talking about earlier, and the fact that Miss Freebery

11  left when you had the guest speaker, when that guest

12  speaker is there, do teachers still have duties with the

13  students?

14     A.   Absolutely.

15     Q.   And what are those duties?

16     A.   They are in charge of discipline.  They are in

17  charge of really handling the everyday things, like a

18  student needs to go to the bathroom, those type of things

19  as well.

20     Q.   So it is not like it is free time?

21     A.   No.

22     Q.   And Exhibit 10, which I believe is the e-mail

23  that you sent to Miss Freebery --

24     A.   Yes.

219

1    Q.    -- early on, before this exhibit was entered you

2    testified that you weren't angry, and then in the e-mail

3    it says you were angry.  And I just want to get it

4    clarified whether you were angry or not.  Do you recall

5    being angry about this?

6    A.    I did not -- I think before when I testified is I

7    did not keep the log out of anger.  Was I hurt and upset

8    about the statements being made, yes.

9    Q.    Okay.  Do you have a watch on today?

10   A.    No, I don't.

11   Q.    The day of the tape that you shut off because you

12   testified that you thought it was going to run out, did

13   you have a watch on that day?

14   A.    I do not know.

15   Q.    Do you normally wear a watch?

16   A.    It depended if I was going to be outside or

17   inside with the students.  So I guess the day I shut the

18   tape off was December 17, the middle of winter, so we

19   would have been inside, so I probably didn't wear a watch

20   that day.  It depended on where I was going to have the

21   students.

22   Q.    Do you have a recollection or do you remember

23   knowing exactly what time that meeting started that day?

24   A.    No, no.



WILCOX & FETZER LTD.
Registered Professional Reporters

B-0219

220

1    Q.   Can you tell me why the team teaching stopped

2  with Miss Freebery?

3    A.   As far as I know, it is because I kept a log.  I

4  wasn't even notified of it.  It was just the next day --

5  next semester when we started health, and at that time I

6  went to look at the multi-purpose room I saw Miss

7  Freebery had for her classes and I said something, I

8  don't know who it was to, either Mr. Rumford or Miss

9  Basara, and I was notified at that time that we were

10  teaching separately.

11    Q.   And when you team taught did you use the lesson

12  plans from Mr. Rumford?

13    A.   Yes.

14    Q.   Both of you used them?

15    A.   Yes.

16    Q.   After you stopped team teaching did both of you

17  use the lesson plans for Mr. Rumford?

18    A.   As far as my knowledge is, yes.

19    Q.   Do you have any knowledge of Miss Freebery being

20  disciplined for using those plans?

21    A.   No, I don't.

22    Q.   Several times in your testimony you stated that

23  your recollection to your write-ups and your disciplines

24  comes from reading your rebuttals and not from

Richard Wilcoxon

221

```
 1    independent recollection, correct?

 2       A.   Correct.

 3       Q.   When you drafted the rebuttals was everything

 4    that you put in there true?

 5       A.   Yes.

 6       Q.   Do you recall that everything you put in those

 7    rebuttals was true?

 8       A.   Yes.

 9       Q.   Do you recall putting anything in there that was

10    false?

11       A.   No.

12            MR. WILSON:   I have nothing further.

13                RE-EXAMINATION

14    BY MR. WILLOUGHBY:

15       Q.   If you don't recall the conversations how can you

16    tell whether the rebuttals were true or false?

17       A.   How can I tell if the rebuttals were true or

18    false?

19       Q.   Aren't you just assuming they are true because

20    you wrote them?

21       A.   No.   In talking with my union representation,

22    that they told me to write down rebuttals.   You have on

23    the e-mail it was factually based and true.   And that's

24    what I followed.
```

Richard Wilcoxon

222

1    Q.    But if you don't remember independently the

2    conversations, how can you judge now whether what you

3    wrote then was accurate?  Aren't you just assuming that

4    it was accurate because you wrote it down?

5    A.    When I wrote down, I wrote down based off my

6    union representation's advice.

7    Q.    You knew at that point you were trying to rebut

8    things that the district had said were wrong with your

9    performance?

10    A.    Absolutely.

11    Q.    And weren't you trying to put the best spin on it

12    possible from your perspective?

13    A.    I was writing down the truth.

14    Q.    So you weren't trying to put down information you

15    thought was helpful to you?

16    A.    Not necessarily, no.

17    Q.    Going back to Exhibit 10, that was written right

18    at the time you found out about the log, correct?  A

19    matter of a half hour at most, you said?

20    A.    Yes.

21    Q.    And didn't you say right there in black and

22    white, "I was really hurt, angry, concerned"?  Didn't you

23    say that?

24    A.    I was hurt by the comments she made.

223

1      Q.    Doesn't it say, "I was really hurt, angry and

2    concerned"?

3      A.    Yes.

4      Q.    So you are now saying you weren't angry?

5      A.    I was saying I was angry -- I was hurt and upset

6    or angry by the comments that were made.

7      Q.    By what comments?

8      A.    By the comments Miss Freebery made.

9      Q.    What comments she made?

10      A.    That I was difficult to get along with, and Frank

11    will just have to deal with Rich, he is too hard to get

12    along with.

13      Q.    So you were angry at those comments?

14      A.    Yes.

15      Q.    And that's when you started making the log,

16    correct?

17      A.    I made the log to cover myself.  I was concerned.

18      Q.    Doesn't it say hurt, angry, etcetera, in your

19    e-mail?

20      A.    Yes, it does say that.

21      Q.    Now, you said that you think you are entitled to

22    union representation at all these meetings you had with

23    Ms. Basara, correct?

24      A.    Yes.

Richard Wilcoxon

224

1    Q.    And that's based on your interpretation of the

2    contract?

3    A.    All the meetings where I received disciplinary

4    letters, yes.

5    Q.    You are aware that the school district's position

6    is that there were occasions when you are not entitled to

7    union representation, aren't you?

8    A.    I am not aware of that, but if that -- that could

9    be their position.

10   Q.    Didn't we go over an exhibit where Miss Basara

11   sent you a response saying that a principal can meet with

12   a teacher at any time?

13   A.    Yes, but that was about 48-hour notice, not about

14   union representation.

15   Q.    So when you say you thought you were entitled to

16   union representation, were you giving us your

17   interpretation of the collective bargaining agreement?

18   A.    Yes.

19   Q.    And obviously, the association, in fact, never

20   took that interpretation to an independent arbitrator for

21   review, did they?

22   A.    Did not take it to an arbitrator, no.

23   Q.    And you were asked a question about did you have

24   the union representation of your choice.  Do you remember

Richard Wilcoxon

225

1    those questions by your attorney?

2        A.    Yes.

3        Q.    And what do you mean by that, that you didn't

4    have the union representation of your choice?

5        A.    Miss Basara invited a union rep to be at all

6    meetings for me, so I had little notice of the meetings.

7        Q.    Who was that?

8        A.    Tom Meade.

9        Q.    Did you tell the union that you didn't want Tom

10   Meade?

11       A.    I talked to Mr. Norton about it.

12       Q.    What did he say?

13       A.    I don't recall the exact words, but he asked me

14   to start requesting that I be given 48 hours notice if it

15   was going to result in a disciplinary action.

16       Q.    Of Miss Basara?

17       A.    A disciplinary action from Miss Basara of me,

18   yes.

19       Q.    When you made that request, what happened?

20       A.    The only time I was able to make that request

21   after my union made that decision was when I was given my

22   letter of termination, and they said, "This is not a

23   letter of discipline.  You are also getting one in the

24   certified mail.  We wanted to hand deliver this one."

Richard Wilcoxon

226

1    Q.   So you wanted Mr. Norton instead of Mr. Meade?

2    A.   Yes.

3    Q.   Why is that?

4    A.   I felt Mr. Meade was a part of their social

5    group.  I don't know how close they were, but he was part

6    of the same social group that went out after events as

7    Miss Basara and Miss Freebery.

8    Q.   Was he a teacher at school?

9    A.   Yes, he is.

10   Q.   Did you ever tell him that?

11   A.   Tell him what?

12   Q.   That you didn't want him to represent you?

13   A.   No, I did not.

14   Q.   Do you know if Ms. Freebery had her own lesson

15   plans?

16        What you had was in Mr. Rumford's writing,

17   correct?

18   A.   That's correct.

19   Q.   Do you know if Ms. Freebery had her own lesson

20   plans?

21   A.   As far as?

22   Q.   Her own things she wrote up herself, different

23   from that book you copied from Mr. Rumford?

24   A.   The content of the plans were the same.  I'm sure

227

1    -- according to her letter, it was in Miss Freebery's

2    writing.

3        Q.    Did you ever see her lesson plans?

4        A.    No, I did not.

5        Q.    Do you know how often she updated them?

6        A.    No, I do not.

7        Q.    You do know that she and Mr. Rumford developed

8    those lesson plans together?

9        A.    Actually I was told that Mr. Flynn and Miss

10   Freebery developed those together.

11       Q.    You know she was involved in developing those

12   lesson plans initially?

13       A.    I believe so.  I don't know.

14       Q.    You haven't seen her actual lesson plans so you

15   don't know what she did to update them?

16       A.    No, I do not.

17               MR. WILLOUGHBY:  That's all for now.  We

18   have the tape issue that we are going to work on.  We may

19   not need to come back for that.

20               Do you want to advise him on reading and

21   signing?

22               MR. WILSON:  We are going to read.

23               (Proceedings conclude at 4:07 p.m.)

24



# WILCOX & FETZER LTD.

### In the Matter Of:



# Wilcoxon

## v.

# Red Clay Consolidated School District

## C.A. # 05-524-SLR

---

### Transcript of:

### Janay Freebery

### May 25, 2006

---

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

B-0228

| | | |
|---|---|---|
| Wilcoxon<br>Janay Freebery | v.<br>C.A. # 05-524-SLR | Red Clay Consolidated School District<br>May 25, 2006 |

Page 1

```
              IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF DELAWARE


RICHARD WILCOXON              : CIVIL ACTION
              Plaintiff       :
                              :
                              :
     -v-                      :
                              :
RED CLAY CONSOLIDATED         :
SCHOOL DISTRICT BOARD OF      : NO. 05-524-SLR
EDUCATION, and JANAY          :
FREEBERY                      :
              Defendants      :
```

              Deposition of JANAY FREEBERY, taken before
Elaine Gallagher Parrish, Registered Professional
Reporter, at 1509 Gilpin Avenue, Wilmington, Delaware on
May 25, 2006, commencing approximately at 2:40 p.m.

APPEARANCES:

              TIMOTHY J. WILSON, ESQ.
              Margolis Edelstein
                1509 Gilpin Avenue
                Wilmington, Delaware 19806
                for the Plaintiff,

              BARRY M. WILLOUGHBY, ESQ.
              Young Conaway Stargatt & Taylor, LLP
                P.O. Box 391
                The Brandyine Building
                1000 West Street, 17th Floor
                Wilmington, Delaware 19801
                for the Defendants.

ALSO PRESENT:

              DEBORAH COLES, Paralegal
              RICHARD WILCOXON
              DIANE DUNMON

                     WILCOX & FETZER
         1330 King Street - Wilmington, Delaware 19801
                     (302) 655-0477

**B-0229**

Wilcoxon                                    v.                    Red Clay Consolidated School District
Janay Freebery                      C.A. # 05-524-SLR                              May 25, 2006

Page 2

1    JANAY FREEBERY,
2  having been first duly sworn according to law, was
3  examined and testified as follows:
4        DIRECT EXAMINATION
5  BY MR. WILSON:
6    Q.  Good afternoon, Miss Freebery.  My name is Tim
7  Wilson.  We met before.  I'm Mr. Wilcoxon's attorney in
8  his lawsuit against you and Red Clay Consolidated School
9  District.  I am going to go over the instructions again.
10       MR. WILLOUGHBY:  Could we just agree that
11  she's heard the instructions and that she'll follow
12  them?
13       MR. WILSON:  Yes.
14       THE WITNESS:  Fine.
15  BY MR. WILSON:
16    Q.  You have heard them twice so. . .  Have you ever
17  been deposed before?
18    A.  No.
19    Q.  Where were you born?
20    A.  Wilmington, Delaware.
21    Q.  And what's your date of birth?
22    A.  1-5-73.
23    Q.  Your address?
24    A.  200 Saturn, S-a-t-u-r-n, Drive, Newark,

Page 3

1  Delaware, 19711.
2    Q.  How long have you lived there?
3    A.  Eight years.
4    Q.  Do you own?
5    A.  Yes.
6    Q.  Have you ever been charged with a crime?
7    A.  No.
8    Q.  Did you serve in the military?
9    A.  No.
10    Q.  Have you ever been sued in your individual
11  capacity?
12    A.  No.
13       MR. WILLOUGHBY:  You mean other than this
14  case?
15       MR. WILSON:  Yes.
16       THE WITNESS:  I'm sorry.
17  BY MR. WILSON:
18    Q.  Have you ever sued someone else?
19    A.  No.
20    Q.  Have you ever been treated or counseled for
21  alcohol problems?
22    A.  No.
23    Q.  Drug problems?
24    A.  No.

Page 4

1    Q.  Did you go to college?
2    A.  Yes.
3    Q.  Where did you go?
4    A.  University of Delaware.
5    Q.  Graduate?
6    A.  Yes.
7    Q.  What year?
8    A.  1995.
9    Q.  And what is your degree in?
10    A.  Bachelor's of Science, physical education and
11  health teacher.
12    Q.  Did you graduate with honors?
13    A.  Yes.
14    Q.  What were the honors?
15    A.  I had distinguished honors my first year and
16  then graduated with a grade point average that allows
17  you to be considered honors and I was also awarded the
18  Woman of Promise Award for that year.
19    Q.  What does the Woman of Promise signify?
20    A.  It is an award that the university acknowledges
21  a woman who they believe is going to make something of
22  herself and do something good some day for others,
23  excuse me.
24    Q.  Have you done any graduate work?

Page 5

1    A.  Yes.
2    Q.  Do you have any degrees?
3    A.  Yes.
4    Q.  And from where?
5    A.  Wilmington College.
6    Q.  What degree?
7    A.  A master's of education with a concentration in
8  reading to be a reading specialist.
9    Q.  What year did you get that?
10    A.  2004.
11    Q.  Are you currently employed by Red Clay?
12    A.  Yes.
13    Q.  And in what capacity?
14    A.  Physical education, health teacher.
15    Q.  Is that the same title you had in 2002-2003
16  school year?
17    A.  Yes.
18    Q.  And the 2003-2004 school year?
19    A.  Yes.
20    Q.  How long have you worked for Red Clay?
21    A.  Since 1995.
22    Q.  Did you meet with Mr. Willoughby to prepare for
23  today's deposition?
24    A.  Yes.

**B-0230**

2 (Pages 2 to 5)

Wilcoxon
Janay Freebery

v.

C.A. # 05-524-SLR

Red Clay Consolidated School District
May 25, 2006

Page 6

1    Q.  How long did you meet with him?
2    A.  A couple of hours.
3    Q.  And when was that?
4    A.  One day last week and again yesterday.
5    Q.  Do you recall the documents -- did you look at
6    any documents?
7    A.  Yes.
8    Q.  And do you recall which ones you looked at?
9    A.  No.
10   Q.  Did you listen to the tapes?
11   A.  Briefly.  Just one.
12   Q.  Did you talk to anybody other than
13   Mr. Willoughby to prepare for the deposition?
14   A.  No.
15   Q.  Have you talked to anybody in general about the
16   lawsuit?
17   A.  No.
18   Q.  Have you talked to Frank Rumford?
19   A.  No.
20   Q.  Janet Basara?
21   A.  No.
22   Q.  Okay.
23   A.  When you said anyone in general, my immediate
24   family, they know that I'm going through this.

Page 7

1    Q.  Okay.  But anybody that has any knowledge of the
2    case?
3    A.  No.
4    Q.  And prior to the 2002-2003 school year there has
5    been testimony that you were out of work that year or
6    part of that year to give birth?
7    A.  Yes.
8    Q.  Okay.  Was there any tension between you and
9    Mr. Wilcoxon during the 2002-2003 school year?
10   A.  Tension meaning negative tension?  The tension
11   -- the only tension that was there in the beginning when
12   I first returned and met him was that I basically had to
13   take the lead, mentor him, guide him.  I had to
14   basically carry the load as far as lesson plans, units
15   were concerned, ideas, handouts, books.
16   Q.  Did you resent Mr. Wilcoxon for this?
17   A.  No, because I know -- I was informed that he and
18   the substitute were having a tough time getting class
19   together, discipline management, things like that.
20   Q.  By the substitute, you mean the person that
21   filled in for you the prior year?
22   A.  Yes.
23   Q.  And who was that?
24   A.  Jill Orensky, O-r-e-n-s-k-y.  I don't know her.

Page 8

1    Q.  Do you know where she's at now?
2    A.  Absolutely no idea.
3    Q.  During that first year back were you having any
4    personal problems in the 2002-2003 school year?
5    A.  The only ones were in relation to my husband.
6    Q.  And you were going through a divorce?
7    A.  Yes.
8    Q.  Did that cause you any emotional distress?
9    A.  I guess so, yeah.
10   Q.  Were you during that time period were you ever
11   medicated for depression?
12   A.  No.
13   Q.  Did you ever have difficulty sleeping?
14   A.  No.  Other than when a newborn baby would wake
15   me up.
16   Q.  When was your baby born?
17   A.  April 4th, 2002.
18   Q.  And it was a daughter, correct?
19   A.  Uh-huh.
20   Q.  Was that a problem with your daughter, waking
21   you up at night?
22   A.  No.  Just normal newborn baby things.  She still
23   does it.
24   Q.  Okay.  Did the breakup of your marriage and the

Page 9

1    birth of your child have any impact on your job at all?
2    A.  Absolutely none.
3    Q.  Were you disciplined at all during that year?
4    A.  No.
5    Q.  Were you subject to any observations during the
6    2002-2003 school year?
7    A.  I don't remember.  I'm sure I was.  2002-2003.
8    I'm sure I was.  I remember being observed.  I don't
9    know if it was 2002 or -- the 2002-2003 year or
10   2003-2004 by Mr. Bob Bartoli.
11   Q.  And that was just one observation?
12   A.  That I can remember, yes.
13   Q.  Do you recall the results of that observation?
14   A.  No.
15   Q.  Okay.  And you and Mr. Wilcoxon taught together
16   again in 2003-2004, correct?
17   A.  Yes.
18   Q.  Prior to December was there any tension between
19   you two?
20   A.  Yes.
21   Q.  Okay.  What was that tension?
22   A.  Once again, it -- I figured that over the summer
23   and after teaching with me a half a year that he, and
24   also having prior teaching experience that he would

Wilcoxon                                    v.           Red Clay Consolidated School District
Janay Freebery                    C.A. # 05-524-SLR                          May 25, 2006

Page 10

1  contribute to the lesson plan development, to exploring
2  and finding updated or changed handouts, information,
3  anything new and updated that we could use to
4  incorporate into our lessons.  On routine basis I would
5  ask him is there anything you would like to change;
6  would you like to add something; what can we do to make
7  this better; where can we find something different?  I
8  feel we should change this into this; add this to that;
9  remove this and replace this with that.
10     MR. WILLOUGHBY:  Slow down a little bit.
11  She's keeping up with you.
12     THE WITNESS:  Oh, I'm sorry.
13     MR. WILLOUGHBY:  No, that's okay.  She may
14  have a hard time keeping up.  I wouldn't be surprised.
15     THE WITNESS:  I'm sorry.  And he kept
16  saying nope, everything is fine just the way you have
17  it.  I would also -- we had a joint planning time that I
18  was used to team planning with my previous partners, and
19  Mr. Wilcoxon never offered one idea, never showed me a
20  lesson, never gave me one handout, never showed me a
21  book, never showed me information that he had used in
22  other schools or he had found on his own to contribute
23  to the curriculum.
24  BY MR. WILSON:

Page 11

1     Q.  So did you resent this that in the second year
2  that he hadn't stepped up and, in your perspective, to
3  start pulling his own weight?
4     A.  I -- I wouldn't say resented because I'm not
5  that kind of person.  I was disappointed and lost a lot
6  of confidence in him as a partner because of what I knew
7  in the past.  He was very different and just I felt that
8  I was carrying a lot of the weight, but I had taught it
9  and I had done things and I had experienced I guess a
10  lot more situations, so I just would handle them and
11  move on.  I was asked when I returned or mentioned that
12  they were struggling and they couldn't wait for me to
13  come back, and Mr. Wilcoxon even himself mentioned that
14  things were much better once I was there due to
15  classroom management and disciplinary procedures.
16     Q.  Did you, in a sense, feel as though you were
17  Mr. Wilcoxon's supervisor?
18     A.  Never.
19     Q.  But you did feel as though you were a mentor to
20  him?
21     A.  I was asked to help him develop better
22  disciplinary procedures and classroom management and
23  lessons and I think as a team partner you just do that
24  with each other.

Page 12

1     Q.  Did you ever give instruction to Mr. Wilcoxon as
2  to what he needed to do?
3     A.  I would have -- I would ask him if he had
4  anything to contribute to the planning of a new lesson
5  or a new topic, subject topic such as drugs, alcohol.
6  He would say no.  I would show him all the handouts for
7  the entire unit that I had developed over the years, and
8  he would say those are just fine, and I would say okay,
9  I'm going to take care and copy this for this day, can
10  you please copy these for this day.  That was mainly I
11  guess the only kind of direction I -- or instruction I
12  would give to him other than I'd have to ask him to help
13  me with -- if you're not going to contribute to the
14  planning of the lessons can you at least contribute to
15  running the copies.
16     Q.  Did you feel that since you were contributing
17  more in terms of planning the lessons that he should
18  contribute more in terms of teaching the lessons and,
19  you know, interacting with the students in the class?
20     A.  Never.  Because I did most of the teaching
21  because when he did do it, just as anyone else would
22  experience when you're teaching someone else's lesson,
23  you leave things out because you didn't develop it
24  yourself.  So when he would be instructing I was always

Page 13

1  having to interject and make sure that the students got
2  the information that they would then be responsible for
3  or make sure that they had understanding because a lot
4  of times they didn't.
5     Q.  Did you continue to have personal issues during
6  the 2003-2004 school years regarding the breakup of your
7  marriage and your daughter?
8     A.  I don't believe so because the divorce was final
9  on February 6th of that year.
10     Q.  Of 2003?
11     A.  Yes.
12     Q.  Or 2004?
13     A.  2000 -- she was born in April of '02, so -- '03.
14     Q.  All right.  During -- from here on out I am
15  going to be talking about 2003-2004 unless I indicate
16  otherwise, okay?
17     A.  Okay.
18     Q.  During that year were you disciplined at all?
19     A.  No.
20     Q.  Were you given any verbal warnings?
21     A.  Yes.
22     Q.  And what was that for?
23     A.  That was only during the situation that the log
24  was found and Mrs. Basara said that if there was

B-0232                      I (Pages 10 to 13)

Wilcoxon                              v.              Red Clay Consolidated School District
Janay Freebery              C.A. # 05-524-SLR                    May 25, 2006

Page 14

1  anything in that log that I did believe may have been
2  true that I need to not do that any more.
3    Q.  Okay.  Did she ask you if anything in there was
4  true?
5    A.  She asked me -- I don't -- I don't recall.  She
6  was asking all, I mean questions that whole meeting that
7  we had.
8    Q.  Okay.  Did you arrive late for morning duty at
9  any time during that school year?
10   A.  For morning -- what do you mean morning duty?
11   Q.  Well, okay.  Were you scheduled to teach morning
12  duty with Mr. Wilcoxon?
13   A.  No.
14   Q.  Okay.  Can you explain to me what morning duty
15  is?
16   A.  Some teachers are assigned a morning duty,
17  whether its bus duty, hallway duty, and others are not.
18  And I don't know what his morning duty was.
19   Q.  Okay.  But you were not scheduled for any
20  morning duty?
21   A.  No.
22   Q.  Why are some teachers scheduled for morning duty
23  and some teachers not?
24   A.  Because I guess some have bus duty or certain

Page 15

1  areas of the building duty or home room duty, and some
2  of us don't.  I would -- I mean I don't know if you
3  consider -- I mean it's not considered a official duty
4  but I would make sure that the locker room was available
5  for the students to go and drop things off in the
6  morning and again in the afternoon.
7    Q.  So there is no procedure used to determine who
8  has duty in the morning and who doesn't?
9    A.  They let you know I guess from year to year, and
10  on the sheet it just said locker room.
11   Q.  So are the teachers that don't have morning
12  duty, are they permitted to come to school later than
13  those that do have morning duty?
14   A.  No.
15   Q.  What do the teachers that don't have morning
16  duties do during that timeframe?
17   A.  I don't know.
18   Q.  What did you do?
19   A.  I would come to school, go down to the locker
20  room.  I would get -- stop by the gym.  I would make
21  copies.  I would post team intramural team lists.  I
22  would set up things in the multi-purpose room.  I would
23  -- there -- I cover for other teachers who maybe were
24  coming in late or they had a parent conference or

Page 16

1  another issue; meet with a child who needed somebody in
2  that locker room.  One year I had to give a bath to a
3  student every day in the locker room or shower.  So it
4  just, for me, it was kind of like you make sure the
5  locker room is available if they need to put something
6  in it or take something out, and then other than that I
7  was in the office sometimes answering phone calls if a
8  secretary was out and they didn't have coverage.  There
9  was multiple things I could be doing and did.
10   Q.  Would it be fair to say that it would be easier
11  for a teacher that wasn't assigned to morning duty to
12  come in late than it would be for a teacher who was
13  assigned the morning duty?
14   A.  No.
15   Q.  And why is that?
16   A.  Because we're all -- we're all supposed to be
17  there at the same time.
18   Q.  Okay.  Did you arrive late during that school
19  year?
20   A.  I'm sure occasionally.  A minute or two, three.
21  Just as a lot of other people, including Mr. Wilcoxon.
22   Q.  Do you recall admitting at one of the meetings
23  that Mr. Wilcoxon recorded that you were late
24  frequently?

Page 17

1    A.  No.
2    Q.  If you did admit that at one of those meetings
3  would that be an inaccurate statement?
4    A.  If I did admit it?
5    Q.  If you did say that?
6    A.  I was probably referring to the occasional
7  minute or two.  If it was something further than that I
8  would have called in to the secretary.
9    Q.  During the 2003-2004 school year Bruce Hannah
10  was your boyfriend, correct?
11   A.  Uh-huh.
12   Q.  And did he ever come in and eat breakfast with
13  you at school?
14   A.  No.
15   Q.  Never?
16   A.  He would come in and drop off coffee during my
17  planning period.
18   Q.  Did he stay and visit?
19   A.  No.
20   Q.  Did he sign in?
21   A.  I don't know.  Usually people who stayed for a
22  longer time would sign in.  I would assume he would just
23  drop it off and leave.
24   Q.  So he didn't sit there and drink coffee with

**B-0233**

Wilcox & Fetzer, Ltd.        Professional Court Reporters        (302)655-0477

Wilcoxon                                           v.                              Red Clay Consolidated School District
Janay Freebery                        C.A. # 05-524-SLR                                          May 25, 2006

Page 18

1   you?
2   A.  Unless -- no.  Unless it was for two or three
3   minutes during my planning time.  That's about it.
4       Q.  Is this permissible for a teacher to have a
5   visitor during her planning time?
6       A.  Yes.
7       Q.  But the visitor would have to sign in, correct?
8       A.  If they're there for an extended time or I guess
9   walking around the building, I would assume so.  I don't
10  know how the policy is but since he never stayed and
11  never walked around the building.  He would just drop
12  off coffee.  I had visitors on a routine basis stopping
13  by, parents into the gym who had not signed in, out on
14  the fields on a routine basis.  There was a mom who
15  would walk her two kids, see us out there, the two kids
16  would come running out and play on the field for a
17  couple minutes and run back with their mother.  A man
18  that routinely walked his dog would stop and talk, hey,
19  what are you teaching them?  This is so neat.  How did
20  you come up with this activity?  You know, the kids
21  would then demonstrate and be very excited to be able to
22  show somebody their skills or techniques.  So . . .
23      Q.  Mr. Rumford mentioned that you were dating
24  somebody else during this two-year time period?

Page 19

1   A.  Okay.
2       Q.  Were you?
3   A.  In the very beginning.
4       Q.  Of the 2002-2003?
5   A.  Yes.
6       Q.  And who was that?
7   A.  His name?
8       Q.  Yes.
9   A.  John.
10      Q.  Last name?
11  A.  Hubis.
12      Q.  H-u-b-i-s?
13  A.  Uh-huh.
14      Q.  Did he ever eat breakfast with you?
15  A.  Never.  How many times during the 2003-2004 school year
16      Q.
17  do you think Mr. Hannah came to school to see you?
18  A.  A couple.
19      Q.  Two?
20  A.  To -- to see me or to just drop something off?
21      Q.  Either one.
22  A.  I don't know.  Maybe -- I don't know.
23      Q.  Ten?
24  A.  No.

Page 20

1       Q.  Less than ten?
2   A.  Yes.
3       Q.  When you were team teaching with Mr. Wilcoxon
4   did you ever leave class?
5   A.  I'm sure I did.
6       Q.  Frequently?
7   A.  No.
8       Q.  Did you ever leave without telling him you were
9   leaving?
10  A.  No.
11      Q.  You always told him?
12  A.  Uh-huh.  Unless, maybe, there is a possibility
13  there may have been an emergency bathroom situation and
14  I would have been back within three to five minutes but
15  every other time I told him exactly what I was doing.
16      Q.  Did Mr. Wilcoxon ever complain to you about or
17  joke with you about you not being in class?
18  A.  Never.
19      Q.  Never even made a joke about it?
20  A.  Never.
21      Q.  When you were team teaching with him during that
22  year what's the longest that you were away from class?
23  A.  I don't recall.
24      Q.  Did you ever get an extended leave approved

Page 21

1   during that year?
2   A.  Extended leave of absence?
3       Q.  From class.  No.  Extended leave of class for a
4   day?
5   A.  Never a full day.
6       Q.  For a part of a day did you ever go through the
7   steps of getting it approved to leave for a portion of a
8   day?
9   A.  A small portion.
10      Q.  And what was the reason for that?
11  A.  I went to a mommy-baby swim lesson.
12      Q.  Do you recall when that was?
13  A.  Wintertime.
14      Q.  Who approved it?
15  A.  Administration.
16      Q.  Anybody in particular?
17  A.  Janet.
18      Q.  Janet?
19  A.  Basara.
20      Q.  Meaning Miss Basara?
21  A.  And I think I mentioned it to Mr. Rumford also.
22      Q.  Was there ever any other instance where you had
23  to get that approval?
24  A.  Not that I recall.

6 (Pages 18 to 21)

Wilcox & Fetzer, Ltd.          Professional Court Reporters          (302)655-0477

Wilcoxon
Janay Freebery

v.

C.A. # 05-524-SLR

Red Clay Consolidated School District
May 25, 2006

Page 22

1    Q.   You just referred to Miss Basara as Janet, is
2  she a friend of yours?
3    A.   A work friend.
4    Q.   What's your definition of a work friend?
5    A.   Someone that you have a positive relationship or
6  a cooperative relationship or you work with.
7    Q.   Do you ever see her outside of work?
8    A.   No.
9    Q.   Okay. Can you explain - you're aware of the
10  journal we have been talking about all day - can you
11  explain to me how you came into possession of that
12  journal?
13    A.   On December 15th, 2003 Mr. Wilcoxon called out
14  sick. There were no lesson plans available. I didn't
15  have anything from him, didn't know he was going to be
16  out. Therefore the sub was very confused to what to do.
17  Apparently the sub discussed it with Mr. Rumford. I
18  don't know how it ended up coming about, but Mr. Rumford
19  gave the legal pad to the substitute. I don't know what
20  their conversation was prior to that because I wasn't
21  there. The substitute just was very, very upset, did
22  not know what to do, couldn't -- didn't even know what
23  to do when he was told just to take the attendance. So
24  I said to him, don't worry about it, I will handle this,

Page 23

1  and I just brought the two classes together and very
2  quickly came up with -- altered my entire lesson and
3  schedule for the day that I planned to be able to teach
4  my kids, and covered for him.
5         I took the legal pad from the sub and said
6  don't worry, I'm going to show you how to do this and
7  then I will take attendance for my kids for the rest of
8  the day, you can take attendance for his like this or
9  with whatever they give you later, and I just took the
10  pad, he handed it to me, I just took it. I went like
11  this to flip it up to go to write the date on it and
12  right then and there I saw log on Janay and I just stood
13  there and, you know, I'm in the middle of 60, 70 kids, a
14  substitute, who has no idea of what he's to do to teach
15  all day long, and I just stood there and I was in
16  complete and utter shock. And I said to myself, you got
17  to get yourself together. You don't even know what's
18  going on with this. So I just said to the substitute,
19  okay, I'm going to give you another piece of paper,
20  we're going to take attendance on something completely
21  different. Let's just put this aside. I don't even
22  know what else I did. I was so upset.
23         I went and taught the class, two classes.
24  In between I called Mr. Rumford and said I don't know

Page 24

1  what's going on but I have some log here that's on me,
2  and it's absolutely blowing my mind, and I said, you
3  know, I'm having to cover for his classes. I'm having
4  to teach my class. This poor substitute doesn't know
5  what to do, and all of a sudden I'm put on the spot and
6  I was upset. And he said come up after this class and
7  we'll talk with you. I said okay. So I kept the log.
8  I didn't do anything to it. At that time I could have
9  done whatever I wanted to that log, but I knew that
10  something was wrong and I thought to myself why would
11  someone ever do this to me? I have been here for ten
12  years, never had one negative conflict, one negative
13  conversation. I have never had an incident with any
14  teacher in this building, ever. And I was shocked. I
15  was completely shocked and very upset, confused. I
16         I left the log laying there for the entire
17  two classes and then I walked it into Janet's office.
18    Q.   Do you recall who the sub was?
19    A.   I do not.
20    Q.   You heard testimony earlier today about a
21  comment that supposedly you made about Mr. Wilcoxon
22  being difficult to work with?
23    A.   Yes.
24    Q.   Did you ever make that comment?

Page 25

1    A.   No.
2    Q.   Did you ever say anything to that effect about
3  working with Mr. Wilcoxon, anything similar to him being
4  difficult to work with?
5    A.   The only time I mentioned something was briefly
6  to Frank that it was -- it was getting tougher and
7  tougher for me to handle the covering, the constant
8  load, and the inappropriate comments were getting out of
9  hand.
10    Q.   And what were the inappropriate comments?
11    A.   What were they?
12    Q.   Yes.
13    A.   There were a lot. Do you want me to go through
14  and just tell you a ton of them?
15    Q.   Sure.
16         MR. WILLOUGHBY: Tell him the ones you can
17  remember.
18         THE WITNESS: He would come in during our
19  planning period and pull a chair out. I had two chairs:
20  One at my desk, one off to the left side of my desk: He
21  would pull that chair right up next to me, whatever I
22  was doing on my computer, lesson plans, adjustments,
23  changes, telephone calls, he would just come and sit
24  right down in the girls locker room and I would

Page 26

1  sometimes look at him like, what do you need, and he
2  would just say, nothing, just go ahead do what you're
3  doing. I said, do you want to plan something? Do you
4  want to get something together for another lesson? Do
5  you have a problem with something? Do you want to talk
6  about something? No. And I would say okay. Well,
7  what's -- what's up then?
8         And he would just say something, you know,
9  very rude and disrespectful such as, so, what's the deal
10  with you and Bruce, have you had sex with him yet?
11        And I would say, where -- where would you
12  come up with this?
13        Well, how long have you been dating him
14  now? Isn't it about time you have had sex with him.
15        And I would say, this is none of your
16  business. This is not your concern.
17        Oh, come on, I'm just kidding. Come on,
18  you can tell me. Come on. I'm going through a divorce.
19  I'm not getting any. I'd love to hear from somebody who
20  might be. Come on, are you still dating John, too?
21        I would say, that's none of your business.
22        Come on, that would be great. You don't
23  know anyone other than your husband and wouldn't that be
24  great to date two guys at once? Anybody would love

Page 27

1  that.
2         What are you and Bruce doing this weekend?
3         I don't know.
4         He would say, come on, you don't know what
5  you're going to do? And he would say, I sure know what
6  he's going to do. And I would say, Rich, that's enough.
7  You're making me a little sick here. I just went
8  through a divorce. I have a newborn baby. I have trust
9  issues. I did share with him some of the different
10  things I was dealing with with my ex-husband. He knew I
11  had trust issues. He knew I was going to possibly have
12  relationship issues, and he pushed it. I would walk by
13  him in the gym one time, "Sure do look good in those
14  pants" in front of students.
15  BY MR. WILSON:
16  Q.  When did that happen?
17  A.  I would say fall of 2003. Possibly November,
18  October, November. Students were -- students were
19  there. Students would comment, you know, Miss Freebery,
20  I think he's stalking you. I think he's staring at you
21  again. We think Mr. Wilcoxon likes you, Miss Freebery.
22  I would say to them, that's completely ridiculous.
23  We're team teaching partners. That's the only reason we
24  spend the time we have to together. Enough. And I

Page 28

1  would shut it down very quickly.
2         When I did stop team teaching with him I
3  did have two students actually say oh, good, you finally
4  gave him the boot, it's about time, Miss Freebery. I
5  thought to myself you have got to be kidding me, even
6  the kids picked up on some of the inappropriateness,
7  even though I -- it was completely avoided during class.
8         He said to me, I must have gone -- I would
9  have to run through the gym to go to the bathroom. I
10  have a weak stomach. I mean, I do. So sometimes my
11  stomach would be bothering me. I would wave to him. He
12  knew I was running out to go to the bathroom. He said
13  to me later that day, so what's the deal, should I be
14  congratulating you?
15        I said, what do you mean?
16        He said, you must be pregnant. You're
17  complaining you're tired, you're complaining you're
18  nauseous, you're running out to go to the bathroom a
19  lot. Nothing else other than you must be pregnant.
20        I said, please, I have a weak stomach, my
21  stomach is upset, and I drank a lot of water. I said,
22  don't even go there, please, and I would walk away.
23        He then said, next time I see Bruce I'm
24  going to have to congratulation Bruce because I'm going

Page 29

1  to tell him congratulations for being a daddy again.
2         I said Rich, please don't do something like
3  that. That is highly embarrassing. Bruce doesn't need
4  that. I don't need that. I just told you that is not
5  the case. That is the last thing that could possibly go
6  on in my life right now. I don't need it.
7         He waited and waited and waited for the
8  next time Bruce came back to drop by on planning period
9  my coffee. Of course he made his way right over to
10  Bruce who was outside the doors of the outside, like the
11  exterior doors of the gym, and he said to Bruce, so
12  congratulations, daddy, I hear you're going to be a
13  daddy again. And Bruce looked at him and said what are
14  you talking about? I said, Rich, I can't even believe,
15  I have asked you not to go there and do things like
16  that. You know that's inappropriate. And Bruce is
17  like, dude, you're being ridiculous. We were both
18  embarrassed. Bruce and I were both embarrassed. He's
19  thinking why would this guy possibly say this. Why.
20        He then proceeded the third time to make me
21  completely uncomfortable with that same comment in the
22  main office in Frank's presence and Cindy's presence.
23  Cindy Falgowski, F-a-l-g-o-w-s-k-i, and Frank Rumford's,
24  I was talking to Frank and Cindy during our planning

Page 30

1 period discussing - I don't know whether it was an
2 afterschool event because Cindy would help me
3 periodically whenever she could, her and a couple other
4 teachers, with intramurals. I probably was checking --
5 I don't know what I was checking, but the three of us
6 were standing in the main office at the front counter
7 with parents, teachers, students, and other faculty
8 members such as the secretaries, and he said, so, have
9 you congratulated Janay? And Cindy goes, oh, on what?
10 He goes you didn't hear? She's pregnant. And Cindy is,
11 like, what are you talking about? And I looked at him,
12 I said, Rich, I have asked you to stop. It's not funny
13 any more. He didn't even know what we were talking
14 about. He just came right in and interrupted the entire
15 conversation and said did you congratulate her yet.
16     He would ask me on a normal basis down the
17 locker room, so, when are you going to have sex with
18 Bruce? How long would you like to be having sex with or how
19 long do you have sex with Bruce?
20     He would say other inappropriate comments
21 such as in the faculty meeting, I was holding the staff
22 Christmas party at my house, and he had been drawn --
23 his name to win a poinsettia. As he was walking out he
24 says well, I don't need this poinsettia. He says you

Page 31

1 can take it and put it at your house for the party. I
2 said thank you. He turned around and said, why not,
3 you're the closest thing I have to a wife and a bitch.
4 Q. Where did this happen?
5 A. Right after a faculty meeting in the library.
6 Q. Okay. I'm sorry. I didn't mean to interrupt
7 you.
8 A. We were -- the faculty meeting was over. We
9 were all leaving. As we were walking out of the library
10 that's when it happened.
11 Q. Okay.
12 A. And I was so embarrassed. Other comments,
13 constant comments about playing two men, fooling around
14 with two men, all the time I would say to him please,
15 please stop asking me.
16     Oh, come on. Cut me a break. You know,
17 I'm just kidding with you.
18     That was it. I mean there is a lot of
19 examples.
20 Q. When did the comments start?
21 A. They started towards the end of the first year
22 that we were working together. I figured -- I figured
23 he was just somebody -- another guy that just made
24 inappropriate comments or said inappropriate things

Page 32

1 because of being immature. I just kind of shrugged it
2 off, figured sooner or later he'll smarten up and just
3 leave me alone about it. He's not going to keep asking
4 me questions because I'm constantly telling him to leave
5 me alone.
6 Q. And is it your testimony that it continued into
7 the next year?
8 A. Yes.
9 Q. Why is it that you didn't come forward with a
10 complaint earlier than you did?
11 A. Because at the end of the first year I just
12 assumed, like I said, that over the summer he'll start
13 realizing, you know, okay, I need to get some lessons
14 together, I need to get some information, I'll start
15 researching over the summer for some stuff to contribute
16 to lessons, and I assumed he would figure, okay, I'm not
17 going to bother her, it's not going anywhere, so I'm not
18 going to bother with her any more as far as questioning
19 and saying things to her, and I just assumed that he
20 would just grow up and not do it any more, not ask any
21 more.
22 Q. But he didn't?
23 A. Unh-unh.
24 Q. So the next year when this continued why didn't

Page 33

1 you make a complaint?
2 A. I once again thought I could handle this myself
3 by telling him and shutting it down. There was a -- I
4 was embarrassed. I mean, I don't know -- it's
5 embarrassing to sit here and say some somebody would ask
6 you how long did it take you to have sex or you know
7 what he wants to do to you. Come on, you're an
8 attractive woman, you could get any guy you want, he
9 would say to me, things like that. It was embarrassing.
10 I didn't feel -- I don't know. I didn't feel that I
11 needed to talk about it because it was embarrassing. I
12 didn't see myself going in and sitting Mr. Rumford or
13 Mrs. Basara down and saying Rich is asking me how long
14 it takes me to have sex with my boyfriend. It just was
15 a weird situation. I didn't know what to do.
16     I was embarrassed and also I just -- there
17 was so much going on that year, with Nick our, Nick
18 Manolakas, our principal, being diagnosed with a very
19 aggressive cancer, then quickly changing gears, putting
20 Janet as principal, moving Frank, there was a lot of
21 movement. I'm the last person to try to create a
22 problem. You know, I'm the kind you just deal with it
23 yourself, you try to fix it yourself. If it gets too
24 bad that's when you inconvenience someone else. I just

Wilcoxon                                  v.          Red Clay Consolidated School District
Janay Freebery                    C.A. # 05-524-SLR                      May 25, 2006

Page 34

1  didn't feel that I wanted to cause any more rough waters
2  for the office staff. They were going through enough
3  transition and turmoil at the time.
4       Q.  So what was it to make you finally decide to
5  make the complaint?
6       A.  Well, I didn't -- I just -- in the winter, early
7  winter, I mentioned something to Frank Rumford just
8  because it had gotten to the point where I think I was
9  just utterly disgusted by it and I looked at Skyline as
10  my normal safe place. I came to work every day and I
11  loved it. I loved what I did. I loved the students. I
12  enjoyed the staff. I loved what I did. That was my
13  safe place. That was my routine. You had a schedule.
14  Whereas at home I was still learning. I was learning
15  how to become a single mom. Didn't know, wasn't
16  prepared for that. So Skyline was my joy to come to
17  because that was the normal place.
18       I was starting to feel uncomfortable there.
19  I was starting to feel embarrassed and very nervous all
20  the time. When he would come in that locker room door
21  would open and I would just feel myself, oh, my God,
22  what is he going to say today? What's he going to do
23  today? It was a weird feeling to the point where
24  sometimes I actually went into my bathroom which is in

Page 35

1  the office, I would close my door to the office, go into
2  the bathroom and just stand there with the light
3  completely off, and sometimes he would just stand
4  outside of my locker room office door and wait to see
5  whether I was going to come in or out or whether I
6  wasn't even in there yet and that he was just waiting.
7  There were many times when I would come walking into my
8  locker room and there was Rich standing in the girl's
9  locker room outside of my door. And I knew something
10  was wrong.
11       So I said something to Frank Rumford that
12  I'm having some problems. He's being a little
13  inappropriate to me and I don't know what to do. And
14  Frank said what you need to do is stop it now. And that
15  was it. So I got a little more firmer with him and ask
16  me questions like that. Don't say things like that.
17  Somebody could overhear you. Somebody might take that
18  as a rumor and spread it around that I'm pregnant.
19  Somebody might take it as a rumor that, you know, I'm
20  the closest thing you have to a wife and a bitch. And
21  it was embarrassing and I just -- I don't know. I
22  mentioned it to him. Other people heard comments that
23  he made to me that were completely inappropriate and had
24  said something to him at that time, too.

Page 36

1       Q.  Who?
2       A.  At that the wife and the bitch comment Sean
3  Farilla was right there and had said I can't --
4  something along the lines of I can't believe you said
5  that. That's completely inappropriate to her. And I
6  just kind of was like. . . You know, in other words,
7  you people have no clue. You have no clue.
8       Q.  Did anybody else hear it?
9       A.  Oh, I'm sure. I mean there was a whole entire
10  staff leaving a faculty meeting when he heard it. I'm
11  pretty sure Rebecca Perse heard it. There could have
12  been ten, seven -- seven to ten other people right
13  there.
14       Q.  You mentioned something to Frank Rumford you
15  said in early winter?
16          MR. WILLOUGHBY: I don't think she said
17  early winter but . . .
18          THE WITNESS: I think, no. I think I said
19  -- I don't know what I said. I mentioned something to
20  Frank -- no, it was definitely in the fall of '03 that I
21  mentioned something to Frank. It was either in November
22  or -- it was -- I think it was in November of '03, maybe
23  early December, late November, but it was right around
24  that time, because it was prior to the whole wife and

Page 37

1  bitch comment. It was prior to that.
2  BY MR. WILSON:
3       Q.  Okay.
4       A.  And it was right around the same time as the
5  pregnancy comment was made in front of people. That was
6  the time that it happened so . . .
7       Q.  But Mr. Rumford didn't do anything about it?
8       A.  He told me that I needed - I guess because I
9  didn't give him specifics because I was too embarrassed
10  - I don't think he really knew or understood the
11  magnitude of it. He just said you need to tell him stop
12  right now.
13       Q.  Okay. So what made you decide to bring it to
14  Janet Basara's attention and to have something done?
15          MR. WILLOUGHBY: I object. There is no
16  foundation for that question.
17  BY MR. WILSON:
18       Q.  You can answer the question.
19          MR. WILLOUGHBY: You can answer the
20  question. Why don't you repeat the question?
21          (Record read.)
22          MR. WILLOUGHBY: I object to the form of
23  the question.
24          THE WITNESS: Can you say it again? Can

B-0238                      10 (Pages 34 to 37)

Wilcoxon                                    v.         Red Clay Consolidated School District
Janay Freebery                    C.A. # 05-524-SLR                        May 25, 2006

Page 38

1   you -- am I missing something?  I guess I don't --
2           MR. WILLOUGHBY:  He wants to know how it
3   came about that you disclosed --
4           MR. WILSON:  I'll ask her.
5   BY MR. WILSON:
6       Q.  Obviously this became an issue, okay.
7       A.  Yes.
8       Q.  How did it become an issue?
9       A.  The only time that I discussed it formally with
10  Mrs. Basara was when she called the meeting on the
11  December 15th, the day the log was found.
12      Q.  Okay.  Why did you decide to share it with
13  Mrs. Basara that day?
14      A.  Because at that time at the meeting it was just
15  her, myself and Mr. Rumford, and she said to me, you
16  know, I was very upset at the time and she said to me
17  what -- obviously something is wrong here.  She said,
18  you know, you -- something is not right with this team
19  teaching relationship.  What are all the issues?  What
20  is going on?  What are the problems here?  Because there
21  is something not right for someone else -- for you to be
22  this upset, someone else to be keeping a log.  There is
23  something going on with your partnership.  What is going
24  on?  And the purpose of her meeting was to basically

Page 39

1   find out what's going on here.
2           So I told her.  I said what was going on.
3   I said I am, you know, I'm carrying the weight, you know
4   you guys are relying on me to help a new teacher become
5   a better disciplinarian and a better classroom manager,
6   a better lesson planner, a better teacher, you put that
7   on me, and I then decided that that's what I would do.
8   So I did not want to disrupt the office staff, her, Mr.
9   Rumford, anyone else.  I just did what I needed to do.
10  I said to her, you know, it was getting very difficult.
11  The entire time he's never presented a lesson.  He's
12  never presented an idea.  He's never given me a handout.
13  He's never shown me an old lesson from another building
14  or another school or an example.  He's never come up
15  with anything.  You know, I'm dealing with that every
16  single day.
17          I told her that I was embarrassed about
18  some other things.  I was feeling uncomfortable with the
19  inappropriate comments that he was making and that's
20  when she said what are you talking about?  What's
21  happening?  What else is going on?  And that's when I
22  mentioned them.
23      Q.  Okay.  Did Mr. Wilcoxon deny making the
24  comments?

Page 40

1       A.  No.
2       Q.  Okay.  What did he say in response?
3       A.  Well, he wasn't there that day.
4       Q.  Oh, okay.
5       A.  That was the day he was absent.
6       Q.  Oh, okay.  Was there anything else that you
7   complained to Miss Basara about with regards to your
8   relationship with Mr. Wilcoxon?
9       A.  Other than -- I just I always felt like I had to
10  carry the load for him.  He was making inappropriate
11  comments.  He knew that I had a lot going on, you know,
12  in my personal life.  He knew there was a lot going on
13  in the main office transition.  He knew I was the kind
14  of person that if I do what I need to do, I do what I'm
15  told to do, and I do it right.  And he knew that I was
16  not going to come forward with something like this, is
17  how I was made to feel.  He took advantage of the fact
18  that I just wasn't that kind of person and I didn't have
19  the energy, emotionally, time-wise, I didn't have the
20  energy and he knew it.  He knew that my main priority
21  was a newborn baby.  He knew that I was doing this all
22  on my own, he knew, and he took advantage of that.
23          I did talk about at that time that I had,
24  you know, been dealing with him using all of my lesson

Page 41

1   plans, my ideas, the inappropriate comments, that I felt
2   that he was very, you know, just not a team player, not
3   a team partner, and there were times -- I don't know,
4   some other examples --
5       Q.  Well, earlier on you stated that you shared some
6   things with him about your marriage?
7       A.  He had just asked, you know, why are you getting
8   divorced?  What's going on?  You know, what's happening
9   in your life?  I mean, he knew, I guess from others
10  because I wasn't there until the middle of the 02-03
11  school year.  So I guess people talked about what was
12  going on in my life, and he just when I -- I don't know
13  whether it was kind of his way of, you know, trying to
14  get to know me or know the situation I was in.  I don't
15  know.
16      Q.  So did you explain to him what was going on?
17      A.  Briefly, yeah.  I gave him a brief example of
18  what was happening.  Just as he did when he was going
19  through his divorce.  He would ask advice to myself and
20  to Bruce on different issues and situations and stuff.
21      Q.  Okay.  I'd like to introduce this as an exhibit.
22          (Freebery Deposition Exhibit No. Freebery-1
23  was marked for identification.)
24  BY MR. WILSON:

Wilcoxon
Janay Freebery

v.

C.A. # 05-524-SLR

Red Clay Consolidated School District
May 25, 2006

Page 42

1    Q.  Have you ever seen that before?

2    A.  Never.

3    Q.  And is this your handwriting?

4    A.  No.

5    Q.  Do you know how it got put into the

6    sign-in/sign-out book?

7    A.  I have no idea.

8    Q.  Okay.  Did you know that Mr. Wilcoxon was to

9    meet with Miss Basara on December 16th?

10   A.  No.

11   Q.  On December 16th did you attend a meeting with

12   Miss Basara and Mr. Wilcoxon and Mr. Rumford?

13   A.  No.

14   Q.  On December 17th did you?

15   A.  Yes.

16   Q.  Okay.  Before we get into that meeting, I'd like

17   to have this marked as Freebery-2.  Why don't we take a

18   quick break?

19       (Recess taken.)

20       (Whereupon Mr. Wilcoxon left the deposition

21   for they day.)

22       (Freebery Deposition Exhibit No. Freebery-2

23   was marked for identification.)

24   BY MR. WILSON:

Page 43

1    Q.  Miss Freebery, do you want to take some time and

2    look at this?

3    A.  I have looked at it.

4    Q.  Okay.  Can you tell me what it is?

5    A.  It's the log about me.

6    Q.  Okay.  Is everything in here false?

7    A.  Yes.

8    Q.  There is absolutely nothing in here that's true?

9    A.  Um, other than him stating -- I mean, the only

10   thing that I can say would be even remotely true, to be

11   honest with you, is that I occasionally, just as

12   everyone else does, would come to work a minute or two

13   or three late.

14   Q.  But nothing more than a minute or two or three?

15   A.  Yeah, and if I did on a specific day it was a

16   rarity and I would call in to the main office.  I think

17   there was one time I was traveling back from Newark and

18   there was a car accident on the road from dropping my

19   daughter off and that was a problem.  Other than --

20   and I remember calling in and speaking to the secretary

21   and saying I think I'm going to be a couple minutes

22   late, but I do specifically remember saying but I don't

23   have any students, therefore it will not affect any

24   class periods.  I'm only going to be 10, 15 minutes.

Page 44

1    Q.  In the 2003-2004 school year about how many

2    times would you say that happened?

3        MR. WILLOUGHBY:  Which happened?

4        MR. WILSON:  That she was more than a

5    couple minutes late.

6        THE WITNESS:  Oh, I mean one, maybe two.

7    BY MR. WILSON:

8    Q.  Okay.  Who is Mike Ruth?

9    A.  A teacher at Skyline.

10   Q.  Okay.  Did Mike Ruth have bus duty?

11   A.  I don't know.

12   Q.  Would the person that had bus duty, would he be

13   able to confirm that you were only more than a couple

14   minutes late once or twice?

15   A.  I don't know.

16   Q.  Would the person that has bus duty, would they

17   be outside where the teachers pull in?

18   A.  Sometimes.  They didn't -- they would walk

19   because it was a lot of times Chris Conrad and he would

20   walk -- they didn't just stand.  They had -- they went

21   up and down the entire -- the entire front of the whole

22   building.

23   Q.  All right.  I know it may take a couple minutes

24   but I'd just like to go through this just for you to

Page 45

1    tell me whether these things are true or not.  September

2    8th, Mr. Wilcoxon states that you missed your first two

3    classes and your first planning and half of third class.

4    Is that true?

5    A.  No.

6    Q.  Were you late that day?

7    A.  No.

8    Q.  Was Mr. Wilcoxon alone the first two classes?

9    A.  I have no -- alone maybe in his own class.

10   Q.  Okay.  So the first two class periods you didn't

11   team teach?

12   A.  I -- I don't know.  I mean we -- I have no idea

13   where -- no.  September 8th we probably were teaching

14   physical education and I had my own class and he had

15   his.

16   Q.  Okay.  And the office didn't call in a

17   substitute for you that day?

18   A.  I have absolutely no idea.  No.

19   Q.  Well, if you were there they'd have no reason to

20   call in a substitute, correct?

21   A.  Right.  Correct.

22   Q.  Okay.  Mid September, you missed your first

23   class, is that true?

24   A.  No.

**B-0240**

12 (Pages 42 to 45)

Wilcoxon
Janay Freebery

v.

C.A. # 05-524-SLR

Red Clay Consolidated School District
May 25, 2006

Page 46

1    Q.  Girls were unsupervised in the locker room?
2    A.  No.
3    Q.  November 13th, verbally attacked Jahlil Akil, is
4  that true?
5    A.  No.
6    Q.  Completely false?
7    A.  Yeah.
8    Q.  If there is any truth to these, let me know, you
9  know, maybe it's an exaggeration, but if there is any
10  truth to them --
11    A.  Okay. Well, it may be an exaggeration. Maybe
12  this student made, like he says, an inappropriate
13  comment and he didn't deal with it, therefore I did.
14    Q.  Okay.
15    A.  But I would never verbally attack anyone.
16    Q.  Okay. On November 14th did you leave health
17  class 20 minutes early to work on your Master's thesis?
18    A.  No.
19    Q.  Did you leave class early at all that day to
20  work on your Master's thesis?
21    A.  No.
22    Q.  November 17th, came to the in-service 15 minutes
23  late?
24    A.  No.

Page 47

1    Q.  November 19th, left before the last class
2  started to go to the bathroom and didn't come back until
3  2:25?
4    A.  I very well could have gone to the bathroom.
5    Q.  Okay. November 24th, late, arrived at 8:05,
6  missing student leaders and volleyball signups?
7    A.  No.
8    Q.  Bruce Hannah came in and had breakfast?
9    A.  No.
10    Q.  That same day, left the building to go to the
11  bank during planning period?
12    A.  I very well could have gone to the bank. I
13  don't -- I don't recall.
14    Q.  Let's go down to 11-25?
15    A.  I'd like to say something, though.
16    Q.  Sure.
17    A.  About the 24th, he has continued, the second
18  bullet, left class at 1:15 to call in after-school buses
19  and did not return until that. The times don't make any
20  sense to me. But, I would have to leave class to call
21  in the buses for a second time because he did not write
22  them down. He would forget very frequently to the point
23  where I originally -- he would forget all the time to
24  call -- or to sign up for the after-school buses. It

Page 48

1  was a problem. So what I did was I said to him, here is
2  the schedule. This entire week let -- for example, he
3  would have, say, keeping kids after school on Monday,
4  Wednesday, Thursday. I would say to him okay, you write
5  down how many city and how many suburban kids you need
6  for that Monday, that Tuesday, that Thursday,
7  separately write down the number and the date, and
8  then I would go and write his numbers down for him,
9  because his excuse he was he just can't remember to do it.
10  And we were constantly having problems. I was
11  constantly having to leave class to go and re-call the
12  Sutton Bus Company and it was because the numbers were
13  completely inaccurate. It wasn't one or two kids. I'm
14  talking 40 to 50 to 60 kids and they would not have a
15  ride home.
16        Technically I should have told him at 1:15
17  in the afternoon, forget it, it's too late. It should
18  have been signed up by 9 and 10 o'clock, but I didn't.
19  I always said, all right, I'll be right back. I'll go
20  call them. I would run down to the faculty room, call
21  the buses in, tell them I had an additional bus I needed
22  to order. If it was a problem, please let me know. If
23  it was a problem for them to call me back and let me
24  know, because I would approach him and tell him, it's a

Page 49

1  problem. You can't keep the kids. They already have
2  the buses allotted for other buildings.
3        I did it because that's the kind of person,
4  once again, that I am. I knew he had problems. I knew
5  he couldn't remember it, so here is me, okay, I'll solve
6  -- I'll find a solution to the problem and I'll take on
7  the load once again. So I felt bad for the kids. I
8  didn't -- the amount of times that I could have
9  cancelled his activities by stating, I'm sorry, I
10  already called the buses in, we don't have enough room
11  for that many kids, and I didn't do it because it would
12  have affected the kids and they were excited to stay
13  after and play together.
14    Q.  Was he responsible for actually calling the bus
15  company himself?
16    A.  No, I did. I was. I called every single day.
17    Q.  No, but I mean in theory, was that his
18  responsibility to call the bus company? You're saying
19  he didn't do it?
20    A.  No. He didn't sign up every day.
21    Q.  Okay.
22    A.  So when I would go and calculate it during my
23  planning period I would add up all the city and add up
24  all the suburban numbers of the different teachers that

**B-0241**

13 (Pages 46 to 49)

Wilcoxon                                    v.            Red Clay Consolidated School District
Janay Freebery                      C.A. # 05-524-SLR                    May 25, 2006

Page 50

1  were keeping kids for that day. I would then, either
2  then or during my lunch, because sometimes I couldn't
3  get on to a phone line or sometimes I couldn't get in
4  touch with Sutton Company, do it right then and there,
5  so before 11:20 in the afternoon every single day, no
6  doubt, I would call Sutton Bus Company. I would say, we
7  have 62 city kids and 59 suburban kids. Okay. You're
8  going to need two city buses today and one suburban.
9  Thank you and goodbye. It was called in and it was
10 verified and confirmed that they had that.
11        I would go back up at some point in the
12 middle of the day, whether it's on the way to my next
13 planning period after my lunch and I would write one
14 city bus coming, one suburban bus coming and the total
15 number. I was -- that was my responsibility every day.
16    Q.  For everybody in the whole school?
17    A.  Yes.
18    Q.  Okay.
19    A.  They would, the procedure was they would sign up
20 in the morning for how many kids they were keeping.
21        MR. WILLOUGHBY:  If you don't mind me.
22        THE WITNESS:  I'm sorry.
23        MR. WILLOUGHBY:  No. So it's clear, where
24 would the teachers sign up? Can you explain that whole

Page 51

1  process so it's clear?
2        THE WITNESS:  There is a notepad in the
3  main office right on the front counter or the side
4  counter. Year to year they moved it. So it was highly
5  visible for all teachers every single day when they
6  would enter the building. I mean all teachers would
7  come up, check their mailboxes, make phone calls, meet,
8  talk, whatever. So they would all come up. Some days
9  it was one or two, other days it was seven teachers.
10 They would just sign up how many kids they were keeping
11 and then I would at that time every day calculate it all
12 and call the bus so. . .
13        Then we would be in class, and I would
14 somehow mention after-school sports or mention a game
15 that was going on that day, and he would say oh, no, I
16 forgot to sign up again. And I would say how many kids
17 do you have? Oh, I got a ton of them. And he would
18 then leave, go figure out in his locker room, count up
19 his city and count up his suburban, come back and tell
20 me. So then I would then have to leave and go and call.
21 I mean, so it was a complete disruption and it was very
22 often that it happened. So that's when I finally came
23 up with the solution and said to him, every week you
24 look at when you're going to stay, count up the numbers

Page 52

1  and then give them to me. I mean, there were even times
2  I'd call him on the phone from the locker room, Rich,
3  you haven't given me for the week yet your numbers for
4  intramurals; can you give them to me now before you
5  leave the vicinity of the locker room and you have them
6  right there at your fingertips?
7  BY MR. WILSON:
8     Q.  So what was the time that you normally called
9  the bus company?
10    A.  I called them either during my first planning
11 period which was between 9:45 and 10:30, somewhere
12 around there, or during my lunch which was from 11 to
13 11:30.
14    Q.  Okay. All right. The next bullet point says
15 arrived at 6:22 for Choice Open House. Teachers were
16 supposed to arrive at 6, leaving me to set up
17 everything. Is that true?
18    A.  No. Absolutely not. It's completely the
19 opposite.
20    Q.  Okay. He was late?
21    A.  I'm not saying he was late. I don't know
22 what time he came in because I didn't pay attention to
23 that or log it, but I did set everything up after school
24 in the gym. I had all the copies made. I had all the

Page 53

1  handouts, all the pamphlets, all the displays. I set it
2  all up because it was -- I had it all. He had
3  absolutely nothing to contribute to me. I had course
4  outlines, course curriculums. I had the class
5  syllabuses for health and phys ed. I had samples of
6  student work. I had pictures of students that I had
7  taken. I set it all up. I arrived at whatever time I
8  needed to be there before.
9     Q.  So you were there by 6?
10    A.  I have absolutely no time -- no recollection of
11 what time I got there, but it was definitely before the
12 parents because I had to give presentations. We had
13 parents coming in and basically for Choice you have to
14 -- your motive is -- your objective is to sell your
15 program so that you want kids to come to your school and
16 I had a -- I had prepared a presentation for the sixth
17 grade parents to listen to, the seventh grade parents,
18 and the eighth grade parents to be able to talk and tell
19 them what we had to offer the kids and he just stood
20 there.
21    Q.  He didn't talk to anybody?
22    A.  He may have talked to anyone but he did not give
23 a presentation because I prepared them all
24        Then at the very end he left early an

**B-0242**

Wilcox & Fetzer, Ltd.            Professional Court Reporters            (302)655-0477

Wilcoxon                                v.                Red Clay Consolidated School District
Janay Freebery                   C.A. # 05-524-SLR                        May 25, 2006

Page 54

1  was left to clean up everything. I guess he figured it
2  was all my stuff anyway.
3     Q.  All right. The next one says you spent 30
4  minutes of Choice Open House talking to a former
5  student, ignoring parents and others in the gym?
6     A.  I could not have done that. I'm sure that I
7  talked to a former student. I had a lot of former
8  students that would come back when they're in high
9  school and have half days, when we would have open
10  houses, and they would come and talk to me. I had a good
11  rapport with the students just as well as the parents
12  and the staff at Skyline and that I really honestly
13  believe that's a huge exaggeration, because I couldn't
14  have done it for that long. I was giving presentations.
15     Q.  11-25 arrived at 7:45, 15 minutes late?
16     A.  No.
17     Q.  Next one said she couldn't talk today, so I had
18  to teach all the classes. She was going to keep score.
19     A.  I have absolutely no idea. It very well could
20  have been that I lost my voice. That happens usually
21  once or twice a year, but. . .
22     Q.  Okay. The next one: Bruce brought breakfast in
23  for her at 9:08. She ignored the class completely. I
24  was disciplining, teaching, keeping score for both

Page 55

1  classes while she talked to Bruce?
2     A.  Absolutely not. Can I just mention something
3  else?
4     Q.  Sure.
5     A.  I'm sorry. I don't even know if this makes a
6  difference. But Bruce could not stay for an extended
7  period of time ever. He was a landscaper. He had a
8  huge truck, huge trailer, huge equipment. There was no
9  place he could possibly park for him to stay for an
10  extended period of time like Mr. Wilcoxon is alleging,
11  if that's even the correct word.
12     Q.  Whenever he came to drop off coffee where would
13  he park?
14     A.  He would just stop right there, like outside the
15  building on the side of the road, like, I don't know
16  what you call it, where the buses would pull up, and
17  that's where he would just run the coffee in and hand me
18  a cup of coffee.
19     Q.  What type of truck was it?
20     A.  I don't know, a big one. I don't know.
21     Q.  Okay. Like a pickup truck?
22     A.  Yes.
23     Q.  And it pulled a trailer?
24     A.  Yes.

Page 56

1     Q.  About how long was the trailer?
2     A.  Long. It had a lot of equipment on it.
3     Q.  20 feet?
4     A.  I don't know. Probably. Maybe. I don't know
5  if they're that long.
6     Q.  Was it an open trailer?
7     A.  Yes. Yes. Yeah, because it had all the
8  landscaping stuff, multiple mowers and all that.
9     Q.  Okay. All right. The next one: Returned from
10  first planning period at 10:30, four minutes late?
11     A.  No. And the other question, Mr. Wilson, is that
12  I'm in the locker room with the girls. I don't
13  understand - that's why this I think upset me - I don't
14  understand how he could time me for certain things like
15  this because I'm in a locker room that's closed doors
16  with girls. He's in a locker room that's closed doors
17  with boys. I don't understand it. And when he's
18  constantly talking about me when I arrive, when I
19  arrive, honestly, I don't -- you don't -- the teachers
20  don't all come in the exact specific place. There are
21  two entrances to the building, and I may have walked in
22  with another teacher. I mean I do remember walking in a
23  number of times with other teachers talking, laughing,
24  just walking in the far entrance going down, straight

Page 57

1  down the hall, making a left, then entering the main
2  office, possibly checking my mailbox, talking to
3  students, talking to teachers, making copies. I could
4  have gone right down the back hallway to my locker room
5  and Mr. Wilcoxon would have never seen me. So I think
6  that a lot of these times that he has written are when
7  he so-called saw me for the first time. And what clued
8  me in on that was when I was reading, he had written at
9  one point, I saw her at 7:36 with her belongings.
10  That's -- maybe that might have happened with my
11  belongings, but all these other times he has no idea
12  whether I was in the locker room with kids, whether I was
13  was covering another teacher's homeroom, whether I was
14  in the main office, whether I was doing an accelerated
15  reader because I had a group of small kids that I would
16  help who were struggling readers due to my Master's
17  Degree. That wasn't all the time, but sometimes.
18        I'm thinking, you know, the only thing that
19  I could honestly understand why he would do this is
20  because that's the so-called first time he saw me. It
21  doesn't necessarily mean it's the time I entered the
22  building.
23     Q.  All right. 11-26: Arrived at 7:50. Missed
24  student leaders and first period and started half day

Wilcoxon                                        v.          Red Clay Consolidated School District
Janay Freebery                         C.A. # 05-524-SLR                              May 25, 2006

Page 58

1  schedule?
2      A.  No.  I wouldn't just miss an entire first period
3  and it just go unnoticed.  That just wouldn't happen
4  with any teacher.
5      Q.  Okay.  Left during first planning, returned
6  9:23, five minutes late for class?
7      A.  No.  Again.
8      Q.  Arrived at 7:40 on 12-1?
9      A.  No.
10     Q.  Very short and a little demeaning in shouting at
11  kids for not having a pencil.
12     A.  No.  Again, I think he's exaggerating.  I'm not
13  demeaning to any child.
14     Q.  12-2, arrived at 7:38?
15     A.  No.
16     Q.  Left at 9:05 to move an overhead from the
17  cafeteria to the class she borrowed it from, was gone
18  until 9:29, end of first class.
19     A.  I very well could have went to move an overhead
20  considering again, once again, that I was the one who
21  had to compile all the materials and supplies for our
22  lessons, and, once again, I did not ask him to do much.
23  So if I needed to return an overhead to a teacher
24  because they needed it for their class then I'm sure I

Page 59

1  told him that's what I was doing.  The times, again, I
2  don't see it being that long.  I really believe he's
3  exaggerating.
4      Q.  Okay.  That same day, left school during first
5  plan to go watch daughter swim, missed an entire class
6  and did not return until after lunch?
7      A.  I have absolutely no idea.  I did go watch my
8  daughter during the first planning.  That was when I was
9  told by the swimming school you know, this is perfect,
10  I was the only mom who was working, all the other ones
11  were there on their normal basis with the children, she
12  said tomorrow, if at all possible, we're having mommies
13  get in the water with the babies tomorrow, if you can at
14  all be possible to be here that would be great.
15     Q.  Where did the swimming thing take place?
16     A.  At the YMCA on Kirkwood Highway.
17     Q.  Kirkwood Highway.  Okay.  All right.  On 12-5
18  Bruce arrived at 10:05 and stayed the remainder of the
19  day?
20     A.  The times, again, I don't recall.  There was one
21  time that Bruce did come and stay for an extended time,
22  and the situation was very different.  What happened was
23  on this day we were being dismissed early due to a snow
24  day.  We were being dismissed at 11 or 11:30.  He was

Page 60

1  waiting outside because he had heard on the radio that
2  we were being dismissed at a specific time.  He was
3  worried that I would, you know, I -- the roads out there
4  are very bad.  He was worried that I was not going to be
5  able to get home safely and therefore he was out in the
6  parking lot.  He called and said hey, I'm out here, I'll
7  wait until, you know, it's time for you guys to leave
8  and I'm going to make sure you get home safely.
9          At the time it was when the sexual
10  education teacher was there and I had said to her, you
11  know, that he was out there type of deal.  She said why
12  don't you invite him in?  Bruce was taking physical
13  education and health education courses at the University
14  of Delaware at that time also.  I met him many, many
15  years ago in that program.  He chose not to finish it,
16  so he was going back.  The sexual education teacher,
17  Mrs. Bowen, mentioned, well, since he's going through this
18  course and these classes why don't you have him come in,
19  let him get a taste of what it's like to teach middle
20  school sex education.  And I thought oh, I don't think
21  he's going to want to do that.  And she says call him
22  back and see if he does.  She says, he can sit in and be
23  a guest.  I called him and said would you like to come
24  in?  The guest speaker would like to see if you would

Page 61

1  like to come in and be a guest since you're going
2  through this process and eventually you're going to need
3  to deal with this as a physical education and health
4  teacher.  He said I guess I'll try it.  It's not my cup
5  of tea but I'll come in, and so he did and he did sign
6  in that day.
7      Q.  12-8 arrived at 7:46, had girls waiting for a
8  picture to be taken?
9      A.  Doesn't mean that I arrived at the building at
10  7:46.  I could have been getting a camera together.  I
11  don't know.  The picture-taking situations were
12  constantly being cancelled, not just me but every club
13  in the building because certain things were always
14  happening.  It was very hard to get a team picture for
15  any kid.
16     Q.  Okay.  Next one:  Left class at 9 without
17  talking to me about it, leaving her kids with me and a
18  guest speaker, returned at 9:16 and immediately left to
19  talk on her cell phone for five minutes?
20     A.  Again, if I left the class I would have said
21  something to him.  I would have said I need to run into
22  the office.  He did the same things.
23     Q.  So you never left without saying anything to
24  him?

B-0244

Page 62

1   A. Like I said, there may -- I can't ever say never
2   because I don't know if there were any times that I
3   might have ran out due to a bathroom situation.
4   Q. Okay. The next one he says you left during next
5   class at 9:50 and did not return to the dismissal of
6   that class at 10:07?
7   A. No. No. I would never -- I would never --
8   there is no reason for me to leave one class and then
9   leave another class. There is no reason for me to do
10  that.
11  Q. All right. The next one: Bruce was here with
12  her when I returned after planning period. He stayed
13  through class?
14  A. No. Bruce may have stopped by at that time.
15  Rich did go out during every planning period and maybe
16  he came back and at that time was when Bruce was
17  dropping off coffee. I don't know.
18  Q. But didn't you testify Bruce was only there
19  twice?
20      MR. WILLOUGHBY: She never said he was only
21  there twice.
22      MR. WILSON: Earlier.
23      THE WITNESS: No.
24      MR. WILLOUGHBY: You asked if he was there

Page 63

1   for extended periods.
2       MR. WILSON: No. Earlier in your testimony
3   didn't you say that Bruce was only there twice?
4       MR. WILLOUGHBY: No, you asked --
5       MR. WILSON: I'm asking her a question,
6   Barry.
7       MR. WILLOUGHBY: I think it's
8   inappropriate, but go ahead, you can answer.
9       THE WITNESS: Remember, you put down less
10  than ten. Is that right?
11      MR. WILSON: Yes.
12      THE WITNESS: That's what I said.
13  BY MR. WILSON:
14  Q. Okay. Left at 12:05 during class without
15  telling me.
16  A. No.
17  Q. Returned at 12:06. After a second planning
18  Janay arrived at 1:23, class begin at 1:11?
19  A. No.
20  Q. The next one: Janay informed me(she did not
21  ask) that tomorrow she would leave during first plan and
22  not - I think it says return - until lunch is over
23  (missing her first --
24  A. 8th grade.

Page 64

1   Q. 8th grade class). She was going to go swimming
2   with her daughter?
3   A. First of all, I remember that absolutely
4   specifically and exactly, because I was very tickled and
5   excited and I was standing there with him and Jane
6   Bowen, the sexual education teacher, telling them that
7   how excited I was to have this opportunity. It just so
8   happened to be, you know, at this time when the sexual
9   education teacher was there. I then went on to proceed
10  to ask her and Rich if it was okay with the two of you
11  that I go and participate in this activity, and by no
12  means -- Jane Bowen absolutely said to me absolutely.
13  She's like this might be the only time you ever get to
14  do this. And Rich stood right there and shook his head
15  and said absolutely and smiled. He knew exactly where I
16  was going. He knew how tickled I was. He knew that I
17  had talked with them.
18      I talked with them both prior to that the
19  day before, too, because that was when I found out that
20  I could do it and I spoke with both of them at that
21  point because I never would have been able to make
22  arrangements unless it was already okayed.
23  Q. 12-9, called out sick?
24  A. Possibly.

Page 65

1   Q. 12-10, arrived at 7:40?
2   A. No.
3   Q. Next bullet, told me today was the day she was
4   going swimming with daughter. Left at 9:45(did not sign
5   out) missed 8-1 class that started at 10:26 until 11:05
6   and returned at 11:46. Late for 8-2 class.
7   A. I don't. . .
8   Q. It's on the last page. 12-10.
9   A. Okay. This is an example that this isn't true.
10  This is another example of this not being true because
11  he's writing here that I went swimming with my daughter
12  and then he's writing here that I went swimming with my
13  daughter and I didn't do that.
14  Q. Okay. The next day arrived at 7:48?
15  A. Once again, no. It's obviously maybe when he
16  saw me for the first time or whatever.
17  Q. Okay. And the final one, he states that Bruce
18  came in at 9:05 and ate breakfast with you again --
19  A. No.
20  Q. -- in front of the students?
21  A. No.
22  Q. Okay. Okay. Were you present at the meeting
23  with Mr. Wilcoxon on December 17th?
24  A. Yes.

B-0245

17 (Pages 62 to 65)

Page 66

1  Q.  Was there a union representative there on his
2  behalf?
3  A.  There was no union representative there for
4  either of us.
5  Q.  Who else was at that meeting?
6  A.  Mrs. Janet Basara, Mr. Frank Rumford, myself and
7  Mr. Wilcoxon.
8  Q.  Okay.  What was the purpose of this meeting?
9  A.  The main purpose in my opinion was to try to
10 reconcile our relationship.  Mrs. Basara knew that this
11 was in trouble and that we had to work closely.  I mean
12 we shared a gym.  We shared equipment.  We shared a
13 multi-purpose room.  And her main focus was for me to
14 let Mr. Wilcoxon know what he was doing and how he was
15 making me feel, and for any issues that he may have had
16 for us to get it out in the open and talk about it.
17 Q.  Okay.  Did you speak to Mr. Wilcoxon at the
18 meeting?
19 A.  I don't know if I spoke to him.  I think I just
20 spoke when spoken to.  I just answered questions.
21 Q.  Did you ask him who advised him to keep a
22 journal?
23 A.  I think I did.  I think when he said -- I think
24 when he said I was advised to keep the journal I think I

Page 67

1  might have said who would tell you to do that on me.
2  More out of shock and sadness because, like I said, I
3  had been in that building my entire career and never
4  once had a negative word said to me or to anyone, never
5  a negative relationship with any teacher.  So I was
6  feeling sad that there was somebody in this building
7  that was telling him to do something hurtful to me when
8  nobody knew, you know, nobody -- I didn't talk about
9  other stuff other than with my administration about the
10 issues with him, so it just bothered me because
11 obviously he was talking about, you know, something with
12 me, with reference to me, and someone told him to log me
13 and that made me really sad.
14 Q.  Did it make you angry?
15 A.  No.  I was not angry.  I was more confused, sad,
16 and just upset.
17 Q.  Did the meeting reconcile your relationship?
18 A.  No.
19 Q.  Why not?
20 A.  Because at that point I -- I was just to the
21 point where I couldn't believe that somebody that I had
22 been pulling along and helping and never complaining to
23 him about never -- other than saying he needs to
24 contribute and hey, why aren't you doing this and don't

Page 68

1  you have anything, and, you know, and the sexual
2  comments, I just -- I was so hurt, that I just -- I
3  couldn't believe it, and I just thought to myself, you
4  know, I have been hiding, covering up an awful lot on
5  you and for you to go and do something like this to me I
6  can't trust you.  I have given you everything that I
7  have ever developed in the entire ten years that I have
8  been teaching I have shared and given to you, and now
9  you're going to turn and do this to me.  Why?
10 And he kept saying because you said I was
11 difficult to work with.  You said I was difficult to
12 work with someone.  And I kept saying I don't remember
13 saying that to anyone.  I didn't talk about you to
14 people.  I don't understand why this is happening.  And
15 he just said I did that, I did it to cover my own ass.
16 I was afraid someone told -- this is what he was saying
17 to me, someone told me that you said in the presence of
18 an administrator that Rich was difficult to work with.
19 He said then that person told me that you should start
20 logging her because if she's complaining to
21 administration about you, you never know what could
22 happen, and he said I got scared.  I was fearful.  I
23 didn't understand what you were doing.
24 And I said to him in that meeting why

Page 69

1  didn't you come talk to me?  You felt so comfortable
2  asking me how long it takes to have sex is with someone
3  but you can't come to me and say someone told me I was
4  difficult to work with, because he knew why he was
5  difficult.  He knew why he was difficult to work with.
6  He knew in his heart he never contributed to that
7  curriculum, not even an idea, let alone a lesson or a
8  paper or a book or a handout or a video or a movie or
9  anything.  He knew that.  And he also knew that he was
10 saying those things to me that were completely wrong.
11 And he was afraid and he thought ut-oh, maybe if she's
12 starting to say this then I better start covering myself
13 with something, too.
14 Q.  So you couldn't accept that as an excuse from
15 him for why he did it?
16 A.  No.  Absolutely.  It was dishonest.  It was
17 unloyal and I was nothing but honest and loyal to him
18 for the entire time that I knew him.  I very easily
19 could have made this an issue much sooner and I didn't
20 because I really didn't want to inconvenience everybody
21 else.  I could have said I don't want to team teach with
22 you any more, you're too difficult, you're lazy, I don't
23 have confidence that these children are getting what
24 they needed to get to be tested, therefore I'm doing it

Page 70

1  on my own and you're doing it on your own. I didn't do
2  it. If I had the chance now, knowing that that's the
3  kind of person he is, yeah, because that's not fair.
4      Q. Okay. Can you tell me about this faculty
5  basketball game during the 2003-2004 school year?
6      A. I don't really know what's going on with that
7  whole thing to be honest with you. Again --
8      Q. Were you initially contacted by Mr. Rumford to
9  help organize that?
10     A. Yes, and Mrs. Perez. I spoke with both of them
11 on a normal basis.
12     Q. Were you aware that Mr. Wilcoxon was also
13 involved?
14     A. I was aware that he was involved. I didn't know
15 what to the extent. I knew that he wasn't doing much
16 and I also knew that he was not coming to it. And I
17 think since he wasn't coming to it and participating in
18 it, he kind of just went off to the wayside and didn't
19 really do anything for it. Mrs. Perez and I spoke on a
20 number of occasions to get this thing going.
21     Q. At this point when this was going on were you on
22 speaking terms with Mr. Wilcoxon?
23     A. Only professionally.
24     Q. Were you still team teaching at this point?

Page 71

1      A. No.
2      Q. When did you stop team teaching?
3      A. Right after this whole issue came out.
4      Q. In December?
5      A. Uh-huh.
6      Q. Was Mrs. Basara on speaking terms with
7  Mr. Wilcoxon?
8      A. As far as I know. I never saw her, ever, show
9  anything other than how she would greet and talk to and
10 deal with any other teacher.
11     Q. Did Mr. Wilcoxon ever attempt to apologize to
12 you for the -- for keeping the journal?
13     A. He never told me he was sorry. He never said he
14 was sorry. He sent me an e-mail that morning on
15 December 15th when he was out, when the log was all
16 found, Mr. Rumford contacted him by phone, and told him
17 that it had been found and that I was upset and hurt and
18 that when he came back they were going to meet
19 apparently because Mr. Rumford said Rich knows that you
20 know, so we will discuss this in a meeting. I said
21 fine.
22          Apparently according to the time on the
23 e-mail it was immediately after talking to Mr. Rumford
24 that he e-mailed me at school from his home to school,

Page 72

1  my school computer, saying that he's sorry that I found
2  the book, it must have been very upsetting to me. It
3  must have been, but you have to understand that when I
4  heard that you were complaining I was difficult to work
5  with I needed to cover my own ass in case you went to
6  administration. I never intended to show it to anybody.
7  And he said -- he never told me he was sorry, though,
8  never, because I kept waiting. And I'm the kind of
9  person that if somebody did, if he approached me, even
10 if it was just the two of us, and if he approached me
11 and said to me, I am sorry, I did this, I lied about
12 stuff to make you look bad because I was afraid of what
13 you had on me, can we please reconcile this and move on?
14 I'm going to carry my weight now. I was taking
15 advantage of you all the time. You did carry me. You
16 did teach me. You did help me. I'm going to contribute
17 now, and I will never ask you a personal, sexual,
18 inappropriate comments again; I think it would have
19 ended right then and there and we would not be sitting
20 here right now because I would have accepted the apology
21 and I would have taught with him again.
22          But I was waiting, every day, waiting for
23 him to say he was sorry. Because he admitted in that
24 meeting on December 17th that he exaggerated times, he

Page 73

1  lied about certain things, and some of his exact wording
2  because I misconstrued my words. I was angry. Janay, I
3  was angry. As soon as I heard these accusations that
4  you had brought up against me, I was angry. He did
5  admit that he was saying inappropriate things such as
6  the pregnancy comments. He admitted those. He admitted
7  things in that meeting and now he's saying that he
8  didn't, and he did, and they were on that tape because
9  right when he cut it off that's when I was giving
10 examples. And he did, and he said to me right then and
11 there, you just don't get my personality, a lot of
12 people don't get my personality. I was only joking with
13 you. I was only kidding with you. And I said but you
14 hurt me and you made me feel uncomfortable a lot.
15     Q. You just said that if he had apologized we
16 wouldn't be sitting here?
17     A. Meaning that I wouldn't be -- none of this
18 defamation stuff or whatever is going on would be
19 happening because it would have ended right then and
20 there on December 17th in that meeting with the four of
21 us.
22     Q. Do you think he would have been terminated at
23 the end of the year?
24     A. I have no idea. I had no idea of the other

Wilcoxon                           v.              Red Clay Consolidated School District
Janay Freebery              C.A. # 05-524-SLR                      May 25, 2006

Page 74

1  stuff that was going on with him. I honestly didn't.
2  Mr. Rumford and Mrs. Basara did not speak to me about
3  anything. I had absolutely no idea when he had
4  meetings. I had no idea, you know, when you're talking
5  of this union representative and these meetings, I have
6  no idea of any of that.
7        And when I was told about this lawsuit last
8  summer I was completely and utterly shocked once again
9  with him. I thought that that was just a learning
10  experience and that he went on his separate ways and I
11  learned how you deal with things now, you don't just try
12  to do it yourself any more, you don't cover up, you do
13  what you need to do, and if people are doing something
14  wrong, you let somebody know.
15     Q.  Getting back to the basketball thing for a
16  second, did you ever communicate to Mrs. Basara or Mr.
17  Rumford that you did not want to work with Mr. Wilcoxon
18  on this project?
19     A.  No.
20     Q.  Okay. I'm almost done. Just let me look at
21  some notes.
22        MR. WILLOUGHBY:  Do you need to make a
23  phone call?
24        THE WITNESS:  Not yet.

Page 75

1        MR. WILSON:  I'm very close to being done.
2        THE WITNESS:  Okay. Thank you.
3  BY MR. WILSON:
4     Q.  Your first year back in the 2002-2003 school
5  year, did Mr. Wilcoxon suggest changing the plans and
6  did you respond to him these lessons have worked for
7  nine years and they will again?
8     A.  Absolutely not. I always asked him if there was
9  anything he wanted to add because that's what I knew
10  from my other partners. It's what I experienced the
11  following year after he was gone.
12     Q.  Had you had those lesson plans for nine years?
13     A.  No. No. The lesson plans -- the topics were
14  the same, the lessons and the units that you taught were
15  very different from year to year, sometimes even from
16  class period to class period. You always have to adapt
17  and change, alter, add, take away. I mean there were
18  certain times with the first sixth grade class the
19  lesson was great but you knew the second sixth grade
20  couldn't handle it, so, therefore, you'd have to change
21  the teaching methods or strategies and have a separate
22  plan for that group. Plus times change, sorry, but
23  times change and we would update lots of times according
24  to dates and times.

Page 76

1        MR. WILSON:  Okay, Miss Freebery. That's
2  all I have for now.
3        MR. WILLOUGHBY:  For now?
4        MR. WILSON:  Well, if you have some
5  follow-ups I may have some.
6  BY MR. WILLOUGHBY:
7     Q.  I have one question and one question only. This
8  Exhibit 1, Freebery-1, the note that was left in the --
9  apparently left in the log for him, you already said
10  wasn't your handwriting. You were asked had you ever
11  seen it before and you responded never. Had you seen
12  this earlier today?
13     A.  Yes.
14     Q.  Okay.
15     A.  I'm sorry.
16     Q.  When was that?
17     A.  With I think Janet Basara's, I don't know, or
18  Mr. Rumford's.
19     Q.  You saw it in one of the earlier depositions?
20     A.  Yes.
21        MR. WILLOUGHBY:  That's all I have. We
22  will read and sign.
23        MR. WILSON:  Okay. Thanks for coming in.
24  I appreciate it.

Page 77

1        (Whereupon the Deposition concluded at
2  approximately 4:25 p.m.)
3
4              I N D E X
5
   DEPONENT: JANAY FREEBERY                    PAGE
6
   Examination by Mr. Wilson               2
7  Examination by Mr. Willoughby          76
8          E X H I B I T S
   JANAY FREEBERY DEPOSITION EXHIBITS        MARKED
9  1 Handwritten note to Rich          41
10  2 Log about Janay                   42
11
   ERRATA SHEET/DEPONENT'S SIGNATURE     PAGE 78
12
   CERTIFICATE OF REPORTER               PAGE 79
13
14
15
16
17
18
19
20
21
22
23
24

B-0248

20 (Pages 74 to 77)



**WILCOX & FETZER LTD.**



## In the Matter Of:

# Wilcoxon

## v.

# Red Clay Consolidated School District

## C.A. # 05-524-SLR

---

## Transcript of:

## Frank Rumford

## May 25, 2006

---

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

B-0249

Wilcoxon
Frank Rumford

v.

C.A. # 05-524-SLR

Red Clay Consolidated School District
May 25, 2006

Page 1

1          IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF DELAWARE

2
    RICHARD WILCOXON            : CIVIL ACTION
3                Plaintiff      :
                               :
4           -v-                 :
                               :
5   RED CLAY CONSOLIDATED       :
    SCHOOL DISTRICT BOARD OF    : NO. 05-524-SLR
6   EDUCATION, and JANAY        :
    FREEBERY                    :
7                Defendants     :
8                Deposition of FRANK RUMFORD, taken before
    Elaine Gallagher Parrish, Registered Professional
9   Reporter, at 1509 Gilpin Avenue, Wilmington, Delaware on
    May 25, 2006, commencing approximately at 1:15 p.m.

10
    APPEARANCES:
11
                TIMOTHY J. WILSON, ESQ.
12              Margolis Edelstein
                  1509 Gilpin Avenue
13                Wilmington, Delaware 19806
                  for the Plaintiff,
14
                BARRY M. WILLOUGHBY, ESQ.
15              Young Conaway Stargatt & Taylor, LLP
                  P.O. Box 391
16                The Brandyine Building
                  1000 West Street, 17th Floor
17                Wilmington, Delaware 19801
                  for the Defendants.
18
    ALSO PRESENT:
19
                DEBORAH COLES, Paralegal
20              RICHARD WILCOXON
                JANAY FREEBERY
21              DIANE DUNMON
22
23              WILCOX & FETZER
         1330 King Street - Wilmington, Delaware 19801
24              (302)655-0477

**B-0250**