# STATE OF DELAWARE

# PUBLIC EMPLOYMENT RELATIONS BOARD

CAESAR RODNEY EDUCATION )
ASSOCIATION, DSEA/NEA )
)
        Petitioner, )
)
        and )
)
)
CAESAR RODNEY SCHOOL DISTRICT, )
BOARD OF EDUCATION )
)
        Respondent, )

Board Decision on Review

ULP No. 96-01-165

## BOARD DECISION ON REVIEW OF

## INTERIM DECISION ON JURISDICTION

On September 9, 1998, the Executive Director issued an interim decision finding jurisdiction by the PERB over this matter. On September 16, 1998, the Caesar Rodney School District Board of Education appealed arguing that: (1) the PERB lacks jurisdiction over the matter because resolution would require the interpretation of the Collective Bargaining Agreement between the parties; and (2) the Association waived its right to file an Unfair Labor Practice Charge when it failed to file for arbitration. Both arguments are without merit.

First, the PERB has the exclusive authority to resolve unfair labor practice charges. The parties to this dispute are bound by a valid collective bargaining agreement. The applicable contract language setting forth the procedure for processing a grievance is clear and unambiguous on its face. Thus, it is within the jurisdiction of the PERB to determine whether the District's refusal to schedule a Level III meeting constitutes a unilateral change in the grievance procedure, which a mandatory subject of bargaining.

Secondly, while the District has admitted it refused to participate in a Level III meeting, it argues that the PERB has no jurisdiction since the Association failed to appeal to

arbitration. This argument is disingenuous. There is nothing in the record to support this defense.

Wherefore, the September 9, 1998 decision of the Executive Director is affirmed.

HENRY E. KRESSMAN, CHAIRMAN

JOHN D. DANIELLO, MEMBER

JAMES F. MAHER, ESQUIRE, MEMBER

Dated: 6 November 1998

## STATE OF DELAWARE
## PUBLIC EMPLOYMENT RELATIONS BOARD

RICHARD FLOWERS,                       )
       Charging Party,            )
                                 )
                                 )
   v.                                  )      <u>ULP No. 05-02-468</u>
                                 )
JACKIE HERBERT, PRESIDENT,              )
ATU, LOCAL 842                          )
       Respondent.                )

### BACKGROUND

At the time this charge was filed Richard Flowers ("Flowers" or "Charging Party") was a public employee within the meaning of 19 <u>Del.C</u>. §1302(o) of the Public Employment Relations Act ("Act" or "PERA"). Flowers was employed by the Delaware Transit Corporation ("DTC"), a public employer within the meaning of 19 <u>Del. C.</u> §1302(p), as a Fixed Route Driver at the time his employment was terminated on or about September 28, 2004. At all times relevant to this Charge, Charging Party was a member of the Amalgamated Transit Union, Local 842 ("ATU").

ATU is the exclusive bargaining representative of the Fixed Route Drivers employed by DTC within the meaning of 19 <u>Del.C.</u> §1302(j). DTC and ATU, Local 842, are parties to a collective bargaining agreement for the period December 1, 2002, through November 30, 2007. Jackie Herbert, President, ATU, Local 842, ("Herbert" or "Respondent") is the former President of the ATU and while in that capacity was a

designated representative of an employee organization within the meaning of §1302(i) of the PERA.

On February 16, 2005, Charging Party filed this unfair labor practice charge against Herbert alleging violations of 19 Del.C. Chapter 13, the Public Employment Relations Act ("PERA" or "Act"), specifically §1307(a)(1) through (8) and §1307(b)(1) through (6).

On April 15, 2005, the Executive Director issued the following Probable Cause Determination.

> 1. Consistent with the foregoing discussion, the pleadings fail to establish probable cause to believe that a violation of 19 Del.C. §1307(a)(1) through (a)(8), as alleged, may have occurred.
>
> 2. The pleadings fail to establish probable cause to believe that a violation of 19 Del.C. §1307 (b)(2), (b)(4), (b)(5) or (b)(6), may have occurred.
>
> 2. The pleadings establish probable cause to believe that a violation of 19 Del.C. §1307(b)(1) and/or (b)(3) may have occurred.

The Executive Director held that deferral to arbitration, as requested by the Respondent, was inappropriate in this matter because the underlying issue involved neither an alleged contract violation nor the merits of Charging Party's grievance, but rather whether there was interference with the grievant's statutory right to representation.

A hearing was held on June 29, 2005, at which the parties presented testimony and documentary evidence in support of their respective positions. Written closing argument was received by the hearing officer on August 22, 2005. The following discussion and decision result from the record thus compiled.

## ISSUE

Whether a violation of 19 Del.C. §1307(b)(1) and/or
(b)(3), as alleged, occurred?

## PRINCIPAL POSITIONS OF THE PARTIES

Charging Party: Charging Party argues that following his discharge the ATU,

specifically ATU President, Jackie Herbert, failed to process the resulting grievance.

Herbert:  The Delaware PERB has held that to establish a breach of the duty of

fair representation, a charging party must establish that the union's conduct was arbitrary,

discriminatory or in bad faith. It is clear in this matter that the crux of Charging Party's

complaint is simply that things did not unfold in the way he desired.

The grievance protesting the grievant's discharge was processed through the

contractual grievance procedure to arbitration. At each step of the grievance procedure

the ATU provided Charging Party with informed and capable representation in the person

of the ATU Vice President, President and legal counsel. As a result, the grievant was

reinstated with full back pay and benefits.

## ISSUE

Whether the Respondent violated 19 Del.C. Section 1307(b)(1)
and (b)(3), as alleged?

## DISCUSSION

A breach of the duty of fair representation occurs "only when a union's conduct

toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad

3

faith . . . ." <u>Vaca v. Sipes,</u> 386 U.S. 171 (1967). See also <u>Granville R. Morris v.</u>

<u>Delaware Correctional Officers Association and State of Delaware, Department of</u>

<u>Correction,</u> ULP No. 99-12-272, Del. PERB, III PERB 2161 (2001).

Here, the negotiated grievance procedure permits the union to waive steps in the

grievance procedure. Such a provision is not uncommon in that it allows a grievance to

be considered by union and management representatives with the requisite authority to

resolve disputes at the earliest possible step of the grievance procedure.

The processing of Charging Party's grievance commenced at a Step 3 meeting

held on August 25, 2004. Charging Party attended and was represented by ATU Vice

President, Wali Rushdan, and ATU Steward, Eileen Chubbs.

Unable to resolve the matter, ATU President Herbert, by e-mail dated September

20, 2004, appealed the grievance to Step 4, of the contractual grievance procedure.

Herbert so notified the grievant by certified letter dated September 28, 2004. The step

four meeting was held on October 5, 2004. The State Director of Labor Relations

attended in place of the Deputy Director for Employee Relations, as set forth in the

collective bargaining agreement.

Charging Party attended the step 4 meeting, was represented by ATU President

Herbert, and provided with the opportunity to actively participate. Management offered

to reinstate Flowers without back pay but with the right to arbitrate the back pay issue.

However, DTC's settlement offer was rejected by Charging Party because of the "last

chance" condition attached.

As required by the local ATU's bylaws and its practice, authorization to proceed

to arbitration requires an affirmative vote by the bargaining unit membership. Charging

Party addressed the bargaining unit with regard to his grievance on August 13, 2004. The general membership voted not to authorize the arbitration of Charging Party's grievance.

Charging Party then contacted the International Union which, by letter from the International Vice President dated November 10, 2004, directed the local union to submit Charging Party's grievance to arbitration. An arbitrator was selected pursuant to the rules of the American Arbitration Association and the grievance was heard on May 3, 2005, before arbitrator J. Joseph Lowenberg. Charging Party was represented by ATU counsel Joseph S. Pass, Esquire, who, following the close of the hearing, submitted a written post-hearing brief in support of the Union's position that the discharge of Charging Party was not for "just cause" and requested that Charging Party be reinstated and made whole.

By decision dated June 17, 2005, Arbitrator Lowenberg reinstated Charging Party with full back pay and benefits.

The only material fact established by Charging Party was that the State Deputy Director for Employee Relations did not attend the Step 4 grievance hearing as provided for in Section 7, Step 4, of the collective bargaining agreement. The Deputy Director's designee, the State Director of Labor Relations, attended in place of the Deputy Director. This substitution constituted, at most, a technical violation of the collective bargaining agreement which is not at issue here. Most importantly, the substitution did not affect the grievant's due process rights.

It is noted that, at all times relevant to this matter, conflict existed between factions within the ATU. Charging Party and the Respondent were on opposite sides of the conflict. Based upon the hearing record and the foregoing discussion it is apparent

that this Charge originated more from internal union politics rather than a failure by the

Respondent to adequately represent Charging Party in his pursuit of reinstatement.


## DECISION

The Respondent did not violate 19 <u>Del.C.</u> Section 1307(b)(1)

and/or Section (b)(3), as alleged.

Therefore, the Charge is dismissed.


**It is so ordered.**



Dated: September 7, 2005

Charles D. Long, Jr.,
Executive Director

## STATE OF DELAWARE

## PUBLIC EMPLOYMENT RELATIONS BOARD

Barry R. Newman, Jr.,                    :
           CHARGING PARTY,    :
                      :
          v.                    :          <u>ULP No. 02-12-374</u>
                      :
Delaware Correctional Officers            :
Association ("DCOA"),                     :
                      :
Correctional Officers Association         :
of Delaware ("COAD"), AND                 :
                      :
State of Delaware, Department             :
of Correction ("DOC"),                    :
           RESPONDENTS.    :

## <u>BACKGROUND</u>

The Department of Correction of the State of Delaware ("State") is a public employer within the meaning of section 1302(p)[1] of the Public Employment Relations Act, 19 <u>Del.C.</u> Chapter 13.

Barry R. Newman was employed by the Department of Correction until his termination on or about June 22, 2001. His efforts to have this termination reviewed through grievance arbitration is the subject of this charge. As such, the Charging Party is a "public employee" within the meaning of 19 <u>Del.C.</u> §1302(o).[2]  At the time of his

---

[1]  19 <u>Del.C.</u> §1302(p): "Public employer or "employer" means the State, any county of the State or any agency thereof, and/or any municipal corporation, municipality, city or town located within the State or any agency thereof, which upon the affirmative legislative act of its common council or other governing body has elected to come within the former Chapter 13 of this title or which hereafter elects to come within this chapter, or which employs 100 or more full-time employees.

[2]  19 <u>Del.C.</u> §1302(o): "Public employee" or "employee" means any employee of a public employer except: (1) any person elected by popular vote or appointed to office by the Governor; (2) any person who is a prisoner or inmate or who is otherwise held in lawful custody by an agency of the State; (3) any person appointed to serve on a board or commission; (4) any employee, as defined in Chapter 40 of Title 14 of a public school employer, as defined in Chapter 40 of Title 14; (5) any police officers and firefighters

termination, Charging Party was a member in good standing of the Delaware Correctional Officers Association.

Delaware Correctional Officers Association ("DCOA") is an "employee organization" within the meaning of 19 Del.C. §1302(i) [3] and was the "exclusive bargaining representative" of the bargaining unit of DOC Correctional Officers at all times relevant to this dispute prior to June 13, 2002. 19 Del.C. §1302(j).[4]

Correctional Officers Association of Delaware ("COAD") is an employee organization within the meaning of 19 Del.C. §1302(i). COAD was certified as the exclusive bargaining representative of the bargaining unit of DOC Correctional Officers on June 13, 2002, replacing DCOA in that capacity as a result of a decertification election conducted by the PERB. 19 Del.C. §1302(j).

On December 17, 2002, the Charging Party filed an unfair labor practice complaint against the Respondents alleging that by failing and refusing to represent Mr. Newman in the arbitration of his termination, DCOA and/or COAD violated 19 Del.C. §1307(b)(1) and §1307(b)(3), which provide:

---

employed by the State or any political subdivisions of the State or any agency thereof, or any municipal corporation, municipality, city or town located within the State or any agency thereof which, upon the affirmative legislative act of its common council or other governing body, has elected to come within Chapter 16 of this title, or which hereafter elects to come within Chapter 16 of this title. Any police officers and firefighters included in this subsection shall be subject to Chapter 16 of this title; (6) Confidential employees of the public employer; and (7) Supervisory employees of the public employer, provided, however, that any supervisory position in a bargaining unit deemed to be appropriate prior to September 23, 1994 shall so continue unless said unit is decertified in accordance with §1311(b) of this title, or is modified in accordance with procedures authorized by §1310(e) of this title.

[3] 19 Del.C. §1302(i): "Employee organization" means any organization which admits to membership employees of a public employer and which has as a purpose the representation of such employees in collective bargaining, and includes any person acting as an officer, representative or agent of said organization.

[4] 19 Del.C. §1302(j): "Exclusive bargaining representative" or "exclusive representative" means the employee organization which as a result of certification by the Board has the right and responsibility to be the collective bargaining agent for all employees in that bargaining unit.

   (b) It is an unfair labor practice for a public employee or for
      an employee organization or its designated representative
      to do any of the following:

      (1) Interfere with, restrain or coerce any employee in or
         because of the exercise of any right guaranteed under
         this chapter.

      (3) Refuse or fail to comply with any provision of this
         chapter or with rules and regulations established by the
         Board pursuant to its responsibility to regulate the
         conduct of collective bargaining under this chapter.

The Complaint requested that the Public Employment Relations Board ("PERB") find the

Respondents had violated the statute and committed unfair labor practices and order the

responsible party or parties to proceed with the grievance arbitration.   Alternatively,

Charging Party joined the employer, DOC, as a party and requested that if PERB found

the complained of conduct did not constitute an unfair labor practice, that the PERB order

that Charging Party's termination case be heard before the Delaware Merit Employee

Relations Board.

        On December 19, 2002, the State filed a Motion to be dismissed as a party

to the action, asserting that the Complaint included no allegations that the State had

violated its obligations under the Public Employment Relations Act. Charging Party

clarified its inclusion of the State as a party by letter dated December 23, 2002:

> The purpose of this letter is to clarify the Charging Party's
> position concerning the Motion to Dismiss filed by the State.
> Count I of this Complaint does not allege any unfair labor
> practice on the part of the State. Thus, there is really nothing
> that needs to be dismissed. The State was joined as a party only
> because they have an interest with respect to the allegations in
> Count II (Request for Declaratory Statement). [5]

---

[5] Paragraphs 15 – 17 of the Complaint include the substantive portions of the Charging Party's "Count II":
   15.  The facts set forth below amount to a "controversy" within the meaning of Board
       Rule 6.1(c) concerning the interplay between the Act and the merit system statutes
       and that a declaratory statement will assist in the resolution of the controversy.

By letter dated December 26, 2002, the State withdrew its Motion, on the basis that "the Charging Party is not asserting an Unfair Labor Practice Charge against the State and that the State therefore has no liability with respect to the Charge."

On January 13, 2003, COAD filed a Motion requesting to be dismissed as a party to this action. The Motion was denied by the PERB Executive Director on January 16, 2003. COAD filed an Answer to the Complaint on February 26, 2003, denying the allegations and requesting the charge be dismissed.

DCOA filed its Answer to the Complaint on January 15, 2003, denying the allegations and requesting the charge be dismissed.

An evidentiary hearing was conducted before the Executive Director of the Public Employment Relations Board on April 3, 2003, at which time all parties were afforded the opportunity to present evidence, present and examine witnesses, and make argument.

Additional written argument was accepted from the parties. The Charging Party, DCOA and COAD each provided written argument; the State waived its right to do so. The final memorandum was received from COAD on May 23, 2003.

This decision results from the record created by the parties as described above.

---

16. As a consequence of decertification of DCOA, Newman's rights under the CBA [*collective bargaining agreement*] defaulted to the grievance procedures set forth in 29 Del.C. §5913(a), which provides for a hearing before the Merit Employee Relations Board. *See Department of Correction v. Correctional Officer Supervisors*, 514 A.2d 405, 407 (Del. 1986).

17. Thus, if the Board finds that the actions of DCOA and/or COAD do not amount to an unfair labor practice, or if the Board fails to order DCOA and/or COAD to proceed with the Arbitration Case, then Charging Party requests that the Board declare that his grievance arising from the termination of his employment shall be heard before the Merit Employee Relations Board.

## FACTS

The material facts in this case are not is dispute.

On or about June 22, 2001, the State terminated the employment of Charging Party, Barry R. Newman. The Delaware Correctional Officers Association ("DCOA") which was, at that time, the exclusive bargaining representative of the bargaining unit of State Correctional Officers, initiated a grievance on Mr. Newman's behalf protesting his termination. Unable to resolve the matter in the lower steps of the contractual grievance procedure, DCOA filed for arbitration with the American Arbitration Association, and entered into the process of selecting an arbitrator and arbitration date with the State.

On November 1, 2001, the arbitration was scheduled to be heard on June 26, 2002.

As a result of a secret ballot election conducted by the Public Employment Relations Board, on June 13, 2002, DCOA was decertified as the exclusive representative of the bargaining unit of Correctional Officers. Correctional Officers Association of Delaware ("COAD") succeeded DCOA as the exclusive representative of the unit as the result of that election.

By letter dated June 13, 2002, DCOA President Robert Proctor, advised Charging Party, "Due to the De-certification, DCOA will no longer be able to represent you in your arbitration that has been scheduled for June 26, 2002. If you would like to still pursue your grievance, please Contact State Personnel." *Charging Party Exhibit 4.*

COAD President William Gosnell attempted to formally contact DCOA President Proctor by letter dated July 19, 2002:

> 1. Sir, I have been trying to set up some kind of arrangement with your Treasurer and or your First District Rep. to discuss the possibility of COAD taking your case load that

need to go to pre-arbitration and arbitration. As of this date and time, I have not met with either of these individuals.

2. I request an immediate reply from your office of dates and times that you will be able to sit down and discuss this with myself and my service provider. Time is of the essence. Many of these cases need immediate attention before they are out of timely guidelines. *Charging Party Exhibit 5.*

The record includes no evidence of a response to COAD's request from DCOA.

On September 27, 2002, the State sent a letter to Charging Party advising him:

On July 29, 2002, the Delaware Correctional Officers Association (DCOA) advised the American Arbitration Association (AAA) that it would not be responsible for any outstanding arbitration cases (including yours) that were filed prior to its decertification. As a result, your arbitration case has not been rescheduled with AAA and our office has taken no further action with respect to it.

If you have any questions or would like to pursue this matter further, please contact Jerry M. Cutler at (302) 577-8977. *State Exhibit 3.*

On September 30, 2002, Charles R. Wood, DCOA Executive Board Grievance Representative, addressed a letter to AAA Case Manager Naida which stated:

This letter is to confirm that files listed in DCOA Exhibit B have been sent to the Correctional Officers Association of Delaware (COAD) on this date. With this letter is a copy of the receipt and notarized statement the files being sent from Windswept Enterprises, LTD., INC via UPS.

There is one correction to the mailing address of COAD. Their mailing address is 19 South State Street, Dover, DE 19901 not 12 South State Street as stated in their newsletter. Their phone number is ...

Also included with this letter is a brief chronology of events involved with the exchange of these files. If you should have any questions or need additional information you can contact me at work ...or at home... You may also send me an e-mail ...

6

>   I thank you for your time and help during this difficult time for
>   the DCOA executive board.

This letter was attached to the Complaint as Exhibit A; however only one document was attached to the letter, namely a list entitled, "INDIVIDUAL CASES THAT WERE OUTSTANDING AT THE TIME OF DECERTIFICATION AND LISTED AS EXHIBIT B WITH THE AMERICAN ARBITRATION ASSOCIATION". Information was redacted from this document, presumably the names of individual grievants. The exhibit did not include the "brief chronology of events involved with the exchange of these files" referenced in the letter, and that document was not otherwise placed on the record.

Charging Party Newman testified that at some point he received a copy of his grievance file from COAD former-President William Gosnell. The current [6] COAD President testified he had never seen Charging Party's grievance file, to his knowledge COAD never received the file from DCOA and that he has no knowledge of the current location of the file.

### ISSUE

WHEN A GRIEVANCE IS FILED AND SCHEDULED FOR ARBITRATION, AND THE EXCLUSIVE BARGAINING REPRESENTATIVE IS SUBSEQUENTLY DECERTIFIED AND REPLACED BY A SUCCESSOR REPRESENTATIVE BEFORE THE SCHEDULED HEARING DATE, WHAT OBLIGATIONS, IF ANY, DO THE TWO ORGANIZATIONS RESPECTIVELY HAVE TO REPRESENT THE GRIEVANT UNDER THE PUBLIC EMPLOYMENT RELATIONS ACT (19 DEL.C. CHAPTER 13)?

---

[6] COAD President Alan Deal testified he took office in January, 2003. Prior to that time, he served as a Vice President since COAD's creation.

## POSITIONS OF THE PARTIES

Charging Party:

Charging Party asserts DCOA committed an unfair labor practice, based on decisions under parallel federal labor laws, when it declined to process Mr. Newman's grievance to completion through arbitration. It asserts that DCOA was responsible for processing the grievance through arbitration. In order to insure that the grievance is effectively arbitrated, Charging Party requests PERB find DCOA committed an unfair labor practice, but to then direct COAD to review the case to determine whether it is willing to assume responsibility for processing it through arbitration. If COAD is willing, Charging Party requests PERB "order DCOA to pay to COAD all legal fees, costs and expenses involved in completing the case."

Alternatively, Charging Party argues that as a result of DCOA's decertification, his rights under the collective bargaining agreement reverted to the Merit System grievance procedure which is available to all State merit system employees who are not represented by labor unions. If PERB finds no unfair labor practice was committed, Charging Party requests PERB provide the option for Mr. Newman to bring his case before the Merit Employee Relations Board for a hearing on the merits of the dismissal.

Delaware Correctional Officers Association ("DCOA"):

DCOA argues it had no responsibility to continue to process the grievance filed on behalf of Charging Party after it was decertified as the exclusive representative of the bargaining unit. On June 13, 2002, when COAD replaced DCOA as the exclusive representative for the unit, DCOA lost its legal ability and obligation to represent Charging Party in the arbitration process.

DCOA argues that requiring it to process grievances after decertification creates the untenable impression of there being two representatives, a situation which is at odds with the statute's mandate of "exclusive" representation. It asserts that once the decertification results were finalized, DCOA essentially ceased to exist in so far as the bargaining unit was concerned.

Correctional Officers Association of Delaware ("COAD"):

COAD, as the newly certified exclusive bargaining representative, asserts DCOA had a continuing obligation to complete any pending grievances either by representing or providing for representation after DCOA was decertified. COAD notes Charging Party was never a member of COAD, nor in the bargaining unit at any time since COAD was certified to represent the unit on June 13, 2002.

COAD argues DCOA reaped the benefits of Charging Party's union membership up through the time of his termination on June 22, 2001. DCOA investigated Charging Party's termination, filed the grievance on his behalf under the terms of the collective bargaining agreement between DCOA and the State, represented him through each step of the contractual grievance procedure, made the decision to arbitrate the case, and engaged with the State in selecting the arbitrator and scheduling the hearing date through the American Arbitration Association.

COAD made a good faith effort to ensure that Charging Party's rights were protected when it became aware of the pending grievance by contacting DCOA. COAD could not and should not be forced to represent Charging Party unless DCOA cooperates in turning over the necessary documentation and in meeting the financial obligations of such representation, which DCOA did not do.

9

COAD also argues, in the alternative, that because the Charging Party was charged with and convicted of criminal offenses and was represented by private counsel, both COAD and DCOA are alleviated of their representational duties.

Delaware Department of Correction ("State"):

The State moved to be dismissed as a party to this Charge, asserting the issue raised was one concerning the duty of an exclusive bargaining representative to fairly represent a bargaining unit member in the grievance process.   The pleadings raised no allegation that the State participated in any violation of the Charging Party's rights under the Public Employment Relations Board.   The State withdrew its Motion following clarification from the Charging Party that the State was only joined in the Charge to provide an alternative requested remedy to order that the substance of Mr. Newman's grievance be heard before the Merit Employee Relations Board.

The State attended the hearing in this mater but did not present witnesses or offer argument.   The State entered into the record three documents evidencing its continued willingness to proceed with the arbitration of the Charging Party's grievance.

**OPINION**

The PERB has looked for guidance to the federal labor law, as well as to decisions rendered under similar public sector labor laws, in interpreting Delaware's public sector collective bargaining law. Seaford Ed. Assn. v. Bd. of Education, Del.PERB, ULP 2-2-84, I PERB 1 (1984); Appoquinimink Ed. Assn. v. Board of Education, Del.PERB, D.S. 1-3-84-3-2A, I PERB 35 (1984); Williams v. Norton, Del.PERB, ULP 85-10-006, I PERB 159 (1986).

An exclusive bargaining representative's duty of fair representation to bargaining unit members is well established under private sector labor laws and was formally recognized by the United States Supreme Court in <u>Vaca v. Sipes</u>, 386 US 171 (1967). PERB first addressed the scope of a union's duty of fair representation in <u>Williams v. Norton</u>, (<u>Supra.</u>, p. 166). The question concerning the limits of that duty following a decertification election is one of first impression for this Board.

The 5th Circuit Court of Appeals addressed the rights of employees, *vis-à-vis* an exclusive bargaining representative following its decertification, in <u>U.S. Gypsum v. United Steelworkers of America, AFL-CIO</u>, 384 F.2d 38, 66 LRRM 2232, 2235 (1967),

> It must be borne in mind that what we are talking about relates only to the right of the Union to act as the champion for the employees to assert their substantive rights under the contract. The duration in time of the substantive rights themselves is not affected by decertification. Decertification cannot ordinarily extinguish substantive rights. But it might have a powerful effect on whether the union can champion those rights…
>
> Since the union has presumably obtained the disputed "right" in the first instance by getting it in the contract, there does not seem to be any reason why it should not be the champion of that right when the controversy comes alive, certainly not where there is then no competing union claiming to be the contemporary bargaining representative.
>
> This result obviously is called for as to those substantive rights which arise under the contract and ripen into some relief which becomes operative prior to decertification. Such grievances … are ones which arose under the contract and for breach of which effective relief was available prior to decertification. With respect to grievances relief for which is operative up to the time of decertification, the Union clearly has the right to assert them.

The 10th Circuit Court of Appeals held in <u>International Union, UAAIWA v. Telex</u>, 816 F.2d 519, 523; 125 LRRM 2163 (1987),

> ...[D]ecertification does not retroactively obliterate contract
> rights. Events which may change relations between and among
> employer, union, and employees may impact but do not destroy
> the right of redress arising under and relating to a valid
> preexisting contract.
>
> . . . The Union negotiated this contract, administered it during
> its term, and is best situated to interpret and enforce its
> provisions advantageously for the employees . . . It also
> brought the grievance in question and is in the best position
> knowledgeably and efficiently to see it to completion, absent a
> showing that some other organization can and will do so.
> Since the Union is the named party to the contract, it is
> accorded the *prima facie* right to proceed under the contract
> against the employer. Further delays, confusion and legal
> entanglements await any attempt to substitute parties or permit
> intervention by one or more employees who may be
> proceeding on an individual rather than collective interest
> basis.

Although the bargaining unit in Telex did not choose a successor union to represent it after decertifying the union, the case clearly establishes decertification does not deprive the union of its standing to pursue grievances under and according to the terms of the prior collective bargaining agreement which arose prior to decertification.

These cases are representative of the federal decision line which specifically holds that an employer may not refuse to complete the processing of grievances after decertification of the union where those grievances were filed prior to the decertification. A bargaining unit employee's rights under the collective bargaining agreement, including the right to have a viable grievance processed the contractual grievance procedure by the exclusive representative, are not altered by the subsequent decertification of that representative.

Applying the logic of the Telex decision, it was DCOA which negotiated the collective bargaining agreement which the grievance alleges was violated; DCOA investigated and filed the grievance; represented Mr. Newman in the earlier steps of the

contractual grievance procedure; DCOA decided to arbitrate the grievance, and with the State selected the arbitrator and set the date for the arbitration. There can be no question but that DCOA is in the best position to see this grievance to its completion. DCOA was the exclusive bargaining representative of the Charging Party at the time his employment was terminated, and owed to him a duty of fair representation. DCOA's obligation to fairly discharge that duty did not change in the year that followed the filing of the grievance, and has not changed as a result of DCOA's subsequent decertification.

DCOA argues that PERB should rely upon the decision of the U.S. District Court for the Western District of Tennessee in <u>Newsome v. Northwest Airlines</u> (225 F.Supp 2d 822, 2002, US Dist. LEXIS 19348) to decide this case. <u>Newsome</u>, however, addresses a significantly different factual situation on two fronts.

First, the facts of that case concern a decertification effort in which prior to 1999, IAM represented Northwest Airlines employees in the Mechanics and Related crafts class. On June 1, 1999, AMFA became the certified exclusive representative of this group of employees as a result of the decertification election. AMFA thereafter assumed responsibility for administering the collective bargaining agreement that existed between Northwest Airlines and IAM, until Northwest and AMFA negotiated a successor agreement. Northwest and AMFA resolved their negotiations and entered into a new agreement in 2001. In contrast, COAD did not affirmatively assume the DOC/DCOA collective bargaining agreement, but soon after being certified as the exclusive representative, entered into negotiations with the State which resulted in an agreement on October 10, 2002. *Testimony of COAD President Deal, Transcript @ p. 17.* This negotiation process is consistent with the rights of a successor representative as described

by the Delaware Supreme Court in <u>DOC v. Correctional Officer Supervisors</u>, Del. Supr.,

514 A.2d 405, 407 (1986),

> When the union that has signed a collective bargaining contract
> is decertified, the succeeding union certified by the Board is
> not bound by the prior contract, need not administer it, and
> may demand negotiations for a new contract even if the terms
> of the old contract have not yet expired. *citing, NLRB v. Burns
> International Security Services, Inc.,* 406 US 272, 92 S.Ct.
> 1571, 32 L.Ed. 2d 61 (1972).

Second, the issue in the <u>Newsome</u> case arose more than two years after IAM was

decertified and replaced by AMFA as the exclusive bargaining representative. At the

time the issue in that case arose, AMFA was clearly and unquestionably the exclusive

representative of the bargaining unit, and signatory to the existing collective bargaining

agreement. In the COAD/DCOA case, Mr. Newman's grievance was filed by DCOA

approximately one year before DCOA was decertified.

Because Charging Party's grievance predates DCOA's decertification, COAD had

neither the legal authority nor obligation to substitute itself as the grievant's

representative. Indeed, Charging Party has never been nor had the opportunity to be

represented by COAD, as his employment had been terminated approximately one year

prior to the COAD's certification as the bargaining unit representative. Following federal

labor law, the State would not have been obligated to arbitrate this grievance had COAD

unilaterally demanded to step in as the grievant's representative. <u>Arizona Portland

Cement Co.,</u> 302 NLRB 5, 137 LRRM 1228 (1991).

Finally, the issue in this case concerns the processing of a contractual grievance.

The duty of representation accrued to the exclusive representative at that time. The

arbitration process is contractual in nature, while criminal proceedings are statutory. The

fact that the grievant was represented in his criminal proceeding has no bearing on his

right, as a bargaining unit member, to be represented in the grievance and arbitration procedure.

For the reasons set forth above, DCOA is found to have violated its duty to fairly represent Charging Party by failing to pursue the grievance which was pending arbitration at the time of the decertification election on June 13, 2003.

## CONCLUSIONS OF LAW

1.   State of Delaware, Department of Correction is a public employer within the meaning of 19 Del.C. §1302(p).

2.   Charging Party, Barry R. Newman, Jr., was a public employee within the meaning of 19 Del.C. §1302(o) at all times relevant to this Charge.

3.   Delaware Correctional Officers Association ("DCOA") is an employee organization within the meaning of 19 Del.C. §1302 (i) and was the exclusive bargaining representative of the bargaining unit of Correctional  Officers at all times relevant to this Charge prior to June 13, 2002.

4.   DCOA filed a grievance on Charging Party's behalf following the termination of his employment on June 22, 2001. DCOA provided representation to the Charging Party during the processing of this grievance, including the selection of an arbitrator and scheduling of an arbitration hearing for June 26, 2002.

5.   On June 13, 2002, the date that DCOA was decertified as the exclusive representative of the bargaining unit, DCOA President Proctor wrote a letter to Charging Party stating that DCOA (as a result of its decertification) would no longer be representing him in the arbitration hearing scheduled for June 26, 2003.

6.   Correctional Officers Association of Delaware ("COAD") is an employee organization within the meaning of 19 Del.C. §1302 (i) and is and has been the current exclusive bargaining representative of the bargaining unit of Correctional Officers since June 13, 2002.

7.   By failing to bring Charging Party's grievance (which was filed prior to decertification) to completion, DCOA violated 19 Del.C. §1302(b)(1) and (b)(3) in derogation of its duty to provide fair representation under the Public Employment Relations Act to the grievant.

8.   COAD as the successor exclusive representative did not violate the statute as it had no duty or obligation relating to grievances filed prior to its certification as the exclusive representative of the bargaining unit in question.

**WHEREFORE**, DCOA is herewith ordered to provide for the processing of Charging Party's grievance through arbitration with all deliberate speed and to advise the Public Employment Relations Board within thirty (30) days of the receipt of this decision of all steps taken to comply with this Order.

DATE:   24 June 2003

DEBORAH L. MURRAY-SHEPPARD
DELAWARE PERB

16

STATE OF DELAWARE

PUBLIC **EMPLOYMENT** RELATIONS BOARD

GLORIA B. WILLIAMS                          :
2 Colony Blvd., Bldg. 1                      :
Apt. 102 Colony North                       :
Wilmington, DE.      19802                   :
                                            :
                Charging  Party,            :
                                            :
      v.                                    :
                                            :
RUDY NORTON, **UniServ** Director            :    **U.L.P. No. 85-10-006**
Delaware  -State  Education  Association     :
Suite 205                                    :
Prices Corner Center                         :
Wilmington, DE.      19808                   :
                                            :
JO A. CALLISON, President                    :
Christina Affiliate, Inc., NCCEA/DSEA/NEA    :
Christiana High                              :
Salem Church Road                            :
Newark, DE.      19711                       :
                                            :
                Respondents.                :


## DECISION


        The  dispute  presented  for  resolution  results  from  an  alleged
unfair  labor  practice  in  violation  of  section  4007  (b)(l)  of  the
Public  School  Employment  Relations  Act,  14  Del.C.  Chapter  40  (Supp.
1982),  hereinafter  referred  to  as  the  Act.  The  charge  was  filed  on
October 16, 1985 by Ms. Gloria B. Williams (hereinafter Charging
Party)  against  Mr.  Rudy  Norton,  as  Agent  of  the  Christina  Affiliate,
Inc.,  NCCEA/DSEA/NEA  and  Ms.  Jo  A.  Callison,  as  President  of  the
Christina  Affiliate,  Inc.,  NCCEA/DSEA/NEA,  (hereinafter  Respondents).
The  respondents  filed  their  Answer  on  October  22,  1985  and  Charging
Party  filed  her  Response  on  November  1,  1985.  A  hearing  was  held  on
January 7, 1986.

-1-

## FACTS

The relevant facts are determined to be as follows:

All certified professional teachers in the Christina School District comprise a bargaining unit which is represented by the Christina Affiliate, Inc., NCCEA/DSEA/NEA. Hr. Rudy Norton is the authorized Delaware State Education Association (DSEA) staff representative assigned to service the Christina Affiliate, Inc., and Ms. Jo A. Callison is the President of the local association. Charging Party is in the bargaining unit but she is not a member of the Christina Affiliate, Inc.

Ms. Gloria B. Williams, Charging Party, is currently employed as an art teacher in the Christina School District wherein she is primarily assigned to the Leasure Elementary School. Prior to her employment in the Christina District Charging Party also taught in both the New Castle County and the Wilmington School Districts. Since approximately 1983, Charging Party has been desirous of obtaining a transfer to a school nearer her home and, in this regard, has filed with the Christina District several requests for a voluntary transfer. During December, 1984, an unanticipated mid-year retirement created a vacancy in the art department at the Bancroft Elementary School. Aware of this pending vacancy, Charging Party promptly requested a transfer to the Bancroft School; however, a new teacher was hired from outside the District and permanently assigned to fill the Bancroft vacancy. Charging Party was advised by the District Personnel Director that mid-year transfers were not

permitted and that she should file a voluntary transfer request in the spring of **1985 for** the following school year. Prior to **Hay 1, 1985,** Charging Party again filed **a** request **for a** voluntary **transfer,** specifically to the **Bancroft** School. **When** mid-August arrived and she had **not** yet **received** notice of a change in her assignment **for the 1985-86** school year, Charging Party telephoned the Personnel **Director** and **was** informed that her transfer request had not **been** granted because there was no existing vacancy for **an art teacher at** the **Bancroft** School.

On September 17, **1985,** and again on September **18, 1985,** Charging Party attempted to contact **Mr.** Rudy **Norton by telephone. Hr. Norton was not available to receive her calls but did telephone Charging Party** during the evening of September **18, 1985.** A discussion ensued concerning Charging Party's frustration **over her inability to obtain a** transfer to the **Bancroft** School and her desire **to file a grievance** protesting the permanent assignment of a **newly** hired **teacher to the** vacancy created by the mid-term retirement of the **Bancroft art** teacher. Hr. Norton advised Charging **Party that under the terms of** the collective bargaining agreement the District **was not required to** transfer teachers during the course of the school **year** and, **In fact,** did not.. normally do so. **Mr.** Norton explained **that the practice of** the District was to fill **a** mid-year **vacancy with a** new **hire thereby** minimizing disruptions to both teachers and students. **Charging Party was** also **advised** that, In accord with the *terms* of Article III of the collective bargaining agreement, she had fifteen **(15) days from the** mid-August date of notification that her transfer request had **been** denied in which to **file** a grievance. Mr. Norton's opinion was **that**

the fifteen (15) day filing period had long since passed and the submission of a grievance would be untimely. Unsatisfied, Charging Party again telephoned Mr. Norton on September 19, 1985 to further pursue her complaint. It was during this telephone conversation that Hr. Norton allegedly stated that he did not have to represent Charging Party because she was not a member of the association and encouraged her to join the organization. Mr. Norton admits that as a dedicated representative he always encourages nonmembers to join the association; however, he denies ever conditioning representation on membership status. During this conversation, Charging Party requested that grievance forms be sent to her. In response to this request, a staff member of the Delaware State Education Association office inadvertently mailed the wrong grievance forms ; however, the error was promptly discovered and the proper forms were mailed to Charging Party within two days of her request.

On September 19, 1985, Charging Party also wrote a letter to the District Personnel Director wherein she requested the reasons for the denial of her transfer request to the Bancroft School. The Personnel Director responded In a'letter dated October g, 1985, to which there was attached a copy of a letter from him to Charging Party, dated November.. 2, 1984, which stated., in part:

> " . ..we do not allow voluntary transfers after the start of the school year, therefore, you cannot have a voluntary transfer to the Bancroft art position. you may submit a voluntary transfer request prior to May 1, 1985, for the summer of 1985.

Charging Party denies ever receiving or seeing this letter prior to

October, **1985.**

Thereafter, on October **7, 1985,** Charging Party met, at her **request, with the Director** of Elementary Education for the Christina School District to discuss her **complaint.** A written response, dated **October 14, 1985,** was mailed to **Charging** Party denying **a violation of** rny **contract** provision **and advising her** of her right **to file 8 grievance,** if she wished to **pursue the matter further. Although the** exact date is unclear, a grievance **was** subsequently filed.

On Friday, October 11, **1985,** Charging Perty telephoned **Ms.** Jo **Callison,** President **of** the Christina **Affiliate,** Inc., **to advise her that** 8 grievance had been initiated **and** to inquire 8s to whether or **not she was** entitled **to representation** by **the association. Ms. Callison** responded that **as** the newly elected **president** she **was not** sure of the **association's** responsibility **in** this **area** but would check with **Mr. Mike Epler, the** former **president, and** get back to Charging Party. At **no** time thereafter did **Ms. Callison** contact **Charging** Party.

As 8 result of these **actions** by **Mr.** Norton **and Ms. Callison,** this unfair labor practice charge **was** filed.

POSITIONS **OF** THE PARTIES

CHARGING PARTY:

Charging Party contends that the respondents **have engaged** in conduct which interferes with, restrains or **coerces her because of** her **exercise** of **a right guaranteed under the Act, i.e., to not become** a member of the education **association.** Specifically, Charging Party

alleges that during her telephone conversation with Mr. Norton on September 19, 1985, he advised her that he did not have to represent her because she was a not a member of the association and implicdly, if not expressly, attempted to pressure her Into joining the organization. Charging Party contends that because she was not a member of the association, she was denied representation by Hr. Norton. Secondly, Charging Party contends that Hs. Callison, as president of the local association, was under a duty to determine whether or not the association would represent her and to communicate the association's position directly to her as she had requested and as Ms. Callison had indicated she would. Charging Party contends that by Ms. Callison's failure to respond, she was left in an unfamiliar and complicated position with no direction and no other place to seek guidance.

RESPONDENT NORTON:

Mr. Norton denies ever having refused to represent Charging Party, for any reason. He claims that because Charging Party was advised in mid-August that her request for a transfer to the Bancroft School had been denied, the contractual fifteen (15) day filing period had long since elapsed. Mr. Norton also contends that the District's procedure for filling the Bancroft vacancy was consistent with established practice and did hot violate any provision(s) of the collective bargaining agreement. Despite his opinions, he arranged to provide Charging Party with the proper forms so that she could file a grievance and at all times thereafter was available for further guidance, if requested.

RESPONDENT  CALLISON:

Ms. Callison contends that she first spoke with Mr. Norton about Charging Party's question concerning her right to be represented on October-14, 1985. Mr. Norton advised Ms. Callison that he was already involved In the matter and that if Charging Party wanted to be represented in this matter he would represent her. It was agreed that Mr. Norton would contact Charging Party and so advise her. Relying on this conversation, Ms. Callison did not attempt to follow up with Charging Party and, hearing nothing to the contrary, believed that the situation was being handled to Charging Party's satisfaction. Ms.  Callison contends that once a staff representative is contacted concerning a request for representation, the practice is for that particular staff representative to contact the aggrieved party and follow up thereafter.

ISSUE

Whether Respondent Norton and/or Respondent Callison, by their actions as set forth above, engaged in conduct in violation of section 4007(b)(1) of the Act, as alleged?

OPINION

The duty of fair representation is a question of first impression before the Public Employment Relations Board. This issue has, however, been extensively litigated in the private sector both before the National Labor Relations Board and in the courts. The P.E.R.B. has previously recognized that in the absence of local

-7-

precedent interpreting the provisions of the Public School **Employment** Relations Act, there is a logical tendency to look to both the established federal law in the private sector and to developing public sector law In other jurisdictions for guidelines. Appoquinimink Ed. Assn. v. **Bd.** of Ed. of Appoqufnimlnk School District, **Del.P.E.R.B., U.L.P No. 1-3-84-3-2A (1984). While private sector precedent can be of'** value **in reaching decisions in the public** sector it does not necessarily provide an Infallible **basis** for such decisions.  **Seaford** Ed. Assn. v. **Bd.** of Ed. of **Seaford** School District, Del.P.E.R.B., U.L.P. No. 2-2-84 **(1984).**

The exclusive representative's **duty** to fairly represent **members of the bargaining** unit **has** long been established In the private **sector and is** based on the exclusive **position** of the **certified** bargaining representative under section **9(a)** of the National Labor Relations Act.   The United States Supreme Court formally adopted this doctrine and recognized the exclusivity of the certified bargaining representative in **Vaca** v. **Sipes (386 U.S.   171 (1967)).** Acting in its exclusive capacity, an employee representative has **both** power and control over the terms and conditions of employment and therefore over the working lives **of** the bargaining unit members.  Belanger **v. Matteson,** R.I. Supr., 346 **A.2d** 124 **(1976).**

In drafting the Public **School Employment** Relations Act, the **Delaware** legislature expressly **incorporated both** the doctrine of exclusivity and the duty of **fair** representation.  14 **Del.C.** section 4004(a) states:

> The employee organization designated or selected for the purpose of collective bargaining by the majority of the

**employees** in an appropriate collective bargaining unit shall be the exclusive representative of all employees in the unit for such purpose and shall have the duty to represent all unit employees without discrimination.

14 **Del.C.** section **4004(a).**

This mandate clearly requires that the exclusive representative shall **not** discriminate **against or-among those whom it is obligated to represent.**

Having established the statutory duty of **fair representation, it** is necessary to examine the nature of the obligation **and the standard** by which **it is to be measured.** As early **as 1953,** the United **States Supreme** Court held that **"a** wide range of **reasonableness must be** allowed a statutory bargaining representative in serving **the** unit **it** represents" (**Ford** Motor Co. v. **Huffman, 345** U.S. **330 (1953)). It further refined this premise when** it defined the duty to represent unit employees without discrimination as **".** ..**the obligation to serve** the interests of all **members without hostility . ..toward any, to exercise discretion with complete good faith and honesty, and to** avoid arbitrary conduct" (**Vaca** v. **Sipes,** Supra.). The underlying logic of Ford Motor Co. and **Vaca** provides a **realistic and persuasive approach in** defining the scope of the duty **of** fair **representation and** is consistent with the standard contained in section 4004(a) of the **Public** School Employment Relations **Act.** **Consequently,in order to** meet its statutory obligation to represent its members without discrimination an exclusive employee representative has a duty to act honestly, in good faith and in a nonarbitrary manner. These factors form the basis of every fair representation case and must, therefore,

be evaluated on a case by case basis.

In the present matter, the primary incidents relied upon by Charging Party to support her claim are the alleged statement by Respondent Norton during their telephone conversation of September 19, 1985, that he did not have to represent-her because she was not an association member and the failure of Respondent Callison to advise her of the association's position on the representation question.

Concerning the involvement of Mr. Norton, while his actions may be personally unacceptable to Charging Party, they do not constitute a breach of the duty of fair representation. As to the alleged comment regarding the lack of obligation to represent a nonmember of the association, the record contains only the assertion by Charging Party and the denial by Mr. Norton. It is difficult to believe that a union representative of Mr. Norton's tenure and current position would blatantly and expressly refuse representation to a bargaining unit member simply because the potential grievant was not an association member. On the other hand, Charging Party effectively represented herself as a concerned teacher who genuinely believes that she has been deprived of her right to representation; thus, we are faced with a classic credibility issue which can only be resolved through an analysis of the surrounding facts and circumstances. Although Charging Party's attempts to contact Mr. Norton on September 17 and 18, were unsuccessful, Mr. Norton did return her calls during the evening of September 18, 1985. There is no dispute that during this telephone conversation Mr. Norton advised Charging Party of the weaknesses he believed existed with her claim; specifically the lack

of **any** violation **of** the collective bargaining agreement and the expiration of the contractual time **limitations** for the filing **of** a **grievance.**   Upon the request of Charging Party, **Mr.** Norton promptly contacted **his** office and arranged **for** the proper grievance forms to be forwarded to her.   The fact that incorrect forms were sent on September **18** is not material since this inadvertent error, by **someone** other than Hr.  Nor ton, **was** promptly **discovered** and corrected without prejudice to Charging Party.

The collective bargaining agreement **also** provides **assistance in** resolving this issue.   Article III, <u>Grievance Procedure</u>, at **paragraph 3.1.1,** defines a grievance as **"a written claim by an employee that** the terms of the collective bargaining **agreement have** been **violated,** misinterpreted or misapplied resulting in the abridgement of rights granted to the employee by the Agreement". Paragraph **3.1.2** alternatively defines a grievance **as a** written claim **by the** association of the abridgement of rights granted to it **by the** agreement.   Clearly, it is the contractual responsibility of the individual employee, not the **association, to file a grievance** protesting **a** perceived individual wrong.   The steps for an employee to follow **in** the **filing and processing of a** complaint **are** clearly set forth in section **3.5.**   The first step is an Informal meeting between the employee and an appropriate **representative of the District. This** meeting **was held** between Charging Party and the Director of Elementary Education on October **7, 1985.**   Thereafter Charging Party filed a grievance which was processed **through step** 3 **of the grievance** procedure and remained active **as of the date of** the **hearing** on this charge.   Although Charging Party made no request, **Mr.** Norton **did**

attend the step 3 meeting, which was **the first** actual grievance meeting following the pre-grievance discussion between Charging Party and Dr. Russell on October 7, **1985.**

Although unacceptable to Charging Party, Mr. Norton **did** advise her of his opinion on both the substantive and procedural merits of her complaint. His uncontradicted testimony **was** that his positions were consistent with the contractual language concerning the time limitations and with both the contractual language and the established practice within the District concerning the mid-year transfer denial. His efforts to provide the requested grievance **forms were conducted** In a timely manner and he was present at **the** step 3 grievance **meeting. Simply put,** these documented **and** unrefuted actions by Respondent Norton **are** Inconsistent with a breach of the duty of fair **representation.**

Concerning the **charge agalnt** **·Ms.** Callison, **her testimony established that** she spoke with Mr. Norton on Monday, October 14, 1985, and had **been** assured by him that he would represent Charging Party, if she so desired. Because Ms. Callison teaches at a **different school from Charging** Party and does not have immediate or unlimited **access** to a telephone, she requested of Mr. Norton that he **follow up with Charging** Party and relay that information to her. **Mr. Norton** agreed to do so. Ms. Callison testified that it is **the common practice** that when a member calls her and requests representation she Usually **calls** the DSEA office **and asks one of the UniServ representatives to contact** the aggrieved person. **According to her testimony, Ms. Callison again spoke with Mr. Norton on the following day, Tuesday, October** 15, 1985, **to determine whether or not he had**

been in touch with Charging Party. She was advised by **Mr.** Norton that he had indeed **contacted** Charging Party and advised her that while he did not believe she had **a** valid grievance, he would represent her if she wished to pursue the matter further. Considering the intervening weekend during which Hs. Callison was away, the record reflects a sincere and timely effort on her part to **obtain an answer for** Charging Party and to have that **answer** communicated to her. The undisputed **testimony establishes that** Respondent Callison **acted** not only responsibly but also consistent with the manner in which she had handled previous requests for representation. She referred the matter to the individual whose responsibility **it** was to actually represent Charging Party and, without further communication from Charging Party to the contrary, reasonably relied upon the assurances of Hr. Norton that he would, and indeed had, contacted Charging Party.** Considering all the evidence, the record is void of any credible evidence of dishonesty, bad faith or arbitrary treatment of Charging Party by Respondent Callison.

During her testimony, Charging Party stated that she could not' believe that there **was** not a law someplace that **would** permit **a** senior employee with a favorable record to obtain a transfer to a vacant position before that position was permanently filled with **a** new **hire.**

● * Although there **is** a factual dispute as to whether or not Mr. Norton did, ж■ fact., contact Charging Party, it is fmmmaterial since, absent notice to the contrary, Respohdent Callison was entitled to reasonably rely on Hr. Norton's assurances.

This statement, I believe, represents the crux of the real issue here, and that is the frustration of Charging Party over her inability to obtain 'the desired transfer. Despite her dissatisfaction with the inability of the collective bargaining agreement and/or the association or its representatives to satisfy her **desire,** there is no credible evidence of bad faith or **arbitrary** behavior by either respondent. In the day to day administration **of** the collective bargaining agreement, the representatives of the association are required to make good faith judgments and to take action, if any, consistent with the provisions of that agreement. To do otherwise **may** well **constitute bad faith bargaining and/or a** breach of the duty of fair representation, **for** which the **association may be** held accountable either through **an unfair labor practice** charge filed **by** either the employer or by **an** employee whose contractual rights **have** thereby been violated. In the give and take process **of** collective bargaining the terms **of the negotiated** contract **are** controlling and they do not **necessarily provide a remedy for** every perceived individual wrong.

## CONCLUSIONS OF LAW

1.  The Christina Affiliate, Inc., NCCEA/DSEA/NEA is **an Employee** Organization with the meaning of **14 Del.C.** sec. 4002(g).

2.  The Christina Affiliate, Inc., **NCCEA/DSEA/NEA** is the Exclusive Bargaining Representative of the certificated professional employees of the Christina School District within the meaning of 14 **Del.C.** sec. 4002(j).

**3.** Respondent Norton is the authorized Delaware State Education Association **(DSEA)** staff representative assigned to service the local **education** association, Christina Affiliate, Inc.

4. Respondent Callison is the President of the local education **association, Christina** Affiliate, Inc.

**5.** There is insufficient proof **to establish that respondent Norton, by his actions, as set forth above,** engaged in conduct in violation of 14 **Del.C.** sec. **4007(b)(1) as** alleged.

**6.** There is insufficient proof to establish that respondent Callison, by her actions, **as** set forth above, engaged in conduct in **violation** of 14 **Del.C.** sec. **4007(b)(1) as alleged.**

IT IS SO ORDERED.

_C haules O. Long, JR._
CHARLES D. LONG, Executive **Director**
Delaware Public Employment Relations Board

_Deborah L. Murray – Sheppard_
DEBORAH L. MURRAY-SHEPPARD, Princ. Asst.
**Delaware** Public Employment **Relations** Board

ISSUED: **MARCH** 7, 1986