PUBLIC EMPLOYMENT RELATIONS BOARD
FOR THE STATE OF DELAWARE

| | | |
|---|---|---|
| RED CLAY EDUCATION ASSOCIATION, DSEA/NEA, | ) | |
| Charging Party, | ) | ULP No. 05-10-496 |
| v. | ) | Decision |
| | ) | |
| BOARD OF EDUCATION OF THE RED CLAY | ) | |
| CONSOLIDATED SCHOOL DISTRICT, | ) | |
| Respondent. | ) | |

*Appearances*

*Jeffery M. Taschner, General Counsel, DSEA, for the Charging Party*
*Alfred J. D'Angelo, Jr., Esq., Klett Rooney Lieber & Schloring, for the Respondent*

## BACKGROUND

The Red Clay Consolidated School District ("District") is a public school employer within the meaning of §4002(n) of the Public School Employment Relations Act, 14 Del.C. Chapter 40 (1982) ("PSERA").

The Red Clay Education Association, DSEA/NEA ("RCEA") is an "employee organization" within the meaning of 14 Del.C. §4002 (h) and is the exclusive bargaining representative of the District's certificated employees within the meaning of 14 Del.C. §4002(i).

The District and RCEA are parties to a collective bargaining agreement for the period of September 1, 2002, through August 31, 2005. This agreement was in effect at all times relevant to this charge.

On or about October 11, 2005, RCEA filed an unfair labor practice charge alleging a violation of 14 Del.C §4007 (a)(5).[1] Specifically, RCEA alleged that the District violated its duty to bargain in good faith by instituting a unilateral change in the performance evaluation process.

On October 21, 2005, the District filed an Answer to the Charge denying all material allegations, including new matter asserting the charge was untimely, moot and unripe, and should be deferred to the parties' grievance and arbitration procedure. RCEA filed a Response to New Matter on November 4, 2005, denying the District's new matter.

A probable cause determination was issued on December 19, 2005, which concluded:

> Construed in the light most favorable to the Charging Party, the pleadings constitute probable cause to believe that an unfair labor practice, as alleged, may have occurred. Specifically, the issue is whether by placing Mr. Parker on the [Individual Improvement Plan] in question the District violated 14 Del.C. §4007(a)(5).

The Executive Director also dismissed the District's affirmative defenses finding 1) the unfair labor practice was timely filed within 180 days of the April 18, 2005, triggering event; 2) an actual controversy exists which is subject to recurrence and therefore deserves resolution; and 3) deferral of this dispute is not appropriate because the District declined to accept an arbitrator's award in a similar matter under the parties' non-binding process.

---

[1] 14 Del.C. §4007 (a)  It is an unfair labor practice for a public school employer or its designated representative to do any of the following:
  (5) Refuse to bargain collectively in good faith with an employee representative which is the exclusive bargaining representative of employees in an appropriate unit.

2

A hearing was conducted on February 14, 2006, at which time the parties placed into the record a Stipulation of Fact[2] with seventeen accompanying exhibits. The hearing was closed after the examination of a single witness from the Department of Education. Simultaneous opening written argument was received from the parties on March 23, 2006. Simultaneous Responsive Argument was received on April 17, 2006.

This decision is based upon the record created by the parties as described above.

## STIPULATION OF FACT

1. Red Clay Consolidated School District is a public school district in New Castle County, Delaware with approximately fifteen thousand (15,000) students and over one thousand (1,000) teachers. At all times material hereto, the Red Clay Consolidated School District has been an employer within the meaning of 14 Del.C. §4002(n).

2. The Red Clay Education Association is a labor organization and the collective bargaining representative of the certificated employees employed within the Red Clay Consolidated School District. At all times material hereto, the Association has been a labor organization within the meaning of 14 Del.C. §4002(h).

3. The District and the Association were party to a collective bargaining agreement which term runs from September 1, 2002 through August 31, 2005. *[Joint Exhibit 1]*

4. Under Joint Exhibit 1, the District has agreed that teachers shall be evaluated in accordance with the Delaware Performance Appraisal System ("DPAS").

5. The Delaware State Board of Education, effective September 1, 1990, adopted a policy for evaluating teachers and specialists. The State Board of Education has adopted what is known as the Delaware Performance Appraisal System (DPAS). To assist the districts in implementing DPAS, the State Board has published Joint Exhibit 2 which includes the following documents:

    (1)    Policy for appraising teachers and specialists;

    (2)    Supplement 4, Section A Formative Phase;

    (3)    Pre-observation Form;

    (4)    Lesson Analysis Form;

    (5)    Job Analysis Form;

    (6)    Supplement 4, Section B, Criteria, which lists the minimum criteria which shall be the basis upon which the performance of teachers is appraised;

---

[2] The Joint Stipulation of Fact is included herein under "Facts"

(7) Supplement 4, Section C, Performance Appraisal, which guide the appraiser in completing the bi-annual Performance Appraisal form for each teacher;

(8) Performance Appraisal Form;

(9) Individual Improvement Plan Form;

(10) Supplement 4, Section D, Procedures for Teachers/Specialists Appraisal Response;

(11) Delaware Performance Appraisal System Teacher/Specialist Appraisal Response Form that the teacher completes should he or she disagree with the Performance Appraisal; and

(12) Supplement 4, Section E, Definition of Terms.

6. Under the DPAS, tenured teachers are to be observed in the classroom a minimum of three (3) times over a two (2) year period. The observations may either be announced or unannounced.

7. Where a classroom observation is announced, the teacher is required to complete the pre-observation form contained in Joint Exhibit 2 and return it to the appraiser before or during the pre-observation conference. The appraiser and the teacher then have a pre-observation conference in advance of the observation.

8. In the classroom observation, whether announced or unannounced, the observer is required to complete the Lesson Analysis form which observes the teacher in five (5) categories: Instructional Planning; Organization and Management of Classroom; Instructional Strategy; Teacher/Student Interaction; and Evaluation of Student Performance. Upon completion of the Lesson Analysis, the observer meets with the teachers to review the Lesson Analysis.

9. In addition to the minimum of three (3) classroom observations in a two (2) year period, the tenured teacher is to receive a Performance Appraisal completed bi-annually at a minimum. The Performance Appraisal form is also contained in Joint Exhibit 2 and requires that the appraiser rate the teacher as either unsatisfactory, needs improvement, satisfactory, or exemplary in the six (6) areas of instructional planning; organization and management of classroom, instructional strategy; teacher/student interaction; evaluation of student performance; and related responsibilities. Upon completion of the Performance Appraisal, the appraiser meets with the teacher and the teacher may provide written response. A form for written response is also contained in Joint Exhibit 2.

10. Where a teacher's Performance Appraisal is unsatisfactory or needs improvement in any area, the teacher is required to be placed upon an Individual Improvement Plan to remedy deficiencies. The form for such Individual Improvement Plan is also contained in Joint Exhibit 2. Under the DPAS rules, an improvement plan is required if a teacher receives a needs improvement or unsatisfactory on any category of the bi-annual Performance Appraisal or if a Lesson Analysis (classroom observation) is identified with a statement that the teacher's performance was unsatisfactory. (emphasis in original)

11. The District gives its Administration the discretion to develop improvement plans if the Lesson Analysis (classroom observation) of a teacher needs improvement or is

unsatisfactory in one or more areas of observation even if the Lesson Analysis is not identified with the overall statement that performance is unsatisfactory.

12. The Association asserts that the District may not require an improvement plan unless the overall lesson analysis is deemed to be unsatisfactory by the appraiser.

13. Larry Parker is a certificated teacher in the District and works at the Cab Calloway School for the Performing Arts. Mr. Parker is a tenured teacher.

14. Mr. Parker was observed by his principal, Julie Rumschlag, on October 4, 2004. A copy of the Lesson Analysis is attached at Joint Exhibit 3. Also attached as part of Joint Exhibit 3 is Mr. Parker's response dated October 24, 2004.

15. Mr. Parker was observed by Principal Rumschlag on October 25, 2004. A copy of the Lesson Analysis for that observation is attached as Joint Exhibit 4. Also attached as part of Joint Exhibit 4 is Mr. Parker's response to the Analysis dated November 1, 2004.

16. On December 16, 2004 Mr. Parker was observed by a second administrator, Susan Rash. Ms. Rash's Lesson Analysis dated January 4, 2005 and Mr. Parker's Response dated December 24, 2004 are attached as Joint Exhibit 5.

A Lesson Analysis of Mr. Parker's class was conducted by Administrator Angela Freeman on January 12, 2005. A copy of the Lesson Analysis signed by Ms. Freeman on January 20, 2005 is attached hereto as Joint Exhibit 16.

17. Mr. Parker was observed by Principal Rumschlag on March 3, 2005. A copy of Ms. Rumschlag's lesson analysis which is dated March 24, 2005 and Mr. Parker's response are attached as Joint Exhibit 6.

18. Ms. Rumschlag concluded based upon the observations of Mr. Parker that he needed to be placed on an Individual Improvement Plan in the areas of instructional planning, instructional strategy and teacher/student interaction. An improvement plan was created and implemented and signed by Mr. Parker on April 18, 2005. A copy of the improvement plan as well as Mr. Parker's response to the improvement plan which response is dated May 27, 2005, is attached as Joint Exhibit 7.

By Memorandum dated April 18, 2005, Ms. Rumschlag informed Mr. Parker that she was aware there was a disagreement between the District and the Association as to whether use of an Improvement Plan was appropriate. The Memorandum advised Mr. Parker that the District was proceeding with the Improvement Plan that was signed on April 18, 2005. A copy of the April 18, 2005 Memorandum is attached as Joint Exhibit 17.

19. Ms. Rumschlag completed Mr. Parker's bi-annual Performance Appraisal which was given to Mr. Parker and signed by him on June 10, 2005. The Performance Appraisal noted that Mr. Parker was unsatisfactory in the area of instructional planning, needed improvement in the area of organization and management of classrooms; was unsatisfactory in the area of instructional strategy; was unsatisfactory in the area of teacher/student interaction; needed improvement in the area of evaluation of student performance and was effective in the area of related responsibilities. A copy of the Performance Appraisal is attached here to as Joint Exhibit 8.

20. On May 6, 2005 Mr. Parker filed grievance protesting being placed on the April 18 improvement plan on the grounds that he had not received an unsatisfactory lesson analysis prior to that date. See Joint Exhibit 9.

21. Principal Rumschlag responded to the grievance denying the grievance on June 16, 2005. A copy of Ms. Rumschlag's response is attached hereto as Joint Exhibit 10.

22. The Union filed a timely appeal of the grievance to Step 2 and the District responded on July 18, 2005 from Anthony Orga, Director of Secondary Education to Robert Brown, DSEA Uniserv Director, denying the grievance. A copy of Mr. Orga's July 18 denial is attached as Joint Exhibit 11.

23. The Association processed Mr. Parker's grievance to Step 3 in a timely manner on July 21, 2005.

24. While Mr. Parker's grievance was progressing through the grievance procedure, a separate grievance filed by the Association on behalf of three (3) teachers was pending in arbitration. This separate grievance which will be referred to herein as the "Ristano grievance" was pending before Arbitrator Ralph Colflesh and involved issues similar to issues raised in the Parker grievance. Arbitrator Colflesh issued a decision and award on August 3, 2005 a copy of which [was] attached to the Stipulation as Joint Exhibit 12. Arbitrator Colflesh's decision was that the District could not place Ristano on an Individual Improvement Plan and required that the District would note on the Individual Improvement Plan that it would be designated as "required measures for performance advancement" or some other such designation that the parties can agree on.

25. Under [the parties' collective bargaining agreement] Arbitrator Colflesh's decision was advisory to the Red Clay Board of Education which could accept or reject it. On August 17, 2005, by resolution properly adopted by the Red Clay Board of Education, Arbitrator Colflesh's decision was rejected "to the extent that it holds that the District may not address specifically identified areas of teacher performance deficiencies through an Individual Improvement Plan rather than through another instrument." The Board Resolution went on to state that "the Board did not believe it appropriate to delay issuance of an Individual Improvement Plan until such time as a teacher receives a formal evaluation that rates the teacher's performance as less than satisfactory in one or more categories and the Board does not believe that the use of an Individual Improvement Plan as opposed to some other form of performance improvement instrument violates the collective bargaining agreement or applicable State Regulations." [The Board Resolution was attached to the Stipulation as Joint Exhibit 12.]

26. After the Board Resolution referenced above, the Association indicated that it intended to continue to process Mr. Parker's grievance and therefore the District issued a Level 3 Decision denying Mr. Parker's decisions. The Level 3 Decision issued by Assistant Superintendent Diane Dunmon was attached to the Stipulation as Joint Exhibit 13.

27. By letter dated October 3, 2005 the Association advised the District by letter from Rudy Norton, DSEA Uniserv Director, to Ms. Dunmon that the Association intended to submit a demand for arbitration on behalf of Mr. Parker. Mr. Norton's letter was attached to the Stipulation as Joint Exhibit 14.

In addition to the Stipulation of Facts, evidence was received through a single District witness who testified concerning the scope and content of the Delaware Performance Appraisal System as adopted by the Delaware State Board of Education, effective September 1, 1990.

## ISSUE

Did the Red Clay Consolidated School District violate its duty to bargain in good faith and 14 Del.C. §4007(a)(5) by implementing a unilateral change in the negotiated performance evaluation process when it placed an educator on an Individual Improvement Plan following a classroom observation?

## POSITIONS OF THE PARTIES

Red Clay Education Association, DSEA/NEA:

The Association argues the District violated its statutory duty to bargain in good faith when it unilaterally altered the evaluation process by placing Mr. Parker on an IIP under DPAS. It asserts that the evaluation process is a mandatory subject of bargaining, citing *Appoquinimink Education Association v. Bd. of Education, Del. PERB, ULP 1-3-84-3-2A, I PERB 35 (1984)*.

The Association and the District negotiated DPAS as the evaluation system for the District's teachers and specialists and specifically incorporated DPAS into the collective bargaining agreement. The Association asserts the DPAS policy is clear and unambiguous – a teacher or specialist can only be placed on an IIP (1) when the employee's performance in any of the six enumerated categories is appraised as "Needs Improvement" or "Unsatisfactory" at the completion of a full performance appraisal cycle; or (2) when a teacher's overall performance is specifically identified as "unsatisfactory" following a Lesson Analysis (i.e., classroom observation).

Under DPAS, individual educators are evaluated over a period of one or two years (depending upon their tenure status) during which evaluation period a defined minimum number of observations and lesson analysis are required. The Lesson Analysis reflects the observed performance during a single class period, whereas the Performance Appraisal evaluates

7

performance based upon a complete series of observations and other input during the evaluation period. Because the Lesson Analysis is limited to a single observation, it is logical that an employee could be rated as less than satisfactory or needing improvement in a single or multiple performance areas without being rated as overall "unsatisfactory." IIPs are not intended to remedy snapshots of performance revealed by a single classroom observation unless that observation is specifically identified as "unsatisfactory" overall.

The District's witness testified that the DPAS standards for issuance of an IIP should be read as "minimums". She did not, however, provide documented support for this position and admitted she is not involved in or familiar with collective bargaining and its impact on the implementation of DPAS in individual school districts.

The Association asserts that Mr. Parker was not identified by the observing principal as "overall unsatisfactory" following the Lesson Analysis, but rather the principal identified a number of areas for professional growth. When the principal unilaterally imposed an IIP based on that Lesson Analysis, the District violated the evaluation process to which the parties agreed. The District cannot create for itself a new right to place educators on IIP's following individual classroom observations when the overall rating is not "unsatisfactory".

Red Clay Consolidated School District:

The District argues that the addendum to the parties' collective bargaining agreement specifies that the District will be guided by and follow the DPAS system, which provides that the District may utilize IIP's to correct deficient performance and improve good performance regardless of whether the overall Lesson Analysis was determined to be "unsatisfactory".

It asserts that the District does not have an obligation to bargain with the Association concerning its use of the IIP because it is not a mandatory subject of bargaining under the Public

School Employment Relations Act. Neither evaluations nor the improvement of teachers constitutes a "term and condition of employment". The method which the Principal and other administrators choose to correct performance deficiencies are not a required subject of bargaining under Delaware law.

Even if the District had an obligation to bargain concerning evaluations, the Association has waived its right to bargain over this issue. The collective bargaining agreement includes a "zipper clause" that provides:

> This Agreement incorporates the entire understanding of the parties on all matters which were or could have been the subject of negotiation. During the term of the Agreement, neither party will be required to negotiate with respect to any such matter whether or not covered by this Agreement and whether or not within the knowledge or contemplation of either or both of the parties at the time negotiated or executed the Agreement.

The District asserts the Association has waived its right to bargain about anything during the term of the agreement, citing *Red Clay Education Association v. Bd. of Education*, Del.Ch., C.A. 11958, Chandler, VC (Jan. 16, 1992) Mem. Op. at III PERB 753, 760, 139 LRRM 2904.

## DISCUSSION

The PSERA mutually obligates public school employers and exclusive bargaining representatives of their employees to confer and negotiate in good faith with respect to "matters concerning or related to wages, salaries, donated leave programs in compliance with Chapter 13 of [Title 14], hours, grievance procedures and working conditions." *14 Del.C. §4002(e); (r)*. The statute also reserved to employers the right to decline to negotiate concerning matters of "inherent managerial policy, which include but are not limited to, such areas of discretion or policy as the function and programs of the public school employer, its standards of services, overall budget, utilization of technology, the organizational structure, curriculum, discipline, and the selection and direction of personnel." *14 Del.C. §4005*.

The Delaware PERB has held that "... the duty to bargain in good faith unquestionably extends beyond the period of contract negotiations and applies to labor management relations during the term of the agreement." *Smyrna Educators' Assn. v. Bd. of Education, Del. PERB, ULP 87-08-015, I PERB 207, 216 (1987),* (citing *NLRB v. Acme Industrial Co., 385 US 432 (1967))*. Consequently, unilateral changes in mandatory subjects of bargaining are unlawful because they frustrate the statutory obligation of parties to establish working conditions through collective bargaining.

The threshold question in this unfair labor practice charge is whether the evaluation process is a mandatory subject of bargaining. The issue is not whether the District properly determined that a teacher needed professional support as indicated by his performance during the classroom observation, but whether the process the District used to place him on an IIP was the procedure the parties negotiated and included in their collective bargaining agreement.

In one of the very first scope of bargaining cases, PERB provided guidance concerning the differentiation between mandatory and permissible subjects of bargaining:

> ... Generally, where the subject matter of a given proposal relates to substance or the establishment of criteria for the ultimate decision, it tends toward permissive, as infringing upon the decision-making authority of the employer. Where the subject matter of a proposal relates primarily to matters of procedure or communication, it tends toward being mandatory. However, in determining what constitutes inherent managerial policy, impact is an equally important factor. *Appoquinimink E.A. (Supra. at 52).*

The performance evaluation process easily falls under mandatory subjects of bargaining as it is a working condition as defined in *Smynra Educators' Association v. Board of Education, Del.PERB, DS 89-10-046, I PERB 475, 487:*

> Other state jurisdictions in similar public sector statutes and the National Labor Relations Act, governing private sector labor-management relations, rely on the phrase "conditions of employment" as the catch-all category for determining mandatory subjects of bargaining. Delaware law, however, relies on the term "working conditions". While broader in scope than "physical working conditions" (the term used in the Professional Negotiation and Relations Act of 1969), the term

"working condition" is somewhat narrower than a "condition of employment". A working condition is one which relates generally to the job itself, i.e., to circumstances involving the performance of the responsibilities for which one is compensated or the opportunity and qualifications necessary to perform work required of those employees who are members of the certified appropriate bargaining unit.

A satisfactory performance evaluation is a condition necessary to sustain employment. The fairness, regularity and predictability of the process by which performance evaluations are conducted have an immediate and direct impact upon employees and the process is, therefore, a mandatory subject of bargaining.

Having determined the evaluation process is a mandatory subject of bargaining, it must next be determined whether the District unilaterally changed the status quo which existed relating to that process. The parties incorporated DPAS into their collective bargaining agreement by addendum. *[Joint Exhibit 1, p. 43]*. The parties jointly stipulated that under DPAS Rules, an IIP is required "if a teacher receives a needs improvement or unsatisfactory on <u>any</u> category of the bi-annual Performance Appraisal <u>or</u> if a Lesson Analysis (classroom observation) is identified with a statement that the teacher's performance was unsatisfactory." *[Joint Stipulation of Fact, ¶10]*. The directions included in the DPAS policy for use of the Individual Improvement Plan state:

> DIRECTIONS: This Individual Improvement Plan shall be developed when an individual's performance in any category(s) has been appraised as Needs Improvement or Unsatisfactory or if a Lesson/Job Analysis is identified with the statement "Performance is Unsatisfactory". Selected category(s) of improvement shall be checked below. Areas of growth shall address, but not be limited to the appropriate behaviors associated with any category. The plan shall be cooperatively developed by the teacher/specialist and the appraiser. If the plan cannot be cooperatively developed, the appraiser shall have the authority and responsibility to determine the plan. The teacher/specialist shall be held accountable for the implementation of the Individual Improvement Plan. *Joint Exhibit 2, S4-27.*

Additionally, Supplement 4, Section A, Formative Phase, of the DPAS policy provides:

> 4. Following each [lesson] observation the appraiser shall complete the Lesson/Job Analysis to provide feedback to teachers regarding strengths and identified areas for growth. Discussion of the written narrative shall occur during a post conference. The appraiser shall provide a concise written narrative which describes performance for each performance category observed, and which focuses on behaviors in that category...
>> E. If an individual's overall performance during an observed lesson is unsatisfactory, the appraiser shall indicate such above the signature line on the last page of the Lesson/Job Analysis by typing "PERFORMANCE IS UNSATISFACTORY" and initializing the statement. This is an indication that an Individual Improvement Plan shall be developed and implemented. *[Joint Exhibit 2, p. S4-2]*

When the parties are currently bound by a valid collective bargaining agreement, contractual language which is clear and unambiguous on its face effectively establishes the status quo. *Local 1590, IAFF v. City of Wilmington, Del.PERB, ULP 89-05-037, I PERB 413,422 (1989).* In this case, the Addendum (specifically the impact of ¶6 thereof) has been interpreted and applied by an independent arbitrator under circumstances that are identical to the current dispute in all material aspects. *Red Clay Consolidated School District and RCEA (Issuance of IIP to Ristano, Tilghman, & Volkens), AAA 14 390 02087 04, Colflesh, R., August 3, 2005. [Joint Exhibit 10]* The arbitrator found that the grievances contesting the implementation of IIP's following classroom observations which were not rated as overall unsatisfactory were substantively arbitrable and that the District violated the Agreement when it used IIP's to remediate insufficiencies in individual classroom performances. The arbitrator carefully noted that the District did not, however, violate the Agreement when it required remedial measures; it ran afoul of the Agreement only when it chose to use an IIP to accomplish this purpose. He stated:

> There is an obvious reason why DPAS only provides use of the IIP in two special cases. Though nominally designed for "improvement", an IIP is not only a palliative. It carries the stigma of significant failure. Because there is a huge difference between a lesson where a teacher falters in spots and one where his or her performance is generally or "overall" unsatisfactory, use of an IIP as a general response is inappropriate. An IIP following an observed lesson is reserved for those circumstances in which the lesson is generally bad, and not just where the

lesson description, instructional plan, classroom management and organization, instructional strategies, pupil-teacher interaction, or pupil evaluation is weak. . . [N]othing in this Agreement, including the incorporated DPAS procedures, bars the District from documenting and assisting teachers with various problems on observed lessons. Such assistance is not only a retained managerial prerogative under traditional labor law principles, it is required under the District's educational mission. The District's sole lapse in this case was to take those remedial measures in the form of an IIP. This is not raising form over substance. For the reasons set forth above, the IIP has a special status. The District's remedial measures where a teacher has difficulties may be identical to those imposed under an IIP, but due to the special designation inherent in an IIP, those measures should not be contained in a different vessel unless the DPAS conditions for an IIP are met. *[Joint Exhibit 12, p. 11-12]*

Section 3:9.1 provides that the arbitrator's decision is advisory, and that the Board of Education "will accept or reject the arbitrator's decision and such decision will be the final resolution. *[Joint Exhibit 1, p. 5]* In that case, the Board of Education rejected the arbitrator's decision because it disagreed with the result and contested the arbitrability of the issue before the arbitrator. It asserted that because DPAS is a state regulation or policy, it is subject to the exclusive interpretation of the local school board. *[Joint Exhibit 13]*

In his decision, the arbitrator specifically addressed the District's policy argument:

. . . the incorporation of DPAS by reference into the Agreement had two important and benevolent effects: first, it represented an acknowledgement that the parties are responsible for negotiating an evaluation system; second, it temporarily adopted DPAS as the system until the parties craft their own adaptation of DOE requirements. It also had a third effect as well: it made certain evaluation actions – not including the District's prerogatives over dismissals, discharges or non-renewals – subject to the grievance and arbitration procedures. Contrary to the District's position that this case "pertains to . . .[a]ny rule or regulation of the State Department of Education" and is therefore exempt from arbitration under Article 3:7(b), the incorporation of DPAS into the Agreement through the Addendum makes the DPAS evaluative procedures contractual as to these parties. To say otherwise would be to find that the parties either abjured their responsibilities to agree on an evaluation system and never made such a system contractual, or that they agreed on a contractual system but the system, - because it is taken from DPAS – is removed from even the advisory arbitration that is available under the Agreement. Neither conclusion is logical. *[Joint Exhibit 12, p. 7]*

There is nothing in the arbitrator's decision or in the basis of the District's rejection that suggests or would support the conclusion that the arbitrator's decision was arbitrary, capricious, or otherwise contrary to law.

I also note that the parties' collective bargaining agreement contains a provision whereby changes to DPAS procedures may be adopted during the term of that agreement:

> 16:9    Any changes to the Performance Appraisal System mandated by the State of Delaware shall be incorporated by the District except as modified by this agreement, the Evaluation Committee, or the Board of Education as per 25:4.1...
>
> 25:4.1 <u>Evaluation Committee:</u>    The Evaluation Committee will make recommendations or alternate recommendations to the Superintendent. The recommendations will not be binding on the Board which is free to accept, reject or modify such recommendations. However, for the life to this Agreement, unless the committee unanimously recommends otherwise, the Board shall not modify the procedure by returning to a numerical ranking or rating system.    [Joint Exhibit 1]

No evidence was presented which supported a conclusion that the DPAS evaluation procedure had been modified by the parties consistent with these contractual provisions. Neither was evidence presented on which it can be concluded that the State Board of Education has modified the DPAS procedure at any time relevant to this charge. The testimony of Assistant Secretary of Education Taylor established that DPAS was established as a minimum standard and that District's may agree to impose more stringent evaluation requirements and procedures. What the State Board does not concern itself with or become involved in is the collective bargaining process and the obligations thereunder which are at issue here. The arbitrator captured the essence of this issue in his decision at page 10:

> . . . the issue in this case is not the intentions of DOE as to the implementation or interpretation of DPAS. Rather, the dispositive question becomes whether the parties, in adopting DPAS in lieu of a different negotiated evaluation procedure, contemplated IIP's in situations other than where a teacher's "overall performance during an observed lesson is unsatisfactory". . . Therefore, it is DPAS as it existed on that date that the parties incorporated into the Agreement through Paragraph 6. *[Joint Exhibit 12]*

Finally, the District argues that the RCEA is estopped from arguing that the District was required to bargain over extending its use of the IIP during the term of the collective bargaining agreement by the "zipper clause" included in that agreement:

> §2.4 This Agreement incorporates the entire understanding of the parties on all matters which were or could have been the subject of negotiations. During the term of the Agreement, neither party will be required to negotiate with respect to any such matter whether or not covered by this Agreement and whether or not within the knowledge or contemplation of either or both parties at the time they negotiated or executed the Agreement. *[Joint Exhibit 1]*

This provision must, however be read as part of the entire Agreement, which also includes:

> §2.5 This Agreement will not be modified in whole or in part by the parties except by an instrument in writing duly executed by both parties. *[Joint Exhibit 1]*

Both parties are entitled to the benefits and bound by the responsibilities they have created through their bargaining agreement. The zipper clause cannot create a unilateral right for one party to institute unilateral changes in mandatory subjects of bargaining in violation of the Public School Employment Relations Act. Their agreement provides a mechanism for creating and implementing changes to that agreement during its term in §2.5. There is no evidence that the changes in the use of IIP's as part of the classroom observation/ Lesson Analysis process was discussed, negotiated, or mutually modified by the parties.

For the reasons discussed above, it is determined that the District violated its duty to bargain in good faith by unilaterally modifying the evaluation process, a mandatory subject of bargaining, during the term of the parties' collectively bargained agreement.

## CONCLUSIONS OF LAW

1. The Red Clay Consolidated School District is a public school employer within the meaning of 14 Del.C. §4002(n).

2. The Red Clay Education Association, DSEA/NEA, is an employee organization within the meaning of 14 Del.C. §4002(h) and is the exclusive bargaining representative of the District's certificated employees within the meaning of 14 Del.C. §4002(i).

3. Consistent with foregoing discussion, the performance evaluation process is a working condition and therefore constitutes a mandatory subject of bargaining.

4. The District and the Association negotiated and incorporated by reference into their collective bargaining agreement the Delaware Performance Appraisal System ("DPAS") as the process which would be used for purposes of evaluating bargaining unit employee performance.

5. The District implemented a unilateral change in the performance evaluation process when it placed a teacher on an Individual Improvement Plan following a classroom observation and Lesson Analysis on which the observing principal did not conclude "Performance is Unsatisfactory."

6. By implementing a unilateral change in a mandatory subject of bargaining, the District committed a *per se* violation of its duty to bargain in good faith, in violation of 14 Del.C. §4007(a)(5).


**WHEREFORE**, Red Clay Consolidated School District is ordered to cease and desist from implementing Individual Improvement Plans following classroom evaluations in which the educator's overall performance is not rated unsatisfactory unless and until such procedure is negotiated with the Red Clay Education Association.

The District is further ordered to post copies of the Notice of Determination in all locations where notices affecting employees represented by RCEA are normally posted, including in the workplaces and the District's administrative offices. The Notice must remain posted for thirty (30) days.

**IT IS SO ORDERED.**

DATE: <u>6 July 2006</u>

<u>/s/ D. Murray-Sheppard</u>
DEBORAH L. MURRAY-SHEPPARD
Hearing Officer
Del. Public Employment Relations Bd.